**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| WILLIAMS INDUSTRIAL SERVICES GROUP INC., *et al.*,[1] | Case No. 23-10961 |
| | (Joint Administration Requested) |
| Debtors. | |

**DECLARATION OF TRACY D. PAGLIARA IN SUPPORT OF**
**CHAPTER 11 PETITIONS AND FIRST DAY PLEADINGS**

I, Tracy D. Pagliara, declare under penalty of perjury as follows:

1.    I am the President and Chief Executive Officer ("CEO") of Williams Industrial

Services Group Inc. ("Holdings" and together with the affiliated debtors in these cases, the

"Debtors" or "Williams"), and have served in that role since May 2018.  Prior to becoming CEO,

I held several other positions within Williams since joining the company in 2010, including Chief

Administrative Officer and General Counsel.  I am a graduate of the University of Illinois (B.S.,

Accounting, 1985) and of the University of Illinois College of Law (J.D., 1989).  Prior to joining

Williams, I held executive positions with Verizon Communications, Kellwood Company, and

served as Chief Legal Officer and Secretary of Gardner Denver, Inc.  I am licensed to practice

law in the States of Illinois and Missouri.

2.    In my capacity as CEO of Holdings, I am familiar with the Debtors' business, daily

operations, and financial condition.  Except as otherwise indicated herein, I have personal

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Williams Industrial Services Group Inc. (1378), Williams Industrial Services Group, LLC (2666), Williams Industrial Services, LLC (0406), Williams Plant Services, LLC (9575), Williams Specialty Services, LLC (9578), WISG Electrical, LLC (6918), Construction & Maintenance Professionals, LLC (0925), Williams Global Services, Inc. (3708), Steam Enterprises, LLC (9177), GPEG LLC (5707), Global Power Professional Services, Inc. (2550), WISG Canada Ltd. (B.N. 6518), WISG Nuclear Ltd. (B.N. 3510), and WISG Electrical Ltd. (B.N. 2116). The location of the Debtors' corporate headquarters and service address is: 200 Ashford Center N, Suite 425, Atlanta, GA 30338.

knowledge of the matters set forth in this Declaration, and all facts described herein are based on my personal knowledge, discussions with members of the Debtors' senior management and professional advisors, my review of relevant documents, or my experience and knowledge of the Debtors' business and financial condition.  I am authorized to submit this Declaration on the Debtors' behalf, and if called to testify I could and would testify competently to the facts set forth herein.

3.    July 22, 2023 (the "Petition Date"), each of the Debtors commenced a case (collectively, the "Chapter 11 Cases") by filing a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Court").  The Debtors are operating their business and managing their affairs as debtors in possession under sections 1107(a) and 1108 of the Bankruptcy Code.  To date, no creditors' committee has been appointed in these Chapter 11 Cases by the Office of the United States Trustee for Region 3, with responsibility for the District of Delaware (the "US Trustee").  No trustee or examiner has been appointed in these Chapter 11 Cases.

4.    To minimize the disruption to the Debtors' business and on-going operations that might result from the filing of these Chapter 11 Cases, the Debtors have filed certain motions and pleadings seeking immediate relief during the first days of these proceedings (collectively, the "First Day Pleadings").[2]  The relief sought by the Debtors in the First Day Pleadings should, in my judgment, enable the Debtors to fulfill their duties as debtors in possession, minimize disruption and loss of value, and is in the best interest of the Debtors' creditors, and all other stakeholders.

---

[2] Capitalized terms used herein that are not otherwise defined shall have the meaning ascribed to them in the First Day Pleadings.

5.    I submit this Declaration to provide an overview of the Debtors, their business and the Chapter 11 Cases, and to support the First Day Pleadings.  The Declaration is divided into two parts.  Part I provides background information about the Debtors, their business operations, their corporate and capital structure, and the events leading up to the filing of the Chapter 11 Cases.  Part II sets forth relevant facts in support of each of the First Day Pleadings.[3]

## PART I

### A.    The Debtors and Their Business Operations

6.    Williams was established in 1958 as a small industrial coatings contractor.  In 1985, with nearly three decades of experience and expertise in industrial coatings, the company expanded its operations to provide additional specialty services, including asbestos and lead abatement, insulation and roofing.  Almost a decade later, in 1994, Williams began offering mechanical, electrical and construction services to customers engaged in various heavy industrial markets.  Today, the company is a multi-industry, multi-discipline industrial services company that provides infrastructure services, including construction, maintenance and support, to customers in energy, power generation, and industrial end markets.

7.    Williams is based in Atlanta, Georgia and is a publicly traded company listed on the NYSE American stock exchange (NYSE:  WLMS).  The company has regional offices in Astoria, New York and Jacksonville, Florida.

8.    The company provides services through three primary platforms.  Williams Plant Services, LLC ("WPS"), an indirect wholly owned subsidiary of Holdings, provides a comprehensive range of modification and construction services to a wide range of utilities, including nuclear, fossil-fuel, and hydroelectric plants.  The services involve skilled craft labor

---

[3] The facts as set forth in each of the First Day Pleadings are incorporated herein by reference.

and supervision, capital construction projects, quality assurance, systems modifications and upgrades, security screening enhancements, steam generator replacement support, vessel and heat exchanger replacements, condenser tubing and cleaning, specialty welding, electrical and mechanical modifications, and heavy rigging.  In 2022, WPS generated approximately 64% of the total annual revenue of Holdings and its affiliates.

9.     Williams Specialty Services, LLC ("WSS"), another indirect wholly owned subsidiary of Holdings, provides highly specialized maintenance and construction services related to power delivery by utilities and industrial customers, including nuclear, fossil-fuel and hydroelectric plants, and pulp and paper mills.  The services provided include skilled craft labor and supervision, capital construction projects, quality assurance, systems modifications and upgrades, hazardous materials abatement, specialized industrial coatings applications, insulation application and replacement, roofing projects, specialty welding, electrical and mechanical modifications, valve and actuator services, and heavy rigging.   WSS accounted for approximately 19% of the total annual revenue of Holdings and its affiliates in 2022.

10.     Williams Industrial Services, LLC ("WIS"), a third indirect wholly owned subsidiary of Holdings, provides industrial engineering and construction services to utilities and industrial customers, including nuclear and fossil-fuel plants, pulp and paper mills, and water and wastewater facilities.  Among the services provided are outage planning, skilled craft labor and supervision, capital construction projects, facilities services, quality assurance, systems modifications and upgrades, security screening enhancements, steam generator replacement support, scaffold erection, specialty welding, electrical and mechanical modifications, valve and actuator services, and heavy rigging.  WIS generated approximately 17% of the total annual revenue of Holdings and its affiliates in 2022.

