**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>WILLIAMS INDUSTRIAL SERVICES<br>GROUP INC., *et al.*[1]<br><br>　　　　　Debtors. | Chapter 11<br><br>Case No. 23-10961 (TMH)<br><br>(Jointly Administered) |

**DEBTORS' MOTION SEEKING ENTRY OF INTERIM AND FINAL ORDERS
(I) AUTHORIZING THE DEBTORS TO OBTAIN SENIOR SECURED
SUPERPRIORITY POST-PETITION FINANCING; (II) GRANTING LIENS AND
SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS; (III) AUTHORIZING USE
OF CASH COLLATERAL; (IV) MODIFYING THE AUTOMATIC STAY;
(V) SCHEDULING A FINAL HEARING; AND (VI) GRANTING RELATED RELIEF**

The above-captioned debtors and debtors in possession (collectively, the "<u>Debtors</u>")
respectfully submit this motion (the "<u>DIP Motion</u>") for the relief set forth herein.  In support of hereof,
the Debtors rely upon the *Declaration of Tracy Pagliara in Support of Chapter 11 Petitions and First
Day Pleadings* (the "<u>Pagliara Declaration</u>"), and the *Declaration of Victoria Arrigoni of G2 Capital
Advisors in Support of Debtors' Motion Seeking Post-Petition Financing* (the "<u>Arrigoni Declaration</u>")
filed contemporaneously herewith.  In further support of this DIP Motion, the Debtors respectfully
state as follows:

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Williams Industrial Services Group Inc. (1378), Williams Industrial Services Group, LLC (2666), Williams Industrial Services, LLC (0406), Williams Plant Services, LLC (9575), Williams Specialty Services, LLC (9578), WISG Electrical, LLC (6918), Construction & Maintenance Professionals, LLC (0925), Williams Global Services, Inc. (3708), Steam Enterprises, LLC (9177), GPEG LLC (5707), Global Power Professional Services, Inc. (2550), WISG Canada Ltd. (B.N. 6518), WISG Nuclear Ltd. (B.N. 3510), and WISG Electrical Ltd. (B.N. 2116). The location of the Debtors' corporate headquarters and service address is: 200 Ashford Center N, Suite 425, Atlanta, GA 30338.

1.      On the date hereof (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Court").  The Debtors have continued in possession of their properties and have continued to operate and manage their business as debtors in possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code. No request has been made for the appointment of a trustee or examiner, and no official committee of unsecured creditors (the "Committee") has yet been established in these cases.

## JURISDICTION AND VENUE

2.      The Court has jurisdiction over these cases and this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware*, dated February 29, 2012. The Debtors confirm their consent, pursuant to Rule 7008 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), to the entry of a final order by the Court in connection with this motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

3.      This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(A). Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409(a).

4.      The bases for the relief requested herein are Sections 105, 361, 362, 363, 364, 503, and 507 of the Bankruptcy Code, Rules 2002, 4001, and 9014 of the Federal Rules of Bankruptcy Procedure, and Local Rules 2002-1(b) and 4001-2.

## PRELIMINARY STATEMENT[2]

5.      The factual background relating to the Debtors' commencement of these cases is set forth in detail in the Pagliara Declaration filed on the Petition Date and incorporated herein by reference.

6.      The Debtors have commenced these cases for the purpose of pursuing a sale of substantially all of the assets of their businesses pursuant to section 363 of the Bankruptcy Code, in order to provide the greatest possible recovery for their creditors and preserve jobs for a substantial number of their employees. Immediate access to incremental liquidity in the form of post-petition financing (as well as access to Cash Collateral) is vital to preserving the value of the Debtors' estates and to maximizing the likelihood of a successful sale process. The Debtors will suffer immediate and irreparable harm absent access to additional liquidity.

7.      As explained in the Pagliara Declaration and the Arrigoni Declaration, following intensive negotiation with their prepetition secured lenders, (i) the Debtors' Prepetition Term Lenders have agreed to provide a post-petition term loan facility in an aggregate principal amount of $19,500,000, comprised of (a) $14,000,000 to be advanced upon entry of the Interim Order authorizing the financing sought in this motion, (b) $2,750,000 to be advanced one business day following the entry of the Final Order, and (c) $2,750,000 to be advanced one week after the entry of the Final Order; and (ii) the Debtors' Prepetition Revolving Credit Lender, PNC Bank National Association ("PNC") has agreed to provide a post-petition revolving credit facility in a principal amount up to $12,000,000 subject to availability determined in accordance with a borrowing base formula. The provisions of the proposed financing and Interim Order were negotiated at arm's-length and in good faith, and the proposed DIP Facilities provide the best terms presently available to the

---

[2] Capitalized terms used but not defined herein have the meanings ascribed to them in the DIP Term Sheets, or the Interim Order, as applicable.

Debtors.  The Debtors submit that the DIP Facilities will allow the Debtors to continue operations while in chapter 11, including paying its existing employees, vendors, sub-contractors, and tax and regulatory authorities, and satisfying other working capital and operational requirements, and is necessary to preserve and maintain the value of the Debtors' estates while the Debtors pursue their sale process.  The Debtors' ability to access additional liquidity through the available DIP Facilities is necessary to support the process as contemplated.

8.      Accordingly, the Debtors have an immediate need to obtain post-petition financing and to use their Cash Collateral and, therefore, the Debtors respectfully request that the Court approve the entry of the Interim Order and the Final Order.

## **BACKGROUND**

### A.      **Pre-Petition Secured Debt**

#### (i)      **Pre-Petition Revolving Credit Agreement**

9.      Williams Industrial Services Group Inc. ("Holdings") and certain of its subsidiaries are parties to a Revolving Credit and Security Agreement, dated as of December 16, 2020, as amended, with PNC ("Pre-Petition Revolving Agent"), as agent for the lenders, and the lenders party thereto (the "Pre-Petition Revolving Credit Agreement").  Specifically, Holdings, Williams Industrial Services Group, LLC ("WISG"), Williams Industrial Services, LLC ("WIS"), Williams Specialty Services, LLC ("WSS"), Williams Plant Services, LLC ("WPS"), Williams Global Services, Inc. ("Global"), Construction and Maintenance Professionals, LLC ("CMP"), and WISG Electrical, LLC ("Electrical") are each borrowers, and Global Power Professional Services Inc. ("Power"), GPEG, LLC ("GPEG"), Steam Enterprises, LLC ("Steam"), WISG Canada Ltd. ("WISG Canada"), WISG Nuclear Ltd. ("Canada Nuclear"), and WISG Electrical Ltd. ("Canada Electrical") are each guarantors

under the Pre-Petition Revolving Credit Agreement (the foregoing borrowers and guarantors being referred to collectively as the "Pre-Petition Revolving Loan Credit Parties").

10.     The borrowers under the Pre-Petition Revolving Credit Agreement had access prepetition to a revolving line of credit of up to $30 million, subject to availability determined in accordance with a borrowing base formula, and reserves as established by PNC.  As of the Petition Date, the outstanding amount owed under the Pre-Petition Revolving Credit Agreement was approximately $10,400,000 in principal, plus a $500,000 letter of credit issued for which the borrowers have a reimbursement obligation to PNC (the "Pre-Petition Revolving Obligations"), plus accrued interest, fees, costs, and expenses and other obligations owed under the Pre-Petition Revolving Credit Agreement as described in the DIP Orders.  The obligations owed under the Pre-Petition Revolving Credit Agreement are secured by valid, binding, perfected, enforceable and non-avoidable security interests and liens (the "Pre-Petition Revolving Liens"), which are comprised of first-priority security interests in substantially all of the Pre-Petition Revolving Loan Credit Parties' accounts receivable and contract assets, and a second-priority security interest in substantially all other assets of the Pre-Petition Revolving Loan Credit Parties.  The Pre-Petition Revolving Credit Agreement matures on December 16, 2025.

(ii)     <strong>Pre-Petition Term Loan Agreement</strong>

11.     Holdings and certain of its subsidiaries are parties to a Term Loan, Guarantee and Security Agreement, dated as of December 16, 2020, as amended (the "Pre-Petition Term Loan Agreement") with EICF Agent LLC, as agent for the lenders (the Pre-Petition Term Loan Agent"), CION Investment Corporation, as a lender and co-lead arranger, and the other lender parties thereto (the "Pre-Petition Term Lenders").  Specifically, Holdings, WISG, WIS, WSS, WPS, Global and CMP are each borrowers, and Power, Electrical, GPEG, Steam, WISG Canada, Canada Nuclear, and

Canada Electrical are each guarantors under the Pre-Petition Term Loan Agreement (the foregoing borrowers and guarantors being referred to collectively as the "Pre-Petition Term Loan Credit Parties").

12.     The Pre-Petition Term Loan Agreement provided for senior secured term loan facilities in an aggregate principal amount of up to $50 Million (collectively, the "Pre-Petition Term Loans"), consisting of a $35 million closing date term loan facility (the "Closing Date Term Loan") and up to $15 million of borrowings under a delayed draw facility (the "Delayed Draw Term Loan Facility").  The obligations owed under the Pre-Petition Term Loan Agreement are secured by valid, binding, perfected, enforceable and non-avoidable security interests and liens granted by the Debtors to the Pre-Petition Term Loan Agent (the "Pre-Petition Term Liens," together with the "Pre-Petition Revolving Liens," the "Pre-Petition Liens").  Specifically, Debtors granted to the Pre-Petition Term Loan Agent first-priority security interests in substantially all of the Term Loan Credit Parties' assets, other than accounts receivable and contract assets, and a second-priority security interest in the Pre-Petition Term Loan Credit Parties' accounts receivable and contract assets.  The Pre-Petition Term Loan Agreement matures on December 16, 2025.

13.     The Closing Date Term Loan in the amount of $35 million was fully drawn on December 16, 2020.  The Delayed Draw Term Loan Facility expired 18 months later without any funds having been drawn thereunder.

14.     On February 21, 2023, several of the Pre-Petition Term Lenders made protective advances as permitted by the Pre-Petition Term Loan Agreement to address urgent working capital needs of the Debtors.  Energy Impact Credit Fund I LP advanced $428,571.43.  Crowd Out Credit Opportunities Fund LLC advanced $285,714.29.  CION Investment Corporation advanced $285,714.29.

15.     On February 24, 2023, to address the Debtors' need for additional working capital, the Pre-Petition Term Lenders and the Pre-Petition Term Loan Credit Parties amended the Pre-Petition Term Loan Agreement to provide for delayed draw term loans in the maximum aggregate amount of $1,500,000.00.  On that date, Energy Impact Credit Fund I LP advanced $642,857.15. Crowd Out Credit Opportunities Fund LLC advanced $428,571.43.  CION Investment Corporation advanced $428,571.43.

16.     To address the Debtors' continuing need for working capital, the Pre-Petition Term Lenders and the Pre-Petition Term Loan Credit Parties executed a further amendment to the Pre-Petition Term Loan Agreement, dated as of March 31, 2023, to provide for additional delayed draw term loans in the maximum aggregate amount of $3,500,000.  On April 7, 2023, Energy Impact Credit Fund I LP advanced $1,500,000, and Crowd Out Credit Opportunities Fund LLC and CION Investment Corporation each advanced $1,000,000.

17.     As of the Petition Date, the outstanding amount owed under the Pre-Petition Term Loan Agreement was approximately $32,200,000 (the "Pre-Petition Term Obligations," together with the Pre-Petition Revolving Obligations, the "Pre-Petition Obligations").

### B.     Intercreditor Agreement

18.     The Pre-Petition Revolving Agent and Pre-Petition Term Loan Agent are parties to that certain Intercreditor Agreement, dated as of December 16, 2020 (as amended, and as it may be further amended, including in connection with the DIP Facilities, restated, amended and restated, supplemented, or otherwise modified, the "Intercreditor Agreement"), which has been acknowledged and agreed to by the Pre-Petition Revolving Loan Credit Parties and the Pre-Petition Term Loan Credit Parties. The Intercreditor Agreement governs, among other things, the relative priority of the respective Liens on the Collateral granted to holders of Obligations (each as defined in the

Intercreditor Agreement) and is acknowledged to be a "subordination agreement" within the meaning of Bankruptcy Code section 510(a), as set forth therein. The Intercreditor Agreement is binding, valid, and enforceable in accordance with its terms, and the parties thereto have agreed to be bound thereby.

## **RELIEF REQUESTED**

19.    The Debtors seek entry of an interim order, substantially in the form attached hereto as **Exhibit A** (the "Interim Order"), and a final order (the "Final Order"[3] and, together with the Interim Order, the "DIP Orders"):

(a)    authorizing Holdings, WISG, WIS, WPS, WSS, Global, CMP, and Electrical, as borrowers (collectively, the "DIP Borrowers"), and Power, GPEG, Steam, WISG Canada, Canada Nuclear, and Calada Electrical, as guarantors (collectively, the "DIP Guarantors") to obtain post-petition financing through a senior secured debtor-in-possession term loan credit facility (the "DIP Term Facility" and the extensions of credit under the DIP Term Facility, the "DIP Term Loans"), subject to the terms and limitations set forth herein and in the Superpriority Senior Secured Debtor-In-Possession Term Loan, Guarantee and Security Agreement, among the Borrowers and Energy Impact Credit Fund I LP, CION Investment Corporation and Crowd Out Capital LLC, and any other lenders from time to time party thereto (the "DIP Term Lenders") as the same may be amended, restated, amended and restated, supplemented, waived, extended, or otherwise modified from time to time (the "DIP Term Loan Agreement"), substantially in the form attached to this Motion as **Exhibit B** and, together with any other related agreements, documents, security agreements, or pledge agreements, including the Interim Order and the Final Order, collectively, the "DIP Term Loan Documents"), in the aggregate principal amount of $19,500,000 in term loan commitments which shall be available as term loans to the Borrowers upon entry of the Interim Order and satisfaction of the other conditions set forth therein in an initial amount of $14,000,000 (the "Initial DIP Term Loan"), and the remainder of the DIP Term Facility available upon entry of the Final Order to the extent set forth therein.  EICF Agent LLC shall serve as agent for the DIP Term Lenders (the "DIP Term Agent" and, together with the DIP Term Lenders (the "DIP Term Secured Parties").  The DIP Borrowers and the DIP Guarantors shall be referred to as the "DIP Credit Parties";

(b)    authorizing the DIP Credit Parties to obtain post-petition revolving credit financing from PNC in an amount up to the lesser of (a) the Formula Amount (as defined in the DIP Revolving Credit Agreement) and (b) $12,000,000.00 (the "DIP Revolving Loan Facility") and the extension of credit under the DIP Revolving Loan Facility (the "DIP Revolving Loans"), subject to the terms and limitations set forth herein

---

[3] The Debtors will file a proposed Final Order prior to the Final Hearing.

as memorialized in that certain Super-Priority Senior Secured Debtor-in-Possession Revolving Credit and Security Agreement, among PNC, as agent (the "<u>DIP Revolving Agent</u>") and PNC as lender (the "<u>DIP Revolving Lender</u>"), and together with the DIP Revolving Agent (the "<u>DIP Revolving Secured Parties</u>"), and the DIP Credit Parties, as the same may be amended, restated, amended and restated, supplemented, waived, extended or otherwise modified from time to time (the "<u>DIP Revolving Credit Agreement</u>"), substantially in the form attached to this Motion as **<u>Exhibit C</u>**;

