**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| WILLIAMS INDUSTRIAL SERVICES GROUP INC., *et al.*[1] | Case No. 23-10961-BLS |
| | (Jointly Administered) |
| Debtors. | **Objection Deadline:  TBD**<br>**Hearing Date:  TBD** |

**MOTION FOR ENTRY OF AN ORDER (I) APPROVING BIDDING PROCEDURES FOR THE SALE OF ASSETS, (II) SCHEDULING HEARINGS AND OBJECTION DEADLINES WITH RESPECT TO THE DEBTORS' AUTHORITY TO SELL, (III) SCHEDULING BID DEADLINES AND AN AUCTION, (IV) APPROVING THE FORM AND MANNER OF NOTICE THEREOF, (V) APPROVING CONTRACT ASSUMPTION AND ASSIGNMENT PROCEDURES, AND (VI) GRANTING RELATED RELIEF**

The above captioned debtors and debtors in possession (collectively, the "<u>Debtors</u>") file this *Motion for Entry of an Order (i) Approving Bidding Procedures for the Sale of Assets, (ii) Scheduling Hearings and Objection Deadlines with Respect to the Debtors' Authority to Sell, (iii) Scheduling Bid Deadlines and an Auction, (iv) Approving the Form and Manner of Notice thereof, (v) Approving Contract Assumption and Assignment Procedures, and (vi) Granting Related Relief* ("<u>Motion</u>"). Through this Motion, the Debtors seek authority to sell substantially all of the Debtors' assets, including the assets of Williams Industrial Services Group Inc. ("Holdings"), Williams Industrial Services Group, LLC ("WISG"), and Williams Industrial Services, LLC ("WIS"), Construction & Maintenance Professionals, LLC ("CMP"), WISG Electrical, LLC ("Electrical"), Williams Plant Services, LLC ("WPS"), and Williams Specialty Services, LLC

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Williams Industrial Services Group Inc. (1378), Williams Industrial Services Group, LLC (2666), Williams Industrial Services, LLC (0406), Williams Plant Services, LLC (9575), Williams Specialty Services, LLC (9578), WISG Electrical, LLC (6918), Construction & Maintenance Professionals, LLC (0925), Williams Global Services, Inc. (3708), Steam Enterprises, LLC (9177), GPEG LLC (5707), Global Power Professional Services, Inc. (2550), WISG Canada Ltd. (B.N. 6518), WISG Nuclear Ltd. (B.N. 3510), and WISG Electrical Ltd. (B.N. 2116). The location of the Debtors' corporate headquarters and service address is: 200 Ashford Center N, Suite 425, Atlanta, GA 30338.

("WSS") as more particularly described in the Stalking Horse APA defined herein. Filed contemporaneously herewith is the Declaration of Eric Mendelsohn in support of this Motion. In support of this Motion, the Debtors respectfully represent as follows:

## JURISDICTION AND VENUE

1.      This Court has jurisdiction over these cases and this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(A), (N), and (O). Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409(a).

2.      The bases for the relief requested herein are sections 105(a), 363(b), and 365 of title 11 of the United States Code ("Bankruptcy Code"), Rules 2002, 6003, and 6004 of the Federal Rules of Bankruptcy Procedure ("Bankruptcy Rules"), and Rule 6004-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules").

## BACKGROUND

3.      On July 22, 2023 ("Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware ("Court"). The Debtors have continued in possession of their properties and have continued to operate and manage their business as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No request has been made for the appointment of a trustee or examiner, and no official committee has yet been established in these cases.

4.      The factual background relating to the Debtors' commencement of these cases is set forth in detail in the *Declaration of Tracy Pagliara in Support of Chapter 11 Petitions and First Day Pleadings* ("First Day Declaration") filed on the Petition Date and incorporated herein by reference.

A.      **The Debtors' Business**

5.      The Debtors are leading providers of infrastructure related services to customers in energy and industrial end markets, including a broad range of construction, maintenance, modification and support services, with offices in Georgia, Florida and New York. Among the customers served by the Debtors are companies and governmental entities in the nuclear, fossil-fuel, hydroelectric, water, and pulp and paper industries.

6.      Over the past several years, the Debtors have experienced declining financial performance due to, among other things, inflationary pressures, labor shortages, rising labor costs, work delays on projects, supply chain disruptions, and the effects of the COVID-19 pandemic. In addition, one of the Debtors, WIS, has incurred significant losses on fixed price contracts involving water projects in Florida. The Debtors have implemented cost reduction and liquidity enhancing measures to help mitigate the effect of these declines and improve their financial performance and liquidity, but have not been able to overcome these trends.

7.      In January 2023, the Debtors retained Greenhill & Co., LLC ("Greenhill"), an internationally recognized investment banking firm, to assist the Debtors in evaluating various strategic alternatives. The scope of Greenhill's engagement involved an evaluation of a broad range of potential financial and strategic options, including a possible sale of the business. During the course of that process, as the Debtors continued to experience liquidity issues, it became apparent that neither refinancing nor an infusion of new capital were feasible alternatives, and the only viable path forward was a sale of the Debtors' businesses.

B.      **Sale Process**

8.      In February 2023, Greenhill initiated an intensive marketing effort in which it reached out to approximately 140 parties – both strategic and financial investors – who might have an interest in acquiring the company. Approximately fifty of those parties executed non-disclosure

agreements and received comprehensive packets of confidential information regarding the company. Greenhill conducted information calls with many of those parties.

9.      Six parties provided written indications of interest and were invited into a second round to conduct due diligence and attend management presentations. From that process, following intensive due diligence Energy Solutions, Inc. ("Energy Solutions") provided the highest and best offer to acquire the company.

10.     Following additional due diligence, Energy Solutions proposed two alternative structures for the transaction: (i) an out-of-court transaction involving a tender offer for existing equity followed by a short-form merger, or (ii) an acquisition of substantially all of the assets of WPS, WSS, and Electrical, and select assets of Holdings, WISG and WIS, through a sale under section 363 of the Bankruptcy Code.

