**EXHIBIT B**

*BLANK ROME DRAFT* ~~07/21/2023~~07/24/2023

**SUPER-PRIORITY SENIOR SECURED**
**DEBTOR-IN-POSSESSION REVOLVING CREDIT**
**AND**
**SECURITY AGREEMENT**

**PNC BANK, NATIONAL ASSOCIATION**
**(AS AGENT)**

**THE LENDERS PARTY HERETO**
**(AS LENDERS)**

**WITH**

**WILLIAMS INDUSTRIAL SERVICES GROUP INC.**
**WILLIAMS INDUSTRIAL SERVICES GROUP, L.L.C.**
**WILLIAMS INDUSTRIAL SERVICES, LLC**
**WILLIAMS SPECIALTY SERVICES, LLC**
**WILLIAMS PLANT SERVICES, LLC**
**WILLIAMS GLOBAL SERVICES, INC.**
**CONSTRUCTION & MAINTENANCE PROFESSIONALS, LLC**
**WISG ELECTRICAL, LLC**
**(AS BORROWERS)**

**AND**

**GLOBAL POWER PROFESSIONAL SERVICES INC.**
**GPEG, LLC**
**STEAM ENTERPRISES LLC**
**WISG CANADA LTD.**
**WISG NUCLEAR LTD.**
**WISG ELECTRICAL LTD.**
**(AS GUARANTORS)**
**July [25], 2023**

## TABLE OF CONTENTS

I.  DEFINITIONS............................................................................................................2

    1.1.   Accounting Terms ..............................................................................................2
    1.2.   General Terms ....................................................................................................3
    1.3.   Uniform Commercial Code / PPSA Terms ....................................................~~52~~51
    1.4.   Certain Matters of Construction ......................................................................52
    1.5.   Currency Matters ..............................................................................................53
    1.6.   [Reserved] ...................................................................................................~~54~~53
    1.7.   Canadian Terms ..........................................................................................~~54~~53
    1.8.   Conversion of Assets ........................................................................................54
    1.9.   Term SOFR Notification ..................................................................................54
    1.10.  [Reserved] .........................................................................................................54
    1.11.  Conforming Changes Relating to Term SOFR Rate ........................................54
    1.12.  Acknowledgment ........................................................................................~~55~~54
    1.13.  Release ...............................................................................................................55
    1.14.  Adoption and Ratification ................................................................................56

II. ADVANCES, PAYMENTS...................................................................................56

    2.1.   Revolving Advances ..........................................................................................56
    2.2.   Procedures for Requesting Revolving Advances; Procedures for Selection
          of Applicable Interest Rates for All Advances ..............................................57
    2.3.   [Reserved] ..........................................................................................................60
    2.4.   Swing Loans ......................................................................................................60
    2.5.   Disbursement of Advance Proceeds .................................................................61
    2.6.   Making and Settlement of Advances .................................................................61
    2.7.   Maximum Advances .........................................................................................63
    2.8.   Manner and Repayment of Advances ...............................................................63
    2.9.   Repayment of Excess Advances .......................................................................64
    2.10.  Statement of Account ...................................................................................~~65~~64
    2.11.  Letters of Credit ................................................................................................65
    2.12.  Issuance of Letters of Credit .............................................................................65
    2.13.  Requirements For Issuance of Letters of Credit ...............................................66
    2.14.  Disbursements, Reimbursement .......................................................................67
    2.15.  Repayment of Participation Advances ..............................................................68
    2.16.  Documentation ...........................................................................................~~69~~68
    2.17.  Determination to Honor Drawing Request .......................................................69
    2.18.  Nature of Participation and Reimbursement Obligations .................................69
    2.19.  Liability for Acts and Omissions ......................................................................70
    2.20.  Mandatory Prepayments. Subject in each case to the Intercreditor
          Agreement and the Interim Order, or, after the entry of the Final Order,
          the Final Order ................................................................................................72
    2.21.  Use of Proceeds ................................................................................................73
    2.22.  Defaulting Lender .............................................................................................74
    2.23.  Payment of Obligations ....................................................................................76

III.   INTEREST AND FEES......................................................................... 7776
    3.1.   Interest ........................................................................................ 77
    3.2.   Letter of Credit Fees; Cash Collateral ...................................... 77
    3.3.   Fees .............................................................................................. 7978
    3.4.   Computation of Interest and Fees .............................................. 8079
    3.5.   Maximum Charges ...................................................................... 8079
    3.6.   Increased Costs ........................................................................... 80
    3.7.   [Reserved] ................................................................................... 8180
    3.8.   Alternate Rate of Interest; Interest Rate Inadequate or Unfair .... 8180
    3.9.   Capital Adequacy ....................................................................... 86
    3.10.  Taxes............................................................................................ 8786
    3.11.  Replacement of Lenders ............................................................. 9190

IV.   COLLATERAL:  GENERAL TERMS ............................................... 91
    4.1.   Security Interest in the Collateral .............................................. 91
    4.34.2.  Perfection of Security Interest .................................................... 9291
    4.44.3.  Preservation of Collateral ........................................................... 92
    4.54.4.  Ownership and Location of Collateral ........................................ 9392
    4.64.5.  Defense of Agent's and Lenders' Interests ................................. 93
    4.74.6.  Inspection of Premises ................................................................ 9493
    4.84.7.  Appraisals .................................................................................... 94
    4.94.8.  Receivables; Deposit Accounts and Securities Accounts ........... 94
    4.104.9.  Inventory ................................................................................... 98
    4.114.10.  Maintenance of Equipment ....................................................... 98
    4.124.11.  Exculpation of Liability ............................................................ 98
    4.134.12.  Financing Statements .............................................................. 9998
    4.144.13.  Investment Property Collateral ................................................ 9998
    4.154.14.  Provisions Regarding Certain Investment Property Collateral ... 99
    4.164.15.  Superpriority Claims and Collateral Security ......................... 10099
    4.174.16.  No Filings Required ................................................................. 10099
    4.184.17.  Grants, Rights and Remedies ..................................................... 100

V.   REPRESENTATIONS AND WARRANTIES ................................... 100
    5.1.   Authority ...................................................................................... 100
    5.2.   Formation and Qualification ....................................................... 101100
    5.3.   Survival of Representations and Warranties ............................... 101
    5.4.   Tax Returns .................................................................................. 101
    5.5.   [Reserved] .................................................................................... 102101
    5.6.   Entity Names ............................................................................... 102101
    5.7.   O.S.H.A. Environmental Compliance; Flood Insurance ............ 102101
    5.8.   No Litigation, Violation, Indebtedness or Default; ERISA Compliance ... 103102
    5.9.   Intellectual Property ................................................................... 105104
    5.10.  Licenses and Permits .................................................................. 105
    5.11.  [Reserved] ................................................................................... 105
    5.12.  EEA Financial Institution. No Loan Party is an EEA Financial Institution ... 105
    5.13.  No Burdensome Restrictions ...................................................... 105

074658.23049/132216381v.5074658.23049/132216381v.9

5.14.    No Labor Disputes ................................................................ ~~106~~105
5.15.    Margin Regulations .............................................................. ~~106~~105
5.16.    Investment Company Act ..................................................... ~~106~~105
5.17.    Swaps ................................................................................... ~~106~~105
5.18.    Business and Property of the Loan Parties .......................... 106
5.19.    Ineligible Securities ............................................................ 106
5.20.    Federal Securities Laws ...................................................... 106
5.21.    Equity Interests ................................................................... ~~107~~106
5.22.    Commercial Tort Claims ..................................................... ~~107~~106
5.23.    Letter of Credit Rights ........................................................ ~~107~~106
5.24.    Material Contracts .............................................................. ~~107~~106
5.25.    Investment Property Collateral ........................................... 107
5.26.    DIP Term Loan Documents/Wynnefield Loan Documents .... 107
5.27.    Certificate of Beneficial Ownership .................................... ~~108~~107
5.28.    Disclosure ........................................................................... ~~108~~107
5.29.    Braden Holdings .................................................................. ~~108~~107
5.30.    Sanctions and other Anti-Terrorism Laws ........................... ~~108~~107
5.31.    Anti-Corruption Laws ......................................................... 108
5.32.    Budget ................................................................................. 108

VI.    AFFIRMATIVE COVENANTS.~~.~~ ....................................................... 108

6.1.     Compliance with Laws ....................................................... ~~109~~108
6.2.     Conduct of Business and Maintenance of Existence and Assets ..... ~~109~~108
6.3.     Books and Records; Inspection Rights ................................ ~~109~~108
6.4.     Payment of Taxes ............................................................... 109
6.5.     Use of Proceeds .................................................................. ~~110~~109
6.6.     [Reserved] ........................................................................... 109
~~6.6~~6.7.  Insurance.~~.~~ ........................................................................ 110
~~6.7~~6.8.  Payment of Obligations ...................................................... 111
~~6.8~~6.9.  Environmental Matters.~~.~~ .................................................... 111
~~6.9~~6.10.  ........................................................ Standards of Financial Statements    112
~~6.10~~6.11.  ................................................................ Federal Securities Laws    112
~~6.11~~6.12.  ............................................. Execution of Supplemental Instruments    ~~113~~112
~~6.12~~6.13.  ...................................................... Government Receivables    ~~113~~112
~~6.13~~6.14.  ......................................................................... Keepwell    ~~113~~112
~~6.14~~6.15.  ................ Certificate of Beneficial Ownership and Other Additional Information    113
~~6.15.    Compliance with Laws;~~ 6.16. Anti-Corruption Laws, Ex-Im Laws, Anti-Money Laundering Laws
~~6.16~~6.17.  ............................. Inspection Rights and Appraisals; Meetings with the Agent.~~.~~    ~~114~~113
~~6.17~~6.18.  .................................................... Treasury Management Services    ~~115~~114
~~6.18~~6.19.  .................................................................. Further Assurances    ~~115~~114
~~6.19.    Standing Transfer Order~~    ~~115~~
6.20.    [Reserved] ........................................................................... 114
~~6.20~~6.21.  .................................................................... Motor Vehicles    ~~115~~114
~~6.21~~6.22.  ................................................ Bankruptcy Schedules and Covenants.~~.~~    ~~115~~114
~~6.22~~6.23.  ....................................................................... Milestones    ~~116~~115
~~6.23~~6.24.  .......................................................... Stalking Horse Agreement    116

iii

|  | 6.24 6.25. | Canadian Pension Plans | 117 116 |
|---|---|---|---|
| VII. | | NEGATIVE COVENANTS | 117 116 |
| | 7.1. | Merger, Consolidation, Acquisition and Sale of Assets | 117 116 |
| | 7.2. | Creation of Liens | 117 |
| | 7.3. | Guarantees | 117 |
| | 7.4. | Investments | 118 117 |
| | 7.5. | Loans | 118 117 |
| | 7.6. | Capital Expenditures | 118 117 |
| | 7.7. | Dividends and Distributions | 118 117 |
| | 7.8. | Indebtedness | 118 117 |
| | 7.9. | Nature of Business | 118 |
| | 7.10. | Transactions with Affiliates | 118 |
| | 7.11. | Budget Compliance | 118 |
| | 7.12. | Subsidiaries | 119 118 |
| | 7.13. | Fiscal Year and Accounting Changes | 119 118 |
| | 7.14. | Pledge of Credit | 119 |
| | 7.15. | Amendment of Organizational Documents | 119 |
| | 7.16. | Compliance with ERISA | 119 |
| | 7.17. | Prepayment of Indebtedness | 120 |
| | 7.18. | [Reserved] | 120 |
| | 7.19. | DIP Term Loan | 120 |
| | 7.20. | Other Agreements | 121 120 |
| | 7.21. | Locations | 121 120 |
| | 7.22. | Canadian Loan Party Bank Accounts | 121 |
| | 7.23. | Canadian Loan Parties | 121 |
| | 7.24. | Inactive Subsidiaries | 121 |
| | 7.25. | Capital Provision Agreement [Reserved] | 121 |
| | 7.26. | Term Loan Priority Collateral Account | 121 |
| | 7.27. | Bankruptcy Matters | 122 121 |
| VIII. | | CONDITIONS PRECEDENT | 122 |
| | 8.1. | Conditions to Initial Advances | 122 |
| | 8.2. | Conditions to Each Advance | 126 |
| IX. | | INFORMATION AS TO THE LOAN PARTIES | 127 |
| | 9.1. | Disclosure of Material Matters | 128 127 |
| | 9.2. | Schedules | 128 127 |
| | 9.3. | Environmental Reports | 128 |
| | 9.4. | Litigation | 129 |
| | 9.5. | Material Occurrences | 129 |
| | 9.6. | Government Receivables | 130 129 |
| | 9.7. | Annual Financial Statements | 130 129 |
| | 9.8. | Quarterly Financial Statements | 130 |
| | 9.9. | Monthly Financial Statements | 130 |
| | 9.10. | Other Reports | 130 |
| | 9.11. | Additional Information | 131 130 |

9.12.    Budget and Variance Reports.                                                    ~~131~~130
9.13.    [~~Resrved~~Reserved]                                                           ~~132~~131
9.14.    Notice of Suits, Adverse Events                                                 ~~132~~131
9.15.    ERISA Notices and Requests                                                      ~~132~~131
9.16.    Additional Documents                                                           ~~133~~132
9.17.    Updates to Certain Schedules                                                   ~~133~~132
9.18.    Financial Disclosure                                                           133
9.19.    Teleconferences with Loan Parties                                              133
9.20.    Other Bankruptcy Documents                                                     ~~134~~133
9.21.    Consultant                                                                     134
9.22.    Engagement of Chief Restructuring Officer                                      134

X.    EVENTS OF DEFAULT.                                                                135

10.1.    Nonpayment                                                                     135
10.2.    Breach of Representation                                                        135
10.3.    Financial Information                                                           135
10.4.    Judicial Actions                                                               135
10.5.    Noncompliance                                                                  135
10.6.    Judgments                                                                      135
10.7.    [Reserved]                                                                     136
10.8.    [Reserved];                                                                    136
10.9.    Lien Priority                                                                  136
10.10.   Term Loan/Wynnefield Default                                                   136
10.11.   Cross Default                                                                  136
10.12.   Breach of Guaranty, Guarantor Security Agreement or Pledge Agreement          136
10.13.   Change of Control                                                              137
10.14.   Invalidity                                                                     137
10.15.   Seizures                                                                       137
10.16.   [Reserved];                                                                    137
10.17.   Pension Plans                                                                  137
10.18.   Disposition of Collateral                                                      137
10.19.   Inventory                                                                      137
10.20.   Bankruptcy Defaults.                                                           138

XI.    LENDERS' RIGHTS AND REMEDIES AFTER DEFAULT.                                      ~~140~~141

11.1.    Rights and Remedies.                                                           141
11.2.    Agent's Discretion                                                             143
11.3.    [Reserved]                                                                     143
11.4.    [Reserved].                                                                    143
11.5.    Rights and Remedies not Exclusive                                              143
11.6.    Allocation of Payments After Event of Default                                  ~~143~~144

XII.    WAIVERS AND JUDICIAL PROCEEDINGS.                                               144

12.1.    Waiver of Notice                                                               144
12.2.    Delay                                                                          144
12.3.    Jury Waiver                                                                    144

XIII.    EFFECTIVE DATE AND TERMINATION............................................................144
        13.1.    Term.......................................................................................................144
        13.2.    Termination.........................................................................................144145

XIV.    REGARDING AGENT......................................................................................145
        14.1.    Appointment........................................................................................145
        14.2.    Nature of Duties..................................................................................145146
        14.3.    Lack of Reliance on Agent..................................................................146
        14.4.    Resignation of Agent; Successor Agent...............................................146
        14.5.    Certain Rights of Agent......................................................................147
        14.6.    Reliance...............................................................................................147
        14.7.    Notice of Default.................................................................................147
        14.8.    Indemnification...................................................................................147148
        14.9.    Agent in its Individual Capacity..........................................................148
        14.10.  Delivery of Documents........................................................................148
        14.11.  Loan Parties Undertaking to Agent.....................................................148
        14.12.  No Reliance on Agent's Customer Identification Program....................148
        14.13.  Other Agreements...............................................................................148149
        14.14.  [Reserved]...........................................................................................149
        14.15.  Erroneous Payments...........................................................................149

XV.     BORROWING AGENCY...................................................................................151
        15.1.    Borrowing Agency Provisions.............................................................151
        15.2.    Waiver of Subrogation.........................................................................152
        15.3.    Common Enterprise.............................................................................152

XVI.    MISCELLANEOUS...........................................................................................152153
        16.1.    Governing Law....................................................................................152153
        16.2.    Entire Understanding...........................................................................153
        16.3.    Successors and Assigns; Participations; New Lenders..........................156
        16.4.    Application of Payments......................................................................158159
        16.5.    Indemnity............................................................................................159
        16.6.    Notice..................................................................................................160
        16.7.    Survival...............................................................................................162
        16.8.    Severability.........................................................................................162
        16.9.    Expenses.............................................................................................162
        16.10.  Injunctive Relief.................................................................................163
        16.11.  Consequential Damages......................................................................163
        16.12.  Captions..............................................................................................163
        16.13.  Counterparts; Facsimile Signatures.....................................................163
        16.14.  Construction........................................................................................163
        16.15.  Confidentiality; Sharing Information....................................................163164
        16.16.  Publicity..............................................................................................164
        16.17.  Certifications From Banks and Participants; USA PATRIOT Act.........164
        16.18.  Anti-Terrorism Laws...........................................................................165
        16.19.  Acknowledgment and Consent to Bail-In of EEA Financial Institutions..........166

16.20.   Currency Indemnity ................................................................. ~~166~~167

16.21.   Intercreditor Agreement ........................................................... 167

16.22.   Exclusive Remedy For Any Alleged Post-Petition Claim ......... 167

16.23.   Prohibition on Surcharge ......................................................... ~~167~~168

16.24.   Marshalling Obligations ........................................................... ~~167~~168

16.25.   Disavowal and Waiver of Any Subsequent Relief Based on Changed
Circumstances ......................................................................... ~~167~~168

16.26.   Interim Order and Final Order Control ..................................... ~~168~~169

XVII.   GUARANTY~~.~~ .................................................................................. ~~168~~169

17.1.   Guaranty .................................................................................. ~~168~~169

17.2.   Waivers .................................................................................... 169

17.3.   No Defense .............................................................................. 169

17.4.   Guaranty of Payment ............................................................... 169

17.5.   Liabilities Absolute .................................................................. ~~169~~170

17.6.   Waiver of Notice ...................................................................... ~~170~~171

17.7.   Agent's Discretion ................................................................... ~~170~~171

17.8.   Reinstatement .......................................................................... 171

~~074658.23049/132216381v.5~~074658.23049/132216381v.9

LIST OF EXHIBITS AND SCHEDULES

<u>Exhibits</u>

| | |
|---|---|
| I | Interim Order |
| II | Lien Priority Chart |
| III | Initial Budget |
| IV | Intercreditor Agreement |
| Exhibit 1.2(a) | Form of Borrowing Base Certificate |
| Exhibit 1.2(b) | Form of Compliance Certificate |
| Exhibit 2.1 | Form of Revolving Credit Note |
| Exhibit 2.4 | Form of Swing Loan Note |
| Exhibit 3.10 | Forms of US Tax Compliance Certificates |
| Exhibit 8.1(e) | Form of Closing Date Certificate |
| Exhibit 16.3 | Form of Commitment Transfer Supplement |

<u>Schedules</u>

| | |
|---|---|
| Schedule 1.1 | Commitments |
| Schedule 1.2 | Permitted Encumbrances |
| Schedule 1.3 | Existing ~~Letter~~Letters of Credit |
| Schedule 4.4(b)(i) | Equipment and Inventory Locations |
| Schedule 4.4(b)(ii) | Equipment and Inventory Locations – Warehouses |
| Schedule 4.4(b)(iii) | (A) Places of Business and (B) Chief Executive Offices |
| Schedule 4.4(b)(iv) | Owned or Leased Real Property |
| Schedule 4.8(j) | Deposit and Investment Accounts |
| Schedule 5.1 | Consents |
| Schedule 5.2(a) | States of Qualification and Good Standing |
| Schedule 5.2(b) | Subsidiaries |
| Schedule 5.4 | Federal Tax Identification Number |
| Schedule 5.6 | Prior Names |
| Schedule 5.7 | Environmental |
| Schedule 5.8(b) | Litigation |
| Schedule 5.8(c) | Indebtedness |
| Schedule 5.8(e) | Plans |
| Schedule 5.8(f) | Canadian Plans |
| Schedule 5.9 | Intellectual Property |
| Schedule 5.10 | Licenses and Permits |
| Schedule 5.14 | Labor Disputes |
| Schedule 5.21 | Equity Interests |
| Schedule 5.22 | Commercial Tort Claims |
| Schedule 5.23 | Letter of Credit Rights |
| Schedule 5.24 | Material Contracts |
| Schedule 7.3 | Guarantees |
| Schedule 7.4 | Permitted Joint Ventures |
| Schedule 7.5 | Intercompany Loans |

ix

**SUPER-PRIORITY    SENIOR    SECURED    DEBTOR-IN-POSSESSION REVOLVING CREDIT AND SECURITY AGREEMENT**, dated as of July [25], 2023, by and among WILLIAMS INDUSTRIAL SERVICES GROUP INC., a Delaware corporation ("Holdings"), WILLIAMS INDUSTRIAL SERVICES GROUP, L.L.C., a Delaware limited liability company ("WISG"), WILLIAMS INDUSTRIAL SERVICES, LLC, a Georgia limited liability company ("WISI"), WILLIAMS SPECIALTY SERVICES, LLC, a Georgia limited liability company ("WSS"), WILLIAMS PLANT SERVICES, LLC, a Georgia limited liability company ("WPS"), WILLIAMS GLOBAL SERVICES, INC., a Georgia corporation ("Global"), CONSTRUCTION & MAINTENANCE PROFESSIONALS, LLC, a Georgia limited liability company ("Construction"), WISG ELECTRICAL, LLC, a New York limited liability company ("Electrical", and together with Holdings, WISG, WISI, WSS, WPS, Global, Construction, and each Person joined hereto as a Borrower from time to time, and all of their permitted successors and assigns, each, a "Borrower" and collectively, the "Borrowers"), GLOBAL POWER PROFESSIONAL SERVICES INC. a Delaware corporation ("Power"), GPEG, LLC, a Delaware limited liability company ("GPEG"), STEAM ENTERPRISES LLC, a Delaware limited liability company ("Steam"), WISG CANADA LTD., a limited company formed in the province of British Columbia, Canada ("WISG Canada"), WISG NUCLEAR LTD., a limited company formed in the province of British Columbia, Canada ("WISG Nuclear"), WISG ELECTRICAL LTD., a limited company formed in the province of British Columbia, Canada ("WISG Electrical", and together with Power, GPEG, Steam, WISG Canada, WISG Nuclear and each Person joined hereto as a Guarantor from time to time, and all of their permitted successors and assigns, each, a "Guarantor" and collectively, the "Guarantors", and together with the Borrowers, collectively the "Loan Parties" and each a "Loan Party"), the financial institutions which are now or which hereafter become a party hereto (together with their respective successors and assigns, collectively, the "Lenders" and each individually a "Lender"), and PNC BANK, NATIONAL ASSOCIATION ("PNC"), in its capacity as agent for Lenders (in such capacity, together with its successors and assigns, the "Agent").

## RECITALS

A.      On July [ ]22, 2023 (the "Petition Date"), (i) the Borrowers, (ii) Holdings and (iii) certain of the Borrower'sBorrowers' subsidiaries and affiliates (each, a "Debtor" and collectively, the "Debtors") filed voluntary petitions for relief with the United States Bankruptcy Court for the District of Delaware (together with any other court having jurisdiction over the Cases (as defined below), the "Bankruptcy Court") under Chapter 11 of the Bankruptcy Code, (each case of the BorrowerBorrowers and each other Debtor, a "Case" and collectively, the "Cases"). The Cases are identified as Bankruptcy Case No. [    ] ([  ])23-10961. Each Debtor remains in possession of its assets and is operating its business as a debtor-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

B.      Pursuant to that certain Revolving Credit and Security Agreement, dated as of December 16, 2020 (as the same may have been further amended, supplemented and modified through the date hereof, the "Prepetition Revolving Credit Agreement"), by and among the Borrowers, Holdings, certain Subsidiaries of the Borrower, the financial institutions party thereto as lenders as of the Petition Date (collectively, in such capacity, the "Prepetition Revolving

Lenders") and PNC Bank, as Agent and collateral agent for Prepetition Revolving Lenders (in such capacity, "Prepetition Agent"), Prepetition Agent and Prepetition Revolving Lenders made certain credit facilities and advances of credit available to Borrowers prior to the Petition Date on the terms and conditions set forth therein, which credit facilities and advances of credit and all other Prepetition Obligations (as defined below) thereunder are unconditionally guaranteed and secured by Liens on substantially all the assets of the Borrowers and the Prepetition Guarantors.

C.      The Borrowers have requested that during the Cases, Agent and the Lenders make advances and other financial accommodations available to the Borrowers up to the Maximum Revolving Advance Amount specified herein on a, with respect to the Borrowers, senior secured, superpriority basis, pursuant to, inter alia, Sections 364(c) and (d) of the Bankruptcy Code, as more fully set forth herein (the "DIP Revolving Facility").

D.      Agent and the Lenders are willing to provide Advances and other financial accommodations to the Debtors on a senior secured, superpriority basis on the terms and subject to the conditions of this Agreement, so long as, among other things, such post-petition credit obligations are, subject to the Interim Order and, upon entry of the Final Order, the Final Order and the Intercreditor Agreement, (i) secured by Liens on all of the assets, property and interests, real and personal, tangible and intangible, of the Debtors, whether now owned or hereafter acquired, which Liens are superior to all other Liens pursuant to Sections 364(c) and (d) of the Bankruptcy Code (except as set forth herein and in the Interim Order and Final Order); (ii) given priority over any administrative expenses of the kind specified in the Bankruptcy Code, including without limitation, under Sections 105, 326, 328, 330, 331, 364(c)(1), 365, 503, 506(c) (upon entry of the Final Order), 507, 546(c), 726, 1113 or 1114 of the Bankruptcy Code, as provided in, and subject to, the Interim Order and the Final Order; (iii) secured by Liens on all of the assets, property and interests, real and personal, tangible and intangible, of the Debtors, whether now owned or hereafter acquired, which Liens are superior to all other Liens (except as set forth herein and in the Interim Order and Final Order); and (iv) guaranteed by the Guarantors pursuant to the terms hereof.

E.      On the Closing Date, the Borrowers will also obtain loans and commitments under the DIP Term Loan Credit Agreement (as hereinafter defined).

F.      The Borrowers and the Guarantors are engaged in related businesses, and each Guarantor will derive substantial direct and indirect benefit from the extensions of credit to the Borrowers under this Agreement

**NOW, THEREFORE,** in consideration of the premises and the agreements, provisions and covenants herein contained, the parties hereto agree as follows:

I.      DEFINITIONS.

1.1.      Accounting Terms.  As used in this Agreement, the Other Documents or any certificate, report or other document made or delivered pursuant to this Agreement, accounting terms not defined in Section 1.2 hereof or elsewhere in this Agreement and accounting terms partly defined in Section 1.2 hereof to the extent not defined shall have the respective meanings

2

given to them under GAAP; provided, however that, whenever such accounting terms are used for the purposes of determining compliance with financial covenants in this Agreement, such accounting terms shall be defined in accordance with GAAP as applied in preparation of the audited financial statements of Holdings and its Subsidiaries for the fiscal year ended December 31, 2022. If there occurs after the Closing Date any change in GAAP that affects in any respect the calculation of any covenant set forth in this Agreement or the definition of any term defined under GAAP used in such calculations, Agent, Lenders and the Loan Parties shall negotiate in good faith to amend the provisions of this Agreement that relate to the calculation of such covenants with the intent of having the respective positions of Agent, Lenders and the Loan Parties after such change in GAAP conform as nearly as possible to their respective positions as of the Closing Date, provided, that, until any such amendments have been agreed upon, the covenants in this Agreement shall be calculated as if no such change in GAAP had occurred and the Loan Parties shall provide additional financial statements or supplements thereto, attachments to Compliance Certificates and/or calculations regarding financial covenants as Agent may require in order to provide the appropriate financial information required hereunder with respect to the Loan Parties both reflecting any applicable changes in GAAP and as necessary to demonstrate compliance with the financial covenants before giving effect to the applicable changes in GAAP.

1.2.    <u>General Terms</u>.  For purposes of this Agreement, the following terms shall have the following meanings:

"<u>Administrative Questionnaire</u>" shall mean the administrative questionnaire in a form supplied by Agent to be completed by each Lender.

"<u>Advance Rates</u>" shall mean the advance rates in respect of Eligible Receivables, Eligible JV Receivables, and Eligible Unbilled Receivables set forth in Section 2.1(a) hereof.

"<u>Advances</u>" shall mean and include the Revolving Advances, Letters of Credit, and the Swing Loans.

"<u>Affected Financial Institution</u>" shall mean (a) any EEA Financial Institution or (b) any UK Financial Institution.

"<u>Affected Lender</u>" shall have the meaning set forth in Section 3.11 hereof.

"<u>Affiliate</u>" of any Person shall mean (a) any Person which, directly or indirectly, is in control of, is controlled by, or is under common control with such Person, or (b) any Person who is a director, manager, member, managing member, general partner or officer (i) of such Person, (ii) of any Subsidiary of such Person or (iii) of any Person described in clause (a) above.  For purposes of this definition, control of a Person shall mean the power, direct or indirect, (x) to vote five percent (5%) or more of the Equity Interests having ordinary voting power for the election of directors of such Person or other Persons performing similar functions for any such Person, or (y) to direct or cause the direction of the management and policies of such Person whether by ownership of Equity Interests, contract or otherwise.

3

"Agent" shall have the meaning set forth in the preamble to this Agreement and shall include its successors and assigns.

"Agreement" shall mean this Super-Priority Senior Secured Debtor-In-Possession Revolving Credit and Security Agreement dated as of July [25], 2023 , as the same may be amended, modified, supplemented, renewed, restated or replaced from time to time.

"Allowed Professional Fees" shall have the meaning set forth in in the Final Order, or, prior to the entry of the Final Order, the Interim Order.

"Alternate Base Rate" shall mean, for any day, a rate per annum equal to the highest of (a) the Base Rate in effect on such day, (b) the sum of the Overnight Bank Funding Rate in effect on such day plus one half of one percent (0.5%), and (c) the sum of Daily Simple SOFR in effect on such day plus one percent (1.0%), so long as Daily Simple SOFR is offered, ascertainable and not unlawful; provided, however, if the Alternate Base Rate as determined above would be less than zero, then such rate shall be deemed to be zero.  Any change in the Alternate Base Rate (or any component thereof) shall take effect at the opening of business on the day such change occurs.

"Alternate Source" shall have the meaning set forth in the definition of "Overnight Bank Funding Rate".

Anti-Corruption Laws shall mean the United States Foreign Corrupt Practices Act of 1977, as amended, the UK Bribery Act 2010, and any other similar anti-corruption laws or regulations administered or enforced in any jurisdiction in which the Borrower or any of its Subsidiaries conduct business.

Anti-Terrorism Laws shall mean any Laws relating to terrorism, trade sanctions programs and embargoes (including economic or financial sanction or trade embargoes imposed, administered or enforced by (a) the United States Government, including, without limitation, the Office of Foreign Assets Control, or (b) the United Nations Security Council, Canada, the European Union, any European Union member state or Her Majesty's Treasury of the United Kingdom), import/export licensing, money laundering, corruption or bribery (including Laws comprising or implementing the Canadian Anti-Money Laundering & Anti-Terrorism Legislation), and any regulation, order, or directive promulgated, issued or enforced pursuant to such Laws, including the *Proceeds of Crime (Money Laundering) and Terrorist Financing Act (Canada)*, all as amended, supplemented or replaced from time to time.

"Applicable Law" shall mean all Laws applicable to the Person, conduct, transaction, covenant, Other Document or contract in question, all provisions of all applicable state, province, federal and foreign constitutions, statutes, rules, regulations, treaties, directives and orders of any Governmental Body, and all orders, judgments and decrees of all courts and arbitrators.

"Applicable Margin" shall mean (a) an amount equal to three and one quarter percent (3.25%) for (i) Revolving Advances consisting of Domestic Rate Loans and (ii) Swing Loans,

4

(b) an amount equal to four and one quarter percent (4.25%) for Revolving Advances consisting of Term SOFR Rate Loans.

"Application Date" shall have the meaning set forth in Section 2.8(b) hereof.

"Approvals" shall have the meaning set forth in Section 5.7(b) hereof.

"Approved 363 Sale" shall mean any sale of the Debtors' assets or business pursuant to Section 363 of the Bankruptcy Code approved by the Agent pursuant to appropriate orders of the Bankruptcy Court that are approved by and acceptable to Agent.

"Approved Bankruptcy Court Order" shall mean (a) each of the DIP Orders, as such order is amended and in effect from time to time in accordance with this Agreement, (b) any other order entered by the Bankruptcy Court regarding, relating to or impacting (i) any rights or remedies of any Secured Party, (ii) the Credit Documents (including the Loan Parties' obligations thereunder), (iii) the Collateral, any Liens thereon or any superpriority claims (including, without limitation, any sale or other disposition of Collateral outside of the ordinary course of business or, subject to the Carve Out, the priority of any such Liens or superpriority claims), (iv) use of Cash Collateral, (v) debtor-in-possession financing, (vi) adequate protection or otherwise relating to any Prepetition Secured Indebtedness or (vii) any plan of reorganization, in the case of each of the foregoing clauses (i) through (vii), that (x) is in form and substance reasonably satisfactory to the Agent (with respect to its own treatment) and the Required Lenders, (y) has not been vacated, reversed or stayed and (z) has not been amended or modified in a manner adverse to the rights of the Agent or the Lenders except as agreed in writing by the Agent (solely with respect to its own treatment) and the Required Lenders in their sole discretion, and (c) any other order entered by the Bankruptcy Court that (i) is in form and substance satisfactory to the Agent and the Required Lenders, (ii) has not been vacated, reversed or stayed and (iii) has not been amended or modified except in a manner reasonably satisfactory to the Agent and the Required Lenders.

"Approved Budget" shall mean, as of any date of determination, (i) the Initial Budget or (ii) the then most current Budget prepared by the Borrowers, as approved by the Agent in its sole discretion.

"Approved Electronic Communication" shall mean each notice, demand, communication, information, document and other material transmitted, posted or otherwise made or communicated by e-mail, e-fax, the Credit Management Module of PNC's PINACLE® system, or any other equivalent electronic service agreed to by Agent, whether owned, operated or hosted by Agent, any Lender, any of their Affiliates or any other Person, that any party is obligated to, or otherwise chooses to, provide to Agent pursuant to this Agreement or any Other Document, including any financial statement, financial and other report, notice, request, certificate and other information material; provided that Approved Electronic Communications shall not include any notice, demand, communication, information, document or other material that Agent specifically instructs a Person to deliver in physical form.

"Authorized Officer" shall mean, with respect to any Person, any Financial Officer of such Person or any individual holding the position of chief executive officer, president, chief

administrative officer, vice president (or the equivalent thereof) or secretary of such Person; provided that, when such term is used in reference to any document executed by, or a certification of, an Authorized Officer, the secretary, assistant secretary or other Authorized Officer of such Person shall have delivered an incumbency certificate to the Agent as to the authority of such individual.

"Bail-In Action" shall mean the exercise of any Write-Down and Conversion Powers by the applicable Resolution Authority in respect of any liability of an Affected Financial Institution.

"Bail-In Legislation" shall mean (a) with respect to any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European Union, the implementing law, regulation rule or requirement for such EEA Member Country from time to time which is described in the EU Bail-In Legislation Schedule and (b) with respect to the United Kingdom, Part I of the United Kingdom Banking Act 2009 (as amended from time to time) and any other law, regulation or rule applicable in the United Kingdom relating to the resolution of unsound or failing banks, investment firms or other financial institutions or their affiliates (other than through liquidation, administration or other insolvency proceedings).

"Bail-In Legislation Schedule" shall mean the EU Bail-In Legislation Schedule published by the Loan Market Association (or any successor person), as in effect from time to time.

"Bankruptcy Code" shall mean Title 11, U.S.C., as now or hereafter in effect, or any successor thereto.

"Bankruptcy Court" shall have the meaning set forth in the recitals hereto.

"Bankruptcy Law" shall mean each of (i) the Bankruptcy Code, (ii) any domestic or foreign law relating to liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, administration, insolvency, reorganization, debt adjustment, receivership or similar debtor relief from time to time in effect and affecting the rights of creditors generally (including without limitation any plan of arrangement provisions of applicable corporation statutes), and (iii) any order made by a court of competent jurisdiction in respect of any of the foregoing.

"Base Rate" shall mean the base commercial lending rate of PNC as publicly announced to be in effect from time to time, such rate to be adjusted automatically, without notice, on the effective date of any change in such rate.  This rate of interest is determined from time to time by PNC as a means of pricing some loans denominated in U.S. Dollars to its customers and is neither tied to any external rate of interest or index nor does it necessarily reflect the lowest rate of interest actually charged by PNC to any particular class or category of customers of PNC.

"Beneficial Owner" shall mean, for each Loan Party (other than Holdings), each of the following: (a) each individual, if any, who, directly or indirectly, owns 25% or more of such Loan Party's Equity Interests; and (b) a single individual with significant responsibility to control, manage, or direct such Loan Party.

"Benefited Lender" shall have the meaning set forth in Section 2.6(e) hereof.

"Blocked Account Bank" shall have the meaning set forth in Section 4.8(h) hereof.

"Blocked Accounts" shall have the meaning set forth in Section 4.8(h) hereof.

"Borrower" or "Borrowers" shall have the meaning set forth in the preamble to this Agreement and shall include their respective successors and permitted assigns.

"Borrowers' Account" shall have the meaning set forth in Section 2.10 hereof.

"Borrowing Agent" shall mean Holdings.

"Borrowing Base Certificate" shall mean a certificate in substantially the form of Exhibit 1.2(a) hereto duly executed by the President, Chief Financial Officer or Controller of Borrowing Agent and delivered to Agent, appropriately completed, by which such officer shall certify to Agent the Formula Amount and calculation thereof as of the date of such certificate.

"Braden" shall mean Braden Holdings, LLC, a Delaware limited liability company.

"Braden Mexico" shall mean Braden Manufacturing SA de CV, a company formed under the laws of Mexico.

"Budget" shall mean (a) initially, the Initial Budget, and (b) subsequent to the Initial Budget, each updated thirteen-week budget delivered pursuant to Section 9.12(b) hereof.

"Business Day" shall mean any day other than Saturday or Sunday or a legal holiday on which commercial banks are authorized or required by Law to be closed for business in East Brunswick, New Jersey; provided that when used in connection with an amount that bears interest at a rate based on SOFR or any direct or indirect calculation or determination of SOFR, the "Business Day" means any such day that is also a U.S. Government Securities Business Day.

"Canadian Benefit Plans" shall mean any plan, fund, program, or policy, whether or not written, formal or informal, funded or unfunded, insured or uninsured, providing benefits including medical, hospital care, dental, sickness, accident, disability, life insurance, pension, retirement or savings benefits under which any Loan Party has any liability with respect to any employees or former employees, arising from employment in Canada, but excluding any Canadian Pension Plan and any Canadian Union Plan.

"Canadian Dollar" and the sign "CA$" shall mean lawful money of Canada.

"Canadian Dollar Sublimit" shall mean $0.

"Canadian Loan Parties" shall mean WISG Canada, WISG Nuclear, WISG Electrical and each other Loan Party joined hereto from time to time who is formed in Canada or a province or territory of Canada.

"Canadian Loan Party Bank Account" means, any bank account maintained by a Canadian Loan Party in the Ordinary Course of Business

"Canadian Pension Event" shall mean (a) the termination or wind-up in whole or in part of any Canadian Pension Plan or the institution of proceedings by any Governmental Body to terminate or wind-up in whole or in part or have a trustee or a replacement administrator appointed to administer a Canadian Pension Plan, (b) the occurrence of an event under the Income Tax Act (Canada) that could reasonably be expected to affect the registered status of any Canadian Pension Plan, (c) the taking of any action with respect to any Canadian Pension Plan which could reasonably be expected to have a Material Adverse Effect, (d) receipt by a Loan Party of any order or notice of intention to issue an order from the applicable pension standards regulator or similar Governmental Body that could reasonably be expected to affect the registered status or cause the termination or wind-up (in whole or in part) of any Canadian Pension Plan, (e) the receipt of notice by the administrator or the funding agent of any failure to remit contributions to a Canadian Pension Plan, (f) the adoption of any amendment to a Canadian Pension Plan that would require the provision of security pursuant to Applicable Law, or (g) any other extraordinary event or condition with respect to a Canadian Pension Plan that could reasonably be expected to result in a Lien or any acceleration of any statutory requirements to fund all or a substantial portion of the unfunded liabilities of such plan.

"Canadian Pension Plans" shall mean a pension plan that is a "registered pension plan" as defined in subsection 248(1) of the Income Tax Act (Canada) and which is maintained or contributed to by, or to which there is or may be an obligation to contribute by any Borrower in respect of its employees or former employees, arising from employment in Canada, but does not include the Canada Pension Plan or the Quebec Pension Plan as maintained by the Government of Canada or the Province of Quebec and does not include any Canadian Union Plans.

"Canadian Union Plans" means any and all pension and other benefit plans for the benefit of employees or former employees, arising from employment in Canada, of any Loan Party that are not maintained, sponsored or administered solely by such Loan Party, but to which such Loan Party is or was required to contribute pursuant to a collective agreement or participation agreement.

"Capital Expenditures" shall mean expenditures made or Indebtedness incurred for the acquisition of any fixed assets or improvements (or of any replacements or substitutions thereof or additions thereto) which have a useful life of more than one year and which, in accordance with GAAP, would be classified as capital expenditures.  Capital Expenditures for any period shall include the total principal portion of Capitalized Lease Obligations paid in such period.

"Capitalized Lease Obligation" shall mean any Indebtedness of any Loan Party represented by obligations under a lease that is required to be capitalized for financial reporting purposes in accordance with GAAP.

"Captive Insurance Subsidiary" shall mean a wholly-owned Subsidiary of a Loan Party formed after the Closing Date that (a) provides bona fide risk-mitigation services for any Loan Party or the Loan Parties (and no other Persons), (b) is subject to regulation under Applicable Law as an insurance company, and (c) has been formed, and continues to be operated, because

the Loan Parties have reasonably determined that either (i) the Loan Parties cannot find a third-party insurer to insure them against particular business risks that the insurance subsidiary provides insurance for, (ii) the premiums paid to the insurance subsidiary result in material tax savings for the Loan Parties, taken as a whole, and/or (iii) the insurance provided by the insurance subsidiary is more affordable, and/or offers better coverage (taken as a whole), than is available from a third-party insurer.

"Carve Out" shall have the meaning set forth in the Interim Order and, upon entry of the Final Order, the Final Order.  For the avoidance of doubt, the Agent and the Lenders shall have no obligation to fund the Carve Out.

"Carve Out Reserve" shall have the meaning set forth in the Interim Order and, upon entry of the Final Order, the Final Order.  For the avoidance of doubt, the Agent and the Lenders shall have no obligation to fund the Carve Out Reserve.

"Cases" shall have the meaning set forth the recitals hereto.

"Cash Equivalents" shall mean (a) marketable direct obligations issued by, or unconditionally guaranteed by, the federal government of Canada or any agency thereof or the United States or any agency thereof and backed by the full faith and credit of the United States, in each case maturing within one year from the date of acquisition thereof, (b) marketable direct obligations issued or fully guaranteed by any state of the United States or any political subdivision of any such state or any public instrumentality thereof or any province of Canada or maturing within one year from the date of acquisition thereof and, at the time of acquisition, having one of the two highest ratings obtainable from either S&P or Moody's, (c) commercial paper maturing no more than 270 days from the date of creation thereof and, at the time of acquisition, having a rating of at least A-1 from S&P or at least P-1 from Moody's, (d) certificates of deposit, time deposits, overnight bank deposits or bankers' acceptances maturing within one year from the date of acquisition thereof issued by any bank organized under the laws of Canada or the United States or any state thereof or the District of Columbia or any Canadian or United States branch of a foreign bank having at the date of acquisition thereof combined capital and surplus of not less than $500,000,000, (e) deposit accounts maintained with (i) any bank that satisfies the criteria described in clause (d) above, or (ii) any other bank organized under the laws of Canadian or the United States or any state thereof so long as the full amount maintained with any such other bank is insured by Canada Deposit Insurance Corporation or, as the case may be, the Federal Deposit Insurance Corporation, (f) repurchase obligations of any commercial bank satisfying the requirements of clause (d) of this definition or recognized securities dealer having combined capital and surplus of not less than $500,000,000, having a term of not more than seven days, with respect to securities satisfying the criteria in clauses (a) or (d) above, (g) debt securities with maturities of six months or less from the date of acquisition backed by standby letters of credit issued by any commercial bank satisfying the criteria described in clause (d) above, and (h) Investments in money market funds substantially all of whose assets are invested in the types of assets described in clauses (a) through (g) above.

"Cash Management Orders" shall mean, collectively, the order approving that certain *Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) continue to Operate Their Cash Management System (B) Maintain Existing Bank*

*Accounts, Business Forms, and Books and Records, (II) Authorizing Continued Intercompany Transactions, (III) Granting Administrative Expense Status to Postpetition Intercompany Transactions, and (IV) Granting Related Relief* filed on or before the date hereof and entered in any of the Cases (in each case, together with all extensions, modifications and amendments thereto, and in each case, in form and substance acceptable to the Agent and the Required Lenders), which among other matters authorizes the Debtors to maintain their existing cash management system and bank accounts and to continue to engage in intercompany transactions, which is in form and substance acceptable to the Agent and the Required Lenders.

"Cash Management Obligations" shall mean the Indebtedness of any Loan Party and its Subsidiaries to the provider of any Cash Management Products and Services (including all Indebtedness owing to such provider in respect of any returned items deposited with such provider). For purposes of this Agreement and all of the Other Documents, all Cash Management Obligations of any Loan Party owing to any of the Secured Parties shall be "Obligations" hereunder and under the Other Documents, and the Liens securing such Cash Management Obligations shall be pari passu with the Liens securing all other Obligations under this Agreement and the Other Documents, subject to the express provisions of Section 11.6 hereof.

"Cash Management Products and Services" shall mean agreements or other arrangements under which Agent, any Lender or any Affiliate of Agent or any Lender provides or arranges for and provides credit support for the provision of any of the following products or services to any Loan Party: (a) credit cards; (b) credit card processing services; (c) debit cards and stored value cards; (d) commercial cards; (e) ACH transactions; and (f) cash management and treasury management services and products, including without limitation controlled disbursement accounts or services, lockboxes, blocked accounts, automated clearinghouse transactions, overdrafts and interstate depository network services.

"CCAA" shall mean Companies' Creditors Arrangement Act (Canada).

"CEA" shall mean the Commodity Exchange Act (7 U.S.C. §1 et seq.), as amended from time to time, and any successor statute.

"CERCLA" shall mean the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended, 42 U.S.C. §§9601 et seq.

"Certificate of Beneficial Ownership" shall mean, for each Loan Party (other than Holdings), the certificate in form and substance acceptable to Agent (as amended or modified by Agent from time to time in its sole discretion), certifying, among other things, the Beneficial Owner of such Loan Party.

"CFTC" shall mean the Commodity Futures Trading Commission.

"Change in Law" shall mean the occurrence, after the Closing Date, of any of the following: (a) the adoption or taking effect of any Applicable Law; (b) any change in any Applicable Law or in the administration, implementation, interpretation or application thereof by any Governmental Body; or (c) the making or issuance of any request, rule, guideline or directive (whether or not having the force of Law) by any Governmental Body; provided that

notwithstanding anything herein to the contrary, (x) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, regulations, guidelines, interpretations or directives thereunder or issued in connection therewith (whether or not having the force of Applicable Law) and (y) all requests, rules, regulations, guidelines, interpretations or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities (whether or not having the force of Law), in each case pursuant to Basel III, shall in each case be deemed to be a Change in Law regardless of the date enacted, adopted, issued, promulgated or implemented.

"Change of Control" shall mean the occurrence of any event (whether in one or more transactions) which results in: (a) any Person or "group" (within the meaning of Rules 13d-3 and 13d-5 under the Exchange Act) (i) acquiring beneficial ownership of thirty-five percent (35%) or more on a fully diluted basis of the voting and/or economic interest in the Equity Interests of Holdings or (ii) obtaining the power (whether or not exercised) to elect a majority of the members of the board of directors (or similar governing body) of Holdings, (b) the majority of the seats (other than vacant seats) on the board of directors (or similar governing body) of Holdings cease to be occupied by Persons who either (i) were members of the board of directors of Holdings on the Closing Date, or (ii) were nominated for election by the board of directors of Holdings, a majority of whom were directors on the Closing Date or whose election or nomination for election was previously approved by a majority of such directors, (c) except with respect to Braden Mexico, Holdings failing to own, directly or indirectly, one hundred (100%) percent of the Equity Interests (on a fully diluted basis) of any other Loan Party, (d) WISG failing to own, directly or indirectly, one hundred (100%) percent of the Equity Interests (on a fully diluted basis) of WISI, WSS, WPS, Global, Construction and WISG Canada, (e) WISG Canada failing to own one hundred (100%) percent of the Equity Interests (on a fully diluted basis) of WISG Nuclear and WISG Electrical, and/or (f) other than as permitted pursuant to Section 7.1 hereof, any merger, consolidation or sale of substantially all of the property or assets of any Loan Party; provided, that the sale by Holdings of any Equity Interests of any Loan Party shall be deemed a sale of substantially all of Holding's assets.  For purposes of this definition, "control" of any Person shall mean the power, direct or indirect (x) to vote more than fifty percent (50%) of the Equity Interests having ordinary voting power for the election of directors (or the individuals performing similar functions) of such Person or (y) to direct or cause the direction of the management and policies of such Person by contract or otherwise.

"Charges" shall mean all taxes, charges, fees, imposts, levies or other assessments, including all net income, gross income, gross receipts, sales, use, ad valorem, value added, transfer, franchise, profits, inventory, capital stock, license, withholding, payroll, employment, social security, Canada Pension Plan and provincial pension plan contributions, unemployment, excise, severance, stamp, occupation and property taxes, custom duties, fees, assessments, liens, claims and charges of any kind whatsoever, together with any interest and any penalties, additions to tax or additional amounts, imposed by any taxing or other authority, domestic or foreign (including the PBGC or any environmental agency or superfund), upon the Collateral, any Loan Party or any of its Affiliates.

"CIP Regulations" shall have the meaning set forth in Section 14.12 hereof.

"Claims" shall have the meaning assigned to such term in section 101 of the Bankruptcy Code.

"Closing Date" shall mean the date of this Agreement.

"Collateral" shall mean and include all right, title and interest of each Loan Party in all of the following property and assets of such Loan Party, in each case whether now existing or hereafter arising or created and whether now owned or hereafter acquired and wherever located:

(a)     all Receivables and all supporting obligations relating thereto;

(b)     all Equipment and fixtures;

(c)     all general intangibles (including all payment intangibles and all software) and all supporting obligations related thereto;

(d)     all Inventory;

(e)     all Subsidiary Stock, securities, Investment Property, Intellectual Property and financial assets;

(f)     all contract rights, rights of payment which have been earned under any contract, chattel paper (including electronic chattel paper and tangible chattel paper), commercial tort claims, documents (including all warehouse receipts and bills of lading), deposit accounts, goods, instruments (including promissory notes), letters of credit (whether or not the respective letter of credit is evidenced by a writing) and letter-of-credit rights, cash, certificates of deposit, insurance proceeds (including hazard, flood and credit insurance), security agreements, eminent domain proceeds, condemnation proceeds, tort claim proceeds and all supporting obligations;

(g)     all ledger sheets, ledger cards, files, correspondence, records, books of account, business papers, computers, computer software (owned by such Loan Party or in which it has an interest), computer programs, tapes, disks and documents, including all of such property relating to the property described in clauses (a) through and (h) of this definition; and

(h)     all proceeds and products of the property described in clauses (a) through and including (g) of this definition, in whatever form.

It is the intention of the parties hereto that if Agent shall fail to have a perfected Lien in any particular property or assets of any Loan Party for any reason whatsoever, but the provisions of this Agreement and/or of the Other Documents, together with all financing statements and other public filings relating to Liens filed or recorded by Agent against the Loan Parties, would be sufficient to create a perfected Lien in any property or assets that such Loan Party may receive upon the sale, lease, license, exchange, transfer or disposition of such particular property or assets, then all such "proceeds" of such particular property or assets shall be included in the Collateral as original collateral that is the subject of a direct and original grant of a security interest as provided for herein and in the Other Documents (and not merely as proceeds (as

074658.23049/132216381v.5074658.23049/132216381v.9

defined in Article 9 of the Uniform Commercial Code) in which a security interest is created or arises solely pursuant to Section 9-315 of the Uniform Commercial Code).

Notwithstanding the foregoing, Collateral shall not include any Excluded Property.

"Commitments" shall mean the Revolving Commitments.

"Commitment Transfer Supplement" shall mean a document in the form of Exhibit 16.3 hereto, properly completed and otherwise in form and substance satisfactory to Agent by which the Purchasing Lender purchases and assumes all or a portion of the right, title and interest of the assigning Lender in respect of the outstanding Revolving Advances and Letters of Credit and such assigning Lender's Revolving Commitments hereunder.

"Committee" shall mean the "Creditors' Committee" as set forth in the Interim Order, or, after the entry of the Final Order, in the Final Order.

"Compliance Certificate" shall mean a compliance certificate substantially in the form of Exhibit 1.2(b) hereto to be signed by the Chief Financial Officer or Controller of Borrowing Agent.

"Conforming Changes" shall mean, with respect to the Term SOFR Rate or any Benchmark Replacement, any technical, administrative or operational changes (including changes to the definition of "Alternate Base Rate," the definition of "Business Day," the definition of "Interest Period," timing and frequency of determining rates and making payments of interest, timing of borrowing requests or prepayment, conversion or continuation notices, the applicability and length of lookback periods, the applicability of breakage provisions, and other technical, administrative or operational matters) that the Agent decides may be appropriate to reflect the adoption and implementation of the Term SOFR Rate or such Benchmark Replacement and to permit the administration thereof by the Agent in a manner substantially consistent with market practice (or, if the Agent decides that adoption of any portion of such market practice is not administratively feasible or if the Agent determines that no market practice for the administration of the Term SOFR Rate or the Benchmark Replacement exists, in such other manner of administration as the Agent decides is reasonably necessary in connection with the administration of this Agreement and the Other Documents).

"Consents" shall mean all filings and all licenses, permits, consents, approvals, authorizations, qualifications and orders of Governmental Bodies and other third parties, domestic or foreign, necessary to carry on any Loan Party's business or necessary (including to avoid a conflict or breach under any agreement, instrument, other document, license, permit or other authorization) for the execution, delivery or performance of this Agreement, the Other Documents, or the DIP Term Loan Documents, including any Consents required under all applicable federal, state or other Applicable Law.

"Consigned Inventory" shall mean Inventory of any Loan Party that is in the possession of another Person or a Loan Party on a consignment, sale or return, or other basis that does not constitute a final sale and acceptance of such Inventory.

"Consultant" shall have the meaning set forth in Section 9.21 hereof.

"Contract Rate" shall have the meaning set forth in Section 3.1 hereof.

"Controlled Group" shall mean, at any time, each Loan Party and all trades or businesses (whether or not incorporated) under common control within the meaning of Section 4001(b)(1) of ERISA with any Loan Party and all other entities which, together with any Loan Party, are treated as a single employer under Section 414(t) of the Internal Revenue Code.

"Construction" shall have the meaning set forth in the preamble to this Agreement and shall include its successors and assigns.

"Covered Entity" shall mean (a) each Loan Party, each Subsidiary of each Loan Party, and all pledgors of Collateral and (b) each Person that, directly or indirectly, is in control of a Person described in clause (a) above.  For purposes of this definition, control of a Person shall mean the direct or indirect (x) ownership of, or power to vote, twenty-five percent (25%) or more of the issued and outstanding equity interests having ordinary voting power for the election of directors of such Person or other Persons performing similar functions for such Person, or (y) power to direct or cause the direction of the management and policies of such Person whether by ownership of equity interests, contract or otherwise.

"Customer" shall mean and include the account debtor with respect to any Receivable and/or the prospective purchaser of goods, services or both with respect to any contract or contract right, and/or any party who enters into or proposes to enter into any contract or other arrangement with any Loan Party, pursuant to which such Loan Party is to deliver any personal property or perform any services.

"Customs" shall have the meaning set forth in Section 2.13(b) hereof.

"Daily Simple SOFR" shall mean, for any day (a "SOFR Rate Day"), the interest rate per annum determined by the Agent by dividing (the resulting quotient rounded upwards, at the Agent's discretion, to the nearest 1/100th of 1%) (A) SOFR for the day (the "SOFR Determination Date") that is two (2) Business Days prior to (i) such SOFR Rate Day if such SOFR Rate Day is a Business Day or (ii) the Business Day immediately preceding such SOFR Rate Day if such SOFR Rate Day is not a Business Day, by (B) a number equal to 1.00 minus the SOFR Reserve Percentage, in each case, as such SOFR is published by the Federal Reserve Bank of New York (or a successor administrator of the secured overnight financing rate) on the website of the Federal Reserve Bank of New York, currently at http://www.newyorkfed.org, or any successor source identified by the Federal Reserve Bank of New York or its successor administrator for the secured overnight financing rate from time to time.  If Daily Simple SOFR as determined above would be less than the SOFR Floor, then Daily Simple SOFR shall be deemed to be the SOFR Floor.  If SOFR for any SOFR Determination Date has not been published or replaced with a Benchmark Replacement by 5:00 p.m. (Pittsburgh, Pennsylvania time) on the second Business Day immediately following such SOFR Determination Date, then SOFR for such SOFR Determination Date will be SOFR for the first Business Day preceding such SOFR Determination Date for which SOFR was published in accordance with the definition of "SOFR"; provided that SOFR determined pursuant to this sentence shall be used for

purposes of calculating Daily Simple SOFR for no more than 3 consecutive SOFR Rate Days. If and when Daily Simple SOFR as determined above changes, any applicable rate of interest based on Daily Simple SOFR will change automatically without notice to the Borrowers, effective on the date of any such change.

"Debtor Relief Laws" shall mean the Bankruptcy Code, the BIA, the CCAA, the Bankruptcy and Insolvency Act (Canada), the Companies' Creditors Arrangement Act (Canada) and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization or similar debtor relief laws of the United States of America, Canada or other applicable jurisdictions from time to time in effect.

"Debtor" or "Debtors" shall have the meaning set forth in the recitals hereto.

"Default" shall mean an event, circumstance or condition which, with the giving of notice or passage of time or both, would constitute an Event of Default.

"Default Rate" shall have the meaning set forth in Section 3.1 hereof.

"Defaulting Lender" shall mean any Lender that: (a) has failed, within two (2) Business Days of the date required to be funded or paid, to (i) fund any portion of its Revolving Commitment Percentage of Advances, (ii) if applicable, fund any portion of its Participation Commitment in Letters of Credit or Swing Loans or (iii) pay over to Agent, any Issuer, Swing Loan Lender or any Lender any other amount required to be paid by it hereunder, unless, in the case of clause (i) above, such Lender notifies Agent in writing that such failure is the result of such Lender's good faith determination that a condition precedent to funding (specifically identified and including a particular Default or Event of Default, if any) has not been satisfied; (b) has notified the Loan Parties or Agent in writing, or has made a public statement to the effect, that it does not intend or expect to comply with any of its funding obligations under this Agreement (unless such writing or public statement indicates that such position is based on such Lender's good faith determination that a condition precedent (specifically identified and including a particular Default or Event of Default, if any) to funding an Advance under this Agreement cannot be satisfied) or generally under other agreements in which it commits to extend credit; (c) has failed, within two (2) Business Days after request by Agent, acting in good faith, to provide a certification in writing from an authorized officer of such Lender that it will comply with its obligations (and is financially able to meet such obligations) to fund prospective Advances and, if applicable, participations in then outstanding Letters of Credit and Swing Loans under this Agreement, provided that such Lender shall cease to be a Defaulting Lender pursuant to this clause (c) upon Agent's receipt of such certification in form and substance satisfactory to Agent; (d) has become the subject of an Insolvency Event; (e) has failed at any time to comply with the provisions of Section 2.6(e) hereof with respect to purchasing participations from the other Lenders, whereby such Lender's share of any payment received, whether by setoff or otherwise, is in excess of its pro rata share of such payments due and payable to all of the Lenders; or (f) has become the subject of a Bail-In Action.

"Depository Accounts" shall have the meaning set forth in Section 4.8(h) hereof.

074658.23049/132216381v.5074658.23049/132216381v.9

"Designated Lender" shall have the meaning set forth in Section 16.2(c) hereof.

"DIP Revolving Facility" shall have the meaning set forth in the recitals hereto.

"DIP Order" shall mean the Interim Order and/or the Final Order, as applicable.

"DIP Superpriority Claims" shall have the meaning set forth in the Interim Order or the Final Order, as applicable.

"DIP Term Loan Credit Agreement" shall mean the Super-Priority Senior Secured Debtor- in-Possession Term Loan , Guarantee and Security Agreement dated as of the Closing Date, among the Borrowers, the Guarantors, the lenders party thereto and EICF Agent LLC, as Agent thereunder.

"DIP Term Loan Credit Documents" shall mean the Credit Documents as defined in the DIP Term Loan Credit Agreement.

"DIP Term Loan Facility" shall mean the credit facilities made available to the Borrowers pursuant to the DIP Term Loan Credit Agreement.

"Disposition" shall mean, with respect to any particular property or asset (other than cash or Cash Equivalents), the sale, lease, license, gift, exchange, transfer or other disposition of such property or asset, and to "Dispose" of any particular property or asset shall mean to sell, lease, license, exchange, transfer or otherwise dispose of such property or asset.

"Disqualified Equity Interests" shall mean any Equity Interests which, by their terms (or by the terms of any security or other Equity Interests into which they are convertible or for which they are exchangeable), or upon the happening of any event or condition, (a) mature or are mandatorily redeemable, pursuant to a sinking fund obligation or otherwise, or are redeemable at the option of the holder thereof, in whole or in part, on or prior to the date which is 91 days following the last day of the Term (excluding any provisions requiring redemption upon a "change of control" or similar event; provided that such "change of control" or similar event results in the Payment in Full of the Obligations), (b) are convertible into or exchangeable for (i) debt securities or (ii) any Equity Interests referred to in clause (a) above, in each case, at any time on or prior to the date which is 91 days following the last day of the Term, or (c) are entitled to receive scheduled dividends or distributions in cash prior to the time that the Obligations are Paid in Full.

"Document" shall have the meaning given to the term "document" in the Uniform Commercial Code.

"Domestic Rate Loan" shall mean any Advance that bears interest based upon the Alternate Base Rate.

"Drawing Date" shall have the meaning set forth in Section 2.14(b) hereof.

"EEA Financial Institution" shall mean (a) any credit institution or investment firm established in any EEA Member Country which is subject to the supervision of an EEA

16

Resolution Authority, (b) any entity established in an EEA Member Country which is a parent of an institution described in clause (a) of this definition, or (c) any financial institution established in an EEA Member Country which is a subsidiary of an institution described in clauses (a) or (b) of this definition and is subject to consolidated supervision with its parent.

"EEA Member Country" shall mean any of the member states of the European Union, Iceland, Liechtenstein and Norway.

"EEA Resolution Authority" shall mean any public administrative authority or any person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

"Effective Date" shall mean the date indicated in a document or agreement to be the date on which such document or agreement becomes effective, or, if there is no such indication, the date of execution of such document or agreement.

"Effective Federal Funds Rate" means for any day the rate per annum (based on a year of 360 days and actual days elapsed and rounded upward to the nearest 1/100 of 1%) announced by the Federal Reserve Bank of New York (or any successor) on such day as being the weighted average of the rates on overnight federal funds transactions arranged by federal funds brokers on the previous trading day, as computed and announced by such Federal Reserve Bank (or any successor) in substantially the same manner as such Federal Reserve Bank computes and announces the weighted average it refers to as the "Effective Federal Funds Rate" as of the date of this Agreement; provided that if such Federal Reserve Bank (or its successor) does not announce such rate on any day, the "Effective Federal Funds Rate" for such day shall be the Effective Federal Funds Rate for the last day on which such rate was announced. Notwithstanding the foregoing, if the Effective Federal Funds Rate as determined under any method above would be less than zero percent (0.00%), such rate shall be deemed to be zero percent (0.00%) for purposes of this Agreement.

"Eligibility Date" shall mean, with respect to each Loan Party and each Swap, the date on which this Agreement or any Other Document becomes effective with respect to such Swap (for the avoidance of doubt, the Eligibility Date shall be the Effective Date of such Swap if this Agreement or any Other Document is then in effect with respect to such Loan Party, and otherwise it shall be the Effective Date of this Agreement and/or such Other Documents to which such Loan Party is a party).

"Eligible Contract Participant" shall mean an "eligible contract participant" as defined in the CEA and regulations thereunder.

"Eligible JV Receivables" shall mean and include each JV Receivable of a Borrower arising in the Ordinary Course of Business and which Agent, in its sole discretion exercised in a commercially reasonable manner, shall deem to be an Eligible JV Receivable, based on such considerations as Agent may from time to time deem appropriate. In addition, no JV Receivable shall be an Eligible Receivable unless (a) it satisfies all of the criteria of Eligible Receivables, other than clause (a)(i) of the definition of Eligible Receivables and (b) the Customer obligated on such JV Receivable (other than Richmond, defined below) shall have executed in favor of the

Agent and delivered to the Agent a valid and enforceable "no offset" agreement, in form and substance reasonably satisfactory to the Agent, pursuant to which such Customer shall have waived any right it may have to set off against the payment of the applicable JV Receivable amounts or other obligations owing to it by such Borrower, unless such Borrower shall have notified the Agent in writing that such Customer is unwilling to execute and deliver to the Agent such "no offset" agreement, so long as the Agent shall have determined that such Borrower in fact used its commercially reasonable efforts to cause such Customer to execute and deliver such "no offset" agreement to the Agent.  As of the Closing Date, the only JV Receivables that may constitute Eligible JV Receivables (provided all eligibility criteria are met, as determined by the Agent, in its sole discretion, exercised in a commercially reasonable manner) are those with respect to which the Customer obligated on such JV Receivables is Richmond County Constructors, LLC, a limited liability company formed under the laws of the state of Delaware ("Richmond").

"Eligible Receivables" shall mean and include each Receivable of a Borrower arising in the Ordinary Course of Business and which Agent, in its sole discretion exercised in a commercially reasonable manner, shall deem to be an Eligible Receivable, based on such considerations as Agent may from time to time deem appropriate.  In addition, no Receivable shall be an Eligible Receivable if:

(a)    such Receivable arises out of a sale made by any Borrower (i) to an Affiliate of any Loan Party or (ii) to a Person controlled by an Affiliate of any Loan Party;

(b)    such Receivable is due or unpaid more than ninety (90) days or, solely with respect to Southern Receivables (or any other Receivables in Agent's sole discretion), one hundred twenty (120) days, after the original invoice date or sixty (60) days after the original due date;

(c)    such Receivable is due from a Customer with respect to which fifty percent (50%) or more of the Receivables owing from such Customer are not otherwise deemed Eligible Receivables hereunder (such percentage may, in Agent's sole discretion exercised in a commercially reasonable manner, be increased or decreased from time to time);

(d)    such Receivable is not subject to Agent's first priority perfected Lien or is subject to any other Liens (other than Permitted Encumbrances);

(e)    any covenant, representation or warranty set forth in this Agreement with respect to such Receivable has been breached;

(f)    such Receivable is due from a Customer with respect to which an Insolvency Event shall have occurred;

(g)    the sale giving rise to such Receivable is to a Customer outside the continental United States , unless such sale is on letter of credit, guaranty or acceptance terms, in each case acceptable to Agent in its sole discretion exercised in a commercially reasonable manner;

074658.23049/132216381v.5074658.23049/132216381v.9

(h)    the sale giving rise to such Receivable is on a bill-and-hold, guaranteed sale, sale-and-return, sale on approval, consignment or any other repurchase or return basis with the applicable Customer or such Receivable is evidenced by chattel paper or an instrument;

(i)    Agent believes, in its sole discretion exercised in a commercially reasonable manner, that the ability to collect such Receivable is insecure or that such Receivable may not be paid by reason of the Customer's financial inability to pay;

(j)    such Receivable is (i) due from a Customer which is the United States, any state or any department, agency or instrumentality of any of them, unless the applicable Borrower assigns its right to payment of such Receivable to Agent pursuant to the Assignment of Claims Act of 1940, as amended (31 U.S.C. Sub-Section 3727 et seq. and 41 U.S.C. Sub-Section 15 et seq.) or has otherwise complied with other applicable statutes or ordinances or (ii) due from a Customer which is the federal Government of Canada or any provincial Governmental Body thereof which has adopted legislation requiring any consent or other legal formality of a provincial Governmental Body to the assignment of any claim against such province or provincial Governmental Body and/or the grant of any Lien in such Receivable and such assignment is enforceable against such Governmental Body;

(k)    (i) the goods giving rise to such Receivable have not been delivered to and accepted by the Customer, (ii)  the services giving rise to such Receivable have not been performed by the applicable Borrower and accepted by the Customer or (iii) such Receivable otherwise does not represent a final sale, unless, in the case of this clause (iii), such Receivable is one in a series of related Receivables arising from continuing services performed for the benefit of the same Customer pursuant to the same project, the terms in respect of which permit the progress billing for such services, in each case rendered in the Ordinary Course of Business;

(l)    the Receivables of the Customer from which such Receivable is owing exceed a credit limit determined by Agent, in its sole discretion exercised in a commercially reasonable manner, to the extent such Receivable exceeds such limit;

(m)    such Receivable is owing from a Customer whose total obligations owing to all Borrowers exceed 60% of all Eligible Receivables, to the extent of the obligations owing by such Customer in excess of such percentage; provided, however, such percentage, as applied to a particular Customer (x) may be reduced at any time by Agent in its Permitted Discretion if the creditworthiness of such Customer deteriorates in the determination of Agent, and (y) may be increased at any time by Agent in its sole discretion exercised in a commercially reasonable manner;

(n)    such Receivable is subject to any offset, deduction, defense, dispute, credit or counterclaim (because, among other reasons, the Customer is also a creditor or supplier of a Borrower) or the Receivable is contingent in any respect or for any reason (but such Receivable shall only be ineligible to the extent of such offset, deduction, defense, dispute, credit or counterclaim or contingency);

(o)    the applicable Borrower has made any agreement with any Customer for any deduction therefrom, except for discounts or allowances made in the Ordinary Course of

Business for prompt payment, all of which discounts or allowances are reflected in the calculation of the face value of each respective invoice related thereto;

(p)   any return, rejection or repossession of the merchandise the sale of which gave rise to such Receivable has occurred or the rendition of services giving rise to such Receivable has been disputed;

(q)   such Receivable is not payable to a Borrower;

(r)   such Receivable is not evidenced by an invoice or other documentary evidence satisfactory to Agent; or

(s)   such Receivable is not otherwise satisfactory to Agent as determined by Agent in its Permitted Discretion.

"Eligible Unbilled Receivables" shall mean, collectively, Eligible Unbilled U.S. Receivables and Eligible Unbilled JV Receivables.

"Eligible Unbilled JV Receivables" shall mean and include each JV Receivable of a Borrower arising in the Ordinary Course of Business that (a) satisfies all of the criteria of Eligible JV Receivables, other than clause (r) of the definition of "Eligible Receivables", (b) shall become a standard billed JV Receivable in the Ordinary Course of Business pursuant to the billing of such amount (and the conversion thereof into a Receivable) within thirty (30) days after the date of completion of the services or the delivery of the goods giving rise to such Receivable, and (c) is evidenced by such documentation satisfactory to Agent in its Permitted Discretion.

"Eligible Unbilled U.S. Receivables" shall mean and include each Receivable of a Borrower arising in the Ordinary Course of Business that (a) satisfies all of the criteria of Eligible Receivables, other than clause (r) of the definition of "Eligible Receivables", (b) shall become a standard billed Receivable in the Ordinary Course of Business pursuant to the billing of such amount (and the conversion thereof into a Receivable) within thirty (30) days after the date of completion of the services or the delivery of the goods giving rise to such Receivable, and (c) is evidenced by such documentation satisfactory to Agent in its Permitted Discretion.

"Embargoed Property" shall mean any property (a) beneficially owned, directly or indirectly, by a Sanctioned Person; (b) that is due to or from a Sanctioned Person; (c) in which a Sanctioned Person otherwise holds any interest; (d) that is located in a Sanctioned Jurisdiction; or (e) that otherwise would cause any actual or possible violation by the Lenders or Agent of any applicable Anti-Terrorism Law if the Lenders were to obtain an encumbrance on, lien on, pledge of, or security interest in such property or provide services in consideration of such property.

"Environmental Complaint" shall have the meaning set forth in Section 9.3(b) hereof.

"Environmental Laws" shall mean all federal, state, provincial, territorial and local environmental, land use, zoning, health, chemical use, safety and sanitation Laws relating to the protection of the environment, human health and/or governing the use, storage, treatment, generation, transportation, processing, handling, production or disposal of Hazardous Materials

074658.23049/132216381v.5074658.23049/132216381v.9

and the rules, regulations, policies, guidelines, interpretations, decisions, orders and directives of federal, state, international and local governmental agencies and authorities with respect thereto.

"Equipment" shall have the meaning given to the term "equipment" in the Uniform Commercial Code.

"Equity Interests" shall mean, with respect to any Person, any and all shares, rights to purchase, options, warrants, general, limited or limited liability partnership interests, member interests, participation or other equivalents of or interest in (regardless of how designated) equity of such Person, whether voting or nonvoting, including common stock, preferred stock, convertible securities or any other "equity security" (as such term is defined in Rule 3a11-1 of the General Rules and Regulations promulgated by the SEC under the Exchange Act), including in each case all of the following rights relating to such Equity Interests, whether arising under the Organizational Documents of the Person issuing such Equity Interests (the "Equity Issuer") or under the Applicable Laws of such Equity Issuer's jurisdiction of organization relating to the formation, existence and governance of corporations, limited liability companies or partnerships or business trusts or other legal entities, as the case may be: (i) all economic rights (including all rights to receive dividends and distributions) relating to such Equity Interests; (ii) all voting rights and rights to consent to any particular actions by the applicable Equity Issuer; (iii) all management rights with respect to such Equity Issuer; (iv) in the case of any Equity Interests consisting of a general partner interest in a partnership, all powers and rights as a general partner with respect to the management, operations and control of the business and affairs of the applicable Equity Issuer; (v) in the case of any Equity Interests consisting of the membership/limited liability company interests of a managing member in a limited liability company, all powers and rights as a managing member with respect to the management, operations and control of the business and affairs of the applicable Equity Issuer; (vi) all rights to designate or appoint or vote for or remove any officers, directors, managers, general partners or managing members of such Equity Issuer and/or any members of any board of members/managers/partners/directors that may at any time have any rights to manage and direct the business and affairs of the applicable Equity Issuer under its Organizational Documents as in effect from time to time or under Applicable Law; (vii) all rights to amend the Organizational Documents of such Equity Issuer, (viii) in the case of any Equity Interests in a partnership or limited liability company, the status of the holder of such Equity Interests as a "partner", general or limited, or "member" (as applicable) under the applicable Organizational Documents and/or Applicable Law; and (ix) all certificates evidencing such Equity Interests.

"ERISA" shall mean the Employee Retirement Income Security Act of 1974, as the same may be amended, modified or supplemented from time to time and the rules and regulations promulgated thereunder.

"Erroneous Payment" has the meaning set forth in Section 14.14(a).

"**Erroneous Payment Deficiency Assignment**" has the meaning set forth in Section 14.14 (d)(i).

"Erroneous Payment Impacted Class" has the meaning set forth in Section 14.14(d)(i).

074658.23049/132216381v.5074658.23049/132216381v.9

"<u>Erroneous Payment Return Deficiency</u>" has the meaning set forth in Section 14.14(d)(i).

"<u>Erroneous Payment Subrogation Rights</u>" has the meaning set forth in Section 14.14(e).

"<u>Event of Default</u>" shall have the meaning set forth in Article X hereof.

"<u>Exchange Act</u>" shall mean the Securities Exchange Act of 1934, as amended.

"<u>Exchange Rate</u>" shall mean, with respect to any calculation of the U.S. Dollar Equivalent of any amount denominated in any currency other than U.S. Dollars on any date of determination, the prevailing spot rate of exchange for the conversion of such other currency into U.S. Dollars as determined by Agent's foreign exchange department (in the exercise of its ordinary business practices regarding foreign currency exchange for customers of the Agent similarly situated to Borrowers) as of the close of business for Agent's foreign exchange department on the Business Day immediately preceding such date of determination; <u>provided that</u>, notwithstanding the foregoing, in the context of any actual conversion by Agent or any Lender of any funds received by Agent or any Lender (whether as a payment made by any Loan Party or the proceeds of any Collateral (including any collections on any Receivable received by Agent or any Lender)), or any calculation or valuation of asset values, from one currency to another for the purpose of applying such funds to the Obligations in accordance with the terms of this Agreement or calculating the Formula Amount, "Exchange Rate" means the spot-buying or spot-selling (as the case may be) rate of exchange at which Agent or such Lender is actually able to exchange the one currency for the other in the exercise of its ordinary business practices regarding foreign currency exchange at the time of such actual conversion.

"<u>Excluded Deposit Accounts</u>" shall mean deposit accounts exclusively used for payroll, payroll taxes and other employee wage and benefit payments to or for the benefit of Loan Parties' employees and identified to Agent by a Borrower as such.

"<u>Excluded Hedge Liability or Liabilities</u>" shall mean, with respect to each Loan Party, each of its Swap Obligations if, and only to the extent that, all or any portion of this Agreement or any Other Document that relates to such Swap Obligation is or becomes illegal under the CEA, or any rule, regulation or order of the CFTC, solely by virtue of such Loan Party's failure to qualify as an Eligible Contract Participant on the Eligibility Date for such Swap. Notwithstanding the foregoing or any other provision of this Agreement or any Other Document to the contrary, the foregoing is subject to the following provisos: (a) if a Swap Obligation arises under a master agreement governing more than one Swap, this definition shall apply only to the portion of such Swap Obligation that is attributable to Swaps for which such guaranty or security interest is or becomes illegal under the CEA, or any rule, regulations or order of the CFTC, solely as a result of the failure by such Loan Party for any reason to qualify as an Eligible Contract Participant on the Eligibility Date for such Swap; (b) if a guarantee of a Swap Obligation would cause such obligation to be an Excluded Hedge Liability but the grant of a security interest would not cause such obligation to be an Excluded Hedge Liability, such Swap Obligation shall constitute an Excluded Hedge Liability for purposes of the guaranty but not for purposes of the grant of the security interest; and (c) if there is more than one Loan Party executing this Agreement or the Other Documents and a Swap Obligation would be an Excluded Hedge Liability with respect to one or more of such Loan Parties, but not all of them, the

definition of "Excluded Hedge Liability or Liabilities" with respect to each such Loan Party shall only be deemed applicable to (i) the particular Swap Obligations that constitute Excluded Hedge Liabilities with respect to such Loan Party, and (ii) the particular Loan Party with respect to which such Swap Obligations constitute Excluded Hedge Liabilities.

"Excluded Property" shall mean any non-material lease, license, contract or agreement to which any Loan Party is a party, and any of its rights or interests thereunder, if and to the extent that a security interest therein is prohibited by or in violation of (x) any Applicable Law, or (y) a term, provision or condition of any such lease, license, contract or agreement (unless in each case, such Applicable Law, term, provision or condition would be rendered ineffective with respect to the creation of such security interest pursuant to Sections 9-406, 9-407, 9-408 or 9-409 of the Uniform Commercial Code (or any successor provision or provisions) of any relevant jurisdiction or any other Applicable Law or principles of equity), provided, however, that the foregoing shall cease to be treated as "Excluded Property" (and shall constitute Collateral) immediately at such time as the contractual or legal prohibition shall no longer be applicable and to the extent severable, such security interest shall attach immediately to any portion of such lease, license, contract or agreement not subject to the prohibitions specified in (x) or (y) above, provided, further that Excluded Property shall not include any proceeds of any such lease, license, contract or agreement or any goodwill of Loan Parties' business associated therewith or attributable thereto.

"Excluded Taxes" shall mean any of the following Taxes on or with respect to Agent, any Lender, Swing Loan Lender, any Issuer or any other recipient or required to be withheld or deducted from a payment to any such recipient, (a) Taxes imposed on or measured by net income (however denominated), franchise Taxes, and branch profits Taxes, in each case, imposed as a result of such recipient being organized under the Laws of, or having its principal office or, in the case of any Lender, its applicable lending office located in, the jurisdiction imposing such Tax (or any political subdivision thereof), (b) in the case of a Lender, U.S. federal withholding Taxes imposed on amounts payable to or for the account of such Lender with respect to an applicable interest in an Advance or Commitment pursuant to a Law in effect on the date on which (i) such Lender acquired such interest in the Advance or Commitment (other than pursuant to an assignment request by the Borrowers pursuant to Section 3.11 hereof) or (ii) such Lender changes its lending office, except in each case to the extent that, pursuant to Section 3.10 hereof, amounts with respect to such Taxes were payable either to such Lender's assignor immediately before such Lender became a party hereto or to such Lender immediately before it changed its lending office, (c) Taxes attributable to such Lender's failure to comply with Section 3.10(g) hereof, or (d) any U.S. federal withholding Taxes imposed under FATCA.

"Existing ~~Letter~~Letters of Credit" means those letters of credit outstanding as of the Closing Date and set forth on Schedule 1.3 hereto.

"FATCA" shall mean Sections 1471 through 1474 of the Internal Revenue Code, as of the Closing Date (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations thereunder or official interpretations thereof and any agreements entered into pursuant to Section 1471(b)(1) of the Internal Revenue Code.

074658.23049/132216381v.5074658.23049/132216381v.9

"Fee Letter" shall mean the fee letter, dated as of the Closing Date (as the same may be amended, restated, amended and restated, supplemented or otherwise modified from time to time), executed by the Loan Parties in favor of Agent.

"Final Order" shall mean a final order of the Bankruptcy Court in the Cases authorizing and approving this Agreement and the Loan Documents under, inter alia, Sections 364(c) and (d) of the Bankruptcy Code on a final basis and entered at or after a final hearing, which order is consistent with the Interim Order in all material respects or otherwise in form and substance satisfactory to Agent in its sole discretion.  The Final Order shall, among other things:

(a)    authorize the transactions contemplated by this Agreement and the extensions of credit under this Agreement in an amount not less than the Maximum Revolving Advance Amount provided for herein;

(b)    in respect of the Debtors, grant the claim and Lien status and Liens described herein and in the Pledge Agreement and prohibit the granting of additional Liens on the assets of any Debtor and the DIP Superpriority Claims except for any Liens and Claims specifically provided for in such order;

(c)    provide that such Liens are automatically perfected as of the Petition Date by the entry of the Final Order and also grant to Agent for the benefit of Agent and the Lenders relief from the automatic stay of Section 362(a) of the Bankruptcy Code to enable Agent, if Agent elects to do so in its discretion, to make all filings and recordings and to take all other actions considered necessary or advisable by Agent to perfect, protect and insure the priority of its Liens upon the Collateral of the Debtors as a matter of non-bankruptcy law;

(d)    provide that (except as set forth in the Interim Order) no Person will be permitted to surcharge the Collateral of the Debtors under Section 506(c) of the Bankruptcy Code, nor shall any costs or expenses whatsoever be imposed against the Collateral of the Debtors;

(e)    provide for the Final Roll-Up; and

(f)    provide Agent with relief from the automatic stay in a manner consistent with the terms of Section 11.1.

"Final Roll-Up" shall have the meaning set forth in Section 2.21.

"First Day Orders" shall mean the orders entered by the Bankruptcy Court in respect of first day motions and applications in respect of any of the Cases.

"Flood Laws" shall mean all Applicable Laws relating to policies and procedures that address requirements placed on federally regulated lenders under the National Flood Insurance Reform Act of 1994 and other Applicable Laws related thereto.

"Foreign Currency Hedge" shall mean any foreign exchange transaction, including spot and forward foreign currency purchases and sales, listed or over-the-counter options on foreign currencies, non-deliverable forwards and options, foreign currency swap agreements, currency exchange rate price hedging arrangements, and any other similar transaction providing for the

24

purchase of one currency in exchange for the sale of another currency entered into by any Loan Party or any of their respective Subsidiaries.

"Foreign Currency Hedge Obligations" shall mean the Indebtedness of the Loan Parties and their Subsidiaries owing to the provider of a Foreign Currency Hedge. For purposes of this Agreement and all of the Other Documents, all Foreign Currency Hedge Obligations of any Loan Party or Subsidiary that is party to any Lender-Provided Foreign Currency Hedge shall, for purposes of this Agreement and all of the Other Documents, be "Obligations" of such Person and of each other Loan Party, be guaranteed obligations under any Guaranty and secured obligations under any Guarantor Security Agreement, as applicable, and otherwise treated as Obligations for purposes of the Other Documents, except to the extent constituting Excluded Hedge Liabilities of such Person. The Liens securing the Foreign Currency Hedge Obligations shall be pari passu with the Liens securing all other Obligations under this Agreement and the Other Documents, subject to the express provisions of Section 11.6 hereof.

"Foreign Lender" shall mean any Lender that is organized under the Laws of a jurisdiction other than that in which the Loan Parties are resident for income Tax purposes or in Canada. For purposes of this definition, the United States, each State thereof and the District of Columbia shall be deemed to constitute a single jurisdiction and for the purposes of Canada, Canada and each Province and Territory thereof shall be deemed to constitute a single jurisdiction.

"Foreign Subsidiary" shall mean any Subsidiary of any Person that is not organized or incorporated in the United States, any State or territory thereof or the District of Columbia.

"Formula Amount" shall have the meaning set forth in Section 2.1(a) hereof.

"GAAP" shall mean generally accepted accounting principles in the United States in effect from time to time or in relation to the Canadian Loan Parties, in Canada, in effect from time to time.

"Global" shall have the meaning set forth in the preamble to this Agreement and shall include its successors and assigns.

"Governmental Body" shall mean any nation or government, any state, province or territory or other political subdivision thereof or any entity, authority, agency, division or department exercising the executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to a government (including any supra-national bodies such as the European Union or the European Central Bank) and any group or body charged with setting financial accounting or regulatory capital rules or standards (including, without limitation, the Financial Accounting Standards Board, the Bank for International Settlements or the Basel Committee on Banking Supervision or any successor or similar authority to any of the foregoing).

"GPEG" shall mean GPEG, LLC, a Delaware limited liability company.

"Guarantor" or "Guarantors" shall have the meaning set forth in the preamble to this Agreement and shall include any other Person who may hereafter guarantee payment or

performance of the whole or any part of the Obligations and each of their respective successors and permitted assigns.

"<u>Guarantor Security Agreement</u>" shall mean any security agreement executed by any Guarantor in favor of Agent securing the Obligations or the Guaranty of such Guarantor, in form and substance  satisfactory to Agent, as such security agreements may be amended, restated, amended and restated, supplemented or otherwise modified from time to time.

"<u>Guaranty</u>" shall mean any guaranty of the Obligations executed by a Guarantor in favor of Agent for its benefit and for the ratable benefit of Lenders, in form and substance  satisfactory to Agent, including Article XVII hereof.

"<u>Hazardous Discharge</u>" shall have the meaning set forth in Section 9.3(b) hereof.

"<u>Hazardous Materials</u>" shall mean, without limitation, any flammable explosives, radon, radioactive materials, asbestos, urea formaldehyde foam insulation, polychlorinated biphenyls, petroleum and petroleum products, methane, hazardous materials, Hazardous Wastes, hazardous or Toxic Substances or related materials as defined in or subject to regulation under Environmental Laws.

"<u>Hazardous Wastes</u>" shall mean all waste materials subject to regulation under CERCLA, RCRA or applicable state Law, and any other applicable Federal and state Laws or Canadian, provincial or territorial laws now in force or hereafter enacted relating to hazardous waste disposal.

"<u>Hedge Obligations</u>" shall mean collectively, the Foreign Currency Hedge Obligations and the Interest Rate Hedge Obligations.

"<u>Holdings</u>" shall have the meaning set forth in the preamble to this Agreement and shall include its successors and assigns.

"<u>Inactive Subsidiaries</u>" shall mean each of GPEG, Power, Steam, Braden, Braden Mexico and Koontz-Wagner.

"<u>Indebtedness</u>" shall mean, as to any Person at any time, any and all indebtedness, obligations or liabilities (whether matured or unmatured, liquidated or unliquidated, direct or indirect, absolute or contingent, or joint or several) of such Person for or in respect of: (a) borrowed money; (b) amounts received under or liabilities in respect of any note purchase or acceptance credit facility, and all obligations of such Person evidenced by bonds, debentures, notes or other similar instruments; (c) all Capitalized Lease Obligations; (d) reimbursement obligations (contingent or otherwise) under any letter of credit agreement, banker's acceptance agreement or similar arrangement; (e) obligations under any Interest Rate Hedge, Foreign Currency Hedge, or other interest rate management device, foreign currency exchange agreement, currency swap agreement, commodity price protection agreement or other interest or currency exchange rate or commodity price hedging arrangement; (f) any other advances of credit made to or on behalf of such Person or other transaction (including forward sale or purchase agreements, capitalized leases and conditional sales agreements to the extent of the value of such property (other than customary reservations or retentions of title under agreements

074658.23049/132216381v.5074658.23049/132216381v.9

with suppliers entered into in the Ordinary Course of Business) having the commercial effect of a borrowing of money entered into by such Person to finance its operations or capital requirements including to finance the purchase price of property or services and all obligations of such Person to pay the deferred purchase price of property or services (but not including trade payables and accrued expenses incurred in the Ordinary Course of Business which are not represented by a promissory note or other evidence of indebtedness and which are not more than sixty (60) days past due); (g) all Equity Interests of such Person subject to repurchase or redemption rights or obligations (excluding repurchases or redemptions at the sole option of such Person); (h) all indebtedness, obligations or liabilities secured by a Lien on any asset of such Person, whether or not such indebtedness, obligations or liabilities are otherwise an obligation of such Person; (i) all obligations of such Person for "earnouts", purchase price adjustments, profit sharing arrangements, deferred purchase money amounts and similar payment obligations or continuing obligations of any nature of such Person arising out of purchase and sale contracts; (j) off-balance sheet liabilities and/or pension plan liabilities of such Person; (k) obligations arising under bonus, deferred compensation, incentive compensation or similar arrangements, other than those arising in the Ordinary Course of Business; and (l) any guaranty of any indebtedness, obligations or liabilities of a type described in the foregoing clauses (a) through (k).

"Indemnified Taxes" shall mean (a) Taxes other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of any Loan Party under this Agreement or any Other Document, and (b) to the extent not otherwise described in the foregoing clause (a), Other Taxes.

"Ineligible Security" shall mean any security which may not be underwritten or dealt in by member banks of the Federal Reserve System under Section 16 of the Banking Act of 1933 (12 U.S.C. Section 24, Seventh), as amended.

"Initial Budget" shall mean the thirteen-week budget delivered to and approved by Agent on or before the Closing Date and attached hereto as Exhibit III, setting forth Debtors' cash flow forecast in reasonable detail satisfactory to Agent with line item detail approved by on or before the Closing Date, including receipts, and disbursements, as well as projected collateral balances for the thirteen-week period commencing with the week in which the Closing Date shall occur.

"Insolvency Event" shall mean, with respect to any Person, including without limitation any Lender, such Person or such Person's direct or indirect parent company (a) becomes the subject of a bankruptcy or insolvency proceeding (including any proceeding under any Insolvency Laws), or regulatory restrictions, (b) has had a receiver, interim receiver, receiver and manager, monitor, liquidator, conservator, trustee, administrator, custodian, assignee for the benefit of creditors or similar Person charged with the reorganization or liquidation or wind up of its business appointed for it or has called a meeting of its creditors, (c) admits in writing its inability, or is generally unable, to pay its debts as they become due or ceases operations of its present business, (d) with respect to a Lender, such Lender is unable to perform hereunder due to the application of Applicable Law, or (e) in the good faith determination of Agent, has taken any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any such proceeding or appointment of a type described in clauses (a) or (b), provided that an Insolvency Event shall not result solely by virtue of any ownership interest, or the acquisition of any ownership interest, in such Person or such Person's direct or indirect parent company by a

Governmental Body or instrumentality thereof if, and only if, such ownership interest does not result in or provide such Person with immunity from the jurisdiction of courts within the United States or from the enforcement of judgments or writs of attachment on its assets or permit such Person (or such Governmental Body or instrumentality) to reject, repudiate, disavow or disaffirm any contracts or agreements made by such Person.

"Insolvency Laws" shall mean any of Title 11 of the United States Code, the Bankruptcy and Insolvency Act (Canada), the Companies' Creditors Arrangement Act (Canada), the Winding-Up and Restructuring Act (Canada), any applicable governing corporate statute dealing with the compromise of creditor's claims or arrangements, each as now and hereafter in effect, any successors to such statutes and any other applicable insolvency, bankruptcy, liquidation, receivership, wind up, reorganization, arrangement or relief of debtor or other similar Law of any jurisdiction, including the Business Corporation Act (British Columbia) where such statute is used by a Person to propose an arrangement and any Applicable Law of any jurisdiction permitting a debtor to obtain a stay or a compromise of the claims of its creditors against it.

"Intellectual Property" shall mean property constituting a patent, copyright, trademark (or any application in respect of the foregoing), service mark, trade name, mask work, trade secrets, design right, industrial designs, assumed name or license or other right to use any of the foregoing under Applicable Law.

"Intellectual Property Claim" shall mean the assertion, by any means, by any Person of a claim that any Loan Party's ownership, use, marketing, sale or distribution of any Inventory, Equipment, Intellectual Property or other property or asset is violative of any ownership of or right to use any Intellectual Property of such Person.

"Intercreditor Agreement" shall mean that certain Intercreditor Agreement dated as December 16, 2020, as amended by the First Amendment thereto and the Second Amendment thereto and that certain Third Amendment to Intercreditor Agreement dated as of the Closing Date, in substantially the form set forth in Exhibit A among the Prepetition Revolving Agent, the Agent, the Prepetition Term Loan Agent, the DIP Term Loan Agent and the Loan Parties, as such agreement may be amended, restated, amended and restated, supplemented or otherwise modified from time to time as permitted therein.

"Interest Period" shall mean the period provided for any Term SOFR Rate Loan pursuant to Section 2.2(b) hereof.

"Interest Rate Hedge" shall mean an interest rate exchange, collar, cap, swap, floor, adjustable strike cap, adjustable strike corridor, cross-currency swap or similar agreements entered into by any Loan Party and/or its Subsidiaries in order to provide protection to, or minimize the impact upon, such Loan Party and/or its Subsidiaries of increasing floating rates of interest applicable to Indebtedness.

"Interest Rate Hedge Obligations" shall mean the Indebtedness of a Loan Party and its Subsidiaries owing to the provider of any Interest Rate Hedge.  For purposes of this Agreement and all of the Other Documents, all Interest Rate Hedge Obligations of any Loan Party or Subsidiary that is party to any Lender-Provided Interest Rate Hedge shall be "Obligations"

hereunder and under the Other Documents, except to the extent constituting Excluded Hedge Liabilities of such Person, and the Liens securing such Interest Rate Hedge Obligations shall be pari passu with the Liens securing all other Obligations under this Agreement and the Other Documents, subject to the express provisions of Section 11.6 hereof.

"Interim Order" shall mean an order of the Bankruptcy Court in any of the Cases authorizing and approving this Agreement and the Credit Documents, for an interim period, under, inter alia, Sections 364(c) and (d) of the Bankruptcy Code and entered at or after a hearing, in form and substance satisfactory to Agent in its sole discretion and attached hereto as Exhibit I.

"Interim Period" shall have the meaning as set forth in the Interim Order, or, after the entry of the Final Order, in the Final Order.

"Interim Roll-Up" shall have the meaning set forth in Section 2.21.

"Internal Revenue Code" shall mean the Internal Revenue Code of 1986, as the same may be amended, modified or supplemented from time to time, and any successor statute of similar import, and the rules and regulations thereunder, as from time to time in effect.

"Inventory" shall mean and include as to each Loan Party all of such Loan Party's inventory (as defined in Article 9 of the Uniform Commercial Code) and all of such Loan Party's goods, merchandise and other personal property, wherever located, to be furnished under any consignment arrangement, contract of service or held for sale or lease, all raw materials, work in process, finished goods and materials and supplies of any kind, nature or description which are or might be used or consumed in such Loan Party's business or used in selling or furnishing such goods, merchandise and other personal property, and all Documents.

"Investment Property" shall mean and include, with respect to any Person, all of such Person's now owned or hereafter acquired securities (whether certificated or uncertificated), securities entitlements, securities accounts, commodities contracts and commodities accounts, and any other asset or right that would constitute "investment property" under the Uniform Commercial Code.

"Issuer" shall mean (a) Agent in its capacity as the issuer of Letters of Credit under this Agreement and (b) any other Lender which Agent in its discretion shall designate as the issuer of and cause to issue any particular Letter of Credit under this Agreement in place of Agent as issuer.

"JV Receivable" shall mean a Receivable of a Borrower arising from the sale of goods or the rendition of services by such Borrower to a Joint Venture, provided such Joint Venture constitutes a legal entity  organized or formed under the laws of the United States or any State thereof, including, by way of illustration, a corporation, limited liability company or limited partnership, but excluding a sole proprietorship  or unincorporated association.

"Joint Venture" shall mean any joint venture or partnership between any Loan Party, on the one hand, and any other Person, on the other hand.

29

"Koontz-Wagner" shall mean Koontz-Wagner Custom Controls Holdings LLC, an Indiana limited liability company, which Person (i) is a subsidiary of Holdings, (ii) filed a voluntary petition for relief under Chapter 7 of Title 11 of the U.S. Bankruptcy Code with the U.S. Bankruptcy Court for the Southern District of Texas on July 11, 2018, and (iii) has been administratively dissolved, effective as of February 5, 2019.

"Law(s)" shall mean any law(s) (including common law and equitable principles), constitution, statute, treaty, regulation, rule, ordinance, opinion, issued guidance, code, release, ruling, order, executive order, injunction, writ, decree, bond, judgment, authorization or approval, lien or award of or any settlement arrangement, by agreement, consent or otherwise, with any Governmental Body, foreign or domestic.

"Leasehold Interests" shall mean all of each Loan Party's right, title and interest in and to, and as lessee of, the premises identified as leased Real Property on Schedule 4.4(b)(iv) hereto.

"Lender" and "Lenders" shall have the meaning ascribed to such term in the preamble to this Agreement and shall include each Person which becomes a transferee, successor or assign of any Lender.  For the purposes of any provision of this Agreement or any Other Document which provides for the granting of a security interest or other Lien to Agent for the benefit of Lenders as security for the Obligations, "Lenders" shall include any Affiliate of a Lender to which such Obligation (specifically including any Hedge Obligations and any Cash Management Obligations) is owed.

"Lender-Provided Foreign Currency Hedge" shall mean a Foreign Currency Hedge which is provided by any Lender and for which such Lender confirms to Agent in writing prior to the execution thereof that it: (a) is documented in a standard International Swap Dealers Association, Inc. Master Agreement or another reasonable and customary manner; (b) provides for the method of calculating the reimbursable amount of such Lender's credit exposure in a reasonable and customary manner; and (c) is entered into for hedging (rather than speculative) purposes.

"Lender-Provided Interest Rate Hedge" shall mean an Interest Rate Hedge which is provided by any Lender and with respect to which such Lender confirms to Agent in writing prior to the execution thereof that it: (a) is documented in a standard International Swap Dealers Association, Inc. Master Agreement or another reasonable and customary manner; (b) provides for the method of calculating the reimbursable amount of such Lender's credit exposure in a reasonable and customary manner; and (c) is entered into for hedging (rather than speculative) purposes.

"Letter of Credit Application" shall have the meaning set forth in Section 2.12(a) hereof.

"Letter of Credit Borrowing" shall have the meaning set forth in Section 2.14(d) hereof.

"Letter of Credit Approved Currencies" shall mean, collectively, U.S. Dollars and Canadian Dollars.

"Letter of Credit Fees" shall have the meaning set forth in Section 3.2 hereof.

"Letter of Credit Sublimit" shall mean ~~the U.S. Dollar Equivalent of~~ $500,000, which Letter of Credit Sublimit, for the avoidance of doubt, includes the outstanding Existing ~~Letter~~Letters of Credit.

"Letters of Credit" shall have the meaning set forth in Section 2.11 hereof.

"License Agreement" shall mean any agreement between any Loan Party and a Licensor pursuant to which such Loan Party is authorized to use any Intellectual Property in connection with the manufacturing, marketing, sale or other distribution of any Inventory of such Loan Party or otherwise in connection with such Loan Party's business operations.

"Licensor" shall mean any Person from whom any Loan Party obtains the right to use (whether on an exclusive or non-exclusive basis) any Intellectual Property in connection with such Loan Party's manufacture, marketing, sale or other distribution of any Inventory or otherwise in connection with such Loan Party's business operations.

"Licensor/Agent Agreement" shall mean an agreement between Agent and a Licensor, in form and substance satisfactory to Agent, by which Agent is given the unqualified right, vis-à-vis such Licensor, to enforce Agent's Liens with respect to and to dispose of any Loan Party's Inventory with the benefit of any Intellectual Property applicable thereto, irrespective of such Loan Party's default under any License Agreement with such Licensor.

"Lien" shall mean any mortgage, deed of trust, pledge, hypothecation, assignment, security interest, lien or adverse right or claim or deemed trust (whether statutory or otherwise), Charge, claim or encumbrance, or preference, priority or other security agreement or preferential arrangement held or asserted in respect of any asset of any kind or nature whatsoever including any conditional sale or other title retention agreement, any lease having substantially the same economic effect as any of the foregoing, and the filing of, or agreement to give, any financing statement under the Uniform Commercial Code or comparable law of any jurisdiction.

"Lien Priority Chart" shall mean the lien priority chart attached hereto as Exhibit II.

"Lien Waiver Agreement" shall mean an agreement in form and substance reasonably satisfactory to Agent which is executed in favor of Agent by a Person who owns or occupies premises at which any Collateral may be located from time to time.

"LLC Division" shall mean, in the event a Loan Party is a limited liability company, (a) the division of such Loan Party into two or more newly formed limited liability companies (whether or not such Loan Party is a surviving entity following any such division) pursuant to Section 18-217 of the Delaware Limited Liability Company Act or any similar provision under any similar act governing limited liability companies organized under the laws of any other State or Commonwealth or of the District of Columbia, or (b) the adoption of a plan contemplating, or the filing of any certificate with any applicable Governmental Body that results or may result in, any such division.

31

"Loan Party" or "Loan Parties" shall have the meaning set forth in the preamble to this Agreement and shall include their respective successors and permitted assigns.

"Material Adverse Effect" shall mean a material adverse effect on (a) the condition (financial or otherwise), results of operations, assets, business, properties of the Loan Parties, taken as a whole, (b) the ability the Loan Parties, taken as a whole, to pay or perform the Obligations in accordance with the terms of this Agreement or any Other Documents, as the case may be, (c) the value of the Collateral, or Agent's Liens on the Collateral or the priority of any such Lien or (d) the practical realization of the benefits of Agent's and each Lender's rights and remedies under this Agreement and the Other Documents; provided that Material Adverse Effect shall expressly exclude the effect of the filing of any of the Cases, the events and conditions resulting from or leading up thereto and any action required to be taken under the Other Documents or the DIP Orders.

"Material Contract" shall mean any contract, agreement, instrument, permit, lease or license, written or oral, of any Loan Party, which the termination (prior to the scheduled maturity or termination thereof, and other than as a result of the satisfaction of all contractual obligations thereunder), failure to comply with would, or could reasonably be expected to, result in a Material Adverse Effect.

"Material Owned Property" means (a) the Real Property owned by any Loan Party and listed as Material Owned Real Property on Schedule 4.4(b)(iv) hereto and (b) any other Real Property owned by any Loan Party or acquired by a Loan Party with a fair market value in excess of $1,000,000.

"Maturity Date" shall mean September 29, 2023.

"Maximum Revolving Advance Amount" shall mean an amount equal to ~~the U.S. Dollar Equivalent of~~ $12,000,000 less the amount of Prepetition Obligations.

"Maximum Swing Loan Advance Amount" shall mean an amount equal to ~~the U.S. Dollar Equivalent of~~ $0.

"Maximum Undrawn Amount" shall mean, with respect to any outstanding Letter of Credit as of any date, the amount equal to ~~the U.S. Dollar Equivalent of~~ such Letter of Credit that is or may become available to be drawn, including all automatic increases provided for in such Letter of Credit, whether or not any such automatic increase has become effective.

"Modified Commitment Transfer Supplement" shall have the meaning set forth in Section 16.3(d) hereof.

"Multiemployer Plan" shall mean a "multiemployer plan" as defined in Section 3(37) or 4001(a)(3) of ERISA to which contributions are required or, within the preceding five plan years, were required by any Loan Party or any member of the Controlled Group.

"Multiple Employer Plan" shall mean a Plan which has two or more contributing sponsors (including any Loan Party or any member of the Controlled Group) at least two of

074658.23049/132216381v.5074658.23049/132216381v.9

whom are not under common control, as such a plan is described in Section 4063 or 4064 of ERISA.

"Net Cash Proceeds" shall mean: (a) with respect to any Disposition of Collateral (other than Equity Interests), by any Loan Party or any of its Subsidiaries, the aggregate cash proceeds (including cash proceeds received pursuant to policies of insurance and by way of deferred payment of principal pursuant to a note, installment receivable or otherwise, but only as and when received) received by such Loan Party or Subsidiary pursuant to such Disposition net of (i) the reasonable direct costs related to such Disposition (including sales commissions and legal, accounting and investment banking fees, commissions and expenses), (ii) any portion of such proceeds deposited in an escrow account pursuant to the documents relating to such Disposition (provided that such amounts shall be treated as Net Cash Proceeds upon their release from such escrow account to any Loan Party), (iii) Taxes paid or reasonably estimated by any Loan Party to be payable as a result thereof (after taking into account any available tax credits or deductions and any tax sharing arrangements), and (iv) amounts required to be applied to the repayment of any Indebtedness secured by a Permitted Encumbrance prior to the Lien of Agent on the asset subject to such Disposition, all of the costs and expenses reasonably incurred in connection with the collection of such proceeds, award or other payments, and any amounts retained by or paid to parties having superior rights to such proceeds, awards or other payments; and (b) with respect to the Disposition of Equity Interests or the incurrence or issuance of any Indebtedness by any Loan Party or any of its Subsidiaries, the excess of (i) the sum of the cash and Cash Equivalents received by such Loan Party or Subsidiary in connection with such transaction over (ii) the underwriting discounts and commissions, and other reasonable and customary out-of-pocket expenses, incurred by such Loan Party or Subsidiary in connection therewith.

"Non-Defaulting Lender" shall mean, at any time, any Revolving Lender that is not a Defaulting Lender at such time.

"Non-Qualifying Party" shall mean any Loan Party that on the Eligibility Date fails for any reason to qualify as an Eligible Contract Participant.

"Notes" shall mean, collectively, the Revolving Credit Note and the Swing Loan Note.

"Obligations" shall mean and include any and all loans (including without limitation, all Advances), advances, debts, liabilities, obligations (including without limitation all reimbursement obligations and cash collateralization obligations with respect to Letters of Credit issued hereunder), covenants and duties owing by any Loan Party or any Subsidiary of any Loan Party to Issuers, Swing Loan Lender, Lenders or Agent (or to any other direct or indirect subsidiary or affiliate of any Issuer, Swing Loan Lender, any Lender or Agent) of any kind or nature, present or future (including all principal, all accrued and unpaid interest or other amounts accruing thereon, any fees accruing under or in connection therewith, any costs and expenses of any Person payable by any Loan Party and any indemnification obligations payable by any Loan Party arising or payable after maturity, or after the filing of any petition in bankruptcy, or the commencement of any insolvency, reorganization or like proceeding relating to any Loan Party under any Insolvency Laws, whether or not a claim for post-filing or post-petition interest, fees or other amounts is allowable or allowed in such proceeding), whether or not evidenced by any note, guaranty or other instrument, whether arising under any agreement, instrument or

33

document (including this Agreement, the Other Documents, Lender-Provided Interest Rate Hedges, Lender-Provided Foreign Currency Hedges and any Cash Management Products and Services) whether or not for the payment of money, whether arising by reason of an extension of credit, opening or issuance of a letter of credit, loan, equipment lease, establishment of any commercial card or similar facility or guarantee, under any interest or currency swap, future, option or other similar agreement, or in any other manner, whether arising out of overdrafts or deposit or other accounts or electronic funds transfers (whether through automated clearing houses or otherwise) or out of Agent's or any Lender's non-receipt of or inability to collect funds or otherwise not being made whole in connection with depository transfer check or other similar arrangements, whether direct or indirect (including those acquired by assignment or participation), absolute or contingent, joint or several, due or to become due, now existing or hereafter arising, contractual or tortious, liquidated or unliquidated, regardless of how such indebtedness or liabilities arise or by what agreement or instrument they may be evidenced or whether evidenced by any agreement or instrument, including, but not limited to, (i) any and all of any Loan Party's Indebtedness and/or liabilities (and any and all indebtedness, obligations and/or liabilities of any Subsidiary of any Loan Party) under this Agreement, the Other Documents or under any other agreement between Issuers, Agent or Lenders and any Loan Party and any amendments, extensions, renewals or increases and all costs and expenses of any Issuer, Agent and any Lender incurred in the documentation, negotiation, modification, enforcement, collection or otherwise in connection with any of the foregoing, including but not limited to attorneys' fees and expenses and all obligations of any Loan Party to Issuers, Agent or Lenders to perform acts or refrain from taking any action, (ii) all Hedge Obligations, (iii) all Cash Management Obligations and (iv) after entry of the Interim Order and  after giving effect to the Interim Roll-Up and Final Roll-Up, as applicable, in each case whether now existing or arising hereafter and notwithstanding that any such Obligations or claims therefor shall be disallowed, voided or subordinated in any Insolvency Proceeding or under any Debtor Relief Law or other applicable law, all Prepetition Obligations.  Notwithstanding anything to the contrary contained in the foregoing, the Obligations shall not include any Excluded Hedge Liabilities.

"Order" has the meaning set forth in Section 2.4(k)(ii).

"Ordinary Course of Business" shall mean, with respect to any Loan Party, the ordinary course of such Loan Party's business as conducted on the Closing Date.

"Organizational Documents" shall mean, with respect to any Person, any charter, articles or certificate of incorporation, certificate of organization, registration or formation, certificate of partnership or limited partnership, bylaws, operating agreement, limited liability company agreement, or partnership agreement of such Person and any and all other applicable documents relating to such Person's formation, organization or entity governance matters (including any shareholders' or equity holders' agreement or voting trust agreement) and specifically includes, without limitation, any certificates of designation for preferred stock or other forms of preferred equity.

"Other Documents" shall mean the Notes, the Perfection Certificate, the Certificate of Beneficial Ownership, any Guaranty, any Guarantor Security Agreement, any Pledge Agreement, any Lender-Provided Interest Rate Hedge, any Lender-Provided Foreign Currency Hedge, any Cash Management Products and Services, any Budget, the Interim Order, the Final

Order, and any and all other agreements, instruments and documents, including the Intercreditor Agreement, other intercreditor agreements, guaranties, pledges, powers of attorney, consents, interest or currency swap agreements or other similar agreements and all other agreements, documents or instruments heretofore, now or hereafter executed by any Loan Party and/or delivered to Agent or any Lender in respect of the transactions contemplated by this Agreement, in each case together with all amendments, modifications, supplements, renewals, extensions, restatements, substitutions and replacements thereto and thereof.

"Other Taxes" shall mean all present or future stamp, court or documentary, intangible, recording, filing, other excise or property Taxes or similar Taxes, charges or similar levies that arise from any payment made under, from the execution, delivery, performance, enforcement or registration of, from the receipt or perfection of a security interest under, or otherwise with respect to, this Agreement or any Other Document.

"Out-of-Formula Loans" shall have the meaning set forth in Section 16.2(d) hereof.

"Overnight Bank Funding Rate" shall mean, for any, day the rate per annum (based on a year of 360 days and actual days elapsed) comprised of both overnight federal funds and overnight Eurocurrency borrowings by U.S.-managed banking offices of depository institutions, as such composite rate shall be determined by the Federal Reserve Bank of New York, as set forth on its public website from time to time, and as published on the next succeeding Business Day as the overnight bank funding rate by such Federal Reserve Bank (or by such other recognized electronic source (such as Bloomberg) selected by Agent for the purpose of displaying such rate) (an "Alternate Source"); provided, that if such day is not a Business Day, the Overnight Bank Funding Rate for such day shall be such rate on the immediately preceding Business Day; provided, further, that if such rate shall at any time, for any reason, no longer exist, a comparable replacement rate determined by Agent at such time (which determination shall be conclusive absent manifest error). If the Overnight Bank Funding Rate determined as set forth above would be less than zero, then such rate shall be deemed to be zero. The rate of interest charged shall be adjusted as of each Business Day based on changes in the Overnight Bank Funding Rate without notice to the Borrowers.

"Parent" of any Person shall mean a corporation or other entity owning, directly or indirectly, fifty percent (50%) or more of the Equity Interests issued by such Person having ordinary voting power to elect a majority of the directors of such Person, or other Persons performing similar functions for any such Person.

"Participant" shall mean each Person who shall be granted the right by any Lender to participate in any of the Advances and who shall have entered into a participation agreement in form and substance satisfactory to such Lender.

"Participation Advance" shall have the meaning set forth in Section 2.14(d) hereof.

"Participation Commitment" shall mean the obligation hereunder of each Revolving Lender to buy a participation equal to its Revolving Commitment Percentage (subject to any reallocation pursuant to Section 2.22(b)(iii) hereof) in the Swing Loans made by Swing Loan

074658.23049/132216381v.5074658.23049/132216381v.9

Lender hereunder as provided for in Section 2.4(c) hereof and in the Letters of Credit issued hereunder as provided for in Section 2.14(a) hereof.

"<u>Payment in Full</u>" or "<u>Paid in Full</u>" shall mean, with respect to the Obligations, the indefeasible payment and satisfaction in full in cash of all of the Obligations (and prior to giving effect to the Final Roll-Up, the then outstanding Prepetition Obligations) (other than contingent indemnification obligations for which a claim has not been made) in cash or in other immediately available funds; <u>provided</u> that (a) in the case of any Obligations with respect to outstanding Letters of Credit, in lieu of the payment in full in cash, the delivery of cash collateral or a backstop letter of credit in form and substance satisfactory to the applicable Issuer in an amount equal to 105% of the Maximum Undrawn Amount of all outstanding Letters of Credit shall constitute payment in full of such Obligations and (b) in the case of any Obligations with respect to Cash Management Products and Services and any Lender-Provided Interest Rate Hedges or Lender-Provided Foreign Currency Hedges, in lieu of the payment in full in cash, the delivery of cash collateral in such amounts as shall be required by the applicable Lender or other arrangements in form and substance satisfactory to such Lender in respect thereof shall constitute payment in full of such Obligations.  Notwithstanding the foregoing, in the event that, after receipt of any payment of, or proceeds of Collateral applied to the payment of, any of the Obligations, Agent or any Lender is required to surrender or return such payment or proceeds to any Person for any reason, then the Obligations intended to be satisfied by such payment or proceeds shall be reinstated and continue as if such payment or proceeds had not been received by Agent or such Lender.

"<u>Payment Office</u>" shall mean initially Two Tower Center Boulevard, East Brunswick, New Jersey 08816; thereafter, such other office of Agent, if any, which it may designate by notice to Borrowing Agent and to each Lender to be the Payment Office.

"<u>PBGC</u>" shall mean the Pension Benefit Guaranty Corporation established pursuant to Subtitle A of Title IV of ERISA or any successor.

"<u>Pension Benefit Plan</u>" shall mean at any time any "employee pension benefit plan" as defined in Section 3(2) of ERISA (including a Multiple Employer Plan, but not a Multiemployer Plan) which is covered by Title IV of ERISA or is subject to the minimum funding standards under Section 412, 430 or 436 of the Internal Revenue Code and either (i) is maintained or to which contributions are required by any Loan Party or any member of the Controlled Group or (ii) has at any time within the preceding five years been maintained or to which contributions have been required by a Loan Party or any entity which was at such time a member of the Controlled Group.

"<u>Perfection Certificate</u>" shall mean the information questionnaire and the responses thereto provided by each Loan Party and delivered to Agent.

"<u>Permitted Assignees</u>" shall mean: (a) Agent, any Lender or any of their direct or indirect Affiliates; (b) a federal or state chartered bank  (including its Canadian Affiliates or branches), a United States branch of a foreign bank, an insurance company, or any finance company generally engaged in the business of making commercial loans; (c) any fund that is administered or managed by Agent or any Lender, an Affiliate of Agent or any Lender or a related entity; and

(d) any Person to whom Agent or any Lender assigns its rights and obligations under this Agreement as part of an assignment and transfer of such Agent's or Lender's rights in and to a material portion of Agent's or such Lender's portfolio of asset-based credit facilities; provided, that in no event shall (x) a natural person or (y) Holdings or any of its Affiliates be a "Permitted Assignee.

"Permitted Captive Insurance Subsidiary" shall mean a Captive Insurance Subsidiary that Agent has approved as a Permitted Captive Insurance Subsidiary pursuant to Section 7.12(b).

"Permitted Discretion" shall mean a determination made in good faith and in the exercise (from the perspective of a secured asset-based lender) of commercially reasonable business judgment.

"Permitted Encumbrances" shall mean: (a) Liens in favor of Agent for the benefit of the Secured Parties, including without limitation, Liens securing Hedge Obligations and Cash Management Products and Services; (b) Liens for taxes, assessments, Priority Payables or other governmental charges not delinquent for a period of more than thirty (30) days (provided any such Liens in respect of Priority Payables have not been registered and/or are not being enforced) or being Properly Contested and a Reserve has been established against the Formula Amount; (c) deposits or pledges to secure obligations under worker's compensation, social security or similar laws, or under unemployment insurance (but not any Liens being registered or enforced in respect of any Priority Payables); (d) deposits or pledges to secure bids, tenders, contracts (other than contracts for the payment of money), leases, statutory obligations, surety, stay, indemnity, customs and appeal bonds and other obligations of like nature (including those to secure health, safety and environmental obligations) arising in the Ordinary Course of Business; (e) Liens arising by virtue of the rendition, entry or issuance against any Loan Party or any Subsidiary, or any property of any Loan Party or any Subsidiary, of any judgment, writ, order or decree to the extent the rendition, entry, issuance or continued existence of such judgment, writ, order or decree (or any event or circumstance relating thereto) has not resulted in the occurrence of an Event of Default under Section 10.6 hereof; (f) carriers', warehousemen's, suppliers', mechanics', materialmen's, repairmen's or other similar liens arising in the Ordinary Course of Business and securing indebtedness not yet due and payable or overdue for more than thirty (30) days or being Properly Contested and adequate reserves with respect thereto are maintained on the books of the applicable Person to the extent required in accordance with GAAP; (g) Liens securing Indebtedness under clause (b) of the definition of "Permitted Indebtedness" provided that (i) any such Lien shall not encumber any other property of any Loan Party other than the property financed by such Debt, replacements thereof and additions and accessions to such property and the proceeds thereof and customary security deposits and (ii) the aggregate amount of Indebtedness secured by such Liens incurred as a result of such purchases during any fiscal year shall not exceed the amount permitted by such clause (b) of the definition of "Permitted Indebtedness"; (h) other Liens incidental to the conduct of any Loan Party's business or the ownership of its property and assets which were not incurred in connection with the borrowing of money or the obtaining of advances or credit, and which do not in the aggregate materially detract from Agent's or Lenders' rights in and to the Collateral or the value of any Loan Party's property or assets or which do not materially impair the use thereof in the operation of any Loan Party's business; (i) easements, rights-of-way, zoning restrictions, minor defects or irregularities in title and other charges or encumbrances, in each case, which do not interfere in

any material respect with the Ordinary Course of Business of the Loan Parties; (j) Liens granted to the DIP Term Loan Agent and the Prepetition Term Loan Agent to secure the "Obligations" arising under, and as such term is defined in, the DIP Term Loan Agreement and the Prepetition Term Loan Agreement, as applicable; provided that such Liens are subject to the terms of the Intercreditor Agreement; (k) Liens listed on <u>Schedule 1.2</u> hereto, including the modification, replacement, renewal or extension thereof; <u>provided</u> <u>that</u> (i) such Liens shall secure only those obligations which they secure on the Closing Date and shall not subsequently apply to any other property or assets of any Loan Party other than the property and assets to which they apply as of the Closing Date and (ii) such renewal, extension or refinancing of the obligations secured or benefited by such Liens is permitted by Section 7.8 hereof; (l) Liens that are contractual rights of set-off (i) solely with respect to cash and Cash Equivalents on deposit in one or more accounts maintained by any Loan Party, in each case, which set-off rights are granted in the Ordinary Course of Business in favor of the depository bank or financial institution with which such accounts are maintained, securing amounts owing to such bank or institution with respect to cash management and operating account arrangements, including those involving pooled accounts and netting arrangements, (ii) solely with respect to cash and Cash Equivalents on deposit in one or more accounts maintained by any Loan Party, in each case, which set-off rights relate to pooled deposit or sweep accounts of any Loan Party to permit satisfaction of overdraft or similar obligations incurred in the Ordinary Course of Business or (iii) relating to purchase orders and other agreements entered into with customers of any Loan Party in the Ordinary Course of Business; (m) the filing of Uniform Commercial Code and PPSA financing statements solely as a precautionary measure in connection with operating leases entered into by Holdings and its Subsidiaries in the Ordinary Course of Business; (n) Liens in connection with the cash collateralization of the Existing ~~Letter~~Letters of Credit (and any replacements thereof), so long as the amount secured thereunder does not exceed 105% of the aggregate face amount of such Existing ~~Letter~~Letters of Credit; (or such replacement letters of credit); (o) Liens in favor of customs and revenue authorities arising as a matter of applicable Law and in the Ordinary Course of Business to secure payment of customs duties in connection with the importation of goods; (p) non-exclusive licenses of patents, trademarks, copyrights and other intellectual property rights in the Ordinary Course of Business and not interfering in any material respect with the business of any Loan Party; and (q) Liens created under the Orders.  Furthermore, it is hereby understood and agreed by the parties hereto that the definition and use of the term "Permitted Encumbrances" herein shall mean that such encumbrances are permitted to exist but shall in no way be interpreted to mean that such encumbrances are entitled to any priority over Agent's security interests and Liens and the Loan Parties hereby specifically and expressly acknowledge and agree that any such encumbrances not properly perfected under Applicable Law shall not be entitled to priority over Agent's security interests and Liens and that this Agreement is not intended and shall not confer any rights upon any Person whatsoever who is not a party to this Agreement. For the avoidance of doubt, a "Permitted Encumbrance" shall not include a Lien or statutory deemed trust in respect of or arising in connection with a Canadian Pension Plan or Canadian Union Plan.

"<u>Permitted Indebtedness</u>" shall mean: (a) the Obligations; (b) any guarantees of Indebtedness permitted under Section 7.3 hereof; (c) any Indebtedness on the Closing Date listed on Schedule 5.8(b) hereto, (d) the Carve Out, (e) Interest Rate Hedges and Foreign Currency Hedges that are entered into by a Loan Party to hedge its risks with respect to outstanding Indebtedness of such Loan Party and not for speculative or investment purposes so long as such

Interest Rate Hedges and Foreign Currency Hedges that are not Lender-Provided Interest Rate Hedges or Lender-Provided Foreign Currency Hedges are unsecured; (f) Indebtedness outstanding under the Prepetition Term Loan Documents and the DIP Term Loan Documents in an aggregate amount not exceeding the "Maximum Priority Term Loan Debt" (as defined in the Intercreditor Agreement), provided that such Indebtedness is subject to the terms of the Intercreditor Agreement; (g) intercompany Indebtedness owing from one or more Loan Parties (other than Inactive Subsidiaries) to any other one or more Loan Parties (other than Inactive Subsidiaries) in accordance with clause (c) of the definition of "Permitted Loans"; (h) Indebtedness incurred by any Loan Party in respect of performance bonds, surety bonds, completion guarantees, appeal bonds, bid bonds, in each case incurred in the Ordinary Course of Business, and reimbursement obligations in respect of any of the foregoing, warehouse receipts or similar instruments issued or created in the Ordinary Course of Business, including in respect of workers compensation claims, health, disability or other employee benefits or property, casualty or liability insurance or self-insurance or other Indebtedness with respect to reimbursement-type obligations regarding workers compensation claims; (i) unsecured Indebtedness incurred by any Loan Party in respect of accounts payable to trade creditors for goods and services and current operating liabilities (not the result of the borrowing of money) incurred in the Ordinary Course of Business in accordance with customary terms and paid within the specified time, unless contested in good faith by appropriate proceedings and reserved for substantially in accordance with GAAP; (j) unsecured Indebtedness (other than for borrowed money) that may be deemed to exist pursuant to any bona fide warranty or contractual service obligations or performance in the Ordinary Course of Business of any Loan Party; (k) the Existing ~~Letter~~Letters of Credit (and any replacements thereof); and (l) the Permitted Koontz-Wagner Pension Plan Obligations.

"Permitted Investments" shall mean investments in: (a) obligations issued or guaranteed by the United States or the federal government of Canada or any agency thereof; (b) commercial paper with maturities of not more than 180 days and a published rating of not less than A-1 or P-1 (or the equivalent rating); (c) certificates of time deposit and bankers' acceptances having maturities of not more than 180 days and repurchase agreements backed by United States or Canadian federal government securities of a commercial bank if (i) such bank has a combined capital and surplus of at least $500,000,000, or (ii) its debt obligations, or those of a holding company of which it is a Subsidiary, are rated not less than A (or the equivalent rating) by a nationally recognized investment rating agency; (d) U.S. money market funds that invest solely in obligations issued or guaranteed by the United States or an agency thereof; (e) Permitted Loans; (f) investments by any Loan Party in cash and Cash Equivalents, (g) equity investments owned as of the Closing Date in any Subsidiary and disclosed on Schedule 5.2(b); (h) to the extent constituting investments, those expressly permitted under Sections 7.1, 7.2, 7.7 and 7.8 hereof, respectively, and Capital Expenditures; provided, however, that no investments may be made solely pursuant to this clause (h); (i) [reserved]; (j) investments in the form of advances to subcontractors in the Ordinary Course of Business; (k) investments received in the form of settlement of amounts due in the Ordinary Course of Business or owing to any Loan Party as a result of insolvency proceedings involving an account debtor or upon the foreclosure or enforcement of any Lien in favor of a Loan Party or its Subsidiaries; (l) Equity Interests or other securities acquired in connection with the satisfaction or enforcement of Indebtedness or claims due or owing to a Loan Party or its Subsidiaries (in bankruptcy of customers or suppliers or

otherwise outside the Ordinary Course of Business) or as security for any such Indebtedness or claims; and (m) the Wynnefield Indebtedness.

"Permitted Joint Venture" means any Joint Venture formed prior to the Closing Date which satisfied all of the conditions set forth in the definition of "Permitted Joint Venture" in the Prepetition Revolving Credit Agreement and disclosed on Schedule 7.4.

"Permitted Koontz-Wagner Pension Plan Obligations" shall mean obligations of the Loan Parties in an aggregate amount not to exceed $2,700,000 for their obligations arising under the International Brotherhood of Electrical Workers Local Union 1392 multi-employer pension plan of Koontz-Wagner.

"Permitted Loans" shall mean: (a) prior to the Closing Date, the extension of trade credit by a Loan Party (other than an Inactive Subsidiary) to its Customers in the Ordinary Course of Business in connection with a sale of Inventory or rendition of services, in each case on open account terms; (b) prior to the Closing Date, loans to employees of a Loan Party (other than an Inactive Subsidiary) in the Ordinary Course of Business not to exceed as to all such loans the aggregate amount of $50,000 at any time outstanding; and (c) prior to the Closing Date, intercompany loans between and among the Loan Parties (other than Inactive Subsidiaries) as disclosed on Schedule 7.5, so long as, at the request of Agent, each such intercompany loan is evidenced by a promissory note (including, if applicable, any master intercompany note executed by the Loan Parties) on terms and conditions (including terms subordinating payment of the Indebtedness evidenced by such note to the prior Payment in Full of all of the Obligations) reasonably acceptable to Agent in its sole discretion that has been delivered to Agent either endorsed in blank or together with an undated instrument of transfer executed in blank by the applicable Loan Parties that are the payees on such note.

"Person" shall mean any individual, sole proprietorship, partnership, corporation, business trust, joint stock company, trust, unincorporated organization, association, limited and unlimited liability company, limited liability partnership, institution, public benefit corporation, joint venture, entity or Governmental Body (whether federal, state, county, city, municipal or otherwise, including any instrumentality, division, agency, body or department thereof).

"Petition Date" has the meaning assigned to such term in the recitals hereto.

"Plan" shall mean any employee benefit plan within the meaning of Section 3(3) of ERISA (including a Pension Benefit Plan and a Multiemployer Plan, as defined herein) maintained by any Loan Party or any member of the Controlled Group or to which any Loan Party or any member of the Controlled Group is required to contribute.

"Pledge Agreement" shall mean that certain Collateral Pledge Agreement, dated as of the Closing Date, by Holdings, WISG and WISG Canada in favor of Agent, and any other pledge agreements executed and delivered by any other Person subsequent to the Closing Date to secure the Obligations, as each may be amended, restated, amended and restated, supplemented or otherwise modified from time to time.

"PNC" shall have the meaning set forth in the preamble to this Agreement and shall extend to all of its successors and assigns.

"Post-Petition Obligations" shall mean all Obligations other than the Prepetition Obligations.

"Power" shall mean Global Power Professional Services, Inc., a Delaware corporation.

"Prepetition Agent" shall have the meaning set forth in the recitals hereto.

"Prepetition Collateral" shall mean all "Collateral" as defined in Prepetition Revolving Credit Agreement and Prepetition Revolving Credit Documents in existence as of the Petition Date and all Proceeds, including all Cash Proceeds and non-Cash Proceeds, and products of any and all of the foregoing Collateral.

"Prepetition Obligations" shall mean the Obligations (as defined in the Prepetition Revolving Credit Agreement) and all Designated Cash Management Services Obligations, in each case owing as of the Petition Date.  Without limiting the foregoing, the Prepetition Obligations shall include all indemnification obligations of the Borrowers and the Guarantors to the Prepetition Agent and Prepetition Revolving Lenders arising under the Prepetition Revolving Credit Agreement and the Prepetition Revolving Credit Documents, including without limitation the indemnitee and other protections provided to indemnitees under the obligations arising under the Prepetition Revolving Credit Agreement which survive payment in full of the Prepetition Obligations.

"Prepetition Other Documents" shall mean the "Other Documents" as defined in the Prepetition Revolving Credit Agreement and each document, agreement and instrument (and all schedules and exhibits thereto) executed in connection therewith, in each case, as in effect immediately prior to the Petition Date.

"Prepetition Payment" shall mean a payment (by way of adequate protection or otherwise) of principal or interest or otherwise on account of any Prepetition Indebtedness or trade payables or other Prepetition claims against any Debtor.

"Prepetition Released Claim or Prepetition Released Claims" shall have the meaning set forth in Section 1.08(a) hereof.

"Prepetition Revolving Credit Agreement" shall have the meaning set forth in the recitals hereto.

"Prepetition Revolving Credit Documents" shall mean the Prepetition Revolving Credit Agreement, the "Other Documents" as defined in the Prepetition Revolving Credit Agreement and each document, agreement and instrument (and all schedules and exhibits thereto) executed in connection therewith, in each case, as in effect immediately prior to the Petition Date.

"Prepetition Revolving Credit Facility" shall mean the credit facilities made available to the Borrowers pursuant to the Prepetition Revolving Credit Agreement.

"Prepetition Revolving Lenders" shall have the meaning set forth in the recitals hereto.

"Prepetition Revolving ~~Credit~~Loan Priority Collateral" shall mean all Revolving ~~Credit~~Loan Priority Collateral (as defined in the Prepetition Revolving Credit Agreement) in existence as of the Petition Date and all Proceeds, including all Cash Proceeds and non-Cash Proceeds, and products of any and all of the foregoing Collateral.

~~"Prepetition Revolving Lenders" shall have the meaning set forth in the recitals hereto.~~

"Prepetition Revolving Loans" shall have the meaning set forth in Section 2.21.

"Prepetition Secured Parties" shall mean, collectively, the Prepetition Agent, the Prepetition Revolving Lenders, PNC, as Letter of Credit Issuer under the Prepetition Revolving Credit Agreement, and each Credit Product Provider (each as defined in the Prepetition Revolving Credit Agreement)and the Prepetition Term Loan Agent.

"Prepetition Term Loan Agent" shall mean EICF Agent LLC, a Delaware limited liability company.

"Prepetition Term Loan Credit Agreement" shall mean  that certain Term Loan, Guarantee and Security Agreement by and among the Borrowers, the Guarantors, the Prepetition Term Loan Agent, and the Prepetition Term Loan Lenders from time to time party thereto, as the same may be amended, modified, supplemented, renewed, restated or replaced in accordance with the Intercreditor Agreement.

"Prepetition Term Loan Documents" shall mean, collectively, the following (as the same may be amended, modified, supplemented, renewed, restated or replaced in accordance with the Intercreditor Agreement): (a) the Prepetition Term Loan Credit Agreement and, all exhibits, schedules and disclosure letters referred to therein or delivered pursuant thereto, if any, (b) all amendments thereto, waivers relating thereto and other side letters or agreements affecting the terms thereof, and (c) all of the other agreements, documents and instruments executed and delivered in connection therewith or related thereto.

"Prepetition Term Loan Lenders" shall mean, collectively, Energy Impact Credit Fund I LP, CION Investment Corporation, Murray Hill Funding II, LLC, CrowdOut Capital LLC, and CrowdOut Credit Opportunities Fund LLC.

"Prepetition Term Loan Obligations" shall mean all Obligations (as defined in the Prepetition Term Loan Credit Agreement).

"PPSA" shall mean, collectively, the Personal Property Security Act (Ontario), the Civil Code of Quebec, as amended, supplemented, restated and superseded, or any other applicable Canadian federal or provincial statute pertaining to the granting, perfecting, priority or ranking of security interests, liens, hypothecs on personal and moveable property, and any successor statutes, together with any regulations thereunder, in each case as in effect from time to time. References to sections of the PPSA shall be construed to also refer to any successor sections.

"Priority Payables" shall mean (a) the full amount of the liabilities of any Loan Party which (i) have a trust imposed to provide for payment or a security interest, pledge, Lien, hypothec or charge ranking or capable of ranking senior to or pari passu with security interests, Liens, hypothecs or charges securing the Obligations on any Collateral under any federal, provincial, state, county, district, municipal, local or foreign law or (ii) have a right imposed to provide for payment ranking or capable of ranking senior to or pari passu with the Obligations under federal, provincial, state, county, district, municipal, local or foreign law, regulation or directive, including, but not limited to, claims for unremitted and/or accelerated rents, taxes, wages, withholdings taxes, value added taxes, amounts payable to an insolvency administrator, employee withholdings or deductions, vacation pay, severance and termination pay, workers' compensation obligations, government royalties or pension obligations in each case to the extent such trust, or security interest, Lien hypothec or charge has been or may be imposed, including under the Wage Earner Protection Program Act (Canada), and (b) the amount equal to the aggregate value of the Inventory which the Agent, in good faith, and on a reasonable basis, considers is or may be subject to retention of title by a supplier or a right of a supplier to recover possession thereof, where such supplier's right has priority over the security interests, liens, hypothecs or charges securing the Obligations, including, without limitation, Inventory subject to a right of a supplier to repossess goods pursuant to Section 81.1 of the Bankruptcy and Insolvency Act (Canada) or any applicable laws granting revendication or similar rights to unpaid suppliers or any similar laws of Canada or any other applicable jurisdiction.

"Properly Contested" shall mean, in the case of any Indebtedness, Lien or Taxes, as applicable, of any Person that are not paid as and when due or payable by reason of such Person's bona fide dispute concerning its liability to pay the same or concerning the amount thereof: (a) such Indebtedness, Lien or Taxes, as applicable, are being properly contested in good faith by appropriate proceedings promptly instituted and diligently conducted; (b) the Agent has established Reserves hereunder and such Person has established reserves as shall be required in conformity with GAAP; (c) the non-payment of such Indebtedness or Taxes will not have a Material Adverse Effect or will not result in the forfeiture of any assets of such Person; (d) no Lien, other than Liens for Priority Payables, is imposed upon any of such Person's assets with respect to such Indebtedness or taxes unless such Lien (x) does not attach to any Receivables or Inventory, (y) is at all times junior and subordinate in priority to the Liens in favor of Agent (except only with respect to property Taxes that have priority as a matter of applicable state law) and, (z) enforcement of such Lien is stayed during the period prior to the final resolution or disposition of such dispute; and (e) if such Indebtedness or Lien, as applicable, results from, or is determined by the entry, rendition or issuance against a Person or any of its assets of a judgment, writ, order or decree, enforcement of such judgment, writ, order or decree is stayed pending a timely appeal or other judicial review.

"Protective Advances" shall have the meaning set forth in Section 16.2(e) hereof.

"Purchasing CLO" shall have the meaning set forth in Section 16.3(d) hereof.

"Purchasing Lender" shall have the meaning set forth in Section 16.3(c) hereof.

"Qualified ECP Loan Party" shall mean each Loan Party that on the Eligibility Date is (a) a corporation, partnership, proprietorship, organization, trust, or other entity other than a

074658.23049/132216381v.5074658.23049/132216381v.9

"commodity pool" as defined in Section 1a(10) of the CEA and CFTC regulations thereunder that has total assets exceeding $10,000,000 or (b) an Eligible Contract Participant that can cause another person to qualify as an Eligible Contract Participant on the Eligibility Date under Section 1a(18)(A)(v)(II) of the CEA by entering into or otherwise providing a "letter of credit or keepwell, support, or other agreement" for purposes of Section 1a(18)(A)(v)(II) of the CEA.

"Qualified Equity Interests" means any Equity Interests that are not Disqualified Equity Interests.

"RCRA" shall mean the Resource Conservation and Recovery Act, 42 U.S.C. §§ 6901 et seq., as same may be amended, modified or supplemented from time to time.

"Real Property" shall mean all of the real property owned, leased or operated by any Loan Party on or after the Closing Date, together with, in each case, all improvements and appurtenant fixtures, equipment, personal property, easements and other property and rights incidental to the ownership, lease or operation thereof.

"Receivables" shall mean and include, as to each Loan Party, all of such Loan Party's accounts (as defined in Article 9 of the Uniform Commercial Code) and all of such Loan Party's contract rights, instruments (including those evidencing indebtedness owed to such Loan Party by its Affiliates), documents, chattel paper (including electronic chattel paper), general intangibles relating to accounts, contract rights, instruments, documents and chattel paper, all drafts and acceptances, credit card receivables and all other forms of obligations owing to such Loan Party arising out of or in connection with the sale or lease of Inventory or the rendition of services, all supporting obligations, guarantees and other security therefor, whether secured or unsecured, now existing or hereafter created, and whether or not specifically sold or assigned to Agent hereunder.

"Register" shall have the meaning set forth in Section 16.3(e) hereof.

"Reimbursement Obligation" shall have the meaning set forth in Section 2.14(b) hereof.

"Release" shall have the meaning set forth in Section 5.7(c)(i) hereof.

"Reportable Compliance Event" shall mean that any Covered Entity becomes a Sanctioned Person, or is charged by indictment, criminal complaint or similar charging instrument, arraigned, or custodially detained in connection with any Anti-Terrorism Law or any predicate crime to any Anti-Terrorism Law, or has knowledge of facts or circumstances to the effect that it is reasonably likely that any aspect of its operations is in actual or probable violation of any Anti-Terrorism Law.

"Reportable ERISA Event" shall mean a reportable event described in Section 4043 of ERISA or the regulations promulgated thereunder, other than an event for which the 30-day notice period is waived.

"Required Lenders" shall mean Lenders (not including Swing Loan Lender (in its capacity as such) or any Defaulting Lender) holding at least fifty one percent (51%) of either (a) the aggregate of the Revolving Commitment Amounts of all Lenders (excluding any Defaulting

44

Lender), or (b) after the termination of all of the Commitments, the sum of (x) the outstanding Revolving Advances and Swing Loans, plus (y) the Maximum Undrawn Amount of all outstanding Letters of Credit; provided, however, if there are fewer than three (3) Lenders, Required Lenders shall mean all Lenders (excluding any Defaulting Lender).

"Reserves" shall mean reserves against the Maximum Revolving Advance Amount or the Formula Amount as Agent may deem proper and necessary from time to time, including in respect of Priority Payables in respect of any Canadian Loan Party.

"Resolution Authority" shall mean an EEA Resolution Authority or, with respect to any UK Financial Institution, a UK Resolution Authority.

"Responsible Officer" means the (i) President, Chief Executive Officer, Chief Financial Officer, Controller, Treasurer or General Counsel of a Loan Party, (ii) any person performing similar functions of the forgoing clause (i), or (iii) any person with supervisory or managerial responsibilities of a Loan Party.

"Restricted Distribution" means as to any Person (a) any dividend or distribution on any Equity Interests of any Loan Party (other than dividends or distributions payable in its stock (other than Disqualified Equity Interests)), (b) any split-ups or reclassifications of its Equity Interests (other than Disqualified Equity Interests)), (c) any application any of its funds, property or assets to the purchase, redemption or other retirement of any of its Equity Interests, or of any options to purchase or acquire any Equity Interests of any Person, and (d) any payment of principal, premium, if any, or interest (whether in cash, securities or other property) of any intercompany note between and among the Loan Parties evidencing Indebtedness permitted to be incurred pursuant to the terms hereof.

"Revolving Advances" shall mean Advances other than Letters of Credit and the Swing Loans.

"Revolving Commitment" shall mean, as to any Lender, the obligation of such Lender (if applicable), to make Revolving Advances and participate in Swing Loans and Letters of Credit, in an aggregate principal and/or face amount not to exceed the Revolving Commitment Amount (if any) of such Lender.

"Revolving Commitment Amount" shall mean, as to any Lender, the Revolving Commitment amount (if any) set forth opposite such Lender's name on Schedule 1.1 hereto (or, in the case of any Lender that became party to this Agreement after the Closing Date pursuant to Section 16.3(c) or (d) hereof, the Revolving Commitment amount (if any) of such Lender as set forth in the applicable Commitment Transfer Supplement).

"Revolving Commitment Percentage" shall mean, as to any Lender, the Revolving Commitment Percentage (if any) set forth opposite such Lender's name on Schedule 1.1 hereto (or, in the case of any Lender that became party to this Agreement after the Closing Date pursuant to Section 16.3(c) or (d) hereof, the Revolving Commitment Percentage (if any) of such Lender as set forth in the applicable Commitment Transfer Supplement).

"Revolving Credit Adequate Protection Payments" shall have the meaning set forth in the Interim Order, and upon entry of the Final Order, in the Final Order.

"Revolving Credit Cash Collateral" shall mean "Revolving Credit Cash Collateral" as defined in the Interim Order, or, after the entry of the Final Order, in the Final Order.

"Revolving Credit Note" shall mean, collectively, the promissory notes referred to in Section 2.1(a) hereof, as each may be amended, restated, amended and restated, supplemented or otherwise modified from time to time.

"Revolving Interest Rate" shall mean (a) with respect to Revolving Advances that are Domestic Rate Loans and Swing Loans, an interest rate per annum equal to the sum of the Applicable Margin for Revolving Advances and Swing Loans plus the Alternate Base Rate and (b) with respect to Revolving Advances that are Term SOFR Rate Loans, an interest rate per annum equal to the sum of the Applicable Margin for Revolving Advances plus the Term SOFR Rate.

"Revolving Lender" shall mean each Lender holding a Revolving Commitment.

"Revolving Loan Priority Collateral" shall have the meaning set forth in the Intercreditor Agreement.

"Sanctioned Jurisdiction" shall mean a country, territory or government or agency of any of the foregoing, in each case that is subject to or the subject or target of any sanctions or sanctions program maintained under any Anti-Terrorism Law, including, as of the Closing Date, Cuba, Iran, North Korea, Syria, and the Crimea region of Ukraine.

"Sanctioned Person" shall mean any individual person, group, regime, entity or thing listed or otherwise recognized as a specially designated, prohibited, sanctioned or debarred person, group, regime, entity or thing, or subject to or the subject or target of any limitations or prohibitions (including but not limited to the blocking of property or rejection of transactions), under any Anti-Terrorism Law, including the Corruption of Foreign Public Officials Act (Canada), the Freezing Assets of Corrupt Foreign Officials Act (Canada) and the United Nations Act, including, without limitation, the Regulations Implementing the United Nations Resolutions on the Suppression of Terrorism (Canada) and the United Nations Al-Qaida and Taliban Regulations (Canada) promulgated under the United Nations Act.

"SEC" shall mean the Securities and Exchange Commission or any similar applicable Governmental Body or any successor thereto.

"Secured Parties" shall mean, collectively, Agent, Issuers, Swing Loan Lender and Lenders, together with any Affiliates of Agent or any Lender to whom any Hedge Obligations or Cash Management Obligations are owed and with each other holder of any of the Obligations, and the respective successors and assigns of each of them.

"Securities Act" shall mean the Securities Act of 1933, as amended.

074658.23049/132216381v.5074658.23049/132216381v.9

"Settlement" shall have the meaning set forth in Section 2.6(d) hereof.

"Settlement Date" shall have the meaning set forth in Section 2.6(d) hereof.

"SOFR" shall mean, for any day, a rate equal to the secured overnight financing rate as administered by the Federal Reserve Bank of New York (or a successor administrator of the secured overnight financing rate).

"SOFR Adjustment" shall mean, the following:

| SOFR Adjustment | Interest Period |
|---|---|
| 15 basis points (0.15%) | For a 1-month Interest Period |
| 25 basis points (0.25%) | For a 3-month Interest Period |
| 35 basis points (0.35%) | For a 6-month Interest Period |

"SOFR Floor" means a rate of interest per annum equal to 100 basis points (1.00%).

"SOFR Reserve Percentage" shall mean, for any day, the maximum effective percentage in effect on such day, if any, as prescribed by the Board of Governors of the Federal Reserve System (or any successor) for determining the reserve requirements (including, without limitation, supplemental, marginal and emergency reserve requirements) with respect to SOFR funding.

"Southern Receivables" shall mean Receivables owing to WPS by Southern Nuclear Operating Company, Inc., a Delaware corporation.

"Stalking Horse Agreement" shall mean an asset purchase agreement providing for the application of any sale proceeds in accordance with the Interim Order and the priorities set forth therein, which purchase agreement shall be on terms acceptable to Agent in its sole discretion (as may be amended in accordance with the terms hereof).

"Stalking Horse Bidder" shall have the meaning set forth in Section 6.24.

"Steam" shall mean Steam Enterprises LLC, a Delaware limited liability company.

"Subordinated Indebtedness" shall mean the Wynnefield Indebtedness and all other Indebtedness of any Loan Party (a) having amounts, maturities, terms and conditions reasonably satisfactory to, and approved in writing by, Agent and (b) that are subordinated to the payment of the Obligations in a manner and on terms and conditions reasonably satisfactory to, and approved in writing by, Agent.

"Subordination Agreements" shall mean, collectively, any subordination agreement by and among Agent, any Loan Party and any holder of Subordinated Indebtedness (as the same may be amended, modified, supplemented, renewed, restated or replaced from time to time), in each case in form and substance acceptable to Agent.

"Subsidiary" of any Person shall mean a corporation or other entity of whose Equity Interests having ordinary voting power (other than Equity Interests having such power only by

reason of the happening of a contingency) to elect a majority of the directors of such corporation, or other Persons performing similar functions for such entity, are owned, directly or indirectly, by such Person.  In no event shall the term "Subsidiary" include any Permitted Joint Venture or Koontz-Wagner (other than in its capacity as an "Inactive Subsidiary").

"Subsidiary Stock" shall mean (a) with respect to the Equity Interests issued to a Loan Party by any Subsidiary (other than a Foreign Subsidiary), 100% of such issued and outstanding Equity Interests, and (b) with respect to any Equity Interests issued to a Loan Party by any Foreign Subsidiary (i) 100% of such issued and outstanding Equity Interests not entitled to vote (within the meaning of Treas. Reg. Section 1.956-2(c)(2)) and (ii) 66.67% (or such greater percentage that could not reasonably be expected to cause any material adverse U.S. federal, state or local income Tax consequences to a Loan Party) of such issued and outstanding Equity Interests entitled to vote (within the meaning of Treas. Reg. Section 1.956-2(c)(2)).

"Swap" shall mean any "swap" as defined in Section 1a(47) of the CEA and regulations thereunder other than (a) a swap entered into, or subject to the rules of, a board of trade designated as a contract market under Section 5 of the CEA, or (b) a commodity option entered into pursuant to CFTC Regulation 32.3(a).

"Swap Obligation" shall mean any obligation to pay or perform under any agreement, contract or transaction that constitutes a Swap which is also a Lender-Provided Interest Rate Hedge, or a Lender-Provided Foreign Currency Hedge.

"Swing Loan Lender" shall mean PNC, in its capacity as lender of the Swing Loans.

"Swing Loan Note" shall mean the promissory note described in Section 2.4(a) hereof, as such note may be amended, restated, amended and restated, supplemented or otherwise modified from time to time.

"Swing Loans" shall mean the Advances made pursuant to Section 2.4 hereof.

"Tax Distribution" shall mean the additional federal, state or local income Taxes assumed to be payable by a shareholder or member of any Loan Party as a result of the taxable income of such Loan Party that gets allocated to such shareholder or member due to such Loan Party's status for federal, state or local income Tax purposes as a partnership, subchapter S corporation or any other entity that is a pass-through entity or disregarded entity for federal, state and local income Tax purposes (as applicable) but only for so long as such Loan Party continues to be so treated as a pass-through entity or disregarded entity for federal, state and local income tax purposes, as evidenced and substantiated by the tax returns filed by such Loan Party (as applicable), with such income Taxes assumed to be payable by a shareholder or member of any Loan Party being calculated for all members or shareholders, as applicable, at the highest combined marginal federal, state and local income Tax rate applicable to the taxable income of the applicable member or shareholder at issue for which such tax is being calculated that is allocated to the member or shareholder of the Loan Party, taking into consideration (A) the character and nature of such income (i.e., whether such income is subject to income Tax at capital gains rates, ordinary income rates or any special rates), (B) losses previously allocated to each such member or shareholder, as applicable, by such Loan Party to the extent such losses

48

have not previously been applied to reduce the Tax Distribution hereunder, provided that capital losses and capital loss carry forwards shall be taken into account only to the extent they are currently usable to offset income or gain allocated by such Loan Party to a member or shareholder, as applicable; and provided, further, that to the extent that any losses allocated by such Loan Party result in a payback by a member to such Loan Party of previous Tax Distributions pursuant to Section 7.7 hereof, then such losses shall not be taken into account for purposes of determining the Tax Distribution hereunder, and (C) the deduction under Section 199A of the Internal Revenue Code in respect of the taxable income of the Loan Parties.

"Taxes" shall mean all present or future taxes, levies, imposts, duties, deductions, withholdings, assessments, fees or other charges imposed by any Governmental Body, including any interest, additions to tax or penalties applicable thereto.

"Term" shall have the meaning set forth in Section 13.1 hereof.

"Termination Date" means the earliest to occur of (the date of such earliest occurrence, the "Termination Date"): (a) the Maturity Date; (b) delivery of a Termination Notice to Borrowing Agent during the continuance of an Event of Default; (c) the effective date or substantial consummation of an Approved 363 Sale with respect to Accounts or other Revolving Credit Priority Collateral; (d) the effective date or substantial consummation of a plan of reorganization or plan of liquidation in any of the Cases; (e) the date of filing or support by the Debtors of a plan of reorganization or plan of liquidation that does not provide for the indefeasible payment in full in cash of all Obligations (including for the avoidance of doubt, even if prior to the Final Order, all Prepetition Revolving Credit Loan Obligations); (f) date of the conversion of any of the Cases to a case under Chapter 7 of the Bankruptcy Code; (g) the date of the dismissal of any of the Cases (such period from of the date hereof through and ending on the Termination Date, the "Term").  Debtors may terminate this Agreement at any time, subject to providing seven (7) Business Days' prior written notice to Agent, upon Payment in Full of all Obligations (including for the avoidance of doubt, even if prior to the Final Order, all Prepetition Revolving Credit Loan Obligations).

"Termination Event" shall mean: (a) a Reportable ERISA Event with respect to any Pension Benefit Plan; (b) the withdrawal of any Loan Party or any member of the Controlled Group from a Pension Benefit Plan during a plan year in which such entity was a "substantial employer" as defined in Section 4001(a)(2) of ERISA or a cessation of operations that is treated as such a withdrawal under Section 4062(e) of ERISA; (c) the providing of notice of intent to terminate a Pension Benefit Plan in a distress termination described in Section 4041(c) of ERISA; (d) the commencement of proceedings by the PBGC to terminate a Pension Benefit Plan or Multiemployer Plan; (e) any event or condition (i) which would be reasonably expected to constitute grounds under Section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any Pension Benefit Plan or Multiemployer Plan, or (ii) that would be reasonably expected to result in the termination of a Multiemployer Plan pursuant to Section 4041A of ERISA; (f) the partial or complete withdrawal, within the meaning of Section 4203 or 4205 of ERISA, of any Loan Party or any member of the Controlled Group from a Multiemployer Plan; (g) notice that a Multiemployer Plan is subject to Section 4245 of ERISA;

or (h) the imposition of any material liability under Title IV of ERISA, other than for PBGC premiums due but not delinquent, upon any Loan Party or any member of the Controlled Group.

"<u>Term Loan Adequate Protection Claim</u>" shall have the meaning set forth in the Interim Order, and upon entry of the Final Order, in the Final Order.

"<u>Term Loan Priority Collateral</u>" shall have the meaning set forth in the Intercreditor Agreement.

"<u>Term Loan Priority Collateral Account</u>" shall have the meaning set forth in the DIP Term Loan Agreement in effect on the Closing Date.

"<u>Term SOFR Administrator</u>" means CME Group Benchmark Administration Limited (CBA) (or a successor administrator of the Term SOFR Reference Rate selected by the Agent in its reasonable discretion).

"<u>Term SOFR Rate</u>" shall mean, with respect to any Term SOFR Rate Loan for any Interest Period, the interest rate per annum determined by the Agent by dividing (the resulting quotient rounded upwards, at the Agent's discretion, to the nearest 1/100th of 1%) (A) the Term SOFR Reference Rate for a tenor comparable to such Interest Period on the day (the "<u>Term SOFR Determination Date</u>") that is two (2) Business Days prior to the first day of such Interest Period, as such rate is published by the Term SOFR Administrator, by (B) a number equal to 1.00 minus the SOFR Reserve Percentage.  If the Term SOFR Reference Rate for the applicable tenor has not been published or replaced with a Benchmark Replacement by 5:00 p.m. (Pittsburgh, Pennsylvania time) on the Term SOFR Determination Date, then the Term SOFR Reference Rate, for purposes of clause (A) in the preceding sentence, shall be the Term SOFR Reference Rate for such tenor on the first Business Day preceding such Term SOFR Determination Date for which such Term SOFR Reference Rate for such tenor was published in accordance herewith, so long as such first preceding Business Day is not more than three (3) Business Days prior to such Term SOFR Determination Date.  If the Term SOFR Rate, determined as provided above, would be less than the SOFR Floor, then the Term SOFR Rate shall be deemed to be the SOFR Floor.  The Term SOFR Rate shall be adjusted automatically without notice to the Borrowing Agent on and as of (i) the first day of each Interest Period, and (ii) the effective date of any change in the SOFR Reserve Percentage.

"<u>Term SOFR Rate Loan</u>" means an Advance that bears interest based on Term SOFR Rate.

"<u>Term SOFR Reference Rate</u>" shall mean the forward-looking term rate based on SOFR.

"<u>Toxic Substance</u>" shall mean and include any material present on any Real Property (including any leasehold interests) which has been shown to have significant adverse effect on human health or which is subject to regulation under the Toxic Substances Control Act (TSCA), 15 U.S.C. §§ 2601 et seq., applicable state law, or any other applicable Federal or state laws or Canadian or provincial laws now in force or hereafter enacted relating to toxic substances. "Toxic Substance" includes but is not limited to asbestos, polychlorinated biphenyls (PCBs) and lead-based paints.

074658.23049/132216381v.5074658.23049/132216381v.9

"<u>Transactions</u>" shall mean the transactions under or contemplated by this Agreement, the Other Documents and the DIP Term Loan Documents.

"<u>Transferee</u>" shall have the meaning set forth in Section 16.3(d) hereof.

"<u>Trustee</u>" shall have the meaning set forth in the Interim Order, or, after entry of the Final Order, in the Final Order.

"<u>UK Financial Institution</u>" shall mean any BRRD Undertaking (as such term is defined under the PRA Rulebook (as amended form time to time) promulgated by the United Kingdom Prudential Regulation Authority) or any person falling within IFPRU 11.6 of the FCA Handbook (as amended from time to time) promulgated by the United Kingdom Financial Conduct Authority, which includes certain credit institutions and investment firms, and certain affiliates of such credit institutions or investment firms.

"<u>UK Resolution Authority</u>" shall mean the Bank of England or any other public administrative authority having responsibility for the resolution of any UK Financial Institution.

"<u>Uniform Commercial Code</u>" shall mean the Uniform Commercial Code as in effect from time to time in the State of New York.

"<u>Unused Line Fee</u>" shall have the meaning set forth in Section 3.3 hereof.

"<u>USA PATRIOT Act</u>" shall mean the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, Public Law 107-56, as the same has been, or shall hereafter be, amended, modified, supplemented, renewed, extended or replaced.

"<u>U.S. Dollar</u>" and the sign "<u>$</u>" shall mean lawful money of the United States.

"<u>U.S. Dollar Equivalent</u>" shall mean, at any time, (i) as to any amount denominated in U.S. Dollars, the amount thereof at such time, and (ii) as to any amount denominated in any other currency, the equivalent amount in U.S. Dollars calculated by the Agent in good faith at such time using the Exchange Rate in effect on the day of determination.

"<u>U.S. Funding Account</u>" shall mean a deposit account of Borrowing Agent established for the purpose of receiving proceeds of Advances made in U.S. Dollars.

"<u>U.S. Government Securities Business Day</u>" means any day except for (a) a Saturday or Sunday or (b) a day on which the Securities Industry and Financial Markets Association recommends that the fixed income departments of its members be closed for the entire day for purposes of trading in United States government securities.

"<u>U.S. Guarantor</u>" shall mean any Guarantor that is a U.S. Person.

"<u>U.S. Loan Party</u>" shall mean any Loan Party that is a U.S. Person.

"U.S. Person" shall mean any Person that is a "United States Person" as defined in Section 7701(a)(30) of the Internal Revenue Code.

"United States" means the United States of America.

"Usage Amount" shall have the meaning set forth in Section 3.3 hereof.

"Water Project Contracts"  shall mean all contracts entered into in connection with water and wastewater construction and maintenance projects of Williams Industrial Services, LLC.

"WISG" shall have the meaning set forth in the preamble to this Agreement and shall include its successors and assigns.

"WISG Canada" shall have the meaning set forth in the preamble to this Agreement and shall include its successors and assigns.

"WISG Electrical" shall have the meaning set forth in the preamble to this Agreement and shall include its successors and assigns.

"WISI" shall have the meaning set forth in the preamble to this Agreement and shall include its successors and assigns.

"Withholding Agent" shall mean any Loan Party and Agent.

"Write-Down and Conversion Powers" shall mean, (a) with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which write-down and conversion powers are described in the EU Bail-In Legislation Schedule, and (b) with respect to the United Kingdom, any powers of the applicable Resolution Authority under the Bail-In Legislation to cancel, reduce, modify or change the form of a liability of any UK Financial Institution or any contract or instrument under which that liability arises, to convert all or part of that liability into shares, securities or obligations of that person or any other person, to provide that any such contract or instrument is to have effect as if a right had been exercised under it or to suspend any obligation in respect of that liability or any of the powers under that Bail-In Legislation that are related to or ancillary to any of those powers.

"WPS" shall have the meaning set forth in the preamble to this Agreement and shall include its successors and assigns.

"WSS" shall have the meaning set forth in the preamble to this Agreement and shall include its successors and assigns.

"Wynnefield Guaranties" shall mean, collectively, (i) that certain Guaranty, dated as of January 9, 2023, by the Guarantors, as guarantors, in favor of Wynnefield Partners Small Cap Value, L.P. I and (ii) that certain Guaranty, dated as of January 9, 2023, by the Guarantors, as guarantors, in favor of Wynnefield Partners Small Cap Value, L.P.

"<u>Wynnefield Indebtedness</u>" shall mean the Indebtedness evidenced by the Wynnefield Loan Documents.

"<u>Wynnefield Lenders</u>" shall mean, collectively, Wynnefield Partners Small Cap Value, L.P. and Wynnefield Partners Small Cap Value, L.P. I.

"<u>Wynnefield Loan Documents</u>" shall mean the Wynnefield Notes and the Wynnefield Guaranties, as the same may from time to time be amended, restated, or otherwise modified or replaced in accordance with the terms of the applicable Subordination Agreement.

"<u>Wynnefield Notes</u>" shall mean, collectively, (i) that certain Unsecured Promissory Note, dated as of January 9, 2023, by and among Holdings, as the borrow, and Wynnefield Partners Small Cap Value, L.P. I, as the Lender in the original principal amount of $400,000.00 and (ii) that certain Unsecured Promissory Note, dated as of January 9, 2023, by and among Holdings, as the borrow, and Wynnefield Partners Small Cap Value, L.P., as the Lender in the original principal amount of $350,000.00.

1.3.    <u>Uniform Commercial Code / PPSA Terms</u>.  All terms used herein and defined in the Uniform Commercial Code as adopted in the State of New York from time to time (the "Uniform Commercial Code") shall have the meaning given therein unless otherwise defined herein.  Without limiting the foregoing, the terms "accounts", "chattel paper" (and "electronic chattel paper" and "tangible chattel paper"), "commercial tort claims", "deposit accounts", "documents", "equipment", "financial asset", "fixtures", "general intangibles", "goods", "instruments", "inventory", "investment property", "letter-of-credit rights", "payment intangibles", "proceeds", "promissory note" "securities", "software" and "supporting obligations" as and when used in the description of Collateral shall have the meanings given to such terms in Articles 8 or 9 of the Uniform Commercial Code.  To the extent the definition of any category or type of collateral is expanded by any amendment, modification or revision to the Uniform Commercial Code, such expanded definition will apply automatically as of the date of such amendment, modification or revision.  All terms used herein and defined in the PPSA (in respect of Collateral located in Canada) shall have the meaning given therein unless otherwise defined herein.  Without limiting the foregoing, the terms "accounts", "chattel paper", "goods", "instruments", "intangibles", "proceeds", "securities", "investment property", "document of title", "inventory", "equipment" and "fixtures", as and when used in the description of Collateral located in Canada shall have the meanings given to such terms in the PPSA.  To the extent the definition of any category or type of collateral is expanded by any amendment, modification or revision to the PPSA, such expanded definition will apply automatically as of the date of such amendment, modification or revision.

1.4.    <u>Certain Matters of Construction</u>.  The terms "herein", "hereof" and "hereunder" and other words of similar import refer to this Agreement as a whole and not to any particular section, subsection, clause or paragraph.  All references herein to Articles, Sections, Exhibits and Schedules shall be construed to refer to Articles and Sections of, and Exhibits and Schedules to, this Agreement, except where the context clearly requires otherwise.  Any pronoun used shall be deemed to cover all genders.  Wherever appropriate in the context, terms used herein in the singular also include the plural and vice versa.  All references to statutes and related regulations shall include any amendments of same and any successor statutes and regulations.  Unless

53

otherwise provided, all references to any instruments or agreements to which Agent is a party, including references to any of the Other Documents, shall include any and all modifications, supplements or amendments thereto, any and all restatements or replacements thereof and any and all extensions or renewals thereof.  Except as otherwise expressly provided for herein, all references herein to the time of day shall mean the time in New York, New York.  Unless otherwise provided, all financial calculations shall be performed with Inventory valued on a first-in, first-out basis. Whenever the words "including" or "include" shall be used, such words shall be understood to mean "including, without limitation" or "include, without limitation".  A Default or an Event of Default shall be deemed to exist at all times during the period commencing on the date that such Default or Event of Default occurs to the date on which such Default or Event of Default is waived in writing pursuant to this Agreement or, in the case of a Default, is cured within any period of cure expressly provided for in this Agreement; and an Event of Default shall "continue" or be "continuing" until such Event of Default has been waived in writing by Required Lenders.  Any Lien referred to in this Agreement or any of the Other Documents as having been created in favor of Agent, any agreement entered into by Agent pursuant to this Agreement or any of the Other Documents, any payment made by or to or funds received by Agent pursuant to or as contemplated by this Agreement or any of the Other Documents, or any act taken or omitted to be taken by Agent, shall, unless otherwise expressly provided, be created, entered into, made or received, or taken or omitted, for the benefit or account of Agent and Lenders.  Wherever the phrase "to the best of Borrowers' knowledge" or "to the best of the Loan Parties' knowledge" or words of similar import relating to the knowledge or the awareness of any Loan Party are used in this Agreement or Other Documents, such phrase shall mean and refer to (i) the actual knowledge of a senior officer of any Loan Party or (ii) the knowledge that a senior officer would have obtained if he/she had engaged in a good faith and diligent performance of his/her duties, including the making of such reasonably specific inquiries as may be necessary of the employees or agents of such Loan Party and a good faith attempt to ascertain the existence or accuracy of the matter to which such phrase relates.  All covenants hereunder shall be given independent effect so that if a particular action or condition is not permitted by any of such covenants, the fact that it would be permitted by an exception to, or otherwise within the limitations of, another covenant shall not avoid the occurrence of a default if such action is taken or condition exists.  In addition, all representations and warranties hereunder shall be given independent effect so that if a particular representation or warranty proves to be incorrect or is breached, the fact that another representation or warranty concerning the same or similar subject matter is correct or is not breached will not affect the incorrectness of a breach of a representation or warranty hereunder.

1.5.  <u>Currency Matters</u>.  Principal, interest, reimbursement obligations, fees, and all other amounts payable under this Agreement and the Other Documents to the Secured Parties shall be payable in the currency in which such Obligations are denominated. Unless stated otherwise, all calculations, comparisons, measurements or determinations under this Agreement, shall be made in U.S. Dollars.  For the purpose of all calculations, comparisons, measurements or determinations hereunder, including all calculations of the Formula Amount and all financial performance or results and all calculations with respect to financial ratios and/or financial covenants, including calculation of the component parts thereof, amounts denominated in other currencies shall be converted to the U.S. Dollar Equivalent thereof at the Exchange Rate in effect on the day of determination. If Agent shall receive payment in a currency other than the currency in which the Obligations are due, whether pursuant to the exercise of control under a securities

account control agreement or deposit account control agreement, or as proceeds or realization of the Collateral or otherwise, then Agent shall be authorized to convert such amounts at the Exchange Rate in effect on the day of determination to the currencies in which such Obligations are due for application thereto.  All financial statements, Borrowing Base Certificate and Compliance Certificates shall be set forth in U.S. Dollars.

1.6.    [Reserved].

1.7.    Canadian Terms.  In this Agreement, (i) any term defined in this Agreement by reference to the "Uniform Commercial Code" shall also have any extended, alternative or analogous meaning given to such term in applicable Canadian personal property security and other laws (including, without limitation, the PPSA, the Bills of Exchange Act (Canada) and the Depository Bills and Notes Act (Canada)), in all cases for the extension, preservation or betterment of the security and rights of the Agent, (ii) all references in this Agreement to "Article 8 of the Code" or "Article 8 of the Uniform Commercial Code" shall be deemed to refer also to applicable Canadian securities transfer laws (including, without limitation, the Securities Transfer Act, 2006 (Ontario) and the Securities Transfer Act (British Columbia), as applicable), (iii) all references in this Agreement to the United States Copyright Office or the United States Patent and Trademark Office shall be deemed to refer also to the Canadian Intellectual Property Office, (iv) all references in this Agreement to a financing statement, continuation statement, amendment or termination statement shall be deemed to refer also to the analogous documents used under applicable Canadian personal property security laws, (v) all references to the United States, or to any subdivision, department, agency or instrumentality thereof shall be deemed to refer also to Canada, or to any subdivision, department, agency or instrumentality thereof, (vi) all references to federal or state securities law of the United States shall be deemed to refer also to analogous federal and provincial securities laws in Canada, (vii) all references to "state or federal bankruptcy laws" shall be deemed to refer also to any insolvency proceeding occurring in Canada or under Canadian law, (viii) all calculations of U.S. Dollar amounts which utilize amounts expressed in Canadian Dollars shall be made using the U.S. Dollar Equivalent of such Canadian Dollar amounts in a manner calculated by the Agent and (ix) all financial statements required to be delivered to Agent or Lenders hereunder shall be presented in U.S. Dollars.

1.8.    Conversion of Assets.  All of the property and assets of any Canadian Loan Party, including, without limitation, its Receivables, shall be valued in, and converted into, the U.S. Dollar Equivalent in accordance with PNC's customary banking and conversion practices and procedures.

1.9.    Term SOFR Notification.  Section 3.8.2. of this Agreement provides a mechanism for determining an alternate rate of interest in the event that the Term SOFR Rate is no longer available or in certain other circumstances.  The Agent does not warrant or accept any responsibility for and shall not have any liability with respect to, the administration, submission or any other matter related to the Term SOFR Rate or with respect to any alternative or successor rate thereto, or replacement rate therefor.

1.10.    [Reserved].

1.11.    Conforming Changes Relating to Term SOFR Rate.  With respect to the Term SOFR Rate, the Agent will have the right to make Conforming Changes from time to time and, notwithstanding anything to the contrary herein or in any Other Document, any amendments implementing such Conforming Changes will become effective without any further action or consent of any other party to this Agreement or any Other Document; provided that, with respect to any such amendment effected, the Agent shall provide notice to the Borrowers and the Lenders of each such amendment implementing such Conforming Changes reasonably promptly after such amendment becomes effective.

1.12.    Acknowledgment.

(a)    As of the Petition Date, the aggregate amount of all Prepetition Obligations owing by the Borrowers to the Prepetition Revolving Lenders under and in connection with the Prepetition Revolving Credit Agreement was not less than (i) $10,891,003.32, including, without limitation, $10,391,003.32 in outstanding principal amount of Prepetition Revolving Loans,  $500,000.00 of aggregate Maximum Undrawn Amount of all outstanding Letters of Credit, plus accrued but unpaid interest, fees and per diem, plus (ii) all accrued and accruing charges and Credit Product Obligations in respect of Credit Products Arrangement, plus (iii) all accrued and accruing costs and expenses (including attorneys' fees and legal expenses), plus (iv) any other charges and liabilities accrued, accruing or chargeable, whether due or to become due, matured or contingent, under the Prepetition Revolving Credit Agreement.

(b)    Each Debtor confirms and agrees that Agent, for the benefit of itself and the other Secured Parties (as defined in the Prepetition Revolving Credit Agreement), has and shall continue to have valid, enforceable and perfected first priority (except as set forth in the Interim Order or Final Order) security interests and Liens upon Prepetition Collateral heretofore granted to Agent, in its capacity as Prepetition Agent, pursuant to the Prepetition Revolving Credit Agreement as in effect immediately prior to the Petition Date to secure all of the Prepetition Obligations, as well as valid and enforceable first priority security interests in and Liens upon all Collateral of the Debtors granted to Agent, in accordance with the Interim Order and the Final Order, for the benefit of itself and the Prepetition Secured Parties and the Secured Parties, upon the entry of, and under, the Interim Order or Final Order, and under this Agreement.

1.13.    Release.

(a)    In consideration of and as a condition to the Agent and the Lenders making Advances under this Agreement, the consent by the Prepetition Secured Parties and the Secured Parties to the use of Revolving Credit Cash Collateral, and providing other credit and financial accommodations to the Debtors pursuant to the provisions of the DIP Orders and the Other Documents, each Debtor, on behalf of itself, and successors and assigns and its Estate (as defined in the Interim Order) (collectively, the "Releasors") hereby absolutely releases and forever discharges and acquits each Prepetition Secured Party and each of their respective successors, participants, and assigns, and their present and former shareholders, affiliates, subsidiaries, divisions, predecessors, directors, officers, attorneys, employees, and other representatives (the Prepetition Agent and each of the Prepetition Revolving Lenders, and all

56

such other parties being hereinafter referred to collectively as the "Releasees") of and from any and all claims, demands, causes of action, suits, covenants, contracts, controversies, agreements, promises, sums of money, accounts, bills, reckonings, damages, and any and all other claims, counterclaims, cross claims, defenses, rights of set-off, demands, and liabilities whatsoever (individually, a "Prepetition Released Claim" and collectively, the "Prepetition Released Claims") of every kind, name, nature and description, known or unknown, foreseen or unforeseen, matured or contingent, liquidated or unliquidated, primary or secondary, suspected or unsuspected, both at law and in equity, including, without limitation, any so-called "lender liability" claims or defenses, that any Releasor may now or hereafter own, hold, have, or claim to have against the Releasees, or any of them for, upon, or by reason of any nature, cause, or thing whatsoever that arose or may have arisen at any time on or prior to the date hereof, in respect of the Debtors and arising out of, relating to, or in connection with, any of the Prepetition Obligations, the Prepetition Revolving Credit Documents, and any Prepetition Obligations, Prepetition Term Loan Obligations, or other financial accommodations under the Prepetition Revolving Credit Documents; *provided*, however, that such release shall not be effective with respect to the Debtors until the Final Order shall have been entered and with respect to the Estates until the expiration of the Challenge Period.  In addition, upon the Payment in Full of all Obligations, and termination of the rights and obligations arising under the Interim Order, the Final Order, and the Credit Documents (which payment and termination shall be on terms and conditions reasonably acceptable to the Agent), Agent and the Lenders shall be automatically deemed to be absolutely and forever released and discharged from any and all obligations, liabilities, actions, duties, responsibilities, commitments, claims, and causes of action arising, occurring in connection with, or related to this Agreement, the Credit Documents, the Interim Order and the Final Order (whether known or unknown, direct or indirect, matured or contingent, foreseen or unforeseen, due or not due, primary or secondary, liquidated or unliquidated).

(b)     Subject to [Section VIII]IX of the Interim Order with respect to all applicable parties other than the Debtors, each Releasor hereby absolutely, unconditionally and irrevocably covenants and agrees with each Releasee that it will not sue (at law, in equity, in any regulatory proceeding, or otherwise) any Releasee on the basis of any Prepetition Released Claim that has been released and discharged by each Releasor pursuant to Section 1.13(a) above. If any Releasor violates the forgoing covenant, Debtors agree to pay, in addition to such other damages as any Releasee may sustain as a result of such violation, all attorneys' fees and costs incurred by any Releasee as a result of such violation.

1.14.   Adoption and Ratification.  Each Loan Party hereby (a) ratifies, assumes, adopts and agrees to be bound by all of the Prepetition Other Documents to which it is a party and (b) agrees to pay all Prepetition Obligations in accordance with the terms of the Prepetition Other Documents and in accordance with the Interim Order and Final Order.  Each Prepetition Other Document to which any Loan Party is a party is hereby incorporated herein by reference and hereby is and shall be deemed adopted and assumed in full by such Loan Party, and in respect of each Debtor, as a debtor and debtor-in-possession, and considered an agreement among the Loan Parties, on the one hand, and the applicable Secured Parties, on the other hand.

II.     ADVANCES, PAYMENTS.

2.1.    Revolving Advances.

(a)    Amount of Revolving Advances.  Subject to the terms and conditions set forth in this Agreement, each Revolving Lender, severally and not jointly, will make Revolving Advances to Borrowers denominated in U.S. Dollars in aggregate amounts outstanding at any time equal to such Lender's Revolving Commitment Percentage of the lesser of (x) the Maximum Revolving Advance Amount, less the outstanding amount of all Swing Loans, less the aggregate Maximum Undrawn Amount of all outstanding Letters of Credit, less Reserves established hereunder or (y) an amount equal to the result of the following (hereinafter, the "Formula Amount"):

(i)    up to an amount equal to (A) 85% of Eligible Receivables and (B) subject to the limitations set forth in clause (e) below, 85% of Eligible JV Receivables, plus

(ii)    subject to the limitations set forth in clause (e) below, up to the lesser of (a) an amount equal to 65% of Eligible Unbilled Receivables and (b) $5,500,000, minus

(iii)    the aggregate Maximum Undrawn Amount of all outstanding Letters of Credit, minus

(iv)    Reserves established hereunder, minus

(v)    the amount of Prepetition Obligations.

The Revolving Advances shall be evidenced by one or more secured promissory notes (collectively, the "Revolving Credit Note") substantially in the form attached hereto as Exhibit 2.1(a) hereto.

(b)    Approved Budget.

(i)    Notwithstanding anything to the contrary set forth herein, Revolving Lenders shall not make any Revolving Advances in any week in an aggregate amount in excess of the "Total Disbursements" projected to be made in such week in the Approved Budget less the total collections received such week (except as otherwise agreed by Revolving Lenders in their sole discretion).

(ii)    Notwithstanding anything to the contrary set forth herein, Revolving Lenders shall have no obligation at any time to make any Revolving Advances in connection with any Approved Budget that contains funding of non-ordinary course weekly or bi-weekly payroll or union payments unless there is a simultaneous consummation and closing of an Approved 363 Sale that, subject to Section 4.1 of the Intercreditor Agreement, provides for a purchase price sufficient to repay in full all Obligations (including for the avoidance of doubt, all Prepetition Revolving Obligations).

(c)    Discretionary Rights.  The Advance Rates may be increased or decreased by Agent at any time and from time to time in the exercise of its Permitted Discretion, provided, that, Agent shall endeavor to give Borrowers notice of any decrease in the Advance Rates.  Each Borrower consents to any such increases or decreases and acknowledges that decreasing the

074658.23049/132216381v.5074658.23049/132216381v.9

Advance Rates or increasing or imposing Reserves may limit or restrict Advances requested by Borrowing Agent. The amount of any Reserves established by Agent shall have a reasonable relationship to the event, condition, other circumstance, or fact that is the basis for such Reserve and shall not be duplicative of any other Reserve established and currently maintained. The rights of Agent under this subsection are subject to the provisions of Section 16.2(b) hereof.

        (d)     [Reserved].

        (e)     Limitation on Advances against Eligible JV Receivables and Eligible Unbilled JV Receivables. Notwithstanding anything to the contrary contained herein, the principal amount of Revolving Advances made hereunder against (i) Eligible Unbilled JV Receivables shall not exceed $250,000 in the aggregate at any one time outstanding and (ii) Eligible JV Receivables and Eligible Unbilled JV Receivables, on a combined basis, shall not exceed $1,000,000 in the aggregate at any one time outstanding.

        2.2.    Procedures for Requesting Revolving Advances; Procedures for Selection of Applicable Interest Rates for All Advances.

        (a)     (i) Borrowing Agent on behalf of any Borrower may notify Agent prior to 1:00 p.m. (New York time) on a Business Day of a Borrower's request to incur, on that day, a Revolving Advance denominated in U.S. Dollars hereunder. All Revolving Advances denominated in U.S. Dollars shall be funded into the U.S. Funding Account. Should any amount required to be paid as interest hereunder, or as fees or other charges under this Agreement or any other agreement with Agent or Lenders, or with respect to any other Obligation under this Agreement, become due, the same shall be deemed a request for a Revolving Advance maintained as a Domestic Rate Loan as of the date such payment is due, in the amount required to pay in full such interest, fee, charge or Obligation, and such request shall be irrevocable. If the Borrowers enter into a separate written agreement with Agent regarding Agent's auto-advance service, then each Advance made pursuant to such service (including Advances made for the payment of interest, fees, charges or obligations) shall be deemed an irrevocable request for a Revolving Advance maintained as a Domestic Rate Loan as of the date such auto-advance is made. (ii) Notwithstanding anything in this Agreement to the contrary, all Advances under this Agreement shall be maintained as Domestic Rate Loans and Term SOFR Rate Loans shall not be available at any time unless and until Agent notifies Borrowing Agent in writing that Term SOFR Rate Loans are available pursuant to the terms of this Agreement, which determination shall be made by Agent in its sole and absolute discretion.

        (b)     Notwithstanding the provisions of subsection (a) above, in the event any Borrower desires to obtain a Term SOFR Rate Loan for any Advance (other than a Swing Loan), Borrowing Agent shall give Agent written notice by no later than 1:00 p.m. (New York time) on the day which is three (3) Business Days prior to the date such Term SOFR Rate Loan is to be borrowed, specifying (i) the date of the proposed borrowing (which shall be a Business Day), (ii) the type of borrowing and the amount of such Advance to be borrowed, which amount shall be in a minimum amount of $100,000 and in integral multiples of $50,000 thereafter, and (iii) the duration of the first Interest Period therefor, as applicable. Interest Periods for Term SOFR Rate Loans shall be for one, three or six months; provided that, if an Interest Period would end on a day that is not a Business Day, it shall end on the next succeeding Business Day unless such day

falls in the next succeeding calendar month in which case the Interest Period shall end on the next preceding Business Day. Any Interest Period that begins on the last Business Day of a calendar month (or a day for which there is no numerically corresponding day in the last calendar month of such Interest Period) shall end on the last Business Day of the last calendar month of such Interest Period.  Upon and after the occurrence of an Event of Default and during the continuation thereof, at the option of Agent or at the direction of the Required Lenders, no Term SOFR Rate Loan shall be made available to any Borrower.

(c)     Each Interest Period of a Term SOFR Rate Loan shall commence on the date such Term SOFR Rate Loan is made, as applicable, and shall end on such date as Borrowing Agent may elect as set forth in subsection (b)(iii) above, provided that the exact length of each Interest Period shall be determined in accordance with the practice of the interbank market for offshore U.S. Dollar and no Interest Period shall end after the last day of the Term.

(d)     Borrowing Agent shall elect the initial Interest Period applicable to a Term SOFR Rate Loan by its notice of borrowing given to Agent pursuant to Section 2.2(b) or by its notice of conversion given to Agent pursuant to Section 2.2(e), as the case may be. Borrowing Agent shall elect the duration of each succeeding Interest Period by giving irrevocable written notice to Agent of such duration not later than 1:00 p.m. (New York time) on the day which is three (3) Business Days prior to the last day of the then current Interest Period applicable to such Term SOFR Rate Loan.  If Agent does not receive timely notice of the succeeding Interest Period elected by Borrowing Agent, Borrowing Agent shall be deemed to have elected to convert  such Term SOFR Rate Loan to a Domestic Rate Loan as of the last day of the Interest Period applicable to such Term SOFR Rate Loan.

(e)     Provided that no Default or Event of Default shall have occurred and be continuing, Borrowing Agent may, on the last Business Day of the then current Interest Period applicable to any outstanding Term SOFR Rate Loan, or on any Business Day with respect to Domestic Rate Loans, convert any such Term SOFR Rate Loan into a Domestic Rate Loan, provided that any conversion of a Term SOFR Rate Loan shall be made only on the last Business Day of the then current Interest Period applicable to such Term SOFR Rate Loan, as applicable. If Borrowing Agent desires to convert a Term SOFR Rate Loan or Domestic Rate Loan, Borrowing Agent shall give Agent written notice by no later than 1:00 p.m. (i) on the day which is three (3) Business Days prior to the date on which such conversion is to occur with respect to a conversion from a Domestic Rate Loan to a Term SOFR Rate Loan or (ii) on the day which is one (1) Business Day prior to the date on which such conversion is to occur (which date shall be the last Business Day of the Interest Period for the applicable Term SOFR Rate Loan) with respect to a conversion from a Term SOFR Rate Loan to a Domestic Rate Loan, specifying, in each case, the date of such conversion, the Term SOFR Rate Loan(s), or Domestic Rate Loan(s) to be converted and if the conversion is to a Term SOFR Rate Loan, the duration of the first Interest Period therefor.

(f)     At its option and upon written notice given prior to 1:00 p.m. at least three (3) Business Days prior to the date of such prepayment (or such shorter notice as Agent may agree), Borrowers may, subject to Section 2.2(g) below, prepay the Term SOFR Rate Loans in whole at any time or in part from time to time with accrued interest on the principal being

prepaid to the date of such repayment.  Borrowing Agent shall specify the date of prepayment of Advances which are Term SOFR Rate Loans and the amount of such prepayment.  In the event that any prepayment of a Term SOFR Rate Loan is required or permitted on a date other than the last Business Day of the then current Interest Period with respect thereto, Borrowers shall indemnify Agent and Lenders therefor in accordance with Section 2.2(g) hereof.

(g)    Each Loan Party shall indemnify Agent and Lenders and hold Agent and Lenders harmless from and against any and all losses or expenses that Agent and Lenders may sustain or incur as a consequence of any prepayment, conversion of or any default by any Borrower in the payment of the principal of or interest on any Term SOFR Rate Loan or failure by any Borrower to complete a borrowing of, a prepayment of or conversion of or to a Term SOFR Rate Loan after notice thereof has been given, including, but not limited to, any interest payable by Agent or Lenders to lenders of funds obtained by it in order to make or maintain its Term SOFR Rate Loans hereunder.  A certificate as to any additional amounts payable pursuant to the foregoing sentence (with backup calculation in reasonable detail) submitted by Agent or any Lender to Borrowing Agent shall be conclusive absent manifest error.

(h)    Notwithstanding any other provision hereof, if any Applicable Law, treaty, regulation or directive, or any change therein or in the interpretation or application thereof, including without limitation any Change in Law, shall make it unlawful for Lenders or any Lender (for purposes of this subsection (h), the term "Lender" shall include any Lender and the office or branch where any Lender or any Person controlling such Lender makes or maintains any Term SOFR Rate Loans) to make or maintain its Term SOFR Rate Loans, the obligation of Lenders (or such affected Lender) to make Term SOFR Rate Loans hereunder shall forthwith be cancelled and Borrowers shall, if any affected Term SOFR Rate Loans are then outstanding, promptly upon request from Agent, either pay all such affected Term SOFR Rate Loans or convert such affected Term SOFR Rate Loans into Domestic Rate Loans.  If any such payment or conversion of any Term SOFR Rate Loan is made on a day that is not the last day of the Interest Period applicable to such Term SOFR Rate Loan, Borrowers shall pay Agent, upon Agent's request, such amount or amounts set forth in clause (g) above.  A certificate as to any additional amounts payable pursuant to the foregoing sentence (with backup calculation in reasonable detail) submitted by Lenders to Borrowing Agent shall be conclusive absent manifest error.

(i)    Anything to the contrary contained herein notwithstanding, neither any Agent nor any Lender, nor any of their participants, is required actually to acquire Term SOFR deposits or bankers' acceptances to fund or otherwise match fund any Obligation as to which interest accrues based on the Term SOFR Rate.  The provisions set forth herein shall apply as if each Lender or its participants had match funded any Obligation as to which interest is accruing based on the Term SOFR Rate by acquiring SOFR deposits for each Interest Period in the amount of the Term SOFR Rate Loans.

2.3.    [Reserved].

2.4.    Swing Loans.

(a)      Subject to the terms and conditions set forth in this Agreement, and in order to minimize the transfer of funds between Revolving Lenders and Agent for administrative convenience, Agent, Revolving Lenders and Swing Loan Lender agree that in order to facilitate the administration of this Agreement, Swing Loan Lender may, at its election and option made in its sole discretion cancelable at any time for any reason whatsoever, make swing loan advances denominated in U.S. Dollars ("Swing Loans") available to Borrowers as provided for in this Section 2.4 at any time or from time to time after the Closing Date to, but not including, the last day of the Term, in an aggregate principal amount up to but not in excess of the Maximum Swing Loan Advance Amount, provided that the outstanding aggregate principal amount of Swing Loans and the Revolving Advances at any one time outstanding shall not exceed an amount equal to the lesser of (i) the Maximum Revolving Advance Amount, less the Maximum Undrawn Amount of all outstanding Letters of Credit or (ii) the Formula Amount.  All Swing Loans shall be Domestic Rate Loans only.  Borrowers may borrow (at the option and election of Swing Loan Lender), repay and re-borrow (at the option and election of Swing Loan Lender) Swing Loans and Swing Loan Lender may make Swing Loans as provided in this Section 2.4 during the period between Settlement Dates.  All Swing Loans shall be evidenced by a secured promissory note (the "Swing Loan Note") substantially in the form attached as Exhibit 2.4 hereto.  Swing Loan Lender's agreement to make Swing Loans under this Agreement is cancelable at any time for any reason whatsoever and the making of Swing Loans by Swing Loan Lender from time to time shall not create any duty or obligation, or establish any course of conduct, pursuant to which Swing Loan Lender shall thereafter be obligated to make Swing Loans in the future.

(b)      Upon either (i) any request by Borrowing Agent for a Revolving Advance made pursuant to Section 2.2(a) hereof or (ii) the occurrence of any deemed request by Borrowers for a Revolving Advance pursuant to the provisions of Section 2.2(a) hereof, Swing Loan Lender may elect, in its sole discretion, to have such request or deemed request treated as a request for a Swing Loan, and may advance same day funds to Borrowers as a Swing Loan; provided that notwithstanding anything to the contrary provided for herein, Swing Loan Lender may not make Swing Loan Advances if Swing Loan Lender has been notified by Agent or by Required Lenders that one or more of the applicable conditions set forth in Section 8.2 hereof have not been satisfied or the Revolving Commitments have been terminated for any reason.

(c)      Upon the making of a Swing Loan (whether before or after the occurrence of a Default or an Event of Default and regardless of whether a Settlement has been requested with respect to such Swing Loan), each Revolving Lender shall be deemed, without further action by any party hereto, to have unconditionally and irrevocably purchased from Swing Loan Lender, without recourse or warranty, an undivided interest and participation in such Swing Loan in proportion to its Revolving Commitment Percentage.  Swing Loan Lender or Agent may, at any time, require the Revolving Lenders to fund such participations by means of a Settlement as provided for in Section 2.6(d) hereof.  From and after the date, if any, on which any Revolving Lender is required to fund, and funds, its participation in any Swing Loans purchased hereunder, Agent shall promptly distribute to such Revolving Lender its Revolving Commitment Percentage of all payments of principal and interest and all proceeds of Collateral received by Agent in respect of such Swing Loan; provided that no Revolving Lender shall be obligated in any event to make Revolving Advances in an amount in excess of its Revolving Commitment Amount minus its Participation Commitment (taking into account any reallocations

62

under Section 2.22 hereof) of the Maximum Undrawn Amount of all outstanding Letters of Credit.

2.5.    <u>Disbursement of Advance Proceeds</u>.    All Advances shall be disbursed from whichever office or other place Agent may designate from time to time and, together with any and all other Obligations of the Loan Parties to Agent or Lenders, shall be charged to Borrowers' Account on Agent's books.  The proceeds of each Revolving Advance or Swing Loan requested by Borrowing Agent on behalf of any Borrower or deemed to have been requested by any Borrower under Section 2.2(a), 2.6(b) or 2.14 hereof shall, (i) with respect to requested Revolving Advances, to the extent Lenders make such Revolving Advances in accordance with Section 2.2(a), 2.6(b) or 2.14 hereof, and with respect to Swing Loans made upon any request or deemed request by Borrowing Agent for a Revolving Advance to the extent Swing Loan Lender makes such Swing Loan in accordance with Section 2.4(b) hereof, be made available to the applicable Borrower on the day so requested by way of credit to such Borrower's operating account at PNC, or such other bank as Borrowing Agent may designate following notification to Agent, in immediately available federal funds or other immediately available funds or, (ii) with respect to Revolving Advances deemed to have been requested by any Borrower or Swing Loans made upon any deemed request for a Revolving Advance by any Borrower, be disbursed to Agent to be applied to the outstanding Obligations giving rise to such deemed request.  During the Term, Borrowers may use the Revolving Advances and Swing Loans by borrowing, prepaying and re-borrowing, all in accordance with the terms and conditions hereof.

2.6.    <u>Making and Settlement of Advances</u>.

(a)    Each borrowing of Revolving Advances shall be advanced according to the applicable Revolving Commitment Percentages of Revolving Lenders (subject to any contrary terms of Section 2.22 hereof).  Each borrowing of Swing Loans shall be advanced by Swing Loan Lender alone.

(b)    Promptly after receipt by Agent of a request or a deemed request for a Revolving Advance pursuant to Section 2.2(a) hereof and, with respect to Revolving Advances, to the extent Agent elects not to provide a Swing Loan or the making of a Swing Loan would result in the aggregate amount of all outstanding Swing Loans exceeding the maximum amount permitted in Section 2.4(a) hereof, Agent shall notify the Revolving Lenders of its receipt of such request specifying the information provided by Borrowing Agent and the apportionment among Lenders of the requested Revolving Advance as determined by Agent in accordance with the terms hereof.  Each Lender shall remit the principal amount of each Revolving Advance to Agent such that Agent is able to, and Agent shall, to the extent the applicable Lenders have made funds available to it for such purpose and subject to Section8.2 hereof, fund such Revolving Advance to Borrowers in U.S. Dollars and immediately available funds at the Payment Office prior to the close of business, on the applicable borrowing date; provided that if any applicable Lender fails to remit such funds to Agent in a timely manner, Agent may elect in its sole discretion to fund with its own funds the Revolving Advance of such Lender on such borrowing date, and such Lender shall be subject to the repayment obligation in Section 2.6(c) hereof.

(c)    Unless Agent shall have been notified by telephone, confirmed in writing, by any Revolving Lender that such Lender will not make the amount which would constitute its

applicable Revolving Commitment Percentage of the requested Revolving Advance available to Agent, Agent may (but shall not be obligated to) assume that such Lender has made such amount available to Agent on such date in accordance with Section 2.6(b) hereof and may, in reliance upon such assumption, make available to Borrowers a corresponding amount.  In such event, if a Lender has not in fact made its applicable Revolving Commitment Percentage of the requested Revolving Advance available to Agent, then the applicable Lender and Borrowers severally agree to pay to Agent on demand such corresponding amount with interest thereon, for each day from and including the date such amount is made available to Borrowers through but excluding the date of payment to Agent, at (i) in the case of a payment to be made by such Lender, the greater of (A) (x) the daily average Effective Federal Funds Rate (computed on the basis of a year of 360 days) during such period as quoted by Agent, times (y) such amount or (B) a rate determined by Agent in accordance with banking industry rules on interbank compensation, and (ii) in the case of a payment to be made by Borrowers, the Revolving Interest Rate for Revolving Advances that are Domestic Rate Loans.  If such Lender pays its share of the applicable Revolving Advance to Agent, then the amount so paid shall constitute such Lender's Revolving Advance.  Any payment by Borrowers shall be without prejudice to any claim Borrowers may have against a Revolving Lender that shall have failed to make such payment to Agent.  A certificate of Agent submitted to any Lender or Borrowers with respect to any amounts owing under this subsection (c) shall be conclusive, in the absence of manifest error.

(d)     Agent, on behalf of Swing Loan Lender, shall demand settlement (a "Settlement") of all or any Swing Loans with Revolving Lenders on at least a weekly basis, or on any more frequent date that Agent elects or that Swing Loan Lender at its option exercisable for any reason whatsoever may request, by notifying Revolving Lenders of such requested Settlement by facsimile, telephonic or electronic transmission no later than 3:00 p.m. (New York time) on the date of such requested Settlement (the "Settlement Date").  Subject to any contrary provisions of Section 2.22 hereof, each Revolving Lender shall transfer the amount of such Revolving Lender's Revolving Commitment Percentage of the outstanding principal amount (plus interest accrued thereon to the extent requested by Agent) of the applicable Swing Loan with respect to which Settlement is requested by Agent, to such account of Agent as Agent may designate not later than 5:00 p.m. (New York time) on such Settlement Date if requested by Agent by 3:00 p.m. (New York time), otherwise not later than 5:00 p.m. (New York time) on the next Business Day.  Settlements may occur at any time notwithstanding that the conditions precedent to making Revolving Advances set forth in Section 8.2 hereof have not been satisfied or the Revolving Commitments shall have otherwise been terminated at such time.  All amounts so transferred to Agent shall be applied against the amount of outstanding Swing Loans and, when so applied shall constitute Revolving Advances of such Revolving Lenders accruing interest as Domestic Rate Loans.  If any such amount is not transferred to Agent by any Revolving Lender on such Settlement Date, Agent shall be entitled to recover such amount on demand from such Revolving Lender together with interest thereon as specified in Section 2.6(c) hereof.

(e)     If any Lender or Participant (a "Benefited Lender") shall at any time receive any payment of all or part of its Advances, or interest thereon, or receive any Collateral in respect thereof (whether voluntarily or involuntarily or by set-off) in a greater proportion than any such payment to and Collateral received by any other Lender, if any, in respect of such other Lender's Advances, or interest thereon, and such greater proportionate payment or receipt of

074658.23049/132216381v.5074658.23049/132216381v.9

Collateral is not expressly permitted hereunder, such Benefited Lender shall purchase for cash from the other Lenders a participation in such portion of each such other Lender's Advances, or shall provide such other Lender with the benefits of any such Collateral, or the proceeds thereof, as shall be necessary to cause such Benefited Lender to share the excess payment or benefits of such Collateral or proceeds ratably with each of the other Lenders; provided, however, that if all or any portion of such excess payment or benefits is thereafter recovered from such Benefited Lender, such purchase shall be rescinded, and the purchase price and benefits returned, to the extent of such recovery, but without interest. Each Borrower consents to the foregoing and agrees, to the extent it may effectively do so under Applicable Law, that each Lender so purchasing a portion of another Lender's Advances may exercise all rights of payment (including rights of set-off) with respect to such portion as fully as if such Lender were the direct holder of such portion, and the obligations owing to each such purchasing Lender in respect of such participation and such purchased portion of any other Lender's Advances shall be part of the Obligations secured by the Collateral, and the obligations owing to each such purchasing Lender in respect of such participation and such purchased portion of any other Lender's Advances shall be part of the Obligations secured by the Collateral.

2.7. <u>Maximum Advances</u>. Notwithstanding anything to the contrary set forth in Section 2.1(a) or otherwise in this Agreement, the aggregate balance of the principal amount of Revolving Advances plus Swing Loans outstanding at any time shall not exceed the lesser of (a) the Maximum Revolving Advance Amount less the aggregate Maximum Undrawn Amount of all issued and outstanding Letters of Credit or (b) the Formula Amount.

2.8. <u>Manner and Repayment of Advances</u>.

(a) The Revolving Advances and Swing Loans shall be due and payable in full on the last day of the Term subject to earlier prepayment as herein provided. Notwithstanding the foregoing, all Advances shall be subject to earlier repayment upon (x) acceleration upon the occurrence of an Event of Default under this Agreement or (y) termination of this Agreement. Each payment (including each prepayment) by any Borrower on account of the principal of and interest on the Advances shall be applied, first, to the outstanding Swing Loans and next, pro rata according to the applicable Revolving Commitment Percentages of Lenders, to the outstanding Revolving Advances (subject to any contrary provisions of Section 2.22 hereof).

(b) Each Borrower recognizes that the amounts evidenced by checks, notes, drafts or any other items of payment relating to and/or proceeds of Collateral may not be collectible by Agent on the date received by Agent. Agent shall conditionally credit Borrowers' Account for each item of payment on the next Business Day after the Business Day on which such item of payment is received by Agent (and the Business Day on which each such item of payment is so credited shall be referred to, with respect to such item, as the "<u>Application Date</u>"). Agent is not, however, required to credit Borrowers' Account for the amount of any item of payment which is unsatisfactory to Agent and Agent may charge Borrowers' Account for the amount of any item of payment which is returned, for any reason whatsoever, to Agent unpaid. Subject to the foregoing, Borrowers agree that for purposes of computing the interest charges under this Agreement, each item of payment received by Agent shall be deemed applied by Agent on account of the Obligations on its respective Application Date. The Loan Parties

further agree that there is a monthly float charge payable to Agent for Agent's sole benefit, in an amount equal to (y) the face amount of all items of payment received each day during the prior month (including items of payment received by Agent as a wire transfer or electronic depository check) multiplied by (z) the Revolving Interest Rate with respect to Domestic Rate Loans for one (1) day (i.e. the Revolving Interest Rate divided by 360 or 365/366, as applicable). The monthly float charge shall be calculated daily and charged once per month, relating to all payments collected in the prior month. All proceeds received by Agent shall be applied to the Obligations in accordance with Section 4.8(h) hereof.

(c)     All payments of principal, interest and other amounts payable hereunder, or under any of the Other Documents shall be made to Agent at the Payment Office not later than 1:00 p.m. (New York time) on the due date therefor in U.S. Dollars in federal funds or other funds immediately available to Agent. Agent shall have the right to effectuate payment of any and all Obligations due and owing hereunder by charging Borrowers' Account or by making Advances as provided in Section 2.2 hereof.

(d)     Except as expressly provided herein, all payments (including prepayments) to be made by any Borrower on account of principal, interest, fees and other amounts payable hereunder shall be made without deduction, setoff or counterclaim and shall be made to Agent on behalf of Lenders to the Payment Office, in each case on or prior to 1:00 p.m. (New York time), in U.S. Dollars ~~or Canadian Dollars, as applicable,~~ and in immediately available funds.

2.9.    <u>Repayment of Excess Advances</u>.    If at any time the aggregate balance of outstanding Advances taken as a whole exceeds the maximum amount of such type or any sublimit of Advances and/or Advances taken as a whole (as applicable) permitted hereunder, such excess Advances shall be immediately due and payable without the necessity of any demand, at the Payment Office, whether or not a Default or an Event of Default has occurred.

2.10.    <u>Statement of Account</u>.    Agent shall maintain, in accordance with its customary procedures, a loan account denominated in U.S. Dollars ( "<u>Borrowers' Account</u>") in the name of the applicable Borrower in which shall be recorded the date and amount of each Advance made by Agent or Lenders and the date and amount of each payment in respect thereof; provided, however, the failure by Agent to record the date and amount of any Advance shall not adversely affect Agent or any Lender. Each month, Agent shall send to Borrowing Agent a statement showing the accounting for the Advances made, payments made or credited in respect thereof, and other transactions between Agent, Lenders and Borrowers during such month. The monthly statements shall be deemed correct and binding upon Borrowers in the absence of manifest error and shall constitute an account stated between Lenders and Borrowers unless Agent receives a written statement of Borrowers' specific exceptions thereto within thirty (30) days after such statement is received by Borrowing Agent. The records of Agent with respect to Borrowers' Accounts shall be conclusive evidence absent manifest error of the amounts of Advances and other charges thereto and of payments applicable thereto.

2.11.    <u>Letters of Credit</u>.

(a)     Subject to the terms and conditions hereof, the applicable Issuer shall issue or cause the issuance of standby and/or trade letters of credit denominated in U.S. Dollars ("Letters of Credit") for the account of any Borrower except to the extent that the issuance thereof would then cause the sum of (i) the ~~U.S. Dollar Equivalent of the~~ outstanding Revolving Advances plus (ii) the outstanding Swing Loans, plus (iii) the Maximum Undrawn Amount of all outstanding Letters of Credit, plus (iv) the Maximum Undrawn Amount of the Letter of Credit to be issued to exceed the lesser of (x) the Maximum Revolving Advance Amount or (y) the Formula Amount (calculated without giving effect to the deductions provided for in Section 2.1(a) hereof.  The Maximum Undrawn Amount of all outstanding Letters of Credit shall not exceed in the aggregate at any time the Letter of Credit Sublimit.  All disbursements or payments related to Letters of Credit shall be deemed to be Domestic Rate Loans consisting of Revolving Advances and shall bear interest at the Revolving Interest Rate for Domestic Rate Loans.  Letters of Credit that have not been drawn upon shall not bear interest (but fees shall accrue in respect of outstanding Letters of Credit as provided in Section 3.2 hereof).  The Existing ~~Letter~~Letters of Credit shall be deemed to be issued under this Agreement

(b)     Notwithstanding any provision of this Agreement, no Issuer shall be under any obligation to issue any Letter of Credit if (i) any order, judgment or decree of any Governmental Body or arbitrator shall by its terms purport to enjoin or restrain such Issuer from issuing any Letter of Credit, or any Law applicable to such Issuer or any request or directive (whether or not having the force of law) from any Governmental Body with jurisdiction over such Issuer shall prohibit, or request that such Issuer refrain from, the issuance of letters of credit generally or the Letter of Credit in particular or shall impose upon such Issuer with respect to the Letter of Credit any restriction, reserve or capital requirement (for which such Issuer is not otherwise compensated hereunder) not in effect on the Closing Date, or shall impose upon such Issuer any unreimbursed loss, cost or expense which was not applicable on the Closing Date, and which such Issuer in good faith deems material to it, or (ii) the issuance of the Letter of Credit would violate one or more policies of such Issuer applicable to letters of credit generally.

2.12.   Issuance of Letters of Credit.

(a)     Borrowing Agent, on behalf of any Borrower, may request any Issuer to issue or cause the issuance of a Letter of Credit by delivering to such Issuer, with a copy to Agent at the Payment Office, prior to 1:00 p.m. (New York time), at least five (5) Business Days prior to the proposed date of issuance, such Issuer's form of Letter of Credit Application (the "Letter of Credit Application") completed to the satisfaction of Agent and such Issuer; and, such other certificates, documents and other papers and information as Agent or such Issuer may request.  No Issuer shall issue any requested Letter of Credit if such Issuer has received notice from Agent or any Lender that one or more of the applicable conditions set forth in Section 8.2 hereof have not been satisfied or the Revolving Commitments have been terminated for any reason.

(b)     Each Letter of Credit shall, among other things, (i) provide for the payment of sight drafts, or other written demands for payment, or acceptances of usance drafts when presented for honor thereunder in accordance with the terms thereof and when accompanied by the documents described therein and (ii) have an expiry date not later than twelve (12) months after such Letter of Credit's date of issuance and in no event later than the

last day of the Term, unless Agent, Issuer and Borrowing Agent agree for such Letter of Credit to be cash collateralized immediately upon the expiration of the Term, pursuant to Section 3.2(b) hereof. Each standby Letter of Credit shall be subject either to the Uniform Customs and Practice for Documentary Credits as most recently published by the International Chamber of Commerce at the time a Letter of Credit is issued (the "UCP") or the International Standby Practices (International Chamber of Commerce Publication Number 590), or any subsequent revision thereof at the time a standby Letter of Credit is issued, as determined by the applicable Issuer, and each trade Letter of Credit shall be subject to the UCP. In addition, no trade Letter of Credit may permit the presentation of an ocean bill of lading that includes a condition that the original bill of lading is not required to claim the goods shipped thereunder.

(c)    Agent shall use its reasonable efforts to notify Lenders of the request by Borrowing Agent for a Letter of Credit hereunder.

2.13.    <u>Requirements For Issuance of Letters of Credit</u>.

(a)    Borrowing Agent shall authorize and direct the applicable Issuer to name the applicable Borrower as the "Applicant" or "Account Party" of each Letter of Credit. If Agent is not the Issuer of any Letter of Credit, Borrowing Agent shall authorize and direct the applicable Issuer to deliver to Agent all agreements, documents or instruments and property received by such Issuer pursuant to such Letter of Credit and to accept and rely upon Agent's instructions and agreements with respect to all matters arising in connection with such Letter of Credit, and the application therefor.

(b)    In connection with all trade Letters of Credit issued or caused to be issued by any Issuer under this Agreement, each Borrower hereby appoints each Issuer, or its designee, as its attorney, with full power and authority if an Event of Default shall have occurred and be continuing: (i) to sign and/or endorse such Borrower's name upon any warehouse or other receipts, and acceptances; (ii) to sign such Borrower's name on bills of lading; (iii) to clear Inventory through the United States Customs Department or Canada Border Services Agency (collectively, "<u>Customs</u>") in the name of such Borrower or such Issuer or such Issuer's designee, and to sign and deliver to Customs officials powers of attorney in the name of such Borrower for such purpose; and (iv) to complete in such Borrower's name or in the name of such Issuer or its designee, any order, sale or transaction, obtain the necessary documents in connection therewith, and collect the proceeds thereof. Neither Agent, nor any Issuer nor their attorneys will be liable for any acts or omissions nor for any error of judgment or mistakes of fact or law, except for Agent's, any Issuer's or their respective attorneys' willful misconduct. This power, being coupled with an interest, is irrevocable as long as any Letters of Credit remain outstanding.

2.14.    <u>Disbursements, Reimbursement</u>.

(a)    Immediately upon the issuance of each Letter of Credit, each Revolving Lender shall be deemed to, and hereby irrevocably and unconditionally agrees to, purchase from the applicable Issuer a participation in each Letter of Credit and each drawing thereunder in an amount equal to such Lender's Revolving Commitment Percentage of the Maximum Undrawn

Amount of such Letter of Credit (as in effect from time to time) and the amount of such drawing, respectively.

(b)        In the event of any request for a drawing under a Letter of Credit by the beneficiary or transferee thereof, the applicable Issuer will promptly notify Agent and Borrowing Agent.  Regardless of whether Borrowing Agent shall have received such notice, Borrowers shall reimburse such Issuer in an amount equal to the amount so paid by such Issuer (such obligation to reimburse such Issuer shall sometimes be referred to as a "Reimbursement Obligation") prior to 12:00 p.m. (New York time) on each date that an amount is paid by such Issuer under such Letter of Credit (each such date, a "Drawing Date").  In the event Borrowers fail to reimburse such Issuer for the full amount of any drawing under any Letter of Credit by 12:00 p.m. (New York time) on the Drawing Date, such Issuer will promptly notify Agent and each Revolving Lender thereof, and Borrowers shall be automatically deemed to have requested that a Revolving Advance maintained as a Domestic Rate Loan be made by Lenders to be disbursed on the Drawing Date under such Letter of Credit, and Revolving Lenders shall be unconditionally obligated to fund such Revolving Advance (all whether or not the conditions specified in Section 8.2 hereof are then satisfied or the Revolving Commitments have been terminated for any reason) as provided for in Section 2.14(c) below.  Any notice given by any Issuer pursuant to this Section 2.14(b) may be oral if promptly confirmed in writing; provided that the lack of such a confirmation shall not affect the conclusiveness or binding effect of such notice.

(c)        Each Revolving Lender shall upon any notice pursuant to Section 2.14(b) above make available to the applicable Issuer through Agent at the Payment Office an amount in immediately available funds equal to its Revolving Commitment Percentage (subject to any contrary provisions of Section 2.22 hereof) of the amount of the drawing, whereupon the participating Lenders shall (subject to Section 2.14(d) hereof) each be deemed to have made a Revolving Advance maintained as a Domestic Rate Loan to Borrowers in that amount.  If any Revolving Lender so notified fails to make available to Agent, for the benefit of the applicable Issuer, the amount of such Lender's Revolving Commitment Percentage of such amount by 2:00 p.m. (New York time) on the Drawing Date, then interest shall accrue on such Lender's obligation to make such payment, from the Drawing Date to the date on which such Lender makes such payment (i) at a rate per annum equal to the Effective Federal Funds Rate during the first three (3) days following the Drawing Date and (ii) at a rate per annum equal to the rate applicable to Revolving Advances maintained as a Domestic Rate Loan on and after the fourth day following the Drawing Date.  Agent and the applicable Issuer will promptly give notice of the occurrence of the Drawing Date, but failure of Agent or such Issuer to give any such notice on the Drawing Date or in sufficient time to enable any Revolving Lender to effect such payment on such date shall not relieve such Lender from its obligations under this Section 2.14(c), provided that such Lender shall not be obligated to pay interest as provided in this Section 2.14(c) until and commencing from the date of receipt of notice from Agent or such Issuer of a drawing.

(d)        With respect to any unreimbursed drawing that is not converted into a Revolving Advance maintained as a Domestic Rate Loan to Borrowers in whole or in part as contemplated by Section 2.14(b) hereof, because of Borrowers' failure to satisfy the conditions set forth in Section 8.2 hereof (other than any notice requirements) or for any other reason,

Borrowers shall be deemed to have incurred from Agent a borrowing (each a "Letter of Credit Borrowing") in the amount of such drawing.  Such Letter of Credit Borrowing shall be due and payable on demand (together with interest) and shall bear interest at the rate per annum applicable to a Revolving Advance maintained as a Domestic Rate Loan.  Each applicable Lender's payment to Agent pursuant to Section 2.14(c) hereof shall be deemed to be a payment in respect of its participation in such Letter of Credit Borrowing and shall constitute a "Participation Advance" from such Lender in satisfaction of its Participation Commitment in respect of the applicable Letter of Credit under this Section 2.14.

(e)     Each Lender's Participation Commitment in respect of the Letters of Credit shall continue until the last to occur of any of the following events: (x) Issuers cease to be obligated to issue or cause to be issued Letters of Credit hereunder; (y) no Letter of Credit issued or created hereunder remains outstanding and uncanceled; and (z) all Persons (other than Borrowers) have been fully reimbursed for all payments made under or relating to Letters of Credit.

2.15.   Repayment of Participation Advances.

(a)     Upon (and only upon) receipt by Agent for the account of Issuer of immediately available funds from Borrowers (i) in reimbursement of any payment made by Issuer or Agent under the Letter of Credit with respect to which any Lender has made a Participation Advance to Agent, or (ii) in payment of interest on such a payment made by Issuer or Agent under such a Letter of Credit, Agent will pay to each Revolving Lender, in the same funds as those received by Agent, the amount of such Revolving Lender's Revolving Commitment Percentage of such funds, except Agent shall retain the amount of the Revolving Commitment Percentage of such funds of any Revolving Lender that did not make a Participation Advance in respect of such payment by Agent (and, to the extent that any of the other Revolving Lenders have funded any portion such Defaulting Lender's Participation Advance in accordance with the provisions of Section 2.22 hereof, Agent will pay over to such Non-Defaulting Lenders a pro rata portion of the funds so withheld from such Defaulting Lender).

(b)     If Issuer or Agent is required at any time to return to any Borrower, or to a trustee, receiver, monitor, liquidator, custodian, or any official in any insolvency proceeding under any Insolvency Law, any portion of the payments made by Borrowers to Issuer or Agent pursuant to Section 2.15(a) hereof in reimbursement of a payment made under the Letter of Credit or interest or fee thereon, each applicable Lender shall, on demand of Agent, forthwith return to Issuer or Agent the amount of its Revolving Commitment Percentage of any amounts so returned by Issuer or Agent plus interest at the Effective Federal Funds Rate.

2.16.   Documentation.  Each Borrower agrees to be bound by the terms of the Letter of Credit Application and by Issuer's interpretations of any Letter of Credit issued on behalf of such Borrower and by Issuer's written regulations and customary practices relating to letters of credit, though Issuer's interpretations may be different from such Borrower's own.  In the event of a conflict between the Letter of Credit Application and this Agreement, this Agreement shall govern.  It is understood and agreed that, except in the case of gross negligence or willful misconduct (as determined by a court of competent jurisdiction in a final and non-appealable

judgment or order), Issuer shall not be liable for any error, negligence and/or mistakes, whether of omission or commission, in following Borrowing Agent's or any Borrower's instructions or those contained in the Letters of Credit or any modifications, amendments or supplements thereto.

2.17.   <u>Determination to Honor Drawing Request</u>.  In determining whether to honor any request for drawing under any Letter of Credit by the beneficiary thereof, Issuer shall be responsible only to determine that the documents and certificates required to be delivered under such Letter of Credit have been delivered and that they comply on their face with the requirements of such Letter of Credit and that any other drawing condition appearing on the face of such Letter of Credit has been satisfied in the manner so set forth.

2.18.   <u>Nature of Participation and Reimbursement Obligations</u>.  The obligation of each Revolving Lender in accordance with this Agreement to make the Revolving Advances or Participation Advances as a result of a drawing under a Letter of Credit, and the obligations of Borrowers to reimburse Issuer upon a draw under a Letter of Credit, shall be absolute, unconditional and irrevocable, and shall be performed strictly in accordance with the terms of this Section 2.18 under all circumstances, including the following circumstances:

(i)   any set-off, counterclaim, recoupment, defense or other right which such Lender or any Borrower, as the case may be, may have against Issuer, Agent, any Borrower or such Lender, as the case may be, or any other Person for any reason whatsoever;

(ii)   the failure of any Borrower or any other Person to comply, in connection with a Letter of Credit Borrowing, with the conditions set forth in this Agreement for the making of a Revolving Advance, it being acknowledged that such conditions are not required for the making of a Letter of Credit Borrowing and the obligation of Lenders to make Participation Advances under Section 2.14 hereof;

(iii)   any lack of validity or enforceability of any Letter of Credit;

(iv)   any claim of breach of warranty that might be made by any Borrower, Agent, Issuer or any Lender against the beneficiary of a Letter of Credit, or the existence of any claim, set-off, recoupment, counterclaim, cross-claim, defense or other right which any Borrower, Agent, Issuer or any Lender may have at any time against a beneficiary, any successor beneficiary or any transferee of any Letter of Credit or assignee of the proceeds thereof (or any Persons for whom any such transferee or assignee may be acting), Issuer, Agent or any Lender or any other Person, whether in connection with this Agreement, the transactions contemplated herein or any unrelated transaction (including any underlying transaction between any Borrower or any Subsidiaries of such Borrower and the beneficiary for which any Letter of Credit was procured);

(v)   the lack of power or authority of any signer of (or any defect in or forgery of any signature or endorsement on) or the form of or lack of validity, sufficiency, accuracy, enforceability or genuineness of any draft, demand, instrument, certificate or other document presented under or in connection with any Letter of Credit, or any fraud or alleged fraud in connection with any Letter of Credit, or the transport of any property or provision of

71

services relating to a Letter of Credit, in each case even if Issuer or any of Issuer's Affiliates has been notified thereof;

(vi)    payment by Issuer under any Letter of Credit against presentation of a demand, draft or certificate or other document which is forged or does not fully comply with the terms of such Letter of Credit (provided that the foregoing shall not excuse Issuer from any obligation under the terms of any applicable Letter of Credit to require the presentation of documents that on their face appear to satisfy any applicable requirements for drawing under such Letter of Credit prior to honoring or paying any such draw);

(vii)    the solvency of, or any acts or omissions by, any beneficiary of any Letter of Credit, or any other Person having a role in any transaction or obligation relating to a Letter of Credit, or the existence, nature, quality, quantity, condition, value or other characteristic of any property or services relating to a Letter of Credit;

(viii)    any failure by Issuer or any of Issuer's Affiliates to issue any Letter of Credit in the form requested by Borrowing Agent, unless Agent and Issuer have each received written notice from Borrowing Agent of such failure within three (3) Business Days after Issuer shall have provided Agent and Borrowing Agent a copy of such Letter of Credit and such error is material and no drawing has been made thereon prior to receipt of such notice;

(ix)    the occurrence of any Material Adverse Effect;

(x)    any breach of this Agreement or any Other Document by any party thereto;

(xi)    the occurrence or continuance of an insolvency proceeding under any Insolvency Law with respect to any Loan Party;

(xii)    the fact that a Default or an Event of Default shall have occurred and be continuing;

(xiii)    the fact that the Term shall have expired or this Agreement or the Revolving Commitments have been terminated; and

(xiv)    any other circumstance or happening whatsoever, whether or not similar to any of the foregoing.

2.19.   <u>Liability for Acts and Omissions</u>.

(a)    As between Borrowers, on the one hand, and Issuer, Swing Loan Lender, Agent and Lenders, on the other hand, each Borrower assumes all risks of the acts and omissions of, or misuse of the Letters of Credit by, the respective beneficiaries of such Letters of Credit. In furtherance and not in limitation of the foregoing, Issuer shall not be responsible for: (i) the form, validity, sufficiency, accuracy, genuineness or legal effect of any document submitted by any party in connection with the application for an issuance of any such Letter of Credit, even if it should in fact prove to be in any or all respects invalid, insufficient, inaccurate, fraudulent or forged (even if Issuer or any of its Affiliates shall have been notified thereof); (ii) the validity or

sufficiency of any instrument transferring or assigning or purporting to transfer or assign any such Letter of Credit or the rights or benefits thereunder or proceeds thereof, in whole or in part, which may prove to be invalid or ineffective for any reason; (iii) the failure of the beneficiary of any such Letter of Credit, or any other party to which such Letter of Credit may be transferred, to comply fully with any conditions required in order to draw upon such Letter of Credit or any other claim of any Borrower against any beneficiary of such Letter of Credit, or any such transferee, or any dispute between or among any Borrower and any beneficiary of any Letter of Credit or any such transferee; (iv) errors, omissions, interruptions or delays in transmission or delivery of any messages, by mail, facsimile or otherwise, whether or not they be in cipher; (v) errors in interpretation of technical terms; (vi) any loss or delay in the transmission or otherwise of any document required in order to make a drawing under any such Letter of Credit or of the proceeds thereof; (vii) the misapplication by the beneficiary of any such Letter of Credit of the proceeds of any drawing under such Letter of Credit; or (viii) any consequences arising from causes beyond the control of Issuer, including any act or omission, whether rightful or wrongful, of any present or future de jure or de facto Governmental Body, and none of the above shall affect or impair, or prevent the vesting of, any of Issuer's rights or powers hereunder. Nothing in the preceding sentence shall relieve Issuer from liability for Issuer's gross negligence or willful misconduct (as determined by a court of competent jurisdiction in a final and non-appealable judgment or order) in connection with actions or omissions described in such clauses (i) through (viii) of such sentence.  In no event shall Issuer or its Affiliates be liable to any Loan Party for any indirect, consequential, incidental, punitive, exemplary or special damages or expenses (including without limitation attorneys' fees), or for any damages resulting from any change in the value of any property relating to a Letter of Credit.

(b)    Without limiting the generality of the foregoing, Issuer and each of its Affiliates:  (i) may rely on any oral or other communication believed in good faith by Issuer or such Affiliate to have been authorized or given by or on behalf of the applicant for a Letter of Credit; (ii) may honor any presentation if the documents presented appear on their face substantially to comply with the terms and conditions of a Letter of Credit; (iii) may honor a previously dishonored presentation under a Letter of Credit, whether such dishonor was pursuant to a court order, to settle or compromise any claim of wrongful dishonor, or otherwise, and shall be entitled to reimbursement to the same extent as if such presentation had initially been honored, together with any interest paid by Issuer or its Affiliates; (iv) may honor any drawing that is payable upon presentation of a statement advising negotiation or payment, upon receipt of such statement (even if such statement indicates that a draft or other document is being delivered separately), and shall not be liable for any failure of any such draft or other document to arrive, or to conform in any way with the relevant Letter of Credit; (v) may pay any paying or negotiating bank claiming that it rightfully honored under the laws or practices of the place where such bank is located; and (vi) may settle or adjust any claim or demand made on Issuer or its Affiliates in any way related to any order issued at the applicant's request to an air carrier, a letter of guarantee or of indemnity issued to a steamship agent or carrier or any document or instrument of like import (each an "Order") and honor any drawing in connection with any Letter of Credit that is the subject of such Order, notwithstanding that any drafts or other documents presented in connection with such Letter of Credit fail to conform in any way with such Letter of Credit.

(c)    In furtherance and extension and not in limitation of the specific provisions set forth above, any action taken or omitted by Issuer under or in connection with the Letters of Credit issued by it or any documents and certificates delivered thereunder, if taken or omitted in good faith and without gross negligence (as determined by a court of competent jurisdiction in a final and non-appealable judgment or order), shall not put Issuer under any resulting liability to any Borrower, Agent or any Lender.

2.20.    <u>Mandatory Prepayments</u>. Subject in each case to the Intercreditor Agreement and the Interim Order, or, after the entry of the Final Order, the Final Order:

(a)    Subject to Section 7.1 hereof, upon the receipt by any Loan Party of the proceeds of any sale or other disposition of any Collateral (other than Inventory in the Ordinary Course of Business), Borrowers shall prepay the Advances in an amount equal to the Net Cash Proceeds of such sale or other disposition, such prepayments to be made promptly but in no event more than five (5) Business Days following receipt of such Net Cash Proceeds, and until the date of payment, such proceeds shall be held in trust for Agent; provided, that such Net Cash Proceeds shall not be required to be applied as a mandatory prepayment on such date to the extent that (x) no Default or Event of Default has occurred and is continuing or would result therefrom and (y) Loan Parties have delivered an officers' certificate to the Agent on or prior to such date stating that such Net Cash Proceeds are expected to be reinvested in fixed or capital assets within six (6) months following the date of such disposition (which officers' certificate shall set forth the estimates of the proceeds to be so expended); provided further, that if all or any portion of such Net Cash Proceeds is not so reinvested within such six (6)-month period, such unused portion shall be applied on the last day of such period as a mandatory prepayment as provided in this Section 2.20(a); provided, further, that if the property subject to such disposition constituted Collateral, then all property purchased with the Net Cash Proceeds thereof pursuant to this Section 2.20(a) shall be made subject to the Lien created pursuant to this Agreement in favor of the Agent for the benefit of the Lenders in accordance with Section 6.11<u>6.19</u>.  The foregoing shall not be deemed to be implied consent to any such sale or other disposition otherwise prohibited by the terms and conditions hereof.  Such prepayments shall be applied to either the Obligations or the Prepetition Obligations in the sole discretion of the Agent in accordance with the Interim Order and the Final Order, subject to the Borrowers' ability to reborrow Revolving Advances in accordance with the terms hereof.

(b)    Subject to the terms of the Intercreditor Agreement, in the event of any issuance or other incurrence of Indebtedness (other than Permitted Indebtedness) by the Loan Parties or the issuance of any Equity Interests by any Loan Party, the Borrowers shall, no later than one (1) Business Day after the receipt by such Loan Party of (i) the Net Cash Proceeds from any such issuance or incurrence of Indebtedness or (ii) the Net Cash Proceeds of any issuance of Equity Interests, as applicable, prepay the Advances in an amount equal to (x) one hundred percent (100%) of such Net Cash Proceeds in the case of such incurrence or issuance of Indebtedness and (y) one hundred percent (100%) of such Net Cash Proceeds in the case of an issuance of Equity Interests.    Such prepayments shall be applied to the Advances.    Such prepayments shall be applied to either the Obligations or the Prepetition Obligations in the sole discretion of the Agent in accordance with the Interim Order and the Final Order, subject to the Borrowers' ability to reborrow Revolving Advances in accordance with the terms hereof.

74

(c)     Subject to the last sentence of this Section 2.19(c) and the terms of the Intercreditor Agreement, all Net Cash Proceeds received by Borrowers or Agent (i) under any insurance policy on account of damage or destruction of any assets or property of any Borrowers, (ii) as a result of any taking or condemnation of any assets or property, or (iii) under any business interruption insurance, in each case, shall be applied in accordance with Section 6.66.7 hereof; provided, that, with respect to any Net Cash Proceeds received as a result of the occurrence of an event described in the immediately preceding clauses (i) and (ii) such Net Cash Proceeds shall not be required to be applied as a mandatory prepayment on such date to the extent that (x) no Default or Event of Default has occurred and is continuing or would result therefrom and (y) Loan Parties have delivered an officers' certificate to the Agent on or prior to such date stating that such Net Cash Proceeds are expected to be reinvested in fixed or capital assets within six (6) months following the date of such casualty event (which officers' certificate shall set forth the estimates of the Net Cash Proceeds to be so expended); provided further, that if all or any portion of such Net Cash Proceeds is not so reinvested within such six (6)-month period, such unused portion shall be applied on the last day of such period as a mandatory prepayment as provided in this Section 2.20(c); provided, further, that if the property subject to such casualty event constituted Collateral, then all property purchased with the Net Cash Proceeds thereof pursuant to this Section 2.20(c) shall be made subject to the Lien created pursuant to this Agreement in favor of the Agent for the benefit of the Lenders in accordance with Section 6.116.19. Such prepayments shall be applied to either the Obligations or the Prepetition Obligations in the sole discretion of the Agent in accordance with the Interim Order and the Final Order, subject to the Borrowers' ability to reborrow Revolving Advances in accordance with the terms hereof.

2.21.   Use of Proceeds.

(a)     Subject to the DIP Orders and as limited by the Approved Budget, Borrowers shall apply the proceeds of Advances (a) for general operating, corporate, and working capital purposes of the Loan Parties in the Ordinary Course of Business; (b) to pay reasonable and documented costs, fees, and other expenses of the Secured Parties; (c) to make Revolving Credit Adequate Protection Payments; (d) following entry of the Interim Order, applying Revolving Credit Cash Collateral collected during the Interim Period to the Prepetition Obligations ("Interim Roll-Up") and Obligations outstanding in accordance with the terms of this Agreement and the Other Documents and the Interim Order, in such order and manner determined by Agent in its sole and absolute discretion; and (e) upon entry of the Final Order, exchanging and substituting in Agent's sole discretion the remaining amount of Advances (as defined in the Prepetition Revolving Credit Agreement; referred to herein as the "Prepetition Revolving Loans") and all other Prepetition Obligations on a cashless, dollar-for-dollar basis into Revolving Advances outstanding under this Agreement (the "Final ABL Roll-Up"); provided, that, no proceeds of Advances or Revolving Loan Priority Collateral, including Revolving Credit Cash Collateral, shall be used to (x) make any payments on account of the DIP Term Loan Facility or the Prepetition Term Loan Obligations, including any adequate protection payable to the Prepetition Term Loan Lenders, (y) pay the fees, costs, and expenses of any party involved in these Chapter 11 Cases other than the fees, costs, and expenses of the Prepetition Secured Parties and the Secured Parties including, without limitation, Revolving Credit Adequate Protection Obligations, or (z) prepay any amounts owing under the DIP Term Loan

Facility or the Wynnefield Indebtedness or to pay or otherwise fund the Carve Out or any Term Loan Adequate Protection Claim.

(b)    Without limiting the generality of Section 2.21(a) above, neither the Loan Parties nor any other Person which may in the future become party to this Agreement or the Other Documents as a Loan Party, intends to use nor shall they use any portion of the proceeds of the Advances, directly or indirectly, for any purpose in violation of Applicable Law.

2.22.    Defaulting Lender.

(a)    Notwithstanding anything to the contrary set forth herein, in the event any Lender is a Defaulting Lender, all rights and obligations hereunder of such Defaulting Lender and of the other parties hereto shall be modified to the extent of the express provisions of this Section 2.22 so long as such Lender is a Defaulting Lender.

(b)    Except as otherwise expressly provided for in this Section 2.22, Revolving Advances shall be made pro rata from Revolving Lenders which are not Defaulting Lenders based on their respective Revolving Commitment Percentages, and no Revolving Commitment Percentage of any Lender or any pro rata share of any Revolving Advances required to be advanced by any Lender shall be increased as a result of any Lender being a Defaulting Lender. Amounts received in respect of principal of any type of Revolving Advances shall be applied to reduce such type of Revolving Advances of each Revolving Lender (other than any Defaulting Lender) in accordance with their Revolving Commitment Percentages; provided, that, Agent shall not be obligated to transfer to a Defaulting Lender any payments received by Agent for Defaulting Lender's benefit, nor shall a Defaulting Lender be entitled to the sharing of any payments hereunder (including any principal, interest or fees). Amounts payable to a Defaulting Lender shall instead be paid to or retained by Agent. Agent may hold and, in its discretion, re-lend to a Borrower the amount of such payments received or retained by it for the account of such Defaulting Lender.

(i)    Fees pursuant to Section 3.3 hereof shall cease to accrue in favor of such Defaulting Lender.

(ii)    If any Swing Loans are outstanding or any Letters of Credit (or drawings under any Letter of Credit for which Issuer has not been reimbursed) are outstanding or exist at the time any such Revolving Lender becomes a Defaulting Lender, then:

(i)    Defaulting Lender's Participation Commitment in the outstanding Swing Loans and of the Maximum Undrawn Amount of all outstanding Letters of Credit shall be reallocated among Revolving Lenders which are Non-Defaulting Lenders in proportion to the respective Revolving Commitment Percentages of such Non-Defaulting Lenders to the extent (but only to the extent) that (x) such reallocation does not cause the aggregate sum of outstanding Revolving Advances made by any such Revolving Lender that is a Non-Defaulting Lender plus such Revolving Lender's reallocated Participation Commitment in the outstanding Swing Loans plus such Lender's reallocated Participation Commitment in the aggregate Maximum Undrawn Amount of all outstanding Letters of Credit to exceed the

Revolving Commitment Amount of any such Non-Defaulting Lender, and (y) no Default or Event of Default has occurred and is continuing at such time;

(ii)     if the reallocation described in clause (A) above cannot, or can only partially, be effected, Borrowers shall within one Business Day following notice by Agent (x) first, prepay any outstanding Swing Loans that cannot be reallocated, and (y) second, cash collateralize for the benefit of Issuer, Borrowers' obligations corresponding to such Defaulting Lender's Participation Commitment in the Maximum Undrawn Amount of all Letters of Credit (after giving effect to any partial reallocation pursuant to clause (A) above) in accordance with Section 3.2(b) hereof for so long as such Obligations are outstanding;

(iii)     if Borrowers cash collateralize any portion of such Defaulting Lender's Participation Commitment in the Maximum Undrawn Amount of all Letters of Credit pursuant to clause (B) above, Borrowers shall not be required to pay any fees to such Defaulting Lender pursuant to Section 3.2(a) hereof with respect to such Defaulting Lender's Revolving Commitment Percentage of Maximum Undrawn Amount of all Letters of Credit during the period such Defaulting Lender's Participation Commitment in the Maximum Undrawn Amount of all Letters of Credit are cash collateralized;

(iv)     if Defaulting Lender's Participation Commitment in the Maximum Undrawn Amount of all Letters of Credit is reallocated pursuant to clause (A) above, then the fees payable to Revolving Lenders pursuant to Section 3.2(a) hereof shall be adjusted and reallocated to Revolving Lenders which are Non-Defaulting Lenders in accordance with such reallocation; and

(v)     if all or any portion of such Defaulting Lender's Participation Commitment in the Maximum Undrawn Amount of all Letters of Credit is neither reallocated nor cash collateralized pursuant to clauses (A) or (B) above, then, without prejudice to any rights or remedies of Issuer or any other Lender hereunder, all Letter of Credit Fees payable under Section 3.2(a) hereof with respect to such Defaulting Lender's Revolving Commitment Percentage of the Maximum Undrawn Amount of all Letters of Credit shall be payable to the Issuer (and not to such Defaulting Lender) until (and then only to the extent that) such Participation Commitment in the Maximum Undrawn Amount of all Letters of Credit is reallocated and/or cash collateralized; and

(vi)     so long as any Revolving Lender is a Defaulting Lender, Swing Loan Lender shall not be required to fund any Swing Loans and Issuer shall not be required to issue, amend or increase any Letter of Credit, unless such Issuer is satisfied that the related exposure and Defaulting Lender's Participation Commitment in the Maximum Undrawn Amount of all Letters of Credit and all Swing Loans (after giving effect to any such issuance, amendment, increase or funding) will be fully allocated to Revolving Lenders which are Non-Defaulting Lenders and/or cash collateral for such Letters of Credit will be provided by Borrowers in accordance with clause (A) and (B) above, and participating interests in any newly made Swing Loan or any newly issued or increased Letter of Credit shall be allocated among Non-Defaulting Lenders in a manner consistent with Section 2.22(b)(iii)(A) above (and such Defaulting Lender shall not participate therein).

(c)     A Defaulting Lender shall not be entitled to give instructions to Agent or to approve, disapprove, consent to or vote on any matters relating to this Agreement and the Other Documents, and all amendments, waivers and other modifications of this Agreement and the Other Documents may be made without regard to a Defaulting Lender and, for purposes of the definition of "Required Lenders", a Defaulting Lender shall not be deemed to be a Lender, to have any outstanding Advances or a Revolving Commitment Percentage.

(d)     Other than as expressly set forth in this Section 2.22, the rights and obligations of a Defaulting Lender (including the obligation to indemnify Agent) and the other parties hereto shall remain unchanged.  Nothing in this Section 2.22 shall be deemed to release any Defaulting Lender from its obligations under this Agreement and the Other Documents, shall alter such obligations, shall operate as a waiver of any default by such Defaulting Lender hereunder, or shall prejudice any rights which any Borrower, Agent or any Lender may have against any Defaulting Lender as a result of any default by such Defaulting Lender hereunder.

(e)     In the event that Agent, Borrowers, Swing Loan Lender and Issuer agree in writing that a Defaulting Lender has adequately remedied all matters that caused such Lender to be a Defaulting Lender, then Agent will so notify the parties hereto, and, if such cured Defaulting Lender is a Revolving Lender, then Participation Commitments of Revolving Lenders (including such cured Defaulting Lender) of the Swing Loans and Maximum Undrawn Amount of all outstanding Letters of Credit shall be reallocated to reflect the inclusion of such Lender's Revolving Commitment, and on such date such Lender shall purchase at par such of the Revolving Advances of the other Lenders as Agent shall determine may be necessary in order for such Lender to hold such Revolving Advances in accordance with its Revolving Commitment Percentage.

(f)     If Swing Loan Lender or Issuer has a good faith belief that any Revolving Lender has defaulted in fulfilling its obligations under one or more other agreements in which such Lender commits to extend credit, Swing Loan Lender shall not be required to fund any Swing Loans and Issuer shall not be required to issue, amend or increase any Letter of Credit, unless Swing Loan Lender or Issuer, as the case may be, shall have entered into arrangements with Borrowers or such Lender, satisfactory to Swing Loan Lender or Issuer, as the case may be, to defease any risk to it in respect of such Lender hereunder.

2.23.   <u>Payment of Obligations</u>.   Agent may charge to Borrowers' Account as a Revolving Advance or, at the discretion of Swing Loan Lender, as a Swing Loan (i) all payments with respect to any of the Obligations required hereunder (including without limitation principal payments, payments of interest, payments of Letter of Credit Fees and all other fees provided for hereunder and payments under Sections 16.5 and 16.9 hereof) as and when each such payment shall become due and payable (whether as regularly scheduled, upon or after acceleration, upon maturity or otherwise), (ii) without limiting the generality of the foregoing clause (i), (a) all amounts expended by Agent or any Lender pursuant to Sections 4.2 or 4.3 hereof and (b) all expenses which Agent incurs in connection with the forwarding of Advance proceeds and the establishment and maintenance of any Blocked Accounts or Depository Accounts as provided for in Section 4.8(h) hereof, and (iii) any sums expended by Agent or any Lender due to any Loan Party's failure to perform or comply with its obligations under this Agreement or any Other Document including any Loan Party's obligations under Sections 3.3, 3.4, 4.4, 4.7, 6.4,

6.6, 6.7 and 6.8 hereof, and all amounts so charged shall be added to the Obligations and shall be secured by the Collateral.  To the extent Revolving Advances are not actually funded by the other Lenders in respect of any such amounts so charged, all such amounts so charged shall be deemed to be Revolving Advances made by and owing to Agent and Agent shall be entitled to all rights (including accrual of interest) and remedies of a Lender under this Agreement and the Other Documents with respect to such Revolving Advances.

III.    INTEREST AND FEES.

3.1.    <u>Interest</u>.  Interest on Advances shall be payable in arrears (a) on the first Business Day of each month with respect to Domestic Rate Loans, (b) with respect to Term SOFR Rate Loans having an Interest Period of one or three at the end of the applicable Interest Period and (c) with respect to Term SOFR Rate Loans having an Interest Period in excess of three months, at the end of each three month period during such Interest Period.  Interest charges shall be computed on the actual principal amount of Advances outstanding during the applicable month at a rate per annum equal to (i) with respect to Revolving Advances, the applicable Revolving Interest Rate plus the SOFR Adjustment for the applicable Interest Period, and (ii) with respect to Swing Loans, the Revolving Interest Rate for Domestic Rate Loans, provided, that notwithstanding anything in this Agreement to the contrary, all Advances under this Agreement shall be maintained as Domestic Rate Loans and Term SOFR Rate Loans shall not be available at any time unless and until Agent notifies Borrowing Agent in writing that Term SOFR Rate Loans are again available pursuant to the terms of this Agreement, which determination shall be made by Agent in its sole and absolute discretion (as applicable, the "<u>Contract Rate</u>").  Except as expressly provided otherwise in this Agreement, any Obligations other than the Advances that are not paid when due shall accrue interest at the Revolving Interest Rate for Domestic Rate Loans, subject to the provision of the final sentence of this Section 3.1 regarding the Default Rate.  Whenever, subsequent to the Closing Date, the Alternate Base Rate is increased or decreased, the applicable Contract Rate shall be similarly changed without notice or demand of any kind by an amount equal to the amount of such change in the Alternate Base Rate during the time such change or changes remain in effect.  The Term SOFR Rate shall be adjusted with respect to Term SOFR Rate Loans without notice or demand of any kind on the effective date of any change in the SOFR Reserve Percentage as of such effective date.  Upon and after the occurrence of an Event of Default, and during the continuation thereof, at the option of Agent or at the direction of Required Lenders (or, in the case of any Event of Default under Section 10.7 hereof, immediately and automatically upon the occurrence of any such Event of Default without the requirement of any affirmative action by any party), the Obligations shall bear interest at the applicable Contract Rate plus two percent (2%) per annum (as applicable, the "<u>Default Rate</u>").

3.2.    <u>Letter of Credit Fees; Cash Collateral</u>.

(a)    Borrowers shall pay (x) to Agent, for the ratable benefit of Revolving Lenders, fees for each outstanding Letter of Credit for the period from and excluding the date of issuance of such Letter of Credit to and including the date of expiration or termination, equal to the daily face amount of all outstanding Letters of Credit multiplied by the Applicable Margin for Revolving Advances consisting of Domestic Rate Loans, such fees to be calculated on the basis of a 360-day year for the actual number of days elapsed and to be payable quarterly in arrears on the first day of each calendar quarter and on the last day of the Term, and (y) to the

applicable Issuer, a fronting fee in the amount of one quarter of one percent (0.25%) per annum times the daily face amount of all outstanding Letters of Credit for the period from and excluding the date of issuance of same to and including the date of expiration or termination, to be payable quarterly in arrears on the first day of each calendar quarter and on the last day of the Term (all of the foregoing fees, the "Letter of Credit Fees").  In addition, Borrowers shall pay to Agent, for the benefit of Issuer, any and all administrative, issuance, amendment, payment and negotiation charges with respect to Letters of Credit and all fees and expenses as agreed upon by Issuer and Borrowing Agent in connection with any Letter of Credit, including in connection with the opening, amendment or renewal of any such Letter of Credit and any acceptances created thereunder, all such charges, fees and expenses, if any, to be payable on demand.  All such charges shall be deemed earned in full on the date when the same are due and payable hereunder and shall not be subject to rebate or pro-ration upon the termination of this Agreement for any reason.  Any such charge in effect at the time of a particular transaction shall be the charge for that transaction, notwithstanding any subsequent change in Issuer's prevailing charges for that type of transaction.  Upon and after the occurrence of an Event of Default, and during the continuation thereof, at the option of Agent or at the direction of the Required Lenders (or, in the case of any Event of Default under Section 10.7 hereof, immediately and automatically upon the occurrence of any such Event of Default without the requirement of any affirmative action by any party), the Letter of Credit Fees described in clause (x) of this Section 3.2(a) shall be increased by an additional two percent (2.0%) per annum.

(b)    At any time following the occurrence and during the continuance of an Event of Default, at the option of Agent or at the direction of the Required Lenders (or, in the case of any Event of Default under Section 10.7 hereof, immediately and automatically upon the occurrence of such Event of Default, without the requirement of any affirmative action by any party), or on the last day of the Term or any other termination of this Agreement (and also, if applicable, in connection with any mandatory prepayment under Section 2.20 hereof), Borrowers will cause cash to be deposited and maintained in an account with Agent, as cash collateral, in an amount equal to one hundred and five percent (105%) of the Maximum Undrawn Amount of all outstanding Letters of Credit (or, in the case of each Letter of Credit denominated in Canadian Dollars, one hundred and ten percent (110%) of the U.S. Dollar Equivalent of the Maximum Undrawn Amount of such Letter of Credit), and each Borrower hereby irrevocably authorizes Agent, in its discretion, on such Borrower's behalf and in such Borrower's name, to open such an account and to make and maintain deposits therein, or in an account opened by such Borrower, in the amounts required to be made by such Borrower, out of the proceeds of Receivables or other Collateral or out of any other funds of such Borrower coming into any Lender's possession at any time.  Agent may, in its discretion, invest such cash collateral (less applicable reserves) in such short-term money-market items as to which Agent and such Borrower mutually agree (or, in the absence of such agreement, as Agent may select) and the net return on such investments shall be credited to such account and constitute additional cash collateral, or Agent may (notwithstanding the foregoing) establish the account provided for under this Section 3.2(b) as a non-interest bearing account and in such case Agent shall have no obligation (and Borrowers hereby waive any claim) under Article 9 of the Uniform Commercial Code, the PPSA or under any other Applicable Law to pay interest on such cash collateral being held by Agent.  No Borrower may withdraw amounts credited to any such account except upon the occurrence of all of the following: (x) Payment in Full of all of the Obligations; (y) expiration of all Letters of Credit; and (z) termination of the Commitments and of this

Agreement.  Borrowers hereby assign, pledge and grant to Agent, for its benefit and the ratable benefit of Issuer, Lenders and each other Secured Party, a continuing security interest in and to and Lien on any such cash collateral and any right, title and interest of Borrowers in any deposit account, securities account or investment account into which such cash collateral may be deposited from time to time to secure the Obligations, specifically including all Obligations with respect to any Letters of Credit.   Borrowers agree that upon the coming due of any Reimbursement Obligations (or any other Obligations, including Obligations for Letter of Credit Fees) with respect to the Letters of Credit, Agent may use such cash collateral to pay and satisfy such Obligations.

3.3.    Fees.

(a)    Unused Line Fee.   If, for any day in each calendar quarter during the Term, the daily unpaid balance of the sum of the U.S. Dollar Equivalent of all Revolving Advances plus the U.S. Dollar Equivalent of all Swing Loans plus the Maximum Undrawn Amount of all outstanding Letters of Credit (the "Usage Amount") does not equal the Maximum Revolving Advance Amount, then Borrowers shall pay to Agent, for the ratable benefit of Revolving Lenders based on their Revolving Commitment Percentages, a fee at a rate equal to one quarter of one percent (0.25%) per annum for each such day on the amount by which the Maximum Revolving Advance Amount on such day exceeds such Usage Amount (the "Unused Line Fee").  The Unused Line Fee shall be payable to Agent in arrears on the first Business Day of each calendar quarter with respect to each day in the previous calendar quarter and on the last day of the Term with respect to the period ending on the last day of the Term.

(b)    Closing Fee.   Borrowers shall pay to the Lenders a closing fee, fully earned on the Closing Date, and due and payable (x) on the Closing Date in an aggregate amount equal to $60,000 ( "Closing Fee").  The Closing Fee shall be allocated pro rata between the Lenders based on their respective Revolving Commitment Percentages.

(c)    Collateral Evaluation Fee.   All of the fees and out-of-pocket costs and expenses of any appraisals conducted pursuant to Sections 4.7 and 6.17 hereof shall be paid for when due, in full and without deduction, off-set or counterclaim by Borrowers.

(d)    Collateral Monitoring Fee.   Agent, for its sole and separate account and not the account of any Lender, a collateral monitoring fee in the amount of $2,500 per month commencing on the first day of the month following the Closing Date and on the first day of each month thereafter during the Term.  The collateral monitoring fee shall be deemed earned in full on the date when same is due and payable hereunder and shall not be subject to rebate or proration upon termination of this Agreement for any reason.

(e)    Prepetition Revolving Credit Agreement Fees.  Borrowers agree to pay to the Administrative Agent, for the sole and separate account of Administrative Agent, on the Termination Date, all accrued and unpaid fees, costs and expenses, including, without limitation, $900,000 of fees that were due and payable upon the acceleration of the Prepetition Revolving Credit Facility.

3.4.    <u>Computation of Interest and Fees</u>.  Interest and fees hereunder shall be computed on the basis of a year of (a) with respect to Term SOFR Rate Loans and fees, three hundred sixty (360) days and for the actual number of days elapsed, and (b) with respect to Domestic Rate Loans, three hundred sixty five (365) days and for the actual number of days elapsed.  If any payment to be made hereunder becomes due and payable on a day other than a Business Day, the due date thereof shall be extended to the next succeeding Business Day and interest thereon shall be payable at the applicable Contract Rate during such extension.

3.5.    <u>Maximum Charges</u>.  In no event whatsoever shall interest and other charges charged hereunder exceed the highest rate permissible under Applicable Law.  In the event interest and other charges as computed hereunder would otherwise exceed the highest rate permitted under Applicable Law: (a) the interest rates hereunder will be reduced to the maximum rate permitted under Applicable Law; (b) such excess amount shall be first applied to any unpaid principal balance owed by Borrowers; and (c) if then remaining excess amount is greater than the previously unpaid principal balance, Lenders shall promptly refund such excess amount to Borrowers and the provisions hereof shall be deemed amended to provide for such permissible rate.

3.6.    <u>Increased Costs</u>.  In the event that any Applicable Law or any Change in Law or compliance by any Lender (for purposes of this Section 3.7, the term "Lender" shall include Agent, Swing Loan Lender, any Issuer or Lender and any corporation or bank controlling Agent, Swing Loan Lender, any Lender or Issuer and the office or branch where Agent, Swing Loan Lender, any Lender or Issuer (as so defined) makes or maintains any Term SOFR Rate Loans) with any request or directive (whether or not having the force of law) from any central bank or other financial, monetary or other authority, shall:

(a)    subject Agent, Swing Loan Lender, any Lender or Issuer to any tax of any kind whatsoever with respect to this Agreement, any Letter of Credit, any participation in a Letter of Credit, any Term SOFR Rate Loan, or change the basis of taxation of payments to Agent, Swing Loan Lender, such Lender or Issuer in respect thereof (except for Indemnified Taxes or Other Taxes covered by Section 3.10 and the imposition of, or any change in the rate of, any Excluded Tax payable by Agent, Swing Loan Lender, such Lender or the Issuer);

(b)    impose, modify or deem applicable any reserve, special deposit, assessment, special deposit, compulsory loan, insurance charge or similar requirement against assets held by, or deposits in or for the account of, advances or loans by, or other credit extended by, any office of Agent, Swing Loan Lender, Issuer or any Lender, including pursuant to Regulation D of the Board of Governors of the Federal Reserve System; or

(c)    impose on Agent, Swing Loan Lender, any Lender or Issuer any other condition, loss or expense (other than Taxes) affecting this Agreement or any Other Document or any Advance made by any Lender, or any Letter of Credit or participation therein;

and the result of any of the foregoing is to increase the cost to Agent, Swing Loan Lender, any Lender or Issuer of making, converting to, continuing, renewing or maintaining its Advances hereunder by an amount that Agent, Swing Loan Lender, such Lender or Issuer deems to be material or to reduce the amount of any payment (whether of principal, interest or otherwise) in

respect of any of the Advances by an amount that Agent, Swing Loan Lender or such Lender or Issuer deems to be material, then, in any case Borrowers shall promptly pay Agent, Swing Loan Lender, such Lender or Issuer, upon its demand, such additional amount as will compensate Agent, Swing Loan Lender or such Lender or Issuer for such additional cost or such reduction, as the case may be, provided that the foregoing shall not apply to increased costs which are reflected in the Term SOFR Rate.  Agent, Swing Loan Lender, such Lender or Issuer shall certify the amount of such additional cost or reduced amount to Borrowing Agent, and such certification shall be conclusive absent manifest error.

3.7.    [Reserved].

3.8.    Alternate Rate of Interest; Interest Rate Inadequate or Unfair.  In the event that Agent or any Lender shall have determined that:

(a)    reasonable means do not exist for ascertaining, the Term SOFR Rate applicable pursuant to Section 2.2 hereof for any Interest Period;

(b)    U.S. Dollar deposits (or bankers acceptances) in the relevant amount and for the relevant maturity are not available, with respect to an outstanding Term SOFR Rate Loan, a proposed Term SOFR Rate Loan, or a proposed conversion of a Domestic Rate Loan into a Term SOFR Rate Loan;

(c)    the making, maintenance or funding of any Term SOFR Rate Loan has been made impracticable or unlawful by compliance by Agent or such Lender in good faith with any Applicable Law or any interpretation or application thereof by any Governmental Body or with any request or directive of any such Governmental Body (whether or not having the force of law); or

(d)    the Term SOFR Rate will not adequately and fairly reflect the cost to any Lender of the establishment or maintenance of any Term SOFR Rate Loan and Lenders have provided notice of such determination to Agent, then Agent shall give Borrowing Agent prompt written or telephonic notice of such determination.

If, with respect to any Term SOFR Rate Loan, such notice is given prior to a Benchmark Replacement Date (as defined below), (i) any such requested Term SOFR Rate Loan shall be made as a Domestic Rate Loan, unless Borrowing Agent shall notify Agent no later than 1:00 p.m. (New York time) two (2) Business Days prior to the date of such proposed borrowing, that its request for such borrowing shall be cancelled or made as an unaffected type of Term SOFR Rate Loan, (ii) any Domestic Rate Loan or Term SOFR Rate Loan which was to have been converted to an affected type of Term SOFR Rate Loan shall be continued as or converted into a Domestic Rate Loan, or, if Borrowing Agent shall notify Agent, no later than 1:00 p.m. (New York time) two (2) Business Days prior to the proposed conversion, shall be maintained as an unaffected type of Term SOFR Rate Loan, and (iii) any outstanding affected Term SOFR Rate Loans shall be converted into a Domestic Rate Loan, or, if Borrowing Agent shall notify Agent, no later than 1:00 p.m. (New York time) two (2) Business Days prior to the last Business Day of the then current Interest Period applicable to such affected Term SOFR Rate Loan, shall be converted into an unaffected type of Term SOFR Rate Loan, on the last Business Day of the

83

then current Interest Period for such affected Term SOFR Rate Loans (or sooner, if any Lender cannot continue to lawfully maintain such affected Term SOFR Rate Loan), and until such notice has been withdrawn, Lenders shall have no obligation to make an affected type of Term SOFR Rate Loan or maintain outstanding affected Term SOFR Rate Loans and no Borrower shall have the right to convert a Domestic Rate Loan or an unaffected type of Term SOFR Rate Loan into an affected type of Term SOFR Rate Loan.

3.8.1    [Reserved].

3.8.2    Benchmark Replacement Setting.

(a)    Benchmark Replacement.   Notwithstanding anything to the contrary herein or in any Other Document (and any agreement executed in connection with an Interest Rate Hedge shall be deemed not to be an "Other Document" for purposes of this Section titled "Benchmark Replacement Setting"), if a Benchmark Transition Event and related Benchmark Replacement Date have  occurred prior to any setting of the then-current Benchmark, then (A) if a Benchmark Replacement is determined in accordance with clause (1) of the definition of "Benchmark Replacement" for such Benchmark Replacement Date, such Benchmark Replacement will replace such Benchmark for all purposes hereunder and under any Other Document in respect of such Benchmark setting and subsequent Benchmark settings without any amendment to, or further action or consent of any other party to, this Agreement or any Other Document and (B) if a Benchmark Replacement is determined in accordance with clause (2) of the definition of "Benchmark Replacement" for such Benchmark Replacement Date, such Benchmark Replacement will replace such Benchmark for all purposes hereunder and under any Other Document in respect of any Benchmark setting at or after 5:00 p.m. (New York City time) on the fifth (5th) Business Day after the date notice of such Benchmark Replacement is provided to the Lenders without any amendment to, or further action or consent of any other party to, this Agreement or any Other Document so long as the Agent has not received, by such time, written notice of objection to such Benchmark Replacement from Lenders comprising the Required Lenders.

(b)    Benchmark Replacement Conforming Changes.   In connection with the use, administration, adoption or implementation of a Benchmark Replacement, the Agent may make Conforming Changes from time to time and, notwithstanding anything to the contrary herein or in the Other Documents, any amendments implementing such Conforming Changes will become effective without any further action or consent of any other party to this Agreement or any Other Document.

(c)    Notices; Standards for Decisions and Determinations. Agent will promptly notify the Borrowing Agent and the Lenders of (i) the implementation of any Benchmark Replacement, and (ii) the effectiveness of any Conforming Changes in connection with the use, administration, adoption or implementation of a Benchmark Replacement.  The Agent will notify the Borrower of, (x) the removal or reinstatement of any tenor of a Benchmark pursuant to paragraph (d) below and (y) the commencement of any Benchmark Unavailability Period. Any determination, decision or election that may be made by the Agent or, if applicable, any Lender (or group of Lenders) pursuant to this Section 3.8.2, including any determination with respect to a tenor, rate or adjustment or of the occurrence or non-occurrence of an event, circumstance or

074658.23049/132216381v.5074658.23049/132216381v.9

date and any decision to take or refrain from taking any action or any selection, will be conclusive and binding absent manifest error and may be made in its or their sole discretion and without consent from any other party to this Agreement or any Other Document except, in each case, as expressly required pursuant to this Section 3.8.2.

(d)    Unavailability of Tenor of Benchmark.  Notwithstanding anything to the contrary herein or in any of the Other Documents, at any time (including in connection with the implementation of a Benchmark Replacement), (i) if the then-current Benchmark is a term rate and either (A) any tenor for such Benchmark is not displayed on a screen or other information service that publishes such rate from time to time as selected by the Agent in its reasonable discretion or (B) the regulatory supervisor for the administrator of such Benchmark has provided a public statement or publication of information announcing that any tenor of such Benchmark is not or will not be representative, then the Agent may modify the definition of "Interest Period" (or any similar or analogous definition) for any Benchmark settings at or after such time to remove such unavailable or non-representative tenor and (ii) if a tenor that was removed pursuant to clause (i) above either (A) is subsequently displayed on a screen or information service for a Benchmark (including a Benchmark Replacement) or (B) is not, or is no longer, subject to an announcement that it is not or will not be representative for a Benchmark (including a Benchmark Replacement), then the Agent may modify the definition of "Interest Period" (or any similar or analogous definition) for all Benchmark settings at or after such time to reinstate such previously removed tenor.

(e)    Benchmark Unavailability Period. Upon the Borrowers' receipt of notice of the commencement of a Benchmark Unavailability Period, the Borrowers may revoke any pending request for an Advance bearing interest based on the Term SOFR Rate, conversion to or continuation of Advances bearing interest based on the Term SOFR Rate to be made, converted or continued during any Benchmark Unavailability Period and, failing that, the Borrowers will be deemed to have converted any such request into a request for a Domestic Rate Loan.  During any Benchmark Unavailability Period or at any time that a tenor for the then-current Benchmark is not an Available Tenor, the component of the Alternate Base Rate based upon the then-current Benchmark or such tenor for such Benchmark, as applicable, will not be used in any determination of the Alternate Base Rate.

(f)    Certain Defined Terms. As used in this Section 3.8.2:

*"Available Tenor"* shall mean, as of any date of determination and with respect to the then-current Benchmark, as applicable (x) if such Benchmark is a term rate or is based on a term rate, any tenor for such Benchmark (or component thereof) that is or may be used for determining the length of an interest period pursuant to this Agreement or (y) otherwise, any payment period for interest calculated with reference to such Benchmark (or a component thereof) that is or may be used for determining any frequency of making payments of interest calculated with reference to such Benchmark pursuant to this Agreement, in each case, as of such date and not including, for the avoidance of doubt, any tenor of such Benchmark that is then-removed from the definition of "Interest Period" pursuant to paragraph (d) of this Section 3.8.2.

85

"*Benchmark*" shall mean, initially, the Term SOFR Rate; provided that if a Benchmark Transition Event has occurred with respect to the Term SOFR Rate or the then-current Benchmark, then "Benchmark" means the applicable Benchmark Replacement to the extent that such Benchmark Replacement has replaced such prior benchmark rate pursuant to this Section 3.8.2.

"*Benchmark Replacement*" shall mean, with respect to any Benchmark Transition Event, the first alternative set forth in the order below that can be determined by the Agent for the applicable Benchmark Replacement Date:

(1) the sum of (A) Daily Simple SOFR and (B) the SOFR Adjustment for a 1-month Interest Period;

(2) the sum of: (a) the alternate benchmark rate that has been selected by the Agent and the Borrowers, giving due consideration to (x) any selection or recommendation of a replacement benchmark rate or the mechanism for determining such a rate by the Relevant Governmental Body or (y) any evolving or then-prevailing market convention, for determining a benchmark rate as a replacement to the then-current benchmark for U.S. dollar-denominated syndicated credit facilities at such time and (B) the related Benchmark Replacement Adjustment;

provided that, if the Benchmark Replacement as determined pursuant to clause (2) above would be less than the Floor, the Benchmark Replacement will be deemed to be the Floor for the purposes of this Agreement and the Other Documents; provided further that any Benchmark Replacement shall be administratively feasible as determined by the Agent in its sole discretion.

"*Benchmark Replacement Adjustment*" shall mean, with respect to any replacement of the then-current Benchmark with an Unadjusted Benchmark Replacement, the spread adjustment, or method for calculating or determining such spread adjustments, (which may be a positive or negative value or zero) that has been selected by the Agent and the Borrowing Agent giving due consideration to (A) any selection or recommendation of a spread adjustment, or method for calculating or determining such spread adjustment, for the replacement of such Benchmark with the applicable Unadjusted Benchmark Replacement by the Relevant Governmental Body or (B) any evolving or then-prevailing market convention for determining a spread adjustment, or method for calculating or determining such spread adjustment, for the replacement of such Benchmark with the applicable Unadjusted Benchmark Replacement for U.S. dollar-denominated syndicated credit facilities at such time.

"*Benchmark Replacement Date*" shall mean a date and time determined by the Agent, which date shall be no later than the earliest to occur of the following events with respect to the then-current Benchmark:

(1) in the case of clause (1) or (2) of the definition of "Benchmark Transition Event," the later of (A) the date of the public statement or publication of information referenced

therein and (B) the date on which the administrator of such Benchmark (or the published component used in the calculation thereof) permanently or indefinitely ceases to provide all Available Tenors of such Benchmark (or such component thereof); or

(2)     in the case of clause (3) of the definition of "Benchmark Transition Event," the date determined by the Agent, which date shall promptly follow the date of the public statement or publication of information referenced therein.

For the avoidance of doubt, the "Benchmark Replacement Date" will be deemed to have occurred in the case of clause (1) or (2) with respect to any Benchmark upon the occurrence of the applicable event or events set forth therein with respect to all then-current Available Tenors of such Benchmark (or the published component used in the calculation thereof).

*"Benchmark Transition Event"* shall mean the occurrence of one or more of the following events with respect to the then-current Benchmark:

(1)     a public statement or publication of information by or on behalf of the administrator of such Benchmark (or the published component used in the calculation thereof) announcing that such administrator has ceased or will cease to provide all Available Tenors of such Benchmark (or such component thereof), permanently or indefinitely, provided that, at the time of such statement or publication, there is no successor administrator that will continue to provide any Available Tenor of such Benchmark (or such component thereof);

(2)     a public statement or publication of information by a Governmental Body having jurisdiction over the Agent, the regulatory supervisor for the administrator of such Benchmark (or the published component used in the calculation thereof), the Federal Reserve Board, the Federal Reserve Bank of New York, an insolvency official with jurisdiction over the administrator for such Benchmark (or such component), a resolution authority with jurisdiction over the administrator for such Benchmark (or such component) or a court or an entity with similar insolvency or resolution authority over the administrator for such Benchmark (or such component), which states that the administrator of such Benchmark (or such component) has ceased or will cease to provide all Available Tenors of such Benchmark (or such component thereof) permanently or indefinitely, provided that, at the time of such statement or publication, there is no successor administrator that will continue to provide any Available Tenor of such Benchmark (or such component thereof); or; or

(3)     a public statement or publication of information by the regulatory supervisor for the administrator of such Benchmark (or the published component used in the calculation thereof) or a Governmental Body having jurisdiction over the Agent announcing that all Available Tenors of such Benchmark (or such component thereof) are not, or as of a specified future date will not be, representative.

For avoidance of doubt, a "Benchmark Transition Event" will be deemed to have occurred with respect to any Benchmark if a public statement or publication of information set forth above has occurred with respect to each then-current Available Tenor of such Benchmark (or the published component used in the calculation thereof).

"***Benchmark Unavailability Period***" shall mean the period (if any) (x) beginning at the time that a Benchmark Replacement Date has occurred if, at such time, no Benchmark Replacement has replaced the then-current Benchmark for all purposes hereunder and under any Other Document in accordance with this Section 3.8.2 and (y) ending at the time that a Benchmark Replacement has replaced the then-current Benchmark for all purposes hereunder and under any Other Document in accordance with this Section 3.8.2.

"***Floor***" shall means the benchmark rate floor, if any, provided in this Agreement initially (as of the execution of this Agreement, the modification, amendment or renewal of this Agreement or otherwise) with respect to the Term SOFR Rate or, if no floor is specified, zero.

"***Relevant Governmental Body***" shall mean the Board of Governors of the Federal Reserve System or the Federal Reserve Bank of New York, or a committee officially endorsed or convened by the Board of Governors of the Federal Reserve System or the Federal Reserve Bank of New York, or any successor thereto.

"***Unadjusted Benchmark Replacement***" shall means the applicable Benchmark Replacement excluding the related Benchmark Replacement Adjustment.

3.8.3   [Reserved].

3.9.   Capital Adequacy.

(a)   In the event that Agent, Swing Loan Lender or any Lender shall have determined that any Applicable Law or guideline regarding capital adequacy, or any Change in Law or any change in the interpretation or administration thereof by any Governmental Body, central bank or comparable agency charged with the interpretation or administration thereof, or compliance by Agent, Swing Loan Lender, Issuer or any Lender (for purposes of this Section 3.9, the term "Lender" shall include Agent, Swing Loan Lender, Issuer or any Lender and any corporation or bank controlling Agent, Swing Loan Lender or any Lender and the office or branch where Agent, Swing Loan Lender or any Lender (as so defined) makes or maintains any Term SOFR Rate Loans) with any request or directive regarding capital adequacy (whether or not having the force of law) of any such authority, central bank or comparable agency, has or would have the effect of reducing the rate of return on Agent, Swing Loan Lender or any Lender's capital as a consequence of its obligations hereunder (including the making of any Swing Loans) to a level below that which Agent, Swing Loan Lender or such Lender could have achieved but for such adoption, change or compliance (taking into consideration Agent's, Swing Loan Lender's and each Lender's policies with respect to capital adequacy) by an amount deemed by Agent, Swing Loan Lender or any Lender to be material, then, from time to time, Borrowers shall pay upon demand to Agent, Swing Loan Lender or such Lender such additional amount or amounts as will compensate Agent, Swing Loan Lender or such Lender for such reduction. In determining such amount or amounts, Agent, Swing Loan Lender or such Lender may use any reasonable averaging or attribution methods. The protection of this Section 3.9 shall be available to Agent, Swing Loan Lender and each Lender regardless of any possible

88

contention of invalidity or inapplicability with respect to the Applicable Law, rule, regulation, guideline or condition.

(b)     A certificate of Agent, Swing Loan Lender or such Lender setting forth such amount or amounts as shall be necessary to compensate Agent, Swing Loan Lender or such Lender with respect to Section 3.9(a) hereof when delivered to Borrowing Agent shall be conclusive absent manifest error.

3.10.   <u>Taxes</u>.

(a)     <u>Defined Terms</u>.  For purposes of this Section 3.10, the term "Lender" includes any Issuer, Swing Loan Lender or any Participant and the term "Applicable Law" includes FATCA.

(b)     <u>Payment Free of Taxes</u>.  Any and all payments by or on account of any Obligations of any Loan Party under this Agreement or any Other Document shall be made without deduction or withholding for any Taxes, except as required by Applicable Law.  If any Applicable Law (as determined in the good faith discretion of an applicable Withholding Agent) requires the deduction or withholding of any Tax from any such payment by a Withholding Agent, then the applicable Withholding Agent shall be entitled to make such deduction or withholding and shall timely pay the full amount deducted or withheld to the relevant Governmental Body in accordance with Applicable Law and, if such Tax is an Indemnified Tax, then the sum payable by the applicable Loan Party shall be increased as necessary so that after such deduction or withholding has been made (including such deductions and withholdings applicable to additional sums payable under this Section) Agent or any Lender, as the case may be, receives an amount equal to the sum it would have received had no such deduction or withholding been made.  Notwithstanding the submission of documentation by any Lender under Section 3.10(g) hereof claiming a reduced rate of or exemption from U.S. withholding Tax, Agent shall be entitled to withhold United States federal income Taxes at the full 30% withholding rate if in its judgment it is required to do so under the due diligence requirements imposed upon Agent under §1.1441-7(b) of the United States Income Tax Regulations or other Applicable Law.

(c)     <u>Payment of Other Taxes by the Loan Parties</u>.  The Loan Parties shall timely pay to the relevant Governmental Body in accordance with Applicable Law, or at the option of Agent, promptly reimburse Agent for the payment of, any Other Taxes.

(d)     <u>Indemnification by the Loan Parties</u>.  Each Loan Party shall jointly and severally indemnify Agent and each Lender, within ten (10) days after demand therefor, for the full amount of any Indemnified Taxes (including Indemnified Taxes imposed or asserted on or attributable to amounts payable under this Section) paid or payable by Agent or any Lender or required to be withheld or deducted from a payment to Agent or such Lender, as the case may be, and any penalties, interest and out-of-pocket expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes were correctly or legally imposed or asserted by the relevant Governmental Body.  A certificate as to the amount of such payment or liability

074658.23049/132216381v.5074658.23049/132216381v.9

delivered to Borrowers by any Lender (with a copy to Agent), or by Agent on its own behalf or on behalf of a Lender, shall be conclusive absent manifest error.

(e)  <u>Indemnification by the Lenders</u>.  Each Lender shall severally indemnify Agent, within ten (10) days after demand therefor, for (i) any Indemnified Taxes attributable to such Lender (but only to the extent that any Loan Party has not already indemnified Agent for such Indemnified Taxes and without limiting the obligation of the Loan Parties to do so), and (ii) any Excluded Taxes attributable to such Lender, in each case, that are payable or paid by Agent in connection with this Agreement or any Other Document, and any expenses arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally imposed or asserted by the relevant Governmental Body.  In addition, each Lender shall severally indemnify Agent under §1.1461-1(e) of the United States Income Tax Regulations against any claims and demands of any Lender for the amount of any Tax it deducts and withholds in accordance with regulations under §1441 of the Internal Revenue Code.  A certificate as to the amount of such payment or liability delivered to any Lender by Agent shall be conclusive absent manifest error. Each Lender hereby authorizes Agent to set off and apply any and all amounts at any time owing to such Lender hereunder or under any Other Document or otherwise payable by Agent to such Lender from any other source against any amount due to Agent under this subsection (e).

(f)  <u>Evidence of Payments</u>.  As soon as practicable after any payment of Taxes by any Loan Party to a Governmental Body pursuant to this Section 3.10, such Loan Party shall deliver to Agent the original or a certified copy of a receipt issued by such Governmental Body evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to Agent.

(g)  <u>Status of Lenders</u>.  (i) Any Lender that is entitled to an exemption from or reduction of withholding Tax with respect to payments hereunder or under any Other Document shall deliver to Borrowing Agent and Agent, at the time or times reasonably requested by Borrowers or Agent, such properly completed and executed documentation required by Applicable Law as will permit such payments to be made without withholding or at a reduced rate of withholding.  In addition, any Lender, if reasonably requested by Borrowing Agent or Agent, shall deliver such other documentation required by Applicable Law or reasonably requested by Borrowing Agent or Agent as will enable Borrowers or Agent to determine whether or not such Lender is subject to backup withholding or information reporting requirements. Notwithstanding anything to the contrary in the preceding two sentences, the completion, execution and submission of such documentation (other than such documentation set forth in Sections 3.10(g)(ii)(A), (ii)(B) and (ii)(D) below) shall not be required if in the applicable Lender's reasonable judgment such completion, execution or submission would subject such Lender to any material unreimbursed cost or expense or would materially prejudice the legal or commercial position of such Lender.

(h)  Without limiting the generality of the foregoing, in the event that any Borrower is a U.S. Loan Party,

(i)  any Lender that is a U.S. Person shall deliver to Borrowing Agent and Agent on or prior to the date on which such Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of any Borrower or

Agent), two (2) duly completed and executed copies of IRS Form W-9 certifying that such Lender is exempt from U.S. federal backup withholding Tax;

(ii)     any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to Borrowing Agent and Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of Borrowing Agent or Agent), whichever of the following is applicable:

(1)     in the case of a Foreign Lender claiming the benefits of an income tax treaty to which the United States is a party (x) with respect to payments of interest under this Agreement or any Other Document, two (2) duly completed and executed copies of IRS Form W-8BEN or W-8BEN-E (as applicable) establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "interest" article of such tax treaty and (y) with respect to any other applicable payments under this Agreement or any Other Document, two (2) duly completed and executed copies of IRS Form W-8BEN or W-8BEN-E (as applicable) establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "business profits" or "other income" article of such tax treaty;

(2)     two (2) duly completed and executed copies of IRS Form W-8ECI;

(3)     in the case of a Foreign Lender claiming the benefits of the exemption for portfolio interest under Section 881(c) of the Internal Revenue Code, (x) two (2) duly completed and executed copies of a certificate substantially in the form of Exhibit 3.10-1 hereto to the effect that such Foreign Lender is not a "bank" within the meaning of Section 881(c)(3)(A) of the Internal Revenue Code, a "10 percent shareholder" of the Borrowers within the meaning of Section 881(c)(3)(B) of the Internal Revenue Code, or a "controlled foreign corporation" described in Section 881(c)(3)(C) of the Internal Revenue Code (a "U.S. Tax Compliance Certificate") and (y) two (2) duly completed and executed copies of IRS Form W-8BEN; or

(4)     to the extent a Foreign Lender is not the beneficial owner, two (2) duly completed and executed copies of IRS Form W-8IMY, accompanied by two (2) duly completed and executed copies of IRS Form W-8ECI, IRS Form W-8BEN or W-8BEN-E (as applicable), two (2) duly completed and executed copies of a U.S. Tax Compliance Certificate substantially in the form of Exhibit 3.10-2 or Exhibit 3.10-3 hereto, two (2) duly completed and executed copies of IRS Form W-9, and/or other certification documents from each beneficial owner, as applicable; provided that if the Foreign Lender is a partnership and one or more direct or indirect partners of such Foreign Lender are claiming the portfolio interest exemption, such Foreign Lender may provide two (2) duly completed and executed copies of a U.S. Tax Compliance Certificate substantially in the form of Exhibit 3.10-4 hereto on behalf of each such direct and indirect partner;

(iii)     any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to the Borrowers and Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Foreign Lender becomes a Lender under this

Agreement (and from time to time thereafter upon the reasonable request of Borrowing Agent or Agent), executed copies of any other form required by Applicable Law as a basis for claiming exemption from or a reduction in U.S. federal withholding Tax, duly completed, together with such supplementary documentation as may be required by Applicable Law to permit the Borrowers or Agent to determine the withholding or deduction required to be made; and

(iv)    If a payment to a Lender under this Agreement or any Other Document would be subject to U.S. Federal withholding Taxes imposed by FATCA if such Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Internal Revenue Code, as applicable), such Lender shall deliver to Borrowing Agent and Agent at the time or times required by Applicable Law and at such time or times reasonably requested by the Borrowers or Agent such documentation required by Applicable Law (including as required by Section 1471(b)(3)(C)(i) of the Internal Revenue Code) and such additional documentation reasonably requested by the Borrowers or Agent as may be necessary for the Borrowers and Agent to comply with their obligations under FATCA and to determine that such Lender has complied with such Lender's obligations under FATCA or to determine the amount to deduct and withhold from such payment.  Solely for purposes of this clause (D), "FATCA" shall include any amendments made to FATCA after the date of this Agreement.

(ii)    Each Lender agrees that if any form or certification it previously delivered expires or becomes obsolete or inaccurate in any respect, it shall update such form or certification or promptly notify the Borrowers and Agent in writing of its legal inability to do so.

(i)    <u>Treatment of Certain Refunds</u>.  If any party determines, in its sole discretion exercised in good faith, that it has received a refund of any Taxes as to which it has been indemnified pursuant to this Section 3.10 (including by the payment of additional amounts pursuant to this Section 3.10), it shall pay to the indemnifying party an amount equal to such refund (but only to the extent of indemnity payments made under this Section with respect to the Taxes giving rise to such refund), net of all out-of-pocket expenses (including Taxes) of such indemnified party and without interest (other than any interest paid by the relevant Governmental Body with respect to such refund).  Such indemnifying party, upon the request of such indemnified party, shall repay to such indemnified party the amount paid over pursuant to this subsection (h) (plus any penalties, interest or other charges imposed by the relevant Governmental Body) in the event that such indemnified party is required to repay such refund to such Governmental Body.  Notwithstanding anything to the contrary in this subsection (h), in no event will the indemnified party be required to pay any amount to an indemnifying party pursuant to this subsection (h) the payment of which would place the indemnified party in a less favorable net after-Tax position than the indemnified party would have been in if the Tax subject to indemnification and giving rise to such refund had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts with respect to such Tax had never been paid.  This subsection shall not be construed to require any indemnified party to make available its Tax returns (or any other information relating to its Taxes that it deems confidential) to the indemnifying party or any other Person.

(j)    <u>Survival</u>.  Each party's obligations under this Section 3.10 shall survive the resignation or replacement of Agent or any assignment of rights by, or the replacement of, a

Lender, the termination of the Commitments and the repayment, satisfaction or discharge of the Obligations.

3.11.  <u>Replacement of Lenders</u>.  If any Lender (an "Affected Lender") (a) makes demand upon Borrowers for (or if Borrowers are otherwise required to pay) amounts pursuant to Section 3.7, 3.9 or 3.10 hereof, (b) is unable to make or maintain Term SOFR Rate Loans as a result of a condition described in Section 2.2(h) hereof, (c) is a Defaulting Lender, or (d) denies any consent requested by Agent pursuant to Section 16.2(b) hereof, Borrowers may, within ninety (90) days of receipt of such demand, notice (or the occurrence of such other event causing Borrowers to be required to pay such compensation or causing Section 2.2(h) hereof to be applicable), or such Lender becoming a Defaulting Lender or denial of a request by Agent pursuant to Section 16.2(b) hereof, as the case may be, by notice in writing to Agent and such Affected Lender (i) request the Affected Lender to cooperate with Borrowers in obtaining a replacement Lender satisfactory to Agent and Borrowers (the "Replacement Lender"); (ii) request the non-Affected Lenders to acquire and assume all of the Affected Lender's Advances and its Revolving Commitment Percentage as provided herein, but none of such Lenders shall be under any obligation to do so; or (iii) propose a Replacement Lender subject to approval by Agent in its good faith business judgment.  If any satisfactory Replacement Lender shall be obtained, and/or if any one or more of the non-Affected Lenders shall agree to acquire and assume all of the Affected Lender's Advances and its Revolving Commitment Percentage, then such Affected Lender shall assign, in accordance with Section 16.3 hereof, all of its Advances and its Revolving Commitment Percentage, and other rights and obligations under this Agreement and the Other Documents to such Replacement Lender or non-Affected Lenders, as the case may be, in exchange for payment of the principal amount so assigned and all interest and fees accrued on the amount so assigned, *plus* all other Obligations then due and payable to the Affected Lender.

## IV.    COLLATERAL:  GENERAL TERMS

4.1.    <u>Security Interest in the Collateral</u>4.21.1.        .  To secure the prompt payment and performance to the Post-Petition Secured Parties of the Post-Petition Obligations (and, upon entry of the Final Order, any and all Obligations, including without limitation, all Prepetition Obligations and Post-Petition Obligations) of whatever kind, nature or description, absolute or contingent, now existing or hereafter arising, the Agent, for the benefit of itself and the other Secured Parties, shall have and is hereby granted by (x) each Debtor, effective as of the Petition Date, valid and perfected first priority (subject to (x) the priority of Liens set forth [in Section 10(b)] of the Interim Order‡ and (y) the Intercreditor Agreement) security interests and liens in and upon all pre- and post- petition property of such Debtor constituting US Collateral, whether existing on the Petition Date or thereafter acquired (which shall, for the avoidance of doubt, include the property listed in the following clause (y)) and (y) the Loan Parties a continuing security interest in and to and Lien on all of its Collateral, whether now owned or existing or hereafter created, acquired or arising and wheresoever located. Each Loan Party shall mark its books and records as may be necessary or appropriate to evidence, protect and perfect Agent's security interest and shall cause its financial statements to reflect such security interest and hereby acknowledges and confirms that value has been given, that it has rights in the Collateral

---

‡ NTD:  Check section reference

and that the parties have not agreed to postpone the time for attachment of any security interest constituted hereby to any of the property, assets or undertakings of any the Loan Parties.  Each Loan Party shall provide Agent with written notice of all commercial tort claims promptly upon the occurrence of any events giving rise to any such claims (regardless of whether legal proceedings have yet been commenced), such notice to contain a brief description of the claims, the events out of which such claims arose and the parties against which such claims may be asserted and, if applicable in any case where legal proceedings regarding such claims have been commenced, the case title together with the applicable court and docket number.  Upon delivery of each such notice, such Loan Party shall be deemed to thereby grant to Agent a security interest and lien in and to such commercial tort claims described therein and all proceeds thereof.  Each Loan Party shall provide Agent with written notice promptly upon becoming the beneficiary under any letter of credit or otherwise obtaining any right, title or interest in any letter of credit rights, and at Agent's request shall take such actions as Agent may request for the perfection of Agent's security interest therein. The Prepetition Secured Parties are entitled to adequate protection as set forth in the Interim Order and, once entered, the Final Order.

4.34.2. Perfection of Security Interest.  Subject to the Orders and the Intercreditor Agreement, each Loan Party shall take all action that may be necessary or desirable, or that Agent may request, so as at all times to maintain the validity, perfection, enforceability and priority (subject to the terms of the Intercreditor Agreement) of Agent's security interest in and Lien on the Collateral or to enable Agent to protect, exercise or enforce its rights hereunder and in the Collateral, including, but not limited to, (a) immediately discharging all Liens other than Permitted Encumbrances, (b) subject to Section 7.20, obtaining Lien Waiver Agreements, (c) delivering to Agent, endorsed or accompanied by such instruments of assignment as Agent may specify, and stamping or marking, in such manner as Agent may specify, any and all chattel paper, instruments, letters of credit and advices thereof and documents evidencing or forming a part of the Collateral, (d) entering into warehousing, lockbox, customs and freight agreements and other custodial arrangements reasonably satisfactory to Agent, and (e) executing and delivering financing statements, control agreements (other than with respect to Excluded Deposit Accounts), instruments of pledge, mortgages (with respect to Material Owned Real Property only), notices and assignments, in each case in form and substance reasonably satisfactory to Agent, relating to the creation, validity, perfection, maintenance or continuation of Agent's security interest and Lien under the Uniform Commercial Code, PPSA or other Applicable Law. By its signature hereto, each Loan Party hereby authorizes Agent to file against such Loan Party, one or more financing, continuation or amendment statements pursuant to the Uniform Commercial Code or PPSA, as applicable, in form and substance reasonably satisfactory to Agent (which statements may have a description of collateral which is broader than that set forth herein, including without limitation a description of Collateral as "all assets" and/or "all personal property" of any Loan Party).  All charges, expenses and fees Agent may incur in doing any of the foregoing, and any local taxes relating thereto, shall be charged to Borrowers' Account as a Revolving Advance of a Domestic Rate Loan and added to the Obligations, or, at Agent's option, shall be paid by the Loan Parties to Agent for its benefit and for the ratable benefit of Lenders immediately upon demand.

4.44.3. Preservation of Collateral.  Subject to the Orders and the Intercreditor Agreement, during the occurrence  of a Default or Event of Default, in addition to the rights and remedies set forth in Section 11.1 hereof, Agent: (a) may at any time take such steps as Agent deems

necessary to protect Agent's interest in and to preserve the Collateral, including the hiring of security guards or the placing of other security protection measures as Agent may deem appropriate; (b) may employ and maintain at any of any Loan Party's premises a custodian who shall have full authority to do all acts necessary to protect Agent's interests in the Collateral; (c) may lease warehouse facilities to which Agent may move all or part of the Collateral; (d) may use any Loan Party's owned or leased lifts, hoists, trucks and other facilities or Equipment for handling or removing the Collateral; and (e) shall have, and is hereby granted, a right of ingress and egress to the places where the Collateral is located, and may proceed over and through any Real Property owned or leased by any Loan Party. Each Loan Party shall cooperate fully with all of Agent's efforts to preserve the Collateral and will take such actions to preserve the Collateral as Agent may direct. All of Agent's expenses of preserving the Collateral, including any expenses relating to the bonding of a custodian, shall be charged to Borrowers' Account as a Revolving Advance maintained as a Domestic Rate Loan and added to the Obligations.

4.54.4. Ownership and Location of Collateral.

(a)        With respect to the Collateral, at the time the Collateral becomes subject to Agent's security interest: (i) each Loan Party shall be the sole owner of and fully authorized and able to sell, transfer, pledge and/or grant a first priority Lien (subject only to Permitted Encumbrances and the Intercreditor Agreement) upon each and every item of its respective Collateral to Agent; and, except for Permitted Encumbrances the Collateral shall be free and clear of all Liens whatsoever; (ii) each document and agreement executed by each Loan Party or delivered to Agent or any Lender in connection with this Agreement shall be true and correct in all respects; (iii) all signatures and endorsements of each Loan Party that appear on such documents and agreements shall be genuine and each Loan Party shall have full capacity to execute same; and (iv) each Loan Party's Equipment and Inventory shall be located as set forth on Schedule 4.4 hereto, as such Schedule may be updated from time to time, and shall not be removed from such locations without the prior written consent of Agent except with respect to the sale of Inventory in the Ordinary Course of Business and Equipment to the extent permitted in Section 7.1(b) hereof.

(b)        (i) There is no location at which any Loan Party has any Inventory (except for Inventory in transit) or other Collateral other than those locations listed on Schedule 4.4(b)(i) hereto; (ii) Schedule 4.4(b)(ii) hereto contains a correct and complete list of the legal names and addresses of each warehouse at which Inventory of any Loan Party is stored, and none of the receipts received by any Loan Party from any warehouse states that the goods covered thereby are to be delivered to bearer or to the order of a named Person or to a named Person and such named Person's assigns; (iii) Schedule 4.4(b)(iii) hereto sets forth a correct and complete list of (A) each place of business of each Loan Party and (B) the chief executive office of each Loan Party; and (iv) Schedule 4.4(b)(iv) hereto sets forth a correct and complete list of the location, by state and street address, of all Real Property owned or leased by each Loan Party, identifying which Real Properties are owned (including whether such owned Real Property constitutes Material Owned Real Property) and which are leased, together with the names and addresses of any landlords or other third parties in possession, custody or control of any Collateral.

4.64.5. Defense of Agent's and Lenders' Interests. Until (a) the Payment in Full of all of the Obligations and (b) termination of the Commitments and termination of this Agreement,

Agent's interests in the Collateral shall continue in full force and effect. During such period no Loan Party shall, without Agent's prior written consent, pledge, sell (except for sales or other dispositions otherwise permitted in Section 7.1(b) hereof), assign, transfer, create or suffer to exist a Lien upon or encumber or allow or suffer to be encumbered in any way except for Permitted Encumbrances, any part of the Collateral. Each Loan Party shall defend Agent's interests in the Collateral against any and all Persons whatsoever. At any time following demand by Agent for payment of all Obligations, Agent shall have the right to take possession of the indicia of the Collateral and the Collateral in whatever physical form contained, including: labels, stationery, documents, instruments and advertising materials. If Agent exercises this right to take possession of the Collateral, the Loan Parties shall, upon demand, assemble it in the best manner possible and make it available to Agent at a place convenient to Agent. In addition, with respect to all Collateral, Agent and Lenders shall be entitled to all of the rights and remedies set forth herein and further provided by the Uniform Commercial Code, PPSA or other Applicable Law. Each Loan Party shall, and Agent may, at its option, instruct all suppliers, carriers, forwarders, warehousers or others receiving or holding cash, checks, Inventory, documents or instruments in which Agent holds a security interest to deliver same to Agent and/or subject to Agent's order and if they shall come into any Loan Party's possession, they, and each of them, shall be held by such Loan Party in trust as Agent's trustee, and such Loan Party will immediately deliver them to Agent in their original form together with any necessary endorsement.

4.74.6. Inspection of Premises. At all reasonable times and, absent the occurrence of an Event of Default, during normal business hours, and from time to time as often as Agent shall elect in its sole discretion exercised in a commercially reasonable manner, Agent and each Lender shall have full access to and the right to audit, check, inspect and make abstracts and copies from each Loan Party's books, records, audits, correspondence and all other papers relating to the Collateral and the operation of each Loan Party's business. Agent, any Lender and their agents may enter upon any premises of any Loan Party at any time during business hours and at any other time, and from time to time as often as Agent shall elect in its sole discretion, for the purpose of inspecting the Collateral and any and all records pertaining thereto and the operation of such Loan Party's business; provided that, absent the occurrence and continuance of an Event of Default, (a) neither Agent nor any Lender shall exercise any rights pursuant to this Section 4.6 more than three (3) times during any fiscal year, and (b) Agent or any Lender exercising any rights pursuant to this Section 4.6 shall give the applicable Loan Party or any applicable Subsidiary commercially reasonable prior notice of such exercise.

4.84.7. Appraisals. Agent may, in its sole discretion, exercised in a commercially reasonable manner, at any time after the Closing Date and from time to time, engage the services of an independent appraisal firm or firms of reputable standing, satisfactory to Agent, for the purpose of appraising the then current values of the Loan Parties' assets, and unless an Event of Default shall have occurred and be continuing, Agent shall consult with Borrowing Agent as to the identity of any such firm. In the event the value of the Loan Parties' assets, as so determined pursuant to such appraisal, is less than anticipated by Agent or Lenders, such that the Revolving Advances are in excess of such Advances permitted hereunder, then, promptly upon Agent's demand for same, the Borrowers shall make mandatory prepayments of the then outstanding Revolving Advances so as to eliminate the excess Advances. All of the fees and out-of-pocket costs and expenses of any appraisals conducted pursuant to this Section 4.7 shall be paid for

when due, in full and without deduction, off-set or counterclaim by Borrowers; provided that, absent the occurrence and continuance of an Event of Default, Borrowers shall not be required to pay for more than three (3) such appraisals during any fiscal year.

4.94.8. Receivables; Deposit Accounts and Securities Accounts.

(a)     Each of the Receivables shall be a bona fide and valid account representing a bona fide indebtedness incurred by the Customer therein named, for a fixed sum as set forth in the invoice relating thereto (provided immaterial or unintentional invoice errors shall not be deemed to be a breach hereof) with respect to an absolute sale or lease and delivery of goods upon stated terms of a Loan Party, or work, labor or services theretofore rendered by a Loan Party as of the date each Receivable is created.   Same shall be due and owing in accordance with the applicable Loan Party's standard terms of sale and, to the best of the applicable Loan Party's knowledge, without dispute, setoff or counterclaim except as may be stated on the accounts receivable schedules delivered by the Loan Parties to Agent.

(b)     Each Customer, to the best of each Loan Party's knowledge, as of the date each Receivable is created, is and will be solvent and able to pay all Receivables on which the Customer is obligated in full when due.   With respect to such Customers of any Loan Party who are not solvent, such Loan Party has set up on its books and in its financial records bad debt reserves adequate to cover such Receivables.

(c)     Each Loan Party's chief executive office is located as set forth on Schedule 4.4(b)(iii) hereto (together with any updated provided pursuant to Section 9.17 hereof). Until written notice is given to Agent by Borrowing Agent of any other office at which any Loan Party keeps its records pertaining to Receivables, all such records shall be kept at such executive office.

(d)     The Loan Parties shall instruct their Customers to deliver all remittances upon Receivables (whether paid by check or by wire transfer of funds) to such Blocked Accounts and/or Depository Accounts (and any associated lockboxes) as Agent shall designate from time to time as contemplated by Section 4.8(h) hereof or as otherwise agreed to from time to time by Agent.   Notwithstanding the foregoing, to the extent any Loan Party directly receives any remittances upon Receivables, such Loan Party shall, at such Loan Party's sole cost and expense, but on Agent's behalf and for Agent's account, collect as Agent's property and in trust for Agent all amounts received on Receivables, and shall not commingle such collections with any Loan Party's funds or use the same except to pay the Obligations, and shall as soon as possible and in any event no later than one (1) Business Day after the receipt thereof (i) in the case of remittances paid by check, deposit all such remittances in their original form (after supplying any necessary endorsements) and (ii) in the case of remittances paid by wire transfer of funds, transfer all such remittances, in each case, into such Blocked Accounts and/or Depository Accounts. Each Loan Party shall deposit in the Blocked Account and/or Depository Account or, upon request by Agent, deliver to Agent, in original form and on the date of receipt thereof, all checks, drafts, notes, money orders, acceptances, cash and other evidences of Indebtedness.

(e)     At any time after the occurrence and during the continuance of an Event of Default, Agent shall have the right to send notice of the assignment of, and Agent's security interest in and Lien on, the Collateral (other than Receivables) to any and all Customers or any third party holding or otherwise concerned with any of the Collateral and to take possession of the Collateral, or both.  At any time, Agent shall have the right, exercised in its Permitted Discretion (except that after the occurrence and during the continuance of an Event of Default such right shall be exercised in Agent's sole discretion) to send notice of the assignment of, and Agent's security interest in and Lien on, the Receivables to any and all Customers or any third party holding or otherwise concerned with any of the Receivables and Agent shall have the sole right to collect the Receivables.  Agent's actual collection expenses, including, but not limited to, stationery and postage, telephone, facsimile, secretarial and clerical expenses and the salaries of any collection personnel used for collection, may be charged to Borrowers' Account and added to the Obligations.

(f)     Agent shall have the right, exercised in its Permitted Discretion (except that after the occurrence and during the continuance of an Event of Default such right shall be exercised in Agent's sole discretion), to receive, endorse, assign and/or deliver in the name of Agent or any Loan Party any and all checks, drafts and other instruments for the payment of money relating to the Receivables, and each Loan Party hereby waives notice of presentment, protest and non-payment of any instrument so endorsed.  Each Loan Party hereby constitutes Agent or Agent's designee as such Loan Party's attorney with power (i) at any time, in its Permitted Discretion (except that after the occurrence and during the continuance of an Event of Default it shall be in Agent's sole discretion): (A) to endorse such Loan Party's name upon any notes, acceptances, checks, drafts, money orders or other evidences of payment or Collateral; (B) to sign such Loan Party's name on any invoice or bill of lading relating to any of the Receivables, drafts against Customers, assignments and verifications of Receivables; (C) to send verifications of Receivables to any Customer; (D) to sign such Loan Party's name on all agreements, documents or instruments deemed necessary or appropriate by Agent to preserve, protect, or perfect Agent's interest in the Collateral and to file same; and (E) to receive, open and dispose of all mail addressed to any Loan Party at any post office box/lockbox maintained by Agent for the Loan Parties or at any other business premises of Agent; and (ii) at any time following the occurrence of a Default or an Event of Default: (A) to demand payment of the Receivables; (B) to enforce payment of the Receivables by legal proceedings or otherwise; (C) to exercise all of such Loan Party's rights and remedies with respect to the collection of the Receivables and any other Collateral; (D) to sue upon or otherwise collect, extend the time of payment of, settle, adjust, compromise, extend or renew the Receivables; (E) to settle, adjust or compromise any legal proceedings brought to collect Receivables; (F) to prepare, file and sign such Loan Party's name on a proof of claim in bankruptcy or similar document against any Customer; (G) to prepare, file and sign such Loan Party's name on any notice of Lien, assignment or satisfaction of Lien or similar document in connection with the Receivables; (H) to accept the return of goods represented by any of the Receivables; (I) to change the address for delivery of mail addressed to any Loan Party to such address as Agent may designate; and (J) to do all other acts and things necessary to carry out this Agreement.  All lawful acts of said attorney or designee are hereby ratified and approved, and said attorney or designee taken in accordance with the foregoing shall not be liable for any acts of omission or commission nor for any error of judgment or mistake of fact or of law, unless done maliciously or with gross (not mere) negligence (as determined by a court of competent jurisdiction in a final and

98

non-appealable judgment or order); this power being coupled with an interest is irrevocable while any of the Obligations remain unpaid.

(g)    Neither Agent nor any Lender shall, under any circumstances or in any event whatsoever, have any liability for any error or omission or delay of any kind occurring in the settlement, collection or payment of any of the Receivables or any instrument received in payment thereof, or for any damage resulting therefrom.

(h)    Subject to the terms of the Intercreditor Agreement, all proceeds of Collateral (other than Term Loan Priority Collateral) shall be deposited by the Loan Parties into either (i) a lockbox account, dominion account or such other "blocked account" (each a "Blocked Account" and collectively the "Blocked Accounts") established at a bank or banks as may be acceptable to Agent (each such bank, a "Blocked Account Bank" and collectively, "Blocked Account Banks") pursuant to an arrangement with such Blocked Account Bank as may be acceptable to Agent or (ii) depository accounts established at Agent for the deposit of such proceeds ("Depository Accounts"). ~~Subject to Section 6.16(a) of this Agreement,~~ Each applicable Loan Party, Agent and each Blocked Account Bank shall enter into a deposit account control or blocked account agreement in form and substance reasonably satisfactory to Agent that is sufficient to give Agent "control" (as if Agent's security interest in such Blocked Accounts is able to be perfected by "control" for purposes of Articles 8 and 9 of the Uniform Commercial Code) over such Blocked Accounts and which directs such Blocked Account Bank to transfer such funds so deposited on a daily basis or at other times acceptable to Agent, to Agent, either to any account maintained by Agent at said Blocked Account Bank or by wire transfer to an appropriate account at Agent.  All funds deposited in the Blocked Accounts or Depository Accounts shall immediately become subject to the security interest of Agent, for its own benefit and the ratable benefit of the Secured Parties, and Borrowing Agent shall obtain the agreement by each Blocked Account Bank to waive any offset rights against the funds so deposited.  Neither Agent nor any Lender assumes any responsibility for such blocked account arrangement, including any claim of accord and satisfaction or release with respect to deposits accepted by any Blocked Account Bank thereunder.  Agent shall apply all funds received by it from the Blocked Accounts and/or Depository Accounts to reduce the Prepetition Obligations or the Post-Petition Obligations in any order at the sole discretion of Agent, subject to Borrowers' ability to re-borrow Revolving Advances in accordance with the terms hereof, provided that, in the absence of any Event of Default, Agent shall apply all such funds representing collection of Receivables first to the prepayment of the principal amount of the Swing Loans, if any, and then to the Revolving Advances.  Furthermore, the parties hereto hereby acknowledge, confirm and agree that the implementation of the cash management arrangements is a contractual right provided to Agent and the Lenders hereunder in order for Agent and the Lenders to manage and monitor their collateral position and not a proceeding for enforcement or recovery of a claim, or pursuant to, or an enforcement of, any security or remedies whatsoever, that the cash management arrangements contemplated herein are critical to the structure of the lending arrangements contemplated herein, that Agent and Lenders are relying on the Loan Parties' acknowledgment, confirmation and agreement with respect to such cash management arrangements in making accommodations of credit available to Borrowers and in particular that any accommodations of credit are being provided by the Lenders to Borrowers strictly on the

basis of a borrowing base calculation to fully support and collateralize any such accommodations of credit hereunder.

(i)    No Loan Party will, without Agent's consent, compromise or adjust any material amount of the Receivables (or extend the time for payment thereof) or accept any material returns of merchandise or grant any additional discounts, allowances or credits thereon except for those compromises, adjustments, returns, discounts, credits and allowances as have been heretofore customary in the Ordinary Course of Business of such Loan Party.

(j)    All deposit accounts (including all Blocked Accounts and Depository Accounts), securities accounts and investment accounts of each Loan Party and its Subsidiaries are set forth on Schedule 4.8(j) hereto.  No Loan Party shall open any new deposit account, securities account or investment account with a bank, depository institution or securities intermediary other than Agent unless (i) the Loan Parties shall have obtained the prior written approval of Agent and (ii) if required by Agent in its sole discretion, such bank, depository institution or securities intermediary, each applicable Loan Party and Agent shall first have entered into an account control or blocked account agreement in form and substance reasonably satisfactory to Agent sufficient to give Agent "control" (as if Agent's security interest in such deposit account is able to be perfected by "control" for purposes of Articles 8 and 9 of the Uniform Commercial Code) over such account other than an Excluded Deposit Account.

(k)    Notwithstanding anything to the contrary contained herein, solely with respect to the Canadian Loan Party Bank Accounts, Agent shall have the sole and exclusive right to direct, and is hereby authorized to give instructions pursuant to any control agreement or otherwise directing, the disposition of funds in the Blocked Accounts and Depository Accounts of a Canadian Loan Party to Agent on a daily basis, either to a deposit account maintained at PNC or by wire transfer to a deposit account by Agent at PNC, which such funds may be applied by Agent to repay the Obligations, and, if an Event of Default has occurred and is continuing, to cash collateralize outstanding Letters of Credit in accordance with Section 3.2(b) hereof.  Agent shall apply all funds received by it from the Blocked Accounts and/or Depository Accounts or a Canadian Loan Party to the satisfaction of the Obligations (including the cash collateralization of all Obligations relating to any outstanding Letters of Credit in accordance with the provisions of Section 3.2(b) hereof) in such order as Agent shall determine in its Permitted Discretion.

4.104.9.    Inventory.  To the extent Inventory held for sale or lease has been produced by any Loan Party, it has been and will be produced by such Loan Party in accordance with the Federal Fair Labor Standards Act of 1938, as amended, modified or supplemented, in the case of Inventory produced by any Loan Party in the United States, and, as the case may be, all rules, regulations and orders thereunder and any equivalent legislation under Canadian Applicable Laws, in the case of Inventory produced by any Loan Party in Canada.

4.114.10.    Maintenance of Equipment.  The Loan Parties' Equipment shall be maintained in good operating condition and repair (reasonable wear and tear excepted) and all necessary replacements of and repairs thereto shall be made so that the value and operating efficiency of its Equipment shall be maintained and preserved.  No Loan Party shall use or

operate its Equipment in violation of any law, statute, ordinance, code, rule or regulation, to the extent such violation could reasonably be expected to result in a Material Adverse Effect.

4.124.11.    Exculpation of Liability.  Nothing set forth herein shall be construed to constitute Agent or any Lender as any Loan Party's agent for any purpose whatsoever, nor shall Agent or any Lender be responsible or liable for any shortage, discrepancy, damage, loss or destruction of any part of the Collateral wherever the same may be located and regardless of the cause thereof.  Neither Agent nor any Lender, whether by anything herein or in any assignment or otherwise, assume any of any Loan Party's obligations under any contract or agreement assigned to Agent or such Lender, and neither Agent nor any Lender shall be responsible in any way for the performance by any Loan Party of any of the terms and conditions thereof.

4.134.12.    Financing Statements.  Except with respect to the financing statements filed by Agent, the financing statements described on Schedule 1.2 hereto, and any financing statements filed in connection with Permitted Encumbrances, no financing statement covering any of the Collateral or any proceeds thereof is or will be on file in any public office.

4.144.13.    Investment Property Collateral.

(a)    Each Loan Party has the right to transfer all Investment Property, subject to applicable securities laws and the rules of any applicable stock exchange, owned by such Loan Party free of any Liens other than Permitted Encumbrances and will use commercially reasonable efforts to defend its title to the Investment Property against the claims of all Persons. Each Loan Party shall (i) ensure that each operating agreement, limited partnership agreement and any other similar agreement permits Agent's Lien on the Equity Interests of wholly-owned Subsidiaries (other than Foreign Subsidiaries) arising thereunder, foreclosure of Agent's Lien and admission of any transferee as a member, limited partner or other applicable equity holder thereunder and (ii) use commercially reasonable efforts to provide that each operating agreement, limited partnership agreement and any other similar agreement with respect to any other Person permits Agent's Lien on the Investment Property of such Loan Party arising thereunder, foreclosure of Agent's Lien and admission of any transferee as a member, limited partner or other applicable equity holder thereunder.

(b)    Each Loan Party shall, if the Investment Property includes securities or any other financial or other asset maintained in a securities account, cause the custodian with respect thereto to execute and deliver a notification and control agreement or other applicable agreement reasonably satisfactory to Agent in order to perfect and protect Agent's Lien in such Investment Property.

(c)    Except as set forth in Article XI hereof, (i) the Loan Parties will have the right to exercise all voting rights with respect to the Investment Property and (ii) the Loan Parties will have the right to receive all cash dividends and distributions, interest and premiums declared and paid on the Investment Property to the extent otherwise permitted under this Agreement.  In the event any additional Equity Interests are issued to any Loan Party as a stock dividend or distribution or in lieu of interest on any of the Investment Property, as a result of any split of any of the Investment Property, by reclassification or otherwise, any certificates evidencing any such additional shares will be delivered to Agent within ten (10) Business Days

101

and such shares will be subject to this Agreement and a part of the Investment Property to the same extent as the original Investment Property.

4.154.14.    Provisions Regarding Certain Investment Property Collateral.    The operating agreement or limited partnership agreement (as applicable) of any Subsidiary (other than a Foreign Subsidiary) of any Loan Party hereafter formed or acquired that is a limited liability company or a limited partnership, shall contain the following language (or language to the same effect): "The members of the Company and the Company expressly authorize the pledge of the Membership Interests (the "Pledged Collateral") to one or more security agents, collateral agents or other agents for lenders to, or purchasers purchasing notes issued by, the Company and/or its affiliates (any such agents or purchasers in such capacity, together with each of their respective successors and assigns, collectively and individually as the context may require, "Agent") and Agent's successors and assigns, or to any foreclosure upon or subsequent disposition of such Pledged Collateral by Agent in accordance with the terms and conditions of the security documents governing the pledge of the Pledged Collateral, including any limitations thereon set forth therein (each, a "Transfer").  In connection with such Transfer, the assignee shall be admitted as a member and shall have all of the rights and powers (including without limitation voting, control, consent, approval and management rights) of the member that previously owned such Membership Interests without any further consent of any member (including without limitation, the right to remove any or all of the managers of the Company and appoint any representatives or designees of Agent to be  a manager and any limitations contained in this Agreement inconsistent with the provisions of the security documents or this Section shall be deemed waived, void and of no further force and effect until all obligations of any nature owing from the Company, its direct or indirect parent entities, and/or its direct or indirect subsidiaries, to the Agent and the lenders and/or note purchasers for which the Agent serves as agent have been paid in full)."

4.164.15.    Superpriority Claims and Collateral Security.    Each Debtor hereby represents, warrants and covenants that, upon the entry by the Bankruptcy Court of the Interim Order and/or the Final Order, as applicable, the Obligations are entitled to superpriority Liens and claims to the extent provided by [Section 7Paragraphs 10 and 11 of the Interim Order]² and, once entered, the Final Order.

4.174.16.    No Filings Required.  The Liens securing the Obligations of the Debtors shall be deemed valid and perfected and duly recorded by entry of the Interim Order.  Agent shall not be required to file any financing statements, mortgages, notices of Lien or similar instruments in any jurisdiction or filing office or to cause any account control agreements to be entered into by any otherwise applicable parties with respect to any deposit account or securities account or to take any other action in order to validate or perfect the Lien granted by or pursuant to the Interim Order, the Final Order, this Agreement or any Other Document.

4.184.17.    Grants, Rights and Remedies.    The Lien and administrative priority granted by or pursuant to the Interim Order, the Final Order, this Agreement or any Other Document are independently granted.  The Interim Order, the Final Order, this Agreement and

---

² NTD:  Check section reference

074658.23049/132216381v.5074658.23049/132216381v.9

the Other Documents supplement each other, and the grants, priorities, rights and remedies of Agent and Lenders hereunder and thereunder are cumulative.

V.      REPRESENTATIONS AND WARRANTIES.

To induce the Secured Parties to enter into this Agreement and to make Advances hereunder, each Loan Party represents and warrants to the Agent and the Lenders, that:

5.1.    <u>Authority</u>.  Subject to entry by the Bankruptcy Court of the Interim Order and the Final Order, as applicable, each Loan Party has full power, authority and legal right to enter into this Agreement and the Other Documents to which it is a party and to perform all its respective Obligations hereunder and thereunder.  This Agreement and the Other Documents to which it is a party have been duly executed and delivered by each Loan Party, and subject to entry by the Bankruptcy Court of the Interim Order and the Final Order, as applicable, this Agreement and the Other Documents to which it is a party constitute the legal, valid and binding obligation of such Loan Party enforceable in accordance with their terms.  Subject to entry by the Bankruptcy Court of the Interim Order and the Final Order, as applicable, the execution, delivery and performance of this Agreement and of the Other Documents to which it is a party (a) are within such Loan Party's corporate or company powers, as applicable, have been duly authorized by all necessary corporate or company action, as applicable, are not in contravention of law or the terms of such Loan Party's Organizational Documents or to the conduct of such Loan Party's business or of any Material Contract or undertaking to which such Loan Party is a party or by which such Loan Party is bound, including the DIP Term Loan Documents, the Prepetition Term Loan Documents and the Wynnefield Loan Documents, (b) will not conflict with or violate any law or regulation, or any judgment, order or decree of any Governmental Body, (c) will not require the Consent of any Governmental Body, any party to a Material Contract or any other Person, and (d) will not conflict with, nor result in any breach in any of the provisions of or constitute a default under or result in the creation of any Lien except Permitted Encumbrances upon any asset of such Loan Party under the provisions of any agreement, instrument, or other document to which such Loan Party is a party or by which it or its property is a party or by which it may be bound, including the DIP Term Loan Documents, the Prepetition Term Loan Documents and the Wynnefield Loan Documents.

5.2.    <u>Formation and Qualification</u>.

(a)      Each Loan Party is duly incorporated or formed, as applicable, and in good standing under the laws of the state or province listed on Schedule 5.2(a) hereto and is qualified to do business and is in good standing in the states or provinces listed on Schedule 5.2(a) hereto which constitute all states and provinces in which qualification and good standing are necessary for such Loan Party to conduct its business and own its property and where the failure to so qualify could reasonably be expected to have a Material Adverse Effect on such Loan Party.  Each Loan Party has delivered to Agent true and complete copies of its Organizational Documents and, subject in certain instances to Section 7.15, will promptly notify Agent of any amendment or changes thereto.

(b)      The only Subsidiaries of the Loan Parties are listed on Schedule 5.2(b) hereto.  Schedule 5.2(b) hereto sets forth a true, complete and correct list of all Equity Interests

103

held by Holdings and each Loan Party in each of its Subsidiaries and (ii) includes a true, correct and complete listing of all certificates evidencing all Equity Interests held by Holdings and each Loan Party in each of its Subsidiaries.

5.3.    <u>Survival of Representations and Warranties</u>.  All representations and warranties of such Loan Party in this Agreement and the Other Documents to which it is a party shall be true and correct in all material respects at the time of such Loan Party's execution of this Agreement and the Other Documents to which it is a party, and shall survive the execution, delivery and acceptance thereof by the parties thereto and the closing of the transactions described therein or related thereto.

5.4.    <u>Tax Returns</u>.   Each Loan Party's federal tax identification number and/or Canadian business number (where applicable) is set forth on Schedule 5.4 hereto.  Each Loan Party has filed all federal, state, Canadian, provincial and other material local Tax returns and other material reports each is required by law to file and has paid all such Taxes, assessments, fees and other governmental charges that are due and payable, except those which are being Properly Contested or the nonpayment of which is permitted or required by the Bankruptcy Court.  The provision for Taxes on the books of each Loan Party is adequate for all years not closed by applicable statutes, and for its current fiscal year, and no Loan Party has any actual knowledge of any deficiency or additional assessment in connection therewith not provided for on its books.

5.5.    [Reserved].

5.6.    <u>Entity Names</u>.   No Loan Party has been known by any other company or corporate name, as applicable, in the past five (5) years and does not sell Inventory under any other name except as set forth on Schedule 5.6 hereto, nor has any Loan Party been the surviving corporation or limited liability company, as applicable, of a merger or consolidation or acquired all or substantially all of the assets of any Person during the preceding five (5) years.

5.7.    <u>O.S.H.A. Environmental Compliance; Flood Insurance</u>.

(a)    Except as set forth on Schedule 5.7 hereto, each Loan Party is in compliance with, and its facilities, business, assets, property, Leasehold Interests, Real Property and Equipment are (to the extent applicable) in compliance with the Federal Occupational Safety and Health Act, and Environmental Laws and there are no outstanding citations, notices or orders of non-compliance issued to any Loan Party or relating to its business, assets, property, leaseholds or Equipment under any such laws, rules or regulations, except where such non-compliance, citation, notice or order could not reasonably be expected to result in a Material Adverse Effect.

(b)    Except as set forth on Schedule 5.7 hereto, each Loan Party (to the extent applicable) has been issued all required federal, Canadian, state, provincial, territorial and local licenses, certificates or permits (collectively, "Approvals") relating to all applicable Environmental Laws and all such Approvals are current and in full force and effect, except to the extent those which have not been issued or are not current and in full force and effect and the consequences thereof could not reasonably be expected to result in a Material Adverse Effect.

104

(c)     Except as set forth on Schedule 5.7 hereto, and except where the consequences thereof could not reasonably be expected to result in a Material Adverse Effect: (i) there have been no releases, spills, discharges, leaks or disposal (collectively referred to as "Releases") of Hazardous Materials at, upon, under or migrating from or onto any  Real Property owned, leased or occupied by any Loan Party, except for those Releases which are in full compliance with Environmental Laws; (ii) there are no underground storage tanks or polychlorinated biphenyls on any  Real Property owned, leased or occupied by any Loan Party, except for such underground storage tanks or polychlorinated biphenyls that are present in compliance with Environmental Laws; (iii) all of the  Real Property owned, leased or occupied by any Loan Party has never been used by any Loan Party to dispose of Hazardous Materials, except as authorized by Environmental Laws; and (iv) no Hazardous Materials are managed by any Loan Party on any  Real Property owned, leased or occupied by any Loan Party, excepting such quantities as are managed in accordance with all applicable manufacturer's instructions and compliance with Environmental Laws and as are necessary for the operation of the commercial business of any Loan Party or of its tenants.

(d)     All Real Property owned by the Loan Parties is insured pursuant to policies and other bonds which are valid and in full force and effect and which provide adequate coverage from reputable and financially sound insurers in amounts sufficient to insure the assets and risks of each such Loan Party in accordance with prudent business practice in the industry of such Loan Party.  Each Loan Party has (to the extent applicable) taken all actions required under the Flood Laws and/or requested by Agent to assist in ensuring that each Lender is in compliance with the Flood Laws applicable to the Collateral, including, but not limited to, providing Agent with the address and/or GPS coordinates of each structure located upon any Material Owned Real Property that will be subject to a mortgage or deed of trust in favor of Agent, and, to the extent required, obtaining flood insurance for such property, structures and contents prior to such property, structures and contents becoming Collateral.

5.8.    <u>No Litigation, Violation, Indebtedness or Default; ERISA Compliance</u>.

(a)     [Reserved].

(b)     Except as disclosed in Schedule 5.8(b) hereto and except for the Cases, no Loan Party has any pending or, to any Loan Party's knowledge, threatened litigation, arbitration, actions or proceedings that (i) would be reasonably be expected to result in Material Adverse Effect or (ii) could affect the legality, validity or enforceability of this Agreement, any Other Document or  the DIP Term Loan Documents, the Wynnefield Loan Documents or the consummation of the Transactions.

(c)     No Loan Party has any outstanding Indebtedness other than the Obligations, except for (i) Indebtedness disclosed in Schedule 5.8(c) hereto and (ii) Indebtedness otherwise permitted under Section 7.8 hereof.

(d)     No Loan Party is in violation of any applicable statute, law, rule, regulation or ordinance in any respect which could reasonably be expected to have a Material

Adverse Effect, nor is any Loan Party in violation of any order of any court, Governmental Body or arbitration board or tribunal.

(e)     No Loan Party or any member of the Controlled Group maintains or is required to contribute to any Plan other than those listed on Schedule 5.8(e) hereto. Each Plan is in compliance in all material respects with the applicable provisions of ERISA, the Internal Revenue Code and other Applicable Laws and, except as would not reasonably be expected to result, individually or in the aggregate, in a Material Adverse Effect: (i) Each Loan Party and each member of the Controlled Group has met all applicable minimum funding requirements under Section 302 of ERISA and Section 412 of the Internal Revenue Code in respect of each Pension Benefit Plan, and each Pension Benefit Plan is in compliance with Sections 412, 430 and 436 of the Internal Revenue Code and Sections 206(g), 302 and 303 of ERISA, without regard to waivers and variances; (ii) each Plan which is intended to be a qualified plan under Section 401(a) of the Internal Revenue Code as currently in effect has been determined by the Internal Revenue Service to be qualified under Section 401(a) of the Internal Revenue Code and the trust related thereto is exempt from federal income tax under Section 501(a) of the Internal Revenue Code or an application for such a determination is currently being processed by the Internal Revenue Code or the Plan is the subject of a favorable opinion or advisory letter from the Internal Revenue Service on the form of such Plan; (iii) neither any Loan Party nor any member of the Controlled Group has incurred any liability to the PBGC other than for the payment of premiums, and there are no premium payments which have become due which are unpaid; (iv) no Pension Benefit Plan has been terminated by the plan administrator thereof nor by the PBGC, and there is no occurrence which would reasonably be expected to cause the PBGC to institute proceedings under Title IV of ERISA to terminate any Pension Benefit Plan; (v) the current value of the assets of each Pension Benefit Plan exceeds the present value of the accrued benefits and other liabilities of such Pension Benefit Plan and neither any Loan Party nor any member of the Controlled Group knows of any facts or circumstances which would materially change the value of such assets and accrued benefits and other liabilities; (vi) neither any Loan Party nor any member of the Controlled Group has breached any of the responsibilities, obligations or duties imposed on it by ERISA with respect to any Plan; (vii) neither any Loan Party nor any member of the Controlled Group has incurred any liability for any excise tax arising under Section 4971, 4972 or 4980B of the Internal Revenue Code; (viii) neither any Loan Party nor any member of the Controlled Group nor any fiduciary of, nor any trustee to, any Plan, has engaged in a "prohibited transaction" described in Section 406 of ERISA or Section 4975 of the Internal Revenue Code nor taken any action which would constitute or result in a Termination Event with respect to any such Plan which is subject to ERISA; (ix) no Termination Event has occurred or is reasonably expected to occur; (x) there exists no Reportable ERISA Event; (xi) neither any Loan Party nor any member of the Controlled Group has engaged in a transaction that would reasonably be subject to Section 4069 or 4212(c) of ERISA; (xii) neither any Loan Party nor any member of the Controlled Group maintains or is required to contribute to any Plan which provides health, accident or life insurance benefits to former employees, their spouses or dependents, other than in accordance with Section 4980B of the Internal Revenue Code; (xiii) neither any Loan Party nor any member of the Controlled Group has withdrawn, completely or partially, within the meaning of Section 4203 or 4205 of ERISA, from any Multiemployer Plan so as to incur liability under the Multiemployer Pension Plan Amendments Act of 1980 and there exists no fact which would reasonably be expected to result in any such liability; and (xiv) no Plan fiduciary (as defined in

Section 3(21) of ERISA) has any liability for breach of fiduciary duty or for any failure in connection with the administration or investment of the assets of a Plan.

(f)    Schedule 5.8(f) lists each Canadian Pension Plan (including the applicable registration number(s) and any such plan which contains a defined benefit provision), as such term is defined in subsection 147.1(1) of the Income Tax Act (Canada) and, except as could not reasonably result in a Material Adverse Effect, (i) none of the Canadian Benefit Plans provide retiree welfare benefits or retiree life insurance benefits; (ii) the Canadian Pension Plans are registered under the Income Tax Act (Canada) and all other Applicable Laws which require registration and to the knowledge of the Loan Parties, no event has occurred which is reasonably likely to cause the loss of such registered status; (iii) except as could not reasonably be expected to result in a Material Adverse Effect, all material obligations of each of the Loan Parties required to be performed in connection with the Canadian Pension Plans have been performed in a timely fashion, in accordance with the terms of the particular plan, Applicable Law and the terms of all applicable collective bargaining agreements, participation agreements, employment contracts and funding agreements; (iv) except as could not reasonably be expected to result in a Material Adverse Effect, all employer and employee payments and contributions (including "normal cost", "special payments" and any other required payments in respect of any funding deficiencies or shortfalls) required to be withheld, made, remitted or paid by the Loan Parties to or in respect of each Canadian Pension Plan have been withheld, made, remitted or paid on a timely basis in accordance with the terms of such plans, any applicable collective bargaining agreement, participation agreement, employment contract and all Applicable Law; (v) to the knowledge of the Loan Parties, no condition exists and no event or transaction has occurred with respect to any Canadian Pension Plan that is reasonably likely to result in any Loan Party incurring any liability, fine or penalty; (vi) no Lien has arisen or exists in respect of a Loan Party or its property in connection with any Canadian Pension Plan; (vii) to the knowledge of the Loan Parties, there are no material outstanding disputes concerning the assets or liabilities of any Canadian Pension Plan; and (viii) no Loan Party has taken any action or intends to take any action to cause the termination or wind-up, in whole or in part, of any Canadian Pension Plan that contains a defined benefit provision as such term is defined in subsection 147.1(1) of the Income Tax Act (Canada) and each Loan Party is of the reasonable opinion that no circumstances exist or are expected to arise that would provide any basis for a Governmental Body under Applicable Law to take steps to cause the termination or wind-up, in whole or in part, of any Canadian Pension Plan.

(g)    No Loan Party currently participates in, contributes to or is obligated to contribute to a pension plan that, if contributed to by a Loan Party would constitute a Canadian Union Plan.

5.9.    <u>Intellectual Property</u>.  All Intellectual Property owned or utilized by any Loan Party: (a) is set forth on Schedule 5.9 hereto; and (b) constitutes all of the intellectual property rights which are necessary for the operation of its business.  Except, in each case, as would not, individually or in the aggregate, be reasonably likely to have a Material Adverse Effect: (i) such Intellectual Property is valid and has been duly registered or filed with all appropriate Governmental Bodies; (ii) there is no objection to, pending challenge to the validity of, or proceeding by any Governmental Body to suspend, revoke, terminate or adversely modify, any such Intellectual Property and no Loan Party is aware of any grounds for any challenge or

107

proceedings, except as set forth in Schedule 5.9 hereto; (iii) such Intellectual Property owned or held by any Loan Party consists of original material or property developed by such Loan Party or was lawfully acquired by such Loan Party from the proper and lawful owner thereof; and (iv) each of such items has been maintained so as to preserve the value thereof from the date of creation or acquisition thereof, other than with respect to such Intellectual Property that, in the reasonable judgment of such Loan Party, is determined to be uneconomical, negligible or obsolete in the conduct of its business.

5.10.   Licenses and Permits.  Except as set forth in Schedule 5.10 hereto, each Loan Party (a) is in compliance with and (b) has procured and is now in possession of, all material licenses or permits required by any applicable federal, state, provincial or local law, rule or regulation for the operation of its business in each jurisdiction wherein it is now conducting or proposes to conduct business and where the failure to comply with or procure such licenses or permits could reasonably be expected to have a Material Adverse Effect.

5.11.   [Reserved]

5.12.   EEA Financial Institution. No Loan Party is an EEA Financial Institution.

5.13.   No Burdensome Restrictions.   No Loan Party is party to any contract or agreement the performance of which could reasonably be expected to have a Material Adverse Effect.  As of the Closing Date, each Loan Party has heretofore delivered to Agent true and complete copies of all Material Contracts to which it is a party or to which it or any of its properties is subject.  No Loan Party has agreed or consented to cause or permit in the future (upon the happening of a contingency or otherwise) any of its property, whether now owned or hereafter acquired, to be subject to a Lien which is not a Permitted Encumbrance, except pursuant to customary provisions restricting pledges, assignments, subletting or other transfers contained in leases, licenses and similar agreements entered in the Ordinary Course of Business (provided that such restrictions are limited to the property or assets subject to such leases, licenses or agreements).

5.14.   No Labor Disputes.  No Loan Party is involved in any labor dispute; there are no strikes or walkouts or union organization of any Loan Party's employees in existence or, to any Loan Party's knowledge, threatened, that, individually or in the aggregate, would reasonably be expected to have a Material Adverse Effect, and no labor contract is scheduled to expire during the Term other than as set forth on Schedule 5.14 hereto.

5.15.   Margin Regulations.  No Loan Party is engaged, nor will it engage, principally or as one of its important activities, in the business of extending credit for the purpose of "purchasing" or "carrying" any "margin stock" within the respective meanings of each of the quoted terms under Regulation U of the Board of Governors of the Federal Reserve System as now and from time to time hereafter in effect.  No part of the proceeds of any Advance will be used for "purchasing" or "carrying" "margin stock" as defined in Regulation U of such Board of Governors.

5.16.   Investment Company Act.  No Loan Party is an "investment company" registered or required to be registered under the Investment Company Act of 1940, as amended, nor is it controlled by such a company.

5.17.   Swaps.  No Loan Party is a party to, nor will it be a party to, any swap agreement whereby such Loan Party has agreed or will agree to swap interest rates or currencies unless same provides that damages upon termination following an event of default thereunder are payable on an unlimited "two-way basis" without regard to fault on the part of either party.

5.18.   Business and Property of the Loan Parties.  Upon and after the Closing Date, the Loan Parties do not propose to engage in any business that is fundamentally and substantively different from their existing lines of business conducted by them on the Closing Date, taken as a whole, other than activities reasonably related, complementary or ancillary to such existing lines of business or reasonable extensions thereof. On the Closing Date, each Loan Party will own all the property and possess all of the rights and Consents necessary for the conduct of the business of such Loan Party.

5.19.   Ineligible Securities.  The Loan Parties do not intend to use and shall not use any portion of the proceeds of the Advances, directly or indirectly, to purchase during the underwriting period, or for 30 days thereafter, Ineligible Securities being underwritten by a securities Affiliate of Agent or any Lender.

5.20.   Federal Securities Laws.  No Loan Party (other than Holdings) or any of its Subsidiaries (a) is required to file periodic reports under the Exchange Act, (b) has any securities registered under the Exchange Act or (c) has filed a registration statement that has not yet become effective under the Securities Act.

5.21.   Equity Interests.  The authorized and outstanding Equity Interests of each Loan Party (other than Holdings), and each legal and beneficial holder thereof are as set forth on Schedule 5.21 hereto.  All of the Equity Interests of each Loan Party have been duly and validly authorized and issued and are fully paid and non-assessable and have been sold and delivered to the holders hereof in compliance with, or under valid exemption from, all federal and state and provincial laws and the rules and regulations of each Governmental Body governing the sale and delivery of securities.  Except for the rights and obligations set forth on Schedule 5.21 hereto, there are no subscriptions, warrants, options, calls, commitments, rights or agreement by which any Loan Party or any of the shareholders of any Loan Party is bound relating to the issuance, transfer, voting or redemption of shares of its Equity Interests or any pre-emptive rights held by any Person with respect to the Equity Interests of the Loan Parties.  Except as set forth on Schedule 5.21 hereto, the Loan Parties have not issued any securities convertible into or exchangeable for shares of its Equity Interests or any options, warrants or other rights to acquire such shares or securities convertible into or exchangeable for such shares.

5.22.   Commercial Tort Claims.  No Loan Party has any commercial tort claims except as set forth on Schedule 5.22 hereto.

5.23.   Letter of Credit Rights.  As of the Closing Date, no Loan Party has any letter of credit rights except as set forth on Schedule 5.23 hereto.

074658.23049/132216381v.5074658.23049/132216381v.9

5.24.  Material Contracts.  Schedule 5.24 hereto sets forth all Material Contracts of the Loan Parties, which, together with any updates provided pursuant to Section 9.17, are in full force and effect and no material defaults currently exist thereunder. No Loan Party has (i) received any notice of termination or non-renewal of any Material Contract, or (ii) exercised any option to terminate or not to renew any Material Contract, in each case of clauses (i) and (ii) above, prior to the scheduled maturity or termination thereof, and other than as a result of the satisfaction of all contractual obligations thereunder, as applicable.

5.25.  Investment Property Collateral.  (a) There are no restrictions on the pledge or transfer of any of the Subsidiary Stock other than restrictions referenced on the face of any certificates evidencing such Subsidiary Stock, restrictions under Applicable Law or restrictions stated in the Organizational Documents of such Loan Party with respect thereto, as applicable; (b) each Loan Party is the legal owner of the Investment Property pledged by it hereunder, which is registered in the name of such Loan Party, a custodian or a nominee; (c) the Investment Property is free and clear of any Liens except for Permitted Encumbrances which, in the case of any Investment Property constituting certificated securities, do not have priority over the Liens of Agent thereon; and (d) the pledge of and grant of the security interest in the Investment Property is effective to vest in Agent a valid security interest therein.

5.26.  DIP Term Loan Documents/Wynnefield Loan Documents.  Agent has received true, correct and complete copies of the DIP Term Loan Documents and the Wynnefield Loan Documents.  None of the DIP Term Loan Documents nor the Wynnefield Loan Documents has been amended or supplemented, nor have any of the provisions thereof been waived, except pursuant to a written agreement or instrument which has heretofore been delivered to Agent.

5.27.  Certificate of Beneficial Ownership.  The Certificate of Beneficial Ownership executed and delivered to Agent and Lenders for each Loan Party (other than Holdings) on or prior to the Closing Date, as updated from time to time in accordance with this Agreement, is accurate, complete and correct as of the date hereof and as of the date any such update is delivered. The Loan Parties acknowledge and agree that the Certificate of Beneficial Ownership is one of the Other Documents.

5.28.  Disclosure.  No representation or warranty made by any Loan Party in this Agreement, the Other Documents, the DIP Term Loan Documents, the Wynnefield Loan Documents or in any financial statement, report, certificate or any other document delivered in connection herewith or therewith contains when furnished any untrue statement of a material fact or omits to state any material fact necessary to make the statements herein or therein not misleading.  There is no fact known to any Loan Party or which should  be known to such Loan Party  which such Loan Party has not disclosed to Agent in writing with respect to the Transactions which could reasonably be expected to have a Material Adverse Effect.

5.29.  Braden Holdings.  Holdings is a holding company and does not engage in any operations or business, other than (a) the ownership of 99.998% of the outstanding Equity Interests in Braden Mexico, (b) maintaining its corporate existence pending its dissolution ~~pursuant to Section 6.16(d) hereof~~, and (c) liabilities, assets, operations and business incidental to the foregoing.

5.30.    <u>Sanctions and other Anti-Terrorism Laws</u>. No (a) Covered Entity, nor any employees, officers, directors, affiliates, consultants, brokers or agents acting on a Covered Entity's behalf in connection with this Agreement: (i) is a Sanctioned Person; (ii) directly, or indirectly through any third party, is engaged in any transactions or other dealings with or for the benefit of any Sanctioned Person or Sanctioned Jurisdiction, or any transactions or other dealings that otherwise are prohibited by any Anti-Terrorism Laws; (b) Collateral is Embargoed Property.

5.31.    <u>Anti-Corruption Laws</u>. Each Covered Entity has (a) conducted its business in compliance with all Anti-Corruption Laws and (b) has instituted and maintains policies and procedures designed to ensure compliance with such Laws.

5.32.    <u>Budget</u>.  The Initial Budget was prepared in good faith by a Responsible Officer of each Debtor and based upon assumptions which were reasonable in light of the conditions existing at the time of delivery thereof and reflect each Debtor's reasonable estimate of its future financial performance for such period, it being understood that projections by their nature are inherently uncertain and the results reflected therein may not actually be achieved and actual results may differ and differences may be material.

## VI.    AFFIRMATIVE COVENANTS.

Each Loan Party shall, until the Payment in Full of the Obligations, the termination of the Commitments and the termination of this Agreement:

6.1.    <u>Compliance with Laws</u>.  Comply in all material respects with all Applicable Laws with respect to the Collateral or any part thereof or to the operation of such Loan Party's business the non-compliance with which could reasonably be expected to have a Material Adverse Effect (except to the extent any separate provision of this Agreement shall expressly require compliance with any particular Applicable Laws pursuant to another standard).

6.2.    <u>Conduct of Business and Maintenance of Existence and Assets</u>.  (a) Conduct continuously and operate actively its business according to good business practices and maintain all of its properties useful or necessary in its business in good working order and condition (reasonable wear and tear excepted and except as may be disposed of in accordance with the terms of this Agreement), including all Intellectual Property and take all actions necessary to enforce and protect the validity of any Intellectual Property right or other right included in the Collateral; (b) keep in full force and effect its existence and comply in all material respects with all Applicable Laws governing the conduct of its business where the failure to do so could reasonably be expected to have a Material Adverse Effect; and (c) make all such reports and pay all such franchise and other taxes and license fees and do all such other acts and things as may be lawfully required to maintain its rights, licenses, leases, powers and franchises under the laws of the United States or Canada any political subdivision thereof; provided, that nothing in this Section 6.2 shall prevent any Loan Party from discontinuing operations of its Subsidiaries that are not Loan Parties or its Inactive Subsidiaries in accordance with the terms of this Agreement or maintaining any of the property of its Subsidiaries that are not Loan Parties or its Inactive

074658.23049/132216381v.5074658.23049/132216381v.9

Subsidiaries if such discontinuance is, in the business judgment of such Loan Party, desirable in the conduct of its Subsidiary's business and is not materially adverse to the Lenders.

6.3.    <u>Books and Records; Inspection Rights</u>. (a)  Keep proper books of record and account in which full, true and correct entries will be made in all material respects of all dealings or transactions of or in relation to its business and affairs (including without limitation accruals for taxes, assessments, Charges, levies and claims, allowances against doubtful Receivables and accruals for depreciation, obsolescence or amortization of assets), all in accordance with, or as required by, GAAP consistently applied in the opinion of such independent public accountant as shall then be regularly engaged by the Loan Parties.

(b)    Permit any representatives designated by the Agent or any Lender (including employees of the Agent, any Lender or any consultants, accountants, lawyers, agents and appraisers retained by the Agent), upon reasonable prior notice, to visit and inspect its properties, to conduct at such Loan Party's premises field examinations of such Loan Party's assets, liabilities, books and records, including examining and making extracts from its books and records, environmental assessment reports and Phase I or Phase II studies, and to discuss its affairs, finances and condition with its officers and independent accountants, all at such reasonable times and as often as reasonably requested.

6.4.    <u>Payment of Taxes</u>.    Pay, when due, all Priority Payables and all Taxes, assessments and other Charges lawfully levied or assessed upon such Loan Party or any of the Collateral, including real and personal property taxes, assessments and charges and all franchise, income, employment, social security benefits, withholding and sales Taxes; provided that no Loan Party shall be required to pay any Tax obligation which is being Properly Contested unless and until the non-payment of such Tax obligation results in a Lien attaching to such Loan Party's property, at which time such Loan Party shall immediately pay the full amount of such Tax obligation.  Subject to the foregoing sentence, if any Taxes, assessments or other Charges remain unpaid after the final date fixed for their payment, or if any claim shall be made which, in Agent's reasonable opinion, may possibly create a valid Lien on the Collateral, Agent may without notice to the Loan Parties pay the Taxes, assessments or other Charges and each Loan Party hereby indemnifies and holds Agent and each Lender harmless in respect thereof.  Agent will not pay any Taxes, assessments or Charges to the extent that any applicable Loan Party has Properly Contested those Taxes, assessments or Charges.  The amount of any payment by Agent under this Section 6.4 shall be charged to Borrowers' Account as a Revolving Advance maintained as a Domestic Rate Loan and added to the Obligations and, until the Loan Parties shall provide Agent with an indemnity therefor (or supply Agent with evidence reasonably satisfactory to Agent that due provision for the payment thereof has been made), Agent may hold without interest any balance standing to the Loan Parties' credit and Agent shall retain its security interest in and Lien on any and all Collateral held by Agent.

6.5.    <u>Use of Proceeds</u><del>6.6</del>1.2.          .

(a)    The Borrowers will use the proceeds of the Advances for the purposes set forth in Section 2.21.  Notwithstanding anything in this Agreement to the contrary, neither the Borrower nor any Credit Party may use the proceeds of the Advances or the proceeds of any Revolving <u>Loan</u> Priority Collateral to pay down any Obligations under and as defined in the DIP

Term Loan Credit Agreement or the DIP Term Loan Credit Documents, including, without limitation, any voluntary or mandatory prepayments thereunder.

(b)     No portion of the proceeds of any Advance will be used by the Borrowers in any manner, whether directly or indirectly, that causes or could reasonably be expected to cause any such Advance or the application of any such proceeds to violate Regulation T, Regulation U or Regulation X or any other regulation of the Board of Governors of the United States Federal Reserve System.

6.6.     [Reserved].

6.7.     Insurance.

(a)     (i) Keep all its insurable properties and properties in which such Loan Party has an interest insured against the hazards of fire, flood, sprinkler leakage, those hazards covered by extended coverage insurance and such other hazards, and for such amounts, as is customary in the case of companies in similar locations engaged in businesses similar to such Loan Party's including business interruption insurance; (ii) maintain a bond in such amounts as is customary in the case of companies in similar locations engaged in businesses similar to such Loan Party insuring against larceny, embezzlement or other criminal misappropriation of insured's officers and employees who may either singly or jointly with others at any time have access to the assets or funds of such Loan Party either directly or through authority to draw upon such funds or to direct generally the disposition of such assets; (iii) maintain public and product liability insurance against claims for personal injury, death or property damage suffered by others; (iv) maintain all such worker's compensation or similar insurance as may be required under the laws of any state or jurisdiction in which such Loan Party is engaged in business; and (v) deliver to Agent (A) copies of all policies and evidence of the maintenance of such policies by the renewal thereof at least thirty (30) days before any expiration date, and (B) appropriate loss payable endorsements in form and substance satisfactory to Agent, naming Agent as an additional insured, lender loss payee and, with respect to coverage on Material Owned Real Property, mortgagee, as applicable, as its interests may appear with respect to all insurance coverage referred to in clauses (i) and (iii) above, and providing (I) that all proceeds thereunder shall be payable to Agent, (II) no such insurance shall be affected by any act or neglect of the insured or owner of the property described in such policy, and (III) that such policy and loss payable clauses may not be cancelled, amended or terminated unless at least thirty (30) days prior written notice is given to Agent (or in the case of non-payment, at least ten (10) days prior written notice).  In the event of any loss thereunder, the carriers named therein hereby are directed by Agent and the applicable Loan Party to make payment for such loss to Agent and not to such Loan Party and Agent jointly.  If any insurance losses are paid by check, draft or other instrument payable to any Loan Party and Agent jointly, Agent may endorse such Loan Party's name thereon and do such other things as Agent may deem advisable to reduce the same to cash.

(b)     Each Loan Party shall take all actions required under the Flood Laws and/or requested by Agent to assist in ensuring that each Lender is in compliance with the Flood Laws applicable to the Collateral, including, but not limited to, providing Agent with the address and/or GPS coordinates of each structure on any Material Owned Real Property that will be subject to a mortgage or deed of trust in favor of Agent, and, to the extent required, obtaining

113

flood insurance for such property, structures and contents prior to such property, structures and contents becoming Collateral, and thereafter maintaining such flood insurance in full force and effect for so long as required by the Flood Laws.

(c)     Agent is hereby authorized to adjust and compromise claims under insurance coverage referred to in Sections 6.6(a)(i) and (iii) and 6.6(b) above and, subject to the Intercreditor Agreement, all loss recoveries received by Agent under any such insurance may be applied to the Obligations, in such order as Agent in its sole discretion shall determine. Any surplus shall be paid by Agent to the Loan Parties or applied as may be otherwise required by law. Any deficiency thereon shall be paid by the Loan Parties to Agent, on demand. If any Loan Party fails to obtain insurance as hereinabove provided, or to keep the same in force, Agent, if Agent so elects, may obtain such insurance and pay the premium therefor on behalf of such Loan Party, which payments shall be charged to Borrowers' Account and constitute part of the Obligations.

6.8.    <u>Payment of Obligations</u>.  Pay and discharge all its obligations and liabilities set forth in the Budget.

6.9.    <u>Environmental Matters</u>.

(a)     Ensure that all of the  Real Property owned or leased by any Loan Party and all operations and businesses conducted thereon are in compliance and remain in compliance with all Environmental Laws in all material respects, and it shall manage any and all Hazardous Materials on any  Real Property owned or leased by any Loan Party in compliance with Environmental Laws.

(b)     Establish and maintain an environmental management and compliance system intended to monitor continued material compliance with all applicable Environmental Laws which system shall include periodic environmental compliance audits to be conducted by knowledgeable environmental professionals. All potential material violations and violations of Environmental Laws shall be reviewed with legal counsel to determine any required reporting to applicable Governmental Bodies and any required corrective actions to address such potential violations or violations.

(c)     Respond promptly to any Hazardous Discharge or Environmental Complaint and take all necessary action in order to safeguard the health of any Person and to avoid subjecting the Collateral or Real Property to any Lien. If any Loan Party shall fail to respond promptly to any Hazardous Discharge or Environmental Complaint or any Loan Party shall fail to comply with any of the requirements of any Environmental Laws, to the extent such failure to comply is reasonably likely to result in a fine or penalty in excess of $500,000, Agent on behalf of Lenders may, but without the obligation to do so, for the sole purpose of protecting Agent's interest in the Collateral:  (i) give such notices or (ii) enter onto the applicable Real Property (or authorize third parties to enter onto such Real Property) and take such actions as Agent (or such third parties as directed by Agent) deems necessary or advisable, to remediate, remove, mitigate or otherwise manage with any such Hazardous Discharge or Environmental Complaint. All reasonable and documented out-of-pocket costs and expenses incurred by Agent and Lenders (or such third parties) in the exercise of any such rights, including any sums paid in

connection with any judicial or administrative investigation or proceedings, fines and penalties, together with interest thereon from the date expended at the Default Rate for Domestic Rate Loans constituting Revolving Advances shall be paid upon demand by the Loan Parties, and until paid shall be added to and become a part of the Obligations secured by the Liens created by the terms of this Agreement or any other agreement between Agent, any Lender and any Loan Party.

(d)     With respect to any Material Owned Property on which Agent has a mortgage, promptly upon the written request of Agent from time to time, the Loan Parties shall provide Agent, at the Loan Parties' expense, with an environmental site assessment or environmental compliance audit report prepared by an environmental engineering firm acceptable in the opinion of Agent, to assess with a reasonable degree of certainty the existence of a Hazardous Discharge and the potential costs in connection with abatement, remediation and removal of any Hazardous Materials found on, under, at or within all of the Real Property owned or leased by any Loan Party.  Any report or investigation of such Hazardous Discharge proposed and acceptable to the responsible Governmental Body shall be acceptable to Agent.  If such estimates exceed $500,000, Agent shall have the right to require the Loan Parties to post a bond, letter of credit or other security satisfactory to Agent to secure payment of these costs and expenses.

6.10.    <u>Standards of Financial Statements</u>.  Cause all financial statements referred to in Sections 9.7, 9.8, 9.9, 9.10, 9.11, 9.12 and 9.13 hereof as to which GAAP is applicable to be complete and correct in all material respects (subject, in the case of interim financial statements, to normal year-end audit adjustments and the absence of footnotes) and to be prepared in reasonable detail and in accordance with GAAP applied consistently throughout the periods reflected therein (except as disclosed therein and agreed to by such reporting accountants or officer, as applicable).

6.11.    <u>Federal Securities Laws</u>.  Promptly notify Agent in writing if any Loan Party (other than Holdings) or any of its Subsidiaries (a) is required to file periodic reports under the Exchange Act, (b) registers any securities under the Exchange Act or (c) files a registration statement under the Securities Act.

6.12.    <u>Execution of Supplemental Instruments</u>.  Execute and deliver to Agent from time to time, upon  demand, such supplemental agreements, statements, assignments and transfers, or instructions or documents relating to the Collateral, and such other instruments as Agent may reasonably request, in order that the full intent of this Agreement may be carried into effect.

6.13.    <u>Government Receivables</u>.  Take all steps necessary to protect Agent's interest in the Collateral under the Federal Assignment of Claims Act, the Uniform Commercial Code, PPSA, the Financial Administration Act (Canada) and all other applicable state, provincial or local statutes or ordinances and deliver to Agent appropriately endorsed, any instrument or chattel paper connected with any Receivable arising out of any contract between any Loan Party and the United States, Canada any state, province or territory or any department, agency or instrumentality of any of them.

6.14.    Keepwell.  If it is a Qualified ECP Loan Party, then jointly and severally, together with each other Qualified ECP Loan Party, hereby absolutely unconditionally and irrevocably (a) guarantees the prompt payment and performance of all Swap Obligations owing by each Non-Qualifying Party (it being understood and agreed that this guarantee is a guaranty of payment and not of collection), and (b) undertakes to provide such funds or other support as may be needed from time to time by any Non-Qualifying Party to honor all of such Non-Qualifying Party's obligations under this Agreement or any Other Document in respect of Swap Obligations (provided, however, that each Qualified ECP Loan Party shall only be liable under this Section 6.136.14 for the maximum amount of such liability that can be hereby incurred without rendering its obligations under this Section 6.136.14, or otherwise under this Agreement or any Other Document, voidable under Applicable Law, including Applicable Law relating to fraudulent conveyance or fraudulent transfer, and not for any greater amount).  The obligations of each Qualified ECP Loan Party under this Section 6.136.14 shall remain in full force and effect until the Payment in Full of the Obligations, the termination of the Commitments and the termination of this Agreement and the Other Documents.  Each Qualified ECP Loan Party intends that this Section 6.136.14 constitute, and this Section 6.136.14 shall be deemed to constitute, a guarantee of the obligations of, and a "keepwell, support, or other agreement" for the benefit of each other Loan Party for all purposes of Section 1a(18(A)(v)(II) of the CEA.

6.15.    Certificate of Beneficial Ownership and Other Additional Information.  Provide to Agent and the Lenders, promptly upon request: (a) confirmation of the accuracy of the information set forth in the most recent Certificate of Beneficial Ownership provided to Agent and Lenders; (b) a new Certificate of Beneficial Ownership, in form and substance acceptable to Agent and each Lender, when the individual(s) to be identified as a Beneficial Owner have changed; and (c) such other information and documentation as may be requested by Agent or any Lender from time to time for purposes of compliance by Agent or such Lender with Applicable Laws (including without limitation the USA Patriot Act and other "know your customer" and anti-money laundering rules and regulations), and any policy or procedure implemented by Agent or such Lender to comply therewith.

Anti-Corruption Laws, Ex-Im Laws, Anti-Money Laundering Laws and Sanctions(a)    Notwithstanding the general applicability of Section 6.1 above, comply with the requirements of all Anti-Corruption Laws, Ex-Im Laws, Anti-Money Laundering Laws and Sanctions applicable to Borrower and shall cause each other Loan Party and each of its and their respective Subsidiaries to comply with the requirements of all Anti-Corruption Laws, Ex-Im Laws, Anti-Money Laundering Laws and Sanctions applicable to such Persons.

(b)    Borrower will maintain in effect and enforce policies and procedures reasonably designed to ensure compliance by the Loan Parties and each of their Subsidiaries with applicable Anti-Corruption Laws, Ex-Im Laws, Anti Money-Laundering Laws and Sanctions.

6.17.    Inspection Rights and Appraisals; Meetings with the Agent.

(a)    Upon the request of the Agent after reasonable prior notice (unless an Event of Default is continuing in which case no notice shall be required), permit representatives and independent contractors of the Agent to visit and inspect any of its properties, to examine its

116

corporate, financial and operating records, and make copies thereof or abstracts therefrom, and to discuss its affairs, finances and accounts with its directors, officers, and Registered Public Accounting Firm, and permit the Agent or professionals (including investment bankers, consultants, accountants, and lawyers) retained by the Agent to conduct evaluations of the Loan Parties' business plan, forecasts and cash flows, at the expense of the Loan Parties, during normal business hours and as often as may be reasonably desired, upon reasonable advance notice to the Lead Borrower.

(b)    Upon the request of the Agent after reasonable prior notice, permit the Agent or professionals (including investment bankers, consultants, accountants, and lawyers) retained by the Agent to conduct field exams and other evaluations, including, without limitation, of (i) the Lead Borrower's practices in the computation of the Formula Amount and (ii) the assets included in the Formula Amount and related financial information such as, but not limited to, sales, gross margins, payables, accruals and reserves. The Loan Parties shall pay the fees and expenses of the Agent and such professionals with respect to such examinations and evaluations; provided however that so long as no Event of Default is continuing, Borrowers shall not be liable for the costs and expenses of more than three (3) field examinations during any of the Cases.

(c)    Upon the request of the Agent after reasonable prior notice, permit the Agent or professionals (including appraisers) retained by the Agent to conduct appraisals of the Inventory or Accounts. The Loan Parties shall pay the fees and expenses of the Agent and such professionals with respect to such appraisals; provided however that so long as no Event of Default is continuing, Borrowers shall not be liable for the costs and expenses of more than one (1) appraisal during any of the Cases.

(d)    Without limiting the foregoing, Borrowers shall host teleconferences and/or virtual conferences with the Agent and Lenders and any of their relevant advisors, and Borrowers shall cause members of the Borrowers' management team (including the chief restructuring officer) and any other relevant advisors to the Borrowers to participate in such teleconferences and/or virtual conferences, on at least a weekly basis on such dates and at such times as reasonably agreed between the Borrowers and the Agent or on such other dates and times as reasonably requested by Agent, the purpose of which conferences shall be for the Borrowers and Agent and Lenders (and their financial consultant) to discuss the Loan Parties' business and financial performance.

6.18.    <u>Treasury Management Services</u>. Each Loan Party shall continue to maintain its primary lockbox deposit accounts and Collection Accounts exclusively with PNC and shall utilize PNC for its primary disbursement account and other Treasury Management and Other Services.

6.19.    <u>Further Assurances</u>. At the Borrowers' cost and expense, promptly upon request of the Agent, duly execute and deliver or cause to be duly executed and delivered, to the Agent such further information, instruments, documents, certificates, financing and continuation statements, and do and cause to be done such further acts that may be reasonably necessary or advisable in the reasonable opinion of the Agent to carry out more effectively the provisions and purposes of this Agreement, the Security Instruments and the other Loan Document, including,

074658.23049/132216381v.5074658.23049/132216381v.9

to create, continue or preserve the liens and security interests in Collateral (and the perfection and priority thereof) of the Agent contemplated hereby and by the other Loan Documents and specifically including all Collateral acquired by the Borrowers after the Closing Date.

6.20.   [Reserved].

6.21.   Motor Vehicles.  Promptly after request by Agent, note, or have noted, Agent's Lien on all certificates of title constituting Collateral, to the extent such Collateral is located in the United States or Canada and subject to motor vehicle registration requirements, provided that Agent shall not request such notation unless such Collateral has a fair market value in excess of $100,000 in the aggregate.

6.22.   Bankruptcy Schedules and Covenants.

(a)   File with the Bankruptcy Court and deliver to Agent, all Schedules of each Debtor within the time periods required by the Bankruptcy Court.

(b)   Serve all:

(i)   secured creditors, all judgment creditors (if any) actually known to the Debtors, the twenty (20) largest unsecured creditors, the federal and state taxing authorities, any and all Governmental Bodies holding a claim and any other party claiming an interest in the Collateral in accordance with the Federal Rules of Bankruptcy Procedure a copy of the Motion and Interim Order as approved by the Bankruptcy Court in accordance with the Federal Rules of Bankruptcy Procedure; and

(ii)   all parties from whom any Debtor has received or that any Debtor believes they may have received goods from within twenty (20) days of the filing of each of the Cases, a copy of the Interim Order and notice of the hearing on entry of the proposed Final Order in accordance with the Federal Rules of Bankruptcy Procedure.

6.23.   Milestones.  Within the time periods set forth below, unless such time period(s) is/are extended in writing by the Agent in its sole and absolute discretion, each Debtor shall perform each action with respect to each of the Cases as set forth below (and for the avoidance of doubt all motions and pleadings set forth below shall be in form and substance acceptable to Agent):   Within one (1) Business Day after the Petition Date, file a motion (the "Bidding Procedures Motion") seeking among other things, approval of (A) bidding procedures for a post-petition 363 sale process of all of the Debtors' assets (the "Bidding Procedures") and (B) a sale of all or substantially all Accounts and Revolving Loan Priority Collateral that results as a result offrom the sale process;   On or prior to the third (3rd) Business Day after the Petition Date, the Bankruptcy Court shall have entered the Interim Order in form and substance acceptable to the Agent and its counsel;   On or prior to the eighteenth (18th) day after the Petition Date the Bankruptcy Court shall have approved the Bid Procedures;   On or prior to the twenty-fifth (25th) day after the Petition Date, the Bankruptcy Court shall have entered the Final Order in form and substance acceptable to the Agent and its counsel; On or prior to the fortieth (40th) day after the Petition Date (or such later date as may be agreed by the Agent), the bid deadline shall have occurred;   On or prior to the forty-second (42nd) day after the Petition

118

Date (or such later date as may be agreed by the Agent), the Debtors shall have commenced a public auction of the assets of Debtors in accordance with the Bidding Procedures (the "<u>Auction</u>"), to be held at a time and place acceptable to the Agent; On or prior to the forty-third (43rd) day after the Petition Date (or such later date as may be agreed by the Agent), the Debtors shall have filed a notice of winning bid(s) with respect to the sale of all or substantially all of the assets of Debtors with a purchaser acceptable to Agent, which winning bid shall provide for a purchase price sufficient to repay in full all Obligations (including for the avoidance of doubt, all Prepetition Revolving Obligations);        On or prior to the forty-fifth (45th)  day after the Petition Date (or such later date as may be agreed by the Agent), the Debtors shall have obtained court approval of the sale of all or substantially all of the assets of Debtors conducted in accordance with the Bidding Procedures (a "<u>Sale Order</u>"); and        On   or   prior   to   the fifty-seventh (57th)  day after the Petition Date (or such later date as may be agreed by the Agent), finalize and close one or more of the 363 Sales with sufficient proceeds to indefeasibly and finally pay and satisfy the Obligations (including for the avoidance of doubt, all Prepetition Revolving Obligations) at the closing of such 363 Sales, no later than the Maturity Date.No Milestone can be amended, modified or waived  without the prior written consent of the Agent.

6.24.   <u>Stalking Horse Agreement</u>.   The Loan Parties agree that the Stalking Horse Agreement shall not be amended, modified or any provision thereof waived (including by extending the closing under the Stalking Horse Agreement to a date that is later than fifty-seven (57) days after the Petition Date) without the prior written consent of the Agent, and (x) the proposed purchaser ("<u>Stalking Horse Bidder</u>") shall be acceptable to Agent in its sole discretion, (y) such offer to purchase the applicable Collateral shall be subject to the receipt of "higher and better bids" and shall provide for a purchase price sufficient to Pay in Full all Obligations and all Prepetition Obligations unless Agent otherwise agrees, and (z) the order approving such Stalking Horse Bidder and the applicable bid shall be acceptable to Agent in its sole discretion.

6.25.   <u>Canadian Pension Plans</u>.  Except when the failure to do so could not reasonably be expected to have a Material Adverse Effect, each Loan Party shall perform in all material respects all obligations required to be performed by such Borrower in connection with each applicable Canadian Pension Plan and remit all contributions under each applicable Canadian Pension Plan and required to be made or paid by it in accordance with Applicable Law and withhold by way of authorized payroll deductions, or otherwise collect and pay into the applicable Canadian Pension Plan, all employee contributions required to be withheld or collected by it in accordance with the terms of each applicable Canadian Pension Plan or Canadian Benefit Plan and Applicable Law.  Each Loan Party shall provide to the Agent (i) a copy of each Canadian Pension Plan, (ii) copies of each annual information return, where applicable, actuarial report (including applicable schedules), and any application for regulatory approval of asset withdrawals other than benefit or individual member account transfers with respect to each Canadian Pension Plan or any fund maintained in respect thereof, and (iii) copies of any notifications or remittances or similar documents prepared and delivered to the trustee or custodian of any Canadian Pension Plan pursuant to section 56.1 of the Pension Benefits Act (Ontario) or similar Applicable Law in another jurisdiction.

VII.    NEGATIVE COVENANTS.

No Loan Party shall, until the Payment in Full of the Obligations, the termination of the Commitments and the termination of this Agreement:

7.1.    Merger, Consolidation, Acquisition and Sale of Assets.

(a)    Enter into any merger, amalgamation, consolidation or other reorganization with or into any other Person, acquire all or a substantial portion of the assets or Equity Interests of any Person, permit any other Person to consolidate with or merge with it, or consummate an LLC Division.

(b)    Sell, lease, transfer or otherwise dispose of any of its properties or assets (in each case including by way of an LLC Division), except (i) the sale of Inventory and immaterial assets in the Ordinary Course of Business (including allowing any registrations or any applications for registration of any immaterial Intellectual Property to lapse or go abandoned in the Ordinary Course of Business), (ii) Dispositions of obsolete, worn out or surplus property in the Ordinary Course of Business and Dispositions of property no longer used or useful in the conduct of the business of Holdings and its Subsidiaries, (iii) Dispositions of property in the Ordinary Course of Business to the extent that (x) such property is exchanged for credit against the purchase price of similar replacement property that is promptly purchased or (y) the proceeds of such Disposition are promptly applied to the purchase price of such replacement property (which replacement property is actually promptly purchased), (iv) Dispositions of property to a Loan Party, (v) Dispositions, such as payments and withdrawals, made in the Ordinary Course of Business, of Cash and Cash Equivalents, that are not otherwise in violation of this Agreement, and (vi) sales of assets pursuant to transactions approved by the Agent and the Lenders and the Bankruptcy Court in the Cases.

7.2.    Creation of Liens(a)    .    Create or suffer to exist any Lien or transfer upon or against any of its property or assets now owned or hereafter created or acquired, except Permitted Encumbrances.

7.3.    Guarantees.    Become liable upon the obligations or liabilities of any Person by assumption, endorsement or guaranty thereof or otherwise (other than to Lenders) except (a) as disclosed on Schedule 7.3 hereto, (b) guarantees by one or more Loan Parties or Subsidiaries thereof of the Indebtedness or obligations of any other Loan Parties or Subsidiaries thereof to the extent such Indebtedness or obligations are permitted to be incurred and/or outstanding pursuant to the provisions of this Agreement and (c) the endorsement of checks in the Ordinary Course of Business.

7.4.    Investments.    Purchase or acquire obligations or Equity Interests of, or any other interest in, any Person, other than Permitted Investments and Permitted Joint Ventures solely as permitted hereunder.

7.5.    Loans.    Make advances, loans or extensions of credit to any Person, including any Parent, Subsidiary or Affiliate other than Permitted Loans.

7.6.    Capital Expenditures.    Contract for, purchase or make any expenditure or commitments for Capital Expenditures except in accordance with the Budget.

074658.23049/132216381v.5074658.23049/132216381v.9

7.7.    <u>Dividends and Distributions</u>.  Declare, pay or make any Restricted Distribution.

7.8.    <u>Indebtedness</u>.  Create, incur, assume or suffer to exist any Indebtedness, other than (a) Permitted Indebtedness, (b) Indebtedness arising from the Prepetition Term Credit Agreement and the DIP Term Credit Agreement, (c) the Wynnefield Indebtedness in an aggregate original principal amount not to exceed $750,000, plus any fees, costs or expenses or incurred or payable in connection therewith, plus any interest accrued thereon in accordance with the terms of the Wynnefield Loan Documents, so long as such Indebtedness is subject to a Subordination Agreement and no Loan Party makes any payment to the Wynnefield Lenders or otherwise in respect of such Indebtedness and (d) Indebtedness under the Loan Documents and the Prepetition Revolving Loan Documents.

7.9.    <u>Nature of Business</u>.  Substantially change the nature of the business in which it is presently engaged, nor except as specifically permitted hereby purchase or invest, directly or indirectly, in any assets or property other than in the Ordinary Course of Business for assets or property which are useful in, necessary for and are to be used in its business as presently conducted, in each case, except as contemplated by the Orders.

7.10.   <u>Transactions with Affiliates</u>.  Directly or indirectly purchase, acquire or lease any property from, or sell, transfer or lease any property to, or otherwise enter into any transaction or deal with, any Affiliate, except for (a) transactions among the Loan Parties (other than Inactive Subsidiaries) which are not expressly prohibited by the terms of this Agreement and which are in the Ordinary Course of Business, (b) payment by the Loan Parties (other than Inactive Subsidiaries) of dividends and distributions permitted under Section 7.7 hereof, and (c) transactions disclosed to Agent in writing, which are in the Ordinary Course of Business, on an arm's-length basis on terms and conditions no less favorable than terms and conditions which would have been obtainable from a Person other than an Affiliate, (d) the provision of insurance by a Permitted Captive Insurance Subsidiary to a Loan Party in the Ordinary Course of Business, and (e) the Wynnefield Indebtedness and the transactions contemplated thereby to the extent expressly permitted under Section 7.8.

7.11.   <u>Budget Compliance</u>. Except in each case as consented to by Agent in writing in its sole discretion, for the first calendar week of each of the Cases (ending [———]July 28, 2023) on both a two-week rolling basis as of the Friday of each week and a rolling basis from the Petition Date to the Friday of each week, (ia) aggregate cash receipts shall not be less than 90% of the aggregate amount set forth in the Budget for such calendar week, (iib) operating disbursements shall not exceed 10% ofabove the corresponding aggregate amount set forth in the Budget, (c) expenses for professionals shall not exceed 10% ofabove the corresponding aggregate amount set forth in the Budget, and (d) aggregate cash receipts net of aggregate operating disbursements shall not be less than 85% of the net amount set forth in the Budget.

7.12.   <u>Subsidiaries</u>.

(a)     Form any new Subsidiary after the Closing Date.

(b)     Form any new Captive Insurance Subsidiary after the Closing Date.

(c)     Enter into any partnership, Joint Venture (other than a Permitted Joint Venture) or similar arrangement after the Closing Date.

7.13.   <u>Fiscal Year and Accounting Changes</u>.  Change its fiscal year from December 31 or make any significant change (a) in accounting treatment and reporting practices except as required by GAAP or (b) in tax reporting treatment except as required by law.

7.14.   <u>Pledge of Credit</u>.  Now or hereafter pledge Agent's or any Lender's credit on any purchases, commitments or contracts or for any purpose whatsoever or use any portion of any Advance in or for any  business other than such Loan Party's  business operations as conducted on the Closing Date or any business reasonably related or ancillary thereto so long as any such business is a service and not manufacturing type business.

7.15.   <u>Amendment of Organizational Documents</u>.  (a) Change its legal name, (b) change its form of legal entity (e.g., converting from a corporation to a limited or unlimited liability company or vice versa), (c) change its jurisdiction of organization or become (or attempt or purport to become) organized in more than one jurisdiction, or (d) otherwise amend, modify or waive any term or material provision of its Organizational Documents unless required by law, in any such case without (i) giving at least thirty (30) days prior written notice of such intended change to Agent, (ii) if applicable, having received from Agent confirmation that Agent has taken all steps  necessary for Agent to continue the perfection of and protect the enforceability and priority of its Liens in the Collateral belonging to such Loan Party and in the Equity Interests of such Loan Party and (iii) in the event any such amendment, modification or waiver would be adverse to the interests of Agent or any Lender, having received the prior written consent of Agent and Required Lenders to such amendment, modification or waiver.

7.16.   <u>Compliance with ERISA</u>.

(a)     (i) (x) Maintain or permit any member of the Controlled Group to maintain, or (y) become obligated to contribute, or permit any member of the Controlled Group to become obligated to contribute, to any Pension Benefit Plan, other than those Plans disclosed on Schedule 5.8(d) hereto, or Multiemployer Plan, except as would not reasonably be expected to, individually or in the aggregate, result in a Material Adverse Effect, and (ii) engage, or permit any member of the Controlled Group to engage, in any non-exempt "prohibited transaction", as that term is defined or described in Section 406 of ERISA or Section 4975 of the Internal Revenue Code, (iii) terminate, or permit any member of the Controlled Group to terminate, any Pension Benefit Plan where such event would reasonably be expected to result in any liability of any Loan Party or any member of the Controlled Group or the imposition of a lien on the property of any Loan Party or any member of the Controlled Group pursuant to Section 4068 of ERISA, (iv) incur, or permit any member of the Controlled Group to incur, any withdrawal liability to any Multiemployer Plan; (v) fail promptly to notify Agent of the occurrence of any Termination Event, (vi) fail to comply, or permit any member of the Controlled Group to fail to comply, with the requirements of ERISA or the Internal Revenue Code or other Applicable Laws in respect of any Plan or Multiemployer Plan, (vii) fail to meet, permit any member of the Controlled Group to fail to meet, or permit any Pension Benefit Plan to fail to meet all minimum funding requirements under ERISA and the Internal Revenue Code, without regard to any waivers or variances, or postpone or delay or allow any member of the Controlled Group to

122

postpone or delay any funding requirement with respect to any Plan or Multiemployer Plan, or (viii) cause, or permit any member of the Controlled Group to cause, a representation or warranty in Section 5.8(d) hereof to cease to be true and correct.

(b)    No Loan Party shall (i) except as required by Applicable Law or except as could not reasonably result in a Material Adverse Effect, commence to participate in, maintain, contribute or assume an obligation to contribute to any single or multi-employer pension plan that contains a defined benefit provision, as such term is defined in subsection 147.1(1) of the Income Tax Act (Canada) for employees or former employees of a Borrower, arising from employment in Canada (including, for greater certainty, any pension plan which would constitute a Canadian Union Plan if contributed to by a Borrower) other than those Canadian Pension Plans disclosed on Schedule 5.9(b), (ii) without the prior consent of the Agent (which consent shall not be unreasonably withheld, conditioned or delayed) acquire an interest in any Person if such Person sponsors, administers, maintains or contributes to, or has any liability in respect of, the defined benefit provision, as such term is defined in subsection 147.1(1) of the Income Tax Act (Canada), of any pension plan which would constitute a Canadian Pension Plan or a Canadian Union Plan if contributed to by a Borrower, (iii) take any action to cause the wind-up, in whole or in part, of any Canadian Pension Plan or which would cause circumstances to exist that would reasonably be expected to provide any basis for a Governmental Body under Applicable Law to take steps to cause the wind-up, in whole or in part, of any Canadian Pension Plan, (iv) except when the failure to do so could not reasonably be expected to have a Material Adverse Effect, fail to meet all required minimum funding requirements under Applicable Law with respect to any Canadian Pension Plan, (v) fail promptly to notify Agent of the occurrence of any Canadian Pension Event, (vi) except when the failure to do so could not reasonably be expected to have a Material Adverse Effect, fail to comply with the requirements of Applicable Law in respect of any Canadian Pension Plan, or (vii) cause a representation or warranty in Section 5.9(b) to cease to be true and correct.

7.17.    Prepayment of Indebtedness~~7.18~~1.3. .  At any time, directly or indirectly, prepay any Indebtedness, or repurchase, redeem, retire or otherwise acquire any Indebtedness of any Loan Party other than (a) Indebtedness owed to Lenders, (b) as permitted pursuant to Section 7.19 hereof and (c) payments not prohibited under the Intercreditor Agreement and in accordance with the Orders.

7.18.    [Reserved].

7.19.    DIP Term Loan.  At any time, directly or indirectly, pay, prepay, repurchase, redeem, retire or otherwise acquire, or make any payment on account of any principal of, interest on or premium payable in connection with the repayment or redemption of the DIP Term Loan, provided, however, that the Loan Parties may make payments of Term Loan Adequate Protection Claims or regularly scheduled payments of interest on the DIP Term Loans, at the times and in the amounts set forth in the DIP Term Loan Agreement in accordance with the Bankruptcy Orders so long as proceeds from the Advances are not used to make any such payments.

7.20.    Other Agreements.  Enter into any material amendment, waiver or modification of (a) the DIP Term Loan Documents or any related agreements, except for amendments or

074658.23049/132216381v.5074658.23049/132216381v.9

modifications made in full compliance with the Intercreditor Agreement or (b) the Wynnefield Loan Documents.

7.21.    <u>Locations</u>.  No Loan Party shall move its chief executive office from the location set forth on Schedule 4.4(b)(iii) hereto (as updated from time to time), permit its material books and records or servers which contain information or data not available at its chief executive office to be located at any location not set forth on Schedule 4.4(b)(iii) hereto, or maintain any place of business other than those set forth on Schedule 4.4 hereto, in each case, without (a) providing Agent with prior written notice thereof, which notice shall be deemed to update Schedule 4.4 hereto, and (b) if requested by Agent with respect to locations of material books, records and servers, using commercially reasonable efforts to provide to Agent a Lien Waiver Agreement duly executed by the owner or lessor of such location.

7.22.    <u>Canadian Loan Party Bank Accounts</u>.  Allow any Canadian Loan Party to maintain deposits in any Canadian Loan Party Bank Account at any one time in excess of $100,000 for all such Canadian Loan Party Bank Accounts in the aggregate.  The Canadian Loan Party shall cause any such excess to promptly be deposited into a Depository Account in U.S. Dollars.  Agent may at any time and from time to time request evidence of the balances in any Canadian Loan Party Bank Account and, upon any such request, the Loan Parties shall deliver to Agent a snap shot reflecting the balances as of the close of business of the date any such request was made.

7.23.    <u>Canadian Loan Parties</u>.  No Canadian Loan Party shall own any property or assets in the United States without first executing and delivering to Agent a security agreement governed by New York law and such other security documents requested by Agent or any Lender to protect, secure, perfect Agent's security interest and Lien on any such property or assets constituting Collateral, all in form and substance acceptable to Agent.

7.24.    <u>Inactive Subsidiaries</u>.  Notwithstanding anything to the contrary contained herein, allow any Inactive Subsidiary to (i) engage in any business activities or conduct any operations, other than maintaining its corporate existence pending its dissolution pursuant to Section 7.1 hereof, (ii) own any material assets, (iii) have any Subsidiaries or (iv) have or incur any liabilities (other than (A) those existing as of the Closing Date and (B) any contingent liability arising under this Agreement, any of the Other Documents or any of the DIP Term Loan Documents), without first obtaining Agent's prior written consent.

7.25.    [Reserved].

7.26.    <u>Term Loan Priority Collateral Account</u>.  Deposit any Cash or Cash Equivalents in the Term Loan Priority Collateral Account unless required by the DIP Term Loan Agreement and the Intercreditor Agreement each in effect on the Closing Date without providing Agent prior written notice thereof, which such written notice shall include an accounting, in reasonable detail, of the item sold and/or event that triggered the requirement under the DIP Term Loan Agreement of such Loan Party to make such deposit.

7.27.    <u>Bankruptcy Matters</u>.

074658.23049/132216381v.5074658.23049/132216381v.9

(a)    Directly or indirectly, seek, consent or suffer to exist: (i) any modification, stay, vacation or amendment to the Interim Order or Final Order, unless the Administration Agent has consented to such modification, stay, vacation or amendment in writing; (ii) entry of any order that could adversely affect Agent's liens on the Collateral or its recovery in any Case that is not, in form and substance, satisfactory to Agent in its Permitted Discretion; (iii) a priority claim for any administrative expense or unsecured claim (now existing or hereafter arising of any kind or nature whatsoever, including any administrative expenses of the kind specified in the Bankruptcy Code, including without limitation Sections 105, 326, 328, 330, 331, 364(c)(1), 365, 503, 506(c) (upon entry of the Final Order), 507, 546, 726, 1113 or 1114 of the Bankruptcy Code) equal or superior to the Superpriority Claim of the Secured Parties in respect of the Obligations and Prepetition Obligations; or (iv) any Lien on any Collateral, having a priority equal or superior to the Lien in favor of the Agent in respect of the Obligations (subject to the Senior Liens (as defined in the Interim Order) and the Lien Priority Chart);

(b)    Prior to the date on which the Obligations (and prior to entry of the Final Order, the Prepetition Obligations) have been indefeasibly paid in full in cash and Lenders' commitment to make Revolving Advances has been terminated, no Debtor shall pay any administrative expense claims not provided for in the Budget; provided however that a Debtor may pay administrative expense claims with respect to (i) any Obligations (and prior to entry of the Final Order, the Prepetition Obligations) due and payable hereunder or under the Interim Order or Final Order and (ii) Statutory Fees; or

(c)    Amend, modify or supplement any final order of the Bankruptcy Court relating to or any agreement providing for an Approved Bankruptcy Sale without the prior written consent of Agent.

VIII.    CONDITIONS PRECEDENT.

8.1.    <u>Conditions to Initial Advances</u>.  The agreement of Lenders to make the initial Advances requested to be made on the Closing Date is subject to the satisfaction, or waiver by Agent, immediately prior to or concurrently with the making of such Advances, of the following conditions precedent, each in form and substance acceptable to Agent:

(a)    <u>Other Documents</u>.  Agent shall have received each of the Other Documents, in each case duly authorized, executed and delivered by the Loan Parties and any other Person party thereto;

(b)    <u>Intercreditor Agreement</u>.  Agent, Prepetition Revolving Agent, DIP Term Loan Agent and Prepetition Term Loan Agent shall have each entered into the amendment to the Intercreditor Agreement;

(c)    [Reserved].

(d)    <u>Default</u>.  No Default has occurred or is continuing or would result after giving effect to this Agreement and the other Loan Documents;

(e)    <u>Closing Certificate</u>.  Agent shall have received a closing certificate signed by the Chief Financial Officer of each Loan Party dated as of the Closing Date, stating that (i) all

representations and warranties set forth in this Agreement and the Other Documents are true and correct on and as of such date, and (ii) on such date no Default or Event of Default has occurred or is continuing;

(f)    Stock Certificates.  Agent shall have received copies of stock certificates representing 100% (or 66.67%, as applicable) of the Equity Interests of each Subsidiary of Holdings, together with stock powers executed in blank, to the extent such Equity Interests are certificated;

(g)    Borrowing Base.  Agent shall have received a Borrowing Base Certificate providing evidence that the aggregate amount of  Eligible Receivables, and Eligible Unbilled Receivables is sufficient in value and amount to support Revolving Advances in the amount requested by the Borrowers on the Closing Date, certified by a Responsible Officer of each Borrower;

(h)    DIP Term Loan.   Agent shall have received the DIP Term Loan Agreement, which shall, among other things, provide for debtor in possession financing provided by the DIP Term Loan Lenders in an aggregate principal amount not less than $19,500,000, with an initial advance funded on the Closing Date in the aggregate principal amount of at least $14,000,000, a second advance to be funded on or within one (1) Business Day after the Final Order has been entered by the Bankruptcy Court in the aggregate principal amount of at least $2,750,000, and a third advance to be funded on the date which is one (1) calendar week after the Final Order has been entered by the Bankruptcy Court in the aggregate principal amount of at least $2,750,000; *provided* that the form of DIP Term Loan Agreement shall be deemed acceptable to the Agent;

(i)    Organization Chart.  Agent shall have received from the Borrower an accurate and complete organization chart reflecting all of the direct and indirect Subsidiaries and joint ventures of Holdings (and any other Person in which Holdings or any of the foregoing Subsidiaries or joint ventures holds Equity Interests) (including the applicable ownership percentages) as of: (i) the date immediately prior to the Closing Date (the "Pre-Closing Organization Chart"), and (ii) the date immediately following the Closing Date (the "Post-Closing Organization Chart") (collectively, the "Organization Charts").  To the extent that the Pre-Closing Organization Chart is identical to the Post-Closing Organization Chart, the Borrower may certify to Agent that the Post-Closing Organization Chart is identical to the Pre-Closing Organization Chart;

(j)    Filings, Registrations and Recordings.  Each document (including any Uniform Commercial Code financing statements, and PPSA financing statements, Uniform Commercial Code termination statements and PPSA termination statements) required by this Agreement, any of the Other Documents or under Applicable Law or requested by Agent to be filed, registered or recorded in order to create, in favor of Agent, a perfected security interest in or lien upon the Collateral and in order to terminate the perfected security interest in or lien upon the Collateral of Existing Lenders shall have been properly filed, registered or recorded in each jurisdiction in which the filing, registration or recordation thereof is so required or requested, and Agent shall have received an acknowledgment copy, or other evidence reasonably

126

satisfactory to it, of each such filing, registration or recordation and reasonably satisfactory evidence of the payment of any necessary fee, tax or expense relating thereto;

(k)    <u>Secretary's Certificates, Authorizing Resolutions and Good Standing Certificates</u>.  Agent shall have received, in form and substance  reasonably satisfactory to Agent, a certificate of the Secretary or Assistant Secretary (or other equivalent officer or manager) of each Loan Party dated as of the Closing Date which shall certify (i) copies of resolutions, in form and substance reasonably satisfactory to Agent, of the board of directors (or other equivalent governing body or member) of such Loan Party authorizing (x) the execution, delivery and performance of this Agreement and the Other Documents to which such Loan Party is a party (including authorization of the incurrence of Indebtedness, borrowing of Advances and requesting of Letters of Credit on a joint and several basis with all Loan Parties as provided for herein), and (y) the granting by such Loan Party of the Liens upon the Collateral to secure all of the joint and several Obligations of the Loan Parties (and such certificate shall state that such resolutions have not been amended, modified, revoked or rescinded as of the date of such certificate), (ii) the incumbency and signature of the officers of such Loan Party authorized to execute this Agreement and the Other Documents, (iii) copies of the Organizational Documents of such Loan Party as in effect on such date, complete with all amendments thereto, and (iv) the good standing (or equivalent status) of such Loan Party in its jurisdiction of organization and each applicable jurisdiction where the conduct of such Loan Party's business activities or the ownership of its properties necessitates qualification and where the failure to so qualify could reasonably be expected to have a Material Adverse Effect on such Loan Party, as evidenced by good standing certificates (or the equivalent thereof issued by any applicable jurisdiction) dated not more than thirty (30) days prior to the Closing Date, issued by the Secretary of State or other appropriate official of each such jurisdiction;

(l)    <u>Opinion of Counsel</u>.  Agent shall have received, in form and substance reasonably satisfactory to Agent, the executed legal opinion of Thompson Hine LLP (US counsel to the Loan Parties ), which shall cover such matters incident to the Transactions as Agent may reasonably require and each Loan Party hereby authorizes and directs such counsel to deliver such opinions to Agent and Lenders;

(m)    <u>No Litigation</u>.  Except for the Cases, no litigation, investigation or proceeding before or by any arbitrator or Governmental Body shall be continuing or, to any Loan Party's knowledge, threatened against any Loan Party or against the officers or directors of any Loan Party (A) in connection with this Agreement, the Other Documents, the DIP Term Loan Documents, the Wynnefield Loan Documents or any of the transactions contemplated hereby or thereby or (B) which could, in the reasonable opinion of Agent, reasonably be expected to have a Material Adverse Effect; and (ii) no injunction, writ, restraining order or other order of any nature materially adverse to any Loan Party or the conduct of its business or inconsistent with the due consummation of the Transactions shall have been issued by any Governmental Body;

(n)    <u>Fees</u>.  Agent shall have received all fees due and payable on the Closing Date for Agent and for the pro rata benefit of the Lenders and shall have reimbursed Agent for all reasonable attorneys' fees, and other costs and expenses of closing due and owing and presented as of the Closing Date, each in immediately available funds, or authorized the Agent to

127

deduct the fees due and payable on the Closing Date under Article III hereof and such other fees, costs and expenses of closing from the amount of any Advance made on the Closing Date;

(o)    Insurance.  Agent shall have received, in form and substance reasonably satisfactory to Agent, (i) evidence that adequate insurance, including without limitation, casualty and liability insurance, required to be maintained under this Agreement is in full force and effect, (ii) insurance certificates issued by the Loan Parties' insurance broker containing such information regarding the Loan Parties' casualty and liability insurance policies as Agent shall request and naming Agent as an additional insured and lenders loss payee, as applicable;

(p)    Payment Instructions.  Agent shall have received written instructions from Borrowing Agent directing the application of proceeds of the initial Advances made pursuant to this Agreement;

(q)    Consents.  Agent shall have received any and all Consents necessary to permit the effectuation of the Transactions and Agent shall have received such Consents and waivers of such third parties as might assert claims with respect to the Collateral, as Agent shall deem necessary;

(r)    No Material Adverse Effect.  (i) Since the Petition Date, there shall not have occurred any event, condition or state of facts which could reasonably be expected to have a Material Adverse Effect and (ii) no representations made or information supplied to Agent or Lenders shall have been proven to be inaccurate or misleading in any material respect;

(s)    Compliance with Laws.  Agent shall be satisfied that each Loan Party is in compliance in all material respects with all pertinent federal, state, provincial, local or territorial regulations, including those with respect to the Federal Occupational Safety and Health Act, the Environmental Protection Act, ERISA and the Anti-Terrorism Laws;

(t)    Certificate of Beneficial Ownership; USA Patriot Act Diligence.  Agent and each Lender shall have received, in form and substance acceptable to Agent, a Certificate of Beneficial Ownership duly authorized, executed and delivered by each Loan Party (other than Holdings) and such other documentation and other information requested in connection with applicable "know your customer" and anti-money laundering rules and regulations, including the USA Patriot Act;

(u)    Bankruptcy Cases.  Each of the Cases shall have been commenced in the Bankruptcy Court and all of the First Day Orders (including without limitation those motions and orders seeking approval of Bidding Procedures (as hereinafter defined) and the Approved 363 Sales with respect to Revolving Loan Priority Collateral entered at the time of commencement of the Cases shall be reasonably satisfactory, in form and substance, to Agent and no trustee or examiner shall have been appointed with respect to any Debtor, or any property of or any estate of any Debtor.

(v)    Interim Order.  The Interim Order shall have been entered by the Bankruptcy Court, which Interim Order (i) shall have been entered upon an application or motion of the Debtors reasonably satisfactory in form and substance to Agent and upon prior notice to such parties required to receive such notice and such other parties as may be reasonably

128

requested by Agent; (ii) shall be in full force and effect and shall not have been amended, modified or stayed, or reversed; and, if the Interim Order is the subject of a pending objection, appeal or motion for reconsideration in any respect, neither the Interim Order, nor the making of the Advances or the performance by any Debtor of any of the Obligations shall be the subject of a presently effective stay, and (iii) shall otherwise satisfy the requirements of the definition of Interim Order set forth herein.  The Debtors and the Secured Parties shall be entitled to rely in good faith upon the Interim Order notwithstanding any such objection, appeal or motion for reconsideration.

       (w)   <u>Budget</u>.  Agent shall have received and approved the Initial Budget.

       (x)   <u>Cash Management Order</u>.    The Bankruptcy Court shall have entered a Cash Management Order adopting and implementing cash management arrangements for the Debtors, which shall be in form and substance and on terms and conditions acceptable to Agent;

       (y)   <u>Stalking Horse Agreement</u>.  Agent shall have received a fully executed Stalking Horse Agreement providing for payment in full of the Obligations and the Prepetition Obligations from the application of sale proceeds in accordance with the Interim Order and the priorities set forth therein, which Stalking Horse Agreement shall also be on terms acceptable to the Agent in its sole discretion;

       (z)   <u>Sales Procedure</u>.  The Debtors shall have submitted a proposed form of bidding procedures sales order (or agreed to motion filed requesting such order) acceptable to the Agent and Lenders;

       (aa)   <u>Water Projects Contracts</u>.   The Debtors shall have filed a motion requesting the rejection of the Water Projects Contracts;

       (bb)   <u>Chief Restructuring Officer</u>.  Borrower shall have appointed a chief restructuring officer reasonably acceptable to the Agent and Lenders; and

       (cc)   <u>Other</u>.  All corporate and other proceedings, and all documents, instruments and other legal matters in connection with the Transactions shall be satisfactory in form and substance to Agent.

    8.2.   <u>Conditions to Each Advance</u>.  The agreement of Lenders to make any Advance requested to be made on any date (including the initial Advance), is subject to the satisfaction of the following conditions precedent as of the date such Advance is made:

       (a)   <u>Representations and Warranties</u>.    Each of the representations and warranties made by any Loan Party in or pursuant to this Agreement and the Other Documents, and each of the representations and warranties in any agreement, document, instrument, certificate or financial or other statement provided at any time under or in connection with this Agreement and the Other Documents shall be true and correct in all material respects on and as of such date as if made on and as of such date (except to the extent any such representation or warranty expressly relates only to any earlier and/or specified date);

(b)      No Default.  No Event of Default or Default shall have occurred and be continuing on such date, or would exist after giving effect to the Advances requested to be made, on such date; provided, however that Agent, in its sole discretion, may continue to make Advances notwithstanding the existence of an Event of Default or Default and that any Advances so made shall not be deemed a waiver of any such Event of Default or Default;

(c)      Maximum Advances.  In the case of any type of Advance requested to be made, after giving effect thereto, the aggregate amount of such type of Advance shall not exceed the maximum amount of such type of Advance permitted under this Agreement; and prior to and after giving effect to the proposed Credit Extension, the Total Revolving Credit Outstandings shall not exceed the Maximum Borrowing Amount;

(d)      Milestones.  The Milestones set forth in Section 6.23 (applicable as of the date of such Advance) shall have been achieved;

(e)      Budget.  In connection with each request of an Advance pursuant to Section 2.1 hereof, Debtors shall deliver to Agent a written notice identifying the line-items on the applicable Approved Budget that Debtors intend to pay with the proceeds of such Advance;

(f)      Stalking Horse Agreement.  The Stalking Horse Agreement shall remain in full force and effect, and no default or breach thereunder shall have occurred and be continuing;

(g)      DIP Term Loan Funding.  The DIP Term Loan Lenders shall have made all of the advances of the DIP Term Loans (applicable as of the date of such Advance) as set forth in the DIP Term Loan Credit Agreement; and

(h)      Interim Order / Final Order.   The Interim Order, or, after the entry of the Final Order, the Final Order, shall be in full force and effect and shall not be the subject of any appeal, motion for reconsideration, stay, order of reversal, amendment or modification.

Each request for an Advance by any Borrower hereunder shall constitute a representation and warranty by each Loan Party as of the date of such Advance that the conditions of this subsection shall have been satisfied.

IX.      INFORMATION AS TO THE LOAN PARTIES.

Each Loan Party shall, or (except with respect to Section 9.11 hereof) shall cause Borrowing Agent on its behalf to, until the Payment in Full of the Obligations, the termination of the Commitments and the termination of this Agreement:

9.1.   Disclosure of Material Matters.  Promptly upon a Responsible Officer obtaining knowledge thereof, report to Agent (a) all matters materially affecting the value, enforceability or collectability of any portion of the Collateral, including any Loan Party's reclamation or repossession of, or the return to any Loan Party of, a material amount of goods or claims or disputes asserted by any Customer or other obligor, and (b) any investigation, hearing,

proceeding or other inquest by any Governmental Body into any Loan Party or any Affiliate of any Loan Party with respect to Anti-Terrorism Laws.

9.2.    <u>Schedules</u>.  Deliver to Agent, in form and substance satisfactory to Agent: (a) on or before the twentieth (20th) day of each month as and for the prior month (i) accounts receivable agings inclusive of reconciliations to the general ledger, (ii) accounts payable schedules inclusive of reconciliations to the general ledger, (iii) Inventory reports, (iv) bank statements evidencing the balances of each Canadian Loan Party Bank Account for each day in the prior month, and (v) a Borrowing Base Certificate (which (A) shall be calculated as of the last day of the prior month, (B) shall not be binding upon Agent or restrictive of Agent's rights under this Agreement and (C) shall include a listing of all Priority Payables (which such listing shall identity the obligee of each Priority Payable and the estimated value of such Priority Payable)), and (b) on or before Tuesday of each week, a sales report / roll forward for the prior week, and (c) at such intervals as Agent may require: (i) confirmatory assignment schedules; (ii) copies of Customer's invoices; (iii) evidence of shipment or delivery; and (iv) such further schedules, documents and/or information regarding the Collateral as Agent may require including trial balances and test verifications.  Agent shall have the right to confirm and verify all Receivables by any manner and through any medium it considers advisable and do whatever it may deem necessary to protect its interests hereunder.  The items to be provided under this Section are to be in form reasonably satisfactory to Agent and executed by each Loan Party and delivered to Agent from time to time solely for Agent's convenience in maintaining records of the Collateral, and any Loan Party's failure to deliver any of such items to Agent shall not affect, terminate, modify or otherwise limit Agent's Lien with respect to the Collateral.  Unless otherwise agreed to by Agent, the items to be provided under this Section 9.2 shall be delivered to Agent by the specific method of Approved Electronic Communication designated by Agent.

9.3.    <u>Environmental Reports</u>.

(a)    Deliver to Agent, concurrently with the delivery of the financial statements referred to in Sections 9.7 and 9.8 hereof, with a certificate signed by the President, Chief Executive Officer or Controller of Borrowing Agent stating, to the best of his knowledge, that each Loan Party is in compliance in all material respects with all applicable Environmental Laws, except to the extent such non-compliance could not reasonably be expected to result in a Material Adverse Effect.  To the extent any Loan Party is not in such material compliance with the foregoing laws, the certificate shall set forth with specificity all areas of non-compliance and the proposed action such Loan Party will implement in order to achieve full compliance.

(b)    In the event any Loan Party obtains, gives or receives notice of any Release or threat of Release of a reportable quantity of any Hazardous Materials at any  Real Property owned or leased by any Loan Party (any such event being hereinafter referred to as a "Hazardous Discharge") or receives any written notice of violation, request for information or notification that it is potentially responsible for investigation or cleanup of environmental conditions at any such Real Property, demand letter or complaint, order, citation, or other written notice with regard to any Hazardous Discharge or violation of Environmental Laws affecting such Real Property or any Loan Party's interest therein or the operations or the business (any of the foregoing is referred to herein as an "Environmental Complaint") from any Person, including any Governmental Body, then Borrowing Agent shall, within five (5) Business Days, give

131

written notice of same to Agent detailing facts and circumstances of which any Loan Party is aware giving rise to the Hazardous Discharge or Environmental Complaint.  Such information is to be provided to allow Agent to protect its security interest in and Lien on the Collateral and is not intended to create nor shall it create any obligation upon Agent or any Lender with respect thereto.

(c)    Borrowing Agent shall promptly forward to Agent copies of any request for information, notification of potential liability, demand letter relating to potential responsibility with respect to the investigation or cleanup of Hazardous Materials at any other site owned, operated or used by any Loan Party to manage of Hazardous Materials and shall continue to forward copies of correspondence between any Loan Party and the Governmental Body regarding such claims to Agent until the claim is settled.  Borrowing Agent shall promptly forward to Agent copies of all material documents and reports concerning a Hazardous Discharge or Environmental Complaint at any  Real Property owned or leased by any Loan Party, operations or business that any Loan Party is required to file under any Environmental Laws.  Such information is to be provided solely to allow Agent to protect Agent's security interest in and Lien on the Collateral.

9.4.    <u>Litigation</u>.  Promptly notify Agent in writing of any claim, litigation, suit or administrative proceeding affecting any Loan Party, whether or not the claim is covered by insurance, and of any litigation, suit or administrative proceeding, which in any such case affects the Collateral or which could reasonably be expected to have a Material Adverse Effect.

9.5.    <u>Material Occurrences</u>.  Immediately upon a Responsible Officer obtaining knowledge thereof, notify Agent in writing upon the occurrence of: (a) any Event of Default or Default; (b) any event of default under the DIP Term Loan Documents or the Wynnefield Loan Documents; (c) any event which with the giving of notice or lapse of time, or both, would constitute an event of default under the DIP Term Loan Documents or the Wynnefield Loan Documents; (d) any event, development or circumstance whereby any financial statements or other reports provided to Agent fail in any material respect to present fairly, in accordance with GAAP consistently applied, the financial condition or operating results of any Loan Party as of the date of such statements; (e) any funding deficiency which, if not corrected as provided in Section 4971 of the Internal Revenue Code, could subject any Loan Party or any member of the Controlled Group to a tax imposed by Section 4971 of the Internal Revenue Code in excess of $500,000 or result in any representation made in Section 5.8 to be untrue; (f) each and every default by any Loan Party which might result in the acceleration of the maturity of any Indebtedness in excess of $500,000, including the names and addresses of the holders of such Indebtedness with respect to which there is a default existing or with respect to which the maturity has been or could be accelerated, and the amount of such Indebtedness; (g) any other development in the business or affairs of any Loan Party, which could reasonably be expected to have a Material Adverse Effect and (h) if any Loan Party is out of good standing in jurisdiction of organization and or is disqualified from conducting business in any jurisdiction where the conduct of such Loan Party's business activities or the ownership of its properties necessitates qualification; in each case as to clauses (a) through (h) of this Section 9.5, describing the nature thereof and the action the Loan Parties propose to take with respect thereto.

9.6.     Government Receivables.  Notify Agent immediately upon a Responsible Officer obtaining knowledge thereof if any of its Receivables arise out of contracts between any Loan Party and the United States, Canada, or any state, province or territory or any department, agency or instrumentality of any of them if the laws thereof require a Consent or other legal formality to the assignment thereof.

9.7.     Annual Financial Statements.  Deliver to Agent within one hundred twenty (120) days after the end of each fiscal year of Holdings, audited financial statements of Holdings and its Subsidiaries on a consolidating and consolidated basis for such fiscal year, including, but not limited to, a balance sheet, statements of income, stockholders' equity and cash flow from the beginning of the current fiscal year to the end of such fiscal year and the balance sheet as at the end of such fiscal year, all prepared in accordance with GAAP applied on a basis consistent with prior practices, and in reasonable detail and reported upon without qualification (other than a qualification pertaining solely to impending debt maturities of any Indebtedness occurring within twelve (12) months of such audit), by an independent certified public accounting firm selected by the Loan Parties and reasonably satisfactory to Agent (Moss Adams LLP shall be acceptable). The reports described in this Section shall be accompanied by a Compliance Certificate.

9.8.     Quarterly Financial Statements.  Deliver to Agent within forty-five (45) days after the end of each fiscal quarter, an unaudited balance sheet of Holdings and its Subsidiaries on a consolidated and consolidating basis and unaudited statements of income, stockholders' equity and cash flow of Holdings and its Subsidiaries on a consolidated and consolidating basis reflecting results of operations from the beginning of the fiscal year to the end of such fiscal quarter and for such fiscal quarter, prepared on a basis consistent with prior practices and complete and correct in all material respects, subject to normal and recurring year-end adjustments and the absence of footnotes that individually and in the aggregate are not material to the Loan Parties' business operations and setting forth in comparative form the respective financial statements for the corresponding date and period in the previous fiscal year.  The reports described in this Section shall be accompanied by a Compliance Certificate.

9.9.     Monthly Financial Statements.  Deliver to Agent within thirty (30) days after the end of each month, an unaudited balance sheet of Holdings and its Subsidiaries on a consolidated and consolidating basis and unaudited statements of income, stockholders' equity and cash flow of Holdings and its Subsidiaries on a consolidated and consolidating basis reflecting results of operations from the beginning of the fiscal year to the end of such month and for such month, prepared on a basis consistent with prior practices and complete and correct in all material respects, subject to normal and recurring year-end adjustments and the absence of footnotes that individually and in the aggregate are not material to the Loan Parties' business operations and setting forth in comparative form the respective financial statements for the corresponding date and period in the previous fiscal year.  The reports described in this Section shall be accompanied by a Compliance Certificate.

9.10.    Other Reports.  Provide Agent as soon as available, but in any event within ten (10) Business Days after the issuance thereof, with (a) copies of such financial statements, reports and returns as each Loan Party shall send to the holders of its Equity Interests and (b)

133

copies of all notices, reports, financial statements and other materials sent or received pursuant to the DIP Term Loan Documents or the Wynnefield Loan Documents.

9.11.  <u>Additional Information</u>.  Provide Agent with such additional information as Agent shall request in order to enable Agent to determine whether the terms, covenants, provisions and conditions of this Agreement and the Other Documents have been complied with by the Loan Parties including, without the necessity of any request by Agent, (a) copies of all environmental audits and reviews, (b) prior written notice of any Loan Party's opening of any new office or place of business or any Loan Party's closing of any existing office or place of business (x) at least thirty (30) days prior thereto for any Canadian Loan Party and (y) prior thereto for any U.S. Loan Party, (c) promptly upon any Loan Party's learning thereof, notice of any labor dispute to which any Loan Party may become a party, any strikes or walkouts relating to any of its plants or other facilities, and the expiration of any labor contract to which any Loan Party is a party or by which any Loan Party is bound, and (d) promptly upon any Loan Party being called upon to satisfy any guaranty obligations with respect to a Permitted Joint Venture.

9.12.  <u>Budget and Variance Reports</u>.

(a)  On or before the Closing Date, Borrowers shall deliver to the Agent and Lenders the Initial Budget, which budget shall (x) be satisfactory in all respects to the Agent and the Lenders and (y) be substantially in the form of <u>Exhibit III</u>.

(b)  Commencing for the first full calendar week following the Petition Date (by no later than 12:00 PM New York City time on Thursday of such calendar week), Borrowers shall deliver to the Agent and Lenders an updated Budget covering the rolling thirteen calendar week period commencing with the first full calendar week following the date each such updated Budget is delivered, which updates shall be subject to the approval of the Agent and the Lenders in their sole discretion with respect to the new 13th calendar week being added to the updated Budget, and with respect to any of the other calendar weeks in such updated Budget.

(c)  Commencing for the first full calendar week following two (2) full calendar weeks after the Petition Date (by no later than 12:00 PM New York City time on Thursday of such calendar week), Borrowers shall deliver to the Agent and Lenders for the two-week period ended on the previous Friday, a variance report, in form and detail acceptable to the Agent, showing compliance or non-compliance, as the case may be, ~~of~~with the variance covenant set forth in Section 7.11 and including, without limitation, actual collections and disbursements against the Approved Budget and any and all variances of the usage of the DIP Facility, together with any proposed modifications to the Approved Budget ~~approved by the Agent~~ (such proposed modifications to be in compliance at all times with the Variance Covenant set forth in Section 7.11).

(d)  Each Budget (except the Initial Budget) shall be accompanied by a reconciliation of the actual results for the immediately preceding calendar week period to the Budget for such immediately preceding calendar week period and a detailed explanation of all material variances from the Budget.

(e)    Each Budget delivered pursuant to Section 9.12(a) and (b) or any proposed amendment or supplement to the Budget delivered by the Debtors to Agent shall replace, amend or supplement, as the case may be, the prior Budget hereunder.

9.13.    [Reserved].

9.14.    Notice of Suits, Adverse Events.  Provide Agent, promptly upon a Responsible Officer obtaining knowledge thereof, with written notice of (a) any lapse or other termination of any Consent issued to any Loan Party by any Governmental Body or any other Person that is material to the operation of any Loan Party's business, (b) any refusal by any Governmental Body or any other Person to renew or extend any such Consent, (c) copies of any periodic or special reports filed by any Loan Party with any Governmental Body or Person, if such reports indicate any material change in the business, operations, affairs or condition of any Loan Party, or if copies thereof are requested by Agent and (d) copies of any material notices and other communications from any Governmental Body or Person which specifically relate to any Loan Party.

9.15.    ERISA Notices and Requests.  Provide Agent, promptly upon a Responsible Officer obtaining knowledge thereof, with written notice in the event that, (i) any Loan Party or any member of the Controlled Group knows or has reason to know that a Termination Event has occurred, together with a written statement describing such Termination Event and the action, if any, which such Loan Party or any member of the Controlled Group has taken, is taking, or proposes to take with respect thereto and, when known, any action taken or threatened by the Internal Revenue Service, Canada Revenue Agency, Department of Labor or PBGC with respect thereto, (ii) any Loan Party knows or has reason to know that a prohibited transaction (as defined in Section 406 of ERISA or 4975 of the Internal Revenue Code) has occurred together with a written statement describing such transaction and the action which such Loan Party has taken, is taking or proposes to take with respect thereto, (iii) a funding waiver request has been filed with respect to any Pension Benefit Plan together with all communications received by any Loan Party or any member of the Controlled Group with respect to such request, (iv) any material increase in the benefits of any existing Plan, Multiemployer Plan or the establishment of any new Pension Benefit Plan or Multiemployer Plan or the commencement of contributions to any Pension Benefit Plan or Multiemployer Plan or Canadian Benefit Plan, Canadian Pension Plan or the commencement of contributions to any Pension Benefit Plan or Multiemployer Plan, Canadian Pension Plan or Canadian Union Plan to which any Loan Party or any member of the Controlled Group was not previously contributing shall occur, (v) any Borrower or any member of the Controlled Group shall receive from the PBGC a notice of intention to terminate a Pension Benefit Plan or Multiemployer Plan or Canadian Pension Plans or to have a trustee appointed to administer a Pension Benefit Plan or Multiemployer Plan, together with copies of each such notice, (vi) any Loan Party or any member of the Controlled Group shall receive any unfavorable determination letter from the Internal Revenue Service regarding the qualification of a Plan under Section 401(a) of the Internal Revenue Code, together with copies of each such letter; (vii) any Loan Party or any member of the Controlled Group shall receive a notice regarding the imposition of withdrawal liability from a Multiemployer Plan, together with copies of each such notice; (viii) any Loan Party or any member of the Controlled Group shall fail to make a required installment or any other required payment to any Pension Benefit Plan or Multiemployer Plan under the Internal Revenue Code or ERISA on or before the due date for

135

such installment or payment; (ix) any Loan Party or any member of the Controlled Group knows that (a) a Multiemployer Plan has been terminated, (b) the administrator or plan sponsor of a Multiemployer Plan or Canadian Union Plan intends to terminate a Multiemployer Plan, (c) the PBGC has instituted or will institute proceedings under Section 4042 of ERISA to terminate a Multiemployer Plan or (d) a Multiemployer Plan is subject to Section 432 of the Internal Revenue Code or Section 305 of ERISA; (x) any Loan Party shall receive notice (or a notice of intent to issue such a notice) from Canada Revenue Agency regarding the revocation of registered status of a Canadian Pension Plan under the Income Tax Act (Canada); or (xi) except when the failure to do so could not reasonably be expected to have a Material Adverse Effect, any Loan Party shall fail to make or remit any required contributions or payments in respect of a Canadian Pension Plan on or before the due date for such contribution or payment or any other Canadian Pension Event.

9.16.   <u>Additional Documents</u>.   Execute and deliver to Agent, upon request, such documents and agreements as Agent may, from time to time, request to carry out the purposes, terms or conditions of this Agreement.

9.17.   <u>Updates to Certain Schedules</u>.   Deliver to Agent promptly as shall be required to maintain the related representations and warranties as true and correct, updates to Schedules 4.4 (Locations of Equipment and Inventory), 5.9 (Intellectual Property), 5.21 (Equity Interests), 5.22 (Commercial Tort Claims), 5.23 (Letter-of-Credit Rights), 5.24 (Material Contracts) Schedule 7.3 (Guarantees) and Schedule 7.11 (Permitted Joint Ventures) to this Agreement; provided, that absent the occurrence and continuance of any Event of Default, the Loan Parties shall only be required to provide such updates on a quarterly basis in connection with delivery of a Compliance Certificate with respect to the applicable quarter.   Any such updated Schedules delivered by the Loan Parties to Agent in accordance with this Section 9.17 shall automatically and immediately be deemed to amend and restate the prior version of such Schedule previously delivered to Agent and attached to and made part of this Agreement.

9.18.   <u>Financial Disclosure</u>.   Each Loan Party hereby irrevocably authorizes and directs all accountants and auditors employed by such Loan Party at any time during the Term to exhibit and deliver to Agent and each Lender copies of any of such Loan Party's financial statements, trial balances or other accounting records of any sort in the accountant's or auditor's possession, and to disclose to Agent and each Lender any information such accountants may have concerning such Loan Party's financial status and business operations.   Each Loan Party hereby authorizes all Governmental Bodies to deliver to Agent and each Lender copies of reports or examinations relating to such Loan Party, whether made by such Loan Party or otherwise; provided however, Agent and each Lender will attempt to obtain such information or materials directly from such Loan Party prior to obtaining such information or materials from such accountants or Governmental Bodies.

9.19.   <u>Teleconferences with Loan Parties:</u>   Commencing on and after the Closing Date, the Loan Parties shall host teleconferences and/or virtual conferences with the Agent and Lenders, and the Loan Parties shall cause members of the Loan Parties' management team to participate in such teleconferences and/or virtual conferences, on at least a monthly basis on such dates and at such times as agreed between the Loan Parties and the Agent or on such other dates and times as reasonably requested by Agent, the purpose of which conferences shall be for

the Loan Parties and Agent and Lenders to discuss the Loan Parties' business and financial performance.

9.20.   Other Bankruptcy Documents.

(a)      The Loan Parties shall deliver to Agent: (i) copies of all pleadings, motions, applications, notices, financial information and other papers and documents filed by any Debtor in any Case or delivered to any Debtor in the case which is not otherwise received by Agent, with copies of such papers and documents also provided to or served on Agent's counsel; (ii) substantially contemporaneous with the receipt and/or execution thereof, copies of all letters of intent, expressions of interest, and offers to purchase with respect to any of the Collateral; (iii) substantially contemporaneously with delivery thereof to the Committee or any other official or unofficial committee in any Case, copies of all material written reports and all term sheets for a plan of reorganization or any sale under Section 363 of the Bankruptcy Code given by any Debtor to the Committee or any other official or unofficial committee in any Case, with copies of such reports and term sheets also provided to or served on Agent's counsel; and (iv) projections, operating plans and other financial information and information, reports or statements regarding any Debtor, its business and the Collateral as Agent may from time to time reasonably request.

(b)      The Loan Parties shall comply (i) after entry thereof, with all of the requirements and obligations set forth in the DIP Orders and the Cash Management Order, as each such order is amended and in effect from time to time in accordance with this Agreement, (ii) after entry thereof, with each order of the type referred to in clause (b) of the definition of "Approved Bankruptcy Court Order", as each such order is amended and in effect in accordance with this Agreement (including, for the avoidance of doubt, the requirements set forth in clause (b) of the definition of "Approved Bankruptcy Court Order") and (iii) after entry thereof, with the orders (to the extent not covered by subclause (i) or (ii) above) approving the Debtors' "first day" and "second day" relief and any pleadings seeking to establish material procedures for administration of the Cases or approving significant or material non-ordinary course transactions and obtained in the Cases, as each such order is amended and in effect in accordance with this Agreement (including, for the avoidance of doubt, the requirements set forth in clause (c) of the definition of "Approved Bankruptcy Court Order"); provided, that any actions taken to enforce any rights or remedies arising from a breach of this Section 9.20(b) shall be subject to any requirements in the DIP Orders requiring a ruling or entry of an order of the Bankruptcy Court.

For the avoidance of doubt, nothing in the foregoing clauses (a) and (b) of this Section 9.20 shall limit or reduce the notice periods required or provided under any other applicable agreement or order.

9.21.   Consultant. The Loan Parties shall continue to engage, at their own expense, the services of G2 Capital Advisors LLC (or such other third-party consultant reasonably acceptable to Agent) (the "Consultant") for the purpose of (i) participating in preparation and delivery of the Budget delivered in accordance with this Agreement, (ii) assisting with the monitoring of vendor payments, and (iii) participating in preparation and delivery of certain reporting to Agent and Lenders, including, without limitation, participating in the preparation and delivery of Borrowing Base Certificates and Compliance Certificates. Each of the Loan Parties expressly

authorizes the Consultant to consult with the Agent and Lenders and to share with Agent and Lenders all records, projections, financial information, reports and other information prepared by or in the possession of the Consultant relating to the Collateral, or the financial condition or operations of the business of the Loan Parties and to respond fully to any reasonable inquiries of the Agent or any Lender regarding the assets, prospects, business and operations of the Loan Parties and communicate and fully cooperate with Agent and the Lenders; provided, that, notwithstanding anything to the contrary contained in this Section 9.21, Consultant shall not be required to disclose such other information where such disclosure of such other information would, in Holdings' reasonable judgment upon the advice of counsel, (1) jeopardize the attorney-client privilege or other immunity or protection from disclosure available to Holdings under applicable law, (2) conflict with the non-disclosure requirements, if any, contained in any bona fide contract with a third-party to which either Consultant (in its capacity as a consultant to Holdings) or Holdings is party or is bound, or (3) constitute the disclosure of materials or work product generated by Consultant or others specifically for review by the Board of Directors of Holdings and where the disclosure of such other information could reasonably be regarded as a poor corporate governance practice or could be reasonably likely to jeopardize the ability of the Board of Directors of Holdings to discharge its fiduciary obligations to Holdings and its stockholders; provided, further, that  in the case of each of the preceding clauses (1), (2) and (3),  the Consultant shall promptly inform the Agent of the general nature of the information being withheld and provide such information, in whole or in part, in a manner that would not result in  the outcome described in the foregoing clause (1), (2) or (3), as applicable.

9.22.    Engagement of Chief Restructuring Officer.  At all times until all Obligations under this Agreement have been Paid in Full, Borrowers shall cause a chief restructuring officer to be appointed and actively engaged in the management of the operations of the business of the Loan Parties, which person shall be reasonably acceptable to Agent and the Lenders.

Documents delivered pursuant to this Article IX may be delivered electronically to Agent for further distribution to each Lender and if so delivered, shall be deemed to have been delivered on the date that the Borrowing Agent delivers such documents to Agent by electronic mail; provided that, upon written request, the Borrowing Agent shall deliver paper copies to Agent for further distribution to the Lenders until a written notice to cease delivering such paper copies is given by Agent to the Borrowing Agent.

X.    EVENTS OF DEFAULT.

Subject to the terms of the Interim Order and any Final Order, any of the following shall constitute an "Event of Default":

10.1.    Nonpayment.  Failure by any Loan Party to pay when due (a) any principal or interest on the Obligations (including without limitation pursuant to Section 2.9 hereof), or (b) any other fee, charge, amount or liability provided for herein or in any Other Document, in each case whether at maturity, by reason of acceleration pursuant to the terms of this Agreement, by notice of intention to prepay or by required prepayment;

10.2.    Breach of Representation.  Except as provided in Section 10.18 hereof, any representation or warranty made or deemed made by any Loan Party in this Agreement, any

138

Other Document or in any agreement, documents, certificate or financial or other written statement provided at any time in connection herewith or therewith shall prove to have been incorrect or misleading in any material respect on the date when made or deemed to have been made;

10.3.   <u>Financial Information</u>.   Failure by any Loan Party to (a) deliver financial information when due under ~~Section 6.2,~~ Article IX or any other Section of this Agreement or, if no due date is specified herein, within three (3) Business Days following a request therefor, or (b) permit the inspection of its books or records or access to its premises for audits and appraisals in accordance with the terms hereof;

10.4.   <u>Judicial Actions</u>.   Issuance of a notice of Lien, levy, assessment, injunction or attachment (a) against any Loan Party's Inventory or Receivables or (b) against a material portion of any Loan Party's other property which is not stayed or lifted within thirty (30) days;

10.5.   <u>Noncompliance</u>.   Except as otherwise provided for in Sections 10.1, 10.3, 10.5(b), and 10.18 hereof, (a) failure or neglect of any Loan Party, or any Person to perform, keep or observe any  term, provision, condition, covenant herein, or in any Other Document or any other agreement or arrangement, now or hereafter entered into between any Loan Party or such Person, and Agent or any Lender, or (b) failure or neglect of any Loan Party to perform, keep or observe any term, provision, condition or covenant in Sections 4.5, 6.1, 6.3, ~~6.11~~6.12, ~~6.13~~6.14, 9.4 or 9.6 hereof which is not cured within ten (10) days from the occurrence of such failure or neglect;

10.6.   <u>Judgments</u>.   Any (a) final judgment, writ, order or decree for the payment of money are rendered against any Loan Party for an aggregate amount in excess of $500,000 or against all Loan Parties for an aggregate amount in excess of $500,000 (to the extent not covered by independent third-party insurance as to which the insurer has been notified of such judgment or order and does not deny or fail to confirm coverage) and (b) action shall be legally taken by any judgment creditor to levy upon assets or properties of any Loan Party to enforce any such judgment and (i) such judgment shall remain undischarged, unvacated, unstayed or unbonded for a period of sixty (60) consecutive days during which a stay of enforcement of such judgment, by reason of a pending appeal or otherwise, shall not be in effect, or (ii) any Liens arising by virtue of the rendition, entry or issuance of such judgment upon assets or properties of any Loan Party shall be senior to any Liens in favor of Agent on such assets or properties;

10.7.   <u>[Reserved]</u>~~.~~;

10.8.   <u>[Reserved]</u>;

10.9.   <u>Lien Priority</u>.   Any Lien created hereunder or provided for hereby or under any of the Other Documents for any reason ceases to be or is not a valid and perfected Lien having a first priority Lien (subject only to Permitted Encumbrances that have priority as a matter of Applicable Law to the extent such Liens only attach to Collateral other than Receivables or Inventory, and the Intercreditor Agreement), except to the extent that any such loss of perfection or priority results from the failure of Agent to maintain possession of certificates actually received by it representing securities pledged under the Pledge Agreement, or to file Uniform

Commercial Code continuation statements in the applicable jurisdictions as required under the Uniform Commercial Code to continue the perfection of such security interest or the equivalent in the applicable jurisdiction;

10.10.  <u>Term Loan/Wynnefield Default</u>.  (a) An event of default has occurred under the DIP Term Loan Documents, which default shall not have been cured or waived within any applicable grace period, or if any Person party to the Intercreditor Agreement breaches or violates, in any material respect, or attempts to terminate or challenge the validity of, such Intercreditor Agreement or (b) an event of default has occurred under the Wynnefield Loan Documents, which default shall not have been cured or waived within any applicable grace period, or if any Person party to the Subordination Agreement applicable to the Wynnefield Loan Documents breaches or violates, in any material respect, or attempts to terminate or challenge the validity of, such Subordination Agreement;

10.11.  <u>Cross Default</u>.  Either (a) any specified "event of default" under any Indebtedness (other than the Obligations and the obligations under the DIP Term Loan Documents and the Wynnefield Loan Documents) of any Loan Party with a then-outstanding principal balance (or, in the case of any Indebtedness not so denominated, with a then-outstanding total obligation amount) of $500,000 or more, or any other event or circumstance which would permit the holder of any such Indebtedness of any Loan Party to accelerate such Indebtedness (and/or the obligations of such Loan Party thereunder) prior to the scheduled maturity or termination thereof, shall occur (regardless of whether the holder of such Indebtedness shall actually accelerate, terminate or otherwise exercise any rights or remedies with respect to such Indebtedness) or (b) a default of the obligations of any Loan Party under any other agreement to which it is a party shall occur which has or is reasonably likely to have a Material Adverse Effect;

10.12.  <u>Breach of Guaranty, Guarantor Security Agreement or Pledge Agreement</u>. Termination or breach of any Guaranty, Guarantor Security Agreement, Pledge Agreement or similar agreement executed and delivered to Agent in connection with the Obligations of any Loan Party, or if any Loan Party or pledgor attempts to terminate or challenges the validity of, its liability under, any such Guaranty, Guarantor Security Agreement, Pledge Agreement or similar agreement (other than as a result of repayment in full of the Obligations and termination of the Commitments);

10.13.  <u>Change of Control</u>.  Any Change of Control shall occur;

10.14.  <u>Invalidity</u>.  Any material provision of this Agreement or any Other Document shall, for any reason other than as expressly permitted hereunder or thereunder or the satisfaction in full of all the Obligations, cease to be valid and binding on any Loan Party, or any Loan Party shall so claim in writing to Agent or any Lender or any Loan Party challenges the validity of its liability under this Agreement or any Other Document (other than as a result of repayment in full of the Obligations and termination of the Commitments);

10.15.  <u>Seizures</u>.  Any (a)  portion of the Collateral  shall be seized, subject to garnishment or taken by a Governmental Body, or any Loan Party, or (b) the title and rights of any Loan Party, in and to  the Collateral  shall have become the subject matter of claim,

litigation, suit, garnishment or other proceeding which might, in the opinion of Agent, upon final determination, result in impairment or loss of the security provided by this Agreement or the Other Documents;

10.16.  [Reserved];

10.17.  <u>Pension Plans</u>.  An event or condition specified in Section 7.16 or 9.15 hereof shall occur or exist with respect to any Plan, Multiemployer Plan, Canadian Pension Plan, Canadian Benefit Plan or Canadian Union Plan,  and, as a result of such event or condition, together with all other such events or conditions, any Loan Party or any member of the Controlled Group shall incur, or in the reasonable opinion of Agent be reasonably likely to incur, a liability to a Plan, Multiemployer Plan, Canadian Pension Plan, Canadian Benefit Plan or Canadian Union Plan, or the PBGC (or one or more) which, in the judgment of Agent, would have a Material Adverse Effect; or the occurrence of any Termination Event or Canadian Pension Event which, in the judgment of Agent, would have a Material Adverse Effect, or any Loan Party's failure to promptly report a Termination Event or Canadian Pension Event in accordance with Section 9.15 hereof; or <u>Anti-Terrorism Laws</u>.  If (a) any representation or warranty contained in (i) Section 16.18 hereof or (ii) any corresponding section of any Guaranty is or becomes false or misleading at any time, (b) any Borrower shall fail to comply with its obligations under Section 16.18 hereof, or (c) any Guarantor shall fail to comply with its obligations under any section of any Guaranty containing provisions comparable to those set forth in Section 16.18 hereof;

10.18.  <u>Disposition of Collateral</u>.  Any sale, transfer, lease, encumbrance, or other disposition of any portion of the Collateral without an order of the Bankruptcy Court and the written consent of the Agent, except as otherwise permitted herein or for sales of the Debtors' inventory in the Ordinary Course of Business;

10.19.  <u>Inventory</u>.  (a) Enter into any agreement to return any inventory to any creditors for application against any pre-petition indebtedness under any applicable provision of Bankruptcy Code section 546 or (b) consent to any creditor exercising any setoff against any of its pre-petition indebtedness based upon any such return pursuant to Bankruptcy Code section 553(b)(1) or otherwise, unless otherwise consented to in writing by the Agent (and no such consent shall be implied, from any other action, inaction or acquiescence by the Agent or any Lender)**;**

10.20.  <u>Bankruptcy Defaults</u>.

(a)  The Bankruptcy Court shall enter any order, that has not been consented to by Agent (i) revoking, reversing, staying, vacating, rescinding, modifying, supplementing or amending (x) the Interim Order, the Final Order, the Cash Management Order, any sale order, this Agreement, the Prepetition Loan Documents or any Loan Document, or (y) any other "first day" orders to the extent such revocation, reversal, stay, vacation, rescission, modification, supplement or amendment is materially adverse to the interests of Secured Parties, or (ii) permitting any administrative expense or any claim (now existing or hereafter arising, of any kind or nature whatsoever) to have administrative priority as to any Debtor equal or superior to the priority of the Agent and Lenders in respect of the Obligations (subject to the Senior Liens

141

(as defined in the Interim Order) and Lien Priority Chart), or there shall arise any such Superpriority Claim, or (iii) granting or permitting the grant of a Lien on the Collateral superior to, or pari passu with, the Liens of Agent on the Prepetition Collateral or the Collateral (subject to the Senior Liens (as defined in the Interim Order) and the Lien Priority Chart);

(b)    the Bankruptcy Court shall enter any order (i) appointing a Chapter 11 trustee under Section 1104 of the Bankruptcy Code in any Case, (ii) appointing an examiner with enlarged powers relating to the operation of the business (powers beyond those set forth in Section 1106(a)(3) and (4) of the Bankruptcy Code) under Section 1106(b) of the Bankruptcy Code in any Case, (iii) appointing a fiduciary or representative of the estate with decision-making or other management authority over some or all of any Debtor's senior management other than such Debtor's Chief Restructuring Officer, (iv) substantively consolidating the estate of the Debtor with the estate of any other Person, (v) dismissing any Case or converting any Case to a Chapter 7 case; or (vi) approving a sale of any of the assets of any Debtor which order does not provide that upon consummation of such sale, all of the net sale proceeds shall be paid to Agent and applied to either the Prepetition Obligations or the Post-Petition Obligations in accordance with the Prepetition Credit Agreement or this Agreement, as applicable;

(c)    this Agreement, any of the Loan Documents, the Interim Order or the Final Order for any reason ceases to be in full force and effect or is declared to be null and void by a court of competent jurisdiction, or any Debtor shall seek to, or shall support (in any such case by way of any motion or other pleading filed with the Bankruptcy Court or any other writing to another party-in-interest executed by or on behalf of the Debtor) any other Person's motion to, disallow in whole or in part the Secured Parties' claim in respect of the Obligations or to challenge the validity and enforceability of the Liens in favor of any Secured Party;

(d)    any Debtor files a motion with the Bankruptcy Court asserting that the Secured Parties do not have a right to, or supports a motion filed with the Bankruptcy Court that asserts the Secured Parties do not have the right to, credit bid for any assets of any Debtor in connection with any sale pursuant to Section 363(k) of the Bankruptcy Code;

(e)    the Bankruptcy Court shall enter any order granting relief from the automatic stay to any creditor holding or asserting a Lien, reclamation claim or other rights on the assets of any Debtor in excess of $100,000;

(f)    any application for any of the orders or motions described in clauses (a) through (e) above shall be made and, if made by a Person other than a Debtor, such application is not being diligently contested by any applicable Debtors in good faith;

(g)    except (i) as permitted by the Interim Order or Final Order and set forth in the Budget, or (ii) as otherwise agreed to by Agent in writing, and approved by all necessary Bankruptcy Court orders/approvals, any Debtor shall make any Prepetition Payment (including, without limitation, related to any reclamation claims) following the Closing Date;

(h)     any Debtor shall be unable to pay its post-petition debts as they mature, shall fail to comply with any order of the Bankruptcy Court in any material respect, or shall fail to make, as and when such payments become due or otherwise;

(i)     any Debtor shall file a motion in any Case (i) to use Revolving Credit Cash Collateral under Section 363(c) of the Bankruptcy Code without Agent's prior written consent except to the extent expressly permitted in the Interim Order or, once entered, the Final Order, (ii) to sell a material portion of the Revolving Credit Priority Collateral of any Debtor without Agent's prior written consent, (iii) to recover from any portions of the Collateral any costs or expenses of preserving or disposing of such Collateral under Section 506(c) of the Bankruptcy Code, or to cut off rights in the Collateral under Section 552(b) of the Bankruptcy Code, (iv) to obtain additional financing under Sections 364(c) or (d) of the Bankruptcy Code not otherwise permitted under this Agreement, unless such motion and additional financing shall provide that upon initial closing and consummation of such financing, that upon consummation of such sale, all of the Obligations (and prior to entry of the Final Order, the Prepetition Obligations) shall be indefeasibly paid and satisfied in full and Secured Parties receive a release (on terms and conditions and in form and substance satisfactory to Agent in its sole discretion) of Secured Parties in full from all claims of each Loan Party (and in respect of a Debtor, the estate of such Debtor), or (v) to take any other action or actions adverse to Secured Parties or their rights and remedies hereunder or under any of the Other Documents or Secured Parties interest in any of the Collateral;

(j)     a plan of reorganization is filed in any Case by any Debtor which does not contain provisions for termination of Agent's and Lenders' commitment to make Revolving Advances hereunder and indefeasible payment in full in cash of the Obligations (and prior to entry of the Final Order, the Prepetition Obligations) and the release of the Secured Parties (on terms and conditions and in form and substance satisfactory to Agent) in full from all claims of each Loan Party and, in respect of a Debtor, the estate of such Debtor, in each case, on or before, and the continuation of the Liens and security interests granted to Agent until, the effective date of such plan of reorganization, or (ii) an order shall be entered by the Bankruptcy Court confirming a plan of reorganization in any Case which does not contain provisions for termination of Agent's and Lenders' commitment to make Revolving Advances hereunder and indefeasible payment in full in cash of the Obligations (and prior to entry of the Final Order, the Prepetition Obligations) and the release of the Secured Parties (on terms and conditions and in form and substance satisfactory to Agent) in full from all claims of each Loan Party (and in respect of a Debtor, the estate of such Debtor) on or before, and the continuation of the Liens and security interests granted to Agent until, the effective date of such plan of reorganization upon entry thereof;

(k)     the expiration or termination, in each case without the prior written consent of the Agent, of the "exclusive period" of any Debtor under Section 1121 of the Bankruptcy Code for the filing of a plan of reorganization;

(l)     any Debtor engages in or supports any challenge to the validity, perfection, priority, extent or enforceability of the credit facility provided hereunder or the Prepetition Other Documents or the liens on or security interest in the assets of any Debtor securing the Obligations or (ii) any Debtor engages in or supports any investigation or asserts

143

any claims or causes of action (or directly or indirectly support assertion of the same) against Secured Parties; provided, however, that it shall not constitute an Event of Default if the Debtor provides information with respect to the Prepetition Credit Agreement and the Prepetition Other Documents to (x) the Committee and (y) with prior written notice to the Agent and the Lenders of any requirement to do so, any other party in interest;

(m)     any Case is converted to a case under Chapter 7 of the Bankruptcy;

(n)     any Case is dismissed;

(o)     a breach of the terms or provisions of, or the occurrence of a defined "Event of Default" under  the Interim Order or Final Order;

(p)     a breach of the terms or provisions of, or the occurrence of a defined "Event of Default" under  the DIP Term Loan Credit Agreement or the DIP Term Loan Credit Documents;

(q)     a breach of the terms or provisions of, or any failure to comply with, the terms of the Stalking Horse Agreement that is not cured within three (3) days of the occurrence thereof (or otherwise waived or modified with the written consent of the Agent);

(r)     solely upon entry of the Final Order, any Person shall be permitted to surcharge the Collateral or the Prepetition Collateral under Section 506(c) of the Bankruptcy Code, or any costs or expenses whatsoever shall be imposed against the Collateral or the Prepetition Collateral;

(s)     solely upon entry of the Final Order, the Agent shall be made subject to any equitable remedy of marshalling or any similar doctrine with respect to the Collateral and the Prepetition Collateral;

(t)     failure of any Debtor to meet any of the Milestones set forth in Section 6.23;

(u)     any material contract or unexpired leases of any Debtor is rejected or otherwise terminated (other than (x) the Water Projects Contracts, or (y) in accordance with its terms) or any property of the Debtors is sold outside the ordinary course of business, in each instance, without the express written consent of the Lenders; or

(v)     the Stalking Horse Agreement shall be amended, modified or any provision thereof waived (including by extending the closing under the Stalking Horse Agreement to a date that is later than fifty-seven (57) days after the Petition Date) without the prior written consent of the Agent.

For the avoidance of doubt, none of the existing defaults or events of default under the Prepetition Revolving Loan Agreement or the Prepetition Term Loan Credit Agreement outstanding on the Petition Date shall constitute an Event of Default hereunder.

XI.     LENDERS' RIGHTS AND REMEDIES AFTER DEFAULT.

11.1.    <u>Rights and Remedies</u>.  Upon the occurrence and during the continuance of an Event of Default:

(a)     the Agent may, and at the direction of the Required Lenders shall, take any or all of the following actions without the necessity of seeking relief from the automatic stay or any further Order of the Bankruptcy Court or providing an Enforcement Notice (defined below):

(i)     declare the commitment of each Revolving Lender to make Revolving Advances to be terminated, whereupon such commitments and obligation shall be terminated;

(ii)     declare the unpaid principal amount of all outstanding Advances, all interest accrued and unpaid thereon, and all other Obligations owing or payable hereunder or under any other Loan Document related thereto to be immediately due and payable, without presentment, demand, protest or other notice of any kind, all of which are hereby expressly waived by the Borrowers;

(iii)     require that the Borrowers Cash Collateralize any Obligations that are contingent or not yet due and payable in amount determined by the Agent in accordance with this Agreement; and

(iv)     (a) the Agent and Lenders shall no longer have any obligation to make any Revolving Advances (or otherwise extend credit) under this Agreement; (b) all Obligations shall, at the option of the Agent, be accelerated and become immediately due and payable; (c) the Agent and the Prepetition Agent shall be entitled to immediately terminate the Debtors' right to use Revolving Credit Cash Collateral, without further application or Order of the Bankruptcy Court, <u>provided</u>, <u>however</u>, that the Debtors shall have the right to use Revolving Credit Cash Collateral to pay their weekly ordinary course payroll included in the Approved Budget through the date on which such Event of Default occurs and to pay expenses set forth in the Approved Budget that accrued prior to the date of the occurrence of the Event of Default; (d) the Debtors shall be bound by all post-default restrictions, prohibitions, and other terms as provided in the Interim Order, this Agreement and the other Loan Documents and the Prepetition Revolving Credit Documents; (e) the Agent shall be entitled to charge the Default Rate; and (f) subject only to the notice requirement set forth in clause (b) below, both the Agent and the Prepetition Agent shall be entitled to take any other action or exercise any other right or remedy as provided in the Interim Order, this Agreement, the Loan Documents, the Prepetition Revolving Credit  Documents, or applicable law, including, without limitation, setting off any Obligations or Prepetition Obligations with Collateral, Prepetition Revolving ~~Credit~~Loan Priority Collateral or proceeds in the possession of any Prepetition Secured Party or Secured Party, and enforcing any and all rights and remedies with respect to the Collateral or Prepetition Revolving ~~Credit~~Loan Priority Collateral, as applicable;

(b)     Without further notice, application or order of this Court, upon the occurrence and during the continuance of an Event of Default, and after providing not less than

145

three (3) business days' advance written notice thereof (the "Notice Period") (which three (3) business day period applies only to the enforcement remedies described in this clause (b)), which notice may be by electronic mail (the "Enforcement Notice"), to counsel to the Debtors, the U.S. Trustee, and counsel to any Committee, the Agent for the benefit of itself and the Lenders, and the Prepetition Agent, for the benefit of itself and the other Prepetition Secured Parties, as applicable, shall be entitled to take any other action and exercise all rights and remedies not described in Section 11.1(a) above and provided to them by the Interim Order, this Agreement, the Loan Documents or the Prepetition Loan Documents, or applicable law (including, without limitation, setting off any Obligations or Prepetition Revolving Credit Loan Obligations with Collateral, Prepetition Revolving ~~Credit~~Loan Priority Collateral or proceeds in the possession of any Prepetition Secured Revolving Credit Secured Party or Secured Party), unless otherwise ordered by the Bankruptcy Court, as the Agent or the Prepetition Agent, as applicable, may deem appropriate in their sole discretion to, among other things, proceed against and realize upon the Collateral (including the Prepetition Revolving ~~Credit~~Loan Priority Collateral) or any other assets or properties of the Debtors' Estates upon which the Agent, for the benefit of itself and the Lenders, and the Prepetition Agent, for the benefit of itself and the other Prepetition Secured Parties, has been or may hereafter be granted liens or security interests to obtain the Payment in Full of the Obligations.  Notwithstanding the foregoing, Agent may continue to apply proceeds received into the lockbox or collection account to reduce the Prepetition Revolving Credit Loan Obligations or the Obligations in any order at the sole discretion of the Agent during the Notice Period; provided that during the Notice Period the Debtors and the Committee shall be entitled to seek an emergency hearing with the Bankruptcy Court with respect to the Enforcement Notice and whether an Event of Default has occurred and is continuing.

(c)    Additionally, upon the occurrence and during the continuance of an Event of Default, expiration of the Notice Period, and the exercise by the Agent or the Prepetition Agent of their respective rights and remedies under the Interim Order, the Final Order, this Agreement, the Loan Documents, the Prepetition Credit Agreement or the Prepetition Loan Documents, the Debtors shall cooperate with the Agent or Prepetition Agent, as applicable, in the exercise of such rights and remedies and assist the Agent in effecting any sale or other disposition of the Collateral required by the Agent, including any sale of Collateral pursuant to Bankruptcy Code section 363 or assumption and assignment of Collateral consisting of contracts and leases pursuant to Bankruptcy Code section 365, in each case, upon such terms that are reasonably acceptable to the Agent; provided that the Debtors and the Agent agree upon a mutually acceptable wind down budget that is funded by the Lenders.

(d)    Upon the occurrence and during the continuance of an Event of Default, and subject to the Notice Period provided for above, in connection with a liquidation of any of the Prepetition Collateral or  Collateral, the Agent (or any of their respective employees, agents, consultants, contractors, or other professionals), as applicable, shall have the right, at the sole cost and expense of the Debtors, to:  (i) enter upon, occupy, and use any real or personal property, fixtures, equipment, leasehold interests, or warehouse arrangements owned or leased by the Debtors; provided, however, that the Agent may only be permitted to do so in accordance with (a) existing rights under applicable non-bankruptcy law, including, without limitation, applicable leases, (b) any pre-petition (and, if applicable, post-petition) landlord waivers or consents, or (c) further Order of the Bankruptcy Court on motion and notice appropriate under

the circumstances; and (ii) use any and all trademarks, tradenames, copyrights, licenses, patents, equipment, or any other similar assets of the Debtors, or assets that are owned by or subject to a lien of any third party and that are used by the Debtors in their businesses; provided, however, Agent may use such assets upon entry of the Interim Order to the extent permitted by non-bankruptcy law.  The Agent and the Lenders will be responsible for the payment of any applicable fees, rentals, royalties, or other amounts owing to such lessor, licensor or owner of such property (other than the Debtors) for the period of time that the Agent actually occupies any real property or uses the equipment or the intellectual property (but in no event for any accrued and unpaid fees, rentals, or other amounts owing for any period prior to the date that the Agent actually occupies or uses such assets or properties).

(e)     the Agent, at the direction of the Required Lenders shall, exercise on behalf of itself and the Lenders all rights and remedies available to it and the Lenders under the Loan Documents or applicable Law;

(f)     No remedy herein is intended to be exclusive of any other remedy and each and every remedy shall be cumulative and shall be in addition to every other remedy given hereunder or now or hereafter existing at law or in equity or by statute or any other provision of Law.

(g)     Each of the Lenders agrees that it shall not, unless specifically requested to do so in writing by Agent, take or cause to be taken any action, including, the commencement of any legal or equitable proceedings to enforce any Loan Document against any Loan Party or to foreclose any Lien on, or otherwise enforce any security interest in, or other rights to, any of the Collateral.

11.2.    Agent's Discretion.  Agent shall have the right in its sole discretion to determine which rights, Liens, security interests or remedies Agent may at any time pursue, relinquish, subordinate, or modify, which procedures, timing and methodologies to employ, and what any other action to take with respect to any or all of the Collateral and in what order, thereto and such determination will not in any way modify or affect any of Agent's or Lenders' rights hereunder as against the Loan Parties or each other.

11.3.    [Reserved].

11.4.    [Reserved].

11.5.    Rights and Remedies not Exclusive.  The enumeration of the foregoing rights and remedies is not intended to be exhaustive and the exercise of any rights or remedy shall not preclude the exercise of any other right or remedies provided for herein or otherwise provided by law, all of which shall be cumulative and not alternative.

11.6.    Allocation of Payments After Event of Default.  Subject to the provisions of the Interim Order, the Final Order (when entered), the Intercreditor Agreement and the Lien Priority Chart, notwithstanding any other provisions of this Agreement to the contrary, after the occurrence and during the continuance of an Event of Default, all amounts collected or received by Agent on account of the Obligations (including without limitation any amounts on account of any of Cash Management Obligations or Hedge Obligations), or in respect of the Collateral may,

147

at Agent's discretion, be applied to either the Prepetition Revolving Obligations or the Post-Petition Revolving Obligations.

## XII.    WAIVERS AND JUDICIAL PROCEEDINGS.

12.1.    Waiver of Notice.  Each Loan Party hereby waives notice of non-payment of any of the Receivables, demand, presentment, protest and notice thereof with respect to any and all instruments, notice of acceptance hereof, notice of loans or advances made, credit extended, Collateral received or delivered, or any other action taken in reliance hereon, and all other demands and notices of any description, except such as are expressly provided for herein.

12.2.    Delay.  No delay or omission on Agent's or any Lender's part in exercising any right, remedy or option shall operate as a waiver of such or any other right, remedy or option or of any Default or Event of Default.

12.3.    Jury Waiver.  EACH PARTY TO THIS AGREEMENT HEREBY EXPRESSLY WAIVES ANY RIGHT TO TRIAL BY JURY OF ANY CLAIM, COUNTERCLAIM, DEMAND, ACTION OR CAUSE OF ACTION (A) ARISING UNDER THIS AGREEMENT, ANY OTHER DOCUMENT OR ANY OTHER INSTRUMENT, DOCUMENT OR AGREEMENT EXECUTED OR DELIVERED IN CONNECTION HEREWITH, OR (B) IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE DEALINGS OF THE PARTIES HERETO OR ANY OF THEM WITH RESPECT TO THIS AGREEMENT, ANY OTHER DOCUMENT OR ANY OTHER INSTRUMENT, DOCUMENT OR AGREEMENT EXECUTED OR DELIVERED IN CONNECTION HEREWITH, OR THE TRANSACTIONS RELATED HERETO OR THERETO IN EACH CASE WHETHER NOW EXISTING OR HEREAFTER ARISING, AND WHETHER SOUNDING IN CONTRACT OR TORT OR OTHERWISE AND EACH PARTY HEREBY CONSENTS THAT ANY SUCH CLAIM, COUNTERCLAIM, DEMAND, ACTION OR CAUSE OF ACTION SHALL BE DECIDED BY COURT TRIAL WITHOUT A JURY, AND THAT ANY PARTY TO THIS AGREEMENT MAY FILE AN ORIGINAL COUNTERPART OR A COPY OF THIS SECTION WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENTS OF THE PARTIES HERETO TO THE WAIVER OF THEIR RIGHT TO TRIAL BY JURY.

## XIII.    EFFECTIVE DATE AND TERMINATION.

13.1.    Term13.21.4.  .  This Agreement, which shall inure to the benefit of and shall be binding upon the respective successors and permitted assigns of each Loan Party, Agent and each Lender, shall become effective on the Closing Date and shall continue in full force and effect until the Termination Date (such period from the Closing Date through and ending on the Termination Date, the "Term").  The Loan Parties may terminate this Agreement at any time, subject to providing seven (7) Business Days' prior written notice to Agent, upon Payment in Full asof all Obligations (including for the avoidance of doubt, even if prior to the Final Order, all Prepetition Obligations), as further provided in Section 13.2 hereof.

13.2.    Termination.  The termination of this Agreement shall not affect Agent's or any Lender's rights, or any of the Obligations having their inception prior to the effective date of such termination or any Obligations which pursuant to the terms hereof continue to accrue after

148

such date, and the provisions hereof shall continue to be fully operative until (a) all of the Obligations have been Paid in Full and the Commitments and this Agreement have been terminated, and (b) each of the Loan Parties has released the Secured Parties from and against any and all claims of any nature whatsoever that any Loan Party may have against the Secured Parties.  The security interests, Liens and rights granted to Agent and Lenders hereunder and the financing statements filed in connection herewith shall continue in full force and effect, notwithstanding the termination of this Agreement or the fact that Borrowers' Account may from time to time be temporarily in a zero or credit position, until all of the Obligations have been Paid in Full after the termination of this Agreement or each Loan Party has provided Agent and Lenders with an indemnification satisfactory to Agent and Lenders with respect thereto.  Accordingly, each Loan Party waives any rights which it may have under the Uniform Commercial Code or PPSA to demand the filing of termination statements with respect to the Collateral, and Agent shall not be required to send such termination statements to any Loan Party, or to file them with any filing office, unless and until this Agreement shall have been terminated in accordance with its terms, the Commitments have been terminated and all of the Obligations have been Paid in Full.  All representations, warranties, covenants, waivers and agreements set forth herein shall survive termination hereof until the Payment in Full of the Obligations, the termination of the Commitments and the termination of this Agreement.

## XIV.    REGARDING AGENT.

14.1.    <u>Appointment</u>.  Each Lender hereby designates PNC to act as Agent for such Lender under this Agreement and the Other Documents.  Each Lender hereby irrevocably authorizes Agent to take such action on its behalf under the provisions of this Agreement and the Other Documents and to exercise such powers and to perform such duties hereunder and thereunder as are specifically delegated to or required of Agent by the terms hereof and thereof and such other powers as are incidental thereto and Agent shall hold all Collateral, payments of principal and interest, fees (except the fees set forth in Sections 2.8(b), 3.3 and 3.4 hereof), charges and collections received pursuant to this Agreement, for the ratable benefit of Lenders.  Agent may perform any of its duties hereunder by or through its agents or employees.  As to any matters not expressly provided for by this Agreement, Agent shall not be required to exercise any discretion or take any action, but shall be required to act or to refrain from acting (and shall be fully protected in so acting or refraining from acting) upon the instructions of Required Lenders, and such instructions shall be binding; provided, however, that Agent shall not be required to take any action which, in Agent's discretion, exposes Agent to liability or which is contrary to this Agreement or the Other Documents or Applicable Law unless Agent is provided with an indemnification satisfactory to Agent with respect thereto.

14.2.    <u>Nature of Duties</u>.  Agent shall have no duties or responsibilities except those expressly set forth in this Agreement and the Other Documents.  Neither Agent nor any of its officers, directors, employees or agents shall be (i) liable for any action taken or omitted by them as such hereunder or in connection herewith, unless caused by their gross (not mere) negligence or willful misconduct (as determined by a court of competent jurisdiction in a final and non-appealable judgment or order), or (ii) responsible in any manner for any recitals, statements, representations or warranties made by any Loan Party or any officer thereof set forth in this Agreement, or in any of the Other Documents or in any certificate, report, statement or other document referred to or provided for in, or received by Agent under or in connection with, this

149

Agreement or any of the Other Documents or for the value, validity, effectiveness, genuineness, due execution, enforceability or sufficiency of this Agreement, or any of the Other Documents or for any failure of any Loan Party to perform its obligations hereunder. Agent shall not be under any obligation to any Lender to ascertain or to inquire as to the observance or performance of any of the agreements set forth in, or conditions of, this Agreement or any of the Other Documents, or to inspect the properties, books or records of any Loan Party. The duties of Agent as respects the Advances to the Borrowers shall be mechanical and administrative in nature. Agent shall not have by reason of this Agreement a fiduciary relationship in respect of any Lender; and nothing in this Agreement, expressed or implied, is intended to or shall be so construed as to impose upon Agent any obligations in respect of this Agreement or the transactions described herein except as expressly set forth herein.

14.3.    <u>Lack of Reliance on Agent</u>. Independently and without reliance upon Agent or any other Lender, each Lender has made and shall continue to make (a) its own independent investigation of the financial condition and affairs of each Loan Party in connection with the making and the continuance of the Advances hereunder and the taking or not taking of any action in connection herewith, and (b) its own appraisal of the creditworthiness of each Loan Party. Agent shall have no duty or responsibility, either initially or on a continuing basis, to provide any Lender with any credit or other information with respect thereto, whether coming into its possession before making of the Advances or at any time or times thereafter except as shall be provided by any Loan Party pursuant to the terms hereof. Agent shall not be responsible to any Lender for any recitals, statements, information, representations or warranties herein or in any agreement, document, certificate or a statement delivered in connection with or for the execution, effectiveness, genuineness, validity, enforceability, collectability or sufficiency of this Agreement or any Other Document, or of the financial condition of any Loan Party, or be required to make any inquiry concerning either the performance or observance of any of the terms, provisions or conditions of this Agreement, the Notes, the Other Documents or the financial condition or prospects of any Loan Party, or the existence of any Event of Default or any Default.

14.4.    <u>Resignation of Agent; Successor Agent</u>. Agent may resign on thirty (30) days written notice to each Lender and Borrowing Agent and upon such resignation, Required Lenders will promptly designate a successor Agent reasonably satisfactory to Borrowing Agent (provided that no notice to or approval of Borrowing Agent shall be required (i) in any case where the successor Agent is one of the Lenders or (ii) after the occurrence and during the continuance of any Event of Default). Any such successor Agent shall succeed to the rights, powers and duties of Agent, and shall in particular succeed to all of Agent's right, title and interest in and to all of the Liens in the Collateral securing the Obligations created hereunder or any Other Document, and the term "Agent" shall mean such successor agent effective upon its appointment, and the former Agent's rights, powers and duties as Agent shall be terminated, without any other or further act or deed on the part of such former Agent. However, notwithstanding the foregoing, if at the time of the effectiveness of the new Agent's appointment, any further actions need to be taken in order to provide for the legally binding and valid transfer of any Liens in the Collateral from former Agent to new Agent and/or for the perfection of any Liens in the Collateral as held by new Agent or it is otherwise not then possible for new Agent to become the holder of a fully valid, enforceable and perfected Lien as to any of the Collateral, former Agent shall continue to hold such Liens solely as agent for perfection of

150

such Liens on behalf of new Agent until such time as new Agent can obtain a fully valid, enforceable and perfected Lien on all Collateral, provided that Agent shall not be required to or have any liability or responsibility to take any further actions after such date as such agent for perfection to continue the perfection of any such Liens (other than to forego from taking any affirmative action to release any such Liens). After Agent's resignation as Agent, the provisions of this Article XIV, and any indemnification rights under this Agreement, including without limitation, rights arising under Section 16.5 hereof, shall inure to its benefit as to any actions taken or omitted to be taken by it while it was Agent under this Agreement (and in the event resigning Agent continues to hold any Liens pursuant to the provisions of the immediately preceding sentence, the provisions of this Article XIV and any indemnification rights under this Agreement, including without limitation, rights arising under Section 16.5 hereof, shall inure to its benefit as to any actions taken or omitted to be taken by it in connection with such Liens).

14.5.    <u>Certain Rights of Agent</u>.  If Agent shall request instructions from Lenders with respect to any act or action (including failure to act) in connection with this Agreement or any Other Document, Agent shall be entitled to refrain from such act or taking such action unless and until Agent shall have received instructions from Required Lenders; and Agent shall not incur liability to any Person by reason of so refraining.  Without limiting the foregoing, Lenders shall not have any right of action whatsoever against Agent as a result of its acting or refraining from acting hereunder in accordance with the instructions of Required Lenders.

14.6.    <u>Reliance</u>.  Agent shall be entitled to rely, and shall be fully protected in relying, upon any note, writing, resolution, notice, statement, certificate, email, facsimile or telecopier message, order or other document or telephone message believed by it to be genuine and correct and to have been signed, sent or made by the proper person or entity, and, with respect to all legal matters pertaining to this Agreement and the Other Documents and its duties hereunder, upon advice of counsel selected by it.  Agent may employ agents and attorneys-in-fact and shall not be liable for the default or misconduct of any such agents or attorneys-in-fact selected by Agent with reasonable care.

14.7.    <u>Notice of Default</u>.  Agent shall not be deemed to have knowledge or notice of the occurrence of any Default or Event of Default hereunder or under the Other Documents, unless Agent has received notice from a Lender or Borrowing Agent referring to this Agreement or the Other Documents, describing such Default or Event of Default and stating that such notice is a "notice of default".  In the event that Agent receives such a notice, Agent shall give notice thereof to Lenders.  Agent shall take such action with respect to such Default or Event of Default as shall be reasonably directed by Required Lenders; provided, that, unless and until Agent shall have received such directions, Agent may (but shall not be obligated to) take such action, or refrain from taking such action, with respect to such Default or Event of Default as it shall deem advisable in the best interests of Lenders.

14.8.    <u>Indemnification</u>.  To the extent Agent is not reimbursed and indemnified by the Loan Parties, each Lender will reimburse and indemnify Agent in proportion to its respective portion of the outstanding Advances and its respective Participation Commitments in the outstanding Letters of Credit and outstanding Swing Loans (or, if no Advances are outstanding, pro rata according to the percentage that its Revolving Commitment Amount constitutes of the total aggregate Revolving Commitment Amounts), from and against any and all liabilities,

074658.23049/132216381v.5074658.23049/132216381v.9

obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind or nature whatsoever which may be imposed on, incurred by or asserted against Agent in performing its duties hereunder, or in any way relating to or arising out of this Agreement or any Other Document; provided that Lenders shall not be liable for any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements resulting from Agent's gross (not mere) negligence or willful misconduct (as determined by a court of competent jurisdiction in a final and non-appealable judgment or order).

14.9.    Agent in its Individual Capacity.  With respect to the obligation of Agent to lend under this Agreement, the Advances made by it shall have the same rights and powers hereunder as any other Lender and as if it were not performing the duties as Agent specified herein; and the term "Lender" or any similar term shall, unless the context clearly otherwise indicates, include Agent in its individual capacity as a Lender.  Agent may engage in business with any Loan Party as if it were not performing the duties specified herein, and may accept fees and other consideration from any Loan Party for services in connection with this Agreement or otherwise without having to account for the same to Lenders.

14.10.    Delivery of Documents.   To the extent Agent receives financial statements required under Sections 9.7, 9.8, 9.9, 9.12 and 9.13 hereof or Borrowing Base Certificates from any Loan Party pursuant to the terms of this Agreement which any Loan Party is not obligated to deliver to each Lender, Agent will promptly provide such documents and information to Lenders.

14.11.    Loan Parties Undertaking to Agent.   Without prejudice to their respective obligations to Lenders under the other provisions of this Agreement, each Loan Party hereby undertakes with Agent to pay to Agent from time to time on demand all amounts from time to time due and payable by it for the account of Agent or Lenders or any of them pursuant to this Agreement to the extent not already paid.  Any payment made pursuant to any such demand shall pro tanto satisfy the relevant Loan Party's obligations to make payments for the account of Lenders or the relevant one or more of them pursuant to this Agreement.

14.12.    No Reliance on Agent's Customer Identification Program.  To the extent the Advances or this Agreement is, or becomes, syndicated in cooperation with other Lenders, each Lender acknowledges and agrees that neither such Lender, nor any of its Affiliates, participants or assignees, may rely on Agent to carry out such Lender's, Affiliate's, participant's or assignee's customer identification program, or other obligations required or imposed under or pursuant to the USA PATRIOT Act or the regulations thereunder, including the regulations contained in 31 CFR 103.121 (as hereafter amended, modified, supplemented or replaced, the "CIP Regulations"), the *Proceeds of Crime (Money Laundering) and Terrorist Financing Act* (Canada) or any other Anti-Terrorism Law, including any programs involving any of the following items relating to or in connection with any of the Loan Parties, their Affiliates or their agents, the Other Documents or the transactions hereunder or contemplated hereby: (i) any identity verification procedures, (ii) any recordkeeping, (iii) comparisons with government lists, (iv) customer notices or (v) other procedures required under the CIP Regulations or such Anti-Terrorism Laws.

074658.23049/132216381v.5074658.23049/132216381v.9

14.13.  Other Agreements.  Each of the Lenders agrees that it shall not, without the prior written consent of Agent, and that it shall, to the extent it is lawfully entitled to do so, upon the request of Agent, set off against the Obligations, any amounts owing by such Lender to any Loan Party or any deposit accounts of any Loan Party now or hereafter maintained with such Lender. Anything in this Agreement to the contrary notwithstanding, each of the Lenders further agrees that it shall not, unless specifically requested to do so by Agent, take any action to protect or enforce its rights arising out of this Agreement or the Other Documents, it being the intent of Lenders that any such action to protect or enforce rights under this Agreement and the Other Documents shall be taken in concert and at the direction or with the consent of Agent or Required Lenders.

14.14.  [Reserved].

14.15.  Erroneous Payments.

(a)     If the Agent notifies a Lender, Issuer or Secured Party, or any Person who has received funds on behalf of a Lender, Issuer or Secured Party (any such Lender, Issuer, Secured Party or other recipient, a "Payment Recipient") that the Agent has determined in its sole discretion (whether or not after receipt of any notice under immediately succeeding clause (b)) that any funds received by such Payment Recipient from the Agent or any of its Affiliates were erroneously transmitted to, or otherwise erroneously or mistakenly received by, such Payment Recipient (whether or not known to such Lender, Issuer, Secured Party or other Payment Recipient on its behalf) (any such funds, whether received as a payment, prepayment or repayment of principal, interest, fees, distribution or otherwise, individually and collectively, an "Erroneous Payment") and demands the return of such Erroneous Payment (or a portion thereof), such Erroneous Payment shall at all times remain the property of the Agent and shall be segregated by the Payment Recipient and held in trust for the benefit of the Agent, and such Lender, Issuer or Secured Party shall (or, with respect to any Payment Recipient who received such funds on its behalf, shall cause such Payment Recipient to) promptly, but in no event later than two Business Days thereafter, return to the Agent the amount of any such Erroneous Payment (or portion thereof) as to which such a demand was made, in same day funds (in the currency so received), together with interest thereon in respect of each day from and including the date such Erroneous Payment (or portion thereof) was received by such Payment Recipient to the date such amount is repaid to the Agent in same day funds at the greater of the Overnight Bank Funding Rate and a rate determined by the Agent in accordance with banking industry rules on interbank compensation from time to time in effect. A notice from the Agent to any Payment Recipient under this clause (a) shall be conclusive, absent manifest error.

(b)     Without limiting immediately preceding clause (a), each Lender, Issuer or Secured Party, or any Person who has received funds on behalf of a Lender, Issuer or Secured Party hereby further agrees that if it receives a payment, prepayment or repayment (whether received as a payment, prepayment or repayment of principal, interest, fees, distribution or otherwise) from the Agent (or any of its Affiliates) (x) that is in an amount different than, or on a different date from, that specified in a notice of payment, prepayment or repayment sent by the Agent (or any of its Affiliates) with respect to such, prepayment or repayment (y) that was not preceded or accompanied by a notice of payment, prepayment or repayment sent by the Agent (or any of its Affiliates), or (z) that such Lender, Issuer or Secured Party, or other such recipient,

074658.23049/132216381v.5074658.23049/132216381v.9

otherwise becomes aware was transmitted, or received, in error or by mistake (in whole or in part) in each case:

(i)    (A) In the case of immediately preceding clauses (x) or (y), an error shall be presumed to have been made (absent written confirmation from the Agent to the contrary) or (B) an error has been made (in the case of immediately preceding clause (z)), in each case, with respect to such payment, prepayment or repayment; and

(ii)    such Lender, Issuer or Secured Party shall (and shall cause any other recipient that receives funds on its respective behalf to) promptly (and, in all events, within one Business Day of its knowledge of such error) notify the Agent of its receipt of such payment, prepayment or repayment, the details thereof (in reasonable detail) and that it is so notifying the Agent pursuant to this Section 14.15(b),

(c)    Each Lender, Issuer or Secured Party hereby authorizes the Agent to set off, net and apply any and all amounts at any time owing to such Lender, Issuer or Secured Party under any Other Document, or otherwise payable or distributable by the Agent to such Lender, Issuer or Secured Party from any source, against any amount due to the Agent under immediately preceding clause (a) or under the indemnification provisions of this Agreement.

(d)    In the event that an Erroneous Payment (or portion thereof) is not recovered by the Agent for any reason, after demand therefor by the Agent in accordance with immediately preceding clause (a), from any Lender or Issuer that has received such Erroneous Payment (or portion thereof) (and/or from any Payment Recipient who received such Erroneous Payment (or portion thereof) on its respective behalf (such unrecovered amount, an "Erroneous Payment Return Deficiency")), upon the Agent's notice to such Lender or Issuer at any time, (i) such Lender or Issuer shall be deemed to have assigned its loans (but not its commitments) of the relevant class with respect to which such Erroneous Payment was made (the "Erroneous Payment Impacted Class") in an amount equal to the Erroneous Payment Return Deficiency (or such lesser amount as the Agent may specify) (such assignment of the loans (but not commitments) of the Erroneous Payment Impacted Class, the "Erroneous Payment Deficiency Assignment") at par plus any accrued and unpaid interest (with the assignment fee to be waived by the Agent in such instance), and is hereby (together with the Borrower) deemed to execute and deliver an assignment and assumption with respect to such Erroneous Payment Deficiency Assignment, and such Lender or Issuer shall deliver any Notes evidencing such loans to the Borrower or the Agent, (ii) the Agent as the assignee Lender shall be deemed to acquire the Erroneous Payment Deficiency Assignment, (iii) upon such deemed acquisition, the Agent as the assignee Lender shall become a Lender or Issuer, as applicable, hereunder with respect to such Erroneous Payment Deficiency Assignment and the assigning Lender or assigning Issuer shall cease to be a Lender or Issuer, as applicable, hereunder with respect to such Erroneous Payment Deficiency Assignment, excluding for the avoidance of doubt, its obligations under the indemnification provisions of this Agreement and its applicable commitments which shall survive as to such assigning Lender or assigning Issuer and (iv) the Agent may reflect in the Register its ownership interest in the loans subject to the Erroneous Payment Deficiency Assignment. The Agent may, in its discretion, sell any loans acquired pursuant to an Erroneous Payment Deficiency Assignment and upon receipt of the proceeds of such sale, the Erroneous Payment Return Deficiency owing by the applicable Lender or Issuer shall be reduced by the net

proceeds of the sale of such loan (or portion thereof), and the Agent shall retain all other rights, remedies and claims against such Lender or Issuer (and/or against any recipient that receives funds on its respective behalf). For the avoidance of doubt, no Erroneous Payment Deficiency Assignment will reduce the commitments of any Lender or Issuer and such commitments shall remain available in accordance with the terms of this Agreement. In addition, each party hereto agrees that, except to the extent that the Agent has sold a loan (or portion thereof) acquired pursuant to an Erroneous Payment Deficiency Assignment, and irrespective of whether the Agent may be equitably subrogated, the Agent shall be contractually subrogated to all the rights and interests of the applicable Lender, Issuer or Secured Party under the Other Documents with respect to such Erroneous Payment Return Deficiency (the "Erroneous Payment Subrogation Rights").

(e)     The parties hereto agree that an Erroneous Payment shall not pay, prepay, repay, discharge or otherwise satisfy any Obligations owed by the Borrower or any other loan party, except, in each case, to the extent such Erroneous Payment is, and solely with respect to the amount of such Erroneous Payment that is, comprised of funds received by the Agent from the Borrower or any other loan party for the purpose of making such Erroneous Payment.

(f)     To the extent permitted by applicable law, no Payment Recipient shall assert any right or claim to an Erroneous Payment, and hereby waives, and is deemed to waive, any claim, counterclaim, defense or right of set-off or recoupment with respect to any demand, claim or counterclaim by the Agent for the return of any Erroneous Payment received, including without limitation, waiver of any defense based on "discharge for value" or any similar doctrine.

(g)     Each party's obligations under this Section 14.15 shall survive the resignation or replacement of the Agent, the termination of all of the commitments and/or repayment, satisfaction or discharge of all Obligations (or any portion thereof) under any Other Document.

XV.     BORROWING AGENCY.

15.1.     Borrowing Agency Provisions.

(a)     Each Loan Party hereby irrevocably designates Borrowing Agent to be its attorney and agent and in such capacity, whether verbally, in writing or through electronic methods (including, without limitation, an Approved Electronic Communication), to (i) borrow, (ii) request advances, (iii) request the issuance of Letters of Credit, (iv) sign and endorse notes, (v) execute and deliver all instruments, documents, applications, security agreements, reimbursement agreements and letter of credit agreements for Letters of Credit and all other agreements, documents, instruments, certificates, notices and further assurances now or hereafter required hereunder, (vi) make elections regarding interest rates, (vii) give instructions regarding Letters of Credit and agree with Issuer upon any amendment, extension or renewal of any Letter of Credit and (viii) otherwise take action under and in connection with this Agreement and the Other Documents, all on behalf of and in the name of such Loan Party or the Loan Parties, and hereby authorizes Agent to pay over or credit all loan proceeds hereunder in accordance with the request of Borrowing Agent.

(b)    The handling of this credit facility as a co-borrowing facility with a borrowing agent in the manner set forth in this Agreement is solely as an accommodation to the Loan Parties and at their request.  Neither Agent nor any Lender shall incur liability to the Loan Parties as a result thereof.  To induce Agent and Lenders to do so and in consideration thereof, each Loan Party hereby indemnifies Agent and each Lender and holds Agent and each Lender harmless from and against any and all liabilities, expenses, losses, damages and claims of damage or injury asserted against Agent or any Lender by any Person arising from or incurred by reason of the handling of the financing arrangements of the Loan Parties as provided herein, reliance by Agent or any Lender on any request or instruction from Borrowing Agent or any other action taken by Agent or any Lender with respect to this Section 15.1 except due to willful misconduct or gross (not mere) negligence by the indemnified party (as determined by a court of competent jurisdiction in a final and non-appealable judgment or order).

(c)    All Obligations shall be joint and several, and each Loan Party shall make payment upon the maturity of the Obligations by acceleration or otherwise, and such obligation and liability on the part of each Loan Party shall in no way be affected by any extensions, renewals and forbearance granted by Agent or any Lender to any Loan Party, failure of Agent or any Lender to give any Loan Party notice of borrowing or any other notice, any failure of Agent or any Lender to pursue or preserve its rights against any Loan Party, the release by Agent or any Lender of any Collateral now or thereafter acquired from any Loan Party, and such agreement by each Loan Party to pay upon any notice issued pursuant thereto is unconditional and unaffected by prior recourse by Agent or any Lender to the other Loan Parties or any Collateral for such Loan Party's Obligations or the lack thereof.  Each Loan Party waives all suretyship defenses.

15.2.    <u>Waiver of Subrogation</u>.  Each Loan Party expressly waives any and all rights of subrogation, reimbursement, indemnity, exoneration, contribution of any other claim which such Loan Party may now or hereafter have against the other Loan Parties or any other Person directly or contingently liable for the Obligations hereunder, or against or with respect to any other Loan Parties' property (including, without limitation, any property which is Collateral for the Obligations), arising from the existence or performance of this Agreement, until the termination of the Commitments, the termination of this Agreement and the Payment in Full of the Obligations.

15.3.    <u>Common Enterprise</u>. The successful operation and condition of each of the Borrowers is dependent on the continued successful performance of the functions of the group of Borrowers as a whole and the successful operation of each Borrower is dependent on the successful performance and operation of each other Borrower. Each of the Borrowers expects to derive benefit (and its board of directors or other governing body has determined that it may reasonably be expected to derive benefit), directly or indirectly, from successful operations of the Loan Parties and each of the other Borrowers. Each Borrower expects to derive benefit (and the board of directors or other governing body of each such Borrower have determined that it may reasonably be expected to derive benefit), directly and indirectly, from the credit extended by the Lenders to the Borrowers hereunder, both in their separate capacities and as members of the group of companies.  Each Borrower has determined that execution, delivery, and performance of this Agreement and any Other Documents to be executed by such Borrower is within its

156

corporate purpose, will be of direct and indirect benefit to such Borrower, and is in its best interest.

XVI.    MISCELLANEOUS.

16.1.    <u>Governing Law</u>.  This Agreement and each Other Document (unless and except to the extent expressly provided otherwise in any such Other Document), and all matters relating hereto or thereto or arising herefrom or therefrom (whether arising under contract law, tort law or otherwise) shall, in accordance with Section 5-1401 of the General Obligations Law of the State of New York, be governed by and construed in accordance with the laws of the State of New York.  Each Loan Party hereby consents to and acknowledges the jurisdiction of the Bankruptcy Court over any actions or proceedings arising in connection with any Case, this Agreement and the Other Loan Documents (or in any way connected with or related or incidental to the dealings of the parties hereto in respect of any Case, this Agreement or any of the Other Documents. If (i) any Case is dismissed, (ii) the Bankruptcy Court abstains from hearing any actions or proceedings arising in connection with this Agreement or any of the Other Documents (or in any way connected with or related or incidental to the dealings of the parties hereto in respect of this Agreement or any of the Other Documents or the transactions related hereto or thereto) or (iii) the Bankruptcy Court refuses to exercise jurisdiction over any actions or proceedings arising in connection with this Agreement or any of the Other Documents (or in any way connected with or related or incidental to the dealings of the parties hereto in respect of this Agreement or any of the Other Documents or the transactions related hereto or thereto), then any judicial proceeding brought by or against any Loan Party with respect to any of the Obligations, this Agreement, the Other Documents or any related agreement may be brought in any court of competent jurisdiction in the State of New York, United States of America (unless and except to the extent expressly provided otherwise in any such Other Document or related agreement) and, by execution and delivery of this Agreement, each Loan Party accepts for itself and in connection with its properties, generally and unconditionally, the non-exclusive jurisdiction of the aforesaid courts, and irrevocably agrees to be bound by any judgment rendered thereby in connection with this Agreement.  Each Loan Party waives any objection to jurisdiction and venue of any action instituted hereunder and shall not assert any defense based on lack of jurisdiction or venue or based upon forum non conveniens.  Each Loan Party waives the right to remove any judicial proceeding brought against such Loan Party in any state court to any federal court.  Any judicial proceeding by any Loan Party against Agent or any Lender involving, directly or indirectly, any matter or claim in any way arising out of, related to or connected with this Agreement or any of the Other Documents, shall be brought only in a federal or state court located in the County of New York, State of New York.

16.2.    <u>Entire Understanding</u>.

(a)    This Agreement and the Other Documents contain the entire understanding between each Loan Party, Agent and each Lender and supersedes all prior agreements and understandings, if any, relating to the subject matter hereof.  Any promises, representations, warranties or guarantees not set forth herein and hereinafter made shall have no force and effect unless in writing, signed by each Loan Party's, Agent's and each Lender's respective officers.  Neither this Agreement nor any portion or provisions hereof may be amended, modified, changed, waived, supplemented, discharged, cancelled or terminated orally

157

or by any course of dealing, or in any manner other than by an agreement in writing, signed by the party to be charged.  The parties hereto shall be permitted to amend this Agreement and the Other Documents without further approval or order of the Bankruptcy Court; provided, however, that any material modification or amendment to this Agreement or the any Other Documents shall be subject to providing notice of such material modification or amendment to counsel to any Committee and the US Trustee each of whom shall have three (3) Business Days from the date of such notice within which to object in writing to such modification or amendment unless the Committee and the US Trustee agree in writing to a shorter period.  Unless the Committee or the US Trustee timely objects to any material modification or amendment to this Agreement or any Other Document, then such modification or amendment shall become effective upon the expiration of the aforementioned notice period. If a timely objection is interposed, the Bankruptcy Court shall resolve such objection prior to such modification or amendment becoming effective.  Each Loan Party acknowledges that it has been advised by counsel in connection with the execution of this Agreement and Other Documents and is not relying upon oral representations or statements inconsistent with the terms and provisions of this Agreement.

(b)    Required Lenders, Agent with the consent in writing of Required Lenders, and the Loan Parties may, subject to the provisions of this Section 16.2(b), from time to time enter into any written amendments to this Agreement or any of the Other Documents or any other supplemental agreements, documents or instruments for the purpose of adding or deleting any provisions or otherwise amending, modifying, supplementing, changing, varying or waiving in any manner the conditions, provisions or terms hereof or thereof or waiving any Event of Default hereunder or thereunder, but only to the extent specified in such written amendments or other agreements, documents or instruments; provided, however, that no such amendment, or other agreement, document or instrument shall:

(i)    increase the Revolving Commitment Percentage, or the maximum U.S. Dollar amount of the Revolving Commitment Amount of any Lender without the consent of such Lender directly affected thereby;

(ii)    whether or not any Advances are outstanding, extend the Term or the time for payment of principal or interest of any Advance (excluding the due date of any mandatory prepayment of an Advance), or any fee payable to any Lender, or reduce the principal amount of or the rate of interest borne by any Advances or reduce any fee payable to any Lender, without the consent of each Lender directly affected thereby (except that Required Lenders may elect to waive or rescind any imposition of the Default Rate under Section 3.1 hereof or of default rates of Letter of Credit fees under Section 3.2 hereof (unless imposed by Agent));

(iii)    increase the Maximum Revolving Advance Amount without the consent of each Lender directly affected thereby;

(iv)    alter, amend or modify the definition of the term "Required Lenders" or this Section 16.2(b) without the consent of all Lenders;

(v)    alter, amend or modify the provisions of Section 11.6 hereof without the consent of all Lenders;

074658.23049/132216381v.5074658.23049/132216381v.9

(vi)    change the rights and duties of Agent without the consent of all Lenders;

(vii)   subject to Section 16.2(d) below, permit any Revolving Advance to be made if after giving effect thereto the total of Revolving Advances outstanding hereunder would exceed the Formula Amount for more than sixty (60) consecutive Business Days or exceed one hundred and ten percent (110%) of the Formula Amount without the consent of all Revolving Lenders;

(viii)  increase the Advance Rates above the Advance Rates in effect on the Closing Date without the consent of all Revolving Lenders; or

(ix)    release any Loan Party without the consent of all Lenders.

Any such supplemental agreement shall apply equally to each Lender and shall be binding upon the Loan Parties, Lenders and Agent and all future holders of the Obligations.  In the case of any waiver, the Loan Parties, Agent and Lenders shall be restored to their former positions and rights, and any Event of Default waived shall be deemed to be cured and not continuing, but no waiver of a specific Event of Default shall extend to any subsequent Event of Default (whether or not the subsequent Event of Default is the same as the Event of Default which was waived), or impair any right consequent thereon.

(c)    In the event that Agent requests the consent of a Lender pursuant to this Section 16.2 and such consent is denied, then Agent may, at its option, require such Lender to assign its interest in the Advances to Agent or to another Lender or to any other Person designated by Agent (the "Designated Lender"), for a price equal to (i) then outstanding principal amount thereof plus (ii) accrued and unpaid interest and fees due such Lender, which interest and fees shall be paid when collected from the Loan Parties.  In the event Agent elects to require any Lender to assign its interest to Agent or to the Designated Lender, Agent will so notify such Lender in writing within forty five (45) days following such Lender's denial, and such Lender will assign its interest to Agent or the Designated Lender no later than five (5) days following receipt of such notice pursuant to a Commitment Transfer Supplement executed by such Lender, Agent or the Designated Lender, as appropriate, and Agent.

(d)    Notwithstanding (i) the existence of a Default or an Event of Default, (ii) that any of the other applicable conditions precedent set forth in Section 8.2 hereof have not been satisfied or the commitments of Lenders to make Revolving Advances hereunder have been terminated for any reason, or (iii) any other contrary provision of this Agreement, Agent may at its discretion and without the consent of any Lender, voluntarily permit the outstanding Revolving Advances at any time to exceed an amount equal to up to ten percent (10%) of the Formula Amount for up to sixty (60) consecutive Business Days (the "Out-of-Formula Loans").  If Agent is willing in its sole and absolute discretion to permit such Out-of-Formula Loans, Lenders holding the Revolving Commitments shall be obligated to fund such Out-of-Formula Loans in accordance with their respective Revolving Commitment Percentages, and such Out-of-Formula Loans shall be payable on demand and shall bear interest at the Default Rate for Revolving Advances consisting of Domestic Rate Loans; provided that, if Agent does permit Out-of-Formula Loans, neither Agent nor Lenders shall be deemed thereby to have changed the

159

limits of Section 2.1(a) nor shall any Lender be obligated to fund Revolving Advances in excess of its Revolving Commitment Amount.  For purposes of this Section, the discretion granted to Agent hereunder shall not preclude involuntary overadvances that may result from time to time due to the fact that the Formula Amount was unintentionally exceeded for any reason, including, but not limited to, Collateral previously deemed to be either "Eligible Canadian Receivables", "Eligible Receivables", "Eligible Unbilled Receivables", or "Eligible JV Receivables", as applicable, becomes ineligible, collections of Receivables applied to reduce outstanding Revolving Advances are thereafter returned for insufficient funds or overadvances are made to protect or preserve the Collateral.  In the event Agent involuntarily permits the outstanding Revolving Advances to exceed the Formula Amount by more than ten percent (10%), Agent shall use its efforts to have Borrowers decrease such excess in as expeditious a manner as is practicable under the circumstances and not inconsistent with the reason for such excess. Revolving Advances made after Agent has determined the existence of involuntary overadvances shall be deemed to be involuntary overadvances and shall be decreased in accordance with the preceding sentence.  To the extent any Out-of-Formula Loans are not actually funded by the other Lenders as provided for in this Section 16.2(d), Agent may elect in its discretion to fund such Out-of-Formula Loans and any such Out-of-Formula Loans so funded by Agent shall be deemed to be Revolving Advances made by and owing to Agent, and Agent shall be entitled to all rights (including accrual of interest) and remedies of a Lender holding a Revolving Commitment under this Agreement and the Other Documents with respect to such Revolving Advances.

(e)    In addition to (and not in substitution of) the discretionary Revolving Advances permitted in Section 16.2(d) above, Agent is hereby authorized by the Loan Parties and Lenders, at any time in Agent's sole discretion, regardless of (i) the existence of a Default or an Event of Default, (ii) whether any of the other applicable conditions precedent set forth in Section 8.2 hereof have not been satisfied or the Revolving Commitments have been terminated for any reason, or (iii) any other contrary provision of this Agreement, to make Revolving Advances to Borrowers on behalf of Revolving Lenders which Agent, in its reasonable business judgment, deems necessary or desirable (A) to preserve or protect the Collateral, or any portion thereof, (B) to enhance the likelihood of, or maximize the amount of, repayment of the Advances and other Obligations, or (C) to pay any other amount chargeable to the Loan Parties pursuant to the terms of this Agreement ("Protective Advances").  Revolving Lenders shall be obligated to fund such Protective Advances and effect a settlement with Agent therefor upon demand of Agent in accordance with their respective Revolving Commitment Percentages.  To the extent any Protective Advances are not actually funded by the other Revolving Lenders as provided for in this Section 16.2(e), any such Protective Advances funded by Agent shall be deemed to be Revolving Advances made by and owing to Agent, and Agent shall be entitled to all rights (including accrual of interest) and remedies of a Revolving Lender with respect to such Revolving Advances.

16.3.    Successors and Assigns; Participations; New Lenders.

(a)    This Agreement shall be binding upon and inure to the benefit of the Loan Parties, Agent, each Lender, all future holders of the Obligations and their respective successors and assigns, except that no Loan Party may assign or transfer any of its rights or obligations

under this Agreement (including, in each case, by way of an LLC Division) without the prior written consent of Agent and each Lender.

(b)     Each Loan Party acknowledges that in the regular course of commercial banking business one or more Lenders may at any time and from time to time sell participating interests in the Advances to other Persons (each such transferee or purchaser of a participating interest, a "Participant").  Each Participant may exercise all rights of payment (including rights of set-off) with respect to the portion of such Advances held by it or other Obligations payable hereunder as fully as if such Participant were the direct holder thereof provided that (i) the Loan Parties shall not be required to pay to any Participant more than the amount which it would have been required to pay to any Lender which granted an interest in its Advances or other Obligations payable hereunder to such Participant had such Lender retained such interest in the Advances hereunder or other Obligations payable hereunder unless the sale of the participation to such Participant is made with Loan Party's prior written consent, and (ii) in no event shall the Loan Parties be required to pay any such amount arising from the same circumstances and with respect to the same Advances or other Obligations payable hereunder to both such Lender and such Participant.  Each Loan Party hereby grants to any Participant a continuing security interest in any deposits, moneys or other property actually or constructively held by such Participant as security for the Participant's interest in the Advances.

(c)     Any Lender, with the consent of Agent, may sell, assign or transfer all or any part of its rights and obligations under or relating to Revolving Advances under this Agreement and the Other Documents to one or more additional Persons and one or more additional Persons may commit to make Advances hereunder (each a "Purchasing Lender"), in minimum amounts of not less than $1,000,000 pursuant to a Commitment Transfer Supplement, executed by a Purchasing Lender, the transferor Lender, and Agent and delivered to Agent for recording, provided, however, that each partial assignment shall be made as an assignment of a proportionate part of all the assigning Lender's rights and obligations under this Agreement with respect to each of the Revolving Advances under this Agreement in which such Lender has an interest.  Upon such execution, delivery, acceptance and recording, from and after the transfer effective date determined pursuant to such Commitment Transfer Supplement, (i) Purchasing Lender thereunder shall be a party hereto and, to the extent provided in such Commitment Transfer Supplement, have the rights and obligations of a Lender thereunder with a Revolving Commitment Percentage as set forth therein, and (ii) the transferor Lender thereunder shall, to the extent provided in such Commitment Transfer Supplement, be released from its obligations under this Agreement, the Commitment Transfer Supplement creating a novation for that purpose.  Such Commitment Transfer Supplement shall be deemed to amend this Agreement to the extent, and only to the extent, necessary to reflect the addition of such Purchasing Lender and the resulting adjustment of the Revolving Commitment Percentages arising from the purchase by such Purchasing Lender of all or a portion of the rights and obligations of such transferor Lender under this Agreement and the Other Documents.  Each Loan Party hereby consents to the addition of such Purchasing Lender and the resulting adjustment of the Revolving Commitment Percentages arising from the purchase by such Purchasing Lender of all or a portion of the rights and obligations of such transferor Lender under this Agreement and the Other Documents.  The Loan Parties shall execute and deliver such further documents and do such further acts and things in order to effectuate the foregoing; provided, however, that the consent of Borrowing Agent (such consent not to be unreasonably withheld, conditioned or

delayed) shall be required unless (x) an Event of Default has occurred and is continuing at the time of such assignment or (y) such assignment is to a Permitted Assignee; provided that Borrowing Agent shall be deemed to have consented to any such assignment unless it shall object thereto by written notice to Agent within five (5) Business Days after having received prior notice thereof.

(d)      Any Lender, with the consent of Agent, which consent shall not be unreasonably withheld or delayed, may directly or indirectly sell, assign or transfer all or any portion of its rights and obligations under or relating to Revolving Advances under this Agreement and the Other Documents to an entity, whether a corporation, partnership, trust, limited liability company or other entity that (i) is engaged in making, purchasing, holding or otherwise investing in bank loans and similar extensions of credit in the ordinary course of its business and (ii) is administered, serviced or managed by the assigning Lender or an Affiliate of such Lender (a "Purchasing CLO" and together with each Participant and Purchasing Lender, each a "Transferee" and collectively the "Transferees"), pursuant to a Commitment Transfer Supplement modified as appropriate to reflect the interest being assigned ("Modified Commitment Transfer Supplement"), executed by any intermediate purchaser, the Purchasing CLO, the transferor Lender, and Agent as appropriate and delivered to Agent for recording. Upon such execution and delivery, from and after the transfer effective date determined pursuant to such Modified Commitment Transfer Supplement, (i) Purchasing CLO thereunder shall be a party hereto and, to the extent provided in such Modified Commitment Transfer Supplement, have the rights and obligations of a Lender thereunder and (ii) the transferor Lender thereunder shall, to the extent provided in such Modified Commitment Transfer Supplement, be released from its obligations under this Agreement, the Modified Commitment Transfer Supplement creating a novation for that purpose. Such Modified Commitment Transfer Supplement shall be deemed to amend this Agreement to the extent, and only to the extent, necessary to reflect the addition of such Purchasing CLO. Each Loan Party hereby consents to the addition of such Purchasing CLO. The Loan Parties shall execute and deliver such further documents and do such further acts and things in order to effectuate the foregoing.

(e)      Agent, acting as a non-fiduciary agent of the Loan Parties, shall maintain at its address a copy of each Commitment Transfer Supplement and Modified Commitment Transfer Supplement delivered to it and a register (the "Register") for the recordation of the names and addresses of each Lender and the outstanding principal, accrued and unpaid interest and other fees due hereunder. The entries in the Register shall be conclusive, in the absence of manifest error, and each Loan Party, Agent and Lenders may treat each Person whose name is recorded in the Register as the owner of the Advance recorded therein for the purposes of this Agreement. The Register shall be available for inspection by Borrowing Agent or any Lender at any reasonable time and from time to time upon reasonable prior notice. Agent shall receive a fee in the amount of $3,500 payable by the applicable Purchasing Lender and/or Purchasing CLO upon the effective date of each transfer or assignment (other than to an intermediate purchaser) to such Purchasing Lender and/or Purchasing CLO.

(f)      Each Loan Party authorizes each Lender to disclose to any Transferee and any prospective Transferee any and all financial information in such Lender's possession concerning such Loan Party which has been delivered to such Lender by or on behalf of such

Loan Party pursuant to this Agreement or in connection with such Lender's credit evaluation of such Loan Party.

(g)     Notwithstanding anything to the contrary set forth in this Agreement, any Lender may at any time and from time to time pledge or assign a security interest in all or any portion of its rights under this Agreement to secure obligations of such Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank; provided that no such pledge or assignment shall release such Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto.

16.4.    Application of Payments.  Agent shall have the continuing and exclusive right to apply or reverse and re-apply any payment and any and all proceeds of Collateral to any portion of the Obligations.  To the extent that any Loan Party makes a payment or Agent or any Lender receives any payment or proceeds of the Collateral for any Loan Party's benefit, which are subsequently invalidated, declared to be fraudulent or preferential, set aside or required to be repaid to a trustee, debtor in possession, receiver, custodian or any other party under any bankruptcy law, common law or equitable cause, then, to such extent, the Obligations or part thereof intended to be satisfied shall be revived and continue as if such payment or proceeds had not been received by Agent or such Lender.

16.5.    Indemnity.  Each Loan Party shall defend, protect, indemnify, pay and save harmless Agent, Issuer, each Lender and each of their respective officers, directors, Affiliates, attorneys, employees and agents (each an "Indemnified Party") for and from and against any and all claims, demands, liabilities, obligations, losses, damages, penalties, fines, actions, judgments, suits, costs, charges, expenses and disbursements of any kind or nature whatsoever (including fees and disbursements of counsel (including allocated costs of internal counsel)) (collectively, "Claims") which may be imposed on, incurred by, or asserted against any Indemnified Party arising out of or in any way relating to or as a consequence, direct or indirect, of: (a) this Agreement, the Other Documents, the Advances and other Obligations and/or the transactions contemplated hereby including the Transactions, (b) any action or failure to act or action taken only after delay or the satisfaction of any conditions by any Indemnified Party in connection with and/or relating to the negotiation, execution, delivery or administration of this Agreement and the Other Documents, the credit facilities established hereunder and thereunder and/or the transactions contemplated hereby including the Transactions, (c) any Loan Party's failure to observe, perform or discharge any of its covenants, obligations, agreements or duties under or breach of any of the representations or warranties made in this Agreement and the Other Documents, (d) the enforcement of any of the rights and remedies of Agent, Issuer or any Lender under this Agreement and the Other Documents, (e) any threatened or actual imposition of fines or penalties, or disgorgement of benefits, for violation of any Anti-Terrorism Law by any Loan Party, any Affiliate or Subsidiary of any of the Loan Parties, and (f) any claim, litigation, proceeding or investigation instituted or conducted by any Governmental Body or instrumentality, any Loan Party, any Affiliate or Subsidiary of any Loan Party, or any other Person with respect to any aspect of, or any transaction contemplated by, or referred to in, or any matter related to, this Agreement or the Other Documents, whether or not Agent or any Lender is a party thereto.  Without limiting the generality of any of the foregoing, each Loan Party shall defend, protect, indemnify, pay and save harmless each Indemnified Party from (x) any Claims which may be imposed on, incurred by, or asserted against any Indemnified Party arising out of

074658.23049/132216381v.5074658.23049/132216381v.9

or in any way relating to or as a consequence, direct or indirect, of the issuance of any Letter of Credit hereunder, and (y) any Claims which may be imposed on, incurred by, or asserted against any Indemnified Party under any Environmental Laws with respect to or in connection with any Real Property owned or leased by any Loan Party, any Hazardous Discharge, the presence of any Hazardous Materials affecting any  Real Property owned or leased by any Loan Party (whether or not the same originates or emerges from such Real Property or any contiguous real estate), including any Claims consisting of or relating to the imposition or assertion of any Lien on any Real Property owned or leased by any Loan Party under any Environmental Laws and any loss of value of such Real Property as a result of the foregoing except to the extent such loss, liability, damage and expense is attributable to any Hazardous Discharge resulting from actions on the part of Agent or any Lender.  The Loan Parties' obligations under this Section 16.5 shall arise upon the discovery of the presence of any Hazardous Materials at any  Real Property owned or leased by any Loan Party, whether or not any federal, state, or local environmental agency has taken or, to any Loan Party's knowledge, threatened any action in connection with the presence of any Hazardous Materials, in each such case except to the extent that any of the foregoing arises out of (x) the gross negligence or willful misconduct of the Indemnified Party (as determined by a court of competent jurisdiction in a final and non-appealable judgment or order), or (y) a dispute among Indemnified Parties, to which the Borrowers and Guarantors are not a party, and which dispute does not arise from any act or omission of the Borrowers or Guarantors any of their respective affiliates (other than a claim against any agent or arranger solely in its capacity as an arranger or agent under the Other Documents).  Without limiting the generality of the foregoing, this indemnity shall extend to any liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses and disbursements of any kind or nature whatsoever (including fees and disbursements of counsel) asserted against or incurred by any of the Indemnified Parties by any Person under any Environmental Laws or similar laws by reason of any Loan Party's or any other Person's failure to comply with laws applicable to solid or hazardous waste materials, including Hazardous Materials and Hazardous Waste, or other Toxic Substances.  This Section 16.5 shall not apply with respect to Taxes other than Taxes that represent losses, claims, damages, etc. arising from any non-Tax claim.

16.6.   Notice.  Any notice or request hereunder may be given to Borrowing Agent or any Loan Party or to Agent or any Lender at their respective addresses set forth below or at such other address as may hereafter be specified in a notice designated as a notice of change of address under this Section.  Any notice, request, demand, direction or other communication (for purposes of this Section 16.6 only, a "Notice") to be given to or made upon any party hereto under any provision of this Agreement shall be given or made by telephone or in writing (which includes by means of electronic transmission (i.e., "e-mail") or facsimile transmission or by setting forth such Notice on a website to which the Loan Parties are directed (an "Internet Posting") if Notice of such Internet Posting (including the information necessary to access such site) has previously been delivered to the applicable parties hereto by another means set forth in this Section 16.6) in accordance with this Section 16.6.  Any such Notice must be delivered to the applicable parties hereto at the addresses and numbers set forth under their respective names set forth below in this Section 16.6 or in accordance with any subsequent unrevoked Notice from any such party that is given in accordance with this Section 16.6.  Any Notice shall be effective:

      (a)      In the case of hand-delivery, when delivered;

164

(b)      If given by mail, four (4) days after such Notice is deposited with the United States or Canadian Postal Service, with first-class postage prepaid, return receipt requested;

(c)      In the case of a telephonic Notice, when a party is contacted by telephone, if delivery of such telephonic Notice is confirmed no later than the next Business Day by hand delivery, a facsimile or electronic transmission, an Internet Posting or an overnight courier delivery of a confirmatory Notice (received at or before noon on such next Business Day);

(d)      In the case of a facsimile transmission, when sent to the applicable party's facsimile machine's telephone number, if the party sending such Notice receives confirmation of the delivery thereof from its own facsimile machine;

(e)      In the case of electronic transmission, when actually received;

(f)      In the case of an Internet Posting, upon delivery of a Notice of such posting (including the information necessary to access such site) by another means set forth in this Section 16.6; and

(g)      If given by any other means (including by overnight courier), when actually received.

Any Lender giving a Notice to Borrowing Agent or any Loan Party shall concurrently send a copy thereof to Agent, and Agent shall promptly notify the other Lenders of its receipt of such Notice.

(A)      If to Agent or PNC at:

PNC Bank, National Association
340 Madison Avenue, 11th Floor
New York, NY 10173
Attention:      Ryan Begley
Facsimile:      (212) 303-0060
Email:            ryan.begley@pnc.com

with a copy to:

Blank Rome LLP
1271 Avenue of the Americas
New York, NY 10020
Attention:      Robert B. Stein
Facsimile:      (917) 332-3750
Email:            rstein@BlankRome.com

(B)      If to a Lender (other than PNC), as specified in its Administrative Questionnaire.

(C)    If to Borrowing Agent or any Loan Party:

Williams Industrial Services Group Inc.
100 Crescent Centre Parkway, Suite 1240
Tucker, Georgia 30084
Attention:    Tracy D. Pagliara, President and Chief Executive Officer
Facsimile:    (866) 947-2710
Email:        tpagliara@wisgrp.com

with a copy to:

Thompson Hine LLP
127 Public Square, 3900 Key Center
Cleveland, OH 44114
Attention:     Katherine D. Brandt
Facsimile:    (216) 566-5800
Email:        Katherine.Brandt@ThompsonHine.com

16.7.    Survival.    The obligations of the Loan Parties under Sections 2.2(f), 2.2(g), 2.2(h), 3.7, 3.8, 3.9, 3.10, 16.5 and 16.9 hereof and the obligations of Lenders under Sections 2.2, 2.15(b), 2.16, 2.18, 2.19 and 14.8 hereof, shall survive the termination of this Agreement and the Other Documents and the Payment in Full of the Obligations.

16.8.    Severability.    If any part of this Agreement is contrary to, prohibited by, or deemed invalid under Applicable Laws, such provision shall be inapplicable and deemed omitted to the extent so contrary, prohibited or invalid, but the remainder hereof shall not be invalidated thereby and shall be given effect so far as possible.

16.9.    Expenses.

(a)    The Loan Parties shall pay (a) all reasonable and documented out-of-pocket expenses incurred by Agent and its Affiliates (including the reasonable fees, charges and disbursements of outside counsel for Agent), in connection with the syndication of the credit facilities provided for herein, the preparation, negotiation, execution, delivery and administration of this Agreement and the Other Documents or any amendments, modifications or waivers of the provisions hereof or thereof (whether or not the transactions contemplated hereby or thereby shall be consummated); provided that, in the case of legal expenses paid or incurred in connection with this clause (a), (x) Agent and the Lenders shall be entitled to one (1) outside counsel for PNC and the Lenders taken together and (y) one (1) local counsel for PNC and the Lenders taken together in each relevant jurisdiction, (b) all reasonable and documented out-of-pocket expenses incurred by Issuer in connection with the issuance, amendment, renewal or extension of any Letter of Credit or any demand for payment thereunder, (c) all out-of-pocket expenses incurred by Agent, any Lender or Issuer (including the  fees, charges and disbursements of any outside counsel for Agent, any Lender or Issuer), in connection with the enforcement or protection of its rights (i) in connection with this Agreement and the Other Documents, including its rights under this Section, or (ii) in connection with the Advances made or Letters of Credit issued hereunder, including all such out-of-pocket expenses incurred during

166

any workout, restructuring or negotiations in respect of such Advances or Letters of Credit, and (d) all reasonable and documented out-of-pocket expenses of Agent's regular employees and agents engaged periodically to perform audits of any Loan Party's or any Loan Party's Affiliate's or Subsidiary's books, records and business properties.

(b)     Loan Parties shall pay all costs and expenses incurred by Agent in connection with each Case, including without limitation, (A) costs and expenses incurred in connection with review of pleadings and other filings made with the Bankruptcy Court, (B) attendance at all hearings in respect of any Case, and (C) defending and prosecuting any actions or proceedings arising out of or relating to the Prepetition Obligations, the Obligations, the Liens securing the Prepetition Obligations and the Obligations or any transactions related to arising in connection with the Prepetition Other Documents or the Other Documents. Each Loan Party agrees that in the event that any actions or proceedings are in effect or are threatened by or Agent reasonably believes any actions or proceedings may be brought by the Committee or any other party in interest attacking the legality, validity, enforceability of the Prepetition Obligations, the Liens arising under the Prepetition Credit Agreement or any other matters relating to the Prepetition Other Documents at the time of the consummation of any sale of the assets of any Loan Party or at the time that any Loan Party proposes to pay and satisfy the Obligations in full, Agent may hold a reserve following the date of payment in full of the Obligations as cash collateral for the expenses (including the fees, charges and disbursements of counsel and other professionals for Agent and Lenders) reasonably expected in Agent's Permitted Discretion to be incurred in connection with such actions or proceedings until the earliest of (x) Agent's receipt of a general release satisfactory in form and substance to Agent, (y) the entry of a final non-appealable order determining the outcome of such litigation, and (z) the expiration of the Challenge Period so long as no Challenge (as defined in the Interim Order or, if entered, the Final Order) has been asserted by that date.

16.10.  <u>Injunctive Relief</u>.  Each Loan Party recognizes that, in the event any Loan Party fails to perform, observe or discharge any of its obligations or liabilities under this Agreement, or threatens to fail to perform, observe or discharge such obligations or liabilities, any remedy at law may prove to be inadequate relief to Lenders; therefore, Agent, if Agent so requests, shall be entitled to temporary and permanent injunctive relief in any such case without the necessity of proving that actual damages are not an adequate remedy.

16.11.  <u>Consequential Damages</u>.  Neither Agent nor any Lender, nor any agent or attorney for any of them, shall be liable to any Loan Party (or any Affiliate of any such Person) for indirect, punitive, exemplary or consequential damages arising from any breach of contract, tort or other wrong relating to the establishment, administration or collection of the Obligations or as a result of any transaction contemplated under this Agreement or any Other Document.

16.12.  <u>Captions</u>.  The captions at various places in this Agreement are intended for convenience only and do not constitute and shall not be interpreted as part of this Agreement.

16.13.  <u>Counterparts; Facsimile Signatures</u>.  This Agreement may be executed in any number of and by different parties hereto on separate counterparts, all of which, when so executed, shall be deemed an original, but all such counterparts shall constitute one and the same

agreement.  Any signature delivered by a party by facsimile or electronic transmission (including email transmission of a PDF image) shall be deemed to be an original signature hereto.

16.14.  <u>Construction</u>.  The parties acknowledge that each party and its counsel have reviewed this Agreement and that the normal rule of construction to the effect that any ambiguities are to be resolved against the drafting party shall not be employed in the interpretation of this Agreement or any amendments, schedules or exhibits thereto.

16.15.  <u>Confidentiality; Sharing Information</u>.  Agent, each Lender and each Transferee shall hold all non-public information obtained by Agent, such Lender or such Transferee pursuant to the requirements of this Agreement in accordance with Agent's, such Lender's and such Transferee's customary procedures for handling confidential information of this nature; provided, however, Agent, each Lender and each Transferee may disclose such confidential information (a) to its examiners, Affiliates, financing sources, directors, officers, partners, employees, agents, outside auditors, counsel and other professional advisors, (b) to Agent, any Lender or to any prospective Transferees, (c) in connection with, and to the extent necessary for, the exercise of any secured creditor remedy under this Agreement or under any of the Other Documents, and (d) as required or requested by any Governmental Body or representative thereof or pursuant to legal process; provided, further that (i) unless specifically prohibited by Applicable Law, Agent, each Lender and each Transferee shall use its reasonable best efforts prior to disclosure thereof, to notify the applicable Loan Party of the applicable request for disclosure of such non-public information (A) by a Governmental Body or representative thereof (other than any such request in connection with an examination of the financial condition of a Lender or a Transferee by such Governmental Body) or (B) pursuant to legal process and (ii) in no event shall Agent, any Lender or any Transferee be obligated to return any materials provided by any Loan Party other than those documents and instruments in possession of Agent or any Lender in order to perfect its Lien on the Collateral once the Obligations have been Paid in Full, the Commitments have been terminated and this Agreement has been terminated.  Each Loan Party acknowledges that from time to time financial advisory, investment banking and other services may be offered or provided to such Loan Party or one or more of its Affiliates (in connection with this Agreement or otherwise) by any Lender or by one or more Subsidiaries or Affiliates of such Lender and each Loan Party hereby authorizes each Lender to share any information delivered to such Lender by such Loan Party and its Subsidiaries pursuant to this Agreement, or in connection with the decision of such Lender to enter into this Agreement, to any such Subsidiary or Affiliate of such Lender, it being understood that any such Subsidiary or Affiliate of any Lender receiving such information shall be bound by the provisions of this Section 16.15 as if it were a Lender hereunder.  Such authorization shall survive the repayment of the other Obligations and the termination of this Agreement.  Notwithstanding any non-disclosure agreement or similar document executed by Agent in favor of any Loan Party or any of any Loan Party's affiliates, the provisions of this Agreement shall supersede such agreements.

16.16.  <u>Publicity</u>.  Each Loan Party and each Lender hereby authorizes Agent to make appropriate announcements of the financial arrangement entered into among the Loan Parties, Agent and Lenders, including announcements which are commonly known as tombstones, in

074658.23049/132216381v.5074658.23049/132216381v.9

such publications and to such selected parties as Agent shall in its sole and absolute discretion deem appropriate.

16.17.   Certifications From Banks and Participants; USA PATRIOT Act.

(a)      Each Lender or assignee or participant of a Lender that is not incorporated under the Laws of the United States or a state thereof (and is not excepted from the certification requirement in Section 313 of the USA PATRIOT Act and the applicable regulations because it is both (i) an affiliate of a depository institution or foreign bank that maintains a physical presence in the United States or foreign country, and (ii) subject to supervision by a banking authority regulating such affiliated depository institution or foreign bank) shall deliver to Agent the certification, or, if applicable, recertification, certifying that such Lender is not a "shell" and certifying to other matters as required by Section 313 of the USA PATRIOT Act and the applicable regulations: (1) within ten (10) days after the Closing Date, and (2) as such other times as are required under the USA PATRIOT Act.

(b)      The USA PATRIOT Act requires all financial institutions to obtain, verify and record certain information that identifies individuals or business entities which open an "account" with such financial institution. Consequently, any Lender may from time to time request, and each Loan Party shall provide to such Lender, such Loan Party's name, address, tax identification number and/or such other identifying information as shall be necessary for such Lender to comply with the USA PATRIOT Act and any other Anti-Terrorism Law.

16.18.   <u>Anti-Terrorism Laws</u>.

(a)      Each Loan Party represents and warrants that (i) no Covered Entity is a Sanctioned Person and (ii) no Covered Entity, either in its own right or through any third party, (A) has any of its assets in a Sanctioned Jurisdiction or in the possession, custody or control of a Sanctioned Person in violation of any Anti-Terrorism Law; (B) does business in or with, or derives any of its income from investments in or transactions with, any Sanctioned Jurisdiction or Sanctioned Person in violation of any Anti-Terrorism Law; or (C) engages in any dealings or transactions prohibited by any Anti-Terrorism Law.

(b)      Each Loan Party covenants and agrees that (i) no Covered Entity will become a Sanctioned Person, (ii) no Covered Entity, either in its own right or through any third party, will (A) have any of its assets in a Sanctioned Jurisdiction or in the possession, custody or control of a Sanctioned Person in violation of any Anti-Terrorism Law; (B) do business in or with, or derive any of its income from investments in or transactions with, any Sanctioned Jurisdiction or Sanctioned Person in violation of any Anti-Terrorism Law; (C) engage in any dealings or transactions prohibited by any Anti-Terrorism Law or (D) use the Advances to fund any operations in, finance any investments or activities in, or, make any payments to, a Sanctioned Jurisdiction or Sanctioned Person in violation of any Anti-Terrorism Law, (iii) the funds used to repay the Obligations will not be derived from any unlawful activity, (iv) each Covered Entity shall comply with  all Anti-Terrorism Laws and (v) the Loan Parties shall promptly notify Agent in writing upon the occurrence of a Reportable Compliance Event.

169

(c)      Each Borrower and each Guarantor covenants and agrees that (i) no Covered Entity will become a Sanctioned Person or allow any employees, officers, directors, affiliates, consultants, brokers, or agents acting on its behalf in connection with this Agreement to become a Sanctioned Person, (ii) no Covered Entity, either in its own right or through any third party, will (A) have any of its assets in a Sanctioned Country or in the possession, custody or control of a Sanctioned Person in violation of any Anti-Terrorism Law; (B) do business in or with, or derive any of its income from investments in or transactions with, any Sanctioned Country or Sanctioned Person in violation of any Anti-Terrorism Law; (C) engage in any dealings or transactions prohibited by any Anti-Terrorism Law or (D) use the Advances to fund any operations in, finance any investments or activities in, or, make any payments to, a Sanctioned Country or Sanctioned Person in violation of any Anti-Terrorism Law, (iii) the funds used to repay the Obligations will not be derived from any unlawful activity, (iv) each Covered Entity shall comply with all Anti-Terrorism Laws, (v) it will not repay the Loans with Embargoed Property or funds derived from any unlawful activity; (vi) it will not permit any Collateral to become Embargoed Property; and (e) it will not cause any Lender or Agent to violate any Anti- Terrorism Law.

(d)      Each Loan Party has implemented and maintains in effect policies and procedures designed to ensure compliance by such Loan Party, its Subsidiaries and their respective directors, officers, employees and agents with Anti-Terrorism Laws.

(e)      Each Loan Party acknowledges that, pursuant to the Proceeds of Crime (Money Laundering) and Terrorist Financing Act (Canada) and other applicable anti-money laundering, anti-terrorist financing, government sanction and "know your client" laws, whether within Canada or elsewhere (collectively, including any guidelines or orders thereunder, "AML Legislation"), the Lenders and Agent may be required to obtain, verify and record information regarding each Loan Party, their respective directors, authorized signing officers, direct or indirect shareholders or other Persons in control of such Loan Party, and the transactions contemplated hereby.  Borrowers shall promptly provide all such information, including supporting documentation and other evidence, as may be requested by any Lender or Agent, or any prospective assign or participant of a Lender or Agent, in order to comply with any applicable AML Legislation, whether now or hereafter in existence.

16.19. <u>Acknowledgment and Consent to Bail-In of EEA Financial Institutions</u>. Notwithstanding anything to the contrary contained in this Agreement, any Other Document, or any other agreement, arrangement or understanding among Agent, Lenders and the Loan Parties, Agent, each Lender and each Loan Party acknowledges that any liability of any Affected Financial Institution arising under this Agreement or any Other Document, to the extent such liability is unsecured, may be subject to the Write-Down and Conversion Powers of the applicable Resolution Authority and agrees and consents to, and acknowledges and agrees to be bound by:

(a)      the application of any Write-Down and Conversion Powers by the applicable Resolution Authority to any such liabilities arising hereunder or under any Other Document which may be payable to it by any party hereto that is an Affected Financial Institution; and

170

(b)    the effects of any Bail-In Action on any such liability, including, if applicable:

(i)    a reduction in full or in part or cancellation of any such liability;

(ii)    a conversion of all, or a portion of, such liability into shares or other instruments of ownership in such Affected Financial Institution, its parent undertaking, or a bridge institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under this Agreement or any Other Document; or

(iii)    the variation of the terms of such liability in connection with the exercise of the Write-Down and Conversion Powers of the applicable Resolution Authority.

16.20.  <u>Currency Indemnity</u>.  If, for the purposes of obtaining judgment in any court in any jurisdiction with respect to this Agreement or any Other Document it becomes necessary to convert into the currency of such jurisdiction (the "Judgment Currency") any amount due under this Agreement or under any of the Other Documents in any currency other than the Judgment Currency (the "Currency Due"), then conversion shall be made at the Exchange Rate at which Agent is able, on the relevant date, to purchase the Currency Due with the Judgment Currency prevailing on the Business Day before the day on which judgment is given. In the event that there is a change in the rate of Exchange Rate prevailing between the Business Day before the day on which the judgment is given and the date of receipt by Agent of the amount due, the Borrowers will, on the date of receipt by Agent, pay such additional amounts, if any, or be entitled to receive reimbursement of such amount, if any, as may be necessary to ensure that the amount received by Agent on such date is the amount in the Judgment Currency which when converted at the rate of exchange prevailing on the date of receipt by Agent is the amount then due under this Agreement or such Other Document in the Currency Due. If the amount of the Currency Due which Agent is able to purchase is less than the amount of the Currency Due originally due to it, the Borrowers shall indemnify and save Agent harmless from and against loss or damage arising as a result of such deficiency. The indemnity contained herein shall constitute an obligation separate and independent from the other obligations contained in this Agreement and the Other Documents, shall give rise to a separate and independent cause of action, shall apply irrespective of any indulgence granted by Agent from time to time and shall continue in full force and effect notwithstanding any judgment or order for a liquidated sum in respect of an amount due under this Agreement or any of the Other Documents or under any judgment or order.

16.21.  <u>Intercreditor Agreement</u>.  Notwithstanding anything herein to the contrary, the Lien and security interest granted to Agent pursuant to this Agreement and the exercise of any right or remedy by Agent on behalf of the Lenders hereunder are subject to the provisions of the Intercreditor Agreement.  In the event of any conflict between the terms of the Intercreditor Agreement and this Agreement, the terms of the Intercreditor Agreement shall govern and control.

16.22.  <u>Exclusive Remedy For Any Alleged Post-Petition Claim</u>.  Notwithstanding anything to the contrary provided for herein, if any Loan Party asserts that it has any adverse

claims against any Post-Petition Secured Party with respect to this Agreement and the transactions contemplated hereby, each Loan Party agrees that its sole and exclusive remedy for any and all such adverse claims will be an action for monetary damages (a "Damage Lawsuit"). Any such Damage Lawsuit, regardless of the procedural form in which it is alleged (e.g., by complaint, counterclaim, cross-claim, third-party claim, or otherwise) will be severed from any enforcement by Post-Petition Secured Parties of their legal, equitable, and contractual rights (including collection of the Obligations and foreclosure or other enforcement against the Collateral) pursuant to the Other Documents, and the Damage Lawsuit (including any and all adverse claims alleged against the Post-Petition Secured Parties) cannot be asserted by any Loan Party as a defense, setoff, recoupment, or grounds for delay, stay, or injunction against any enforcement by any Post-Petition Secured Party of their legal, equitable, and contractual rights under the Final Order, the Other Documents, and otherwise.

16.23. <u>Prohibition on Surcharge</u>. No Person will be permitted to surcharge the Collateral under Section 506(c) of the Bankruptcy Code, nor shall any costs or expenses whatsoever be imposed against the Collateral. The prohibition on surcharging or priming of the Liens of Agent on the Collateral will survive the termination of this Agreement and the dismissal of each of the Cases, such that no Person will be permitted to obtain a Lien or rights (through any means, at law or in equity) which in any case is equal or senior to the Liens of Agent on the Collateral. Upon the termination of this Agreement and the dismissal of each of the Cases, the Bankruptcy Court will retain jurisdiction over the Collateral for the limited purpose of enforcing this section.

16.24. <u>Marshalling Obligations</u>. The Agent shall not be subject to any equitable remedy of marshalling.

16.25. <u>Disavowal and Waiver of Any Subsequent Relief Based on Changed Circumstances</u>. Each Debtor and the Post-Petition Secured Parties know and understand that there are rights and remedies provided under the Bankruptcy Code, the Federal Rules of Civil Procedure, and the Bankruptcy Rules, pursuant to which parties otherwise bound by a previously entered order can attempt to obtain relief from such an order by alleging circumstances that may warrant a change or modification in the order, or circumstances such as fraud, mistake, inadvertence, excusable neglect, newly discovered evidence, or similar matters that may justify vacating the order entirely, or otherwise changing or modifying it (collectively, "Changed Circumstances"). Rights and remedies based on Changed Circumstances include, but are not limited to, modification of a plan of reorganization after confirmation of the plan and before its substantial consummation, pursuant to Section 1127(b) of the Bankruptcy Code, relief from a final order or judgment pursuant to Rule 60(b) of the Federal Rules of Civil Procedure and Bankruptcy Rule 9024, and the commencement and prosecution of a serial Chapter 11 case by a debtor which is in default of obligations under a stipulation or plan of reorganization confirmed in an earlier case. With full knowledge and understanding of what are, or may be, its present or future rights and remedies based on allegations of Changed Circumstances, each Debtor: (i) expressly disavows that there are any matters which constitute any kind of Changed Circumstances as of the date of entry of the Interim Order and (ii) expressly disavows that it is aware of any matters whatsoever that it is assuming, contemplating, or expecting in proceeding with the Final Order and the transactions contemplated by this Agreement and having the Final Order entered that would serve as a basis to allege such Changed Circumstances. Each Debtor understands and agrees that the Post-Petition Secured Parties are not willing to bear any of the

074658.23049/132216381v.5074658.23049/132216381v.9

risks involved in such Debtor's business enterprises and the Post-Petition Secured Parties are not willing to modify any of the rights if such risks cause actual or alleged Changed Circumstances; and each Debtor expressly assumes all risks of any and all such matters, and the consequences that the Post-Petition Secured Parties will enforce their legal, equitable, and contractual rights if the Post-Petition Secured Parties are not paid and dealt with strictly in accordance with the terms and conditions of the Interim Order, the Final Order, this Agreement and the Other Documents. Without limiting the foregoing in any way, each Debtor's use of any cash collateral that is included in the Collateral will be governed exclusively by the terms and conditions of this Agreement, the Interim Order and the Final Order, and, until Payment in Full either before or after a termination of this Agreement, no Debtor will seek authority from the Bankruptcy Court to otherwise use any cash collateral that is included in the Collateral for any purpose whatsoever.

16.26.  <u>Interim Order and Final Order Control</u>.  In the event of any conflict between the terms of the Interim Order and/or the Final Order and this Agreement or any Other Document, the terms of the Interim Order and/or the Final Order, as applicable, shall control to the extent the Interim Order and/or Final Order, as applicable, were approved and acceptable to Agent.

XVII.   GUARANTY.

17.1.  <u>Guaranty</u>.  Each U.S. Guarantor hereby unconditionally guarantees, as a primary obligor and not merely as a surety, jointly and severally with each other Guarantor when and as due, whether at maturity, by acceleration, by notice of prepayment or otherwise, the due and punctual performance of all Obligations; provided that with respect to Obligations under or in respect of any Swap Obligation, the foregoing guarantee shall only be effective to the extent that such U.S. Guarantor is a Qualified ECP Loan Party at the time such Swap Obligation is entered into and such Obligations and such guarantee thereof are not Excluded Hedge Liabilities.  Each payment made by any U.S. Guarantor pursuant to this Guaranty shall be made in lawful money of the United States in immediately available funds.

17.2.  <u>Waivers</u>.   Each U.S. Guarantor hereby absolutely, unconditionally and irrevocably waives (a) promptness, diligence, notice of acceptance, notice of presentment of payment and any other notice hereunder, (b) demand of payment, protest, notice of dishonor or nonpayment, notice of the present and future amount of the Obligations and any other notice with respect to the Obligations, (c) any requirement that Agent, any Lender protect, secure, perfect or insure any security interest or Lien on any property subject thereto or exhaust any right or take any action against any other Loan Party, or any Person or any Collateral, (d) any other action, event or precondition to the enforcement hereof or the performance by each such U.S. Guarantor of the Obligations, and (e) any defense arising by any lack of capacity or authority or any other defense of any Loan Party or any notice, demand or defense by reason of cessation from any cause of Obligations other than the Payment in Full of the Obligations and any defense that any other guarantee or security was or was to be obtained by Agent.

17.3.  <u>No Defense</u>.   No invalidity, irregularity, voidableness, voidness or unenforceability of this Agreement or any Other Document or any other agreement or instrument relating thereto, or of all or any part of the Obligations or of any collateral security therefor shall affect, impair or be a defense hereunder.

17.4.   Guaranty of Payment.   The Guaranty hereunder is one of payment and performance, not collection, and the obligations of each U.S. Guarantor hereunder are independent of the Obligations of the other Loan Parties, and a separate action or actions may be brought and prosecuted against any U.S. Guarantor to enforce the terms and conditions of this Article XVII, irrespective of whether any action is brought against any other Loan Party or other Persons or whether any other Loan Party or other Persons are joined in any such action or actions.  Each U.S. Guarantor waives any right to require that any resort be had by Agent or any Lender to any security held for payment of the Obligations or to any balance of any deposit account or credit on the books of Agent or any Lender in favor of any Loan Party or any other Person.  No election to proceed in one form of action or proceedings, or against any Person, or on any Obligations, shall constitute a waiver of Agent's right to proceed in any other form of action or proceeding or against any other Person unless Agent has expressed any such right in writing.  Without limiting the generality of the foregoing, no action or proceeding by Agent against any Loan Party under any document evidencing or securing indebtedness of any Loan Party to Agent shall diminish the liability of any U.S. Guarantor hereunder, except to the extent Agent receives actual payment on account of Obligations by such action or proceeding, notwithstanding the effect of any such election, action or proceeding upon the right of subrogation of any Guarantor in respect of any Loan Party.

17.5.   Liabilities Absolute.   The liability of each U.S. Guarantor hereunder shall be absolute, unlimited and unconditional and shall not be subject to any reduction, limitation, impairment, discharge or termination for any reason, including, without limitation, any claim of waiver, release, surrender, alteration or compromise, and shall not be subject to any claim, defense or setoff, counterclaim, recoupment or termination whatsoever by reason of the invalidity, illegality or unenforceability of any other Obligation or otherwise.  Without limiting the generality of the foregoing, the obligations of each U.S. Guarantor shall not be discharged or impaired, released, limited or otherwise affected by:

(a)   any change in the manner, place or terms of payment or performance, and/or any change or extension of the time of payment or performance of, release, renewal or alteration of, or any new agreements relating to any Obligation, any security therefor, or any liability incurred directly or indirectly in respect thereof, or any rescission of, or amendment, waiver or other modification of, or any consent to departure from, this Agreement or any Other Document, including any increase in the Obligations resulting from the extension of additional credit to any Loan Party or otherwise;

(b)   any sale, exchange, release, surrender, loss, abandonment, realization upon any property by whomsoever at any time pledged or mortgaged to secure, or howsoever securing, all or any of the Obligations, and/or any offset there against, or failure to perfect, or continue the perfection of, any Lien in any such property, or delay in the perfection of any such Lien, or any amendment or waiver of or consent to departure from any other guaranty for all or any of the Obligations;

(c)   the failure of Agent or any Lender to assert any claim or demand or to enforce any right or remedy against any Loan Party or any other Loan Party or any other Person

174

074658.23049/132216381v.9

under the provisions of this Agreement or any Other Document or any other document or instrument executed and delivered in connection herewith or therewith;

(d)    any settlement or compromise of any Obligation, any security therefor or any liability (including any of those hereunder) incurred directly or indirectly in respect thereof or hereof, and any subordination of the payment of all or any part thereof to the payment of any obligation (whether due or not) of any Loan Party to creditors of any Loan Party other than any other Loan Party;

(e)    any manner of application of Collateral, or proceeds thereof, to all or any of the Obligations, or any manner of sale or other disposition of any Collateral for all or any of the Obligations or any other assets of any Loan Party; and

(f)    any other agreements or circumstance of any nature whatsoever that may or might in any manner or to any extent vary the risk of any Guarantor, or that might otherwise at law or in equity constitute a defense available to, or a discharge of, the Guaranty hereunder and/or the obligations of any Guarantor, or a defense to, or discharge of, any Loan Party or any other Person or party hereto or the Obligations or otherwise with respect to the Advances or other financial accommodations to the Loan Parties pursuant to this Agreement and/or the Other Documents.

17.6.    <u>Waiver of Notice</u>.    Agent shall have the right to do any of the above without notice to or the consent of any U.S. Guarantor and each U.S. Guarantor expressly waives any right to notice of, consent to, knowledge of and participation in any agreements relating to any of the above or any other present or future event relating to Obligations whether under this Agreement or otherwise or any right to challenge or question any of the above and waives any defenses of such U.S. Guarantor which might arise as a result of such actions.

17.7.    <u>Agent's Discretion</u>.    Agent may at any time and from time to time (whether prior to or after the revocation or termination of this Agreement) without the consent of, or notice to, any U.S. Guarantor, and without incurring responsibility to any U.S. Guarantor or impairing or releasing the Obligations, apply any sums by whomsoever paid or howsoever realized to any Obligations regardless of what Obligations remain unpaid.

17.8.    <u>Reinstatement</u>. (a)    The Guaranty provisions herein set forth herein shall continue to be effective or be reinstated, as the case may be, if claim is ever made upon Agent or any Lender for repayment or recovery of any amount or amounts received by such Agent or such Lender in payment or on account of any of the Obligations and such Person repays all or part of said amount for any reason whatsoever, including, without limitation, by reason of any judgment, decree or order of any court or administrative body having jurisdiction over such Person or the respective property of each, or any settlement or compromise of any claim effected by such Person with any such claimant (including any Loan Party); and in such event each U.S. Guarantor hereby agrees that any such judgment, decree, order, settlement or compromise or other circumstances shall be binding upon such U.S. Guarantor, notwithstanding any revocation hereof or the cancellation of any note or other instrument evidencing any Obligation, and each U.S. Guarantor shall be and remain liable to Agent and/or Lenders for the amount so repaid or

175

recovered to the same extent as if such amount had never originally been received by such Persons.

(b)    Agent shall not be required to marshal any assets in favor of any Guarantor, or against or in payment of Obligations.

(ea)    No U.S. Guarantor shall be entitled to claim against any present or future security held by Agent from any Person for Obligations in priority to or equally with any claim of Agent, or assert any claim for any liability of any Loan Party to any U.S. Guarantor in priority to or equally with claims of Agent for Obligations, and no U.S. Guarantor shall be entitled to compete with Agent with respect to, or to advance any equal or prior claim to any security held by Agent for Obligations.

(db)    If any Loan Party makes any payment to Agent, which payment is wholly or partly subsequently invalidated, declared to be fraudulent or preferential, set aside or required to be repaid to any Person under any federal or provincial statute or at common law or under equitable principles, then to the extent of such payment, the Obligation intended to be paid shall be revived and continued in full force and effect as if the payment had not been made, and the resulting revived Obligation shall continue to be guaranteed, uninterrupted, by each U.S. Guarantor hereunder.

(ec)    All present and future monies payable by any Loan Party to any U.S. Guarantor, whether arising out of a right of subrogation or otherwise, are assigned to Agent for its benefit and for the ratable benefit of Lenders as security for such U.S. Guarantor's liability to Agent and Lenders hereunder and are postponed and subordinated to Agent's prior right to Payment in Full of the Obligations.    Except to the extent prohibited otherwise by this Agreement, all monies received by any U.S. Guarantor from any Loan Party shall be held by such U.S. Guarantor as agent and trustee for Agent.    This assignment, postponement and subordination shall only terminate when the Obligations are Paid in Full and this Agreement is irrevocably terminated.

(fd)    Each Loan Party acknowledges this assignment, postponement and subordination and, except as otherwise set forth herein, agrees to make no payments to any U.S. Guarantor without the prior written consent of Agent.  Each Loan Party agrees to give full effect to the provisions hereof.

*[signature pages follow]*

176

Each of the parties has signed this Agreement as of the day and year first above written.

BORROWERS:

**WILLIAMS INDUSTRIAL SERVICES GROUP INC.**
**WILLIAMS INDUSTRIAL SERVICES GROUP, L.L.C.**
**WILLIAMS INDUSTRIAL SERVICES, LLC**
**WILLIAMS SPECIALTY SERVICES, LLC**
**WILLIAMS PLANT SERVICES, LLC**
**WILLIAMS GLOBAL SERVICES, INC.**
**CONSTRUCTION & MAINTENANCE PROFESSIONALS, LLC**
**WISG ELECTRICAL, LLC**

By: _____
Name:
Title:


GUARANTORS:

**GLOBAL POWER PROFESSIONAL SERVICES INC.**
**GPEG, LLC**
**STEAM ENTERPRISES LLC**
**WISG CANADA LTD.**
**WISG NUCLEAR LTD.**
**WISG ELECTRICAL LTD.**

By: _____
Name:
Title:

Signature Page to Revolving Credit and Security Agreement

**PNC BANK, NATIONAL ASSOCIATION,**
as Agent and Lender


By:     _____
Name:
Title:

Signature Page to Revolving Credit and Security Agreement

074658.20114/130115845v.5
074658.23049/132216381v.5074658.23049/132216381v.9

| Summary report: Litera Compare for Word 11.3.0.46 Document comparison done on 7/24/2023 7:46:33 PM ||
|---|---|
| **Style name:** Default Style ||
| **Intelligent Table Comparison:** Active ||
| **Original DMS:** iw://imanage.blankrome.com/BRMATTERS/132216381/5 ||
| **Modified DMS:** iw://imanage.blankrome.com/BRMATTERS/132216381/9 ||
| **Changes:** ||
| Add | 235 |
| Delete | 294 |
| Move From | 1 |
| Move To | 1 |
| Table Insert | 0 |
| Table Delete | 0 |
| Table moves to | 0 |
| Table moves from | 0 |
| Embedded Graphics (Visio, ChemDraw, Images etc.) | 0 |
| Embedded Excel | 0 |
| Format changes | 0 |
| **Total Changes:** | 531 |