**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>WILLIAMS INDUSTRIAL SERVICES GROUP INC., *et al.*[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 23-10961-BLS<br><br>(Jointly Administered)<br><br>**Related Docket Nos. 33, 35, and 81** |

**AMENDMENT AND SUPPLEMENT TO MOTION FOR ENTRY OF AN
ORDER (I) APPROVING BIDDING PROCEDURES FOR THE SALE OF
ASSETS, (II) SCHEDULING HEARINGS AND OBJECTION DEADLINES WITH
RESPECT TO THE DEBTORS' AUTHORITY TO SELL, (III) SCHEDULING BID
DEADLINES AND AN AUCTION, (IV) APPROVING THE FORM AND MANNER
OF NOTICE THEREOF, (V) APPROVING CONTRACT ASSUMPTION AND
ASSIGNMENT PROCEDURES, AND (VI) GRANTING RELATED RELIEF**

The above captioned debtors and debtors in possession (collectively, the "Debtors") file this amendment and supplement (this "Supplement") to their previously filed *Motion for Entry of an Order (i) Approving Bidding Procedures for the Sale of Assets, (ii) Scheduling Hearings and Objection Deadlines with Respect to the Debtors' Authority to Sell, (iii) Scheduling Bid Deadlines and an Auction, (iv) Approving the Form and Manner of Notice thereof, (v) Approving Contract Assumption and Assignment Procedures, and (vi) Granting Related Relief* (D.I. 33) (the "Motion").[2] This Supplement is being filed to seek entry of an order, among other things, (i) authorizing the Debtors to enter into the Stalking Horse APA, (ii) confirming the selection of

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Williams Industrial Services Group Inc. (1378), Williams Industrial Services Group, LLC (2666), Williams Industrial Services, LLC (0406), Williams Plant Services, LLC (9575), Williams Specialty Services, LLC (9578), WISG Electrical, LLC (6918), Construction & Maintenance Professionals, LLC (0925), Williams Global Services, Inc. (3708), Steam Enterprises, LLC (9177), GPEG LLC (5707), Global Power Professional Services, Inc. (2550), WISG Canada Ltd. (B.N. 6518), WISG Nuclear Ltd. (B.N. 3510), and WISG Electrical Ltd. (B.N. 2116). The location of the Debtors' corporate headquarters and service address is: 200 Ashford Center N, Suite 425, Atlanta, GA 30338.

[2] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Motion.

00054622.2

EnergySolutions Nuclear Services, LLC, the Buyer under the proposed Stalking Horse APA, as the Stalking Horse Bidder in accordance with the Bid Procedures to be approved by the Court and authorizing and approving the Debtors' entry into the Stalking Horse APA, and (iii) approving the Bid Protections as administrative expenses under section 503 of the Bankruptcy Code and authorizing payment of the Break-Up Fee and Buyer Expense Reimbursement in accordance with, and subject to, the provisions of Section 8.01 of the Stalking Horse APA if, and only if, the Buyer becomes entitled to such payment in accordance therewith.

### The Stalking Horse APA and Bid Protections

1. The Stalking Horse APA and its terms were negotiated by the Debtors and the Stalking Horse Bidder in good faith and at arm's length. The Stalking Horse Bidder is unwilling to hold open its offer to purchase the Transferred Assets unless it is assured payment of the Bid Protections in accordance with the conditions set forth in the Stalking Horse APA. Entry into the Stalking Horse APA with the Stalking Horse Bidder as a "stalking-horse" sale agreement is in the best interest of the Debtors and the Debtors' estates and creditors. The Stalking Horse APA will enable the Debtors to secure an adequate floor for the Auction and will provide a clear benefit to the Debtors' estates.

2. As set forth herein and in the Motion, the Debtors demonstrate compelling and sound business justifications for authorizing the sale of the Assets, entry into the Stalking Horse APA and the payment of the Bid Protections under the circumstances, consistent with the timing and procedures set forth in the Bidding Procedures. The proposed bidding process will induce prospective competing bidders to expend the time, energy and resources necessary to submit a bid. The Debtors believe the proposed Bidding Procedures are fair and reasonable, and will provide substantial benefit to the Debtors' estates and creditors. Provision of the Bid Protections (including

the Break-Up Fee and Buyer Expense Reimbursement) is therefore warranted and appropriate under the circumstances.

