# EXHIBIT "A"

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| WILLIAMS INDUSTRIAL SERVICES GROUP, INC., *et al.*,[1] | Case No. 23-10961 (BLS) |
| Debtors. | (Jointly Administered) |

**DECLARATION OF GENISE TEICH IN SUPPORT OF**
**MOTION TO LIFT STAY AS TO BONDED CONTRACT FUNDS,**
**ALTERNATIVELY, FOR ADEQUATE PROTECTION**
**FILED BY LIBERTY MUTUAL INSURANCE COMPANY, BERKSHIRE HATHAWAY**
**SPECIALTY INSURANCE COMPANY AND ARCH INSURANCE COMPANY**

Genise Teich hereby declares under penalty of perjury:

1.      I am Senior Surety Claims Counsel for Liberty Mutual Insurance Company, which

is a licensed surety company in the business of, among other things, issuing payment and

performance bonds on construction projects.  I am over the age of 18 years and am competent and

authorized to make this Declaration on behalf of Liberty Mutual and its co-sureties (collectively

"Liberty Mutual") in support of the Motion to Lift Stay as to Bonded Contract Funds,

Alternatively, for Adequate Protection Filed by Liberty Mutual Insurance Company, Berkshire

Hathaway Specialty Insurance Company and Arch Insurance Company (the "Motion to Lift

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Williams Industrial Services Group Inc. (1378), Williams Industrial Services Group, LLC (2666), Williams Industrial Services, LLC (0406), Williams Plant Services, LLC (9575), Williams Specialty Services, LLC (9578), WISG Electrical, LLC (6918),Construction & Maintenance Professionals, LLC (0925), Williams Global Services, Inc. (3708), Steam Enterprises, LLC (9177),  GPEG LLC (5707), Global Power Professional Services, Inc. (2550), WISG Canada Ltd. (B.N. 6518), WISG Nuclear Ltd. (B.N.  3510), and WISG Electrical Ltd. (B.N. 2116). The location of the Debtors' corporate headquarters and service address is: 200 Ashford Center N, Suite 425, Atlanta, GA 30338.

Stay").[2]  I make this Declaration based on my personal knowledge or on the knowledge based on

my review of the business records that Liberty Mutual regularly maintains and that were prepared

at or near the time of the events described in such records by a person with knowledge of such

events.  Such business records are kept in the ordinary course of regularly conducted business

activity of Liberty Mutual, and it is the regular practice of Liberty Mutual to make such business

records.  I routinely rely on such business records in the usual course of my business activities.

2.      At all material times, to Liberty Mutual's knowledge, Williams Industrial Services,

LLC ("Debtor") was engaged in public works construction.  As such, from time to time the Debtor

was required to provide payment bonds and performance bonds in connection with its work, as

security for the Debtor's performance under those contracts and payment of subcontractors,

laborers and materialmen providing labor in connection with and/or materials incorporated into

those contracts.

3.      The Debtor sought a performance and payment bond from Liberty Mutual,

Berkshire Hathaway Specialty Insurance Company and Arch Insurance Company to secure its

payment and performance obligations on Consolidated Rivertown/WTP Project Package – IFB #

029-21 ("Project"), JEA Contract No. JEA10617 (the "Bonded Contract"). Pursuant to a co-surety

agreement, Liberty Mutual, Berkshire and Arch (collectively, "Liberty Mutual" unless specified

otherwise) issued a payment and performance bond (the "Bond") securing Debtor's obligations on

the Project. A true and correct copy of the Bond is attached as **Tab "1."**

---

[2]  Capitalized terms not otherwise defined herein shall have the meanings ascribed in the Motion
to Lift Stay.

4.      Before it would issue the Bond, Liberty Mutual[3] required certain protections from the Debtor of monies to be paid to the Debtor under the Bonded Contract (the "Bonded Contract Funds"), and from loss to liberty Mutual in the event that the Debtor failed to perform all of its obligations under the Bonded Contract or to pay labor and material suppliers on the Bonded Contract.

5.      In issuing performance and payment bonds, Liberty Mutual relied upon its rights of legal and equitable subrogation, based on established law that the surety has a priority right to contract funds on bonded projects for the completion of those projects and payment of subcontractors and suppliers on those projects.

6.      Further, to induce Liberty Mutual to issue the Bond, the Debtor[4] (and others) signed a General Agreement of Indemnity (the "Indemnity Agreement") with Liberty Mutual.  A true and correct copy of the Indemnity Agreement is attached as **Tab "2"** and attached as Exhibit "B" to the Motion to Lift Stay. In the Indemnity Agreement, Debtor acknowledged that the Bonded Contract Funds are trust funds for the payment of Bonded Project costs and obligations.

---

[3] Debtor, or its affiliates or parent entities, executed indemnity agreements with Liberty Mutual, Berkshire and Arch.  Liberty only attaches Debtor's agreement with Liberty Mutual to this Affidavit.

