**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| WILLIAMS INDUSTRIAL SERVICES GROUP INC.,[1] | ) ) | Case No. 23-10961 (BLS) |
| | ) | (Jointly Administered) |
| Debtors. | ) | |

## LIMITED OBJECTION OF LEXON INSURANCE COMPANY TO THE DEBTORS' MOTIONS FOR ENTRY OF A FINAL ORDER AUTHORIZING DIP FINANCING [Doc. No. 13] AND FOR AUTHORIZATION OF BIDDING PROCEDURES [Doc. No. 33]

Lexon Insurance Company and its affiliated sureties ("Surety") submits this Limited Objection ("Objection"),to any Final Order issued in response to:

*Debtor's Motion Seeking Entry of Interim and Final Orders (I) Authorizing the Debtors to Obtain Senior Secured Superpriority Post-Petition Financing; (II) Granting Liens and Superpriority Administrative Expense Claims; (III) Authorizing Use of Cash Collateral; (IV) Modifying the Automatic Stay; (V) Scheduling a Final Hearing and (VI) Granting Related Relief* ("DIP Financing Motion") [Doc. No. 13];

and to any Order issued in response to the Debtors':

*Motion for Entry of an Order (I) Approving Bidding Procedures for the Sale of Assets, (II) Schedule Hearings and Objection Deadlines with Respect to the Debtors' Authority to Sell, (III) Scheduling Bid Deadlines and an Auction, (IV) Approving the Form and Manner of Notice Thereof, (V) Approving Contract Assumption and Assignment Procedures, and (VI) Granting Related Relief* ("Bidding Procedures Motion") [Doc. No. 33].

In support of the Objection, the Surety relies upon the Declaration of John P. Wilson ("Wilson Decl.") [Doc. No. 114-1] and exhibits thereto [Doc. No. 114-2] and states as follows:

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Williams Industrial Services Group Inc. (1378), Williams Industrial Services Group, LLC (2666), Williams Industrial Services, LLC (0406), Williams Plant Services, LLC (9575), Williams Specialty Services, LLC (9578), WISG Electrical, LLC (6918), Construction & Maintenance Professionals, LLC (0925), Williams Global Services, Inc. (3708), Steam Enterprises, LLC (9177), GPEG LLC (5707), Global Power Professional Services, Inc. (2550), WISG Canada Ltd. (B.N. 6518), WISG Nuclear Ltd. (B.N. 3510), and WISG Electrical Ltd. (B.N. 2116). The location of the Debtors' corporate headquarters and service address is 200 Ashford Center N., Suite 425, Atlanta, GA 30338.

**JURISDICTION AND VENUE**

1. This Court has jurisdiction over the DIP Financing Motion, Bidding Procedures Motion and this Objection pursuant to 28 U.S.C. § 1334. The DIP Financing Motion, the Bidding Procedures Motion and the Objection are core proceedings pursuant to 28 U.S.C. § 157. Venue for the DIP Financing Motion, Bidding Procedures Motion and the Objection is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

**BACKGROUND**

2. On July 22, 2023 (the "Petition Date"), Williams Industrial Services Group Inc. and its affiliated entities ("Debtors") each commenced a case under Chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), which cases are now being jointly administered. The Debtors continues to operate their businesses as debtors-in-possession pursuant to Bankruptcy Code Section 1107(a) and 1108.

**A. Surety Bonds, Indemnity Agreements and Collateral**

3. Prior to the Petition Date, at the request of one or more of the Debtors as Principal (including but not limited to Debtor Williams Industrial Services, LLC ["WIS"]), the Surety issued a Performance Bond and a Payment Bond under Surety Bond Number LICX1200716 in favor of JEA [Jacksonville Electric Authority], each bond in the penal sum of $3,358,137.98, with respect to Contract #JEA10286/194526 for "4511 Spring Park Road Pump Station Rehab and Upgrade" ("Spring Park Bonds"). (Wilson Decl., ¶ 3).

