# **EXHIBIT 1**

Greenhill & Co., LLC
1271 Avenue of the Americas
New York, New York 10020

# Greenhill

CONFIDENTIAL

December 21, 2022

Williams Industrial Services Group Inc.
200 Ashford Center North, Suite 425
Atlanta, GA 30338

Attn:   Tracy D. Pagliara
        President, CEO & Director

Dear Tracy:

The purpose of this letter agreement is to confirm the engagement of Greenhill & Co., LLC ("Greenhill") to act as the sole financial advisor to Williams Industrial Services Group Inc. (the "Company") in connection with a potential Transaction. For purposes hereof, a "Transaction" shall mean the direct or indirect sale, transfer or other disposition of all or a material portion of the equity interests, assets, divisions or business of the Company or any of its affiliates or any other business combination or extraordinary corporate transaction involving the Company or any of its subsidiaries, whether in one or a series of transactions, including, without limitation, by way of a negotiated sale, merger or consolidation, spin-off, split-off or other extraordinary dividend of cash, securities or other assets, tender or exchange offer, share exchange, leveraged buyout, investment or joint venture, divestiture or otherwise.

1.  In connection with its engagement hereunder, Greenhill proposes to undertake certain Services on behalf of the Company, including, to the extent requested by the Company and as feasible and appropriate (each a "Service" and together, the "Services"):

    a.  assisting the Company in preparing marketing materials (based entirely on information supplied by the Company) for distribution to potential acquirors;

    b.  assisting the Company in identifying and contacting selected potential acquirors;

    c.  assisting the Company in arranging for potential acquirors to conduct business investigations;

    d.  assisting the Company in evaluating potential financial and strategic alternatives with respect to a potential Transaction;

e.  advising the Company as to the timing, structure and pricing of a potential Transaction;

f.  assisting the Company in negotiating the financial terms of a potential Transaction;

g.  if requested, evaluate potential financing alternatives for the Company as part of, or in parallel to, a Transaction, and advise the Company on the financial implications of each;

h.  if appropriate, rendering an opinion to the Board of Directors of the Company as to the fairness, from a financial point of view, to the Company or, if applicable, holders of the Company's common stock of the consideration to be received by the Company or such holders (or the exchange ratio provided for) in connection with a proposed Transaction (an "Opinion"); it being understood that the nature and scope of Greenhill's investigation as well as the scope, form and substance of, and the assumptions and qualifications contained in, its Opinion, shall be as Greenhill deems appropriate; and

i.  providing such other financial advisory and investment banking services as are customary for similar transactions and mutually agreed upon by the Company and Greenhill.

In connection with the Services contemplated by clauses (a) - (c) above, the Company hereby authorizes the use of data furnished to Greenhill by the Company for distribution to potential acquirors in a potential Transaction.

In order to coordinate most effectively our efforts during the term of the engagement hereunder, the Company and its management will promptly inform Greenhill of any discussions they may have or of any inquiry they may receive concerning a potential Transaction.

In addition to the Services articulated above if, at any time during the term of this letter agreement, a Transaction has not previously occurred and the Company begins substantive preparations for a potential chapter 11 filing including the use of services typically provided by an investment banking firm in relation to a chapter 11 filing, the Company agrees to enter into a separate engagement letter with Greenhill on terms consistent with Restructuring transactions of similar size, scope and scale including the payment of customary fees (but subject to a Tail Period (as defined below) and fee payment arrangement during such Tail Period substantially consistent with the terms of this letter agreement), based upon market precedents for similar transactions, understanding that the total Restructuring fee shall be no less than the Transaction Fee, and in any case not duplicative. As used herein, a "Restructuring" means any one or more of the following, whether or not on an out-of-court basis or pursuant to a plan of reorganization or plan of arrangement of the Company, whether or not pursuant to §363 of the United States Code, 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code") or similar proceedings, and whether proposed by the Company or any other party: any restructuring (including, without limitation, through any exchange, conversion, cancellation, settlement, forgiveness, retirement and/or modification or amendment to the terms, conditions or covenants thereof), reorganization, recapitalization, equitization, exchange offer or tender offer in relation to a restructuring, cram-down, or liquidation, pursuant to which there is a sale, disposition or transfer of all or a material portion of the Company's equity and/or debt securities and/or other indebtedness, obligations or liabilities (including, without limitation, bank debt, swap liabilities, pension liabilities, OPEB liabilities, preferred stock,

