IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>WILLIAMS INDUSTRIAL SERVICES GROUP, INC., et al.,<br><br>Debtors. | Chapter 11<br><br>Case No. 23-10961 (BLS)<br><br>(Jointly Administered) |

**DECLARATION OF JONATHAN PANICO IN SUPPORT OF MOTION OF ARCH INSURANCE COMPANY TO LIFT STAY AS TO BONDED CONTRACT FUNDS, OR, ALTERNATIVELY, FOR ADEQUATE PROTECTION**

Jonathan Panico hereby declares under penalty of perjury:

1. I am Senior Claims Examiner, Surety, for Arch Insurance Company ("Arch") which is a licensed surety company in the business of, among other things, issuing payment and performance bonds on construction projects. I am over the age of 18 years and am competent and authorized to make this Declaration on behalf of Arch in support of the Motion of Arch Insurance Company to Lift Stay as to Bonded Contract Funds, or, Alternatively, for Adequate Protection (the "Motion to Lift Stay"). I make this Declaration based on my personal knowledge or on the knowledge based on my review of the business records that Arch regularly maintains and that were prepared at or near the time of the events described in such records by a person with knowledge of such events. Such business records are kept in the ordinary course of regularly conducted business activity of Arch, and it is the regular practice of Arch to make such business records. I routinely rely on such business records in the usual course of my business activities.

2. At all material times, to Arch's knowledge, Williams Industrial Services, LLC ("Debtor") was engaged in public works construction. As such, from time to time the Debtor was required to provide payment bonds and performance bonds in connection with its work, as security for the Debtor's performance under those contracts and payment of subcontractors, laborers and materialmen providing labor in connection with and/or materials incorporated into those contracts.

3. The Debtor sought a public construction bond from Arch to secure its payment and performance obligations in connection with a contract with St. John's County, Florida ("St. John's") for the construction of the SR 16 WWTF Headworks & RAS/WAS Improvements in St. John's County, Florida (the "Project"), Bid No. 21-03R (the "Bonded Contract"). Arch issued a public construction bond, Bond No. SU1175012 (the "Bond"), securing Debtor's obligations on the Project. A true and correct copy of the Bond is attached as **Exhibit "A"** hereto.

4. Before it would issue the Bond, Arch required certain protections from the Debtor of monies to be paid to the Debtor under the Bonded Contract (the "Bonded Contract Funds"), and from loss to Arch in the event that the Debtor failed to perform all of its obligations under the Bonded Contract or to pay labor and material suppliers on the Bonded Contract.

5. In issuing the Bond, Arch relied upon its rights of legal and equitable subrogation, based on established law that the surety has a priority right to contract funds on bonded projects for the completion of those projects and payment of subcontractors and suppliers on those projects.

6. Further, to induce Arch to issue the Bond and other payment and performance bonds, the Debtor (and others) signed a General Agreement of Indemnity (the "Indemnity Agreement") with Arch. A true and correct copy of the Indemnity Agreement is attached as **Exhibit "B"** hereto.

7. In reliance on its rights of legal and equitable subrogation and the Indemnity Agreement, Arch issued the Bond on behalf of and at the request of the Debtor regarding its work on the Bonded Contract.

8. In early-to-mid July 2023, the Debtor advised Arch that it had encountered financial difficulties and did not anticipate completing certain bonded projects. Arch subsequently learned that the Debtor filed for bankruptcy protection on July 22, 2023 and moved to reject the Bonded Contract. Thus, Debtor has abandoned the Bonded Project and has no intention of completing it.

9. Likely due to the automatic stay, St. John's has not yet declared Debtor in default. St. John's declaration of default is a condition precedent to Arch's performance under the Bond.

10. Based upon its investigation to date, Arch's in-house accountants estimate Arch's cost to complete the Bonded Project to approximate $1,000,000 and to exceed remaining Bonded Contract balances by approximately $600,000.

11. Further, Arch does not know at this time whether all of the remaining Bonded Contract balances amounts are collectable or subject to back charges or offsets. Additionally, Arch anticipates receiving claims against the Bond from unpaid subcontractors and suppliers that could add to its losses.