11.    As of the Petition Date, the Debtors estimate that they employ approximately 839 individuals, comprised of 65 salaried employees and 774 hourly employees.  The salaried employees hold (i) administrative positions at the company's corporate office in Atlanta, (ii) job supervisory positions, and (iii) project site leadership positions.  The hourly employees, for the most part, are craft laborers hired for specific projects.  WPS and WSS utilize union labor for such projects pursuant to a number of collective bargaining agreements.  WIS utilizes non-union labor.

12.    Holdings, through direct and indirect wholly owned subsidiaries, has interests in certain joint ventures.  WPS has a 25% ownership interest in Richmond County Constructors, LLC that was formed for the purpose of constructing certain units of the Alvin W. Vogtle Electric Generating Plant, a nuclear power generation facility in Waynesboro, Georgia.  WPS also has a 33% interest in the profits and losses of GUBMK, a contractual joint venture formed for the purpose of providing infrastructure services to fossil and hydroelectric facilities of the Tennessee Value Authority.

13.    The Debtors are supported by several hundred vendors and suppliers, ranging in size from large multinational corporations to small businesses in the areas in which the Debtors provide services.  Some of these vendors and suppliers provide goods and services on a just in time basis or are subcontractors that are critical to the Debtor's on-going operations, as discussed in more detail below in support of the motion for approval of a critical vendor program.

**B.      Corporate Structure and Governance**[4]

14.    The equity ownership of the Debtors is as follows:

---

[4] A chart depicting the Debtors' corporate structure is attached as Exhibit B.

(a)    <u>Williams Industrial Services Group, Inc</u>.    Holdings is a Delaware corporation and is a publicly traded company listed on the NYSE American stock exchange (NYSE: WLMS).  It has no significant assets or operations other than its equity interests in its wholly owned direct and indirect subsidiaries.

(b)    <u>Williams Industrial Services Group, LLC</u>.  Williams Industrial Services Group, LLC ("<u>WISG</u>") is a Delaware limited liability company and a wholly owned subsidiary of Holdings.  In addition to its equity interests in its wholly owned direct and indirect subsidiaries, WISG maintains certain assets used in providing support services to its direct and indirect operating subsidiaries, including PENTA construction management software licenses, UKG software licenses, and related payroll, IT servers and systems.

(c)    <u>Williams Plant Services, LLC</u>.  WPS is a Georgia limited liability company and a wholly owned subsidiary of WISG.  WPS provides the services described in paragraph 8 above.

(d)    <u>Williams Specialty Services, LLC</u>.  WSS is a Georgia limited liability company and a wholly owned subsidiary of WISG.  WSS provides the services described in paragraph 9 above.

(e)    <u>Williams Industrial Services, LLC</u>.  WIS is a Georgia limited liability company and a wholly owned subsidiary of WISG.  WIS provides the services described in paragraph 10 above.

(f)    <u>WISG Electrical, LLC</u>.  WISG Electrical, LLC ("<u>Electrical</u>") is a New York limited liability company and a wholly owned subsidiary of WISG.  Electrical is a special purpose entity formed to perform electrical work in New York City.  It was formed in order

to hold permits to perform such work in the five boroughs of New York City (and is still in process of securing same) but currently has no operations.

(g)     Williams Global Services, Inc.  Williams Global Services, Inc. ("Global") is a Georgia corporation and a wholly owned subsidiary of WISG.  Global was formed for the purpose of doing business in California, but currently has no significant assets or operations.

(h)     Construction & Maintenance Professionals, LLC.     Construction & Maintenance Professionals, LLC ("CMP") is a Georgia limited liability company and a wholly owned subsidiary of WISG.  CMP is a captive staffing agency company which employs temporary non-union workers.  It has no significant assets.

(i)     WISG Canada Ltd. WISG Canada Ltd. ("WISG Canada") is a British Columbia limited company and a wholly owned subsidiary of WISG. WISG Canada is a holding company whose only assets are its equity interests in two (2) wholly owned subsidiaries, and an anticipated Canadian income tax refund in the estimated amount of CAD $184,000.

(j)     WISG Nuclear Ltd. WISG Nuclear Ltd. ("Canada Nuclear") is a British Columbia limited company and a wholly owned subsidiary of WISG Canada. It currently has no significant assets or operations.

(k)     WISG Electrical Ltd. WISG Electrical Ltd. ("Canada Electrical") is a British Columbia limited company and a wholly owned subsidiary of WISG Canada. It currently has no significant assets or operations.

(l)     Steam Enterprises, LLC.  Steam Enterprises, LLC ("Steam") is a Delaware limited liability company and a wholly owned subsidiary of Holdings.  Steam sold its

business in August 2011 and currently has no operations. The State of Minnesota is holding a letter of credit in the amount of $151,800 for open Workers Compensation liabilities regarding the sold entity.

(m)  <u>GPEG, LLC</u>.  GPEG, LLC ("<u>GPEG</u>") is a Delaware limited liability company and a wholly owned subsidiary of Holdings.  GPEG has no assets or operations.

(n)  <u>Global Power Professional Services Inc</u>.  Global Power Professional Services Inc. ("<u>Power</u>") is a Delaware corporation and a wholly owned subsidiary of Holdings.  Power currently has no assets or operations.

15.  In addition to myself, the board of directors of Holdings consists of the following outside directors:  Robert B. Mills (Chairman), David A.B. Brown, Linda Goodspeed, Mitchell I. Quain, Nelson Obus, and Steven D. Davis.

## C.  Prepetition Secured Debt

### (i)  Prepetition Revolving Credit Agreement

16.  Holdings and certain of its subsidiaries are parties to a Revolving Credit and Security Agreement, dated as of December 16, 2020, as amended, with PNC Bank, National Association ("<u>PNC</u>"), as agent for the lenders, and the lenders party thereto (the "<u>Revolving Credit Agreement</u>").  Specifically, Holdings, WISG, WIS, WSS, WPS, Global, CMP, and Electrical are each borrowers, and Power, GPEG, Steam, WISG Canada, Canada Nuclear, and Canada Electrical are each guarantors under the Revolving Credit Agreement (the foregoing borrowers and guarantors being referred to collectively as the "<u>Revolving Loan Credit Parties</u>").