(c)     authorizing the DIP Credit Parties to (a) enter into, execute and perform all of their respective obligations under (i) the DIP Revolving Credit Agreement and (ii) all security agreements, pledge agreements, notes, guarantees, mortgages, deeds of trust, control agreements, Uniform Commercial Code financing statements, certificates, reports and other agreements, documents and instruments either or both executed and/or delivered with or to the DIP Revolving Agent and/or the DIP Revolving Lenders in connection with or related thereto (collectively, as amended, modified, supplemented, extended, restated or replaced from time to time, the "DIP Revolving Financing Documents"), (b) enter into, execute and perform under (i) the DIP Term Loan Agreement and (ii) all security agreements, pledge agreements, notes, guarantees, mortgages, deeds of trust, control agreements, Uniform Commercial Code financing statements, certificates, reports and other agreements, documents and instruments either or both executed and/or delivered with or to the DIP Term Agent and/or the DIP Term Lenders in connection with or related thereto (collectively, as amended, modified, supplemented, extended, restated or replaced from time to time, the "<u>DIP Term Financing Documents</u>"; together with the DIP Revolving Financing Documents, the Intercreditor Agreement and any amendment to the Intercreditor Agreement entered into in connection with the DIP Facilities, collectively, the "<u>DIP Financing Documents</u>"), and (c) take and perform all other acts and steps as may be required or contemplated by or in connection with the DIP Financing Documents and the DIP Orders;

(d)     authorizing the Debtors to execute, deliver, and enter into the DIP Financing Documents and to perform all of the Debtors' respective obligations thereunder, and such other and further acts as may be required in connection with the DIP Financing Documents;

(e)     authorizing the Debtors to pay all amounts, obligations, and liabilities owing or payable to the DIP Term Agent and the DIP Revolving Agent (collectively, the "<u>DIP Agents</u>") pursuant to the DIP Financing Documents, including, without limitation, any principal, interest, fees, commitment fees, administrative agent fees, audit fees, closing fees, service fees, facility fees, or other fees, costs, expenses, charges, and disbursements of the DIP Agents (including the reasonable and documented fees and expenses of DIP Term Secured Parties and the DIP Revolving Secured Parties (collectively the "<u>DIP Secured Parties</u>") and DIP Agents' attorneys, advisors, accountants, and other consultants), any obligations in respect of indemnity claims, whether contingent or absolute, including, without limitation, any and all obligations in connection with any interest rate, currency swap, or other

hedging agreement or arrangement, in each case, to the extent constituting the DIP Credit Parties' obligations of any kind under the DIP Financing Documents (such obligations collectively, the "DIP Obligations");

(f) authorizing the Debtors to use advances under the DIP Revolving Credit Agreement and proceeds of Revolving Loan Priority Collateral (as defined in the Intercreditor Agreement), such advances together with the proceeds of Revolving Loan Priority Collateral being referred to as "Revolving Credit Cash Collateral," in accordance with the terms of the Interim Order and the Final Order (collectively, the "DIP Orders") and the DIP Revolving Financing Documents, and as limited by the Approved Budget (as defined herein), for, *inter alia*: (a) general operating, corporate, and working capital purposes of the Debtors in the ordinary course of business; (b) reasonable and documented costs, fees, and other expenses of the DIP Revolving Secured Parties; (c) to make Revolving Credit Adequate Protection Payments (as defined herein); (d) following entry of the Interim Order, applying Revolving Credit Cash Collateral collected during the Interim Period to the Pre-Petition Revolving Obligations (the "Interim ABL Roll-Up") and the DIP Revolving Obligations outstanding in accordance with the terms of the DIP Revolving Financing Documents and the Interim Order, in such order and manner determined by the DIP Revolving Agent in its sole and absolute discretion; and (e) upon entry of the Final Order, exchanging and substituting in the DIP Revolving Agent's sole discretion the remaining amount of Revolving Advances (as defined in the Pre-Petition Credit Agreement; referred to herein as the "Pre-Petition Revolving Loans") on a cashless, dollar-for-dollar basis into DIP Revolving Loans (as defined herein) outstanding under the DIP Revolving Facility (the "Final ABL Roll-Up"); *provided*, that, no proceeds of DIP Revolving Loans or Revolving Loan Priority Collateral, including Revolving Credit Cash Collateral, shall be used to (x) make any payments on account of the DIP Term Facility or the Pre-Petition Term Obligations, including any adequate protection payable to the Pre-Petition Term Secured Parties, or (y) pay the fees, costs, and expenses of any party involved in the above-captioned chapter 11 case (as they may be jointly administered, the "Case") other than the fees, costs, and expenses of the Pre-Petition Revolving Secured Parties and the DIP Revolving Secured Parties including, without limitation, Revolving Credit Adequate Protection Obligations;

(g) authorizing the Debtors to use the proceeds of the DIP Term Facility in accordance with the terms of the DIP Orders and the DIP Term Financing Documents, and as limited by the Approved Budget, for, *inter alia*: (a) general operating, corporate, and working capital purposes of the Debtors in the ordinary course of business; (b) the costs and expenses of administering the Case, including funding the Carve Out and the Carve Out Reserve Account (each as defined herein); (c) to make Term Loan Adequate Protection Payments (as defined herein); and (d) to make any other payments expressly authorized by the Interim Order, the Approved Budget, and the DIP Term Loan Agreement to be paid from the proceeds of the DIP Term Facility, including fees and expenses payable to or on behalf of the DIP Term Secured Parties under the DIP Term Facility, Allowed Professional Fees (as defined herein) and to fund the Carve Out (as defined herein) on the terms described herein

(collectively, the "Permitted DIP Term Uses"); *provided* that no proceeds of the DIP Term Loans or Term Loan Priority Collateral (as defined in the Intercreditor Agreement) shall be used to make any payments on account of the DIP Revolving Facility or the Pre-Petition Revolving Obligations, including any adequate protection payable to the Pre-Petition Revolving Secured Parties;

(h)    granting to (a) the DIP Revolving Agent, for itself and on behalf of the DIP Revolving Lenders, priming, valid, perfected and enforceable liens (as defined in Bankruptcy Code section 101 (37)) in and upon all of the DIP Collateral, in accordance with the priorities described in the Lien Priority Chart (as defined herein), to secure all existing and future obligations and liabilities of every kind or nature (including without limitation, principal of, and accrued interest on, amounts advanced to the Debtors under the DIP Revolving Facility, bank products, reimbursement obligations, and fees in respect of letters of credit, which letters of credit, upon entry of the Final Order, shall be deemed issued under the DIP Revolving Credit Agreement), and all other fees, and indemnity obligations, reimbursement obligations, any other Obligations (as defined in the DIP Revolving Credit Agreement) under or in connection with the DIP Revolving Financing Documents, whether due or to become due, absolute or contingent, (collectively, the "DIP Revolving Obligations"), as provided by and more fully defined in, the DIP Revolving Financing Documents, and (b) the DIP Term Agent, for itself and on behalf of the DIP Term Lenders, priming, valid, perfected and enforceable liens (as defined in Bankruptcy Code section 101 (37)) in and upon all of the DIP Collateral, subject to the priorities described in the Lien Priority Chart, to secure all existing and future obligations and liabilities of every kind or nature (including without limitation, principal of, and accrued interest on, amounts advanced to the Debtors under the DIP Term Facility), and all other fees, and indemnity obligations, reimbursement obligations, any other Obligations (as defined in the DIP Term Credit Agreement) under or in connection with the DIP Term Financing Documents, whether due or to become due, absolute or contingent, (collectively, the "DIP Term Obligations"; together with the DIP Revolving Obligations, collectively, the "DIP Obligations"), as provided by and more fully defined in, the DIP Term Financing Documents. For the avoidance of doubt, the proposed priming lien relief set forth herein amounts to the priming of the pre-petition liens the Pre-Petition Secured Parties' respectively possess;

(i)    granting to the DIP Secured Parties allowed superpriority administrative expense claim status for the DIP Obligations, pursuant to Bankruptcy Code section 364(c)(1) and 507(b), subject to the priorities described in the Claim Priority Chart (as defined herein) and the terms of the DIP Orders;

(j)    authorizing the Debtors' use, in accordance with the terms of the DIP Financing Documents and as limited by the Approved Budget, of all Revolving Credit Cash Collateral, DIP Revolving Loans and DIP Term Loans;

(k)    granting adequate protection, including without limitation, Adequate Protection Liens, Adequate Protection Claims, and Adequate Protection Payments (each as

defined herein and collectively, the "Adequate Protection Obligations") to (a) the Pre-Petition Revolving Agent under the Pre-Petition Revolving Credit Agreement by and among the Borrowers ("Pre-Petition Borrowers"), the Guarantors ("Pre-Petition Guarantors") from time to time party thereto, the financial institutions party thereto from time to time comprising Lenders (as defined in the Pre-Petition Revolving Credit Agreement) holding a Revolving Commitment (as defined in the Pre-Petition Revolving Credit Agreement) (collectively, the "Pre-Petition Revolving Credit Lenders", and together with the Pre-Petition Revolving Agent, sometimes collectively referred to as the "Pre-Petition Revolving Secured Parties"), and all security agreements, pledge agreements, notes, mortgages, guarantees, control agreements, collateral access agreements, and related agreements and documents (collectively, with the Pre-Petition Revolving Credit Agreement, as amended, modified, supplemented, extended, restated, amended and restated, or replaced from time to time, the "Pre-Petition Revolving Financing Documents"), (b) the Pre-Petition Revolving Credit Lenders, and (c) the Pre-Petition Term Loan Agent; together with the Pre-Petition Revolving Agent, collectively, the "Pre-Petition Agents"), under that certain Term Loan, Guarantee and Security Agreement dated as of December 16, 2020 (as amended, restated, amended and restated, modified, supplemented, or extended from time to time, the "Pre-Petition Term Credit Agreement"; together with the Pre-Petition Revolving Credit Agreement, the "Pre-Petition Credit Agreements") by and among the Pre-Petition Borrowers, the Pre-Petition Guarantors from time to time party thereto, the financial institutions party thereto from time to time (collectively, the "Pre-Petition Term Lenders", and together with the Pre-Petition Term Loan Agent, sometimes collectively referred to as the "Pre-Petition Term Secured Parties"; Pre-Petition Revolving Secured Parties and the Pre-Petition Term Secured Parties together, the "Pre-Petition Secured Parties"), and all security agreements, pledge agreements, notes, mortgages, guarantees, control agreements, collateral access agreements, and related agreements and documents (collectively, with the Pre-Petition Term Credit Agreement, as amended, modified, supplemented, extended, restated, amended and restated, or replaced from time to time, the "Pre-Petition Term Financing Documents"; together with the Pre-Petition Revolving Financing Documents, the "Pre-Petition Financing Documents"), and (d) the Pre-Petition Term Lenders, all such adequate protection with the priority set forth in the Claim Priority Chart and the Lien Priority Chart (each as defined herein) and otherwise in accordance with the terms set forth in the Interim Order, with respect to the aggregate diminution in value ("Diminution in Value") with respect to their respective interests in the Pre-Petition Collateral (as defined herein), including all "cash collateral" as such term is defined in Bankruptcy Code section 363(a), including, without limitation, all cash and cash equivalents of the Debtors, whenever or wherever acquired, and the proceeds of all Pre-Petition Collateral and DIP Collateral, all in accordance with the terms set forth herein;

(l)  approving the application of collections and proceeds of all of the Revolving Loan Priority Collateral and DIP Collateral and the payment of certain Pre-Petition Revolving Obligations and DIP Revolving Obligations, in each case, in the manner

and on the terms set forth in the DIP Revolving Credit Agreement and the DIP Orders;

(m)     subject to entry of a Final Order, the waiver of: (a) the ability of the Debtors and their bankruptcy estates (as defined under Bankruptcy Code Section 541, the "Estates") to surcharge against the DIP Collateral with respect to the DIP Secured Parties and the Pre-Petition Collateral with respect to the Pre-Petition Secured Parties pursuant to Bankruptcy Code Section 506(c); (b) the applicability of the "equities of the case" exception under Bankruptcy Code Section 552(b) with respect to the proceeds, products, offspring or profits of the DIP Collateral and Pre-Petition Collateral;

(n)     subject to entry of a Final Order, the waiver of the equitable doctrine of "marshaling" and any similar equitable doctrine with respect to (a) any of the DIP Collateral (as defined herein) for the benefit of any party other than the DIP Secured Parties, and (b) any of the Pre-Petition Collateral (as defined herein), including Revolving Credit Cash Collateral, for the benefit of any party other than the Pre-Petition Secured Parties;

(o)     modifying the automatic stay imposed by Bankruptcy Code Section 362 to the extent hereinafter set forth and waiving the fourteen (14) day stay provisions of Bankruptcy Rule 4001(a)(3);

(p)     waiving the 21-day provision of Bankruptcy Rule 6003(b), the notice requirements of Bankruptcy Rule 6004(a), waiving any applicable stay (including under Bankruptcy Rule 6004) and providing for immediate effectiveness of the Interim Order; and

(q)     scheduling of a final hearing on the Motion (the "Final Hearing") to consider entry of the Final Order granting the relief requested in the Motion on a final basis and approving the form of notice with respect to the Final Hearing.

## **MATERIAL TERMS OF DIP FACILITY**

20.     Bankruptcy Rule 4001(c)(1)(B) and Local Rule 4001-2 (a)(ii) require that a motion for authority to obtain credit list or summarize, and set out the location within the relevant documents, all material provisions of the proposed credit agreement and form of order, including interest rate, maturity, events of default, liens, borrowing limits and borrowing conditions.  The principal terms of the DIP Facilities are as follows[4]:

---

[4] The summaries contained in this motion are qualified in their entirety by the provisions of the documents referenced, including the DIP Term Sheets, Interim Order, and other DIP Financing Documents.  To the extent anything in this motion is inconsistent with such documents, the terms of the applicable documents shall control.  Capitalized terms used in this summary chart but not

| Bankruptcy Rule | Debtor-in-Possession Term Loan Summary of Material Terms |
|---|---|
| **Borrowers** Bankruptcy Rule 4001(c)(1)(B) | Williams Industrial Services Group Inc., Williams Industrial Services Group, LLC, Williams Industrial Services, LLC, Williams Specialty Services, LLC, Williams Plant Services, LLC, Williams Global Services, Inc., and Construction Maintenance Professionals, LLC. |
| **Guarantors** Bankruptcy Rule 4001(c)(1)(B) | Global Power Professional Services Inc., GPEG, LLC, Steam Enterprises LLC, WISG Canada Ltd., WISG Nuclear Ltd., WISG Electrical Ltd., and WISG Electrical LLC. |
| **DIP Term Loan Lender** Bankruptcy Rule 4001(c)(1)(B) | Energy Impact Credit Fund I LP, CION Investment Corporation and CrowdOut Capital LLC (or certain of their affiliates in each case of the foregoing).  EICF Agent LLC shall serve as agent. |
| **Term** Bankruptcy Rule 4001(b)(l)(B)(iii), 4001(c)(1)(B) Local Rule 4001-2(a)(ii) | The earlier of: (i) the effective date of a confirmed Plan of Reorganization; (ii) twelve (12) months after the Petition Date; (iii) the occurrence of an Event of Default (defined herein) under the DIP Term Loan Facility; (iv) the date of the closing of a sale of all or substantially all of the Debtors' assets pursuant to Section 363 of the Bankruptcy Code; and (v) the date on which the Court approves the extension of any other credit facilities of the DIP Credit Parties, other than the DIP Revolving Loan Facility without the prior written consent of the DIP Term Lenders, (vi) dismissal of the Case or the conversion of the Case to a chapter 7 case, and (vii) the date of filing or support by the Borrowers of a Plan that does not provide for the indefeasible payment in full in cash of all DIP Term Loans and all other DIP Term Obligations. Notwithstanding the foregoing, the DIP Term Facility shall not terminate if the provisions of any DIP Term Facility involves obligations relating to the wind-down of the Case and is set forth in the Approved Budget. |
| **Commitment** Bankruptcy Rule 4001(c)(1)(B) Local Rule 4001-2(a)(ii) | Up to $19,500,000.00 in aggregate principal amount under a multi-draw term loan DIP Term Facility that consists of the following:   (a) $14,000,000.00 to be funded upon entry of the Interim Order, (b) $2,750,000 one business day following the entry of the Final Order, and (c) $2,750,000 one week after the entry of the Final Order. |
| **Conditions of Borrowing** Bankruptcy Rule 4001(c)(1)(B) Local Rule 4001-2(a)(ii) | The closing of the DIP Term Facility and extensions of credit thereunder are subject to satisfaction of usual and customary conditions precedent set forth in the DIP Term Credit Agreement, including entry of the Interim Order. |

otherwise defined have the meanings ascribed to them in the respective DIP Term Sheets, Interim Order, or other DIP Financing Documents, as applicable.