11.     In its out-of-court proposal, Energy Solutions offered $53 million, based upon a starting enterprise value of $67.5 million, less reductions of $14.5 million attributable to estimated future losses from the Florida water projects ($7.5 million) and the risk of non-renewal of certain contracts with a significant customer ($7 million). The out-of-court transaction, requiring shareholder approval, would not have resulted in any recovery for shareholders. Consequently, the Debtors determined that it was not feasible to attempt to consummate an out-of-court transaction.

12.     In its alternative proposal to acquire assets pursuant to a section 363 sale, Energy Solutions has offered (i) to pay $60 million and (ii) to assume certain liabilities of WPS, WSS, Electrical, Holdings, WISG and WIS.

13.     The Debtors have accepted Energy Solutions' proposal, subject to the receipt of higher and better offers submitted in accordance with Bidding Procedures (as defined below) to

be approved by the Court. The Bidding Procedures are designed to—and the Debtors believe the Bidding Procedures will operate to—maximize the likelihood of a competitive bidding process.

**C.      Stalking Horse Bidder**

14.      To effectuate the proposed transaction, the Debtors have executed an Asset Purchase Agreement with Energy Solutions (the "Stalking Horse APA" or "Purchase Agreement") that identifies EnergySolutions Nuclear Services, LLC as the proposed Stalking Horse Bidder, and provides certain Bid Protections as specified therein. A copy of the Stalking Horse APA is attached hereto as **Exhibit A**. The Stalking Horse APA provides that: Energy Solutions is the Stalking Horse Bidder; the purchase price for the Purchased Assets (as defined in the Bidding Procedures) is $60,000,000 plus the assumption of certain liabilities of WPS, WSS, Electrical, Holdings, WISG, and WIS; the good faith deposit to be placed in escrow by the Stalking Horse Bidder is $6,000,000; and the Bid Protections (as defined in the Bidding Procedures) for the Stalking Horse Bidder include a Break-Up Fee (as defined in the Bidding Procedures) in the amount of $2,400,000 and Buyer Expense Reimbursement (as defined in the Bidding Procedures) up to the amount of $1,000,000, the payment of both of which to become due pursuant to specified conditions set forth in the Stalking Horse APA, as described below. The Debtors assert that these terms are commercially reasonable under the circumstances.

15.      In the event that the Debtors, collectively or any combination of the Debtors, enter into any Additional Stalking Horse APA (as defined in the Bidding Procedures) for assets not being purchased by Energy Solutions that the Debtors determine, after consultation with the Consultation Parties (as defined in the Bidding Procedures), is in the best interests of the Debtors and their estates, the Debtors will file with the Court, and upload to the Data Room (as defined in the Bidding Procedures), a notice that shall include the following: (a) the identification of the Additional Stalking Horse Bidder (as defined in the Bidding Procedures); (b) a copy of the

Additional Stalking Horse APA; (c) the purchase price provided for the assets covered by the Additional Stalking Horse APA; (d) the amount of the deposit paid by the Additional Stalking Horse Bidder; and (e) the amount of any Additional Bid Protections (as defined in the Bidding Procedures). The Debtors will seek expedited approval of any Additional Stalking Horse APA and any Additional Bid Protections provided for therein.

16.     In accordance with Local Rule 6004-1(c)(i)(C), the Debtors highlight the following provisions relating to the Bid Protections:

(1) Go-Shop Period. Section 8.02 of the Stalking Horse APA provides that until the date of entry of the Sale Order, the Debtors are permitted to solicit or encourage submission of proposals or offers by any person in connection with a competing transaction.

(2) Conditions to Payment of Break-Up Fee and Expense Reimbursement. Pursuant to Section 8.01 of the Stalking Horse APA, the Break-Up Fee and Buyer Expense Reimbursement shall only be payable following the termination of the Agreement pursuant to Section 11.01(c) (i.e., Sellers' breach of representations, warranties or covenants that cause a closing condition not to be satisfied); Section 11.01(d) (i.e., closing shall not have occurred by September 17, 2023]; Section 11.01(f) (i.e., Sellers enter into, or Court approves, an agreement for a competing transaction, or any of the Debtors' cases are dismissed or converted to Chapter 7, or an examiner with expanded powers is appointed in Debtors' chapter 11 cases); Section 11.01(g) (i.e., a Sale Order is not entered by September 5, 2023); or Section 11.01(h) (i.e., any Seller determines that its fiduciary obligations prevent it from proceeding with the sale).

In the event the Stalking Horse APA is terminated pursuant to Sections 11.01(c) or 11.01(h), the Break-Up Fee and Buyer Expense Reimbursement shall be due and payable within two (2) business days following the date of termination. In the event the Stalking Horse APA is terminated pursuant to Sections 11.01(d), (f) or (g), and a competing transaction is consummated or entered into within twelve (12) months following termination, the Break-Up Fee and Expense Reimbursement shall be due and payable within one (1) business day following the consummation of the competing transaction.

(3) Break-Up/Topping Fees and Expense Reimbursement. As stated in Paragraphs 11 and 12 of the Bidding Procedures, the Debtors may designate Additional Stalking Horse Bidders for assets not being purchased by Energy Solutions and may offer such Bidders bid protections, including a break-up fee; provided, that, all bid protections must be negotiated by the Debtors, in consultation with the Consultation Parties, subject to notice and an opportunity for parties in interest to object. As

stated in Paragraph 29(b)(v) of the Bidding Procedures, any Credit Bid with respect to the Transferred Assets must include sufficient cash consideration to pay in full all Bid Protections to the Stalking Horse Bidder, and any Credit Bid with respect to any Excluded Assets must include sufficient cash consideration to pay in full any Additional Bid Protections in connection with any Additional Stalking Horse APA with respect to such Excluded Assets.

(4) <u>Bidding Increments</u>. As stated in Paragraph 43 of the Bidding Procedures, the starting bid ("<u>Starting Bid</u>") shall be the highest or best Qualified Bid, as determined by the Debtors in consultation with the Consultation Parties. If the Stalking Horse Bid is selected as the Starting Bid, any Overbid shall include the amount provided for in the Stalking Horse Bid, plus the Bid Protections, plus a minimum overbid increment of $500,000 or a lesser amount to be determined by the Debtors in their business judgment, in consultation with the Consultation Parties.