## KEY TERMS OF THE STALKING HORSE APA

3.  Pursuant to Local Rule 6004-1, a summary of the key terms of the Stalking Horse APA are listed below:[3]

| | |
|---|---|
| **Sellers** | Williams Industrial Services Group Inc., Williams Industrial Services Group, L.L.C., Williams Industrial Services LLC, Construction & Maintenance Professionals, LLC, WISG Electrical, LLC, Williams Plant Services, LLC, and Williams Specialty Services, LLC (*see* Stalking Horse APA at p. 1, at preamble and Preliminary Statements) |
| **Stalking Horse Bidder** | EnergySolutions Nuclear Services, LLC (*see* Stalking Horse APA at p. 1, at preamble and Preliminary Statements) |
| **Purchase Price** | Under Section 3.01 of the Stalking Horse APA, the aggregate consideration to be paid by the Stalking Horse Bidder for the sale of all of the Transferred Assets shall be an amount in cash equal to the sum of (a) $60,000,000, less (b) any Cure Cost Deductions, less (c) any Payables Adjustment. As additional consideration for the Transferred Assets, the Stalking Horse Bidder shall assume the Assumed Liabilities at the Closing. |
| **Sale to Insider (Local Rule 6004-1(b)(iv)(A))** | The Stalking Horse Bidder is not an "insider" as that term is defined in 11 U.S.C. § 101(31). |
| **Agreements with Management (Local Rule 6004-1(b)(iv)(B))** | The Debtors are not aware of any agreements with management. |
| **Releases (Local Rule 6004-1(b)(iv)(C))** | The proposed Sale Order attached to the Stalking Horse APA as Exhibit D, includes standard language approving the sale of the Transferred Assets free and clear of all Liens, Claims, encumbrances, and other interests, except to the extent set forth in the Stalking Horse APA (i.e., other than Assumed Liabilities, Liens created by Buyer and Permitted Liens) (*see* Proposed Sale Order |

---

[3] The following summary is qualified in its entirety by reference to the provisions of the Stalking Horse APA and is provided for convenience purposes only. To the extent any of the terms described below are inconsistent with the Stalking Horse APA, the terms of the Stalking Horse APA shall govern. Capitalized terms used but not defined in this paragraph 3 shall have the meanings ascribed to such terms in the Stalking Horse APA.

| | |
|---|---|
| | attached as Exhibit D to Stalking Horse APA, at ¶10; *see also* Stalking Horse APA at Section 2.02(a) and 2.02(b)). |
| **Private Sale/No Competitive Bidding (Local Rule 6004-1(b)(iv)(D))** | The proposed sale to the Stalking Horse Bidder contemplates an auction process as set forth in the proposed Bidding Procedures (which are attached as Exhibit 1 to the proposed Bidding Procedures Order at Exhibit B to the Motion). |
| **Closing Deadline and Deadlines that are Conditions to Closing (Local Rule 6004-1(b)(iv)(E))** | Under Section 2.04 of the Stalking Horse APA, the contemplated closing deadline is the fifth Business Day following the date upon which all Closing Conditions (as such term is defined in Exhibit A to the Stalking Horse APA, and as set forth in Article X of the Stalking Horse APA) are satisfied or waived in writing (to the extent permitted by applicable Law) in accordance with Article X of the Stalking Horse APA (other than those Closing Conditions that by their nature can only be satisfied at the Closing, but subject to the satisfaction or waiver of those Closing Conditions at such time) or (b) on such other date or at such other time or place as the Parties may agree in writing. |
| **Good Faith Deposit (Local Rule 6004-1(b)(iv)(F))** | Under section 3.02 of the Stalking Horse APA, **$6,000,000** shall be deposited by the Stalking Horse Bidder on the first Business Day following the execution of the Stalking Horse APA, representing ten percent (10%) of the Base Purchase Price, in accordance the Escrow Agreement and the terms and conditions set forth in the Sale Order. The Escrowed Funds (together with any and all accrued investment income thereon) shall be distributed upon the earlier of the Closing or the termination of the Stalking Horse APA in accordance with Sections 3.04(a)(i) and 3.04(b)(ii) or Section 11.03 of the Stalking Horse APA, as applicable. In accordance with Section 53 of the proposed Bidding Procedures, within two (2) business days after the Auction, the Debtors shall direct the Escrow Agent to return the Good Faith Deposit (as defined in the proposed Bidding Procedures) of any bidder (including the aforementioned purchase price deposit of the Stalking Horse Bidder identified in Section 3.02 of the Stalking Horse APA, and any Additional Stalking Horse Bidder), together with interest accrued thereon, who is not declared a Successful Bidder or Back-Up Bidder. |
| **Interim Arrangements with Proposed Buyer (Local Rule 6004-1(b)(iv)(G))** | The Debtors are not entering into any interim agreements or arrangements with the Stalking Horse Bidder, such as interim management arrangements. Under Section 3.04(a)(iv), and at Closing, however, the applicable Sellers are to deliver counterparts of the Transition Services Agreement and Reverse Transition Services Agreement, in each case (and as attached to the Stalking |