[4] Co-Debtor Williams Industrial Services Group, Inc. ("WISG"), executed the Indemnity Agreement.  However, the Indemnity Agreement applies to any of WISG's "subsidiaries or affiliates." Indemnity Agreement, pg. 1.  Debtor is a subsidiary of WISG. See Doc. 1, pg. 26-27 (Omnibus Corporate Ownership Statement stating that "100% of Williams Industrial Services, LLC is owned by Williams Industrial Services Group, LLC" and that "100% of Williams Industrial Services Group, LLC is owned by Williams Industrial Services Group, Inc.").

7.      In reliance on its rights of legal and equitable subrogation and the Indemnity Agreement, Liberty Mutual issued the Bond on behalf of and at the request of the Debtor regarding its work on the Bonded Contract.

8.      In early-to-mid July 2023, the Debtor advised Liberty Mutual that it had encountered financial difficulties and did not anticipate completing the Bonded Contract.  On or about July 19, 2023, Debtor abandoned the Project and instructed its employees and subcontractors not to return to the Project.  Likely due to the automatic stay, JEA has not yet declared Debtor in default.  JEA's declaration of default is a condition precedent to Liberty Mutual's performance under the Bond.

9.      Based upon its investigation to date, which includes the site visit, meetings / discussions with Debtor employees as well as its subcontractors, and review of a limited number of Debtor's internal project documentation, Liberty Mutual's in-house engineering as well as it's outside construction consultant, Joe Mattingly of PC2, estimate Liberty's cost to complete the Project to exceed remaining Bonded Contract balances by approximately $4,000,000.

10.      Further, Liberty Mutual does not know at this time whether all of the remaining Bonded Contract balances amounts are collectable or subject to back charges or offsets. Additionally, Liberty anticipates receiving claims against the Bond from unpaid subcontractors and suppliers that could add to its losses.

11.     Thus, based on information Liberty Mutual has received to date, there are insufficient Bonded Contract Funds to reimburse Liberty Mutual for its losses on Bonded Project, pay outstanding claims on Bonded Project and to complete the Bonded Project.

I declare under penalty of perjury that the foregoing is true and correct.

_Genise N Teich_

Genise Teich

# TAB 1

## JEA CONTRACT NUMBER JEA10617

### SURETY BOND No: - SEE BELOW

### PERFORMANCE BOND

As to the Contractor/Principal:

Name:  WILLIAMS INDUSTRIAL SERVICES, LLC

Telephone: (904) 696-9994

As to the Co-Surety(ies):

Name: Liberty Mutual Insurance Company – **BOND No.: 019079734**

Principal Business Address: 175 Berkeley Street, Boston, MA 02116

Telephone: (617) 357-9500

Name: Berkshire Hathaway Specialty Insurance Company - **BOND No.: 47-SUR-200177-01-0003**

Principal Business Address: 314 Douglas Street, Suite 1400, Omaha, NE 68102

Telephone: (402) 916-3000

Name: Arch Insurance Company - **BOND No.: SU1175024**

Principal Business Address: Harborside 3, 210 Hudson Street, Suite 300, Jersey City, NJ 07311

Telephone: (201) 743-4000

As to the Owner of the Property/Contracting Public Entity:

Name: JEA, 21 W. Church St., Jacksonville, FL 32202

Telephone: (904) 665-6000

AND

Name: St. Johns County, 1205 State Road 16, St. Augustine, FL 32084

Telephone: (904) 209-0655

Description of project including address and description of improvements:

Consolidated Rivertown WTP Project Package – IFB # 029-21

**JEA**

**PERFORMANCE BOND**

**KNOW ALL MEN BY THESE PRESENTS,** that WILLIAMS INDUSTIAL SERVICES, LLC, a Georgia limited liability company, as Principal, (hereinafter called "Contractor"), and LIBERTY MUTUAL INSURANCE COMPANY, a corporation organized and existing under the laws of the State of Massachusetts and BERKSHIRE HATHAWAY SPECIALTY INSURANCE COMPANY, a corporation organized and existing under the laws of the  State  of Nebraska and ARCH INSURANCE COMPANY, a corporation organized and existing under the laws of the State of Missouri and duly authorized to conduct and carry on a general surety business in the State of Florida, as Co-Surety(ies) (hereinafter called "Surety"), are each  held  and  firmly bonded unto JEA, a body politic and corporate, in Duval County, Florida, and St. Johns County, St. Augustine, FL 32084 as Obligee(s) (hereinafter called "JEA"), in the sum of **FOURTEEN MILLION SIX HUNDRED NINETY SEVEN THOUSAND ONE HUNDRED NINETY EIGHT AND 63/100 DOLLARS ($14,697,198.63),** lawful money of the United States of America, for the payment whereof Contractor and Surety bind themselves, their respective heirs, executors, administrators, legal representatives, successors and assigns, jointly and severally, firmly by these presents.

**WHEREAS**, Contractor has by written agreement dated the 1ST day of October, 2021, entered into a contract with JEA (Contract # **JEA10617** ) for "Consolidated Rivertown WTP Project Package" pursuant to IFB # 029-21; all of said work to be done in the time and manner and in strict accordance with any advertisement for bids for said work and done in strict compliance with the drawings, plans and specifications for said work and requirements of JEA proposal and award therefor and of the contract and all documents included as a part of the contract (hereinafter referred to collectively as the "Contract"), all of which are, by this reference, made a part hereof to the same extent as if fully set out herein.