4. Also prior to the Petition Date, at the request of one or more of the Debtors as Principal (including but not limited to WIS), the Surety issued a Performance Bond and a Payment Bond under Surety Bond Number LICX1200727 in favor of City of Green Cove Springs, each bond in the penal sum of $15,426,644.33, with respect to a Construction Contract for "DEP SRF

Harbor Road WRF Expansion, Ph. 2" ("Harbor Road Bonds, and with the Spring Park Bonds, the "Bonds"). (Wilson Decl., ¶ 4).

5. In order to induce the Surety to issue the Bonds, the Surety relief upon (i) its rights of legal and equitable subrogation, based on established law that a surety has an equitable lien and priority right to contract funds on bonded contracts for the completion of those contracts and payments to subcontractors and suppliers, and (ii) a General Agreement of Indemnity ("Indemnity Agreement") executed and delivered by Debtor Williams Industrial Services Group Inc. (on behalf of itself and its present and future subsidiaries, affiliates and successors, among others)("Indemnitors"). A redacted copy of the Indemnity Agreement is attached to the Wilson Declaration as **Exhibit A** [Doc. No. 114-2]. (Wilson Decl., ¶ 5).

6. Pursuant to the Indemnity Agreement, the Debtors agreed to:

> upon demand from the Surety, promptly indemnify, exonerate, reimburse and hold the Surety harmless from and against any and all liability, loss, cost and expense of whatsoever kind or nature and pay the Surety for any Loss sustained or incurred (i) in connection with or arising out of the execution by the Surety of any Bond, (ii) by reason of the failure of the Indemnitor to perform or comply with the covenants and conditions of this Agreement or Other Agreements, and (iii enforcing any of the covenants and conditions of this Agreement ….

(Wilson Decl., ¶ 6, Exhibit A, Indemnity Agreements at ¶ 3).

7. The Indemnity Agreement defines the Indemnitor, in pertinent party as "Every individual and entity executing this Agreement, and their present and future subsidiaries, affiliates, successors …" and defines the Surety, in pertinent part, as "[Lexon Insurance Company] and their affiliates, subsidiaries, assigns, successors or reinsurers…." (Wilson Decl., ¶ 7, Exhibit A, Indemnity Agreement at ¶ 1 [Definitions]).

8. The Indemnity Agreement states that a bonded contract is defined as "[a]ny agreement for which the Surety has issued or procured the issuance, renewal, continuation,

substitution or amendment of a Bond[,]" here Contract #JEA10286/194526 for "4511 Spring Park Road Pump Station Rehab and Upgrade" and City of Green Cove Springs construction contract for "DEP SRF Harbor Road WRF Expansion, Ph. 2" (jointly, "Bonded Contracts and the projects as "Bonded Projects". (*Id.* at ¶ 8, Exhibit A, Indemnity Agreement at ¶ 1 [Definitions]).

9. Events of default under the Indemnity Agreement include: "(1) any abandonment, forfeiture, default or declaration of default, breach, failure, refusal or inability to perform with respect to any of Indemnitor's obligations under any Bond or Bonded Contract . . . (5) . . . an application by any Indemnitor for reorganization or arrangement under the terms of the United States Bankruptcy Code . . ." ("Event of Default"). (*Id.* at ¶ 9, Exhibit A, Indemnity Agreement at ¶ 1 [Definitions]).

10. The Surety's remedies upon an Event of Default, under the Indemnity Agreement, include but are not limited to: "(2) take over the control of all funds, including accounts receivable, on any Bonded Contract …" ("Bonded Contract Funds"). (*Id.* at ¶ 10, Exhibit A, Indemnity Agreement at ¶ 8).

11. The Surety faces potential exposure of $37,569,564.62 (the aggregate penal sums on the Bonds) because the Debtor has not yet completed the Bonded Projects. (*Id.* at ¶ 11).