equity interests, capital or operating lease obligations, trade claims, other contract or tort obligations, and other on and off balance sheet indebtedness), assets, divisions or business of the Company or any of its subsidiaries or any other business combination or extraordinary corporate transaction pursuant to which a similar outcome is achieved involving the Company or any of its subsidiaries, whether in one or a series of transactions, regardless of how such result is achieved, including, without limitation, pursuant to an exchange transaction, a Plan or a solicitation of consents, waivers, acceptances or authorizations, an acquisition or sale related transaction, the issuance of new securities or debt instruments and/or other similar transactions or series of transactions.

This letter agreement is not a commitment, express or implied, on the part of Greenhill to purchase, underwrite or place any securities of the Company.

2. As compensation for Greenhill's Services hereunder, the Company shall pay Greenhill the following cash fees, in U.S. dollars, by direct wire transfer:

Retainer Fee

    a. A retainer fee of $250,000 (the "Retainer Fee"), payable in two (2) equal installments; the first installment (1) at the signing of this letter agreement and a second installment (2) on January 31st, 2023.

Opinion Fee

    b. A creditable, non-refundable, opinion fee of $1,000,000 (the "Opinion Fee"), payable at the time Greenhill delivers any Opinion. No portion of the Opinion Fee shall be contingent upon the consummation of the Transaction, or any conclusion set forth in the Opinion.

Transaction Fee

    c. A success-based transaction fee (the "Transaction Fee") payable at the consummation of a Transaction, if during the term of this letter agreement, or if this letter agreement is terminated by the Company prior to the consummation of a Transaction, or if the Company declines to extend the term of this letter agreement pursuant to Section 4 if Greenhill has confirmed that it is willing to extend such term, and within 18 months thereafter (the "Tail Period"), a Transaction is consummated or a definitive agreement is entered into that subsequently results in a Transaction. The Transaction Fee shall equal:

        i) 4.0% up to $90,000,000 Transaction Value (as defined in Schedule B); plus

        ii) 5.0% of the next $10,000,000 Transaction Value; plus

        iii) 6.0% for anything over $100,000,000 Transaction Value; and

        iv) Subject to a minimum fee of $3,500,000.

    d. In the event that, during the term of this letter agreement or the Tail Period, the Company shall execute a definitive agreement providing for a Transaction, such agreement shall subsequently be terminated and the Company is paid a termination, "break up", liquidated damages or similar fee or payment (including, without limitation, any judgment for damages or amount in settlement of any dispute as a

3

result of such termination) in connection with such termination (a "Break-Up Payment"), then the Company shall pay to Greenhill, upon its receipt of such Break-Up Payment, an amount (the "Break-Up Fee") equal to the lesser of (i) 20% of such Break-Up Payment and (ii) the Transaction Fee (based on the estimated Transaction Fee that would have been payable had the proposed Transaction been consummated in accordance with the terms of such definitive agreement). Any such Break-Up Payment shall be credited to amounts due to Greenhill for any subsequent Transaction Fee.

e. Notwithstanding anything to the contrary in Section 2(c), Section 2(d) or Section 2(f), any Transaction Fee, Break-Up Fee or Financing Fee (as defined below) shall be payable to Greenhill during the Tail Period only if the definitive agreement providing for a Transaction or a Financing (as defined below), or the consummated Transaction (which, for purposes of this clause, may be pursuant to a Restructuring) or Financing, as applicable, is with a Covered Party (as defined immediately below). As soon as reasonably practicable after the end of the term or receipt by Greenhill of a notice of termination of this letter agreement from the Company, Greenhill shall compile and deliver to the Company a list (the "List") of all potential acquirers or, in the case of a Financing, potential financing sources, contacted by Greenhill on behalf of the Company and with whom the Company entered into a confidentiality agreement in connection with the Transaction. Within ten (10) days of receipt of the List, the Company shall supplement the List with all potential acquirers or financing sources who contacted the Company directly, or who were contacted directly by the Company or by any other party acting on the Company's behalf, during the term of this Agreement and with whom the Company entered into a confidentiality agreement in connection with the Transaction. Any potential acquirer or financing sources included on the List (as supplemented by the Company) shall be considered a "Covered Party." The failure of the Company to include an appropriate party on the List shall not relieve the Company of its obligations pursuant hereto.