12. Thus, based on information Arch has received to date, there are insufficient Bonded Contract Funds to reimburse Arch for its losses on Bonded Project, pay outstanding claims on Bonded Project and to complete the Bonded Project.

13. In my professional opinion, the cost to complete Debtor's work on the Bonded Project and close out to date will exceed remaining Contract Balances by approximately $600,000, including subcontractor, supplier, labor, burden and related costs to complete the Bonded Project. This amount does not include open payables on the Bonded Project, which could increase the amount of the loss.

14. We currently do not know whether these remaining Bonded Contract Funds are fully collectible. St. John's may have claims for back charges, direct payments to subcontractors and/or suppliers, and other claims.

I declare under penalty of perjury that the foregoing is true and correct.

Jonathan Panico

*[signature]*

3096380v.1    3096380v.1

**EXHIBIT "A"**

# PUBLIC CONSTRUCTION BOND

Bond No. <u>SU1175012</u>

BY THIS BOND, We, **Williams Industrial Services, Inc., Jacksonville, FL 32220, Phone (904) 696-9994, Email: mmorgan@wisgrp.com,** Contractor; address; phone; email) as Principal and **Arch Insurance Company, 3 Parkway, Suite 1500, Philadelphia, Pa 19102 (267) 768-7175** (Surety Co.; address; phone) a Corporation, as Surety are bound to ST. JOHNS COUNTY, FLORIDA, hereafter referred to as "Owner", in the sum of <u>$2,462,000.00</u> for payment of which we bind ourselves, our heirs, personal representatives, successors, and assigns, jointly and severally.

THE CONDITION OF THIS BOND is that if Principal:

1. Performs the contract dated <u>August 2, 2021</u>, between Principal and Owner for construction of <u>Bid No: 21-03R: SR 16 WWTF Headworks & RAS/WAS Improvements,</u> (Project, address, and brief description of work) the contract being made a part of this bond by reference, and the times and in the manner prescribed in the contract; and

2. Promptly makes payment to all claimants, as defined in Section 255.05(1), Florida Statutes, supplying Principal with labor, materials, or supplies, used directly or indirectly by Principal in the prosecution of the work provided for in the contract; and

3. Promptly pays Owner all losses, damages, expenses, costs and attorney's fees, including appellate proceedings, that Owner sustains because of a default by Principal under the contract; and

4. Performs the guarantee of all work and materials furnished under the contract for the time specified in the contract, then this bond is void; otherwise it remains in full force.

Any action instituted by a claimant under this bond for payment must be in accordance with the notice and time limitation provisions in Section <u>255.05(2)</u>, Florida Statutes.

Any changes in or under the contract documents and compliance or noncompliance with any formalities connected with the contract or the changes does not affect Surety's obligation under this bond.

DATED ON <u>August 3</u>, <u>2021</u>.

| | |
|---|---|
| ATTEST: | Principal:<br>WILLIAMS INDUSTRIAL SERVICES, LLC |
| | |
| _____<br>(Principal)  Secretary | By: _____ |
| (SEAL) | |
| | _____<br>Printed Name/Title |
| _____<br>Witness as to Principal | 100 Crescent Centre Parkway, Suite 1290<br>Address |
| _____<br>Address | Tucker, GA 30084<br>City, State, Zip Code |
| _____<br>City, State, Zip Code | |
| | |
| ATTEST/WITNESS: | |
| _____<br>(Surety)<br>(SEAL) | ARCH INSURANCE COMPANY<br>Surety |
| Kelly G. Hennessy<br>Witness to Surety | By: _____<br>Attorney-in-Fact – William F. Simkiss |
| 1041 Old Cassatt Road<br>Berwyn, Pa. 19312<br>Address | 1041 Old Cassatt Road<br>Berwyn, Pa. 19312<br>Address |

EXHIBIT "B"

FILE COPY

ORIGINAL



**ARCH Insurance Company**
a member of Arch Insurance Group

# Arch Insurance Company
# General Agreement of Indemnity

This General Agreement of Indemnity (hereinafter, "Agreement") is made and entered into by the undersigned, hereinafter referred to individually and/or collectively, as "Indemnitors", for the benefit of Arch Insurance Company for itself, its subsidiaries, affiliates, parents, co-sureties, fronting companies, reinsurers and their successors and assigns, whether now in existence or hereafter formed, individually and collectively, as "Surety" for the purpose of indemnifying the Surety for any Bonds (as hereinafter defined) from any and all Losses (as hereinafter defined).