17.  The borrowers under the Revolving Credit Agreement have access to a revolving line of credit of up to $30 million, subject to availability determined in accordance with a borrowing base formula, and reserves as may be established by PNC.  As of the Petition Date,

the outstanding amount owed under the Revolving Credit Agreement was $15,739,000.  The obligations owed under the Revolving Credit Agreement are secured by first-priority security interests in substantially all of the Revolving Loan Credit Parties' accounts receivable and contract assets, and a second-priority security interest in substantially all other assets of the Revolving Loan Credit Parties.  The Revolving Credit Agreement matures on December 16, 2025.

    **(ii)**        **Prepetition Term Loan Agreement**

    18.    Holdings and certain of its subsidiaries are parties to a Term Loan, Guarantee and Security Agreement, dated as of December 16, 2020, as amended (the "Term Loan Agreement") with EICF Agent LLC, as agent for the lenders, CION Investment Corporation, as a lender and co-lead arranger, and the other lender parties thereto (the "Term Lenders").  Specifically, Holdings, WISG, WIS, WSS, WPS, Global and CMP are each borrowers, and Power, GPEG, Steam, WISG Canada, Canada Nuclear, and Canada Electrical are each guarantors under the Term Loan Agreement (the foregoing borrowers and guarantors being referred to collectively as the "Term Loan Credit Parties").

    19.    The Term Loan Agreement provides for senior secured term loan facilities in an aggregate principal amount of up to $50 Million (collectively, the "Term Loan"), consisting of a $35 million closing date term loan facility (the "Closing Date Term Loan") and up to $15 million of borrowings under a delayed draw facility (the "Delayed Draw Term Loan Facility"). The obligations owed under the Term Loan Agreement are secured by first-priority security interests in substantially all of the Term Loan Credit Parties' assets, other than accounts receivable and contract assets, and a second-priority security interest in the Term Loan Credit

Parties' accounts receivable and contract assets. The Term Loan Agreement matures on December 16, 2025.

20. The Closing Date Term Loan in the amount of $35 million was fully drawn on December 16, 2020. The Delayed Draw Term Loan Facility expired 18 months later without any funds having been drawn thereunder.

21. On February 21, 2023, several of the Term Lenders made protective advances as permitted by the Term Loan Agreement to address urgent working capital needs of the Debtors. Energy Impact Credit Fund I LP ("EIP") advanced $428,571.43. Crowd Out Credit Opportunities Fund LLC ("Crowd Out") advanced $285,714.29. CION Investment Corporation ("CION") advanced $285,714.29.

22. On February 24, 2023, in order to address the Debtors' need for additional working capital, the Term Lenders and the Term Loan Credit Parties amended the Term Loan Agreement to provide for delayed draw term loans in the maximum aggregate amount of $1,500,000. On that date, EIP advanced $642,857.15. Crowd Out advanced $428,571.43. CION advanced $428,571.43.

23. In order to address the Debtors' continuing need for working capital, the Term Lenders and the Term Loan Credit Parties executed a further amendment to the Term Loan Agreement, dated as of March 31, 2023, to provide for additional delayed draw term loans in the maximum aggregate amount of $3,500,000. On April 7, 2023, EIP advanced $1,500,000, and Crowd Out and CION each advanced $1,000,000.

24. As of the Petition Date, the outstanding amount owed under the Term Loan Agreement was $35,619,651.

**D.     Prepetition Subordinated Debt**

25.    WISG is indebted to Wynnefield Partners Small Cap Value, LP and Wynnefield Partners Small Cap Value, LP I as of the Petition Date, in the amount of $850,000 pursuant to Subordinated Notes, dated January 9, 2023. Payment of the Subordinated Notes is guaranteed by WISG, WIS, WSS, WPS, Global, CMP, Power, GPEG, Steam, WISG Canada, Canada Nuclear, Canada Electrical and Electrical pursuant to Subordinated Guarantees dated January 9, 2023.  The Subordinated Notes mature on December 23, 2025.  The obligations under the Subordinated Notes and Subordinated Guarantees are unsecured.

### E.    Letters of Credit and Bonds

26.    In line with industry practice, the Debtors are often required to provide letters of credit and payment and performance surety bonds to customers.  The Revolving Credit Agreement provides for a letter of credit sublimit in an amount up to $2 million.  As of the Petition Date, the outstanding balance of the Debtors' letters of credit under this sublimit was $882,753.

27.    In addition, as of the Petition Date, the Debtors had outstanding payment and performance surety bonds in the amount of $15,827,375.63.

### F.    Events Leading to Filing

28.    The Debtors have operated in a challenging environment for the last several years, dealing with, among other things, inflationary pressures, labor shortages, rising labor costs, work delays on projects, supply chain disruptions, and the effects of the COVID-19 pandemic.  These conditions have made it more difficult to compete with larger and less leveraged competitors who have greater financial and other resources to withstand adverse market conditions within the industry.

29.    In early 2022, the Debtors lost a major contract with a customer in Canada that accounted for approximately 12% of their total revenue and 15% of their gross margin for 2021.

30.    In early 2022, the Debtors lost a major multi-year contract with a customer in the nuclear decommissioning market following the departure of a former executive who was hired by a competitor and took that business with him in violation of a Confidentiality, Non-Competition, and Non-Solicitation Agreement executed by the former executive on May 29, 2017 (the "Non-Compete Agreement"). The Debtors filed a Complaint for Temporary Restraining Order, Injunctive Relief, and Damages against the former executive and his new employer in the Superior Court of Fulton County, Georgia (the "Fulton County Superior Court") for violation of the Non-Compete Agreement, and obtained an injunction preventing the former executive from working in any capacity for the new employer. Thereafter, the Fulton County Superior Court found that the former executive, the new employer, and an executive for the new employer (who was not a named party to the suit) knowingly and willfully violated the court's injunction order and found all of them in criminal contempt. At the end of 2022, the defendants paid the Debtors $2.675 million to settle the lawsuit. The lost multi-year contract and customer accounted for approximately 10% of the Debtors' revenue and 8% of their gross margin for 2021, and contributed to a loss of approximately $361 million in backlog in the years 2022 through 2029, including backlog of approximately $30 million in 2022 and $50 million in 2023.

31.    Despite these setbacks, the Debtors remained focused on pursuing other growth opportunities within their end markets. In order to pursue those opportunities, the Debtors required substantial working capital. Much of the Debtors' work is performed pursuant to complex fixed-price contracts that extend over a lengthy period of time. A high percentage of the Debtors' cost of service on those contracts is attributable to weekly craft labor payrolls. The

lag between incurrence of those payrolls and the subsequent collection of customer billings frequently results in negative cash flows.  Although the Debtors have sought to use their Revolving Credit Facility to cover those negative cash flows, availability under the facility has been impacted by contractual limitations on the frequency of customer invoicing, delays in customer payments and reserves established under the terms of the Revolving Credit Agreement.