| Bankruptcy Rule | Debtor-in-Possession Term Loan Summary of Material Terms |
|---|---|
| **Interest Rates**<br><br>Bankruptcy Rule 4001(c)(1)(B)<br><br>Local Rule 4001-2(a)(ii) | SOFR (based on 1-month interest period) + 9.00%.  Interest shall be calculated at the annual interest rate over a year of 360 days, multiplied by the outstanding principal balance, or any portion thereof, times the actual number of days the principal balance is outstanding.  Interest shall be due and payable on a monthly basis on the first day of each month.<br><br>From and after an Event of Default and so long as an Event of Default is continuing, the default rate of interest will be a fixed rate equal to 2% per annum above the otherwise applicable rate. |
| **Use of DIP Term Facility**<br><br>**Bankruptcy Rule** 4001(b)(l)(B)(ii)<br><br>Local Rule 4001-2(a)(ii) | The proceeds of the DIP Term Facility shall be used for the (i) the Borrowers' and Guarantors' working capital needs consistent with the Approved Budget; (ii) payment of all documented out-of-pocket costs and expenses of the DIP Term Lenders and the DIP Term Agent (including, but not limited to the reasonable attorney fees and expenses of Chapman and Cutler LLP) associated with the preparation, execution, delivery and administration of the DIP Term Loan Documents and any amendments or waivers with respect thereto; (iii) payment of all out-of-pocket transaction expenses incurred in connection with the DIP Term Facility and those documented fees and expenses payable to the DIP Term Lenders; (iv) payment of fees, costs and expenses specifically related to the Case to the extent such fees, costs and expenses are consistent with the Approved Budget, are approved by the Court, and relate solely to fees, costs and expenses of the Borrowers' professionals (allowance of such fees shall be subject to final approval of the Court) or professionals retained by the DIP Term Agent; (v) payment of fees, costs and expenses of lead counsel to the Committee, if any, incurred in the investigation of liens, security interests and claims of secured creditors as approved by the Court subject to a maximum amount not to exceed $25,000; (vi) payments on account of pre-petition obligations (including "critical vendor payments") consistent with the Approved Budget and which have been approved by the Court; (vii) payment of any other amounts included in the Approved Budget; (viii) making payments in connection with the wind down of the Case in a manner consistent with the Approved Budget; and (ix) funding an agreed Carve Out and Carve Out Reserve Account to cover allowed fees of Debtor and Committee Professionals in accordance with the Approved Budget and fees payable to the United States Trustee program. |

| | |
|---|---|
| **Adequate Protection**<br>Bankruptcy Rules 4001(b)(l)(B)(iv), 4001(c)(1)(B)(ii) | Subject to the Lien Priority Chart, which is attached to this Motion as **Exhibit D** and the Interim Order as Exhibit 3 (the "Lien Priority Chart"), Claim Priority Chart attached hereto to this Motion as **Exhibit E** and the Interim Order as Exhibit 4 (the "Claim Priority Chart") and the Intercreditor Agreement, the Pre-Petition Term Loan Agent is being provided Term Loan Adequate Protection based on the following for the benefit of the Pre-Petition Term Lenders:<br><br>(1) Solely to the extent of any Diminution in Value of such interests pursuant to Bankruptcy Code section 362, 363, or 364, and subject to the priority set forth in the Lien Priority Chart, the Debtors shall grant the Pre-Petition Term Loan Agent for the benefit of the Pre-Petition Term Secured Parties valid and perfected replacement security interests in, and liens on (the "Term Loan Adequate Protection Liens") in the DIP Collateral;<br><br>(2) The Term Loan Adequate Protection Liens shall be deemed to be valid, binding, enforceable and fully-perfected as of the Petition Date not subject to subordination (except as set forth in the Lien Priority Chart and the Intercreditor Agreement) or avoidance for any cause or purpose in this Case;<br><br>(3) The Term Loan Adequate Protection Liens shall be enforceable against the Debtors, their Estates and any successors thereto, including without limitation, any trustee or other Estate representative appointed or elected in the Case or any Successor Cases. Except as set forth in the Lien Priority Chart, the Term Loan Adequate Protection Liens (A) shall not be made subject to or *pari passu* with any lien or security interest by any Court Order heretofore or hereafter entered in the Case (unless with the consent of the Pre-Petition Term Secured Parties); (B) except to the extent of the Carve Out and upon entry of the terms of the Final Order, shall not be subject to Bankruptcy Code section 506(c); (C) shall not be subject to Bankruptcy Code sections 510, 549, or 550; and (D) no lien or interest avoided and preserved for the benefit of any Estate pursuant to Bankruptcy Code section 551 shall be made *pari passu* with or senior to the Term Loan Adequate Protection Liens;<br><br>(4) To the extent that the Term Loan Adequate Protection Liens do not adequately protect the Diminution in Value of the Pre-Petition Term Secured Parties' interests in the Pre-Petition Collateral, the Pre-Petition Term Secured Parties, are hereby granted, to the extent of such Diminution in Value, an allowed superpriority administrative expense claim (the "Term Loan Adequate Protection Claim") in the Case or a Successor Case against the Debtors' Estates under Bankruptcy Code sections 503 and 507(b), |

which shall be consistent with the priority set forth in the Claim Priority Chart, have priority over all other administrative expense claims, priority claims, and unsecured claims against the Debtors or their Estates, which are now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, administrative expenses and priority or other claims of the kinds specified in or ordered pursuant to Bankruptcy Code sections 105, 326, 328, 330, 331, 364, 365, 503(a), 503(b), 506(c) (upon entry of a Final Order), 507(a), 507(b), 546(c), 546(d), 726, 1113, and 1114;

(5) The Pre-Petition Term Loan Agent, for the benefit of the Pre-Petition Term Secured Parties, shall be entitled to interest accruing on account of the outstanding Pre-Petition Term Obligations at the rate(s) and in the manner set forth in the Pre-Petition Term Financing Documents, as in effect as of the Petition Date;

(6) Without limiting any rights of the Pre-Petition Term Loan Agent, for the benefit of the Pre-Petition Term Secured Parties, under Bankruptcy Code section 506(b) (which rights are hereby preserved), the Debtors shall pay or reimburse the Pre-Petition Term Loan Agent solely from proceeds of the DIP Term Facility and/or Term Loan Priority Collateral (the "Term Loan Adequate Protection Payments") for any and all of its reasonable out of pocket costs, expenses, and charges accrued and payable under the Pre-Petition Term Financing Documents, including, without limitation, the fees and expenses of the Pre-Petition Term Loan Agent and the Pre-Petition Term Lenders (including attorneys' fees and costs), as provided in the Pre-Petition Term Credit Agreement, whether accrued and unpaid pre-petition or accrued and unpaid post-petition, all without further notice, motion, or application to, Order of, or hearing before, this Court; *provided*, *however*, that the DIP Term Agent shall be permitted to include such fees and expenses in the DIP Term Obligations and make a DIP Term Loan for the purposes of effectuating such payment by the Debtors; and

(7) Within ten (10) days after delivery by Pre-Petition Term Loan Agent of a redacted summary invoice (subject in all respects to applicable privilege or work product doctrines) for all professional, consulting, and legal fees and expenses incurred by Pre-Petition Term Loan Agent to the Debtors and their counsel, the U.S. Trustee and, if appointed, a Committee or its counsel (or such shorter time period agreed to by the Pre-Petition Term Loan Agent, Debtors, the U.S. Trustee, and, if appointed, the Creditors' Committee), Debtors shall pay such reasonable fees and costs solely from proceeds of the DIP Term Facility and/or Term Loan Priority

| Bankruptcy Rule | Debtor-in-Possession Term Loan Summary of Material Terms |
|---|---|
|  | Collateral, *provided*, *however*, that to the extent an objection has been raised to certain professional, consulting, or legal fees and costs within such ten (10) days, Debtors shall pay only such fees and costs to which no objection has been raised, *provided further*, that such ten (10) day notice period shall not apply to the payment of any such fees and costs paid at or in connection with (i) the closing of the DIP Facilities, (ii) pursuant to, and on the effective date of, a plan of reorganization in the Case, or (iii) the closing of any sale of Debtors' assets that results in the payment in full of all Pre-Petition Obligations and DIP Obligations owed to the Prepetition Term Secured Parties and DIP Term Secured Parties, as applicable. To the extent there is an objection with respect to such costs and fees that is not consensually resolved, the Court may resolve the objection. Such written invoices shall include the invoices of Chapman and Cutler LLP, as counsel to the Pre-Petition Term Loan Agent and one local counsel for the Pre-Petition Term Loan Agent, as necessary; *provided, however*, that none of such fees and expenses paid pursuant to this paragraph shall be subject to the United States Trustee Guidelines or shall require approval by the Court unless an objection is interposed that cannot be resolved by the parties.  No recipient of any such payment shall be required to file with respect thereto any interim or final fee application with the Court. |

| | |
|---|---|
| **Liens & Priority**<br><br>Bankruptcy Rule 4001(c)(l)(B)<br><br>Local Rule 4001-2(a)(ii) | All DIP Term Loans under the DIP Term Facility and DIP Term Obligations shall be:<br><br>(1) subject to the Carve Out, entitled to superpriority claim status under Section 364(c)(1) of the Bankruptcy Code, which claims shall have priority in right of payment over any and all other obligations, liabilities and indebtedness of the DIP Credit Parties and over any and all administrative expenses or priority claims of the kind specified in, or ordered pursuant to, inter alia, Bankruptcy Code Sections 105, 327, 328, 330, 331, 503(b), 507(a), 507(b), 704 and/or 364(c)(1) (the "Superpriority Claims"), whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment, which allowed claims shall be payable from and have recourse to all pre-and post-petition property of the DIP Credit Parties and all proceeds thereof, including, without limitation, subject to the entry of the Final Order, all proceeds or other amounts received in respect of the DIP Credit Parties' claims and causes of action arising under chapter 5 of the Bankruptcy Code or the proceeds or amounts received in respect thereof (collectively, the Avoidance Actions), subject to the Claim Priority Chart;<br><br>(2) secured pursuant to Section 364(c)(2) of the Bankruptcy Code, by a perfected first priority lien on all now owned or hereafter acquired assets and property of the DIP Credit Parties and proceeds thereof, including Avoidance Actions upon entry of the Final Order that are (a) not subject to valid, perfected and non-avoidable liens as of the commencement of the Case or perfected after the Petition Date to the extent permitted by Section 546(b) of the Bankruptcy Code, subject to the Carve Out and Lien Priority Chart, but specifically excluding the Avoidance Actions or any proceeds thereof;<br><br>(3) secured by, pursuant to Bankruptcy Code Section 364(c)(3), a continuing valid, enforceable and non-avoidable and fully perfected lien on and security interest in all now owned or hereafter acquired assets and property of the Debtors' right, title and interest in, to, and under all DIP Collateral that is subject to, as of the Petition Date, the Carve Out, and the Lien Priority Chart and subject to valid, perfected and non-avoidable liens as of the commencement of the Case or perfected after the Petition Date to the extent permitted by Section 546(b) of the Bankruptcy Code;<br><br>(4) secured by, pursuant to Section 364(d)(1) of the Bankruptcy Code, a perfected first priority, senior priming perfected lien on, and security interest in, all assets, including the Avoidance Actions |

| Bankruptcy Rule | Debtor-in-Possession Term Loan Summary of Material Terms |
|---|---|
| | upon entry of the Final Order, that are subject to valid, perfected and non-avoidable liens held by the Pre-Petition Term Loan Agent in existence at the time of the commencement of the Case.<br><br>(5) DIP Liens and Adequate Protection Liens granted to the DIP Term Secured Parties set forth herein and in the Interim Order shall not be subject to (A) avoidance or subordination under Sections 510, 549, or 550 or any other provision of the Bankruptcy Code or applicable law, (B) any liens arising after the Petition Date provided for in this Motion or Interim Order, or (C) any intercompany or affiliate liens of the Debtors;  provided that, the DIP Liens and Adequate Protection Liens shall be subject to the priorities set forth in the Lien Priority Chart and as otherwise set forth in the Interim Order. |
| **Repayment Features** Local Rule 4001-2(a)(i)(E) | Full or partial payment to be made from proceeds of Section 363 sale. |
| **Fees** Bankruptcy Rule 4001(c)(1)(B)<br><br>Local Rule 4001-2(a)(ii) | **Application Fee:** An upfront application fee in the amount equal to 1% of the Term Loan Commitments of the DIP Term Lenders, payable from the proceeds of the first draw made available to the Borrowers.<br><br>**Closing Fee:** An upfront closing fee upon the funding of each of the DIP Term Loans in an amount equal to 2% of the respective DIP Term Loans being made, which shall be payable from the proceeds of each applicable DIP Term Loan.<br><br>**Exit Fee**:  An exit fee, which constitutes additional interest under the DIP Term Facility in an amount equal to 1% of the total amount loaned by the DIP Term Lenders, which shall be payable upon the earlier of repayment of all obligations under the DIP Term Facility or termination of the DIP Term Facility (including on the Maturity Date). |
| **Budget** Bankruptcy Rule 4001 (c)(1)(B) Local Rule 4001-2(a)(ii) | All advances, and the use of funds provided, under the DIP Term Facility shall be subject to and consistent with a customary budget to be agreed by the DIP Term Lenders and the DIP Credit Parties (the "Approved Budget") attached to the Motion as **Exhibit F**. |

| Bankruptcy Rule | Debtor-in-Possession Term Loan Summary of Material Terms |
|---|---|
| **Budget Covenant (Variances & Reporting)** Bankruptcy Rule 4001(c)(l)(B) Local Rule 4001-2(a)(ii) | DIP Credit Parties will provide DIP Term Lenders Budget updates on a rolling 13-calendar week. The DIP Credit Parties will be responsible for providing variance reports on a weekly basis showing actual cash receipts, disbursements and net cash flow for the immediately preceding week and shall be due no later than 12:00 pm (EST) of the Friday of each week. The unfavorable variance if any between the DIP Credit Parties' actual disbursements, on a cumulative basis for the most recent 4-consecutive calendar week and the sum of the DIP Credit Parties' forecasted disbursements for the same period, plus any total operating cash disbursements not expended in a prior period shall not exceed [5%]. The unfavorable variance, if any, between the sum of the DIP Credit Parties' cash receipts for a 4-consecutive calendar week then ended and the forecasted cash receipts for the same period, plus the amount of any cash receipts in excess of forecasted receipts for any prior period in excess of forecasted receipts for such period shall not exceed [10%]. |