**D.    Proposed Bidding Procedures**

17.    By this Motion, the Debtors request approval of the Bidding Procedures ("<u>Bidding Procedures</u>") attached as **Exhibit 1** to the proposed order attached hereto as **Exhibit B** ("<u>Bidding Procedures Order</u>"). The proposed Bidding Procedures are designed to permit a fair, efficient, competitive, and value-maximizing auction process for the sale of the assets in the Stalking Horse APA, and other assets of the Debtors (collectively, the "<u>Assets</u>").

18.    In light of the extensive marketing process conducted by Greenhill prior to the Petition Date, the Debtors believe the Bidding Procedures will provide them more than sufficient time to determine the interest of other parties who may have an interest in proposing a competing transaction. Furthermore, the Debtors believe that potential bidders will have ample notice and time to conduct thorough due diligence to submit binding bids in advance of the bid deadline. The Bidding Procedures are designed to encourage all prospective bidders to put their best bid forward, bring finality to the Debtors chapter 11 process, and create a path towards the highest or otherwise best available recoveries to the Debtors' stakeholders.

19.     Because the Bidding Procedures are attached as **Exhibit 1** to the Bidding

Procedures Order (which is attached hereto as **Exhibit B**), they are not restated fully herein.

Generally, however, the Bidding Procedures establish, among other things:[2]

    (1) the Debtors will serve the Bidding Procedures Order (setting forth the schedule for the sale process), Bidding Procedures, and Sale Notice (as defined below) on all relevant notice parties as soon as practicable after entry of the Bidding Procedures Order;

    (2) the availability of, and access to, due diligence by potential bidders;

    (3) the deadlines and requirements for submitting competing bids and the method and criteria by which such competing bids are deemed to be "Qualified Bids" sufficient to trigger the Auction (as defined in the Bidding Procedures) and participate in the Auction;

    (4) the manner in which Qualified Bids will be evaluated by the Debtors to determine the starting bid for the Auction;

    (5) the conditions for having the Auction and procedures for conducting the Auction, if any; and

    (6) various other matters relating to the sale process generally, including the designation of the back-up bid, return of any good faith deposits, and certain reservations of rights.

20.     In accordance with Local Rule 6004-1(c)(i)(A), the Debtors highlight the following

provisions relating to the Qualification of Bidders. A Potential Bidder must:

    (1) Deliver financial information by the Bid Deadline to the Debtors and their Advisors, as defined in the Bidding Procedures, as provided in Paragraph 16 of the Bidding Procedures.

    (2) Demonstrate its financial wherewithal to consummate a sale as provided in Paragraph 16(b) of the Bidding Procedures.

    (3) Execute a non-disclosure agreement as provided in Paragraph 16(a) of the Bidding Procedures.

---

[2] The following summary is provided for convenience purposes only. To the extent any of the terms described below are inconsistent with the Bidding Procedures, the Bidding Procedures control in all respects.

21.     In accordance with Local Rule 6004-1(c)(i)(B), the Debtors highlight the following provisions relating to the Qualification of Bids:

(1) A Potential Bidder must submit a Bid by August 31, 2023 as provided in Paragraph 22 of the Bidding Procedures. Pursuant to Paragraph 37 of the Bidding Procedures, the Debtors may work with any Potential Bidder to cure any deficiencies in the Bid.

(2) A Bid must be in the form as provided in Paragraph 29 of the Bidding Procedures. In particular, a Bid must include an executed agreement ("Proposed Agreement") for the acquisition of all or some of the businesses or assets of the Debtors, together with a redline comparing the Proposed Agreement to the Stalking Horse APA, or any Additional Stalking Horse APA. Among other things, the Bid must state that it is formal, binding and unconditional, not subject to any further due diligence or financing contingency, and irrevocable until the Bidder is notified that the Bid is not the Successful Bid or a Back-Up Bid. The Bid must contain proof of financial ability to perform and identify any governmental or regulatory approval required for the consummation of the transaction. With the exception of the Stalking Horse Bid and any Additional Stalking Horse Bid, the Bid must state that the Bidder shall not be entitled to any break-up fee or expense reimbursement.

(3) A Bid must include a good faith deposit in the amount of ten percent (10%) of the Purchase Price, as provided in Paragraphs 30 and 32 of the Bidding Procedures. Such good faith deposit is not refundable if, as stated in Paragraph 55 of the Bidding Procedures: (i) the Qualified Bidder attempts to modify, amend, or withdraw its Qualified Bid, except as permitted herein, during the time the Qualified Bid remains binding and irrevocable or (ii) the Qualified Bidder is selected as a Successful Bidder or Back-Up Bidder and refuses or fails to enter into the required definitive documentation or to consummate the Sale Transactions according to these Bidding Procedures.

(4) As provided in Paragraph 39 of the Bidding Procedures, secured creditors shall have the right to credit bid all or a portion of their claims with respect to the collateral securing their claims, provided, however, that any such credit bid shall be subject to the lien challenges rights of the creditors committee set forth in any Court order. Any credit bid must also include sufficient cash consideration to satisfy in full all obligations secured by senior liens on the applicable assets, as provided in Paragraph 29(b)(ii) of the Bidding Procedures.

(5) As provided in Paragraph 61 of the Bidding Procedures, all potential Bidders (including the Stalking Horse Bidder and any Additional Stalking Horse Bidders) that participate in the bidding process shall be deemed to have (i) consented to the core jurisdiction of the Court to enter any order or orders, which shall be binding in all respects, in any way related to the Bidding Procedures, the bid process, the Auction, the applicable Sale Hearing (as defined herein), or the construction and enforcement of any agreement or any other document relating to the Sale Transactions (as defined in the Bid Procedures); (ii) waived any right to a jury trial

in connection with any disputes relating to these Bidding Procedures, the bid process, the Auction, the applicable Sale Hearing, or the construction and enforcement of any agreement or any other document relating to the Sale Transactions; and (iii) consented to the entry of a final order or judgment in any way related to these Bidding Procedures, the bid process, the Auction, the applicable Sale Hearing, or the construction and enforcement of any agreement or any other document relating to the Sale Transactions if it is determined that the Court would lack Article III jurisdiction to enter such a final order or judgment absent the consent of the parties.