| | |
|---|---|
| | Horse APA at Exhibits E-1 and E-2, respectively), duly executed by the applicable Sellers. |
| **Use of Proceeds (Local Rule 6004- 1(b)(iv)(H))** | The proposed form of Sale Order attached to the Stalking Horse APA at Exhibit D provides that, at Closing, the net proceeds from the Sale of the Transferred Assets shall be paid by wire transfer directly to PNC Bank, N.A. in its capacity as Prepetition Revolving Agent and DIP Revolving Agent, and EICF Agent LLC in its capacity as Prepetition Term Agent and DIP Term Agent (collectively, the "Agents") in accordance with wire instructions to be provided by the Agents to the Buyer (as such term is defined under the Sale Order). With respect to any proceeds remaining after such payment to Agents, all Liens, Claims, Interests, and other Liabilities with respect to the Transferred Assets shall attach to the proceeds of the Sale ultimately attributable to the property against which such Liens, Claims, Interests, and other Liabilities applied, in the same order of priority and with the same validity, force, and effect that such Liens, Claims, Interests, and other Liabilities applied prior to the Sale, subject to any rights, claims, and defenses of the Debtors or their estates, as applicable, or as otherwise provided in the proposed Sale Order. |
| **Tax Exemption (Local Rule 6004-1(b)(iv)(I))** | There are no provisions in the Motion seeking to have the sale declared exempt from taxes under section 1146(a) of the Bankruptcy Code. However, under Section 9.02 of the Stalking Horse APA, to the extent not exempt under the Sale Order or Section 1146 of the Bankruptcy Code, (a) where Buyer is liable under applicable Law to pay any Transfer Tax imposed or arising with respect to the Transactions or any component thereof, Buyer shall promptly pay and discharge such Transfer Tax, and (b) where any of the Sellers is liable under applicable Law to pay any Transfer Tax imposed or arising with respect to the Transactions or any component thereof, Buyer shall pay the amount of such Transfer Tax to Sellers and shall indemnify, defend and hold harmless Sellers and any of their Affiliates and Representatives from and against any such Transfer Taxes (unless such indemnity is prohibited by (or otherwise invalid under) applicable Law in which case Buyer shall indemnify, defend and hold harmless Sellers for an amount equal to any such Transfer Taxes). Further, Buyer and Sellers each agree to timely sign and deliver (or to cause their respective Affiliates to timely sign and deliver) such certificates or forms as may be necessary or appropriate and to otherwise cooperate to establish any available exemption from (or otherwise reduce) any Transfer Taxes. |