**NOW, THEREFORE, THE CONDITION OF THIS OBLIGATION** is such that, if

Contractor shall: (1) provide JEA with a certified copy of the recorded bond before commencing the work (or before recommencing the work after a default or abandonment; and (2) promptly and faithfully perform the construction work and other work in the time and manner prescribed in said Contract, which is made a part of this Bond, by reference, in strict compliance with the Contract requirements; and (3) perform the guarantee and maintenance of all work and materials furnished under the Contract for the time specified in the Contract; and (4) pay JEA all losses, delay and disruption damages and all other damages, expenses, costs, statutory attorney's fees, including appellate proceedings, that JEA sustains because of a default by Contractor under the Contract;

then this Bond shall be void; otherwise it shall remain in full force and effect, both in equity and in law, in accordance with the laws and statutes of the State of Florida.

**PROVIDED,** that the Surety hereby waives notice of any alteration or extension of time made by JEA, and any changes in or under the Contract and compliance or noncompliance with any formalities connected with the Contract or the changes does not affect Surety's obligation under this bond.

**PROVIDED further**, that whenever Contractor shall be declared by JEA to be in default under the Contract, JEA having performed JEA's obligations thereunder, the Surety shall, at JEA's sole option, take one (1) of the following actions:

(1)    Within a reasonable time, but in no event later than thirty (30) days, from JEA's written notice of termination for default, arrange for Contractor with JEA's consent, which shall not be unreasonably withheld, to complete the Contract and the Surety shall pay JEA all losses, delay and disruption damages and all other damages, expenses, costs and statutory attorney's fees, including appellate proceedings, that JEA sustains because of a default by the Contractor under the Contract; or

(2)    (A) Within a reasonable time, but in no event longer than sixty (60) days after JEA's written notice of termination for default, award a contract to a completion contractor and issue notice to proceed. Surety shall obtain a bid or bids for completing the Contract in accordance with its terms and conditions, and upon determination by Surety of the lowest responsible qualified bidder, award a contract; (B) alternatively, JEA may elect, to have the Surety determine jointly with JEA the lowest responsible qualified bidder, to have the Surety arrange for a contract between such bidder and JEA, and for the Surety to make available as Work progresses sufficient funds to pay the cost of completion less the balance of the Contract price (even though there should be a default or a succession of defaults under the contract or contracts of completion arranged under this

15

paragraph). The term "balance of the Contract price," as used in this Bond, shall mean the total amount payable by JEA to Contractor under the Contract and any approved change orders thereto, less the amount properly paid by JEA to Contractor. (C) Either way, the Surety shall pay JEA all remaining losses, delay and disruption damages, expenses, costs, and statutory attorney's fees, including appellate proceedings, that JEA sustains because of a default by Contractor under the Contract; or

(3)     Within a reasonable time, but in no event later than thirty (30) days from JEA's notice of termination for default, waive its right to complete or arrange for completion of the Contract and, within twenty-one (21) days thereafter, determine the amount for which it may be liable to JEA and tender payment to JEA of any amount necessary in order for JEA to complete performance of the Contract in accordance with its terms and conditions less the balance of the Contract price, and shall also indemnify and save JEA harmless on account of all claims and damages arising from the Contractor's default under the Contract, and pay JEA for all losses, delay and disruption damages and other damages, expenses, costs and statutory attorney's fees, including appellate proceedings, that JEA sustains because of a default of the Contractor under the Contract.

**PROVIDED further**, the Surety shall indemnify and save JEA harmless from any and all claims and damages, arising from the Contractor's default under the Contract including, but not limited to, contractual damages, expenses, costs, injury, negligent default, or intentional default, patent infringement and actual damages (including delay and disruption damages) in accordance with the Contract, and including all other damages and assessments which may arise by virtue of failure of the product to perform or any defects in work or materials within a period of one (1) year from the date on which the Contractor receives from JEA a certificate of final completion under the Contract.

**PROVIDED further,** that during any interim period after JEA has declared Contractor

16

to be in default but Surety has not yet remedied the default in the manner acceptable to JEA, Surety shall be responsible for securing and protecting the work site including, but not limited to, the physical premises, structures, fixtures, materials, and equipment, and shall be responsible for securing and protecting materials and equipment stored off-site in accordance with the Contract.

      **PROVIDED further**, no right of action shall accrue on this Bond to or for the use of any person or corporation other than JEA named herein or the heirs, executors, administrators or successors of JEA.

**REMAINDER OF PAGE LEFT BLANK INTENTIONALLY**

**NEXT PAGE IS THE SIGNATURE PAGE**

SIGNED AND SEALED this 1st day of October, 2021.