12. The Debtors have moved to reject the Bonded Contracts effective as of July 22, 2023. (*Debtors' First Omnibus Motion for Entry of an Order Authorizing the Debtors to Reject Certain Executory Contracts Effective as of the Rejection Date* ("Rejection Motion") [Doc. No. 27]. A hearing on the Rejection Motion is scheduled for August 17, 2023 at 10:00 a.m.

### B. First Day Motions

13. As part of its First Day Motions, the Debtor filed the DIP Financing Motion.

14. On July 26, 2023, the Bankruptcy Court entered an Interim Order granting the DIP Financing Motion ("Interim DIP Financing Order") [Doc. No. 75].

15. This Court has scheduled a final hearing for DIP Financing Motion as well as for the Sale Procedures Motion for August 17, 2023 at 10:00 a.m.

## ARGUMENT

### DIP Financing Motion

16. The Surety objects to the DIP Financing Motion, to the extent that, among other things, it provides priming liens on any Transferred Assets that may be subject to any equitable liens, claims, set off and/or recoupment rights that may be asserted by JEA and/or the City of Green Cove ("Bond Obligees") to which the Surety may be subrogated, and any other set off and recoupment rights of the Surety.

17. Section 364(d) of the Bankruptcy Code permits DIP lenders to prime existing liens as follows:

> The Court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if – (A) the trustee is unable to obtain such credit otherwise; and (B) there is adequate protection of the interest of the holder of the lien on property of the estate on which such senior or equal lien is proposed to be granted.

11 U.S.C. § 364(d).

18. The DIP Financing Motion does not offer to provide any adequate protection to the Surety as no provision is made within the DIP Financing Motion to identify and isolate funds that are subject to the Surety's equitable lien, which funds are not and cannot be subject to the Debtors' bankruptcy estate. *See Pearlman v. Reliance Ins. Co.,* 371 U.S. 132 (1962)(holding that a surety

that is, or may be, called on to complete performance of a bonded contract, or pay for its performance on the default of its principal, steps into the shoes of obligee and becomes subrogated to the obligee's rights to apply funds due or to become due the principal in the hands of the obligee, to the satisfaction of the performance obligation). *See also In re Jones Constr. & Renovation, Inc.,* 337 B.R. 579 (Bankr. E.D.Va. 2006(holding when a debtor-contractor breaches it contract with a project owner, it precludes debtors entitlement to retained funds, and thus those funds are not property of the estate, with the doctrine of equitable subrogation applicable to entitled the surety to any funds that may be due on the bonded contracts to satisfy any bond claims).

19. A surety's equitable subrogation rights are not limited to rights it obtains by standing in the shoes of a defaulting contractor. Although a suety stands in the shoes of a defaulting contractor when it pays the bills for the job, completes the job, and this is entitled to the defaulting contractor's accounts receivables, the surety also stands in the shoes of laborers and materialmen who have been paid by the surety (e.g., the laborers may have liens), and the surety also stands in the shoes of the beneficiary of the bond (the obligees), in this case, JEA and the City of Green Cove Springs. *Transamerica Ins. Co. v. Barnett Bank of Marion County, N.A.,* 540 So.2d 113, 115-16 (Fla. 1989).

20. Additionally, the contract funds are explicitly assigned to the Surety pursuant to the Indemnity Agreement. Upon the happening of an event of default, the Surety is "hereby authorized by each Indemnitor . . . to take over the control of all funds, including accounts receivable, on any Bonded Contract." (*See,* Wilson Decl. at Exhibit A, Indemnity Agreement, at ¶ 8). "As to each Bond or Bonded Contract, the Indemnitor hereby pledges, assigns, transfers and conveys to [the Surety] to secure the obligations under this Agreement, all right, title and interest of the Indemnitor in: (i) all monies due or to become due to the Indemnitor under a Bonded Contract." *Id.* at ¶ 9.

21.     The rights conveyed by assignment in the Indemnity Agreement are transferred to the surety in the event of default, and become vested to the Surety such that the Bonded Contract funds never become property of the bankruptcy estate. *Jones,* 337 B.R. at 587.