<u>Financing Fee</u>

f. If the Company decides to pursue a Financing as part of, or in parallel to, the Transaction, and either (i) requests that Greenhill provide services that are not immaterial in nature or scope in connection therewith, and such services are provided, or (ii) such Financing is associated with the Transaction, (e.g., such Financing is provided by a buyer, or a party providing Financing to support the Transaction), then the Company shall pay Greenhill a financing fee in an amount calculated in accordance with the formula set forth below (the "Financing Fee") if, during the term of this letter agreement, or within 18 months thereafter a Financing is consummated, or a definitive agreement is entered into that subsequently results in a Financing. The Financing Fee shall equal:

  i) 1.5% of the gross proceeds of any indebtedness raised that is secured by a first lien; plus

  ii) 2.0% of the gross proceeds of any indebtedness raised that is (a) secured by a last-out first lien, (b) secured by a second or more junior lien; plus

  iii) 2.5% of the gross proceeds of any indebtedness raised that is unsecured; plus

4

       iv)     3.0% of the gross proceeds of any debt raised with warrants attached to it; plus

       v)     5.0% of the gross proceeds of any capital raised in the form of equity, equity-linked, hybrid, preferred, or convertible capital.

g.    As used herein, the following terms have the meanings set out below:

- "Financing" means any issuance, sale or placement of any hybrid security with debt features, debt, derivative securities, other similar securities or financial instruments, or other obligations of the Company (including any loan or other financing involving any such securities) for the purposes of financing the Company in order to effect the Transaction, with one or more investors, lenders or other counterparties.

- "indebtedness" and "debt" includes term loans or revolving credit facilities or other instruments of bank indebtedness, private placement of debt securities or loan obligations, or other instruments of indebtedness or debt obligations of the Company, with one or more investors, lenders or other counterparties.

- "raised" (and similar expressions) includes the amount committed or otherwise made available to the Company, whether or not such amount (or any portion thereof) is drawn down at closing or is ever drawn down and whether or not such amount (or any portion thereof) is used to refinance existing obligations of the Company. Capital shall have been "raised" upon the earlier to occur of (i) the consummation of such a raise and (ii) the execution of an agreement in principle or a definitive agreement to effect a new capital raise and a new capital raise is eventually consummated at any time thereafter.

The Financing Fee will be payable upon the closing date of a Financing, which shall be deemed to occur on the earlier of (a) when funding under such Funding is provided or (b) all conditions precedent to funding under such Funding have been satisfied or waived.

The Retainer Fee and Opinion Fee, to the extent previously paid, shall be credited once against and otherwise discharged in full by payment of the Transaction Fee or the Break-Up Fee payable to Greenhill hereunder.

No fee payable to any other financial advisor by the Company or any other person in connection with the subject matter of this engagement shall reduce or otherwise affect any fee payable to Greenhill hereunder.

3.    In addition to any fees payable to Greenhill hereunder (and regardless of whether a Transaction is proposed or occurs), the Company shall, at Greenhill's request, promptly reimburse Greenhill for travel and other reasonable and documented expenses incurred by Greenhill and invoiced on a quarterly basis in connection with its engagement hereunder, including the fees and expenses of legal counsel; provided, that Greenhill shall provide advance notice of its intent to engage counsel, including the identity of the firm to be engaged and an estimate of the fee to be paid to such counsel.

4.    Greenhill's engagement hereunder as financial advisor to the Company will terminate on the date that is 18 months after the date hereof (unless extended by mutual written consent) and may be earlier terminated at any time by either party only upon written notice to the other party; provided, however, that no such termination shall affect (i) the indemnification,

contribution and confidentiality obligations of the Company, (ii) the right of Greenhill to receive any fees payable hereunder (including, in the event of a termination by the Company, the right of Greenhill to receive, for the applicable period after any termination of this letter agreement, the Transaction Fee or the Break-Up Fee) or fees that have accrued prior to such termination or (iii) the right of Greenhill to receive reimbursement for its expenses as described in paragraph 3 above.