DEFINITIONS
The term "Bond(s)" shall mean any and all bonds including but not limited to surety bonds, undertakings, guarantees, or any contractual obligations, previously or hereafter executed, issued procured or undertaken by the Surety, whether directly or as a result of any asset purchase, merger, acquisition, or similar transaction, and any renewals, extensions thereof issued by the Surety, or issued by another at the request of the Surety, on behalf of the Indemnitors, whether issued prior to or subsequent to the date of this Agreement.

The term "Indemnitors" shall mean an individual, corporation, partnership, Limited Liability Company (hereinafter call LLC), Limited Liability Partnership (hereinafter called LLP), joint venture, trust, estate or other legal entity, whether individually or jointly with others, who sign this Agreement or whose authorized representatives sign this Agreement or any other agreement that incorporates by reference the terms of this Agreement, whether the Indemnitors are individuals or entities. The Indemnitors warrant and represent that they have a material and beneficial interest in Surety's issuance of Bonds on behalf of the Indemnitors, and acknowledge that Surety would not issue such Bonds without each Indemnitors agreement to reimburse Surety for all Losses arising under the bonds.

The term "Losses" shall mean any and all (a) sums paid by Surety to claimants under the Bonds, (b) sums required to be paid to claimants by Surety but not yet, in fact, paid by the Surety, by reason of execution of such Bonds, (c) all costs and expenses incurred in connection with investigating, paying or litigating any claim under the Bonds, including but not limited to legal fees and expenses, technical and expert witness fees and expenses, (d) all costs and expenses incurred in connection with enforcing the obligations of the Indemnitors under this Agreement including, but not limited to interest, legal fees and expenses, (e) all accrued and unpaid premiums owing to Surety for the issuance, continuation or renewal of any Bonds and/or (f) all other amounts payable to Surety according to the terms and conditions of this Agreement.

As an inducement to the Surety and in consideration of the Surety's execution or procurement of the Bond(s), the Surety's refraining from canceling one or more Bond(s), and/or the Surety's assumption of one or more Bond(s) and for other good and valuable considerations, the receipt and sufficiency of which the Indemnitors hereby acknowledge, the Indemnitors hereby agree, for themselves, successors, and assigns, jointly and severally, as follows:

1. To pay all initial and renewal premiums for each Bond, as they fall due, until Surety has been provided with competent legal evidence, in its sole discretion, that the Surety has been fully released of liability under such Bond.

2. To indemnify, hold harmless and exonerate Surety from and against any and all Losses, as well as any other reasonable expense that the Surety may incur or sustain as a result of or in connection with the furnishing, execution, renewal, continuation or substitution of any Bond(s). Expenses include, but are not limited to: (a) the cost incurred by reason of making an independent investigation in connection with any

Bond(s); (b) the cost of procuring or attempting to procure the Surety's release from liability or a settlement under any Bond(s) upon or in anticipation of Losses, including the defense of any action brought in connection therewith; and (c) the cost incurred in bringing suit to enforce this Agreement against any of the Indemnitors. Payments of amounts due the Surety hereunder, including interest, shall be made immediately upon the Surety's demand. Vouchers, affidavits, or other evidence of payment by the Surety shall be prima facie evidence of the Indemnitors' liability for any such Losses or other expenses.

3. This Agreement shall apply to any and all Bond(s) furnished for or on behalf of any or all of the following as follows:

    (a) One, some or all of the Indemnitors;
    (b) Any joint venture or other form of common enterprise in which Indemnitors were members or stockholders at the time the Bond(s) were furnished;
    (c) Any present or future affiliate and/or subsidiary of Indemnitors;
    (d) Any third party at the request of Indemnitors, their subsidiaries, their affiliates or their agent(s)/broker(s)

4. The Surety may, in its sole discretion, establish a reserve to cover any actual or anticipated, liability, claim, suit, judgment, or Losses under any Bond. In such event, the Indemnitors will, immediately upon demand, deposit with the Surety a sum of money equal to such reserve, and any subsequent increase thereof, to be held by the Surety as collateral security on the Bond(s). Such funds will be used by the Surety to pay Losses or may be held by the Surety as collateral against potential future Losses.