32.    The Debtors suffered significant negative cash flows from operations throughout 2022.  These negative cash flows were primarily caused by:

- Significant losses incurred on a number of fixed price contracts involving water projects undertaken by WIS in Florida

- Start-up costs related to the Debtors' entry into the transmission and distribution market

- The failure to convert pipeline opportunities into revenue which delayed the Debtors' receipt of cash from such opportunities

33.    To address the negative cash flows, the Debtors developed a liquidity plan that was designed, among other things, to aggressively reduce operating expenses and shorten the collection cycle time on the Debtors' accounts receivable.  Notwithstanding their best efforts in implementing the liquidity plan, the Debtors continued to generate significant negative cash flow from operations during 2023, in large part due to a more rapid conversion of backlog to active projects that required additional working capital.  In addition, WIS continued to accrue significant losses related to the Florida fixed price water contracts.

34.    In light of these challenges, the Debtors initiated a process in January 2023 to explore strategic alternatives designed to maximize the value of their businesses.  The Debtors retained Greenhill & Co., LLC ("Greenhill"), an investment banking firm, to lead that process.  The scope of Greenhill's engagement involved an evaluation of a broad range of potential financial and strategic alternatives, including a possible sale of the business.

35.     During the course of that process, as the company continued to experience significant liquidity issues, it became apparent that neither refinancing nor an infusion of new equity capital were feasible alternatives, and the only viable path forward was a sale of the Debtors' businesses.  In February 2023, Greenhill initiated an intensive marketing effort in which it reached out to approximately 140 parties who might have an interest in acquiring the company. Approximately fifty of those parties executed non-disclosure agreements and received comprehensive packets of confidential information regarding the company.  Greenhill conducted information calls with many of those parties.

36.     Six parties provided written indications of interest and were invited into a second round to conduct due diligence and attend management presentations.  From that process, Energy Solutions, Inc. ("Energy Solutions") provided the highest and best offer to acquire the company.

37.     Following additional due diligence, Energy Solutions proposed two alternative structures for the transaction: (i) an out-of-court transaction involving a tender offer for existing equity followed by a short-form merger, or (ii) an acquisition of substantially all of the assets of WPS, WSS, and Electrical, and select assets of Holdings, WISG, and WIS through a sale under section 363 of the Bankruptcy Code.

38.     In its out-of-court proposal, Energy Solutions offered $53 million, based upon a starting enterprise value of $67.5 million, less reductions of $14.5 million attributable to estimated future losses from the Florida water projects ($7.5 million) and the risk of non-renewal of certain contracts with a significant customer ($7 million).  The out-of-court transaction, requiring shareholder approval, would not have resulted in any recovery for shareholders. Consequently, the Debtors determined that it was not feasible to attempt to consummate an out-of-court transaction.

39.   In its alternative proposal to acquire assets pursuant to a section 363 sale, Energy Solutions has offered (i) to pay $60 million, and (ii) to assume certain liabilities of WPS, WSS, Electrical, Holdings, WISG and WIS.

40.   The company is forecasting continuing significant cash flow shortfalls during the second half of 2023 that threaten its ability to operate as a going concern. Additional financing to cover these shortfalls is not available other than through a chapter 11 process conditioned upon a section 363 sale of the assets included in Energy Solutions' proposal. As a consequence, the Debtors have commenced these chapter 11 cases for the purpose of (i) implementing the proposed section 363 sale to Energy Solutions, or such party as may offer a higher and better bid for the Debtors' assets at an auction to be conducted in accordance with the provisions of section 363 of the Bankruptcy Code, and (ii) addressing the assets and liabilities of the remaining Debtors in accordance with the provisions of the Bankruptcy Code.

## PART II

### FIRST DAY PLEADINGS

41.   The Debtors have filed a number of First Day Pleadings.  I have reviewed each of them, including the exhibits and schedules attached thereto, and to the best of my knowledge, believe the facts set forth therein are true.  In addition, I believe that the relief sought in each of the First Day Pleadings is essential to enable the Debtors to transition into, and operate their business in, chapter 11 with the least amount of disruption possible, and is in the best interest of the Debtors and all of their stakeholders.  If called upon to testify, I could and would testify competently to the facts set forth in each of the First Day Pleadings.

A.      **Procedural Motions**

(i)      **Entry of an Order (I) Directing Joint Administration of Related Chapter 11 Cases and (II) Granting Related Relief**

42.    The Debtors request that the Court order procedural consolidation and joint administration of the Chapter 11 Cases, and that the Court maintain one file and one docket for all of the jointly-administered cases under the caption of the case filed by Holdings.

43.    The Debtors believe joint administration of these Chapter 11 Cases will provide significant administrative convenience without impairing the substantive rights of any party in interest. The Debtors anticipate that numerous motions and applications will be filed in these cases. Joint administration for procedural purposes will avoid unnecessary delay and expense by obviating the need for the Debtors to file duplicative motions and applications, and for the Court to enter duplicative orders.  Joint administration will also avoid the burden and expense of providing duplicative notices to numerous creditors.  For these reasons, the Debtors believe joint administration of the Chapter 11 Cases will promote the efficient and economical administration of the Debtors' estates.

(ii)      **Application for an Order Appointing Epiq Bankruptcy Solutions, LLC as Claims and Noticing Agent for the Debtors Pursuant to 28 U.S.C. § 156(C), 11 U.S.C. § 105(A) and LBR 2002-1(F) ("Claims Agent Application")**

44.    The Debtors seek authority to employ Epiq Bankruptcy Solutions, LLC ("Epiq") as claims and noticing agent in these Chapter 11 Cases.  There are more than 1,000 parties-in-interest in these cases to whom certain notices will be sent.  The Debtors believe the most efficient and cost-effective manner to provide notice, and process claims, is to engage an independent third party with experience in matters such as this to act as an agent of the Court.

45.    Epiq is one of the country's leading chapter 11 administrators with significant experience in noticing, claims processing, solicitation, balloting, and other aspects of chapter 11

administration.  I believe they are well qualified to provide such services and will enhance the efficient administration of these Chapter 11 Cases.

46.    The Debtors and their professional advisors received engagement proposals from two (2) other claims and noticing agents.  Based upon a review of this proposal, and the proposal submitted by Epiq, I believe Epiq's rates are competitive and reasonable with respect to the services they will be providing.