| | |
|---|---|
| **Events of Default**<br>Bankruptcy Rule<br>4001(c)(l)(B)<br><br>Local Rule<br>4001-2(a)(ii) | The following shall constitute an event of default:  (i) nonpayment of principal, interest, fees or other amounts within three (3) business days of due date; (ii) failure to perform or observe covenants set forth in the loan documentation within a specified period of time, where customary and appropriate, after such failure; (iii) any representation or warranty proving to have been materially incorrect when made or confirmed; (iv) conversion of chapter 11 proceeding to chapter 7 proceeding or dismissal of the Case; (v) a trustee or an examiner with expanded powers beyond those set forth in Section 1106(a)(3) and (4) of the Bankruptcy Code is appointed without the consent of the DIP Term Lenders, or any DIP Credit Party applies for or consents to such appointment without DIP Term Lenders' consent; (vi) Interim Order or Final Order is stayed, reversed, vacated, amended or otherwise modified without the DIP Term Lenders' prior written consent or Pre-Petition Term Loan Agent; (vii) any DIP Creditor Party files any application for approval or allowance of an administrative expense claim that shall have priority over or being pari passu with the DIP Term Lenders' superpriority claims, except the superpriority claims of PNC set forth herein; (viii) the granting of subsequent debtor-in-possession financing, other than the DIP Revolving Loan Facility, that has either not been consented to in writing by the DIP Term Lenders or does not result in the full satisfaction of the existing debt owed to the DIP Term Lenders; (ix) a Final Order is not entered by the Bankruptcy Court within 25 days of the Interim Order; (x) DIP Credit Parties fail to achieve any of the milestones set forth in the Interim Order or Final Order, including a sale of their assets pursuant to Section 363 of the Bankruptcy Code, and entry of a sale order has not occurred within 45 days of the entry of the Interim Order; (xi) a proposed plan of reorganization or liquidation does not provide for payment in full of the DIP Term Loan Facility and Pre-Petition Term Obligations in cash on the effective date of such plan, if such payment in full has not already occurred, or the termination of the Debtors' "exclusive period" under Section 1121 of the Bankruptcy Code for the filing of a plan or reorganization; (xii) except as otherwise provided herein, any other superpriority administrative expense claims or lien senior to or pari passu with the DIP Term Loan Agreement obligations, or the liens granted to secure DIP Term Loan Agreement obligations shall be granted, approved, imposed or otherwise created; (xiii) the DIP Creditor Parties seeking additional financing under Section 364(c) or 364(d) of the Bankruptcy Code or to grant any other liens without obtaining the written consent of the DIP Term Lenders; (xiv) any DIP Creditor Party challenges the validity, perfection, priority or enforceability of the DIP Term Loan Documents for the DIP Term Loan Facility or the liens granted thereunder or commences any action against the Pre-Petition Term Loan Agent or any related lender; (xv) the entry of an order dismissing the Case that does not provide for the termination of the DIP Term Loan Facility and payment in full of the outstanding DIP Term |

| Bankruptcy Rule | Debtor-in-Possession Term Loan Summary of Material Terms |
|---|---|
| | Loans (xvi) any DIP Collateral becoming subject to surcharge or marshaling; (xvii) the entry of an order of the Bankruptcy Court granting relief from the automatic stay with respect to any assets of any DIP Credit Party which have an aggregate value in excess of $100,000.00 (other than at the request of the DIP Term Lenders); (xviii) any material contract or unexpired lease of any DIP Credit Party is rejected or terminated or any property of any DIP Credit Party is sold outside the ordinary course of business without express written consent of the DIP Term Lenders; and (xix) an Event of Default occurs under the DIP Revolving Loan Facility (collectively, the "Events of Default"). |
| **Costs and Expenses**: Bankruptcy Rule 4001(c)(1)(B)(ix) | DIP Credit Parties agree to pay all loan closing costs, including but not limited to, reasonable DIP Term Lenders' legal fees, title searches, and updates to 3rd party reports.  Proceeds from the DIP Term Facility shall be used to pay these fees and expenses. |
| **Milestones**: Bankruptcy Rule 4001(c)(1)(B) | Interim Order shall be entered within 3 business days of the Petition Date. Final Order shall be entered within 25 days of the Interim Order. Obtain Court approval on Bid Procedures within 18 of the Petition Date. Bid Deadline to be set for 40 days after entry of Interim Order. Public auction to be held 42 days after entry of Interim Order. An Order granting a sale under Section 363 of the Bankruptcy Code must be entered within 45 days following entry of the Interim Order. |
| **Indemnification**: Bankruptcy Rule 4001(c)(1)(B)(ix) | DIP Credit Parties shall indemnify, pay and hold harmless DIP Term Lenders against any loss, liability, cost or expense incurred in connection with the making of the DIP Term Loan Facility, except in situations resulting from the gross negligence, bad faith or willful misconduct of the indemnified party and any claims arising between any DIP Term Lenders. |
| **Release**: Bankruptcy Rule 4001(c)(l)(B)(viii) | The Final Order shall provide for a release and exculpation by the Debtors in favor of the DIP Term Lender and each of its current and former affiliates, and such entities' and its current and former affiliates' current and former directors, managers, officers, principals, members, employees, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, successors, assigns, subsidiaries, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals with respect to any and all claims or causes of action the Debtors may have against such parties, subject to the right of the Creditors' Committee, if any, to assert claims on behalf of the estate within the Challenge Period. |

| Bankruptcy Rule | Summary of Debtor-in-Possession Revolving Loan Material Terms |
|---|---|
| **Borrowers** Bankruptcy Rule 4001(c)(1)(B) | Williams Industrial Services Group Inc., Williams Industrial Services Group, LLC, Williams Industrial Services, LLC, Williams Specialty Services, LLC, Williams Plant Services, LLC, Williams Global Services, Inc., Construction and Maintenance Professionals, LLC. And WISG Electrical, LLC. |
| **Guarantors** Bankruptcy Rule 4001(c)(1)(B) | Global Power Professional Services Inc., GPEG, LLC, Steam Enterprises LLC, WISG Canada Ltd., WISG Nuclear Ltd., WISG Electrical Ltd. |
| **DIP Lender** Bankruptcy Rule 4001(c)(1)(B) | PNC Bank, National Association as agent and lender. |
| **Term** Bankruptcy Rule 4001(b)(l)(B)(iii), 4001(c)(1)(B) Local Rule 4001-2(a)(ii) | The earlier of: (i) the occurrence of an Event of Default under the DIP Revolving Loan Facility; (ii) conversion of any Case to a chapter 7; provided that all amounts in the Budget have been addressed;  (iii) dismissal of any Case; (iv) the date of the closing of a sale of all or substantially all of the Debtors' assets pursuant to Section 363 of the Bankruptcy Code; (v) the effective date of a confirmed Plan of Reorganization; (vi) the date of filing or support by the DIP Credit Parties of a plan of reorganization that does not provide for the indefeasible payment in full in cash of the DIP Revolving Loans; and (vii) September 29, 2023. |
| **Commitment** Bankruptcy Rule 4001(c)(1)(B) Local Rule 4001-2(a)(ii) | An aggregate principal amount equal to the lesser of (A) $12,000,000.00, less the amount of the Pre-Petition Revolving Obligations (the outstanding amount owed under the Pre-Petition Revolving Loans) and (B) the Formula Amount (as defined in the DIP Revolving Loan Documents).  An amount of up to $8,331,000 of the DIP Revolving Loan Facility will be made available upon the Court's entry of the Interim Order. |
| **Conditions of Borrowing** Bankruptcy Rule 4001(c)(1)(B) Local Rule 4001-2(a)(ii) | The closing of the DIP Revolving Facility and extensions of credit thereunder are subject to satisfaction of usual and customary conditions precedent set forth in the DIP Revolving Credit Agreement, including entry of the Interim Order, and the DIP Term Lenders' advance of $14,000,000 under the DIP Term Credit Agreement upon entry of the Interim Order. |
| **Interest Rates** Bankruptcy Rule 4001(c)(1)(B) Local Rule 4001-2(a)(ii) | SOFR (based on 1-month interest period) +  4.00%. From and after an Event of Default and so long as an Event of Default is continuing, the default rate of interest will be a fixed rate equal to 2% per annum. |

| Bankruptcy Rule | Summary of Debtor-in-Possession Revolving Loan Material Terms |
|---|---|
| **Use of DIP Revolving Facility and Cash Collateral**<br><br>**Bankruptcy Rule** 4001(b)(l)(B)(ii)<br><br>Local Rule 4001-2(a)(ii) | The proceeds of the DIP Revolving Loan Facility shall be used for the (i) the Borrowers' working capital needs and other lawful corporate purposes in the ordinary course of business; (ii) payment of fees and expenses relating to the establishment of the DIP Revolving Loan Facility; and (iii) the interim and final roll-up of the Pre-Petition Revolving Loans. |

| | |
|---|---|
| **Adequate Protection**<br><br>Bankruptcy Rules 4001(b)(l)(B)(iv), 4001(c)(1)(B)(ii) | Subject to the Lien Priority Chart, the Claim Priority Chart and the Intercreditor Agreement, as adequate protection for the interests of the Pre-Petition Revolving Agent in the Pre-Petition Collateral, for the benefit of the Pre-Petition Revolving Credit Lenders, on account of the Adequate Protection Obligations, the Pre-Petition Revolving Agent is being provided with the following adequate protection:<br><br>(1) solely to the extent of any Diminution in Value of such interests pursuant to Bankruptcy Code Sections 361 and 363(c), and subject to the priority set forth in the Lien Priority Chart, the Debtors shall grant the Pre-Petition Revolving Agent, for itself and for the benefit of the Pre-Petition Revolving Credit Lenders, valid and perfected replacement security interests in, and liens on (the "Revolving Credit Adequate Protection Liens," together with the Term Loan Adequate Protection Liens, the "Adequate Protection Liens"), the DIP Collateral;<br><br>(2) Revolving Credit Adequate Protection Liens shall be deemed to be valid, binding, enforceable and fully-perfected as of the Petition Date and, not subject to subordination (except as set forth in the Intercreditor Agreement and the Lien Priority Chart) or avoidance for any cause or purpose in this Case;<br><br>(3) Revolving Credit Adequate Protection Liens shall be enforceable against the Debtors, their Estates and any successors thereto, including without limitation, any trustee or other Estate representative appointed or elected in this Case or any Successor Case. Except as set forth in the Lien Priority Chart, the Revolving Credit Adequate Protection Liens (A) shall not be made subject to or *pari passu* with any lien or security interest by any Court Order heretofore or hereafter entered in this Case (unless with the consent of the Pre-Petition Revolving Secured Parties); (B) upon entry of a Final Order, shall not be subject to Bankruptcy Code Section 506(c); (C) shall not be subject to Bankruptcy Code Sections 510, 549, or 550; and (D) no lien or interest avoided and preserved for the benefit of any Estate pursuant to Bankruptcy Code Section 551 shall be made *pari passu* with or senior to the Revolving Credit Adequate Protection Liens;<br><br>(4) to the extent that the Revolving Credit Adequate Protection Liens do not adequately protect the Diminution in Value of the Pre-Petition Revolving Secured Parties' interests in the Pre-Petition Collateral, the Pre-Petition Revolving Agent, for the benefit of the Pre-Petition Revolving Secured Parties, is hereby granted, to the extent of such Diminution in Value, an allowed superpriority administrative expense claim (the "Revolving Credit Adequate |

Protection Claim," together with the Term Loan Adequate Protection Claims, the "Adequate Protection Claims;" and the Revolving Credit Adequate Protection Claim with the Revolving Credit Adequate Protection Liens, the "Revolving Credit Adequate Protection") in this Case or a Successor Case against the Debtors' Estates under Bankruptcy Code Sections 503 and 507(b), which shall be consistent with the priority set forth in the Claim Priority Chart, have priority over all other administrative expense claims, priority claims, and unsecured claims against the Debtors or their Estates, which are now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, administrative expenses and priority or other claims of the kinds specified in or ordered pursuant to Bankruptcy Code Sections 105, 326, 328, 330, 331, 364, 365, 503(a), 503(b), 506(c) (upon entry of a Final Order), 507(a), 507(b), 546(c), 546(d), 726, 1113, and 1114;

(5) Pre-Petition Revolving Agent, for the benefit of the Pre-Petition Revolving Secured Parties, shall be entitled to interest accruing on account of the outstanding Pre-Petition Revolving Obligations at the rate set forth in the Pre-Petition Revolving Financing Documents, which was in effect as of the Petition Date and which shall accrue and be paid at the times and in the manner set forth in the Pre-Petition Revolving Financing Documents;

(6) without limiting any rights of the Pre-Petition Revolving Agent, for the benefit of the Pre-Petition Revolving Secured Parties, under Bankruptcy Code Section 506(b) (which rights are hereby preserved), the Debtors shall pay or reimburse the Pre-Petition Revolving Agent (the "Revolving Credit Adequate Protection Payments") for any and all of its reasonable fees, costs, expenses, and charges accrued and payable under the Pre-Petition Revolving Financing Documents, including, without limitation, the fees, costs and expenses of the Pre-Petition Revolving Agent (including attorneys' fees and costs) as provided in section 16.9 of the Pre-Petition Revolving Credit Agreement, whether accrued and unpaid pre-petition or accrued and unpaid post-petition, all without further notice, motion, or application to, Order of, or hearing before, this Court; *provided*, *however*, that the DIP Revolving Agent shall be permitted to include such fees and expenses in the DIP Revolving Obligations and make a [Revolving Advance] (as defined in the DIP Revolving Credit Agreement; as used herein, the "DIP Revolving Loans") for the purposes of effectuating such payment by the Debtors. Except as provided for in paragraph 13(e) below, any and all fees, costs, and expenses charged under the Pre-Petition Revolving Financing Documents (including, without limitation, collateral management fees, Letter of Credit Fees, and the Unused

| Bankruptcy Rule | Summary of Debtor-in-Possession Revolving Loan Material Terms |
|---|---|
| | Line Fee (each as defined in the Pre-Petition Revolving Credit Agreement)) shall be as set forth in the Pre-Petition Revolving Financing Documents and shall be payable at the times set forth in the Pre-Petition Revolving Financing Documents; and<br><br>(7) within ten (10) days after delivery by Pre-Petition Revolving Agent of a redacted summary invoice (subject in all respects to applicable privilege or work product doctrines) for all professional, consulting, and legal fees and expenses incurred by Pre-Petition Revolving Agent to the Debtors and their counsel, the U.S. Trustee and, if appointed, a Committee (or such shorter time period agreed to by the Pre-Petition Revolving Agent, Debtors, the U.S. Trustee, and, if appointed, the Creditors' Committee), Debtors shall pay such reasonable professional, consulting, and legal fees and costs from the DIP Revolving Loans or Revolving Credit Cash Collateral, *provided, however,* that to the extent an objection has been raised to certain professional, consulting, or legal fees and costs within such ten (10) days, Debtors shall pay only such fees and costs to which no objection has been raised, *provided further,* that such ten (10) day notice period shall not apply to the payment of any such fees and costs paid at or in connection with (i) the closing of the DIP Facilities, (ii) pursuant to, and on or about the effective date of, a Chapter 11 Plan in this Chapter 11 Case, or (iii) the closing of any sale of Debtors' assets that results in the payment in full of all Pre-Petition Obligations and DIP Obligations owed to the Prepetition Revolving Secured Parties and DIP Revolving Secured Parties, as applicable. To the extent there is an objection with respect to such costs and fees that is not consensually resolved, the Court may resolve the objection. Such written invoices shall include the invoices of Blank Rome LLP, as counsel to the Pre-Petition Revolving Agent, Focus Management Group, as financial advisor to the Pre-Petition Revolving Agent, and any other professional, advisor, or agent reasonably retained by the Pre-Petition Revolving Agent or its counsel in connection with the Chapter 11 Cases and as permitted by the Pre-Petition Revolving Financing Documents; *provided*, *however*, that none of such fees and expenses paid pursuant to this paragraph shall be subject to the United States Trustee Guidelines or shall require approval by the Court unless an objection is interposed that cannot be resolved by the parties. No recipient of any such payment shall be required to file with respect thereto any interim or final fee application with the Court. |