(6) As provided in Paragraph 15 of the Bidding Procedures, the Stalking Horse Bidder is a Qualified Bidder, and following the entry of an order designating a party as an Additional Stalking Horse Bidder, such Additional Stalking Horse Bidder shall be a Qualified Bidder.

22.    Importantly, the Bidding Procedures recognize and comply with the Debtors' fiduciary obligations to maximize sale value and do not impair the Debtors' ability to consider all strategic alternatives made at or prior to the Auction. As provided in Paragraphs 8 and 51 of the Bidding Procedures, the Debtors preserve their right, after consulting with the Consultation Parties, to modify the Bidding Procedures as necessary or appropriate to maximize value for the Debtors' estates, provided, however, that the Debtors will not make material modifications without further order of the Court, and the Debtors will not modify the Bid Protections afforded to the Stalking Horse Bidder in the Stalking Horse APA without the written consent of the Stalking Horse Bidder.

23.    As provided in Paragraph 29(c) of the Bidding Procedures, all Bids are irrevocable until the Debtors notify the Potential Bidder that such Bid is not a Successful Bid or a Back-Up Bid, or with respect to a Back-Up Bid until the earlier of (a) the first business day after the close of the Sale Transaction with the Successful Bidder for the Assets bid upon by such Back-Up Bidder or (b) 60 days after the entry of an order approving the Sale Transaction with the Successful Bidder for the Assets Bid upon by such Back-Up Bidder.

E.      **Proposed Sale Schedule**

24.     The Debtors are seeking approval of the Bidding Procedures and the Sale Schedule (as defined below) to establish a clear and open process for the solicitation, receipt, and evaluation of third-party bids on a timeline that will allow the Debtors, or any combination of Debtors, to consummate a Sale. A defined path toward effectuating the Sale will drive the sale process in an expeditious and efficient manner and is designed to encourage all prospective bidders to put their best bids forward at the outset of these chapter 11 cases to provide the highest or otherwise best available recoveries to the Debtors' stakeholders.

25.     The Debtors, with the assistance of Greenhill, conducted an intensive pre-petition marketing effort, and will use the time following entry of the Bidding Procedures Order to continue the process to actively market the Assets. Subject to the Court's availability, the key dates and deadlines the Debtors seek to establish pursuant to the Bidding Procedures Order ("<u>Sale Schedule</u>") are as follows, provided that the Debtors request authority to amend the Sale Schedule without further order of the Court so long as such changes to the Sale Schedule comply with any milestones contained in such DIP Financing Order and/or Cash Collateral Order as may be entered by the Court:

(1)     **Bid Deadline**: August 31, 2023 at 5:00 p.m. (prevailing Eastern Time) is the deadline by which all Bids must be ***<u>actually received</u>*** by the parties specified in the Bidding Procedures (the "<u>Bid Deadline</u>").

(2)     **Auction**: The Auction, if necessary, will be held on September 2, 2023 at 10:00 a.m. (prevailing Eastern Time) at the offices of counsel to the Debtors, Thompson Hine LLP, Two Alliance Center, 3560 Lenox Road NE, Suite 1600, Atlanta, GA 30309 and/or virtually.

(3)     **Sale Objection Deadline**: The deadline by which all objections to the Sale or the assumption and assignment of any executory contracts must be filed with the Court and served so as to be actually received by the appropriate notice parties ("<u>Sale Objection Deadline</u>"), is September 3, 2023 at 5:00 p.m. (prevailing Eastern Time).

(4) **Sale Hearing**: The hearing authorizing the Sale to the Successful Bidder (as defined in the Bidding Procedures) shall take place before the Court on September 5, 2023 at 10:00 a.m. (prevailing Eastern Time).

F.     **Notice of Auction**

26.     As soon as reasonably practicable, but no later than three (3) business days after entry of the Bidding Procedures Order ("Mailing Date"), the Debtors (or their agents) will cause the notice substantially in the form attached as **Exhibit 2** to the Bidding Procedures Order ("Sale Notice"), to be served on the following parties or their respective counsel, if known: (a) the Office of the United States Trustee for the District of Delaware; (b) counsel to the Debtors' pre-petition and post-petition secured lenders, (c) the counsel to the official committee of unsecured creditors, if any; (d) all parties who have expressed a written interest in some or all of the Assets; (e) all parties who are known or reasonably believed, after reasonable inquiry, to have asserted any lien, encumbrance, claim or other interest in the Assets; (f) the Internal Revenue Service; (g) the Georgia Department of Revenue; (h) the Delaware Division of Revenue; (i) the United States Attorney for the District of Delaware; (j) the state attorneys general for states in which the Debtors conduct business; (k) the Securities Exchange Commission; and (l) any party that has requested notice pursuant to Bankruptcy Rule 2002.

27.     In addition, on the Mailing Date, or as soon thereafter as practicable, the Debtors (or their agents) will serve by first-class mail, postage prepaid, the Sale Notice, upon all other known creditors of the Debtors and all counterparties to the Debtors' executory contracts and unexpired leases.

28.     The Debtors submit that the Sale Notice is reasonably calculated to provide all interested parties with timely and proper notice of the proposed Sale, including the date, time, and place of the Auction (if one is held) and the Bidding Procedures and the dates and deadlines related

thereto. Accordingly, the Debtors request that the form and manner of the Sale Notice be approved and that the Court determine that no other or further notice of the Auction is required.