| **Record Retention (Local Rule 6004-1(b)(iv)(J))** | Under Section 7.01(a) of the Stalking Horse APA, the Debtors will retain, or have reasonable access to, their respective books and records to enable them to administer their bankruptcy cases following the Closing Date. |
|---|---|
| **Sale of Avoidance Actions (Local Rule 6004- 1(b)(iv)(K))** | Under Section 2.02(a)(i)(T) of the Stalking Horse APA, the Transferred Assets include all avoidance actions (including any proceeds thereof), including all claims and causes of action arising under Sections 544 through 553 of the Bankruptcy Code or any analogous state law to the extent such actions are against the following parties: (a) any of the Sellers' vendors, suppliers, customers, or trade creditors in regards or related to the Transferred Assets or the Business; and (b) any counterparties to any Transferred Contracts. |
| **Requested Findings as to Successor Liability (Local Rule 6004- 1(b)(iv)(L))** | Under Section 6.11 of the Stalking Horse APA, the Sale Order shall provide that the Stalking Horse Bidder shall not be deemed to: (a) be the successor of any Seller or any of its Affiliates (including with respect to any Withdrawal Liability or contribution obligations, whether arising prior to, on or after, the Closing Date, or with respect to the assumption of contribution history associated with any Multiemployer Plan), (b) have, de facto or otherwise, merged with or into any Seller or any of its Affiliates, (c) be a mere continuation or substantial continuation of any Seller or any of its Affiliates, or (d) be liable for any acts or omissions of Sellers or any of their Affiliates in the conduct of the Business or arising under, or related to, the Transferred Assets or the Business, other than as expressly set forth in Section 2.02(e) of the Stalking Horse APA. *See also* proposed Sale Order attached as Exhibit D to Stalking Horse APA, at ¶¶ 15-17. |
| **Sale Free and Clear of Unexpired Leases (Local Rule 6004- 1(b)(iv)(M))** | The proposed Sale Order attached to the Stalking Horse APA as Exhibit D, includes standard language approving the sale of the Transferred Assets free and clear of all Liens, Claims, encumbrances, and other interests, except to the extent set forth in the Stalking Horse APA (i.e., other than other than Assumed Liabilities, Liens created by Buyer and Permitted Liens) (*see* Proposed Sale Order attached as Exhibit D to Stalking Horse APA, at ¶10; *see also* Stalking Horse APA at Section 2.02(a) and 2.02(b)). |
| **Credit Bid (Local Rule 6004- 1(b)(iv)(N))** | The Stalking Horse Bidder is not credit bidding. |
| **Relief from Bankruptcy Rule** | The proposed Sale Order attached as Exhibit D of the Stalking Horse APA, at ¶ 37, provides that notwithstanding the possible applicability of Bankruptcy Rules 4001(a)(3), 6004(h), 6006(d), 7062, 9014 or any other applicable Bankruptcy Rule, or Rule 62(a) |

| | |
|---|---|
| **6004(h) (Local Rule 6004- 1(b)(iv)(O))** | of the Federal Rules of Civil Procedure, the terms and conditions of the Sale Order shall be immediately effective and enforceable upon its entry, there shall be no stay of execution or effectiveness. |

A.  **The Bidding Procedures are Appropriate and Will Maximize the Value Received for the Transferred Assets**

4.  The paramount goal of any proposed sale of property of a debtor's estate is to maximize the value of the proceeds received by the estate. *See Official Committee of Unsecured Creditors of Cybergenics Corp. v. Chinery*, 330 F.3d 548, 573 (3d Cir. 2003) (the debtor has the "fiduciary duty to maximize the value of the bankruptcy estate."); *Burtch et al. v. Ganz, et al. (In re Mushroom Co.)*, 382 F.3d 325, 339 (3d Cir. 2004) (finding that debtor "had a fiduciary duty to protect and maximize the estate's assets."); *In re Food Barn Stores, Inc.*, 107 F.3d 558, 564-65 (8th Cir. 1997) ("[A] primary objective of the Code [in asset sales is] to enhance the value of the estate at hand.") (citing *Metropolitan Airports Comm'n v. Northwest Airlines, Inc. (In re Midway Airlines, Inc.)*, 6 F.3d 492, 494 (7th Cir. 1993) ("Section 365 . . . advances one of the Code's central purposes, the maximization of the value of the bankruptcy estate for the benefit of creditors.")).

5.  To that end, courts have recognized that procedures established for the purpose of enhancing competitive bidding are consistent with the fundamental goal of maximizing value of a debtor's estate. *See Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.)*, 181 F.3d 527, 537 (3d Cir. 1999) (noting that bidding procedures that promote competitive bidding provide a benefit to a debtor's estate); *see also In re Fin'l News Network, Inc.*, 126 B.R. 152, 156 (Bankr. S.D.N.Y. 1992) ("[C]ourt-imposed rules for the disposition of assets . . . [should] provide an adequate basis for comparison of offers, and [should] provide for fair and efficient resolution of bankrupt estates.").