**ATTEST:**

**WILLIAMS INDUSTRIAL SERVICES, LLC, a Georgia Limited Liability Company**

_____
Signature

_____
Signature

_____
Type/Print Name

_____
Type/Print Name

_____
Title

_____
Title

**AS PRINCIPAL**

Signed, Sealed and Delivered
in the Presence of:

**Liberty Mutual Insurance Company**

_____
By: Daniel P. Dunigan
Its: Attorney-in-Fact

_____
Elizabeth Kelly - Witness

**AS CO-SURETY**

_____

**Berkshire Hathaway Specialty Insurance Company**

Signed, Sealed and Delivered
in the Presence of:

_____
Elizabeth Kelly - Witness

_____

_____
By: Daniel P. Dunigan
Its: Attorney-in-Fact

Signed, Sealed and Delivered
in the Presence of:

**AS CO-SURETY**

_____

**Arch Insurance Company**

_____
Elizabeth Kelly - Witness

_____
By: Daniel P. Dunigan
Its: Attorney-in-Fact

**AS CO-SURETY**

Name of Agent: The Simkiss Agency, Inc.

Address: 1041 Old Cassatt Road

Berwyn, PA 19312

**Note:  Date of Bond Must Not Be Prior to Date of Contract**    18

## JEA CONTRACT NUMBER JEA10617

### SURETY BOND No: - SEE BELOW

### PAYMENT BOND
### REQUIRED
### BY SECTION 255.05, FLORIDA STATUTES

As to the Contractor/Principal:


Name:  WILLIAMS INDUSTRIAL SERVICES, LLC
Telephone: (904) 696-9994


As to the Co-Surety(ies):

Name: Liberty Mutual Insurance Company – **BOND No.: 019079734**
Principal Business Address: 175 Berkeley Street, Boston, MA 02116
Telephone: (617) 357-9500

Name: Berkshire Hathaway Specialty Insurance Company - **BOND No.: 47-SUR-200177-01-0003**
Principal Business Address: 314 Douglas Street, Suite 1400, Omaha, NE 68102
Telephone: (402) 916-3000

Name: Arch Insurance Company - **BOND No.: SU1175024**
Principal Business Address: Harborside 3, 210 Hudson Street, Suite 300, Jersey
City, NJ 07311
Telephone: (201) 743-4000


As to the Owner of the Property/Contracting Public Entity:
Name: JEA, 21 W. Church St., Jacksonville, FL 32202
Telephone: (904) 665-6000
AND
Name: St. Johns County, 1205 State Road 16, St. Augustine, FL 32084
Telephone: (904) 209-0655


Description of project including address and description of improvements:

Consolidated Rivertown WTP Project Package – IFB # 029-21

**JEA**

**PAYMENT BOND REQUIRED BY**

**SECTION 255.05, FLORIDA STATUTES**

**KNOW ALL MEN BY THESE PRESENTS**, that **WILLIAMS INDUSTRIAL SERVICE, LLC**, a Georgia limited liability company, hereinafter called "Principal", and LIBERTY MUTUAL INSURANCE COMPANY, a corporation organized and existing under the laws of the State of Massachusetts and BERKSHIRE HATHAWAY SPECIALTY INSURANCE COMPANY, a corporation organized and existing under the laws of the State of Nebraska and ARCH INSURANCE COMPANY, a corporation organized and existing under the laws of the State of Missouri and duly authorized to conduct and carry on a general surety business in the State of Florida, as Co-Surety(ies)" are each held and firmly bound unto JEA of Jacksonville, a municipal corporation, of Jacksonville, Duval County, Florida, and St. Johns County, St. Augustine, FL 32084 as Obligee(s) hereinafter called "JEA" or "Owner," in the penal sum of **FOURTEEN MILLION SIX HUNDRED NINETY SEVEN THOUSAND ONE HUNDRED NINETY EIGHT AND 63/100 DOLLARS ($14,697,198.63)** in lawful money of the United States of America, for the payment whereof Principal and Surety bind themselves, their respective heirs, executors, administrators, legal representatives, successors and assigns, jointly and severally, firmly by these presents

**WHEREAS** the Principal entered into a certain contract with JEA, dated the 1st day of October, 2021 (JEA Contract Number JEA10617) (the "Contract") which is, by this reference, made a part hereof, as if fully set out herein, for "Consolidated Rivertown WTP Project Package", pursuant to IFB # 029-21, of Specifications entitled "Consolidated Rivertown WTP Project Package" for JEA, in accordance with plans and specifications prepared by JEA..

**NOW, THEREFORE**, **THE CONDITION OF THIS BOND** is such that if the said Principal:

(1) Provides to JEA a certified copy of the recorded bond prior to commencing the work (or before recommencing the work after a default or abandonment) in accordance with Section 255.05(1)(b), Florida Statutes; and

(2) Promptly makes payments to all claimants, as defined in Sections 255.05(1) and 713.01, Florida Statutes, supplying Principal with labor, materials or supplies that are consumed

20

or used directly or indirectly, by Principal in connection with the prosecution of the work provided for in such Contract and including all insurance premiums on the work, and including any authorized extensions or modifications of such Contract; and

(3) Defends, indemnifies and saves JEA harmless from claims, demands, liens, or suits by any person or entity whose claim, demand, lien or suit is for the payment of labor, materials or equipment furnished for use in the performance of the Contract, provided JEA has promptly notified the Principal and Surety of any claims, demands, liens, or suits and provided there is no failure by JEA to pay the Principal as required by the Contract; and

(4) Pays JEA all losses, damages, expenses, costs and attorney's fees, including appellate proceedings, that JEA sustains because of the Principal's failure to promptly make payments to all claimants as provided above, then this Bond is void; otherwise, it remains in full force and effect, both in equity and in law, in accordance with the statutes and the laws of the State of Florida and, specifically Section 255.05, Florida Statutes.