22.     A surety's assignment interest in accounts receivable trumps that of a lender's security interest in the accounts receivable. *See generally, Transamerica,* 540 So.2d at 116-17. A surety's assignment interest is not a security interest subject to the Uniform Commercial Code, and differs from a lender's security interest because a surety's assignment is contingent on performance by the surety in the event the principal defaults (in contrast to a financier's assignment which does not call for performance), and "the U.C.C. itself suggests that a surety's assignment from a contractor, should be excluded from the U.C.C. . . ." *Transamerica,* 540 So.2d at 116. Although "[n]onsurety assignees of a contractor in default would have no enforceable claim on funds withheld by the owner/obligee because of contractor default . . . [all parties in interest] are best served by prompt performance by the surety [such that] it is appropriate to give priority to the claims of the surety, up to the limits of its performance." *Transamerica,* 540 S.2d at 117.

23.     The Interim DIP Financing Order provides among other things that the DIP Liens on DIP Collateral "shall be valid, enforceable, non-avoidable, and fully perfected priming security interests in and priming liens upon all now owned or hereafter acquired assets and property of the Debtors' right, title and interest in, to, and under all PrePetition Collateral…." (Interim DIP Financing Order, Doc. No. 75 at par. 10(b)(iii)).

24.     The Surety's equitable lien on proceeds due and owing (or proceeds that may become due and owing) from JEA and/or the City of Green Cove to any of the Debtors are superior to the lien rights of any of the pre-petition lenders. Hence, these liens should be exempt from being primed by any DIP lender.

25. This is equally the case with respect to the setoff and recoupment rights which may exist in favor of JEA and/or the City of Green Cove and/or the Surety. *See generally In re Communication Dynamics, Inc.*, 300 B.R. 220, 223 – 227 (Bankr. D. Del. 2003) (discussing setoff and recoupment rights and holding that the right of setoff elevates an unsecured claim to secured status and that a right of recoupment – because it is a defense to sums due by the creditor – is not subordinate to a lender's security interest).

26. Recoupment, a creditor's right long recognized in bankruptcy proceedings, is not in the nature of a lien, but is a defense to a claim for payment. *Lee v. Scheiker*, 739 F.2d 870, 875 (3d Cir. 1984). In other words, recoupment is used to determine the proper liability on amounts owed. *Reiter v. Cooper*, 507 U.S. 258, 265 n. 2d (1993); *In re Holford*, 896 F.2d 176, 178 (5th Cir. 1990).

27. While related to recoupment, setoff "gives a creditor the right 'to offset a mutual debt owing by such creditor to the debtor,' provided that both debts arose before commencement of the bankruptcy action and are in fact mutual." *In re University Medical Center*, 973 F.2d 1065, 1079 (quoting *In re Davidovich*, 901 F.2d 1533, 1537 (10th Cir. 1990). While setoff rights are defined and delineated by applicable non-bankruptcy law, the Bankruptcy Code recognizes and preserves these rights: 11 U.S.C. 553(a); *see also Citizens Bank of Maryland v. Strumpf*, 516 U.S. 16, 18 (1995); *see also In re Luongo*, 259 323 333 (5th Cir. 2001) ("It is impossible for us to ignore the clear statement of 553 that this title…does not affect any right of a creditor to offset…").

28. Thus, appropriate language should be added to the Final DIP Financing Order (as set forth below) to clarify that the Surety's equitable liens, as well setoff and/or recoupment rights (both of the Surety and obligees of the Bonds, *i.e.* JEA and/or the City of Green Cove), are

unaffected by the DIP Financing Documents, the Interim DIP Financing Order and/or any final financing/cash collateral order.