5. The Company shall indemnify Greenhill and related persons in accordance with the indemnification letter attached hereto as Schedule A, the provisions of which are incorporated herein by reference in their entirety.

6. The Company shall provide (and, if the Company enters into negotiations with a potential participant in a Transaction, will request such potential participant to furnish) to Greenhill all financial and other information requested by it for the purpose of its assignment hereunder, including access to management and other representatives of the Company (and, if the Company enters into negotiations with a potential participant regarding a potential Transaction, requesting that such potential participant provide Greenhill with access to management and other representatives of the potential acquiror). In performing its Services hereunder (including, without limitation, in rendering any Opinion), Greenhill shall be entitled to rely upon and assume, without assuming any responsibility for independent verification, the accuracy and completeness of all information that is publicly available and all information that has been furnished to it by or on behalf of the Company, any other potential participant in a Transaction or otherwise reviewed by Greenhill, and Greenhill shall not assume any responsibility or have any liability therefor. Greenhill will assume that any projected or forecasted financial information provided by the Company reflects the best available estimates of future financial performance.

The Company agrees that if it learns that any information furnished to Greenhill, including revised projections and forecasts, pursuant to this letter agreement was or becomes inaccurate, incomplete or misleading, the Company shall promptly notify Greenhill in writing. Greenhill shall have no obligation to conduct any appraisal of any assets or liabilities. Greenhill does not provide accounting, tax, legal or regulatory advice. The Company agrees that it will be responsible for ensuring that any Transaction complies with applicable law.

Any financial advice rendered by Greenhill or its representatives pursuant to this letter agreement is intended solely for the benefit and use of the Board of Directors of the Company, acting solely in its capacity as such, in considering and evaluating a Transaction, is not on behalf of, and shall not confer rights or remedies upon, any person other than the Board of Directors of the Company, and may not be used or relied upon for any other purpose. No such financial advice (except as provided in the following sentence) or the terms of this letter agreement may be disclosed publicly in any manner without Greenhill's prior written consent and all such advice and the terms of this letter agreement will be treated by the Company as confidential. Greenhill understands that its Opinion may be reproduced in full in a proxy or information statement or similar disclosure document that is required to be filed under the federal securities laws and mailed to the Company's stockholders; provided that Greenhill has previously reviewed and approved the form and substance of all references to or descriptions of Greenhill or the Opinion in any such proxy or information statement or similar disclosure document. Greenhill will not fail to approve any such references and descriptions that are customary for transactions such as the Transaction. Greenhill shall have no responsibility for the form or content of any such disclosure document, other than the Opinion itself. Greenhill shall provide customary disclosure to the Company regarding any material relationships or

conflicts of interest that it may have with respect to the Company and the Transaction, including any conflicts with respect to the provision of the Opinion.

The Company acknowledges that Greenhill is required to obtain, verify and record certain information that identifies each entity that enters into a formal business relationship with Greenhill (including, but not limited to, the Company's complete legal name, street address and taxpayer ID number or similar identification number) in accordance with the USA Patriot Act and FinCEN rules.

7. Following the public announcement of a Transaction, Greenhill may, at its own expense, place announcements or advertisements in financial newspapers, journals and marketing materials (including its website) describing its Services hereunder. The Company consents to the use of its logo and other marks in any such public announcement and/or general marketing and promotional materials. If requested by Greenhill, the Company shall include a mutually acceptable reference to Greenhill in any press release or other public announcement of the Company in respect of a Transaction.