5. In the event the Surety receives a claim under any Bond or establishes, in its sole discretion, a reserve in anticipation of incurring Losses, the Surety shall have the right to reasonable access to the books, records, and accounts of the Indemnitors, as it relates to said Bond(s) for the purpose of examining same.

6. The obligations of the Indemnitors under this Agreement shall not be impaired by and Surety shall incur no liability on account of: (a) Surety's failure or refusal to furnish Bond(s), including final Bond(s) where the Surety has furnished a bid Bond; (b) Surety's consent or failure to consent to changes in the terms and provisions of any Bond, or the obligation or performance secured by any Bond; (c) the taking, failing to take, or release of security, collateral, assignment, indemnity agreements and the like, as to any Bond; (d) the release by Surety, on terms satisfactory to it, of any Indemnitors; and/or (f) the Surety's cancellation of any Bond(s).

7. The Indemnitors shall not seek indemnity, contribution or collection of any other outstanding obligation against any other Indemnitors or their property until the obligations of the Indemnitors to Surety under this Agreement have been satisfied in full.

8. The Indemnitors acknowledge that the Surety may share copies of any and all statements, agreements, financial statements and any information which it now has or may hereafter obtain concerning Indemnitors with co-sureties, fronting companies, and/or reinsurers.

9. The Indemnitors shall be in default of this Agreement if: (a) Indemnitors shall become a party in any insolvency, receivership, liquidation, or bankruptcy; (b) Indemnitors make representation to the Surety by or on behalf of any of the Indemnitors that prove to have been misleading or materially false when made; (c) Indemnitors fail to provide collateral in response to a proper request made by the Surety; and/or (d) Indemnitors breach any other provision of this Agreement.

10. The Indemnitors represent and warrant to the Surety that they have a substantial, material, and/or beneficial interest in the obtaining of Bond(s) by any of the Indemnitors and in the transaction(s) for which any of the other Indemnitors have applied or will apply to the Surety for Bond(s) pursuant to this Agreement. Indemnitors represent and warrant that they have the full power and authority to execute deliver and perform this Agreement and to carry out the obligations stated herein. Indemnitors further represent and warrant that their execution, delivery and performance of this Agreement does not and will not conflict with, constitute a default under, or result in a breach or violation of any of their respective organization documents, any law, governmental rule or regulation, or any applicable order, writ, injunction, judgment or decree of any court or governmental authority, or any other agreement binding upon the Indemnitors.

11. The Surety may, in its sole discretion, determine one or more of the following: (a) the Indemnitors financial condition has been deteriorating is believed to be deteriorating or will be deteriorating; or (b) there has been or is believed to be some other change that adversely impacts the Surety's risk under the Bond(s). In such an event, within thirty (30) days of receipt of the Surety's written demand, the Indemnitors shall procure the full and complete release of the Bond(s) by providing competent written evidence of release satisfactory to the Surety, in its sole discretion. If the Indemnitors fail to provide the aforementioned release Indemnitors shall, immediately thereafter, provide the Surety with collateral in the amount of 100% of all the unreleased liability under the Bond(s). The liability shall be determined at the time of the Surety's written demand and the unreleased liability will be determined in the Surety's sole discretion. Collateral will be in the form of (a) an irrevocable letter of credit in form, content, and issued by a financial institution acceptable to the Surety in its sole discretion; (b) Cash in a form and manner acceptable to the Surety, in its sole discretion; (c) Other collateral acceptable to the Surety, in its sole discretion. Collateral previously provided to the Surety may be utilized to establish compliance with this provision. If the liability subsequently increases, then it is the Indemnitors responsibility to ensure continued compliance with this provision at all times.