47.    Under the terms of the Retention Agreement with Epiq, the Debtors have agreed to certain indemnification provisions set forth therein.  The Debtors believe such provisions are reasonable, and customary for firms providing the administrative services to be provided by Epiq in these Chapter 11 Cases.

(iii)    **Application of the Debtors for Authority to Retain and Employ Epiq Corporate Restructuring, LLC as Administrative Advisor Effective as of the Petition Date ("<u>Administrative Advisor Motion</u>")**

48.    Similarly, the Debtors request authority to retain Epiq in its capacity as Administrative Advisor to assist the Debtors by providing services ancillary to their role as claims and noticing agent which fall outside the scope of 28 U.S.C. § 156(c).

49.    Compensation to be provided and the terms of engagement are set forth under a single Retention Agreement with Epiq. I have reviewed the Retention Agreement and believe these ancillary administrative advisory services are useful and necessary for the Debtors in light of the complexity of these proceedings.

    **(iv)**      **Debtors' Motion For Entry of an Order (I) Authorizing the Debtors to Redact Certain Personally Identifiable Information and (II) Granting Related Relief ("<u>Redaction Motion</u>")**

50.    Many of the parties-in-interest in this these cases, including hundreds of current and former employees, independent contractors, and creditors, are individuals. In order to protect those individuals from the risk of identity theft, phishing scams, harassment, and stalking, the Debtors seek authority to file a redacted version of the Creditor Matrix (as defined in the Redaction Motion) which does not expose the personal addresses, email addresses, and other personal identifying information (collectively "<u>Personal Identifying Information</u>") of these individuals.

51.    Additionally, the Debtors believe they are subject to certain non-bankruptcy laws that require the protection of Personal Identifying Information on account of their conducting business in jurisdictions that have passed such data-protection laws. The Debtors also seek authority to redact Personal Identifying Information so that they do not incur monetary or other sanctions that would result if the Debtors fail to comply with these laws.

52.    The Debtors propose to provide an unredacted version of the Creditor Matrix to the U.S. Trustee in these cases and to other parties-in-interest upon request. As such, the Debtors believe no party would be prejudiced by the relief requested in the Redaction Motion.

53.    Accordingly, I believe it is in the best interests of the Debtors and the individuals whose data is to be protected that the Redaction Motion be granted.

**B.**      **Operational Motions**

    **(i)**      **Motion Seeking Entry of Interim and Final Orders (I) Authorizing the Debtors to Obtain Senior Secured Superpriority Post-Petition Financing; (II) Granting Liens and Superpriority Administrative Expense Claims; (III) Authorizing Use of Cash Collateral; (IV) Modifying the Automatic Stay; (V) Scheduling a Final Hearing; and (VI) Granting Related Relief (the "DIP Motion")**

54.   In order to maintain current operations while in chapter 11, including paying its existing employees, vendors, subcontractors, and tax and regulatory authorities, and satisfying other working capital and operational requirements, the Debtors require access to post-petition financing. Following intensive negotiation with their prepetition secured lenders, (i) the Debtors' Term Lenders have agreed to provide a post-petition term loan facility in an aggregate principal amount of $19,500,000, comprised of (a) $14,000,000 to be advanced upon entry of an Interim Order authorizing the financing sought in the motion, (b) $2,750,000 to be advanced one business day following the entry of a Final Order, and (c) $2,750,000 to be advanced one week following the entry of a Final Order; and (ii) PNC has agreed to provide a post-petition revolving credit facility in a principal amount up to $12,000,000 subject to availability determined in accordance with a borrowing base formula.

55.   The provisions of the proposed financing and the Interim Order were negotiated at arms-length and in good faith. As set forth in the *Declaration of Victoria Arrigoni of G2 Capital Advisors in Support of the Debtors' Motion Seeking Post-Petition Financing*, prior to the Petition Date, the Debtors' financial advisor, G2 Capital Advisors, solicited on a no-names basis, indications of interest in providing post-petition financing from three potential third-party lenders who specialize in providing debtor-in-possession financing. After considering the facts and circumstances facing the debtors in this case, none of these parties expressed any interest in considering possible DIP financing.

56.   Based upon the advice provided by the Debtors' financial advisor, I believe the terms proposed by the Debtors' Term Lenders and PNC are the best terms available to the Debtors.

(ii)     **Motion for Entry of an Order (I) Authorizing Payment of Prepetition Wages, Payroll Taxes, Certain Employee Benefits, and Related Expenses; (II) Directing Banks to Honor Related Prepetition Transfers; and (III) Granting Related Relief (the "Employee Wage Motion")**

57.     The Debtors seek authority, but not direction, to pay the Employee Obligations that become payable during the pendency of these Chapter 11 Cases.  They also request authority, but not direction, to continue at this time those practices, programs, and policies regarding their Employees as were in effect as of the Petition Date, subject to such rights as may be available to the Debtors within the provisions of the Bankruptcy Code.  In addition to the foregoing relief, the Debtors request that all banks and other financial institutions be authorized and directed, if and when requested by the Debtors, to receive, process, honor, and pay any and all checks drawn on the Debtors' accounts to pay the Employee Obligations, provided that sufficient funds are available in the applicable accounts to make the payments and transfers.  The Debtors similarly request that they be authorized to pay any cost or penalty incurred by their Employees in the event that a check issued by the Debtors for payment of the Employee Obligations is inadvertently not honored because of the filing of the Debtors' bankruptcy cases.  The Debtors believe such costs or penalties, if any, will be *de minimis* in amount, but if the Debtors are not authorized to pay such costs or penalties, then their Employees will suffer the harm the Debtors seek to prevent with the filing of the Employee Wage Motion, and the Debtors will suffer from loss of Employee goodwill.

58.     As of the Petition Date, the Debtors employ approximately 839 individuals, comprised of 65 salaried Employees and 774 hourly Employees. The salaried Employees hold (i) administrative positions at the company's corporate office in Atlanta, (ii) job supervisory positions, and (iii) project site leadership positions. The hourly employees, for the most part, are craft laborers hired for specific projects. Attached to the Employee Wage Motion as Exhibit A

is a chart that provides a breakdown for each Debtor of the number and type of Employee employed by such Debtor.