| Bankruptcy Rule | Summary of Debtor-in-Possession Revolving Loan Material Terms |
|---|---|
| **Repayment Features** Local Rule 4001-2(a)(i)(E) | No later than the effective date of the DIP Credit Parties' Plan, upon the sale of substantially all of the assets of the DIP Creditor Parties, or such other treatment as may be acceptable to PNC, the DIP Revolving Loan Facility shall be indefeasibly paid in full. |
| **Fees** Bankruptcy Rule 4001(c)(1)(B)<br><br>Local Rule 4001-2(a)(ii) | **Closing Fee:** At the closing of the DIP Revolving Loan Facility, PNC will receive a closing fee in connection with the DIP Revolving Loan Facility in an amount equal to $60,000.00. |
| **Budget** Bankruptcy Rule 4001 (c)(1)(B) Local Rule 4001-2(a)(ii) | All advances, and the use of funds provided under the DIP Revolving Loan Facility shall be subject to and consistent with the Budget agreed to by PNC, the DIP Term Lenders and the DIP Credit Parties, and attached to this Motion as **Exhibit F** and as **Exhibit 1** to the Interim Order. |
| **Budget Covenant (Variances & Reporting)** Bankruptcy Rule 4001(c)(l)(B)<br><br>Local Rule 4001-2(a)(ii) | Commencing with the first calendar week of the Bankruptcy Cases, as measured on both a two-week rolling basis as of the Friday of each week and a cumulative rolling basis from the Petition Date to the Friday of each week, (a) aggregate or cumulative, as applicable, cash receipts shall not be less than 90% of the corresponding aggregate or cumulative, as applicable, amount set forth in the Budget, (b) aggregate or cumulative, as applicable, operating disbursements shall not exceed 10% above the corresponding aggregate or cumulative, as applicable, amount set forth in the Budget, (c) aggregate or cumulative, as applicable, expenses for professionals shall not exceed 10% above the corresponding aggregate or cumulative, as applicable, amount set forth in the Budget, and (d) aggregate or cumulative, as applicable, cash receipts net of aggregate or cumulative, as applicable, operating disbursements shall not be less than 85% of the corresponding aggregate or cumulative, as applicable, net amount set forth in the Budget. |

| Bankruptcy Rule | Summary of Debtor-in-Possession Revolving Loan Material Terms |
|---|---|
| **Events of Default**<br><br>Bankruptcy Rule 4001(c)(l)(B)<br><br>Local Rule 4001-2(a)(ii) | The following shall constitute an event of default: (i) failure to perform or observe covenants set forth in the loan documentation and continued unremedied for more than three (3) business days; (ii) conversion of chapter 11 proceeding to chapter 7 proceeding or dismissal of the Case; (iii) appointment of chapter 11 trustee or an examiner with enlarged powers beyond those set forth in Section 1106(a)(3) and (4); (iv) Interim Order or Final Order ceases to be in effect, or is stayed, reversed, vacated, amended or otherwise modified without PNC's prior written consent; (v) any DIP Credit Party files a motion with the Court challenging PNC's ability to credit bid on the DIP Collateral in connection with any Section 363 sale; (vi) the unauthorized payment of any pre-petition obligations that are not provided for in the Budget; (viii) the occurrence of the Termination Date; (x) except as otherwise described herein, the modifying, limiting, subordinating or avoiding the priority of any pre-petition obligations or the perfection, priority or validity of PNC's pre-petition liens or post-petition liens on any collateral or imposing, surcharging or assessing against PNC or its claims or collateral any costs or expenses, whether pursuant to Section 506(c) of the Bankruptcy Code or otherwise, other than as provided in the Interim Order and Final Order; (ix) The Court enters an order that grants or permits the grant of any lien, other than those of the DIP Term Lenders, that is pari passu or senior to the liens granted to PNC under the DIP Revolving Facility or Pre-Petition Revolving Credit Agreement; (x) an Event of Default under the DIP Term Loan Documents shall have occurred; (xi) DIP Credit Parties fail to achieve any of the milestones set forth in the Interim Order or Final Order; (xii) the consummation of a sale of the DIP Credit Parties' assets other than pursuant to Section 363 of the Bankruptcy Code; (xii) a proposed plan of reorganization or liquidation is filed without PNC's consent and does not provide for payment in full of the outstanding Pre-Petition Revolving Obligations and DIP Revolving Obligations, or the termination of Debtors' exclusivity pursuant to Section 1121 of the Bankruptcy Code; (xiii) except as otherwise provided herein, subordination of the DIP Lenders' position; (xiv) any DIP Credit Party challenges the validity, perfection, priority or enforceability of the loan documents for the DIP Revolving Loan Facility or the liens granted thereunder or commences any action against PNC or any related lender; (xv) any DIP Collateral becoming subject to surcharge or marshaling; (xvi) granting relief from automatic stay with respect to any Pre-Petition Collateral, DIP Collateral or any other assets of any DIP Credit Party which have an aggregate value in excess of $100,000.00; or (xvii) an Event of Default, as defined in the Interim Order or Final Order or any other order of the Court occurs (collectively, the "Events of Default"). |

| Bankruptcy Rule | Summary of Debtor-in-Possession Revolving Loan Material Terms |
|---|---|
| **Costs and Expenses**: Bankruptcy Rule 4001(c)(1)(B)(ix) | DIP Credit Parties agree to pay all loan closing costs, including but not limited to, DIP Lenders' reasonable legal fees, title searches, updates to 3rd party reports.  Proceeds from the DIP Revolving Facility shall be used to pay these fees and expenses. |
| **Milestones**: Bankruptcy Rule 4001(c)(1)(B) | Interim Order shall be entered within 3 business days of the Petition Date. Final Order shall be entered within 25 days of the Interim Order. Obtain Court approval on Bid Procedures within 18 days of the Petition Date. Bid Deadline to be set for 40 days after entry of Interim Order. Public auction to be held 42 days after entry of Interim Order. An Order granting a sale under Section 363 of the Bankruptcy Code must be entered within 45 days following entry of the Interim Order. |
| **Indemnification**: Bankruptcy Rule 4001(c)(1)(B)(ix) | DIP Credit Parties shall indemnify, pay and hold harmless PNC against any loss, liability, cost or expense incurred in connection with the making of the DIP Revolving Loan Facility, except in situations resulting from the gross negligence, bad faith or willful misconduct of the indemnified party. |
| **Release**: Bankruptcy Rule 4001(c)(l)(B)(viii) | The Final Order shall provide for a release and exculpation by the Debtors in favor of PNC and each of its current and former affiliates, and such entities' and its current and former affiliates' current and former directors, managers, officers, principals, members, employees, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, successors, assigns, subsidiaries, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals with respect to any and all claims or causes of action the Debtor may have against such parties, subject to the right of the creditors' committee, if any, to assert claims on behalf of the estate within the Challenge Period. |

## HIGHLIGHTED PROVISIONS PURSUANT TO LOCAL RULE 4001-2

21.     The DIP Facilities include certain provisions the Debtors are required to highlight pursuant to Local Rule 4001-2(a)(i) as set forth below.  As discussed in detail herein, the Debtors believe these provisions are reasonable in light of the facts and circumstances of this Case and should be approved.

22.     **Collateralization; Release**:  Local Rule 4001-2(a)(i)(P) requires the disclosure of provisions where priming liens over perfected, non-avoidable liens existing prior to the petition

date are being granted.  As set forth more fully in the DIP Facilities, subject to and in accordance with the priorities as set forth in the Lien Priority Chart to secure the prompt payment and performance of any and all DIP Obligations of the Debtors to each DIP Agent and the DIP Lenders of whatever kind, nature, or description, absolute or contingent, now existing or hereafter arising, each DIP Agent, for the benefit of itself and the applicable DIP Lenders, shall have and be granted, effective as of and from the Petition Date, valid, binding, enforceable, continuing, non-avoidable and perfected security interests and liens (such security interests and liens collectively, "DIP Liens") in and upon all property and rights and interests in property of each of the Debtors or their Estates of any kind or nature whatsoever in existence as of the Petition Date as well as thereafter created or acquired, and wherever located (collectively referred to in the Interim Order as "DIP Collateral").  As noted above, and for the avoidance of doubt, the proposed priming lien relief set forth in the DIP Facilities is effectively a priming of the pre-petition liens the Pre-Petition Secured Parties respectively possess.

23.    The Final Order shall provide for a release and exculpation by the Debtors in favor of the DIP Secured Parties, and each of their current and former affiliates, and such entities' and their current and former affiliates' current and former directors, managers, officers, principals, members, employees, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, successors, assigns, subsidiaries, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals with respect to any and all claims or causes of action the Debtors may have against such parties, subject to the rights of the Creditors' Committee, if any, to assert claims on behalf of the estate within the Challenge Period.

24.     **Waiver of Section 506(c) of the Bankruptcy Code**: Local Rule 4001-2(a)(i)(C) requires disclosure of provisions that constitute a waiver, *without notice*, of whatever rights the estate may have under Section 506(c) of the Bankruptcy Code. The Interim Order provides that the waiver of any rights under Section 506(c) of the Bankruptcy Code is <u>subject to entry of the Final Order</u>. Because this waiver only will be effective upon entry of the Final Order and to the extent such order so provides, the Debtors respectfully submit that parties in interest will have an opportunity to be heard and, as such, the waiver will not be "without notice," but the Debtors disclose the provision out of an abundance of caution.

25.     **Liens on Avoidance Actions**: Local Rule 4001-2(a)(i)(D) requires disclosure of provisions that provide for immediate liens on actions under Sections 544, 545, 547, 548, and 549 of the Bankruptcy Code.  Here, while liens on Avoidance Actions are being granted, as set forth in the Debtor-in-Possession Term Loan Summary of Material Terms above and throughout this Motion, herein, the granting of such liens in the Avoidance Actions is subject to the entry of a Final Order of this Court.

26.     **Carve Out**: Local Rule 4001-2(a)(i)(F) requires disclosure of *disparate* treatment between the professionals retained by the Debtors and the professionals retained by the Committee, if any, with respect to a professional fee carve out. The DIP Liens granted to the DIP Term Agent, DIP Superpriority Claim provided to the DIP Term Agent, Term Loan Adequate Protection Liens, and Term Loan Adequate Protection Claims shall be subject only to the right of payment and priority of the following expenses (which expenses are collectively referred to as the "**Carve Out**"), to the extent provided in the DIP Orders:

(a) all fees required to be paid to the Clerk of the Court and to the U.S. Trustee pursuant to 28 U.S.C. § 1930(a)(6), together with the statutory rate of interest, which shall not be limited by any budget;

(b) the allowed fees and expenses actually incurred by persons or firms retained by the Debtors or the Committee (if appointed) on or after the Petition Date and prior to the delivery of a Carve Out Trigger Notice (as defined herein) whose retention is approved by this Court pursuant to Bankruptcy Code section 327, 328, 363, or 1103 (each a "Professional" and collectively, the "Professionals") and payable, subject in all respects to the terms of the Interim Order, any Final Order, and any other interim or other compensation Order entered by this Court in these Chapter 11 Cases (the "Interim Compensation Procedures"), (i) for the period prior to the delivery of a Carve Out Trigger Notice (defined below) to the Debtors, Debtors' counsel, and counsel for any Committee, an amount not to exceed the lesser of (A) the aggregate weekly amounts budgeted to be funded in advance for each such Professional for such week in accordance with the Approved Budget (to the extent a Carve Out Trigger Notice is delivered mid-week, pro-rated for such week) and (B) the actual amount of such Allowed Professional Fees for each Professional incurred on or after the Petition Date up through and including the date a Carve Out Trigger Notice is delivered ("Allowed Professional Fees").  The Carve Out shall include all Allowed Professional Fees that are incurred or earned (i) at any time before delivery of a Carve Out Trigger Notice as provided above, whether allowed by the Court prior to or after delivery of a Carve Out Trigger Notice, subject and limited in all respects to the amounts set forth in the Approved Budget for payment of such Professionals, *provided*, that the budgeted disbursements for subsequent Approved Budget periods shall be amended so that the Borrowers may (x) carry forward any unspent budgeted line item disbursements for Professionals from prior periods and

(y) carry back any unspent budgeted line item disbursements for Professionals from future periods, and (ii) beginning the first day after the delivery by DIP Term Agent of written notice (which for the avoidance of doubt may be by electronic mail) of the occurrence of an Event of Default (as defined herein) (such notice, the "Carve Out Trigger Notice") to the Debtors, the Debtors' counsel, counsel for any Committee, and counsel for DIP Revolving Agent, the fees and expenses incurred by the Professionals retained by the Debtors in an aggregate amount not to exceed $300,000 (the "Post-EOD Carve Out Amount") (the aggregate amount of clauses (a) and (b), collectively, the "Carve Out Cap"); *provided*, *however*, that the Carve Out shall not include any bonus, sale transaction fees, success fees, completion fees, substantial contribution fees, or any other fees of similar import of any of the Professionals other than fees due to Greenhill & Co. LLC in an aggregate amount not to exceed the sum of (a) $2,900,000, plus (b) $100,000 per month (the "**Greenhill Monthly Fee**") for each month that Greenhill & Co. LLC assists the Debtors during the Chapter 11 Cases, which fees are being paid pursuant to that certain engagement letter dated December 21, 2022, as amended, between certain of the Debtors and Greenhill & Co. LLC (the "**Engagement Letter**"); *provided* that Greenhill & Co. LLC has agreed that, upon the closing of the sale of substantially all of the assets of the Debtors, the fee to be paid to Greenhill pursuant to clause (a) above shall be reduced, in accordance with the terms of the Engagement Letter, by an amount equal to 50% of the aggregate Greenhill Monthly Fee paid to Greenhill & Co. LLC for its assistance to the Debtors during the Chapter 11 Cases. Notwithstanding the foregoing, the Carve Out Trigger Notice shall be deemed to have been delivered to the required notice parties on the Termination Date (as defined in the DIP Credit Agreements).

(c)    Subject to the terms of the Interim Order, the Carve Out Cap shall be allocated on a Professional-by-Professional basis based on the amounts budgeted to be funded in advance for each Professional pursuant to the Approved Budget.

(d)    For the avoidance of doubt, (i) so long as a Carve Out Trigger Notice has not been issued, the Debtors shall be permitted to pay Allowed Professional Fees as the same may be due and payable in accordance with the DIP Term Credit Agreement and the Interim Order; and (ii) nothing herein shall be construed to impair the ability of any party to object to the fees, expenses, reimbursement or compensation described herein.