**G.      Summary of the Assumption and Assignment Procedures**

29.      The Debtors propose the below procedures for the assumption and assignment ("Assumption and Assignment Procedures") for notifying the counterparties to executory contracts and unexpired leases (each a "Contract Counterparty" and collectively, the "Contract Counterparties") of the possible assignment of their contracts or leases and the proposed cure amounts in the event the Debtors decide to assume and assign such contracts or leases in connection with the Sale.

i.      Notice of Potential Assumption and Assignment

30.      In accordance with the Bidding Procedures Order, on or before three business days after the entry of the Bidding Procedures Order (such date, the "Assumption and Assignment Service Date"), the Debtors shall file with the Court and serve a Notice of Potential Assumption and Assignment via first class mail, electronic mail, or overnight delivery the Cure Notice annexed as **Exhibit 3** to the Bidding Procedures Order on all Contract Counterparties and, include as **Exhibit A** to the Cure Notice, a list ("Assigned Contracts Schedule") that specifies: (a) each of the Debtors' executory contracts and unexpired leases that may be assumed and assigned in connection with the Sale (i.e., the "Assigned Contracts"), including the name of the Contract Counterparty to each such contract; (b) the proposed amount necessary, if any, to cure all monetary defaults, if any, under each Assigned Contract (the "Cure Costs"); and (c) the deadline by which any Contract Counterparty may file an objection to the proposed assumption, assignment, cure, and/or adequate assurance and the procedures relating thereto. The Debtors shall serve, via first class mail, a customized version of the Cure Notice, without the Assigned Contracts Schedule, which will include: (w) instructions (the "Instructions") regarding how to view the Assigned Contracts

Schedule        on        the        Debtors'        case        website,
*https://dm.epiq11.com/casse/williamsindustrialservicesgroup/info*  (the  "Case Website");  (x)
information necessary and appropriate to provide notice of the relevant proposed assumption and
assignment of Assigned Contracts and rights thereunder; (y) Cure Costs, if any; and (z) the
procedures for objecting thereto ((x)-(z) collectively, the "Necessary Notice Information"), on
each Contract Counterparty to the Assigned Contracts. The Debtors shall serve on all parties that
requested notice pursuant to Bankruptcy Rule 2002 a modified version of the Cure Notice that
contains the Instructions and Necessary Notice Information. The Debtors believe the service as set
forth herein should be deemed proper, due, timely, good, and sufficient notice and no other or
further notice will be necessary.

31.    A Contract Counterparty listed on the Assigned Contract Schedule may file an
objection ("Assigned Contract Objection") to the proposed assumption and assignment of the
applicable Assigned Contract or the proposed Cure Costs, if any. All Assigned Contract Objections
must: (i) be in writing; (ii) comply with the applicable provisions of the Bankruptcy Rules, the
Local Rules, and any order governing the administration of these chapter 11 cases; (iii) state with
specificity the nature of the objection and, if the objection pertains to the proposed Cure Costs,
state the cure amount alleged to be owed to the objecting Contract Counterparty, together with any
applicable and appropriate documentation in support thereof; and (iv) be filed with the Court and
served and actually received no later than fourteen days after the Assumption and Assignment
Service Date ("Cure Objection Deadline").

32.    If a Contract Counterparty files an Assigned Contract Objection in a manner that is
consistent with the requirements set forth above, and the Stalking Horse Bidder (if any) or other
Successful Bidder (as defined in the Bidding Procedures) has designated in writing that it wishes

to take assignment of such Assigned Contract, and the parties are unable to consensually resolve the dispute prior to the Sale Hearing (as defined below), such objection will be resolved at the Sale Hearing or such later date as determined by the Court. To the extent that any Assigned Contract Objection cannot be resolved by the parties, such Assigned Contract shall be assumed and assigned only upon satisfactory resolution of the Assigned Contract Objection, to be determined in the Stalking Horse Bidder (if any) or other Successful Bidder's discretion. To the extent an Assigned Contract Objection remains unresolved, the Assigned Contract may be conditionally assumed and assigned, subject to the consent of the Stalking Horse Bidder (if any) or other Successful Bidder, pending a resolution of the Assigned Contract Objection after notice and a hearing. If an Assigned Contract Objection is not satisfactorily resolved, the Stalking Horse Bidder (if any) or other Successful Bidder may determine that such Assigned Contract should be rejected and not assigned, in which case the Stalking Horse Bidder (if any) or other Successful Bidder will not be responsible for any Cure Costs in respect of such contract.

      ii.    <u>Supplemental Cure Notice</u>

33.    If (a) the Debtors discover contracts inadvertently omitted from the Assigned Contracts Schedule, (b) the Successful Bidder identifies other executory contracts or unexpired leases that it desires to assume and assign in connection with the Sale, or (c) the previously stated Cure Cost associated with any Assigned Contract requires modification, the Debtors may, at any time after the Assumption and Assignment Service Date: (i) supplement the Assigned Contracts Schedule with the previously omitted Assigned Contracts; (ii) remove any Assigned Contracts from the list of executory contracts and unexpired leases ultimately selected as Assigned Contracts that the Successful Bidder proposes be assumed and assigned to it in connection with the Sale or add to such list; and/or (iii) modify the previously stated Cure Costs associated with any Assigned Contract.

34.     In the event the Debtors exercise any of the rights reserved above, the Debtors shall promptly serve a supplemental notice of assumption and assignment by electronic transmission, hand delivery, or overnight mail on the Contract Counterparty, and its counsel, if known, at the last known address available to the Debtors (a "Supplemental Cure Notice"). Each Supplemental Cure Notice shall include the same information with respect to listed Assigned Contracts as would have been included in the Notice of Potential Assumption and Assignment ("Supplemental Assigned Contracts Schedule").

35.     Any Contract Counterparty that receives a Supplemental Cure Notice may file an objection ("Supplemental Assigned Contract Objection") to the proposed assumption and assignment of the applicable Assigned Contract or the proposed Cure Costs, if any. All Supplemental Assigned Contract Objections must: (a) state, with specificity, the legal and factual basis for the objection as well as what Cure Costs are required, if any; (b) include appropriate documentation in support thereof; and (c) be filed on the date that is the later of (i) the Sale Objection Deadline and (ii) 14 days following the date of service of such Supplemental Cure Notice, which date will be set forth in the Supplemental Cure Notice ("Supplemental Assigned Contract Objection Deadline").