6.      In this case, the proposed Bidding Procedures are appropriate under sections 105(a) and 363 of the Bankruptcy Code and will ensure that the bidding process is fair and reasonable and will yield the maximum value for the Debtors' estates, creditors, stakeholders, and other parties in interest.  The Bidding Procedures are designed to maximize the value received for the Transferred Assets by facilitating a fair and competitive bidding process in which all potential bidders are encouraged to participate and submit competing bids.  The Debtors, with the assistance of their advisors, have structured the Bidding Procedures to attract competitive and active bidding for the Transferred Assets.  The Bidding Procedures will allow the Debtors to conduct an Auction, if necessary, in a fair, controlled and transparent manner that will encourage participation by financially capable bidders that demonstrate the financial wherewithal to close a transaction.  The Bidding Procedures provide the Debtors with the opportunity to consider all competing offers and to select, in their business judgment, the highest and best offer for the Transferred Assets.  The Bidding Procedures further provide potential bidders with sufficient notice and an opportunity to obtain due diligence information necessary to submit a timely and informed competing bid.

7.      In addition, as set forth in the Motion and the *Declaration of David Shim of Greenhill & Co., Inc. in Support of Debtors' Sale Motion* (D.I. 35) (the "Shim Declaration"), the Debtors, in conjunction with their professional advisors, already engaged in an extensive marketing process before the Petition Date.  In February 2023, the Debtors, with the assistance of their advisors, initiated an extensive marketing effort and reached out to approximately 140 parties who might have an interest in acquiring the Debtors' assets.  Shim Declaration ¶ 8.  Approximately fifty of those parties executed non-disclosure agreements and received comprehensive packets of confidential information regarding the Debtors, and six parties provided written indications of interest.  *Id.* ¶¶ 8-9.

8. Given that the universe of potential bidders was identified and contacted months ago in an effort to solicit bids, it is highly likely that any prospective bidders (a) have been aware of the potential sale of the Debtors' assets months before the chapter 11 cases were filed and (b) have already had a sufficient and adequate opportunity to conduct due diligence and submit a bid within the proposed timeline under the Bidding Procedures. Thus, the proposed timeline for the submission of competing bids and the entry of a Sale Order is more than reasonable under the circumstances. Notably, the Stalking Horse APA contains no prohibition on the Debtors' soliciting or receiving offers for the Transferred Assets and, accordingly, the Debtors are able to continue marketing such assets for sale even prior to entry of the Bidding Procedures Order. Therefore, the Debtors and all parties in interest can be assured that the consideration ultimately received for the Transferred Assets as a result of the bidding process will not only be fair and reasonable, but will reflect the maximum price that the market will bear for the Transferred Assets.

9. Accordingly, the Debtors submit that the Bidding Procedures should be approved as reasonable, appropriate, and in the best interests of the Debtors, their creditors, estates and all parties in interest.

**B.    The Court Should Approve the Debtors' Entry Into the Stalking Horse APA**

10. Section 363(b) of the Bankruptcy Code permits debtors to use property of the estate outside of the ordinary course of business after notice and a hearing, and courts apply the business judgment standard in evaluating a debtor's proposed use of property outside of the ordinary course of business. *See Dai-Ichi Kangyo Bank, Ltd. V. Montgomery Ward Holding Corp. (In re Montgomery Ward Holding Corp.)*, 242 B.R. 147, 153-54 (D. Del. 1999) (use of assets outside the ordinary course of business permitted if "sound business purpose justifies such actions"); *Meyers v. Martin (In re Martin)*, 91 F.3d 389, 395 (3d Cir. 1996) (citing *Fulton State Bank v. Schipper (In*

re Schipper*, 933 F.2d 513, 515 (7th Cir. 1991)); *In re Lionel Corp.*, 722 F.2d 1063, 1071 (2d Cir. 1983). The business judgment standard recognizes that informed, good faith decisions by debtors' directors should be ratified so long as they can be attributed to "any rational purpose." *See Marvel Entm't Group, Inc. v. Mafco Holdings, Inc. (In re Marvel Entm't Grp., Inc.)*, 273 B.R. 58, 78 (D. Del. 2002) ("[U]nder the business judgment rule, a board's 'decisions will not be disturbed if they can be attributed to any rational purpose'").