**PROVIDED**, no suit or action for labor, materials or supplies shall be instituted hereunder against the Principal or the Surety unless a claimant provides, to each of them, both of the proper notices, in accordance with the requirements of Section 255.05(2), Florida Statutes. Both notices must be given in order to institute such suit or action.

**PROVIDED further,** an action, except for an action exclusively for recovery of retainage, must be instituted against the Principal or Surety on this Payment Bond within one (1) year after the performance of the labor or completion of delivery of the materials or supplies, in accordance with the requirements of Section 255.05(10), Florida Statutes.

**PROVIDED further,** an action exclusively for the recovery of retainage must be instituted against the Principal or Surety within one (1) year after the performance of the labor or completion of delivery of the materials or supplies, unless an extension beyond the one (1) year period is specifically provided pursuant to Section 255.05(10), Florida Statutes.

21

**PROVIDED further**, that the said Surety, hereby stipulates and agrees that no change, extension of time, alteration or addition of the terms of the Contract or to the work to be performed thereunder or the specifications accompanying the same shall in any wise effect its obligation on this Bond, and it does hereby waive notice of any such change, extension of time, alteration or addition to the terms of the Contract or to the work or to the specifications.

**REMAINDER OF PAGE LEFT BLANK INTENTIONALLY**

**NEXT PAGE IS THE SIGNATURE PAGE**

SIGNED AND SEALED this 1<u>st</u> day of <u>October, 2021</u>.

**ATTEST:**                                           **WILLIAMS INDUSTRIAL SERVICES, LLC,**
                                                      **a Georgia Limited Liability Company**

_____              _____
Signature                                             Signature

_____              _____
Type/Print Name                                       Type/Print Name

_____              _____
Title                                                 Title

                                                      **AS PRINCIPAL**

Signed, Sealed and Delivered                          **Liberty Mutual Insurance Company**
in the Presence of:
                                                      _____
_____              By: Daniel P. Dunigan
<u>Elizabeth Kelly - Witness</u>                      Its: Attorney-in-Fact

                                                      **AS CO-SURETY**

Signed, Sealed and Delivered                          **Berkshire Hathaway Specialty Insurance**
in the Presence of:                                   **Company**


_____              _____
<u>Elizabeth Kelly - Witness</u>                      By: Daniel P. Dunigan
                                                      Its: Attorney-in-Fact

                                                      **AS CO-SURETY**

Signed, Sealed and Delivered                          **Arch Insurance Company**
in the Presence of:
                                                      _____
_____              By: Daniel P. Dunigan
<u>Elizabeth Kelly - Witness</u>                      Its: Attorney-in-Fact

                                                      **AS CO-SURETY**


                                                      Name of Agent: <u>The Simkiss Agency, Inc</u>.

                                                      Address: <u>1041 Old Cassatt Road</u>

                                                      <u>Berwyn, PA 19312</u>


**Note: Date of Bond Must Not Be Prior to Date of Contract**

# TAB 2



# GENERAL AGREEMENT OF INDEMNITY
## COMMERCIAL SURETY

This General Agreement of Indemnity (hereinafter the "Agreement") is made and entered into by the following undersigned individuals, corporations, and/or other business entities **Williams Industrial Services Group Inc.** (individually and collectively hereinafter called "Indemnitors"), jointly and severally, in favor of Liberty Mutual Insurance Company, Liberty Mutual Fire Insurance Company, LM Insurance Corporation, The First Liberty Insurance Corporation, Liberty Insurance Corporation, and any other company that is part of or added to the Liberty Mutual Group, severally not jointly (individually and collectively hereinafter called "Surety") with respect to any bonds, undertakings, recognizances, reinsurances, instruments of guarantee or other Surety obligations (individually and collectively hereinafter called "Bonds"), requested from and/or issued by the Surety before, on or after the date of this Agreement, for:

(i) any of the Indemnitors, and any Indemnitor added hereto by written amendment;

(ii) any of the Indemnitors' subsidiaries or affiliates, whether present or future, and whether directly or indirectly held; and/or

(iii) any other entity or person in response to a request from any party described in items (i) or (ii) above (including requests from their agents, brokers or producers);

and as to all of the foregoing, whether they act alone or in joint venture with others whether or not said others are named herein (individually and collectively hereinafter called "Principals").