29. Accordingly, the Surety requests that the Debtors include the following language in the Final DIP Financing Order in order to protect and preserve the Surety's rights and interest with respect to the Bonds, as well as with respect to the Bond Collateral and Indemnity Agreements:

> Nothing in the DIP Financing Documents, the DIP Financing Motion, the Interim Order, or this Final Order shall in any way prime, alter, limit, modify, waive, affect and/or release any rights, claims, lien rights and/or interests, if any, of the Debtors' sureties, their bond obligees or any beneficiaries of bonds (such as payment bond claimants and/or lienors), including, without limitation, in any subrogation, trust, recoupment and/or setoff rights, if any, in any and all of the proceeds of any contracts bonded by the Debtors' sureties ("Bonded Contract Proceeds"), it being expressly acknowledged that all such rights, claims, and/or interests are reserved and preserved. To the extent that any Bonded Contract Proceeds are being held by the Debtors or their Lenders and are used by any of them, a concomitant replacement trust claim or replacement lien shall be granted to the applicable surety or sureties equal to the amount of such Bonded Contract Proceeds so held or used and such claim or lien shall have the same priority, amount, extent and validity as existed as of the Petition Date.

**Bidding Procedures Motion**

30. The Surety does not object to the concept of the proposed sale of Debtors' assets or the concept of bidding procedures being approved, as contemplated in the Bidding Procedures Motion. However, the Surety hereby objects and puts all parties on notice that, *inter alia*, the Indemnity Agreement and Bonds cannot be sold, transferred and/or assumed and assigned without the consent of the Surety, which consent is currently not granted by the Surety.

A. <u>Indemnity and Surety Agreements Cannot be Assumed or Assigned Without Consent.</u>

31. With respect to the Debtors' notice of potential assumption and assignment of executory contracts (*see*, Bidding Procedures Motion, Doc. No. 33 at ¶ 30), to the extent that the Debtors seek to assume and assign any of the Bonds or the Indemnity, such assumption and

assignment is not allowed pursuant to 11 U.S.C. § 365(c)(2) (absent the Surety's consent). The Indemnity Agreement is a "financial accommodation" contract through which the Bonds, among other things, are executed, issued and/or controlled, and thus all of these and related assets of the Surety may not be assumed or assigned without prior consent of the Surety. [2]

32. Specifically, the ability of a debtor to assume and assign a contract is not unlimited. The Bankruptcy Code specifically prohibits debtors from assuming certain contracts. Section 365 (c)(2) provides the following in pertinent part:

> (c) The trustee may not assume or assign any executory contract or unexpired lease of the debtor, whether or not such contract or lease prohibits or restricts assignment of rights or delegation of duties, if—
> …
> (2) such contract is a contract to make a loan, or extend other debt financing or *financial accommodations*, to or for the benefit of the debtor, or to issue a security of the debtor….

(emphasis added).[3]

33. The Bankruptcy Code does not define the term "financial accommodation." *See e.g. In re Adana Mortg. Bankers, Inc.*, 12 B.R. 977, 986 (Bankr. N.D. Ga. 1980) (regarding "financial accommodations" as used in Section 365(e)(2)(B)).

34. However, in *In re Adana*, the Court found the following regarding guaranty agreements:

> The debtor contends that the Guaranty Agreements do not constitute contracts to make financial accommodations to or for the benefit of debtor. To the contrary, the facts show that the Guaranty Agreements are contracts to make financial accommodations to or

---

[2] It appears that the Debtors are seeking to reject at least one or both of the Bonded Contracts (*see*, *Debtors' First Omnibus Motion for Entry of an Order Authorizing the Debtors to Reject Certain Exeuctory Contracts Effective as of the Rejection Date* [Doc. No. 37 at ¶¶ 10, 24). The Surety is raising its Objection to the Bidding Procedures, should the Debtors' position change.

[3] In addition, Section 365 (e)(2)(B) provides that although certain contracts cannot be terminated or modified based on the bankruptcy filing, this prohibition does not apply when "such contract is a contract to make a loan, or extend other debt financing *or financial accommodations*, to or for the benefit of the debtor, or to issue a security of the debtor." (Emphasis added).