8. This letter agreement (including Schedules A and B) (a) shall be governed by and construed in accordance with the laws of the State of New York, regardless of the laws that might otherwise govern under applicable principles of conflicts of law thereof and no proceeding or claim related directly or indirectly to this letter agreement shall be commenced, prosecuted, pursued or continued in any court other than the courts of the State of New York located in the City and County of New York or in the United States District Court for the Southern District of New York, (b) along with any previously executed non-disclosure agreement, incorporates the entire understanding of the parties with respect to the subject matter hereof and supersedes all previous agreements should they exist with respect thereto, (c) may not be amended or modified except in a writing executed by the Company and Greenhill and (d) shall be binding upon and inure to the benefit of the Company, Greenhill, the other Indemnified Parties (as defined in Schedule A) and their respective successors and assigns. The Company (on the Company's behalf and, to the extent permitted by applicable law, on behalf of the Company's affiliates, securityholders and creditors) and Greenhill agree to waive, to the fullest extent permitted by law, any objection it may now or hereafter have to the laying of venue of any such proceeding brought in any New York court specified in this paragraph and any claim that any such proceeding brought in any such court has been brought in an inconvenient forum and to waive all rights to trial by jury in any action, proceeding or counterclaim brought by or on behalf of either party with respect to any matter whatsoever relating to or arising out of any actual or potential Transaction or the engagement of or performance by Greenhill hereunder.

The Company acknowledges that Greenhill, in connection with its engagement hereunder, is acting as an independent contractor with duties owing solely to the Board of Directors of the Company, acting solely in its capacity as such, that nothing in this letter agreement is intended to confer upon any other person any rights or remedies hereunder or by reason hereof and that Greenhill is not assuming any duties or obligations other than those expressly set forth herein. Nothing in this letter agreement or the nature of Greenhill's Services in connection with this engagement or otherwise shall be deemed to create a fiduciary duty or fiduciary or agency relationship between Greenhill or any of its affiliates and the Company or any of its affiliates, securityholders, employees or creditors. The Company agrees that it shall not make, and hereby waives, any claim based on the assertion of such a fiduciary or agency relationship.

This letter agreement has been duly authorized and executed by the Company and constitutes the legal, binding obligation of the Company, enforceable in accordance with its terms. The invalidity or

unenforceability of any provision of this letter agreement shall not affect the validity or enforceability of any other provision of this letter agreement, which shall remain in full force and effect.

If at any time during our engagement or thereafter you have any questions relating to billing or to regulatory compliance matters, you should contact either the undersigned or Hal Rodriguez, Greenhill's Chief Financial Officer, who handles financial and administrative matters for Greenhill in our New York office.

This letter agreement may be executed in two or more counterparts, each of which shall be deemed to be an original, but all of which shall constitute one and the same agreement. Please confirm that the foregoing is in accordance with your understanding of our agreement by signing and returning to us a copy of this letter agreement.

Very best regards,

GREENHILL & CO., LLC

By: _____
Stephen A. Cruise
Global Co-Head of Industrial
Corporate Advisory

Accepted and agreed to as of
the date set forth above:

WILLIAMS INDUSTRIAL SERVICES GROUP INC.

By: _____
Tracy D. Pagliara
President, CEO & Director

## SCHEDULE A

## INDEMNIFICATION

The Company shall indemnify and hold harmless Greenhill, its affiliates and their respective officers, directors, members, partners, employees, agents, representatives and each other entity or person, if any, controlling Greenhill or any of its affiliates (collectively, the "Indemnified Parties") from and against any losses, claims, damages, demands and liabilities (collectively, "Liabilities") (or actions or proceedings in respect thereof), to which any of the Indemnified Parties may become subject related to or arising in any manner out of any activities performed or Services furnished pursuant to the attached letter agreement, any matter contemplated thereby or an Indemnified Party's role in connection therewith, including prior to the date hereof (the "Indemnified Activities"), except to the extent a court of competent jurisdiction shall have determined by final nonappealable judgment that such Liabilities resulted directly from the gross negligence or willful misconduct of Greenhill in performing the Services that are the subject of the attached letter agreement. In addition, the Company shall promptly reimburse the Indemnified Parties for all customary and documented costs and expenses (including, without limitation, fees, costs and expenses of legal counsel), as incurred, in connection with (i) the investigation of, preparation for, responding to, serving as a witness in respect of, or defending, pursuing, settling or otherwise becoming involved in, any pending or threatened investigative, administrative, judicial, or regulatory or other claim, action or proceeding or any arbitration or investigation in any jurisdiction related to or arising in any manner out of any Indemnified Activities, whether or not in connection with pending or threatened litigation to which Greenhill (or any other Indemnified Party) or the Company or any of its securityholders is, or is threatened to be, a party (collectively, "Proceedings") and (ii) enforcing any Indemnified Party's right under the attached letter agreement (including this Schedule A).