    The Indemnitors waive, to the fullest extent permitted by law, each and every right that they may have to contest this requirement to provide collateral under this Agreement (individually and collectively, the "Collateral Requirement"). The Indemnitors stipulate and agree that the Surety will not have any adequate remedy at law should Indemnitors fail to perform the Collateral Requirement and further agree as a result that the Surety is entitled to specific performance of the Collateral Requirement. The Surety's failure to act to enforce its right to specific performance shall not be construed as a waiver of that right, which right may be enforced at any time, at the Surety's sole discretion. Indemnitors further agree that this Collateral Requirement shall not limit or be deemed a waiver of the Surety's other rights, which it may exercise in its sole discretion, under this Agreement or otherwise to cancel Bond(s), to demand collateral, or to take any other actions the Surety deems necessary and/or prudent, in its sole discretion, to mitigate actual or potential Losses under any and all Bond(s) written in accordance with this Agreement. The exercise of such additional rights shall not be contingent upon the Surety's enforcement of this provision.

12. The Surety may execute or procure Bond(s) that guarantee the Indemnitors' obligations or performance under one or more contracts (each a "Bonded Contract"). The Indemnitors shall be considered in default of a Bonded Contact if any of the following occur: (a) a declaration of default by any Bonded Contract owner; (b) an actual breach or abandonment of the Bonded Contract; and/or (c) an improper diversion of Bonded Contract funds or Indemnitors' assets to the detriment of the Bonded Contract obligations.

    In the event of default under a Bonded Contract, Indemnitors grant to Surety a security interest in all equipment, machinery, inventory, materials, and all proceeds and products in connection with such Bonded Contract. This Agreement shall for all purposes constitute a Security Agreement and Financing Statement for the benefit of Surety in accordance with the Uniform Commercial Code ("UCC") and all similar statures. In the event there is an act of default under any Bonded Contract, Indemnitors hereby irrevocably authorize Surety, without notice to any of the Indemnitors, to perfect the security interest granted herein by filing this Agreement or a copy or other reproduction of this Agreement. Surety may add schedules or other documents to this Agreement as necessary to perfect its rights. The failure to file or record this Agreement or any financing statement shall not release or excuse any of the obligations of Indemnitors under this Agreement. The Surety's exercise of any rights as a secured creditor under this Agreement shall not be a waiver of any of the Surety's legal or equitable rights or remedies, including the Surety's right of subrogation.

13. The obligee or beneficiary under certain Bond(s) may make a demand for payment ("Demand") against the Bond(s). When such Demand is made, the Surety must pay the amount of the Demand, not to exceed the penal sum of the Bond(s), as well as all necessary fees, within the time period required by the Demand. Under such Bond(s), the Surety with the knowledge and consent of the Indemnitors may have expressly waived all defenses to making such payment. If the Indemnitors receive notice from the Surety that a Demand has been made against the Bond(s) by the obligee or beneficiary, then at least five (5) business days before payment of such Demand is due to the obligee, Indemnitors shall pay the Surety the full amount of the Demand, as well as all necessary fees. Such payment will be made by wire transfer or otherwise in immediately available funds to the bank account specified in the notice provided to the Indemnitors by the Surety.

14. This Agreement is a continuing obligation of the Indemnitors and no Indemnitors shall have the right to terminate its obligations for any Bond(s). The Indemnitors may terminate this Agreement as to future Bond(s) by notice to the Surety, but such termination as to the Indemnitors shall in no way affect the obligation of any other Indemnitors who have not given such notice. In order to terminate liability as to future Bond(s), Indemnitors must notify the Surety of such termination and state in such notice the effective date (not less than 30 days after receipt thereof by the Surety) of termination of such Indemnitors liability for future Bond(s). After the effective date of such termination, the Indemnitors giving notice of termination shall nonetheless be liable hereunder for Bond(s) executed, or authorized before such date and renewal, substitutions, and extensions thereof.

15. The Indemnitors understand and agree that their obligations under this Agreement remain in full force and effect for any Bond(s) issued pursuant to this Agreement, notwithstanding that the entity on whose behalf Bond(s) were issued has been sold, dissolved or whose ownership has been otherwise altered in any way.

16. If any provision or portion of this Agreement shall be unenforceable, this Agreement shall not be void, but shall be construed and enforced with the same effect as though such provision or portion were omitted. This Agreement is in addition to and not in lieu of any other agreement relating to the obligations described herein.