59.     As explained more fully in the Employee Wage Motion, the Debtors have incurred certain prepetition Employee Obligations in the ordinary course of business that remain unpaid as of the Petition Date.   Even though arising prior to the Petition Date, these obligations will become due and payable on and after the Petition Date.[5]   These obligations are comprised of: (a) wages, salaries, and other compensation; (b) payroll taxes; (c) vacation and holiday programs; (d) qualified 401(k) plan obligations; (e) expense reimbursement; (f) health and welfare benefits; and (g) miscellaneous other benefits provided to the Employees in the form of "pass through programs" pursuant to which the Debtors withhold amounts from the Employees' paychecks and remit the withheld amounts to the benefit provider.

60.     The Employee Obligations are described in detail in the Employee Wage Motion. I have reviewed the descriptions and the respective amounts of accrued Employee Obligations, as of the Petition Date, set forth in the Employee Wage Motion.   Based upon my personal knowledge, my review of relevant documents, and my discussions with members of senior management responsible for the administration of the Employee Obligations, the descriptions and accrued amounts of the respective Employee Obligations set forth therein are true and correct, to the best of my knowledge, information and belief.

61.     The total amount to be funded at this time to pay the accrued Employee Obligations is $3,428,532.58, as detailed in the schedule attached as <u>Exhibit B</u> to the Employee Wage Motion.   Absent an order granting the relief requested, I believe the Debtors' Employees could suffer undue hardship and, in many instances, serious financial difficulties because the amounts

---

[5] No amount proposed to be paid to any individual Employee will exceed the priority unsecured cap of $15,150 set forth in 11 U.S.C. §507(a)(4) and (5).

involved are needed to enable certain of the Employees to meet their personal financial obligations.  Moreover, as explained in the Employee Wage Motion, certain of the Employee Obligations involve funds that have been deducted from the Employees' paychecks for remittance to taxing or other governmental and judicial authorities, or in connection with pass through programs involving health and welfare benefits.  Such funds are not property of the Debtors' estates.

62.    The Debtors have adequate funding available to satisfy the Employee Obligations. I believe any failure or delay in doing so would have a significant adverse impact on the Debtors' relationships with its Employees, seriously impair Employees' morale, and cause material damage to the Debtors' business and loss of value for all stakeholders.  Accordingly, I believe it is in the best interests of the Debtors, their creditors, and all stakeholders that the Court grant the relief requested in the Employee Wage Motion.

**(iii)      Motion for Entry of an Order (I) Authorizing Debtors to Continue Prepetition Insurance and Workers' Compensation Policies and to Pay Prepetition Premiums and Related Obligations and (II) Granting Related Relief (the "<u>Insurance and Workers' Compensation Motion</u>")**

63.    In connection with the operation of their business, the Debtors maintain various general liability, automobile, commercial liability, environmental, property, director and officer liability, fiduciary liability, and cyber policies and programs (collectively, the "<u>Insurance Policies</u>") as well as workers compensation policies and programs (collectively, the "<u>Workers Compensation Policies</u>", as more specifically set forth on <u>Exhibit A</u> to the Insurance and Workers' Compensation Motion, which references the applicable policy numbers, policy periods and effective dates, premium amounts, fees/surcharges, Insurance Carriers, coverage categories and descriptions, coverage limits, and deductibles.

64.    As detailed in Exhibit A attached to the Insurance and Workers' Compensation Motion, insurance premiums for Debtors' director and officer liability, cyber, fiduciary and other related coverages for policy periods spanning twelve (12) months from May 1, 2023, to May 1, 2024 total $612,519.60. These premiums are financed pursuant to a Premium Financing Agreement (the "First Insurance Premium Financing Agreement") with First Insurance Funding ("First Insurance") dated April 25, 2023. A true and correct copy of the First Insurance Premium Financing Agreement is attached to the Insurance and Workers' Compensation Motion as Exhibit B. Under the First Insurance Premium Financing Agreement, Debtors are required to remit ten (10) monthly installment payments to First Insurance in the amount of $50,807.04 per month, due on the first (1st) day of each month through and including April 1, 2024. As of the Petition Date, the Debtors are current and have no prepetition monthly installment payments outstanding under the First Insurance Premium Financing Agreement and the outstanding balance has been paid in full.

65.    Likewise, as set forth more fully on Exhibit A attached to Insurance and Workers' Compensation Motion, insurance premiums for the Debtors' other Insurance Policies (including general liability, automobile, commercial liability, environmental, and property policies), as well as its Workers' Compensation Premiums (as such term is defined below) for policy periods spanning twelve (12) months from September 15, 2022 to September 15, 2023 total $3,326,673.04. These premiums are financed pursuant to a Commercial Insurance Premium Financing and Security Agreement (the "BankDirect Premium Financing Agreement," and together with the First Insurance Premium Financing Agreement, collectively, the "Premium Financing Agreements") with Bank Direct Capital Finance, a division of Texas Capital Bank ("BankDirect") dated September 16, 2022. A true and correct copy of the BankDirect Insurance

Premium Financing Agreement is attached to the Insurance and Workers' Compensation Motion as <u>Exhibit C.</u> Under the BankDirect Premium Financing Agreement, Debtors are required to remit eleven (11) monthly installment payments to BankDirect in the amount of $282,952.49 per month, due on the fifteenth (15th) day of each month through to and including September 15, 2024. As of the Petition Date, the Debtors have no prepetition monthly installment payments outstanding under the BankDirect Insurance Premium Financing Agreement. The next payment will come due on August 15, 2003 in the amount of $282,952.49.

66.    Under state law, the Debtors are required to maintain workers' compensation insurance policies to provide their employees with coverage for claims arising from or related to their employment with the Debtors. In the ordinary course of business, the Debtors maintain workers' compensation insurance programs and policies at the levels required by statute for each U.S. state in which the Debtors conduct business. The Debtors' Workers' Compensation Policies are administered by Starr Indemnity & Liability Company. The Debtors pay all amounts related to workers' compensation claims up to a fixed per-claim deductible in the amount of $500,000 for losses that exceed the deductible. The Debtors' Workers Compensation Policies are also identified on <u>Exhibit A</u> attached hereto, which references the applicable policy numbers, policy periods and effective dates, premium amounts, fees/surcharges, coverage categories and descriptions, coverage limits, and deductibles.

67.    The Debtors have annual required premiums for the Workers' Compensation Policies, which total $683,225 (collectively, the "<u>Workers' Compensation Premiums</u>"). The Workers' Compensation Policies currently in effect as of the Petition Date have policy periods that run from September 15, 2022 to September 15, 2023. As noted above, the Workers'

Compensation Premiums are financed pursuant to the BankDirect Premium Finance Agreement with payment terms outlined in paragraph 65 above.