27.    **Excluded Professional Fees**.  Notwithstanding anything to the contrary in the Interim Order, neither the Carve Out, nor the proceeds of the DIP Facilities or DIP Collateral shall be used to pay any Allowed Professional Fees or any other fees or expenses incurred by any Professional in connection with any of the following: (a) an assertion or joinder in any claim, counter-claim, action, proceeding, application, motion, objection, defense, or other contested matter seeking any Order, judgment, determination, or similar relief:  (i) challenging the legality, validity, priority, perfection, or enforceability of the Pre-Petition Obligations, the DIP Obligations, the Pre-Petition Agents', the Pre-Petition Secured Parties' or the DIP Agents' respective liens on and security interests in any of the Pre-Petition Collateral or DIP Collateral, as applicable; (ii) seeking to invalidate, set aside, avoid, or subordinate, in whole or in part, the Pre-Petition Obligations or DIP Obligations or the Pre-Petition Agents', the Pre-Petition Secured Parties', or DIP Agents' respective liens on and security interests in the Pre-Petition Collateral or the DIP Collateral, as applicable; or (iii) preventing, hindering, or delaying the Pre-Petition Agents' or DIP Agents' respective assertion or enforcement of any lien, claim, right, or security interest or realization upon any Pre-Petition Collateral or DIP Collateral, as applicable, in accordance with

the terms and conditions of the Interim Order; (b) without the consent of the DIP Revolving Agent, a request to use Revolving Credit Cash Collateral or DIP Revolving Loans in any manner except to the extent expressly permitted in the Interim Order and DIP Revolving Financing Documents; (c) without the consent of the DIP Term Agent, a request to use DIP Term Loans or Term Loan Priority Collateral in any matter except to the extent expressly permitted in the Interim Order and the DIP Term Financing Documents, (d) a request, without the prior written consent of each DIP Agent, for authorization to obtain debtor-in-possession financing or other financial accommodations pursuant to Bankruptcy Code section 364(c) or 364(d) other than from the DIP Secured Parties as contemplated herein), unless such other debtor-in-possession financing or financial accommodation is used, in whole or in part, to indefeasibly pay and satisfy in full in cash all Pre-Petition Obligations and DIP Obligations owed respectively to the Pre-Petition Secured Parties and DIP Secured Parties as contemplated herein; (e) the commencement or prosecution of any action or proceeding of any claims, causes of action, or defenses against the Pre-Petition Secured Parties or the DIP Secured Parties, or any of their respective officers, directors, employees, agents, attorneys, affiliates, successors, or assigns, including, without limitation, any attempt to avoid any claim, lien, or interest of, or obtain any recovery from any of the Pre-Petition Secured Parties or the DIP Secured Parties, under Chapter 5 of the Bankruptcy Code; *provided*, *however*, that, subject to the Carve Out Cap, an amount not to exceed $25,000.00 in the aggregate of the indebtedness incurred pursuant to the DIP Term Facility may be used to pay the Allowed Professional Fees of a Creditors' Committee to investigate (but not prosecute) claims or any Challenge against and possible objections with respect to the Pre-Petition Obligations, and the pre-petition liens and security interests of, the Pre-Petition Secured Parties (including, without

limitation, issues regarding validity, perfection, priority, or enforceability of the secured claims of the Pre-Petition Secured Parties).

    28.    **Payment of Carve Out**.

    (a)    The Debtors shall maintain an escrow account with Thompson Hine LLP ("**Thompson Hine**") for the payment of Allowed Professional Fees (the "**Carve Out Reserve Account**"), which account shall be funded by or on behalf of the Debtors, including through borrowings under the DIP Term Credit Agreement deposited into the DIP Term Proceeds Account, in accordance with the Approved Budget on a weekly basis, in advance, until the delivery of a Carve Out Trigger Notice. Upon the occurrence and during the continuance of an Event of Default, the Carve Out Reserve Account may continue to be funded at the DIP Term Agent's option, up to the Carve Out Cap. Thompson Hine shall pay Allowed Professional Fees to the Professionals, as applicable, from funds in the Carve Out Reserve Account, in compliance with the Interim Compensation Procedures and in the manner set forth in the Interim Order in accordance with the Approved Budget; *provided*, *however*, that, prior to payment in full of the Pre-Petition Obligations, as applicable, and DIP Obligations and termination of the Carve Out, to the extent that Allowed Professional Fees that have accrued from the Petition Date through and including the date a Carve Out Trigger Notice is delivered to the Debtors, the Debtors' counsel, and counsel for any Committee are less than the amounts funded into the Carve Out Reserve Account, the excess amounts in the Carve Out Reserve Account shall be applied (i) first to fund the Post EOD Carve Out Amount, and (ii) second remitted to the DIP Term Agent to apply to reduce either or both the Pre-Petition Term Obligations and the DIP Term Obligations at DIP Term Agent's sole discretion. For the avoidance of doubt, in making payments from the Carve Out Reserve Account, Thompson Hine shall be entitled to conclusively rely upon written certifications of each Professional as to the

amount due and owing to such Professional from the Carve Out Reserve Account and in accordance with the Approved Budget and shall have no liability to any party based upon its reliance on such certifications *provided further* that in the event the Termination Date (as defined in the DIP Credit Agreements) has occurred, and to the extent the Carve Out Reserve Account has been fully funded as required in this Section V and in accordance with the Approved Budget, all obligations of the DIP Term Secured Parties and Pre-Petition Term Secured Parties with respect to the Carve Out shall be terminated.

(b)     The Carve Out Cap shall be reduced, on a dollar-for-dollar basis, on a weekly basis by (without duplication or double counting) the amounts actually funded into the Carve Out Reserve Account and/or the amounts actually paid on account of the Carve Out. To the extent the Carve Out Reserve Account has not been funded in accordance with the Approved Budget prior to the delivery of a Carve Out Trigger Notice, the DIP Term Agent, on behalf of the DIP Term Lenders, may remit the difference to the Carve Out Reserve Account solely from proceeds of DIP Collateral. Payment of any amounts on account of the Carve Out, whether by or on behalf of the DIP Term Agent or any DIP Term Lender, shall not and shall not be deemed to, reduce the Pre-Petition Term Obligations or the DIP Term Obligations, and shall not, and shall not be deemed to, subordinate any of the DIP Term Secured Parties' liens and security interests in the DIP Collateral or the DIP Term Superpriority Claims to any junior pre- or post-petition lien, interest, or claim in favor of any other party. No DIP Term Secured Party shall, under any circumstance, be responsible for the payment or reimbursement of any fees or disbursements of any Professionals incurred in connection with the Chapter 11 Cases or Successor Cases under any chapter of the Bankruptcy Code, and nothing in this Section V shall be construed to obligate any DIP Term Secured Party, in any way, to pay compensation to or to reimburse expenses of any

Professional, or to ensure that the Debtors have sufficient funds to pay such compensation or reimbursement.

(c)     Nothing in the Interim Order shall be construed as a consent to the allowance of the fees and expenses of any Professional or shall affect the right of the Pre-Petition Term Secured Parties and/or the DIP Term Secured Parties to object to the allowance and payment of such fees and expenses. So long as no Event of Default has occurred or is continuing, the Debtors shall be permitted to pay fees and expenses allowed and payable pursuant to an Order of the Court, including any Order approving Interim Compensation Procedures, under Bankruptcy Code sections 330 and 331, as the same may be due and payable, solely to the extent set forth in the Approved Budget, and not to exceed the amounts set forth in the Approved Budget; *provided*, *however*, that any such payment shall be subject to entry of a final Order of the Court of each Professional's final application for allowance of such fees and expenses.

(d)     The claims and liens of (i) the Pre-Petition Revolving Agent under and in connection with the Pre-Petition Revolving Financing Documents and (ii) the DIP Revolving Agent under and in connection with the DIP Revolving Financing Documents (other than with respect to Term Loan Priority Collateral) shall not be subject or subordinate to the claims and liens in respect of the Carve Out in any respect. If any proceeds of any Revolving Loan Priority Collateral are used in any way to fund the Carve Out, such proceeds shall be immediately transferred back to the Debtors and remain subject to the liens of the DIP Revolving Secured Parties.

29.     **Challenge Rights**: For the avoidance of doubt, there shall be no Carve Out obligations with respect to fees and expenses incurred by the Committee, or trustee retained professional in connection with any Challenges (defined below) to the validity, extent, priority,

perfection and enforceability of the liens and security interests granted to the Pre-Petition Secured Parties.

30.     Upon the earliest to occur of (i) the effective date of any plan, (ii) two days prior to closing of any asset sale of all or substantially all of the Debtors' assets pursuant to Bankruptcy Code section 363, and (iii) the date that is seventy-five (75) days from entry of this Interim Order (as applicable for clauses (i) through (iii), the "Initial Challenge Period"), the stipulations and admissions contained in the Interim Order, including without limitation, the Debtors' Stipulations, shall also be binding upon the Debtors' Estates and all other parties in interest, including the Committee, if any, and any other person or entity acting or seeking to act on behalf of the Debtors' Estates, and any chapter 7 or chapter 11 trustee appointed or elected for any of the Debtors (a "Trustee") for all purposes, unless (a) during the Initial Challenge Period the Committee or any other party interest, in each case with request standing, has properly and timely filed an adversary proceeding as required under the Bankruptcy Rules (x) challenging the amount, validity, enforceability, priority or extent of the Pre-Petition Obligations, the liens of the Pre-Petition Agents on the Pre-Petition Collateral securing the Pre-Petition Obligations or (y) otherwise asserting any other claims, counterclaims, causes of action, objections, contests, or defenses against the Pre-Petition Agents and/or any other Pre-Petition Secured Party on behalf of the Debtors' Estates ((x) and (y), collectively, referred to herein as "Challenges") in connection with the matters related to the Pre-Petition Financing Documents, the Pre-Petition Obligations, the Pre-Petition Liens, or the Pre-Petition Collateral, and (b) there is a final non-appealable order in favor of the plaintiff sustaining any such Challenge or claim in any such timely filed adversary proceeding; *provided*, *however*, that, as to the Debtors, all such Challenges are hereby irrevocably waived and relinquished effective as of the Petition Date.  If during the Initial Challenge Period,

the Creditors' Committee or other third party files a motion for standing with a draft complaint

identifying and describing all Challenge(s) consistent with applicable law and rules of procedure,

the Initial Challenge Period will be tolled for the Creditors' Committee or other third party solely

with respect to the Challenge(s) asserted in the draft complaint until three (3) business days from

the entry of an Order granting the motion for standing to prosecute such Challenge(s) described in

the draft complaint and permitted by the Court (the "Extended Challenge Period", together with

the Initial Challenge Period, the "Challenge Period").  If standing is denied by the Court, the

Challenge Period shall be deemed to have expired.  If no such Challenge or motion for standing,

as applicable, is timely filed prior to the expiration of the Initial Challenge Period, without further

order of the Court:  (1) the Debtors' stipulations, admissions and releases contained in the Interim

Order (including the Debtors' Stipulations and the releases set forth in paragraph 25 below) shall

be binding on all parties in interest, including the Debtors' Estates, the Creditors' Committee, and

any subsequently appointed Trustee, case fiduciary, or other successors and assigns of the Debtors

and the Debtors' Estates; (2) the Pre-Petition Obligations shall constitute allowed claims, not

subject to counterclaim, setoff, subordination, recharacterization, defense or avoidance, for all

purposes in this Chapter 11 Case and any Successor Cases, including, without limitation, any

subsequent chapter 7 case; (3) the Pre-Petition Agents' liens on the Pre-Petition Collateral shall be

deemed to have been, as of the Petition Date, and to be, legal, valid, binding, perfected, and with

the priority specified in the Debtors' Stipulations, not subject to defense, counterclaim,

recharacterization, subordination or avoidance; and (4) the Pre-Petition Obligations, the Pre-

Petition Secured Parties' liens on the Pre-Petition Collateral; and the Pre-Petition Secured Parties

(and their respective agents, affiliates, subsidiaries, directors, officers, representatives, attorneys

or advisors) shall not be subject to any other or further Challenge by any Creditors' Committee or

any other party in interest, and any such Creditors' Committee or party in interest shall be enjoined from seeking to exercise the rights of the Debtors' Estates, including, without limitation, any successor thereto (including, without limitation, any estate representative or a Trustee, whether such Trustee is appointed or elected prior to or following the expiration of the Initial Challenge Period); *provided*, *however*, that if this Chapter 11 Case is converted to chapter 7 or a Trustee is appointed prior to the expiration of the Initial Challenge Period, any such estate representative or Trustee shall receive the full benefit of any remaining Initial Challenge Period or ten (10) days from appointment, whichever is greater, subject to the limitations described herein. If any Challenge or motion for standing, as applicable, is timely and properly filed prior to the expiration of the Initial Challenge Period, the releases, stipulations, and admissions (including without limitation, in the Debtors' Stipulations), contained in the Interim Order shall nonetheless remain binding and preclusive (as provided in the second sentence of this paragraph) on any Committee and any other person, including any Trustee appointed in any Chapter 11 Case(s) or Successor Cases, as applicable, except as to any such findings and admissions that were expressly challenged as set forth with specificity in the original complaint initiating the adversary proceeding, and any claims or challenges not so specified shall be deemed forever, waived, released and barred, including any amended or additional claims that may or could have been asserted thereafter through an amended complaint under Federal Rules of Civil Procedure 15 or otherwise. Nothing in the Interim Order will vest or confer on any person, including any Committee, any Trustee, or any other party in interest, standing or authority to pursue any claim or cause of action belonging to the Debtors or their Estates.

31.     **Perfection of Post-Petition Lien**.  Upon the Court's entry of the Interim Order, such order will be sufficient and conclusive evidence of the priority, perfection, and validity of the

post-petition liens and security interests granted herein, effective as of the Petition Date, without any further act and without regard to any other federal, state, or local requirements or law requiring notice, filing, registration, recording, or possession of the DIP Collateral, or other act to validate or perfect such security interest or lien, including, without limitation, control agreements with any financial institution(s) holding any deposit account of the Debtors (a "**Perfection Act**"). Notwithstanding the foregoing, if the DIP Agents or the Pre-Petition Agents elect for any reason to file, record, or otherwise effectuate any Perfection Act, each of the DIP Agents and the Pre-Petition Agents, as applicable, is authorized to perform such Perfection Act, and the Debtors are authorized to perform such Perfection Acts to the extent necessary or required by the DIP Agents or Pre-Petition Agents, which act or acts shall be deemed to have been accomplished as of the Petition Date notwithstanding the date and time actually accomplished, and in such event, the subject filing or recording office is authorized to accept, file, or record any document in regard to such act in accordance with applicable law.  The DIP Agents and/or the Pre-Petition Agents may choose, or may choose to direct the Debtors, to file, record, or present a certified copy of the Interim Order in the same manner as a Perfection Act, which shall be tantamount to a Perfection Act, and, in such event, the subject filing or recording office is authorized to accept, file, or record such certified copy of the Interim Order in accordance with applicable law.  Should the DIP Agents and/or the Pre-Petition Agents so choose and attempt to file, record, or perform a Perfection Act, no defect or failure in connection with such attempt shall in any way limit, waive, or alter the validity, enforceability, attachment, priority, or perfection of the DIP Liens or the Adequate Protection Liens granted by virtue of the entry of the Interim Order.

32.    **Credit Bid Rights**:  Subject to entry of the Final Order, and solely as provided in the Intercreditor Agreement and Lien Priority Chart, in connection with any sale of assets by any

Debtor outside of the ordinary course of business, pursuant to Bankruptcy Code Section 363(k), the Pre-Petition Agents, on behalf of the applicable Pre-Petition Revolving Lenders and Pre-Petition Term Lenders, and the DIP Agents, on behalf of the applicable DIP Lenders, as the case may be, shall be entitled to credit bid for the Pre-Petition Collateral or the DIP Collateral up to the outstanding aggregate amount of the applicable Pre-Petition Obligations and applicable DIP Obligations in respect of any such sale.