36.     If a Contract Counterparty files a Supplemental Assigned Contract Objection in a manner that is consistent with the requirements set forth above, and the parties are unable to consensually resolve the dispute, the Debtors shall seek an expedited hearing before the Court ("Supplemental Assigned Contract Hearing") to determine the Cure Costs, if any, and approve the assumption of the relevant Assigned Contracts. If there is no such objection, then the Debtors shall obtain an order of this Court fixing the Cure Costs and approving the assumption and assignment of any Assigned Contract listed on a Supplemental Cure Notice.

37.     If a Contract Counterparty does not file and serve an Assigned Contract Objection or Supplemental Assigned Contract Objection in a manner that is consistent with the requirements set forth above, and absent a subsequent order of the Court establishing an alternative Cure Cost, (a) the Cure Costs, if any, set forth in the Cure Notice (or Supplemental Cure Notice) shall be controlling, notwithstanding anything to the contrary in any Assigned Contract or any other document, and (b) the Contract Counterparty will be deemed to have consented to the assumption and assignment of the Assigned Contract and the Cure Costs, if any, and will be forever barred from objecting to the assumption and assignment of such Assigned Contract and rights thereunder, including the Cure Costs, if any, and from asserting any other claims related to such Assigned Contract against the Debtors or the Successful Bidder, or the property of any of them.

38.     Any objections to the Successful Bidder's proposed form of adequate assurance of future performance must be filed by the later of the Sale Objection Deadline or Supplemental Assigned Contract Objection Deadline, as applicable, and such objections will be resolved at the Sale Hearing or Supplemental Assigned Contract Hearing, as applicable. The Debtors may, with the consent of the Successful Bidder, adjourn the resolution of any such objection to a later hearing.

39.     For the avoidance of doubt, the inclusion of an Assigned Contract on the Assigned Contracts Schedule or Supplemental Assigned Contracts Schedule shall not obligate the Debtors to assume any such Assigned Contract or obligate any Stalking Horse Bidder or a Successful Bidder to take assignment of any such Assigned Contract. Any Stalking Horse Bidder or other Successful Bidder shall determine whether to take assignment of any Assigned Contracts pursuant to the terms of the Stalking Horse APA, or Additional Stalking Horse APA (as defined in the Bidding Procedures).

## RELIEF REQUESTED

40.     By this Motion, the Debtors seek entry of two orders: (i) following an initial hearing ("Bidding Procedures Hearing"), an order in the form attached hereto as **Exhibit B** (a) authorizing and scheduling the Auction at which the Debtors will solicit the highest or best bid for the Sale; (b) approving the bidding procedures related to the solicitation of Bids and the conduct of the Auction; (c) approving the form and manner of the notices of (1) the proposed sale of the Debtors' Assets, the Auction and the Sale Hearing and (2) the proposed assumption and assignment of the Debtors' executory contracts and unexpired leases and proposed cure costs related thereto; and (ii) following a final hearing ("Sale Hearing"), an order ("Sale Order") authorizing the sale by the Debtors of the Assets to the bidder submitting the highest or best bid for the Assets in connection with the bidding and sale process.

## BASIS FOR RELIEF REQUESTED

### A.     The Assets May Be Sold Free and Clear of Liens, Claims, Interests and Encumbrances under Bankruptcy Code Section 363(f).

41.     Bankruptcy Code section 363(f) authorizes a debtor to sell assets free and clear of all liens, claims, interests and encumbrances provided that one of the following conditions is met:

> (1) applicable non-bankruptcy law permits sale of such property free and clear of such interests;
>
> (2) such entity consents;
>
> (3) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;
>
> (4) such interest is in bona fide dispute; or
>
> (5) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f)(1)-(5).

42.     As section 363(f) of the Bankruptcy Code is stated in the disjunctive, when proceeding pursuant to section 363(b), it is only necessary for a debtor to meet one of the five conditions of section 363(f). *See In re Flyboy Aviation Props., LLC*, 501 B.R. 828, 834 (Bankr. N.D. Ga. 2013); *Mich. Employment Sec. Comm'n v. Wolverine Radio Co. (In re Wolverine Radio Co.)*, 930 F.2d 1132, 1147 n.24 (6th Cir. 1991) (stating that Bankruptcy Code section 363(f) written in disjunctive; holding that court may approve sale "free and clear" provided at least one of the subsections of section 363(f) is met); *In re Zeigler*, 320 B.R. 362, 381 (Bankr. N.D. Ill. 2005); *In re Dundee Equity Corp.*, No. 89-B-10233, 1992 Bankr. LEXIS 436, at *12 (Bankr. S.D.N.Y. Mar. 6, 1992) ("Section 363(f) is in the disjunctive, such that the sale free of the interest concerned may occur if any one of the conditions of §363(f) have been met."); *In re Bygaph, Inc.*, 56 B.R. 596, 606 n.8 (Bankr. S.D.N.Y. 1986) (same).

43.     The Debtors submit that each lien (other than liens that will be assumed liabilities or permitted encumbrance under the Purchase Agreement) satisfies at least one of the five conditions of Bankruptcy Code section 363(f). If an entity with liens on the Assets does not consent to the proposed sale of such Assets, the Debtors intend to demonstrate at the Sale Hearing their satisfaction of the requirements of Bankruptcy Code section 363(f). Alternatively, the Debtors may sell the Assets free and clear of any other interests under section 363(f)(5) because the liens on any Assets sold will attach to the cash proceeds of such Sale in their order of priority and entities holding such interests could be compelled to accept money satisfaction in legal or equitable proceedings. Accordingly, pursuant to Bankruptcy Code section 363, the Debtors may sell the Assets free and clear of all claims, liens and encumbrances.

44.     Moreover, the Debtors have sent or will send the Sale Notice to any purported lienholders. If such lienholders do not object to the Sale, then their consent should reasonably be

presumed. Accordingly, the Debtors request that unless a party asserting a lien on any of the Assets (other than with respect to assumed liabilities and permitted encumbrances under the Purchase Agreement) timely objects to this Motion, such party shall be deemed to have consented to any Sale approved at the Sale Hearing.