11. By applying this standard, courts recognize that a debtor is in the best position to make informed and educated decisions about its business. *Id.*; *see also In re Friedman's, Inc.*, 336 B.R. 891, 895 (Bankr. S.D. Ga. 2005) (holding that the "business judgment rule is a 'policy of judicial restraint born of the recognition that directors are, in most cases, more qualified to make business decisions than are judges'") (quoting *Int'l Ins. Co. v. Johns*, 874 F.2d 1447, 1458 n.20 (11th Cir. 1989)).

12. Once the debtor articulates a valid business justification, the business judgment rule creates "a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." *In re Integrated Resources, Inc.*, 147 B.R. 650, 656 (Bankr. S.D.N.Y. 1992) (quoting *Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985)). Thus, "[w]here the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct." *Comm. Of Asbestos-Related Litigants and/or Creditors v. Johns-Manville Corp. (In re Johns Manville Corp.)*, 60 B.R. 612, 616 (Bank. S.D.N.Y. 1986).

13. Moreover, "[w]here the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not

entertain objections to the debtors' conduct." *In re Johns-Manville Corp.*, 60 B.R. at 616. In fact, to the extent a debtor demonstrates use of reasonable business judgment, a presumption arises that the debtor's decision was made on "an informed basis, in good faith, and in the honest belief, that the action was in the best interest of the company." *In re Integrated Resources, Inc.*, 147 B.R. at 656 (quoting *Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985)); *In re Johns-Manville Corp.*, 60 B.R. at 615-16 ("[T]he Code favors the continued operation of a business by a debtor and a presumption of reasonableness attaches to a debtor's management decisions"). Accordingly, when a debtor's actions satisfy the business judgment rule, the transaction in question should be approved under section 363(b)(1) of the Bankruptcy Code.

14.     Here, the Debtors have demonstrated a sound business judgment for entering into the Stalking Horse APA. The Stalking Horse APA was the result of arms-length, good-faith negotiations between the Debtors and the Stalking Horse Bidder, and the Stalking Horse Bid is the best and the highest offer the Debtors have received to date for the Transferred Assets. Further, the Stalking Horse APA is not the subject of collusive bidding under section 363(n) of the Bankruptcy Code.

15.     Entry into the Stalking Horse APA will establish a floor for other interested bidders to submit, and for the Debtors to pursue, a superior offer on the Transferred Assets, including as part of a bid that includes other of the Debtors' assets. Further, as a condition to funding the sale process, certain of the Debtors' prepetition and proposed postpetition secured lenders required the Debtors' entry into Stalking Horse APA. Based on the foregoing, the Debtors submit that the entry into the Stalking Horse APA was a valid exercise of their business judgment and should be approved by the Court.

C.  **The Bid Protections Are Fair, Market-Based, and an Essential Component of the Stalking Horse Bid and Should be Approved**

16. The use of bid protections such as the Break-Up Fee and the Buyer Expense Reimbursement enables a debtor to ensure a sale to a contractually committed bidder at a price the debtor believes is fair, while providing the debtor with the potential of obtaining an enhanced recovery through an auction process, and courts regularly approve similar Bid Protections in this context as allowed administrative expenses under section 503(b) of the Bankruptcy Code. *See Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.)*, 181 F.3d 527, 535 (3d Cir. 1999) ("[W]hether break-up fees or expenses are allowable under § 503(b) . . . depends upon the requesting party's ability to show that the fees were actually necessary to preserve the value of the estate."); *In re Reliant Energy Channelview LP*, 594 F.3d 200, 206 (3d Cir. 2010) ("[It is] permissible to offer a break-up fee and reimbursement for expenses to induce an initial bid, provided the allowance of the fee does not give an advantage to a favored purchaser over other bidders by increasing the cost of acquisition."); *In re Energy Future Holdings Corp.*, 575 B.R. 616, 634 (Bankr. D. Del. 2017) ("The regular situation in which a termination fee provides an actual benefit . . . is when the fee induces a bid that results in higher competitive bidding for the debtor's asset. Moreover, even if an auction does not occur, a termination fee may be justified when it increases the likelihood that the price at which the debtor is sold will reflect its true worth.") (footnotes and quotation marks omitted).

17. The Debtors recognize the significant expenditure of time, energy, and resources that went into preparing the Stalking Horse Bid and agreed to provide the Bid Protections to the Stalking Horse Bidder to encourage such party to invest the requisite time, money, and effort to negotiate with the Debtors and perform the necessary due diligence attendant to the acquisition of the Transferred Assets, despite the inherent risks and uncertainties of the chapter 11 process.