WHEREAS, the Indemnitors and Principals desire Surety to execute Bonds on their behalf, or to renew, continue, extend, replace or to refrain from canceling Bonds; and WHEREAS, at the request of Indemnitors and Principals and with the understanding that this Agreement be given and in reliance upon this Agreement, the Surety has heretofore or has presently been requested to and/or has executed or has procured to be executed, and, from time to time hereafter, may be requested to and/or may execute or may procure to be executed, Bonds for the Principals;

NOW, THEREFORE, in consideration of these premises, and intending to be legally bound hereby, the Indemnitors and Principals for themselves, their heirs, executors, administrators, successors and assigns, jointly and severally, hereby covenant and agree, in favor of the Surety, its successors and assigns, as follows:

1. BENEFICIAL INTEREST - The Indemnitors represent and warrant that each of them is specifically, materially and beneficially interested in the procurement and/or issuance of each of the Bonds for each of the Principals.

2. PREMIUMS - The Principals or Indemnitors shall pay to the Surety, promptly upon demand, all premiums, costs and charges of the Surety for any Bonds requested from and/or issued by the Surety, in accordance with the Surety's rate filings, its manual of rates, or as otherwise agreed upon, and where such premium, costs and charges are annual, continue to pay the same, until the Principals or Indemnitors shall serve evidence satisfactory to the Surety of its discharge or release from all liability under any Bonds.

3. DECLINE EXECUTION - The Surety has no obligation to execute, renew, continue, extend, amend or replace any Bonds, including final bonds (regardless of whether the Surety has issued a bid or proposal bond), and may, at its sole discretion, decline to do so. The Surety may cancel any Bonds unless the Bonds state otherwise, and the Principals and Indemnitors shall make no claim to the contrary. The Principals and Indemnitors shall make no claim relating to the failure or refusal of any person or entity to accept any of the Surety's Bonds or to award any contract to any Principals.

4. CHANGES - Assent by the Surety to changes in any Bonds and/or in the contracts or obligations covered by any Bonds or refusal so to assent shall not release or in any way affect the obligations of the undersigned to the Surety.

5. INDEMNITY - The Indemnitors shall exonerate, indemnify and save harmless the Surety from and against any and all losses, costs, and damages of whatsoever kind or nature, including, but not limited to, counsel and consultant fees and expenses, court costs, and pre- and post-judgment interest (such interest to accrue from the date of a breach of this Agreement or a breach of any other written agreements executed with or in favor of the Surety by any Indemnitors and/or Principals (hereinafter called the "Other Agreements")), which the Surety may at any time sustain or incur by reason of the extension of surety credit to any Principal, including but not limited to: (1) the request to execute, procure, or deliver any Bonds; (2) the execution, procurement or delivery of any Bonds, whether already or hereafter executed; or the renewal or continuation thereof; (3) making any investigation or payment; (4) obtaining a release from any Bonds or other obligations related to the extension of surety credit; or (5) the prosecution, defense, or obtaining a release from any action brought in connection therewith, including those subject to bankruptcy court jurisdiction, and, further, those actions relating to the recovery or attempt to recover any salvage, the failure of the Principals or Indemnitors to perform or comply with the terms of this Agreement or any Other Agreements, and in the enforcement of the terms of this Agreement or any Other Agreements. The Principals and Indemnitors agree that in any accounting between any of them and the Surety, vouchers or other evidence of payment(s) incurred by the Surety shall constitute *prima facie* evidence of the fact and extent of the liability of the Principals and Indemnitors to the Surety.

6. SETTLEMENTS - The Surety shall have the right, at its option and sole discretion, to adjust, settle or compromise any claim, demand, suit or judgment upon any Bonds.

7. BOOKS AND RECORDS - Until such time as the Surety has been furnished with evidence (satisfactory to the Surety in its sole discretion) of its discharge, without loss, from any and all Bonds, and the Surety is fully reimbursed all amounts due to it under this Agreement or Other Agreements, the Surety shall have the right to reasonable access to the books, records and accounts of the Principals and Indemnitors for the purposes of inspection, copying or reproduction. The Principals and Indemnitors hereby authorize and request that any person or entity doing business with the Principals and Indemnitors shall furnish to the Surety any information requested by the Surety that

General Agreement of Indemnity Commercial Surety
Rev. 12/16

is related or relevant to any Bonds, bonded contracts or obligations, or any obligations of the Principals and Indemnitors to the Surety under this Agreement or Other Agreements.