> for the benefit of debtor. First, the debtor asserts that the securities constitute a type of liability of the debtor. Second, GNMA is obligated to pay the securities holders if the debtor fails to do so. In other words, GNMA is required by the Guaranty Agreements to make payments promptly on liabilities of the debtor, should the debtor fail to make them. The obligation to pay money on the obligation of another is a financial accommodation.

*Id.* at 987.

35. Surety bonds are considered "financial accommodations" because they represent obligations to pay money based on the obligations of another. *In re Wegner Farms Co.*, 49 B.R. 440 (Bankr. N.D. Iowa 1985). The *Wegner Farms* Court explained that:

> Certainly a surety bond does not fit neatly within the framework of traditional debt financing. Nonetheless, as noted by the court in *In re Adana Mortgage Bankers Inc.*, 12 B.R. 977, 987 (Bkrtcy.N.D.Ga.1980) (*Adana I*), even giving the term financial accommodation a narrow construction, "[t]he obligation to pay money on the obligation of another is a financial accommodation" within the meaning of section 365(c) and (e).

*Id.* at 444. Further, as set forth in *Matter of Edwards Mobile Home Sales, Inc.*, 119 B.R. 857, 859 (Bankr. M.D. Fla. 1990):

> This Court agrees with the finding in *Wegner* and *Adana I* that an obligation to pay the debts of another is a "financial accommodation" and as such is encompassed by Section 365(c)(2). Accordingly, the Court finds the Ohio Casualty surety bond to be a financial accommodation which cannot be assumed pursuant to Section 365(c)(2).

36. The Surety also objects to any assumption or assignment of either of the Bonds, as they are not property of the Debtors or their estate and therefore cannot be assigned. "[T]he 'overwhelming weight of authority,' under both the Bankruptcy Act and Code holds that a contractor [principal] has no property interest in a surety bond issued by a third-party [surety] to guarantee the contractor's performance on its commercial or personal services contracts." *O'Malley Lumber Co. v. Lockard (In re Lockard)*, 884 F.2d 1171, 1177 (9th Cir. 1989). Moreover,

11

because the Debtors have no property rights in the Bonds, the Debtors cannot simply transfer the Bonds to Energy Solutions, Inc. (the stalking horse bidder), or the Successful Bidder . The Bonds do not assure performance of any party other than the named principal. In fact, the law of suretyship is clear that a surety is discharged from liability under its bond if there is an involuntary substitution of the principal under the bond, since such a change is a material modification to the underlying bonded contract that is prejudicial to the surety. *See, e.g., Becker v. Faber*, 19 N.E.2d 997, 999 (N.Y. 1939). Accordingly, the Bonds and surety's obligations thereunder are not assignable to a new principal without the surety's consent.

37.     Here, the Surety issued Bonds on behalf of certain of the Debtors and/or their non-debtor affiliates by virtue of, among other things, the Indemnity Agreement. The Bonds and the Indemnity Agreement, without limitation, are financial accommodation contracts and therefore, they are not assignable by the Debtors at this time.

B.    The Bidding Procedures

38.     The Surety objects to bidding procedures which do not specifically provide for the requirement that any Qualified Bidder, including any credit bidder, provide evidence to the Debtors and the Surety as to how the Qualified Bidder will replace any surety bonds, including the Bonds, in connection with any assets, contracts or liabilities they intend to acquire, and the ability to replace any such surety bonds and/or discharge obligations relating to the Bonds and the Indemnity Agreement. This should not place any undue burden on a Qualified Bidder because the bidder is already required to demonstrate its overall financial wherewithal and ability to acquire requisite approvals. (*See*, *e.g.*, Bidding Procedures at ¶ 29(d), Doc. No. 33-1 at p 193 of 219). This information should be provided to the Debtors and the Surety with submission of a Qualified

Bidder's bid because, for instance, if it is provided after notice of the winning bid, then there will not be sufficient time to file an objection, if warranted, prior to the sale hearing.

39. Further, the Surety submits that the Surety should be given copies of all Qualified Bids received by the Debtors, as well as documentation of any Qualified Bidders' financial plan, referenced above.