Greenhill shall notify the Company after it becomes aware that a Proceeding has been commenced (by way of service with a summons or other legal process giving information as to the nature and basis of the claim) against an Indemnified Party in respect of which indemnity may be sought hereunder. In any event, failure to notify the Company shall not relieve the Company from any liability which the Company may have on account of this indemnity or otherwise, except to the extent the Company shall not otherwise have been aware of such Proceeding and the Company shall have been materially prejudiced with respect to the Proceeding by such failure. The Company shall not be liable for any settlement of any Proceeding effected by an Indemnified Party without the Company's written consent, which consent shall not be unreasonably withheld, but if settled in accordance herewith or if there is a judgment against an Indemnified Party, the Company agrees to indemnify the Indemnified Party from and against any Liability by reason of such settlement or judgment. Neither the Company nor any member of the Company's board of directors shall, in any Proceeding where any Indemnified Party is an actual or potential party to such Proceeding, (a) settle, compromise, consent to the entry of a judgment in or otherwise seek to terminate any pending or threatened Proceeding in respect of which indemnity may be sought hereunder, or (b) participate in or facilitate any such settlement, compromise, consent or termination, including on behalf of the Company's board of directors (or a committee thereof), in each case without Greenhill's prior written consent, unless such settlement, compromise, consent or termination includes an unconditional release of each Indemnified Party from all actual or potential Liabilities relating to the Indemnified Activities (such release to be set forth in an instrument signed by all parties to such settlement, compromise, consent or termination) and does not include a statement as to or an admission of fault, culpability or a failure to act, by or on behalf of any Indemnified Party.

The Company agrees that if any indemnification or reimbursement sought pursuant to this Schedule A were for any reason not to be available to any Indemnified Party or insufficient to hold it harmless as

9

and to the extent contemplated by this Schedule A, then the Company shall contribute to the amount paid or payable by such Indemnified Party in respect of Liabilities and expenses in such proportion as is appropriate to reflect the relative benefits to the Company and its affiliates, their respective securityholders and creditors on the one hand, and such Indemnified Party on the other, in connection with the transactions contemplated by the attached letter agreement (whether or not consummated) or, if such allocation is not permitted by applicable law as determined by a court of competent jurisdiction by final nonappealable judgment, in such proportion as is appropriate to reflect not only the relative benefits but also the relative fault of the Company (and its affiliates, and their respective directors, employees, agents and other advisors) on the one hand and such Indemnified Party on the other hand, as well as any other equitable considerations. It is hereby agreed that the relative benefits to the Company and its affiliates and their respective securityholders and creditors and to the Indemnified Party with respect to transactions contemplated by the attached letter agreement shall be deemed to be in the same proportion as (i) the total value paid or received or contemplated to be paid or received by the Company and its affiliates and their respective securityholders and creditors pursuant to transactions contemplated by the attached letter agreement (whether or not consummated) bears to (ii) the fees paid to Greenhill under the attached letter agreement (excluding amounts received by Greenhill as reimbursement of expenses and amounts paid under this Schedule A). The relative fault of the Company and the Indemnified Party shall be determined by reference to, among other things, whether the statements, actions or omissions to act or any other alleged conduct were by the Company (or its affiliates or their respective directors, employees, agents or other advisors) or the Indemnified Party and the parties' relative intent, knowledge, access to information and opportunity to correct or prevent such action or omission to act. In no event shall the Indemnified Parties be required to contribute or otherwise be liable for an amount in excess of the aggregate amount of fees actually received by Greenhill pursuant to the attached letter agreement (excluding amounts received by Greenhill as reimbursement of expenses and amounts paid under this Schedule A).