17. This Agreement may be amended only by a document executed by all parties, or their respective successors or assigns.

18. This Agreement may be executed in multiple counterparts, and by the Indemnitors on separate counterparts, each of which shall be deemed to be an original, but all of which together shall constitute one and the same instrument. Delivery by telecopy or email of a signed counterpart of this Agreement shall be effective as physical delivery. Indemnitors, at the request of Surety, will provide original-signature versions of said counterparts.

19. Nothing herein-contained shall be construed to waive or abridge any right or remedy which the Surety might have if this Agreement was not executed. The Surety's failure to act to enforce any or all of its rights under this Agreement shall not be construed as a waiver of these rights.

20. Indemnitors hereby expressly authorize the Surety to access credit records and to make such pertinent inquiries as may be necessary from third party sources for underwriting purposes, claim purposes and/or debt collection.

21. Separate suits may be brought hereunder as causes of action accrue, and suit may be brought against any and all of the Indemnitors; and any suit or suits upon one or more causes of action, or against one or more of the Indemnitors, shall not prejudice or bar subsequent suits against any other Indemnitors on the same or any other causes of action, whether theretofore or thereafter accruing.

22. All notices and other communication hereunder shall be in writing and shall be deemed to have been duly given if delivered against receipt thereof or mailed by registered or certified mail, return receipt request, postage prepaid, addressed to the Surety at the Surety's then-current address.

23. This Agreement shall be interpreted under the laws of the State of New York.

24. If Surety has or obtains collateral or letters of credit, Surety shall not have any obligation to release collateral or letters of credit or turn over the proceeds thereof until it shall have received a written release in form and substance satisfactory to the Surety (in its sole discretion) with respect to each and every Bond. Any collateral or letters of credit provided to Surety by any Indemnitors or any third party, or the proceeds thereof, may be applied to any Losses.

25. EACH OF THE INDEMNITORS REPRESENT TO THE SURETY THAT SUCH INDEMNITORS HAVE CAREFULLY READ THIS ENTIRE AGREEEMENT, AND THERE ARE NO OTHER AGREEMENTS OR UNDERSTANDINGS WHICH IN ANY WAY LESSEN OR MODIFY THE OBLIGATION SET FORTH HEREIN. IN TESTIMONY HEREOF WE, THE INDEMNITORS, HAVE SET OUR HANDS AND FIXED OUR SEALS AS SET FORTH BELOW. THE SURETY'S

ACCEPTANCE OF THIS AGREEMENT SHALL BE PRESUMED AND IS DEEMED EFFECTIVE BY ITS RECEIPT OF THIS AGREEMENT, IT'S RELIANCE HEREON OR BY ITS EXECUTION OF ANY BOND FOR THE INDEMNITORS OR ANY OF THEM WITH OR WITHOUT THE SURETY'S SIGNATURE BEING AFFIXED THERETO.

Dated as of this __26__ day of __April__, __2019__

BY:

**Williams Industrial Services Group, Inc.**
T.I.N. 73-1541378
100 Crescent Centre Parkway, Suite 1240, Tucker, GA 30084

ATTEST: _____     BY: _____ (Seal)
Darrell E. Holliday                                        Chip Wheelock, General Counsel
VP, Insurance and Risk Management

## CORPORATE ACKNOWLEDGEMENT

STATE OF __Georgia__
                                                    ss.
COUNTY OF __DeKalb__

On this __26__ day of __April__, 20__19__, before me personally appeared ___Chip Wheelock___ and _____, known by me to be the __General Counsel__ _____ of __Williams Industrial Services Group, Inc.__ _____, the corporation described in and which executed the foregoing General Agreement of Indemnity, and who being by me duly sworn, depose any day that they know the seal of said corporation, that the seal affixed to said Agreement is such corporate seal; that it was so affixed by the order of the Board of Directors of said corporation, and that they signed their names hereto by like order.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my OFFICIAL SEAL the day and year first above written.

_____
(Signature of Notary Public)

Notary Public, residing at __2327 Roseberry Ln, Grayson, GA 30017__
(NOTARY SEAL)     My commission expires __4/15/22__