68.    I believe there is sufficient business justification to grant the relief requested in the Insurance and Workers' Compensation Motion because failure to pay the monthly installment amounts under the Premium Financing Agreements, related premiums, and/or related insurance expenses when due may harm the Debtors' estates in several ways.

69.    If the Debtors are unable to continue making payments under the Premium Financing Agreements, the lenders party thereto could seek relief from the automatic stay to cancel applicable Insurance Policies in accordance with the terms of the Premium Financing Agreements or to seek adequate protection of their respective investments. The insurance carriers may refuse to renew the Insurance Policies absent the Debtors' ongoing satisfaction of the insurance obligations when they become due, which will require the Debtors to obtain replacement policies and programs. This would require the commitment of significant resources and could result in less favorable coverage or terms. Additionally, the Insurance Carriers could attempt to terminate the Debtors' existing Insurance Policies, which could threaten the Debtors' ability to continue operating their business, given the Debtors' myriad of regulatory and contractual obligations to maintain specific amounts and types of insurance coverage. The termination of policies would also result in increased risk of incurring liabilities from unforeseen events. Finally, the maintenance of the Workers' Compensation Program is necessary under applicable state law.

70.    The amounts the Debtors propose to pay in respect to the Premium Financing Agreements, the Insurance Policies, and the Workers Compensation Policies, as applicable, are relatively small in comparison to the Debtors' potential exposure absent insurance coverage. It

is critical that the Debtors continue to maintain the Premium Financing Agreements, the Insurance Policies, and the Workers Compensation Policies on an uninterrupted basis and pay installments, premiums and related costs as they may come due in the ordinary course of business and consistent with prepetition practices. Accordingly, I believe it is in the best interests of the Debtors, their creditors, and all stakeholders that the Court grant the relief requested in the Insurance and Workers' Compensation Motion.

    (iv)     **Motion for Entry of Interim and Final Orders (I) Prohibiting Utilities from Altering, Refusing, or Discontinuing Service on Account of Prepetition Invoices; (II) Deeming Utilities Adequately Assured of Future Performance; (III) Establishing Procedures for Determining Adequate Assurance of Payment; and (IV) Granting Related Relief (the "<u>Utilities Motion</u>")**

71.     The Debtors use various utility services, which are essential to the Debtors' ability to sustain their operations while these chapter 11 cases are pending. To operate their business and manage their properties, the Debtors incur utility expenses for natural gas, electricity, water, sewage, waste management, local and long-distance telecommunications, and other similar services. Because of the nature of the Debtors' operations, termination or interruption of the Debtors' utility service would dramatically impair the Debtors' ability to conduct business and would cause considerable inconvenience to the Debtors' customers and employees. If utility providers are permitted to terminate or disrupt service to the Debtors, the Debtors' primary revenue sources would be threatened.

72.     A non-exhaustive list identifying the Utility Providers is set forth in <u>Exhibit A</u> to the Utilities Motion (the "<u>Utilities Service List</u>"). The Debtors spend an aggregate amount of approximately $69,150.00 each month on utility services from the utility providers listed on the Utilities Service List.

73.     In general, the Debtors have established satisfactory payment history with the utility providers and have made payments on a regular and timely basis. To the best of the

Debtors' knowledge, there are no material defaults or arrearages with respect to undisputed invoices for prepetition utility services as of the Petition Date. The Debtors have sufficient funds and intend to pay any post-petition obligations for utility services in a timely fashion and in the ordinary course. Given the Debtors' payment history with the utility providers, I believe the procedures to be followed in the Utilities motion provides the requisite adequate assurance of performance of the utilities obligations.

74.     Accordingly, I believe it is in the best interests of the Debtors, their creditors, and all stakeholders that the Court grant the relief requested in the Utilities Motion.

**(v)       Motion for Entry of Interim and Final Orders (I) Authorizing, but not Directing, Payment of Prepetition Claims of Critical Vendors Pursuant to 11 U.S.C. §§ 363(B), 1107 and 1108, Fed. R. Bankr. P. 6003 and 6004, and Del. Bankr. L.R. 9013-1(m) and (II) Granting Related Relief (the "Critical Vendor Motion")**

75.     Prior to the Petition Date, the Debtors, in consultation with their professionals, reviewed their accounts payable and undertook a process to identify those vendors truly essential to their operations (each a "Critical Vendor").

76.     In the Critical Vendor Motion, the Debtors seek authority to pay the claims of Critical Vendors solely to the extent that such payments are necessary on a post-petition basis to ensure that a particular vendor continues to provide necessary goods and services to the Debtors, up to a maximum of $3,900,000 on an interim basis, and a maximum of $6,500,000 on a final basis. The Critical Vendor Motion also permits the Debtors to condition any payment to Critical Vendors upon an agreement with each Critical Vendor to continue to provide goods and/or services to the Debtors on the most favorable terms in effect between that Critical Vendor and the Debtors in the 12 months before the Petition Date, or on terms more favorable to the Debtors on which the Debtors and the Critical Vendor may otherwise agree.

77.    The Critical Vendors identified by the Debtors are essential to the Debtors' on-going operations. Any disruption in the supply of the goods or services provided by any Critical Vendor would likely result in immediate and irreparable harm, and significant loss of value, to the Debtors' business and their estates by significantly impairing the Debtors' operations, and preventing the Debtors from providing the services they are contractually obligated to provide to their customers. Work on current projects would cease, resulting in significant damage claims and loss of value. The degradation in the value of the business, in my opinion, would likely prevent the Debtors from consummating the section 363 sale described above.

78.    I believe the harm that would stem from the failure to pay any of the Critical Vendors is disproportionate to the amount of the Critical Vendor claims that the Debtors are seeking to pay. Accordingly, I believe it is in the best interests of the Debtors, their creditors, and all stakeholders that the Court grant the relief requested in the Critical Vendor Motion.

(vi)    **Motion for Entry of an Order (I) Authorizing Continued Use of Prepetition Bank Accounts, Cash Management System, Forms, and Books and Records and (II) Granting Related Relief (the "Cash Management Motion")**

79.    The Debtors use a cash management system (the "Cash Management System") in the ordinary course of business which permits the efficient collection and application of funds. Prior to the commencement of these chapter 11 cases, and in the ordinary course of business, the Debtors maintained 25 bank accounts (collectively, the "Bank Accounts"). A list of the Bank Accounts is attached as Exhibit A to the Cash Management Motion. The Debtors' Cash Management System is primarily maintained at PNC, Two Tower Center Blvd, 17th Floor, East Brunswick, NJ 08816 ("PNC Bank").