33.    **Payments and Application of Payments**.  The Debtors are authorized to make all payments and transfers of the Estates' property to the DIP Agents and the DIP Lenders as provided, permitted, or required under the DIP Financing Documents and the Interim Order, which payments, proceeds, and other amounts shall be applied (a) either to the Pre-Petition Revolving Obligations or the DIP Revolving Obligations in such order and manner determined by the DIP Revolving Agent's sole and absolute discretion, including to effectuate the Interim ABL Roll-Up, or (b) to the DIP Term Obligations and thereafter to the Pre-Petition Term Obligations in accordance with the DIP Term Financing Documents or the Pre-Petition Term Credit Agreement, as applicable.  Upon entry of the Interim Order, the DIP Financing Documents shall constitute legal, valid, binding, and non-avoidable obligations of the Debtors, enforceable in accordance with the terms of the Interim Order and the other DIP Financing Documents, against each Debtor, or in any case under chapter 7 of the Bankruptcy Code upon the conversion of any of the Chapter 11 Cases or any other chapter of the Bankruptcy Code, or in any other proceedings superseding or related to any of the foregoing (collectively, the "Successor Cases").  No obligation, payment, transfer, or grant of security hereunder or under the DIP Financing Documents to the DIP Agents and/or the DIP Lenders shall be stayed, restrained, voidable, avoidable, or recoverable under the Bankruptcy Code or under applicable law (including, without limitation, under Bankruptcy Code

sections 502(d), 544, and 547 to 550 or under any applicable state Uniform Voidable Transactions Act, Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act, or similar statute or common law), or subject to any defense, avoidance, reduction, setoff, recoupment, offset, recharacterization, subordination (whether equitable, contractual, or otherwise), disallowance, impairment, claim, counterclaim, cross-claim, or challenge, whether under the Bankruptcy Code or any other applicable law or regulation by any person or entity for any reason.  Without limiting the generality of the foregoing, the Debtors seek authority, without further Order of this Court, to (i) pay all principal, interest, fees, and indemnities when due, under the DIP Financing Documents and (ii) pay or reimburse the DIP Secured Parties, in accordance with the DIP Financing Documents for all present and future costs and expenses, including, without limitation, all reasonable and documented professional fees, consultant fees, and legal fees and expenses paid or incurred by the DIP Secured Parties in connection with the financing transactions as provided in the DIP Financing Documents and the Interim Order regardless of whether such amounts are in the Approved Budget; *provided*, *however*, that each DIP Agent shall send a redacted summary invoice of any post-petition professional fees, consultant fees, and legal fees and expenses incurred by such DIP Secured Party (subject in all respects to applicable privilege or work product doctrines) to the Debtors and their counsel, the U.S. Trustee and, if appointed, the Creditors' Committee or its counsel.  Within ten (10) days after delivery of such invoices in accordance with this paragraph (or such shorter time period agreed to by the DIP Agents, the Debtors, the U.S. Trustee, and, if appointed, the Creditors' Committee), the Debtors shall pay such fees and costs; *provided*, *however*, that to the extent an objection has been raised to certain professional, consultant, or legal fees and costs incurred on or after the Petition Date within such ten (10) days, Debtors shall pay only such fees and costs to which no objection has been raised; *provided further*,

that such ten (10) day notice period shall not apply to the payment of any such professional, consultant, or legal fees and costs paid on or about (x) the effective date of a Plan in this Case or (y) the closing of any sale of Debtors' assets that results in the payment in full of all Pre-Petition Obligations and DIP Obligations owed to the Prepetition Revolving Secured Parties or Prepetition Term Secured Parties, as applicable, or DIP Revolving Secured Parties or DIP Term Secured Parties, as applicable. To the extent there is an objection with respect to any such professional, consultant, or legal fees, costs and expenses that is not consensually resolved, this Court may resolve the objection. Such written invoices shall include the invoices of Blank Rome LLP, counsel to the DIP Revolving Agent, Focus Management Group, financial advisor to the DIP Revolving Agent, Chapman and Cutler LLP, counsel to the DIP Term Agent, and any other professional, advisor, or agent reasonably retained by the DIP Agents in connection with the Chapter 11 Cases and as permitted by the DIP Financing Documents; *provided*, *however*, that none of such fees and expenses payable pursuant to this paragraph shall be subject to the United States Trustee Guidelines or shall require approval by the Court unless an objection is interposed that cannot be resolved by the parties. No recipient of any such payment shall be required to file with respect thereto any interim or final fee application with the Court.

34. **Interest and Fees**. The rate(s) of interest to be charged for the DIP Revolving Loans and DIP Term Loans, as applicable, under the DIP Revolving Facility and DIP Term Facility, as applicable, shall be the rates set forth in the DIP Revolving Credit Agreement and DIP Term Credit Agreement, as applicable, and shall be calculated in the manner and payable at the times set forth therein. The fees charged under the DIP Facilities shall be those set forth in the applicable DIP Credit Agreement and shall be unconditionally payable in the amounts and at the times set forth in the applicable DIP Credit Agreement, which shall be absolutely and

unconditionally earned upon entry of the Interim Order and execution of the DIP Credit Revolving Agreement, and which shall be non-refundable. The Debtors seek authority and be directed to pay, in accordance with the Interim Order, the principal, interest, fees, payments, expenses, and other amounts described above and in the DIP Financing Documents as such amounts become due and without need to obtain further Court approval, and the Debtors shall be jointly and severally obligated to pay all such amounts, and satisfy all such obligations, which in each case shall constitute DIP Obligations hereunder and under the applicable DIP Financing Documents.

35.    **Application of Collections**.  All cash, collections, and proceeds of the Revolving Loan Priority Collateral and the DIP Collateral that is Revolving Loan Priority Collateral shall be applied to reduce the Pre-Petition Revolving Obligations and the DIP Revolving Obligations in accordance with the terms of the DIP Revolving Financing Documents and the Pre-Petition Revolving Financing Documents, as applicable, and the Interim Order, in such order and manner determined by the DIP Revolving Agent in its sole and absolute discretion, subject, as applicable, to the Intercreditor Agreement.

36.    **Continuation of Pre-Petition Procedures**.    Subject to the Intercreditor Agreement, the Lien Priority Chart, and Claim Priority Chart, as applicable, all pre-petition practices and procedures for the payment and collection of proceeds of Revolving Loan Priority Collateral, whether Pre-Petition Collateral or DIP Collateral, including the turnover of Revolving Credit Cash Collateral to the DIP Revolving Agent for application in accordance with the Interim Order and the DIP Revolving Credit Agreement, and the use of any lockbox or blocked depository bank account arrangements, will be unchanged, remain in place, and be identical under the DIP Revolving Financing Documents for the benefit of the DIP Revolving Agent and the DIP

Revolving Lenders and are hereby approved and shall continue without interruption after the commencement of the Chapter 11 Case.

37.    **Final ABL Roll-Up**:  Upon entry of the Final Order, without any further action by the Debtors or any other party, and subject to the rights of parties set forth in the Interim Order, at the option of DIP Revolving Agent and in accordance with the DIP Revolving Credit Agreement and the other DIP Revolving Financing Documents, the Debtors may use the proceeds of the next advance (or deemed advance) under the DIP Revolving Credit Agreement to exchange and substitute all of the remaining Pre-Petition Revolving Obligations, including without limitation the Pre-Petition Revolving Loans outstanding under the Pre-Petition Revolving Credit Agreement on the date of the Final Order on a cashless, dollar-for-dollar basis with the DIP Revolving Facility and subject to the terms and conditions set forth in the DIP Revolving Financing Documents.  The Final ABL Roll-Up shall be subject to the challenge rights of the parties set forth in the Interim Order.

## BASIS FOR RELIEF

I.    **The Debtors Should Be Authorized to Obtain Post-Petition Financing Through the DIP Facilities.**

    A.    **Entry into the DIP Facilities and DIP Financing Documents Is an Exercise of the Debtors' Sound Business Judgment.**

38.    The Court should authorize the Debtors to enter into, as an exercise of their sound business judgment, the DIP Financing Documents, obtain access to the DIP Facilities, and use Cash Collateral.  Section 364 of the Bankruptcy Code authorizes a debtor to obtain secured or superiority financing under certain circumstances discussed in detail below.  Courts grant a debtor-in-possession considerable deference in acting in accordance with its business judgment in obtaining post-petition secured credit, so long as the agreement to obtain such credit does not run afoul of the provisions of, and policies underlying, the Bankruptcy Code.  *See, e.g., In re Trans*

*World Airlines, Inc.*, 163 B.R. 964, 974 (Bankr. D. Del. 1994) (approving a post-petition loan and receivables facility because such facility "reflect[ed] sound and prudent business judgment"); *In re L.A. Dodgers LLC*, 457 B.R. 308, 313 (Bankr. D. Del. 2011) ("[C]ourts will almost always defer to the business judgment of a debtor in the selection of the lender."); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("[C]ases consistently reflect that the court's discretion under Section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest.").

39.     Specifically, to determine whether the business judgment standard is met, a court need only "examine whether a reasonable businessperson would make a similar decision under similar circumstances." *In re Exide Techs.*, 340 B.R. 222, 239 (Bankr. D. Del. 2006); *see also In re Curlew Valley Assocs.*, 14 B.R. 506, 513–14 (Bankr. D. Utah 1981) (noting that courts should not second guess a debtor's business decision when that decision involves "a business judgment made in good faith, upon a reasonable basis, and within the scope of [the debtor's] authority under the [Bankruptcy] Code").

40.     Furthermore, in considering whether the terms of post-petition financing are fair and reasonable, courts consider the terms in light of the relative circumstances of both the debtor and the potential lender. *In re Farmland Indus., Inc.*, 294 B.R. 855, 886 (Bankr. W.D. Mo. 2003); *see also Unsecured Creditors' Comm. Mobil Oil Corp. v. First Nat'l Bank & Trust Co. (In re Elingsen McLean Oil Co., Inc.)*, 65 B.R. 358, 365 n.7 (W.D. Mich. 1986) (recognizing a debtor may have to enter into "hard bargains" to acquire funds for its reorganization). The Court may also appropriately take into consideration non-economic benefits to the Debtor offered by a proposed

post-petition facility.  For example, in *In re ION Media Networks. Inc.*, the bankruptcy court for the Southern District of New York held that:

> Although all parties, including the Debtors and the Committee, are naturally motivated to obtain financing on the best possible terms, a business decision to obtain credit from a particular lender is almost never based purely on economic terms.  *Relevant features of the financing must be evaluated, including non-economic elements such as the timing and certainty of closing, the impact on creditor constituencies and the likelihood of a successful reorganization.*  This is particularly true in a bankruptcy setting where cooperation and establishing alliances with creditor groups can be a vital part of building support for a restructuring that ultimately may lead to a confirmable reorganization plan.  That which helps foster consensus may be preferable to a notionally better transaction that carries the risk of promoting unwanted conflict.

No. 09-13125, 2009 WL 2902568, at *4 (Bankr. S.D.N.Y. July 6, 2009) (emphasis added).

41.     The Debtors' determination to move forward with the DIP Facilities is an exercise of their sound business judgment following a search for other viable and actionable alternatives and an arm's-length process and careful evaluation.  Specifically, the Debtors and their advisors determined that post-petition financing will create certainty with respect to cash flows necessary for the administration of this Case through a sale or plan restructuring process.  The Debtors negotiated the DIP Facilities with the DIP Lenders in good faith, at arm's length, and with the assistance of its respective advisors. Here, the DIP Facilities provide reasonable terms and sufficient liquidity that enables the Debtors to (i) operate their businesses while the Debtors' assets are being marketed in connection with a commercially reasonable sale process and (ii) keep all staff employed.  The Debtors proactively sought, through its investment banker, other debtor-in-possession financing alternatives in the market and attempted on multiple occasions to find an alternative as attractive as the one provided, but these efforts failed to produce legitimate traction. Given the Debtors' current circumstances, the Debtors believe that they have obtained the best financing available. Accordingly, the Court should approve the DIP Facilities and authorize the

Debtors' entry into the DIP Financing Documents, as it is a reasonable exercise of the Debtors' business judgment.

**B.**     **The Debtors Should Be Authorized to Grant Liens and Superpriority Claims.**

42.     The Debtors propose to obtain financing under the DIP Facilities by providing security interests and liens as set forth in the DIP Financing Documents pursuant to Sections 364(c) and (d) of the Bankruptcy Code.  Specifically, the Debtors propose to provide to the DIP Secured Parties post-petition security interests in and liens on the DIP Collateral and pursuant to the Intercreditor Agreement that are valid, perfected, allowed, enforceable, non-avoidable, and not subject to challenge, dispute, or subordination immediately upon entry of the Interim Order, subject to the Carve Out, Intercreditor Agreement, Claim Priority Chart and Lien Priority Chart. *See* Interim Order, at ¶¶10, 11.  Additionally, subject to the Carve Out, Intercreditor Agreement, Claim Priority Chart and Lien Priority Chart, the DIP Secured Parties shall be granted allowed DIP Superpriority Claims pursuant to Section 364(c)(1) of the Bankruptcy Code. *Id*. at ¶11.

43.     The statutory requirement for obtaining post-petition credit under Section 364(c) is a finding, made after notice and hearing, that a debtor is "unable to obtain unsecured credit allowable under Section 503(b)(1) of [the Bankruptcy Code]."  11 U.S.C. § 364(c).  *See In re Crouse Grp., Inc*., 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987) (secured credit under Section 364(c) of the Bankruptcy Code is authorized, after notice and hearing, upon showing that unsecured credit cannot be obtained).  Courts have articulated a three-part test to determine whether a debtor is entitled to financing under Section 364(c) of the Bankruptcy Code.  Specifically, courts look to whether:

> (a)     the debtor is unable to obtain unsecured credit under Section 364(b) of the Bankruptcy Code, i.e., by allowing a lender only an administrative claim;
>
> (b)     the credit transaction is necessary to preserve the assets of the estate; and

(c)     the terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor-borrower and proposed lenders.

*See In re Los Angeles Dodgers LLC*, 457 B.R. 308 (Bankr. D. Del. 2011); *In re Ames Dep't Stores*, 115 B.R. 34, 37–40 (Bankr. S.D.N.Y. 1990); *see also In re St. Mary Hosp.*, 86 B.R. 393, 401-02 (Bankr. E.D. Pa. 1988); *Crouse Grp.*, 71 B.R. at 549.

44.     As described above and as set forth in the Arrigoni Declaration, G2 Capital Advisors ("G2") solicited proposals in March 2023 for debtor-in-possession financing from three potential DIP Lenders.  See Arrigoni Declaration at ¶¶ ___. None of these parties expressed any interest in providing DIP financing to the Debtors.  The proposed DIP Facilities provided by the DIP Lenders represent the best financial terms available to the Debtors.

45.     Absent the DIP Facilities, which will provide certainty that the Debtors will have sufficient liquidity to administer this Case and to continue operating their business, the value of the Debtors' estates would be significantly impaired to the detriment of all stakeholders.  Given the Debtors' circumstances, the Debtors believe that the terms of the DIP Facilities are fair, reasonable, and adequate, all as more fully set forth below.  For all these reasons, the Debtors submit that they have met the standard for obtaining post-petition financing.

46.     In the event that a debtor is unable to obtain unsecured credit allowable as an administrative expense under Section 503(b)(1) of the Bankruptcy Code, Section 364(c) provides that a court "may authorize the obtaining of credit or the incurring of debt (1) with priority over any or all administrative expenses of the kind specified in Section 503(b) or 507(b) of [the Bankruptcy Code]; (2) secured by a lien on property of the estate that is not otherwise subject to a lien; or (3) secured by a junior lien on property of the estate that is subject to a lien."  There is no circumstance under which the Debtors are unable to obtain unsecured credit.  Therefore, approving superpriority claims in favor of the DIP Secured Parties is reasonable and appropriate.

47.    Further, Section 364(d) provides that a debtor may obtain credit secured by a senior

or equal lien on property of the estate already subject to a lien, after notice and a hearing, where

the debtor is "unable to obtain such credit otherwise" and "there is adequate protection of the

interest of the holder of the lien on the property of the estate on which such senior or equal lien is

proposed to be granted."  11 U.S.C. § 364(d)(1).  The Debtors may incur "priming" liens under

the DIP Facilities if either (a) the Pre-Petition Credit Parties have consented or (b) their interests

in collateral are adequately protected.  *See, e.g., Anchor Savs. Bank FSB v. Sky Valley, Inc.*, 99

B.R. 117, 122 (N.D. Ga. 1989) ("[B]y tacitly consenting to the superpriority lien, those

[undersecured] creditors relieved the debtor of having to demonstrate that they were adequately

protected.").