45. It is also appropriate to sell the Assets free and clear of successor liability relating to the Debtors' businesses. Such limitations on successor liability ensure that the Successful Bidder is protected from any claims or lawsuits premised on the theory that the Successful Bidder is a successor in interest to one or more of the Debtors. Courts have consistently held that a buyer of a debtor's assets pursuant to a section 363 sale takes free and clear from successor liability relating to the debtor's business. *See e.g., In re Tran World Airlines, Inc.*, 322 F.3d 283, 288-90 (3d Cir. 2003) (sale of assets pursuant to section 363(f) barred successor liability claims for employment discrimination and rights under travel voucher program); *In re Leckie Smokeless Coal Co.*, 99 F.3d 573, 585 (4th Cir. 1996) (affirming sale of debtors' assets free and clear of certain taxes); *In re Dixie Pellets LLC*, No. 09-05411-11-TOM, 2010 Bankr. LEXIS 5624, at *28 (Bankr. N.D. Ala. May 13, 2010) (approving sale of substantially all of Debtor's assets free and clear of all liens, including but not limited to "all rights or claims based on any theory or principle of successor liability"); *In re Ormet*, No. 13-10334 (MFW), 2014 Bankr. LEXIS 3071, at *6-11 (Bankr. D. Del. July 17, 2014) (permitting sale free and clear of successor liability claims relating to under-funded pension plan); *In re Insilco Techs., Inc.*, 351 B.R. 313, 322 (Bankr. D. Del. 2006) (stating that 363 sale permits buyer to take ownership of property without concern that creditor will file suit based on successor liability theory); *see also In re Gen. Motors Corp.*, 407 B.R. 463, 505-06 (Bankr. S.D.N.Y. 2009) (holding that "the law in this Circuit and District is clear; the Court will permit GM's assets to pass to the purchaser free and clear of successor liability claims, and in that

connection, will issue the requested findings and associated injunction"); *In re Chrysler LLC*, 405 B.R. 84, 111 (Bankr. S.D.N.Y. 2009) ("[I]n personam claims, including any potential state successor or transferee liability claims against New Chrysler, as well as in rem interests, are encompassed by section 363(f) and are therefore extinguished by the Sale Transaction").

46.     The purpose of a sale order purporting to authorize the transfer of assets free and clear of all claims, liens and encumbrances would be defeated if claimants could thereafter use the transfer as a basis to assert claims against a purchaser arising from a seller's pre-sale conduct.

47.     Moreover, without such assurances, a buyer may not agree to purchase the Assets and potential bidders may choose not to participate in the Auction or, if they did, would submit reduced bid amounts. To that end, the Successful Bidder should not be liable under any theory of successor liability relating to the Debtors' businesses, but should hold the Assets free and clear.

**B.      A Successful Bidder Should be Entitled to the Protection of Bankruptcy Code 363(m).**

48.     Pursuant to Bankruptcy Code section 363(m), a good faith purchaser is one who purchases assets for value, in good faith, and without notice of adverse claims. *See Miami Ctr. Ltd. P 'ship v. Bank of N.Y.*, 838 F.2d 1547, 1554 (11th Cir. 1988); *In re Mark Bell Furniture Warehouse, Inc.*, 992 F.2d 7, 9 (1st Cir. 1993); *In re Willemain v. Kivitz*, 764 F.2d 1019, 1023 (4th Cir. 1985); *In re Congoleum Corp.*, No. 03-51524, 2007 Bankr. LEXIS 1707, at *5-7 (Bankr. D.N.J. May 11, 2007); *In re Abbotts Dairies*, 788 F.2d 143, 147 (3d Cir. 1986).

49.     The Purchase Agreement for the Successful Bidder will be negotiated at arm's-length, with each of the parties represented by its own advisors and counsel. Accordingly, the Debtors request that the order approving the Sale include a provision that the Successful Bidder for the relevant Assets is a "good faith" purchaser within the meaning of Bankruptcy Code section 363(m). The Debtors maintain that providing the Successful Bidder with such protection will ensure that the maximum price will be received by the Debtors for the Assets.

**C.**     **The Form, Manner and Extent of Notice of the Motion and the Proposed Sale are Appropriate and Adequate Under the Circumstances.**

50.     The Debtors will serve the Sale Notice and the Cure Notice in accordance with the Bidding Procedures Order. The notice of the proposed Sale to be provided by the Debtors as set forth herein sufficiently describes the terms and conditions of the proposed Sale.

51.     Several sections of the Bankruptcy Code and Bankruptcy Rules dictate the sufficiency of notice and adequacy of service. As discussed below, the content and manner of service of this Motion and the related notices satisfy all such requirements:

(1) Sale Notice — Bankruptcy Code section 363 provides that a trustee may sell property "after notice and hearing." Under Section 102(1) of the Bankruptcy Code, the phrase "after notice and hearing" means "notice as is appropriate in the particular circumstances, and such opportunity for a hearing as is appropriate in the particular circumstances." 11 U.S.C. § 102(1)(A). As set forth above, creditors have been provided notice of the salient details regarding this motion and the Sale Hearing. Accordingly, notice is sufficient under Bankruptcy Code section 363.

(2) Bankruptcy Rule 2002 - Bankruptcy Rule 2002 requires twenty-one (21) days' notice of the proposed sale of property other than in the ordinary course of business. In addition, Bankruptcy Rule 2002 provides that notice of a sale shall "include the time and place of any public sale, the terms and conditions of any private sale and the time fixed for filing objections." Fed. R. Bankr. P. 2002. As set forth above, the notice of this motion that has been and will be provided by the Debtors satisfies each of these requirements.

(3) Bankruptcy Rules 6004 and 6006 - Bankruptcy Rule 6004 requires that notice of sales of property out of the ordinary course of business complies with Bankruptcy Rule 2002. As set forth above, the Debtors have complied with Bankruptcy Rule 2002. Bankruptcy Rule 6006 requires notice of a motion to assume and assign an executory contract or unexpired lease to be served on the counterparty to such contract or lease, as well as on other parties in interest as the Court may direct. The Sale Notice and the Cure Notice have been or will be served on counterparties to the Assigned Contracts, thereby satisfying this requirement.