Therefore, the Bid Protections are actual and necessary to preserve the value of the Debtors' estates. Moreover, the Stalking Horse Bid provides a floor bid with respect to the purchase price for the sale of the Transferred Assets and may encourage other potential bidders to put their best offer forward and engage with the Debtors prior to the bid deadline to provide additional competitive bids. The Stalking Horse Bidder would not have entered into the Stalking Horse APA unless it received the protections afforded by the Break-Up Fee and Buyer Expense Reimbursement. Accordingly, without the Bid Protections, the Debtors might lose the opportunity to obtain the highest or otherwise best offer for the Transferred Assets and would lose the downside protection that will be afforded by the existence of the Stalking Horse Bidder.

18. Furthermore, the aggregate amount of the Bid Protections is reasonable and appropriate in light of the size and nature of the transaction, and is reasonably intended to compensate for the risk that the Stalking Horse Bidder is taking by setting a baseline price and investing resources in making its bid. *See, e.g.*, *In re The Rockport Co., LLC*, No. 18-11145 (LSS) (Bankr. D. Del. June 5, 2018) [D.I. 146] (approving breakup fee and expense reimbursement equal to approximately 4.3% of the purchase price); *In re Orexigen Therapeutics, Inc.*, No.-18-10518 (KG) (Bankr. D. Del. Apr. 23, 2018) [D.I. 231] (approving break-up fee and expense reimbursement equal to approximately 7.3% of the purchase price); *In re The Weinstein Company Holdings LLC*, No. 18-10601) (MFW) (Bankr. D. Del. Apr. 6, 2018) [D.I. 190] (approving break-up fee and expense reimbursement equal to approximately 5% of the purchase price).

19. Accordingly, based on the foregoing, the Debtors submit that the Bid Protections reflect a sound business purpose, are fair and appropriate under the circumstances, are actual and necessary costs and expenses of preserving the Debtors' estates, and should be approved as allowed administrative expenses under section 503(b)(1) of the Bankruptcy Code.

## CONCLUSION

WHEREFORE, based upon the foregoing and as provided in the Motion, the Debtors respectfully request that the Court (a) enter an order following the Bidding Procedures Hearing, substantially in the form attached to the Motion as **Exhibit B**, (i) approving the Debtors' entry into the Stalking Horse APA, (ii) approving the Bidding Procedures, including the Bid Protections as allowed administrative expenses, and (iii) authorizing the Debtors to take all actions reasonably necessary to effectuate such Bidding Procedures and the Sale, and to pay the Break-Up Fee and Buyer Expense Reimbursement if, and only if, the Stalking Horse Bidder is entitled to such payment in accordance with, and subject to, the provisions of Section 8.01 of the Stalking Horse APA, (b) enter the Sale Order following the Sale Hearing, approving the highest or best bid for the Assets and granting the other relief requested in this Motion; and (c) grant such other and further relief as the Court deems just and proper.

*[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]*

Dated: July 27, 2023
Wilmington, Delaware

*/s/ Mark L. Desgrosseilliers*
Mark L. Desgrosseilliers (No. 4083)
**CHIPMAN BROWN CICERO & COLE, LLP**
Hercules Plaza
1313 North Market Street, Suite 5400
Wilmington, Delaware 19801
Telephone: (302) 295-0192
*desgross@chipmanbrown.com*

 -and-

Sean A. Gordon (*pro hac vice* pending)
Austin B. Alexander (*pro hac vice* pending)
**THOMPSON HINE LLP**
Two Alliance Center
3560 Lenox Road NE, Suite 1600
Atlanta, Georgia 30326-4266
Telephone: (404) 541-2900
Facsimile: (404) 541-2905
*Sean.Gordon@thompsonhine.com*
*Austin.Alexander@thompsonhine.com*

Alan R. Lepene (*pro hac vice* pending)
Scott B. Lepene (*pro hac vice* pending)
**THOMPSON HINE LLP**
3900 Key Center
127 Public Square
Cleveland, Ohio 44114-1291
Telephone: (216) 566-5500
Facsimile: (216) 566-5800
*Alan.Lepene@thompsonhine.com*
*Scott.Lepene@thompsonhine.com*

*Proposed Counsel for Debtors*