8.  ASSIGNMENT, SECURITY AND EVENTS OF DEFAULT - The Principals and the Indemnitors hereby grant, assign, pledge and convey to the Surety, as security for the full performance of their obligations under this Agreement and for the payment of any other indebtedness or liability of the Principals and Indemnitors to the Surety, whether heretofore or hereafter incurred, a lien on and security interest in and to the Principals' and/or Indemnitors' interest, title and rights in: (a) the proceeds of any insurance policy affording coverage for all or part of any bonded obligations; and (b) the contracts or the obligations that are the subject of the Bonds, or that grow in any manner out of the Bonds, including without limitation all proceeds thereof, whether such interest, title and rights are accounts or general intangibles (as defined in the relevant Uniform Commercial Code). While the lien and security interest granted to the Surety herein is effective immediately and may be evidenced by the filing of a financing statement by the Surety at any time, the Surety may exercise its remedies with respect to such lien and security interest hereunder and under applicable law only in the event of: 1) any abandonment, forfeiture or breach of any contract or obligations referred to in the Bonds or any breach of any Bonds; or 2) a default in discharging any other indebtedness or liability incurred in connection therewith, when due; or 3) any breach of this Agreement or any Other Agreements; or 4) any assignment by the Principals or Indemnitors for the benefit of creditors, or upon any one or more of the Principals' or Indemnitors' involvement in any agreement or proceeding of liquidation, receivership, or bankruptcy, whether insolvent or not. The Principals and Indemnitors hereby irrevocably grant, appoint and constitute the Surety as their attorney-in-fact with the full right and authority, but not the obligation, to exercise all rights of the Principals and Indemnitors assigned and set over to the Surety in this Agreement, including the authority to execute on behalf of the Principals and Indemnitors any documents or agreements deemed necessary and proper by the Surety in order to give full effect not only to the intent and meaning of the within assignments, but also to the full protection intended to be given to the Surety under all other provisions of this Agreement. The Principals and Indemnitors hereby ratify all actions taken and done by the Surety as attorney-in-fact. Principals and Indemnitors agree to use their best efforts to effectuate all provisions of this Paragraph. This Agreement shall constitute a Security Agreement to the Surety and also a Financing Statement, both in accordance with the provisions of the Uniform Commercial Code of every jurisdiction wherein such Code is in effect, and may be so used by the Surety without in any way abrogating, restricting or limiting the rights of the Surety under this Agreement, under law or in equity. The Principals and Indemnitors hereby authorize Surety to file such financing statements as Surety deems necessary or appropriate to perfect the liens and security interests granted herein.

9.  TAKEOVER OF PERFORMANCE - Upon the happening of any of the events of default described in 1) through 4) of paragraph 8, irrespective of whether the Surety exercises any of its rights and remedies under paragraph 8, the Surety shall have the right, but not the obligation, with or without exercising any other right conferred upon it by law or under the terms of this Agreement, to take over part or all of the performance under any contract(s) or obligation(s) covered by any Bond, and at the expense of the Principals and Indemnitors to complete or arrange for the completion of the same, and the Principals and Indemnitors shall promptly, upon demand, pay to the Surety all losses, costs and damages of whatsoever kind or nature incurred by the Surety, including, but not limited to, counsel and consultant fees and expenses.

10. TRUST FUNDS - The Principals and Indemnitors hereby understand, agree and declare that all of their interest, title and rights in the contract or the obligations that are the subject of a Bond, or that grow in any manner out of said Bond, including but not limited to funds required by statute or regulation to be held in trust for the benefit of any obligee, are trust funds, whether in the possession of the Principals or Indemnitors or otherwise, for the benefit of Surety for any liability or loss it may incur or sustain under said Bond, including but not limited to the payment of obligations incurred in the performance of the bonded contract or obligations; and, further, it is expressly understood, agreed and declared that these trust funds also inure to the benefit of the Surety for any liability or loss it may have or sustain under any other Bonds, under this Agreement, or under any Other Agreements, and this Agreement constitutes notice of the existence of such trust.

11. DISCHARGE/PLACE IN FUNDS - The Indemnitors will, within thirty (30) calendar days or within the Shorter Period (defined below) following the date of Surety's written demand, either: (i) procure the discharge of the Surety from any Bonds and all liability by reason thereof, or, if the Indemnitors are unable to secure such discharge; (ii) place the Surety in immediately available funds in an amount equal to the aggregate amount of the penal sums of all Bonds for which discharge has been demanded; regardless of whether, with respect to any of said Bonds: (a) the Surety has established any reserve; (b) the Surety has made any payments or incurred any liability; or (c) the Surety has received any notice of any claims. If the terms of any outstanding Bonds require the Surety to make payment to the obligee(s) of said Bonds in less than thirty (30) calendar days (which period shall be called the "Shorter Period"), then with respect to such Bonds only, the Surety may require that it be discharged or placed in funds pursuant to this paragraph within said Shorter Period, again regardless of whether the Surety has received any demand or notice of any claims, established any reserve, or made any payments or incurred any liability with respect to such Bonds. The Surety shall send its written demand to the Indemnitors' last known address by overnight courier or by registered or certified mail, and such demand shall be effective upon the date of mailing by the Surety. The terms of this paragraph may be modified by a written amendment to this Agreement, entered into by the Surety and the Indemnitors, providing alternative methods of funding or collateralizing any bonded obligations, but Surety has no obligation to enter into any such alternative arrangements and may do so, or decline to do so, at its sole election and discretion. The Indemnitors hereby represent and acknowledge that if the Indemnitors breach their obligations set forth in this paragraph, the Surety will have no adequate remedy at law, will suffer irreparable harm, and shall be entitled to injunctive relief enforcing the terms of this paragraph, as well as a final decree, order or judgment granting Surety specific performance of the terms of this paragraph.