C. Transition Period.

40. It may be possible that the Debtors and a bidder will enter into a transition or similar agreement.

41. It is submitted that requiring the Surety to continue to bond obligations during this transition period, is improper.

42. Although the Surety recognizes that these issues are most relevant at the time of hearing on a proposed sale, the Surety submits that any proposed transition agreement involving a Qualified Bidder should be provided and made public sufficiently in advance of the objection date to a proposed sale.

43. Further, should a Qualified Bidder wish to try to rely on any of the Surety's bonds, including the Bonds, during the transition period, said bidder should be required to disclose in their bid as to how they propose to protect the Surety, either by agreement with the Surety or by attempting to obtain an order which, in effect, requires the Bonds to remain in place during any transition period.

Accordingly, the Bidding Procedures should require (1) that any Qualified Bidder, including any credit bidder, provide evidence to the Debtors and the Surety as to how the Qualified Bidder will replace any surety bonds, including the Bonds, in connection with any assets, contracts or liabilities they intend to acquire, and the ability to replace any such surety bonds and/or

discharge obligations relating to the Bonds and the Indemnity Agreement, and (2) that any proposed transition agreement involving a Qualified Bidder should be provided and made public sufficiently in advance of the objection date to a proposed sale, to allow for an opportunity to object to the proposed transition agreement.

## RESERVATION OF RIGHTS

44. The submission of this Objection by the Surety is not intended as, and shall not be construed as: (a) the Surety's admission of any liability or waiver of any defenses or limitation of any rights of the Surety with respect to any claims against any one or more of bonds, including the Bonds, or under any agreements, including the Indemnity Agreement; (b) the Surety's waiver or release of any right of exoneration it may have against anyone with respect to, without limitation, the Bonds, or under any agreements, including the Indemnity Agreement; (c) the Surety's waiver or release of its right to be subrogated to the rights of one or more of the parties paid pursuant to any applicable bond, including the Bonds; (d) an election of remedy; or (e) consent to the determination of the Debtors' liability to the Surety by any particular court, including, without limitation, this Bankruptcy Court.

43. The Surety reserves the right to raise any arguments by any other party at the Final Hearings on the DIP Financing Motion and/or at the hearing on the Bidding Procedures Motion.

43. The Surety expressly reserves, and does not waive, any and all of its rights, claims, defenses, limitations, and/or exclusions in connection with the Debtors' rights and obligations relating to any bonds or related documents or instruments, including the Bonds, applicable law or otherwise. The Surety further reserves all rights to assert any and all such rights, claims, defenses, limitations, and/or exclusions in any appropriate manner or forum whatsoever (including, without limitation, any of its rights to have any non-core matter relating to the interpretation of its

contractual rights and Debtor's contractual obligations adjudicated by the United States District Court).

44. The Surety further reserves all of its rights to raise any issues contained in this Objection and any other related issues in any procedurally-appropriate contested matter and/or adversary proceeding, including, without limitation: (i) objections to confirmation of any plan, (ii) a separate adversary proceeding requesting any appropriate declaratory and/or injunctive relief; (iii) or an objection to any subsequent motion seeking approval of an asset sale to any prospective asset purchaser with respect to any contractual rights that may be adversely affected by a sale motion or the confirmation of any plan.

## CONCLUSION

**WHEREFORE**, for the reasons set forth herein, the Surety respectfully requests that the Final Order issued in connection with the DIP Financing Motion be modified as set forth above, and that the Bidding Procedure Order be modified as set forth above.

Respectfully submitted,

**McELROY, DEUTSCH, MULVANEY & CARPENTER, LLP**

Dated: August 10, 2023

*/s/ Gary D. Bressler*
Gary D. Bressler, Esq.
300 Delaware Avenue, Suite 1014
Wilmington, DE  19801
Telephone: 302-300-4515
Facsimile:  302-654-4031
E-mail: gbressler@mdmc-law.com

*Attorneys for Lexon Insurance Company and its affiliated sureties*