The Company further agrees that no Indemnified Party shall have any Liability (whether direct or indirect, in contract or tort or otherwise) to the Company or any person asserting claims on behalf of or in right of the Company for or in connection with Greenhill's engagement hereunder or the transactions contemplated by the attached letter agreement except to the extent a court of competent jurisdiction shall have determined by final nonappealable judgment that any Liability resulted directly from the gross negligence or willful misconduct of Greenhill in performing the Services that are the subject of the attached letter agreement. The indemnity, reimbursement and contribution obligations of the Company shall be in addition to any liability which the Company may otherwise have to an Indemnified Party, shall not be limited by any rights that an Indemnified Party may otherwise have and shall be binding upon and inure to the benefit of any successors, assigns, heirs and personal representatives of the Company or an Indemnified Party.

The indemnity, reimbursement and contribution provisions set forth herein shall remain operative and in full force and effect regardless of (i) any withdrawal, termination or consummation of or failure to initiate or consummate any transaction contemplated by the attached letter agreement, (ii) any investigation made by or on behalf of any party hereto or any person controlling (within the meaning of Section 15 of the Securities Act of 1933, as amended, or Section 20 of the Securities Exchange Act of 1934, as amended) any party hereto, (iii) any amendment or other modification or termination of the attached letter agreement or the completion of Greenhill's engagement and (iv) whether or not Greenhill shall, or shall not be called upon to, render any formal or informal advice in the course of such engagement.

Prior to entering into any agreement or arrangement with respect to, or effecting, any transaction that is reasonably likely to impair the Company's ability to meet its current and potential future obligations pursuant to this Schedule A, the Company shall promptly notify Greenhill in writing thereof and, if

requested by Greenhill, shall arrange alternative means of providing for the obligations of the Company set forth herein upon terms and conditions reasonably satisfactory to Greenhill.

## SCHEDULE B

## TRANSACTION FEE

For the purpose of calculating a Transaction Fee, "Transaction Value" shall equal the aggregate value of (A) the total value of all proceeds and other consideration to be paid or received, directly or indirectly, in connection with a Transaction, including, without limitation: (i) cash; (ii) notes, securities and other property; (iii) payments made in installment; (iv) amounts paid or payable under agreements not to compete or similar agreements; (v) amounts paid under contractual arrangements (including lease arrangements, management fees, put or call agreements); (vi) contingent payments (whether or not related to future earnings or operations); and (vii) amounts held in escrow; plus (B) the aggregate principal amount of all indebtedness and other liabilities (including, without limitation, capitalized leases, pension liabilities and preferred stock obligations) outstanding immediately prior to consummation of a Transaction or otherwise, directly or indirectly, assumed, refinanced, defeased, extinguished or consolidated (including any premiums paid or defeasance costs) in connection with such Transaction. For purposes of computing any fees payable to Greenhill hereunder, (x) shares issuable upon exercise of options, warrants or other rights of conversion shall be deemed outstanding, (y) contingent and installment payments shall be valued based upon the estimated net present value thereof using an appropriate discount rate as determined in good faith by Greenhill, and (z) non-cash consideration shall be valued as follows: (A) publicly traded securities shall be valued at the average of their closing prices (as reported in The Wall Street Journal) for five trading days ending five trading days prior to the closing of the Transaction and (B) any other non-cash consideration shall be valued at the fair market value thereof as determined in good faith by the Company and Greenhill on the day prior to the consummation of the Transaction; provided that, if such parties are unable to agree on a fair market value for such non-cash consideration, then the parties shall submit such issue to a panel of three arbitrators located in New York, New York (with one arbitrator being chosen by each party and the third being chosen jointly by the parties) for determination, which determination shall be binding upon each of the Company and Greenhill.

Transaction Value also shall include, without duplication, (i) the aggregate amount of any dividends or other distributions declared after the date hereof (other than normal recurring cash dividends), (ii) any amounts paid to repurchase any securities (other than repurchases pursuant to and consistent with currently existing stock repurchase programs) and (iii) in the case of a sale of assets, the net value of any working capital (other than cash) not acquired in such Transaction.

In connection with a sale, transfer or other disposition of 50% or more of the outstanding common stock of the acquired company, Transaction Value will be calculated as if 100% of the outstanding common stock on a fully diluted basis had been acquired at the same per share amount paid in such Transaction.