80.    The Bank Accounts utilized by the Debtors consist of:

(a)    Williams Industrial Services Group, LLC ("WISG") maintains a Master Funding Account, the purpose of which is to receive funds advanced by PNC Bank

pursuant to the Debtors' Revolving Credit Agreement. Funds are transferred from the Master Funding Account to the Concentration Account maintained by Holdings.

(b)     Williams Specialty Services, LLC ("WSS"), Williams Plant Services, LLC ("WPS"), and Williams Industrial Services, LLC ("WIS") each maintain separate Collections Accounts, the purpose of which is to receive customer payments. Funds received in the Collection Accounts are swept daily pursuant to Deposit and Account Control Agreements and remitted to PNC Bank for application against the outstanding balance due under the Debtors' Revolving Credit Agreement.

(c)     Williams Industrial Services Group, Inc. ("Holdings") maintains a Concentration Account, the purpose of which is to receive funds from the Master Funding Account for transfer to the Accounts Payable Disbursement Accounts and Payroll Accounts as needed.

(d)     Holdings, WISG, WSS, WPS, WIS, Construction & Maintenance Professionals, LLC ("CMP"), and WISG Electrical, LLC ("Electrical") each maintain separate Accounts Payable Disbursement Accounts. These Accounts are zero balance accounts, the purpose of which is to fund disbursements to satisfy accounts payable. Funds are transferred to these Accounts from the Concentration Account as needed.

(e)     Holdings, WISG, WSS, WPS, WIS, CMP, and Electrical each maintain separate Payroll Accounts. These are zero balance accounts, the purpose of which is to fund payroll and related payroll tax obligations. Funds are transferred to these Accounts from the Concentration Account prior to payroll disbursement on Tuesday mornings.

(f)      Holdings and Steam Enterprises, LLC ("Steam") each maintain separate Operating Accounts, which are required by Minnesota state law to fund captive state-run workers' compensation programs in that state related to potential asbestos liabilities.

(g)      WIS and WPS each maintain separate accounts designated to hold segregated, bonded accounts receivable.

81.    Additionally, WISG Canada Ltd. maintains one general purpose Bank Account at TD Bank.

82.    The Debtors' existing Bank Accounts permit the efficient collection and disbursement of cash for the benefit of the Debtors and all parties in interest. The Debtors' transition into chapter 11 will be significantly less disruptive if the Bank Accounts are maintained following the commencement of these cases with the same account numbers and, where applicable, the same automated relationship. The Debtors further request authority to deposit funds in and withdraw funds from all such accounts post-petition, subject to the same access rights and limitations existing prior to the Petition Date, including, but not limited to, check, wire, transfers, ACH, electronic funds transfers and other debits and to treat the Bank Accounts for all purposes as debtors in possession accounts.

83.    To minimize administrative expense and delay, the Debtors also request authority to continue to use pre-printed business forms (including, but not limited to, letterhead, envelopes, promotional materials and other business forms) substantially in the forms used immediately prior to the Petition Date, without reference to each Debtor's "Debtor in Possession" status.

84.    Finally, the Debtors seek waiver of certain requirements the US Trustee has established for Debtors in Possession and Chapter 11 Trustees (the "Guidelines") to supervise the administration of chapter 11 cases. The Guidelines require a chapter 11 debtor to, among

other things: (i) close its existing books, records and bank accounts, and open new post-petition books, records and bank accounts (which must bear debtor in possession labels, and must be opened at banks approved by the US Trustee); (ii) establish separate bank accounts for operations, payment of taxes, cash collateral and payroll (to the extent that the debtor had a separate payroll account prepetition); and (iii) obtain new checks bearing the designation "Debtor in Possession," along with additional information. Considering the size and complexity the Debtors' Cash Management System, compliance with these requirements would create substantial and unnecessary administrative burdens and cause expense, confusion, and diversion of scarce time and personnel, hindering the efficient use of the Debtors' resources at the early stages of these cases. The additional safeguards proposed in the Cash Management Motion adequately address the concerns that underlie the Guidelines. The Debtors have in place sophisticated, computerized record keeping systems and will be able to ensure that all prepetition and post-petition transactions are properly accounted for and can easily be distinguished. The Debtors will continue to maintain complete and accurate records of all transfers of funds in and out of the Debtors' Bank Accounts. As such, I believe the continuance of the existing Cash Management System will not prejudice any party in interest.

85.     Based on the foregoing, I believe it is beneficial to the creditors and the estate that the Debtors be permitted to use their existing Cash Management System and that the requirements set forth in the Guidelines be waived in order to save precious financial and administrative resources.

(vii)     **Motion for Entry of Interim and Final Orders (I) Authorizing Debtors to Pay Certain Prepetition Taxes and Related Obligations and (II) Granting Related Relief (the "<u>Taxes Motion</u>")**

86.     In connection with the normal operations of their business, the Debtors incur an assortment of taxes and various business license, permit, and other fees payable to various

federal, state, and local taxing and regulatory authorities including, those more fully described in the Taxes Motion and Exhibit A thereto. These taxes and fees include, without limitation, sales and use taxes for the purchase of inventory and raw materials, payroll taxes in connection with the payment of wages to their various employees, and fees required to be paid in connection with the operation of their businesses.

87.    The Debtors estimate that they owe approximately $1,128,562.45 in unpaid taxes and fees as of the Petition Date to various taxing and licensing authorities. By the Taxes Motion, the Debtor seek authority to pay prepetition taxes and fees to the respective taxing and licensing authorities.

88.    Certain funds in the Debtors' possession are held in trust to satisfy payroll, and sales and use, tax obligations and are not considered part of the Debtor's bankruptcy estate. Litigation with these taxing authorities would be expensive and distracting to the Debtors. Moreover, the taxing authorities' claims to recover these taxes are entitled to priority under the Bankruptcy Code.

89.    The failure to pay fees required as a condition of conducting business operations in various jurisdictions could be catastrophic to the Debtors' ability to continue operating in the ordinary course, and disproportionate to the amounts sought to be paid under the Taxes Motion.

90.    Accordingly, I believe it is in the best interests of the Debtors, their creditors, and all stakeholders that the Court grant the relief requested in the Taxes Motion.

[*signature page to follow*]

Dated: July 20, 2023

/s/ Tracy D. Pagliara
Name: Tracy D. Pagliara
Title: President & CEO
Williams Industrial Services Group, Inc.,