48.    Here, the Pre-Petition Revolving Credit Lender and Pre-Petition Term Lenders are

priming themselves.  No other secured creditors with liens senior to the liens held by the Pre-

Petition Revolving Credit Agent and the Pre-Petition Term Loan Agent are being primed.

### C.    The Alternatives to the DIP Facilities Is Not Favorable.

49.    A debtor need only demonstrate "by a good faith effort that credit was not available

without" the protections afforded to potential lenders by Sections 364(c) of the Bankruptcy Code.

*In re Snowshoe Co., Inc*., 789 F.2d 1085, 1088 (4th Cir. 1986); *see also In re Plabell Rubber*

*Prods., Inc.*, 137 B.R. 897, 900 (Bankr. N.D. Ohio 1992).  Moreover, in circumstances where only

a few lenders likely can or will extend the necessary credit to a debtor, "it would be unrealistic and

unnecessary to require [the debtor] to conduct such an exhaustive search for financing."  *In re Sky*

*Valley, Inc*., 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), *aff'd sub nom. Anchor Sav. Bank FSB v.*

*Sky Valley, Inc*., 99 B.R. 117, 120 n.4 (N.D. Ga. 1989); *see also In re Snowshoe Co*., 789 F.2d

1085, 1088 (4th Cir. 1986) (demonstrating that credit was unavailable absent the senior lien by

establishment of unsuccessful contact with other financial institutions in the geographic area); *In*

*re Stanley Hotel, Inc.*, 15 B.R. 660, 663 (D. Colo. 1981) (bankruptcy court's finding that two national banks refused to grant unsecured loans was sufficient to support conclusion that Section 364 requirement was met); *In re Ames Dep't Stores*, 115 B.R. at 37–39 (debtor must show that it made reasonable efforts to seek other sources of financing under Section 364(a) and (b)).

50.     As noted above, the Debtors do not believe that more favorable, alternative sources of financing are reasonably available given the realities imposed by the Debtors' business and the Debtors' unsuccessful solicitation of alternative financing proposals on better terms. Indeed, the Debtors have searched for actionable alternative proposals—in this regard, the market has spoken. No other proposals were received.  Thus, the Debtors have determined that the DIP Facilities provide the best opportunity available to the Debtors under the circumstances to fund this Case and preserve the jobs of the Debtors' employees.  In addition to evidence to be introduced at the hearing on the Interim Order, if necessary, the Debtors submit that the requirement of Section 364 of the Bankruptcy Code that alternative credit on more favorable terms be unavailable to the Debtors is satisfied.

## II.     The Debtors Should Be Authorized to Use Cash Collateral and is Authorized to Provide Adequate Protection.

51.     Section 363 of the Bankruptcy Code generally governs the use of estate property. Section 363(c)(2)(A) permits a debtor in possession to use cash collateral with the consent of the secured party.  Here, the DIP Secured Parties are consenting to the Debtors' use of the DIP Collateral, which includes Cash Collateral, subject to the terms and limitations set forth in the Interim Order.[5]

---

[5] As a requirement to the DIP Lenders' willingness to enter into the DIP Financing Documents, the Debtors will be required to appoint a chief restructuring officer who will, among other things, monitor the Debtors' use of cash collateral and ensure that the Debtors adhere to the approved Budget.

52.     Section 363(e) provides for adequate protection of interests in property when a debtor uses cash collateral.  Further, Section 362(d)(1) of the Bankruptcy Code provides for adequate protection of interests in property due to the imposition of the automatic stay.  *See In re Cont'l Airlines*, 91 F.3d 553, 556 (3d Cir. 1996) (en banc).  While Section 361 of the Bankruptcy Code provides examples of forms of adequate protection, such as granting replacement liens and administrative claims, courts decide what constitutes sufficient adequate protection on a case-by-case basis.  *In re Swedeland Dev. Grp., Inc.*, 16 F.3d 552, 564 (3d Cir. 1994); *In re Satcon Tech. Corp.*, No. 12-12869 (KG), 2012 WL 6091160, at *6 (Bankr. D. Del. Dec. 7, 2012); *In re N.J. Affordable Homes Corp.*, No. 05-60442 (DHS), 2006 WL 2128624, at *14 (Bankr. D.N.J. June 29, 2006); *In re Columbia Gas Sys., Inc.*, Nos. 91-803, 91-804, 1992 WL 79323, at *2 (Bankr. D. Del. Feb. 18, 1992); *see also In re Dynaco Corp.*, 162 B.R. 389, 394 (Bankr. D.N.H. 1993) (citing 2 Collier on Bankruptcy ¶ 361.01[1] at 361–66 (15th ed. 1993) (explaining that adequate protection can take many forms and "must be determined based upon equitable considerations arising from the particular facts of each proceeding").

53.     The concept of adequate protection is designed to shield a secured creditor from diminution in the value of its interest in collateral during the period of a debtor's use.  *See In re Carbone Cos.*, 395 B.R. 631, 635 (Bankr. N.D. Ohio 2008) ("The test is whether the secured party's interest is protected from diminution or decrease as a result of the proposed use of cash collateral); *see also In re Cont'l Airlines, Inc.*, 154 B.R. 176, 180-81 (Bankr. D. Del. 1993) (holding that adequate protection for use of collateral under Section 363 is limited to use-based decline in value).

54.     Here, the adequate protection as described herein and offered to the DIP Secured Parties is fair and reasonable and is consistent with customary protections. Such protection is

adequate for the DIP Secured Parties who are willing to allow the Debtors post-petition to use their

cash collateral under the circumstances and should be approved.

## III.    The Debtors Should Be Authorized to Pay the Fees Required by the DIP Lenders Under the DIP Financing Documents.

55.    In connection with the DIP Term Facility, the Debtors have agreed, subject to Court

approval, to pay certain fees to the DIP Term Lenders consisting of the following:

    (a)    **Application Fee**: An upfront application fee in the amount equal to 1% of the Term Loan Commitments of the DIP Term Lenders, payable from the proceeds of the first draw made available to the Borrowers.

    (b)    **Closing Fee**: An upfront closing fee upon the funding of each of the DIP Term Loans in an amount equal to 2% of the respective DIP Term Loans being made, which shall be payable from the proceeds of each applicable DIP Term Loan.

    (c)    **Exit Fee**:  An exit fee, which constitutes additional interest under the DIP Term Facility in an amount equal to 1% of the total amount loaned by the DIP Term Lenders, which shall be payable upon the earlier of repayment of all obligations under the DIP Term Facility or termination of the DIP Term Facility (including on the Maturity Date).

56.    In connection with the DIP Revolving Facility, the Debtors have agreed, subject to

Court approval, to pay a fee in an amount equal to $60,000.00 upon the closing of the DIP

Revolving Facility.

57.    Under the circumstances of this Case, these fees and costs are reasonable,

customary, and appropriate.  Accordingly, the Court should authorize the Debtors to pay the fees

provided under the DIP Financing Documents in connection with entering into those agreements.

## IV.    Each of the DIP Lenders Should Be Deemed a Good-Faith Lender Under Section 364(e).

58.    Section 364(e) of the Bankruptcy Code protects a good-faith lender's right to

collect on loans extended to a debtor, and its right in any lien securing those loans, even if the

authority of the debtor to obtain such loans or grant such liens is later reversed or modified on

appeal.  Specifically, Section 364(e) of the Bankruptcy Code provides that:

> The reversal or modification on appeal of an authorization under this section to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.

11 U.S.C. § 364(e); *see also Keltic Fin. Partners, LP v. Foreside Mgmt. Co.* (*In re Foreside Mgmt. Co.*), 402 B.R. 446, 451 (B.A.P. 1st Cir. 2009) (citing *Shapiro v. Saybrook Mfg. Co.* (*In re Saybrook Mfg. Co.*), 963 F.2d 1490, 1493 (11th Cir. 1992)); *see also White Rose Food v. General Trading* (*In re Clinton St. Food Corp.*), 170 B.R. 216, 220 (S.D.N.Y. 1994) (noting that Section 364(e)'s purpose "is to overcome[s] parties' reluctance to lend to a bankrupt firm . . ."); *Fleet Nat'l Bank v. Doorcrafters* (*In re N. Atl. Millwork Corp.*), 155 B.R. 271, 279 (Bankr. D. Mass. 1993) ("The purpose of Section 364(e) is to allow good faith lenders to rely upon conditions at the time they extend credit and to encourage lenders to lend to bankruptcy entities.").

59.     As explained herein and in the Pagliara Declaration, the DIP Financing Documents are the result of: (a) the Debtors' reasonable and informed determination that the DIP Lenders offered the most favorable terms on which to obtain vital post-petition financing, and (b) arms'-length, good-faith negotiations between the Debtors and the DIP Lenders. The Debtors submit that the terms and conditions of the DIP Financing Documents are reasonable and appropriate under the circumstances, and the proceeds of the DIP Facilities will be used only for purposes that are permissible under the Bankruptcy Code.  Further, no consideration is being provided to any party to the DIP Financing Documents other than as described herein.  Accordingly, the Court should find that the each of the DIP Lenders is a "good faith" lender within the meaning of section 364(e) of the Bankruptcy Code and is entitled to all of the protections afforded by that section.

**V.     The Automatic Stay Should Be Modified on a Limited Basis.**

60.     The proposed Interim Order provides that the automatic stay provisions of Section 362 of the Bankruptcy Code will be modified to allow the DIP Lenders to file any financing statements, security agreements, notices of liens, and other similar instruments and documents in order to validate and perfect the liens and security interests granted to them under the Interim Order.  The proposed Interim Order further provides that the automatic stay is modified as necessary to permit the Debtors to grant the DIP Liens to the DIP Secured Parties and to incur all liabilities and obligations set forth in the Interim Order.  Finally, the proposed Interim Order provides that, following the occurrence of an Event of Default, the automatic stay shall be modified to the extent necessary to permit the DIP Lenders to exercise all rights and remedies in accordance with the DIP Financing Documents, or applicable law.

61.     Stay modifications of this kind are ordinary and standard features of debtor-in-possession financing arrangements, and, in the Debtors' business judgment, are reasonable and fair under the circumstances of this Case.  *See, e.g., In re Magnum Hunter Res. Corp*., No. 15-12533 (KG) (Bankr. D. Del. Dec. 15, 2015) (terminating automatic stay after event of default); *In re Peak Broad., LLC*, No. 12-10183 (PJW) (Bankr. D. Del. Feb. 2, 2012) (terminating automatic stay after occurrence of termination event); *In re TMP Directional Mktg., LLC*, No. 11-13835 (MFW) (Bankr. D. Del. Jan. 17, 2012) (modifying automatic stay as necessary to effectuate the terms of the order); *In re Broadway 401 LLC*, No. 10-10070 (KJC) (Bankr. D. Del. Feb. 16, 2010) (same); *In re Haights Cross Commc'ns, Inc*., No. 10-10062 (BLS) (Bankr. D. Del. Feb. 8, 2010) (same).

**VI.     Failure to Obtain Immediate Interim Access to the DIP Facilities and Use of Cash Collateral in Which the DIP Secured Parties Are Receiving a Lien Would Cause Immediate and Irreparable Harm.**

62.     Bankruptcy Rules 4001(b) and 4001(c) provide that a final hearing on a motion to obtain credit pursuant to Section 364 of the Bankruptcy Code or to use cash collateral pursuant to

Section 363 of the Bankruptcy Code may not be commenced earlier than 14 days after the service of such motion.  Upon request, however, the Court may conduct a preliminary, expedited hearing on the motion and authorize the obtaining of credit and use of cash collateral to the extent necessary to avoid immediate and irreparable harm to a debtor's estate.

63.     For the reasons noted above, the Debtors have an immediate post-petition need to use Cash Collateral and access to additional liquidity under the DIP Facilities.  The Debtors cannot maintain the value of their estates during the pendency of this Case without access to this liquidity. The Debtors will use cash to, among other things, fund the administration of this Case and the operation of its business. The Debtors will be unable to operate their business or otherwise fund this Case without access to the DIP Facility and Cash Collateral and will suffer immediate and irreparable harm to the detriment of all creditors and other parties in interest.  In short, the Debtors' ability to administer this Case through the use of Cash Collateral and access to additional financing is vital to preserve and maximize the value of the Debtors' estates.

64.     The Debtors request that the Court hold and conduct a hearing to consider entry of the Interim Order authorizing the Debtors, from and after entry of the Interim Order until the Final Hearing, to receive immediate authorization to use Cash Collateral and initial funding under the DIP Facilities.  This relief will enable the Debtors to preserve and maximize value and, therefore, avoid immediate and irreparable harm and prejudice to their estates and all parties in interest, pending the Final Hearing.

## **REQUEST FOR FINAL HEARING**

65.     Pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2), the Debtors request that the Court set a date for the Final Hearing that is as soon as practicable, and in no event more than 28 days after the Petition Date, and fix the time and date prior to the Final Hearing for parties to file objections to this motion.

## **WAIVER OF BANKRUPTCY RULE 6004(A) AND 6004(H)**

66.     To implement the foregoing successfully, the Debtors request that the Court enter an order providing that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a) and that the Debtors have established cause to exclude such relief from the 14-day stay period under Bankruptcy Rule 6004(h).

## **NOTICE**

67.     The Debtors will provide notice of this Motion to: (i) the Office of the U.S. Trustee for the District of Delaware; (ii) the holders of the 30 largest unsecured claims against the Debtor; (iii) counsel to the proposed DIP Revolving Agent, and Pre-Petition Revolving Credit Agent; (iv) counsel to the proposed DIP Term Loan Agent and Pre-Petition Term Loan Agent; (v) the United States Attorney's Office for the District of Delaware; (vi) the Internal Revenue Service; (vii) the United States Securities and Exchange Commission; (viii) all parties known to the Debtors that hold any liens or security interests in the Debtors' assets, including those parties that have filed UCC-1 financing statements against the Debtors, or that, to the Debtors' knowledge, have asserted any liens on any of the Debtors' assets; (ix) all landlords and warehouseman of the Debtors; (x) all creditors known to the Debtors to be holding a judgment against the Debtors; (xi) any other parties claiming an interest in the Pre-Petition Collateral (defined below); and (xii) any party that has

requested notice pursuant to Bankruptcy Rule 2002. The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

WHEREFORE, the Debtors respectfully request that the Court enter the DIP Orders, granting the relief requested herein and such further relief as the Court deems appropriate under the circumstances.

[remainder of page blank – counsel signature page to follow]

Dated:  July 22, 2023
       Wilmington, Delaware

**CHIPMAN BROWN CICERO & COLE, LLP**

/s/ Mark L. Desgrosseilliers
Mark L. Desgrosseilliers (No. 4083)
Hercules Plaza
1313 North Market Street, Suite 5400
Wilmington, Delaware 19801
Telephone:      (302) 295-0192
Email:   desgross@chipmanbrown.com

-and-

Sean A. Gordon (*pro hac vice* pending)
Austin B. Alexander (*pro hac vice* pending)
**THOMPSON HINE LLP**
Two Alliance Center
3560 Lenox Road NE, Suite 1600
Atlanta, Georgia 30326-4266
Telephone: (404) 541-2900
Facsimile: (404) 541-2905
*Sean.Gordon@thompsonhine.com*
*Austin.Alexander@thompsonhine.com*

Alan R. Lepene (*pro hac vice* pending)
Scott B. Lepene (*pro hac vice* pending)
**THOMPSON HINE LLP**
3900 Key Center
127 Public Square
Cleveland, Ohio 44114-1291
Telephone: (216) 566-5500
Facsimile: (216) 566-5800
*Alan.Lepene@thompsonhine.com*
*Scott.Lepene@thompsonhine.com*

*Proposed Counsel for Debtors*