52.     The Debtors submit that the notice they have provided and intend to provide as outlined above with respect to the proposed Sale, the Bidding Procedures, and the Cure Costs, as applicable, is reasonable and appropriate and constitutes good and adequate notice of the proposed

Sale and the procedures and proceedings related thereto and therefore should be approved by this Court.

**D.      The Assumption and Assignment Procedures Should Be Approved.**

53.      To facilitate and effectuate the Sale, the Debtors are seeking approval of the Assumption and Assignment Procedures. The Assumption and Assignment Procedures are reasonable and necessary to properly notify parties of potential assumptions and/or assignments and provide the Contract Counterparties with sufficient time to determine the accuracy of the proposed cure amount and whether the Debtors have provided adequate assurance of future performance.

54.      The Debtors believe that they can and will demonstrate at the Sale Hearing that the requirements for assumption and assignment of the Assigned Contracts to the Successful Bidder will be satisfied. As required by the Bidding Procedures, the Debtors will evaluate the financial wherewithal of potential bidders before designating such party a Qualified Bidder (as defined in the Bidding Procedures) or Successful Bidder (e.g., financial credibility, willingness, and ability of the interested party to perform under the Assigned Contracts), including as it relates to such Qualified Bidder's willingness, and ability to perform under the Assigned Contracts assigned to the Successful Bidder. Further, the Assumption and Assignment Procedures provide the Court and other interested parties ample opportunity to evaluate and, if necessary, challenge the ability of the Successful Bidder to provide adequate assurance of future performance and object to the assumption of the Assigned Contracts or proposed cure amounts. The Court therefore will have a sufficient basis to authorize the Debtors to reject or assume and assign the Assigned Contracts as set forth in the definitive agreement of the Successful Bidder.

55.     Accordingly, the Debtors submit that the Assumption and Assignment Procedures should be approved as reasonable and necessary measures to adequately notify parties in interest and conduct the proposed sale process in a fair, efficient, and proper manner.

**E.     The Stay of the Sale Order Should be Waived.**

56.     Pursuant to Bankruptcy Rules 6004(h) and 6006(d), an order authorizing the sale of property or the assignment of an executory contract or unexpired lease is stayed for fourteen (14) days after the entry of an order unless the Court orders otherwise.

57.     The Debtors request that this Court order that such stay is not applicable with respect to the sale of the Debtors' Assets and assignment and assumption of the related executory contracts and/or unexpired leases. To require the Debtors to effectively be liable under the applicable executory contracts and/or unexpired leases for an extra fourteen (14) days and to delay the closing will burden the estates and require unnecessary expenditures of the Debtors' limited resources. The Debtors note that similar requests to waive the stay imposed under Bankruptcy Rules 6004(h) and 6006(d) are routinely granted in this district and others. *See, e.g., In re Midway Games Inc.*, No. 09-10465 (KG) (Bankr. D. Del. June 3, 2009); *In re Nortel Networks Inc.*, No. 09-10138 (Bankr. D. Del. Feb. 27, 2009); *In re Beaulieu Grp., LLC*, No. 17-41677 (MGD) (Bankr. N.D. Ga. Oct. 31, 2017); *In re the Great Atl. & Pac. Tea Co., Inc.*, Case No. 15-23007 (SCC) (Bankr. S.D.N.Y. Aug. 11, 2015); *In re Delia's, Inc.*, No. 14-23678 (RDD) (Bankr. S.D.N.Y. Feb. 10, 2015).

<u>**NOTICE**</u>

58.     Notice of this Motion has been provided to: (a) the Office of the United States Trustee for the District of Delaware; (b) the Debtors' thirty (30) largest unsecured creditors; (c) counsel to the administrative agents for the Debtors' prepetition credit facilities; (d) the Internal Revenue Service; (e) the Georgia Department of Revenue; (f) the Delaware Division of Revenue;

(g) the United States Attorney for the District of Delaware; (h) the Securities and Exchange Commission; (i) the state attorneys general for states in which the Debtors conduct business; and (j) any party that has requested notice pursuant to Bankruptcy Rule 2002. In light of the nature of the relief requested, the Debtors respectfully submit that no further notice is necessary.

## **<u>CONCLUSION</u>**

WHEREFORE, based upon the foregoing, the Debtors respectfully request that the Court (a) enter an order following the Bidding Procedures Hearing, substantially in the form attached hereto as **<u>Exhibit B</u>**, (i) approving the Bidding Procedures, and (ii) authorizing the Debtors to take all actions reasonably necessary to effectuate such Bidding Procedures and the Sale; (b) enter the Sale Order following the Sale Hearing, approving the highest or best bid for the Assets and granting the other relief requested in this Motion; and (c) grant such other and further relief as the Court deems just and proper.

*[Remainder of Page Intentionally Blank]*

Dated: July 24, 2023.
Wilmington, Delaware

*/s/ Mark L. Desgrosseilliers*

Mark L. Desgrosseilliers (No. 4083)
**CHIPMAN BROWN CICERO & COLE, LLP**
Hercules Plaza
1313 North Market Street, Suite 5400
Wilmington, Delaware 19801
Telephone: (302) 295-0192
*desgross@chipmanbrown.com*

  -and-

Sean A. Gordon (*pro hac vice* pending)
Austin B. Alexander (*pro hac vice* pending)
**THOMPSON HINE LLP**
Two Alliance Center
3560 Lenox Road NE, Suite 1600
Atlanta, Georgia 30326-4266
Telephone: (404) 541-2900
Facsimile: (404) 541-2905
*Sean.Gordon@thompsonhine.com*
*Austin.Alexander@thompsonhine.com*

Alan R. Lepene (*pro hac vice* pending)
Scott B. Lepene (*pro hac vice* pending)
**THOMPSON HINE LLP**
3900 Key Center
127 Public Square
Cleveland, Ohio 44114-1291
Telephone: (216) 566-5500
Facsimile: (216) 566-5800
*Alan.Lepene@thompsonhine.com*
*Scott.Lepene@thompsonhine.com*

*Proposed Counsel for Debtors*