12. OTHER INDEMNITY - The addition to this Agreement of any Indemnitor, including any entities acquired after the date of this Agreement, may be effected by written amendment executed by such Indemnitor only. The Indemnitors shall continue to remain bound under the terms of this Agreement and any Other Agreements even though the Surety may from time to time heretofore or hereafter, with or without notice to or knowledge of the Indemnitors, accept indemnity obligations or collateral from, or release or reduce indemnity obligations or collateral, or release or apply any specific underwriting requirements to, any current or future Principals or Indemnitors for any reason. The Indemnitors waive notice of the Surety's acceptance, release or reduction of any indemnity obligations or collateral or specific underwriting requirements of any current or future Principals or Indemnitors, and agree that they shall make no defense to the enforcement of this Agreement or any Other Agreements based on such action by the Surety.

13. SURETIES - In the event the Surety procures the execution of any Bonds by other sureties, or executes any Bonds with co-sureties, or reinsures any portion of any Bonds with reinsuring sureties, then all the terms and conditions of this Agreement shall inure to the benefit of any such other sureties, co-sureties and reinsurers, their successors and assigns, as their interests may appear.

14. INVALIDITY - Invalidity of any provision of this Agreement by reason of the laws of any jurisdiction shall not render the other provisions hereof invalid. In case any of the parties set forth in this Agreement fail to execute the same, or in case the execution hereof by any of the parties be defective or invalid for any reason, including lack of authority to bind any party, such failure, defect or invalidity shall not in any manner affect the validity of this Agreement or the liability hereunder of any of the parties executing the same, but each and every party so executing shall be and remain fully bound and liable hereunder to the same extent as if such failure, defect or invalidity had not existed. Each party agrees to execute promptly any documentation necessary to cure any such failure, defect or invalidity.

15. ENFORCEMENT - The availability of any particular right or remedy shall not be prejudiced by either (i) a delay by Surety in exercising it, or (ii) Surety's decision to exercise or not exercise any other right or remedy. The obligations of the Principals and Indemnitors hereunder shall be in addition to, and not in lieu of, their obligations to the Surety under any Other Agreements, and in the event of any conflict or inconsistency between the terms of this Agreement and the terms of any of the Other Agreements, the term or interpretation most favorable to the Surety, as determined by the Surety, shall control. Separate suits may be brought under this Agreement and any Other Agreements as causes of action accrue, and the bringing of suit or the obtaining of judgment or recovery of damages upon any cause of action shall not prejudice or bar the bringing of other suits or the obtaining of judgment or recovery of damages upon other causes of action, whether theretofore or thereafter arising. The Indemnitors' liability under this Agreement is joint and several, and the Surety may enforce any or all of the terms and conditions of this Agreement against any or all of the Indemnitors, or any combination of some but less than all of the Indemnitors, at the Surety's sole discretion and election.

16. GOVERNING LAW - This Agreement shall be governed by and construed in accordance with the laws of the State of New York (without giving effect to the conflict of laws principles thereof), except to the extent superseded by U.S. federal law. As to all legal actions or proceedings related to this Agreement, Indemnitors consent and agree to the general jurisdiction of any state or Federal court of the United States or its territories having proper subject matter jurisdiction or in which claim may be brought against Surety under any Bond, and hereby waive any claim or defense in such action or proceeding based on any alleged lack of personal jurisdiction, improper venue, forum non conveniens or any similar basis.

Dated as of this ___18th___ day of ___January___ , in the year __2021__ .

*By signing below, each individual executing this Agreement on behalf of a business entity, and each business entity executing this Agreement on behalf of another business entity, represents and warrants that he, she or it is **duly authorized** by Indemnitor to bind Indemnitor to all of the terms and conditions of this Agreement:*

**ATTEST OR WITNESS:**                                BY:

                                                                                **Williams Industrial Services Group Inc.**
                                                                                **T.I.N.:**
                                                                                **100 Crescent Centre Parkway, Suite 1240, Tucker, GA 30084**

By: _Charles E. Wheelock_                              By: _____ __ (Seal)

Charles E. Wheelock                                        Randall Lay
Vice President, General Counsel, and Secretary      Chief Financial Officer

## NOTARY ACKNOWLEDGMENT

> A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of Georgia )

County of Newton )

On January 18 (Date) before me, Sondra Newton (Notary), personally appeared Charles E. Wheelock , who proved to me on the basis of satisfactory evidence to be the person whose name is subscribed to the within instrument and acknowledged to me that he/she executed the same in his/her authorized capacity, and that by his/her signature on the instrument the person(s), or the entity(ies) upon behalf of which the person acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of Georgia that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _____ (Seal)

Notary Public residing at: Newton
My commission expires: July 21, 2024

---

## NOTARY ACKNOWLEDGMENT

> A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of Georgia )

County of Newton )

On January 18 (Date) before me, Sondra Newton (Notary), personally appeared Randall Lay , who proved to me on the basis of satisfactory evidence to be the person whose name is subscribed to the within instrument and acknowledged to me that he/she executed the same in his/her authorized capacity, and that by his/her signature on the instrument the person(s), or the entity(ies) upon behalf of which the person acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of Georgia that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _____ (Seal)

Notary Public residing at: Newton
My commission expires: July 21, 2024

General Agreement of Indemnity Commercial Surety
Rev. 12/16